ROSEN ✧ SABA, LLP
RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
ALLISON OWENS, ESQ. (State Bar No. 347908)
aowens@rosensaba.com
2310 Rosecrans Ave, Suite 3180
El Segundo, CA 90245
Telephone: (310) 285-1727
Facsimile: (310) 285-1728

JASON A. MASIMORE, ESQ. (*pro hac vice forthcoming*)
jason.masimore@brodbeckslaw.com
BRODBECKS LAW, PLLC
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (347) 804-1093

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

NIELS TROOST; PARAMOUNT ENERGY & COMMODITIES SA, in liquidation; PARAMOUNT ENERGY AND COMMODITIES DMCC; PARAMOUNT ENERGY & COMMODITIES, INC.; and EZI-DIAROC HOLDING SA,

Plaintiffs,

vs.

GAURAV SRIVASTAVA a/k/a "G"; SHARON SRIVASTAVA; NICOLAS BRAVARD; CEDAR WEST VENTURES, LLC; UNITY RESOURCES GROUP, INC.; ORBIMO CORPORATION; UNICOM WORLDWIDE, INC.; 1234 HOLDING SA; BIRDSONG CENTRAL LLC; AURORA POINT LLC; THE GAURAV SRIVASTAVA FOUNDATION, f/k/a The Gaurav and Sharon Srivastava Family Foundation; GLOBAL ENERGY LAW GROUP PC; OWEN ONOUYE; THOMAS GIORDANO-LASCARI; and JOHN MAGUIRE,

Defendants.

Case No.:

**COMPLAINT AND DEMAND FOR JURY TRIAL FOR:**

**1. VIOLATION OF RICO, 18 U.S.C. § 1962(C);**
**2. VIOLATION OF RICO, 18 U.S.C. § 1962(D);**
**3. FRAUDULENT MISREPRESENTATION;**
**4. CONVERSION; AND**
**5. VIOLATION OF CAL. BUS. & PROF. CODE § 17200 ET SEQ.**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. THE PARTIES ........ 7

A. PLAINTIFFS ........ 7

B. RICO DEFENDANTS ........ 8

III. JURISDICTION AND VENUE ........ 13

IV. FACTUAL ALLEGATIONS ........ 13

A. THE ORIGINS OF SRIVASTAVA'S FAKE CIA PLAYBOOK ........ 13

B. THE TROOST CON BEGINS: SRIVASTAVA FALSELY CLAIMS TO WORK FOR THE CIA AND THAT HE CAN USE HIS INFLUENCE TO HELP TROOST ........ 17

1. The Fake FBI Investigation and the "Vetting" of Troost for the "Program" ........ 18

2. The Bali Interrogations ........ 20

3. Troost is "Accepted" into the Program ........ 21

4. Srivastava's Fraudulent Efforts to Obtain Liberian Oil and Mineral Concessions ........ 23

5. Srivastava Uses Stolen Funds To Buy Political Access to Create the Illusion of U.S. Government Support ........ 25

C. THE FAKE PROGRAM'S ACTUAL GOAL: CONTROL OVER PARAMOUNT AND TROOST'S ASSETS ........ 26

1. The Srivastava Enterprise Fraudulently Obtains Beneficial Ownership of 50% of PECSA ........ 27

*2. The Srivastava Enterprise Fraudulently Siphons Tens of Millions of Dollars from Troost's Businesses* ........ 32

i. Wire Fraud and Money Laundering Involving Defendant Global Energy Law Group ........ 34

ii. Wire Fraud and Money Laundering Through Arsari Promissory Notes and Defendant Birdsong ........ 38

iii. Wire Fraud and Money Laundering Through Paramount Inc. ........ 49

iv. Wire Fraud and Money Laundering through Cedar West ........ 53

2. Srivastava Uses PECSA Funds to Hire a Personal Chief of Staff ... 52

3. The Srivastava Enterprise Continues to Gather Political Clout ........ 54

4. The Srivastava Enterprise Attempts to Gain 100% Control of Paramount Through the "Inversion" ............................................... 60

D. AFTER UNCOVERING SRIVASTAVA'S DECEPTIONS, TROOST RESCINDS THE AGREEMENTS AND EXPELS HIM FROM THE COMPANY ................................ 79

E. THE SRIVASTAVA ENTERPRISE CONTINUES ITS RACKETEERING ACTIVITIES AFTER TROOST CUTS TIES.................................................................. 81

1. Following Srivastava's Removal from PECSA, the Enterprise Launches an Extortionate Scheme Targeting Troost ........................ 81

2. The Srivastava Enterprise Attempts to Seize the Remaining $26 Million of PDMCC Funds Held by Arsari ....................................... 84

3. The Srivastava Enterprise Organizes a Smear Campaign Against Troost in an Attempt to Conceal Its Fraud....................................... 92

4. The Srivastava Enterprise Launches a Coordinated Effort to Deflect Responsibility and Continue the Enterprise .................................. 102

5. After Failing with Troost, Srivastava and the Enterprise Continue Running New Fraud Schemes ...................................................... 105

PRAYER FOR RELIEF ........................................................................................ 117

JURY DEMAND.................................................................................................. 117

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Plaintiffs Niels Troost, Paramount Energy & Commodities SA, in liquidation ("PECSA"), Paramount Energy and Commodities DMCC ("PDMCC"), Paramount Energy & Commodities, Inc. ("Paramount Inc." and together with PECSA and PDMCC, "Paramount"), and EZI-Diaroc Holding SA ("EZI"), by undersigned counsel, hereby allege against Defendants Gaurav Srivastava, Sharon Srivastava, Nicolas Bravard, Cedar West Ventures, LLC, Unity Resources Group Inc., Orbimo Corporation, Unicom Worldwide, Inc., 1234 Holding SA, Birdsong Central, LLC, Aurora Point LLC, The Gaurav Srivastava Foundation, formerly known as The Gaurav and Sharon Srivastava Family Foundation, Global Energy Law Group PC, Owen Onouye, Thomas Giordano-Lascari, and John Maguire (collectively, the "RICO Defendants" and members of the "Srivastava Enterprise"), upon knowledge as to themselves and their own acts and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. For more than five years, defendant Gaurav Srivastava led a criminal enterprise that stole and extorted tens of millions of dollars from plaintiffs and other victims based upon the false over-arching narrative that Srivastava was a high-level non-official cover ("NOC") operative for the CIA. Srivastava and the other members of the enterprise (the "Srivastava Enterprise" or the "Enterprise") defrauded victims by convincing them that Srivastava controlled the might of the United States Government and could provide invaluable assistance to his allies and destroy those that dared to cross him. That was all a complete fiction. Srivastava is not a CIA operative—or an agent of any other U.S. federal agency—and never has been. He's not even a U.S. citizen. He's simply a fraud.

2. Starting in 2022, Srivastava, who had no prior experience in commodity trading, particularly oil, teamed up with other Enterprise members to deploy the false CIA operative scheme against Plaintiff Niels Troost, a Dutch oil trader living in Switzerland. Troost had been a successful marketer of oil, including Russian-origin crude, to Chinese refineries. After Russia invaded Ukraine in February 2022 and worldwide public pressure began mounting against the Russian oil economy over the following months, and as Troost

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

was under pressure from a previous business associate, Srivastava and the Enterprise persuaded Troost to work with Srivastava to continue marketing Russian-origin oil as part of a special CIA "Program" operated by Srivastava and approved at the highest levels of the U.S. Government, with the support of Western governments (notably Switzerland and Europe). That was all false. Srivastava and the Enterprise ultimately stole tens of millions of dollars from Troost and Plaintiffs.

3. After defrauding Troost, Plaintiffs, and others with the fake CIA fraud scheme, Srivastava's attorneys and agents have been forced to admit that Srivastava "does not work for the CIA" and "Srivastava did not work for the CIA."[1] Instead, Srivastava's attorneys and agents now incredibly claim that Srivastava "***never claimed that he worked for the CIA***" to Troost or anyone else.

4. But that claim is frivolous. Srivastava repeated similar false CIA claims to multiple witnesses and victims other than Troost. Further, in May 2023, when Troost began to fear Srivastava was defrauding him, Troost bluntly confronted Srivastava regarding whether he was truly a CIA operative and whether the "Program" was real in a series of international calls over Signal, an app for secure internet-based communications. To obtain advice about Srivastava's suspected (at the time) fraud and extortion and document it, Troost recorded the calls (the "Srivastava Recordings"). Srivastava repeatedly claimed that he was "NOC" for the CIA, that he was regularly in direct contact with the Director of the CIA ("DCI"), and that he had the ability to control Democratic politicians at the highest level of the United States Government. Srivastava's recorded lies—criminal wire fraud violations—included, but were not limited to, the following:

- "Because **I am part of a program**. I told this to you before, in which **there's only 30 people part of that program that has been opened and shut over the years by the American government**. It was shut off for some time. We opened it up again and we open it when we want to open it. I am part of the program so I can call anybody. I can reach out to any state, any agency, anybody. **But, it is called 'non-official**

[1] *Troost v. The Arkin Group DE LLC d/b/a The Arkin Group et al.*, 1:25-cv-06487 (S.D.N.Y. Nov. 17, 2025), Dkt. No. 26, at 8 (case voluntarily withdrawn and re-filed in state court).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**cover,' 'NOC.' But you're not supposed to know all this. You're not supposed to even be privy to this information**."

- "**I have had the DCI calling me**. I have had the DO [Director of Operations] calling me. I had the CDI [sic] with the clandestine—**DCI is the head of operations. Bill Burns. He's the head of the CIA**. It's been crazy. . . ."

- "I had one of the most powerful people in the United States, [Senator] Mark Warner, sit across me for basically an hour and a half, and then they've been calling me every day. . . He's the Chairman of the Intelligence Committee. He's the most powerful, number four in the whole [Biden] administration. . . ."

- "I am under, **I have so many obligations where I cannot say stuff to you because of my clearances and stuff I hold**. But you have to understand this by now. The fact that I can reach all these people. I can call, it's not a joke man, call eight Senators in a day and the President in the White House and the ambassador of this country."

- "**When you are an asset, you have to be able to morph into anything you want to be at any given time. And you don't want a footprint.** You don't want an asset print unless you want to create an asset print, finally. **I have created many different asset prints different places in the world.** . . ."[2]

5. Besides seeking to lull Troost into inaction, Srivastava also actively attempted to extort Troost (another federal crime), threatening that he would convince U.S. government intelligence and law enforcement agents that Troost was a Russian spy (false) and cause him and companies related to him to be sanctioned if he failed to comply. In fact, Srivastava promised Troost it would be "**fucking pandemonium in your life**" if Troost did not complete the transfer of his companies giving the Enterprise total control over and access to all of Paramount's assets.

6. In the face of this indisputable proof of Srivastava and the Enterprise's fraud and attempted extortion from Srivastava himself, Srivastava and his agents publicly have made the unsupported claim that the Srivastava Recordings are doctored. That is ridiculous.

[2] Audio of the Srivastava Recordings and their transcripts were filed in *Troost v. The Arkin Group DE LLC d/b/a The Arkin Group et al.*, Index No. 150236/2026 (N.Y. Sup. Ct. Jan. 6, 2026) ("*Troost v. Arkin*") and are available on the public docket, available here, along with sworn witness statements.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Indeed, the Srivastava Recordings have been authenticated by a renowned audio forensics expert, formerly with the FBI, who has examined thousands of separate audio and video recordings and digital still images in over a thousand criminal and other matters in 49 states and 20 countries.[3] They are Srivastava's words—his *lies*—and they are admissible evidence against him in this case, having been recorded consistent with applicable U.S. federal law.[4]

7. Moreover, they are corroborated by a dozen or so victims and witnesses, many of whom have provided sworn declarations regarding Srivastava's fake CIA operative claims.[5] Srivastava claimed to victims and witnesses that he had been recruited by the CIA at age sixteen, that he had trained at "the Farm," had carried out dangerous international operations, could grant special government permissions, and had unparallelled official access to United States Government officials all the way up to then-President Biden due to his CIA status. None of it was true.

8. These fabrications were strikingly convincing for at least four reasons. First, Srivastava is a brazen con man of remarkable skill—a truly gifted mimic and charlatan who has fooled sophisticated world leaders, think tanks, ex-military officials, politicians, and the Plaintiffs alike with his fraud scheme. Second, the Enterprise included individuals who appeared highly credible, including former U.S. military and intelligence officers, an ex-banker, and U.S. lawyers, all of whom repeated or reinforced the lie that Srivastava was a high-level CIA operative. Third, Srivastava and the Enterprise secretly and unbeknownst to Plaintiffs used funds stolen by the fraud scheme to contribute at least $1.6 million to Democratic U.S. politicians, securing photo-ops with then-President Biden and then-Speaker of the House Nancy Pelosi and official videos from then-Senate Majority Leader Chuck Schumer and other high-level members of Congress supporting Srivastava's "foundation," burnishing Srivastava's claims to having official high-level U.S. Government

---

[3] The expert concluded that each of the Srivastava Recordings "is consistent with being an original, continuous, and unaltered recording produced using the 'Voice Memos' audio recording application on an Apple device running iOS 16.3.1" on the date of each recording, made between May 1 and 8, 2023, and that each evidentiary excerpt is "consistent with containing original, continuous, and unaltered content."

[4] *See, e.g.*, *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003); 18 U.S.C. § 2511(2)(d).

[5] *See Troost v. Arkin*, Dkt. Nos. 1, 23-31, and 36-37.

access and control by virtue of his purported association with the CIA. Fourth, Srivastava and the Enterprise used respected national security leaders who were also duped as part of the fraud scheme, like retired General Wesley Clark, the former NATO Supreme Allied Commander, to unwittingly vouch for Srivastava's supposed status as a secret CIA operative.

9. In fact, in order to deceive Troost, upon meeting him in 2022 the Srivastava Enterprise put Troost through the paces, subjecting him to multiple rounds of interviews so that Troost could be "vetted" and approved for participation in the so-called Program. And Srivastava continuously reinforced the fraud. He introduced Troost to General Wesley Clark and others to vouch for Srivastava's fake CIA pedigree. Srivastava took clandestine phone calls and claimed to conduct official U.S. Government business on behalf of the CIA in meetings with foreign government officials and others. Srivastava claimed to have official access to top-level Democratic U.S. politicians, including then-U.S. Senate Majority Leader Chuck Schumer, Speaker Nancy Pelosi, and U.S. Representative Pat Ryan, a former U.S. Army intelligence officer. Srivastava also falsely claimed that he and Democratic Senator Mark Warner, then chair of the U.S. Senate Intelligence Committee, spoke with then-CIA Director Bill Burns about Troost and his participation in the Program. Troost was convinced.

10. The Srivastava Enterprise took full financial advantage of their successful deception. They fooled Troost into transferring half of the interests in his then-profitable companies—worth hundreds of millions of dollars—to Srivastava so they could operate in the purported "Program." The Enterprise also succeeded in fraudulently taking tens of millions of dollars from Paramount while trying to take hundreds of millions more. Unbeknownst to Troost and Plaintiffs, the Enterprise laundered the funds, concealing their source, lining Srivastava's pockets (including the purchase of a $24.5 million Pacific Palisades mansion for his family to live in), and investing them into furthering the Enterprise and its crimes.

11. Troost ultimately expelled Srivastava from Paramount on May 10, 2023. True

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

to his word for once, Srivastava unleashed the "pandemonium" he had promised. Srivastava and his co-conspirators illegally attempted to extort Troost—including via an anonymous Signal message demanding $10 million in cryptocurrency—and, when that didn't work, targeted him and his family with a negative reputation campaign on anonymous websites, in disturbing anonymous emails to his daughter's employer, and in Internet publications to discredit and destroy Troost and his entire family.

12. In furtherance of this false narrative, after Troost expelled Srivastava, the Srivastava Enterprise filed various false criminal complaints around the world against Troost and others. However, seeing the Srivastava Enterprise's false narrative for what it was, prosecutors uniformly rejected these criminal complaints, one even finding they had submitted doctored evidence.[6]

13. As a direct result of Srivastava and the Enterprise's pattern of criminal activity, including wire fraud, extortion, money laundering, and other criminal violations, conceived of and largely orchestrated from inside the United States and heavily dependent on international wire communications from and to the United States, Troost and Paramount suffered tens of millions of dollars in losses. Worse still, and at the Srivastava Enterprise's urging, Plaintiffs became the targets (directly or indirectly) of financially damaging sanctions imposed first by the United Kingdom, and later by the European Union and Switzerland.

14. Accordingly, this action seeks to dismantle Srivastava's criminal enterprise,

---

[6] In August 2023, the Srivastava Enterprise filed a criminal complaint in Dubai falsely alleging that an audit had revealed that Troost and others at Paramount had stolen $47 million from Paramount related to a Turkish oil terminal, along with over $4 billion more in cash. But, in March 2025, the Chief Prosecutor for Dubai, Sultan Saif Mohammed bin Touq, rejected the complaint, his investigation finding that the Srivastava Enterprise had prepared and submitted doctored evidence: The "accounting statements relied upon by [the Srivastava Enterprise in their complaint] **had been modified by deleting key credit entries**, which led to portraying payments as if they were made without consideration, while the company's original records prove otherwise" (emphasis added). The Chief Prosecutor's investigation "verified the accuracy of the [original] accounting entries related to the transactions, transfers, and amounts [claimed stolen], as well as the validity of the approvals and signatures on those entries. . . [and] did not find evidence of misappropriation of those funds by any of the accused." In fact, the investigation did not "find any reports issued by the external auditor or any regulatory or banking authorities indicating the existence of suspicious activities related to the company's accounts." Accordingly, the Chief Prosecutor concluded, "there are no grounds for filing a criminal case." *Troost v. Arkin*, Dkt. No. 44.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

recover the stolen money, repair the financial and reputational damage the Enterprise caused Plaintiffs, hold Srivastava and the Enterprise members accountable for stealing and extorting tens of millions of dollars from Troost and the other plaintiffs, and make a public record so that Srivastava, Nicolas Bravard, John Maguire, and the others can never defraud anyone else. Plaintiffs bring claims against defendants for: (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) violation of the RICO conspiracy statute, 18 U.S.C. § 1962(d); (3) fraudulent misrepresentation; (4) conversion; and (5) violations of California Business & Professional Code § 17200, *et seq*. Plaintiffs seek compensatory, punitive, and treble damages; return of all funds wrongfully obtained by Defendants; costs, attorney's fees, and interest; and any other and further relief as the Court deems proper.

## II. THE PARTIES

### A. Plaintiffs

15. Plaintiff Niels Troost ("Troost") is an individual. At all times relevant to the Complaint, he was a Dutch citizen residing in Geneva, Switzerland.

16. Plaintiff Paramount Energy & Commodities SA, in liquidation ("PECSA"), founded by Troost, is a Swiss company based in Geneva. It is currently in liquidation proceedings in Switzerland, largely as a consequence of Defendants' fraudulent conduct.

17. Plaintiff EZI-DIAROC Holding SA ("EZI"), is a Swiss holding company owned 100% by Troost. At all times relevant to the Complaint, Troost held his shares of PECSA through EZI.

18. Plaintiff Paramount Energy and Commodities DMCC ("PDMCC"), a wholly owned subsidiary of PECSA, is a UAE company based in the Dubai Multi Commodities Centre, a Free Trade Zone located in the Jumeirah Lake Towers district of Dubai. PDMCC was established in December 2020.

19. Plaintiff Paramount Energy & Commodities, Inc. ("Paramount Inc.") is a Wyoming corporation formed in November 2022 and is a 100% subsidiary of PECSA.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**B. RICO Defendants**

20. Defendant Gaurav Srivastava ("Srivastava") is an Indian citizen with lawful permanent resident status in the United States. As last reported, he lives in Los Angeles, California. Srivastava is a serial fraudster and the leader of the Srivastava Enterprise, which he ran from California.[7] Srivastava routinely attempts to evade service of civil lawsuits against him; multiple courts have granted other plaintiffs' applications to serve him by publication.

21. Defendant Sharon Srivastava ("Sharon"), on information and belief, was born in Indonesia in 1978, received a U.S. social security number in or about 2001, and publicly claims to be a U.S. citizen. Sharon Srivastava was formerly known as Pandita Johnson. At all times relevant to this Complaint, Sharon was the president, treasurer and secretary of Unity Accipiter Corporation, a Wyoming company established in February 2021 and owned by the Srivastavas. That company engaged in two deals involving aircraft maintenance for the Indonesian Ministry of Defense, which collapsed before services were provided. Sharon is a self-proclaimed philanthropist and took a high-profile role promoting the Enterprise's reputation through the Gaurav and Sharon Srivastava Family Foundation, appearing prominently on its website and speaking publicly at the November 2022 Atlantic Council's food security conference in Indonesia. Sharon was personally present when Gaurav Srivastava made false statements to others, and she personally benefitted financially from her association with the Enterprise.

22. Defendant Nicolas Régis Christian Bravard ("Bravard") is a Swiss and French citizen residing in Switzerland. Srivastava introduced Bravard to Troost as the FBI's "inside

[7] Gaurav and Sharon Srivastava have a history of civil frauds documented in California Court filings. For example, in February 2019, Gaurav and Sharon signed a publicly filed settlement agreement admitting they had made "intentional misrepresentations" to a woman "in order to obtain [her] money" in the amount of $100,000. The remaining California filings reflect similar patterns of deception and theft: (1) a 2021 suit alleging that the Srivastavas formed a shell company (Unity Resources Group) through a convicted felon and used it to lease a luxury home and then stole over $100,000 in wine and damaged property; (2) a 2019 suit for more than $100,000 in unpaid rent; (3) a separate 2019 collection action for stopped-payment checks totaling over $80,000 for hospital bills; and (4) a 2017 fraud suit that Srivastava agreed to settle for $30,000 but never paid, resulting in a judgment against him.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

man" in Swiss banking. Bravard helped pressure Troost to convey assets to the Srivastava Enterprise and held assets belonging to the Enterprise in various corporate structures as a proxy for Srivastava. Bravard also told various Paramount/EZI-affiliated people in Geneva that Srivastava was with the CIA and showed them photos of Srivastava and then-President Biden. Bravard expected to receive at least $3 million for his participation in the Enterprise through one of his Swiss companies, Dorsay Services, Sàrl.

23.    Defendant Cedar West Ventures LLC ("Cedar West") is a Delaware limited liability company formed as Lothian Road Ventures, LLC on May 25, 2022. On December 8, 2022, Defendant Thomas Giordano-Lascari changed its name to Cedar West. Cedar West was one of the Srivastava Enterprise's shell companies into which its illegally obtained assets were held for the benefit of the Enterprise and to conceal Srivastava's connection to the assets. The Enterprise also used Cedar West to file a false criminal complaint in Dubai against Plaintiffs attempting to take all of Paramount's assets, which relied on doctored evidence and was ultimately rejected by the Chief Prosecutor. The Enterprise also used Cedar West to pay other organizations to assist the Enterprise, such as The Arkin Group and law firms.

24.    Defendant Unity Resources Group Inc. ("Unity Resources Group") was a Wyoming corporation formed by Srivastava on August 18, 2020. Its listed address was 1609 Cravens Avenue, Torrance, CA 90501. Srivastava was its President/Director, Treasurer and Secretary. Srivastava claimed to various people, including Troost, that Unity Resources Group was a front company he used to carry out CIA operations as part of his involvement in the NOC program.

25.    Defendant Orbimo Corporation ("Orbimo") was a Wyoming corporation formed by Defendant Owen Onouye on December 22, 2020 and beneficially owned by Srivastava. Its listed address was 1609 Cravens Avenue, Torrance, CA 90501. Srivastava was its President/Director, Treasurer and Secretary. Orbimo was used by the Srivastava Enterprise to steal money from Paramount Inc. and to secretly make massive political contributions to Democratic causes to enhance the Enterprise's reputation and to gain access

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



to important Democratic U.S. politicians, thereby making Srivastava's claims that he was a powerful covert CIA operative appear legitimate. Gaurav and Sharon Srivastava both operated a late model luxury SUV registered to Orbimo Corporation.

26. Defendant Unicom Worldwide, Inc. ("Unicom") is a Delaware corporation formed by Defendant Thomas Giordano-Lascari on February 28, 2023 and beneficially owned by Srivastava. The Srivastava Enterprise tried to situate Unicom, a U.S.-based vehicle, as Paramount's parent company to gain total control over Paramount's assets. On or about May 4, 2023, Defendants tried to force Troost to sign a purchase agreement with Unicom on behalf of EZI for the purpose of the Srivastava Enterprise taking over all of Paramount's assets.

27. Defendant 1234 Holding SA ("1234 Holding") is a Switzerland-based entity, incorporated by Bravard as a strawman for Srivastava in or about August 2022. The Srivastava Enterprise used 1234 Holding to obtain 50% of PECSA's shares from EZI for a nominal payment of 50,000 Swiss francs, which was not remotely reflective of PECSA's true economic value.[8] Bravard formally held 1234 Holding through his Swiss company, Waterfall Holding Suisse SA, but Srivastava is 1234 Holding's ultimate beneficial owner.

28. Defendant Birdsong Central LLC ("Birdsong") is a Delaware limited liability company formed by Defendant Thomas Giordano-Lascari on October 17, 2022 and beneficially owned by Srivastava. The Srivastava Enterprise used Birdsong to funnel fraudulently obtained money from PDMCC through Indonesia into the United States and ultimately to fund the purchase of Srivastava's $24.5 million mansion and conceal Srivastava's involvement.

---

[8] In March 2025, the Dubai Chief Prosecutor's investigation found that the Enterprise's "completing the acquisition of half of [PECSA]'s shares for [that] amount does not comply with accounting standards or customary commercial practices in ownership transfer operations," particularly as its subsidiary PDMCC's "total recent transactions according to the documents reviewed during the examination period exceed 56.7 billion UAE dirhams [US $15.4 billion]." *Troost v. Arkin*, Dkt. No. 44. In June 2025, Srivastava falsely claimed he invested millions in Paramount. Lara Logan, *Going Rogue with Lara Logan, One on One with Gaurav Srtivastava*, Episode 20 (Lara Logan TV June 7, 2025) ("Logan Podcast"), available at https://laralogan.com/episode/reputation-warfare-part-1-one-on-one-with-gaurav-srivastava-episode-20/ (42:00-42:11).

Rosen ✧ Saba, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



29. Defendant Aurora Point LLC ("Aurora Point") is a Delaware limited liability company formed by Defendant Thomas Giordano-Lascari on October 12, 2022 and beneficially owned by Srivastava. Aurora Point owns all the shares of Birdsong. In November 2023, ownership of Srivastava's $24.5 million mansion was transferred from Birdsong to Aurora Point. Aurora Point was later used to extract almost $5 million from the illegally purchased mansion through a private mortgage loan.

30. Defendant The Gaurav Srivastava Foundation (the "Foundation") is a Delaware nonprofit corporation incorporated as "The Gaurav and Sharon Srivastava Family Foundation," on October 12, 2022, which was its name at all times relevant to the Complaint. On information and belief, the Foundation was controlled by Srivastava and his wife, Sharon Srivastava. Around the time Sharon Srivastava filed for divorce against Srivastava in June 2025, the Foundation changed its name to exclude hers. The Srivastava Enterprise used the Foundation to engage in financial transactions and to bolster Srivastava's public standing by conspicuously sponsoring fancy events and hosting a website, all in furtherance of the Enterprise's goals.

31. Defendant Owen Onouye ("Onouye") is an attorney licensed in California (SBN# 174580) who served two and a half years in a Nebraska penitentiary after a drug trafficking conviction, before being suspended from legal practice for a period of time. At times relevant to the Complaint, Onouye served as counsel to the Srivastava Enterprise and provided assistance to various affiliated corporations, including by forming Orbimo and serving as its Vice President.

32. Defendant Global Energy Law Group PC ("Global Energy Law Group") is a California professional corporation formed on April 18, 2019 and located at 5901 W. Century Blvd., Suite 750, Los Angeles, CA. At all times relevant to the Complaint, it was owned and operated by Owen Onouye. The Srivastava Enterprise used a U.S. bank account held by Global Energy Law Group to attempt to facilitate the transfer of funds from PDMCC and PECSA to the United States, citing sham engagement letters with Global Energy Law Group for exorbitantly high legal fees. Global Energy Law Group purported

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

to have lawyers charging $5,000 an hour, and at one point sought a $6 million retainer as part of the Enterprise.

33. Defendant Thomas Giordano-Lascari ("Lascari") is an attorney licensed in California (SBN# 244485). At various times relevant to the Complaint, Lascari assisted Srivastava and the Enterprise, applying his expertise in setting up opaque corporate structures and serving as director to knowingly facilitate international money laundering transactions and conceal the Enterprise's illegally obtained assets, including by forming Defendants Birdsong, Aurora Point, the Foundation, and Unicom. At various times, Lascari also held director, officer, and/or manager positions at these companies.

34. Defendant John Maguire ("Maguire") is a former Deputy Station Chief in Iraq for the CIA who, after he left government service, provided private consulting services for money. In the past, he has been associated with vouching falsely for the alleged U.S. intelligence bona fides of an individual, Matthew Marshall, who was convicted of defrauding an ultra-high net worth individual in the United States of over $2 million by fraudulently claiming to be a CIA operative.[9] Maguire, who is in the business of making money by vouching for fake CIA operatives was, at various times, employed by the Srivastava Enterprise to help maintain Srivastava's false pretenses that he was working for the CIA and to use his connections in the media and in law enforcement to wage a vicious disinformation campaign targeting Troost and Troost's family. Maguire received money from the Enterprise via his Williamsburg, Virginia-based company, Xenophon Group. Maguire and Srivastava continue to work together in Iraq, Turkey, and other places, attempting to carry out the Enterprise's fraud schemes. Maguire and Srivastava attempted to conduct Russian-origin oil business with Murtaza Lakhani, who has been sanctioned by the UK and the European Union after Srivastava was separated from Paramount.

[9] *See, e.g.*, Ken Silverstein, *Seed Money*, New York Magazine (Nov. 22, 2022); *Press Release*, U.S. Attorney's Office for the District of Montana (Mar. 3, 2022). Marshall admitted to defrauding his victim out of $255,000, $132,000 of which he sent to John Maguire. *U.S. v. Marshall*, No. Cr. 20-32-M-DWM (D. Mont. Jul. 22, 2020) ("*U.S. v. Marshall*"), Dkt. No. 185 at 9-10.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

## III. JURISDICTION AND VENUE

35. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c), which gives federal district courts jurisdiction over civil RICO actions. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, and has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

36. Venue is proper in this District under 28 U.S.C. § 1391 because: (i) a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this District; and (ii) one or more of the Defendants reside here. Venue is also proper under 18 U.S.C. § 1965.

## IV. FACTUAL ALLEGATIONS

### A. The Origins of Srivastava's Fake CIA Playbook

37. Srivastava's CIA-operative scheme was already well-developed before he targeted Troost. For years, he had perfected the same elaborate ruse: present himself as a covert CIA officer, fabricate intelligence missions, and use those staged "operations" to extract money, access, and influence.

38. One of Srivastava's many early targets was Alhaj Habib Kagimu, a Ugandan businessman and Honorary Consul for Malaysia. In or about 2020, a business associate introduced Kagimu to Srivastava as someone who worked for the CIA and wielded substantial influence. Srivastava told Kagimu that he had been recruited by the CIA at age 16 after responding to a roadside advertisement and that he later received military and special operations training to conduct missions in Afghanistan. Srivastava further claimed he had saved former Herat governor Abdul Quayom Rahimi during a CIA operation and arranged a phone call in which the person purporting to be Governor Rahimi described Srivastava as his "savior" who had extracted him from danger. Srivastava also showed him abdominal scars he claimed were wounds from CIA missions.

39. Around the same time, Srivastava told Kagimu he was working with the CIA to help the U.S. government secure the release of Paul Rusesabagina, a human-rights activist detained in Rwanda. Rusesabagina, who was awarded the Presidential Medal of

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Freedom by President George W. Bush, had been kidnapped in August 2020. Srivastava asked Kagimu to contact Rwandan President Paul Kagame—whom Kagimu knew personally—to request Rusesabagina's release. When Kagimu raised the issue, Rwandan officials expressed confusion about why such a communication would come through a private citizen rather than through the U.S. Embassy. Srivastava then told Kagimu that the matter fell under his authority within the CIA's "special operations division," not ordinary diplomatic channels. The Rwandan government declined to assist.

40. In or about August 2021, Srivastava falsely told public officials of Sudan that he was a U.S. CIA operative with experience carrying out special operations. He falsely claimed that he could prevent the Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury from sanctioning Mohamed Hamdan Dagalo (also known as "Hemedti"), commander of the Rapid Support Forces in Sudan (a group that the U.S. government has publicly alleged committed war crimes). Srivastava also falsely claimed that through his work on behalf of the CIA, he had been able to remove Prabowo Subianto, the former Defense Minister and current President of Indonesia from a U.S. travel ban. Srivastava falsely claimed to have a personal relationship with then- President Harris, saying his now-estranged wife, Sharon Srivastava, was the financial controller of Vice President Harris's campaign funds. Srivastava also falsely claimed he was in frequent official contact with then-President Biden and was able to make demands of the President to help U.S. security because Srivastava was with the CIA.

41. Srivastava falsely represented to Sudanese officials that OFAC issued a license to his company, Unity Resources Group, through which he could arrange for approximately 10 former U.S. intelligence operatives to provide security and intelligence training to members of the Rapid Support Forces in Sudan. On information and belief, neither Unity Resources Group, nor any company operated by Srivastava carried out business under an OFAC license nor under any other authority of the U.S. government as he misrepresented.

42. After the supposed "operation" to rescue Rusesabagina failed, Srivastava

began contacting Kagimu at all hours, repeatedly asking for introductions to high-level African officials and access to Kagimu's network, claiming he needed this access to conduct further CIA "operations" and intelligence missions for the U.S. government across Africa. To bolster his false intelligence narrative, Srivastava told Kagimu—and showed him purported documentation—that his alleged CIA front company, Unity Resources Group, had provided training and support to the Sudanese Rapid Support Forces.

43. Srivastava also claimed to Kagimu that he had obtained authorization from the Indonesian government on behalf of the CIA that allowed him to use a fishing company to deploy hundreds of fishing vessels into the South China Sea. He told Kagimu these boats were outfitted with special equipment to spy on China for the CIA. Kagimu also personally heard Srivastava describe this alleged operation to the leader of another country, whom he asked to financially invest in the "operation."

44. As part of his ongoing effort to convince Kagimu that he was a high-level CIA asset with direct access to senior U.S. officials, Srivastava claimed to have a close relationship with then-National Security Advisor Jake Sullivan, said that President Biden had to listen to him on national-security matters, and even went so far as to claim to speak with Sullivan in Kagimu's presence.

45. In or about May 2022, Srivastava told Kagimu that he had previously worked in Libya to sell inferior-quality weapons to General Khalifa Haftar with the U.S. government's permission as part of a CIA effort to get close to the Wagner Group. He showed Kagimu photographs of himself with individuals he said were General Haftar's relatives. Srivastava then gave Kagimu a phone number for an associate of Libyan officials and instructed him to arrange a meeting. Kagimu met that associate at the Four Seasons Hotel in Dubai, where they discussed contracts for crude oil and oil-product exports from Libya. Srivastava asked Kagimu to listen for any other needs Libyan officials might have and to report back to him, which Kagimu did by international communications.

46. In or about 2022, Srivastava told Kagimu that someone owed money to Unity Resources Group and that he wanted to receive a gold-mining concession as payment. He

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



claimed Unity Resources Group had the resources and an affiliated mining company capable of extracting large quantities of gold and that he would sell this gold to "Fort Knox," again invoking purported U.S. government ties. To give this plan an air of legitimacy, Srivastava arranged for Kagimu to meet retired General Wesley Clark and used his collaboration to reinforce the impression that Srivastava was operating as a U.S. intelligence contractor.

47. On or about June 7, 2022, Srivastava also transmitted by international wire to Kagimu a letter he had written to Sudanese General Dagalo on Unity Resources Group stationary about a monetary dispute relating to having provided the Rapid Support Forces with training; Srivastava said they had received $1.2 million of the $3 million they were owed:

"Strength in Unity"

Unity Resources Group

June 7, 2022

Dear General Dagalo

I write to you today regrettably to inform you of a matter that has kept me up for several months. It is my internal conscious and conviction that finally pushed me to tell you about the following matter.

General, it is important for you to know that the gentleman Mr. Mohmad Noor who collected the funds on two occasions has stolen the money.
Me. Mohmad Noor is a cousin of Al Hajj Habib Kagimu and portrayed to me to have a long working relationship. Myself personally or my company has never worked with in any capacity.

Because he Is a relative of Mr. Habib Kagimu and Mr. Habib Kagimu explicitly said he can be trusted , we entrusted him with collecting the funds.

With deep grief , I would like to inform you of the 3 million you have given to Unity, only 1.2 million was ever received by us.
Mr. Mohmad Noor claims his wife has stolen close to 1 million dollars and he still has the remainder of the money with him.

I must inform you I have personally funded the programs while my people were in Khartoum and all other activities in the USA, hoping that Mr. Mohmad Noor on the assurance of the Mr. Habib Kagimu will follow though but he has not.

Mr. Mohmad Noor refuses to pick up my phone or respond to my messages.
At this moment of time, I do not know what to do but seek your guidance on the matter.

Thank You

Kind Regards
Gaurav Srivastava

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

48. Srivastava also sent Kagimu texts revealing that Srivastava was using bank transfers to commit his fraud ("No money. Just checked, no incoming wires."), and outlined his collection strategy of writing to General Dagalo:

49. Having successfully convinced Kagimu that he was a CIA operative and that Unity Resources Group was a CIA front, Srivastava later leveraged this relationship in support of the fraud targeting Plaintiffs. As alleged elsewhere in the Complaint, Srivastava used his prior "CIA" operations with Kagimu in Africa and Libya, and Unity Resources Group's supposed government work, to bolster his claims to Troost that he was a CIA "NOC" and to make his fabricated intelligence persona appear credible.

**B. <u>The Troost Con Begins: Srivastava Falsely Claims to Work for the CIA and That He Can Use His Influence to Help Troost</u>**

50. In early 2022, Russia's invasion of Ukraine disrupted global commodity markets and complicated financing for any firm touching Russian-origin crude. Troost's business PECSA had historically lawfully marketed Russian-origin ESPO crude in Asia, and PDMCC lawfully operated under applicable UAE law even after the G7 price cap took shape in December 2022. Nonetheless, financing pressure and the threat of a smear campaign by a debtor falsely tying Troost to Russian intelligence created potential vulnerability.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

51. Concerned about the debtor's threats to spread these false claims, particularly during a very negative public climate for marketing Russian oil even though entirely lawful, Troost confided in his close business partner, African businessman Ibrahima Camara. Camara believed that their mutual associate, Kagimu, could connect Troost with an individual referred to as "Mr. G," who was purported to work for the CIA and might be able to help protect Troost. Srivastava's supposed links to the CIA made him appear potentially helpful in the situation, given that the debtor had made claims of association with the CIA when entangling himself with Paramount.[10]

**1. The Fake FBI Investigation and the "Vetting" of Troost for the "Program"**

52. In around May 2022, Troost was introduced to Srivastava ("Mr. G") through Kagimu. From the outset, Srivastava deployed his intelligence-operative script. And, at Srivastava's request, Troost prepared a written history of his interactions with the debtor and the debtor's claims of CIA affiliation. Srivastava claimed the FBI had compiled a lengthy report on Troost but assured him that "the Agency" (the CIA) would clear it. He said he ran a CIA "Program" involving monitoring Russian oil flows for U.S. national security and promised Troost that OFAC (and its European counterparts, including Switzerland's Secrétariat d'État à l'économie ("SECO")) would allow his businesses to continue trading Russian-origin oil even if Western sanctions were imposed restricting the oil trade. He also claimed that without Srivastava's help, Troost and his companies ran the risk of being sanctioned by OFAC.

53. Troost, for his part, was convinced that Srivastava's plan of continuing to

[10] In mid-May 2022, at the beginning of Troost's interactions with Srivastava, Troost texted Srivastava a detailed multi-page memo outlining Troost's dealings with the debtor who, himself, claimed CIA affiliation. This memo instantly became Srivastava's blueprint for how to customize his fraud for Troost. Srivastava replicated the debtor's core deceptions—false CIA claims, name-drops (Biden/Gen. Clark), and OFAC licenses—to create the fake Program idea described below. The memo also revealed Troost's critical weak spot—his lingering tolerance for dubious claims. Srivastava saw the opportunity and weaponized this against Troost through psychological pressure and incremental cons. In 2023, Srivastava later sent this memo to journalists and others using a pseudonymized email address (HaydenFischer@proton.me) to attempt discredit Troost by portraying him as someone who fabricates tales about fake CIA spies, but Srivastava fortunately was caught on recordings doing exactly what he claims Troost fabricated.

market Russian-origin oil purportedly in partnership with U.S. intelligence was in the U.S. and Western security interests even despite the invasion, because (1) such business supported the U.S. Dollar, which otherwise might be weakened by the mass migration of Russian-origin oil trading to Chinese or other currency, and (2) bad actors affiliated with Putin and his cronies would take over Paramount's business and funnel the profits into the Russian war machine, whereas Troost intended for Paramount to use profits to fund food security initiatives in Africa and to support Ukraine. Unfortunately, as is the case with many successful frauds, Srivastava took advantage of his victim by serving up generous portions of lies Troost wanted to hear while facing intense pressure.

54. Before joining the Program, however, Srivastava insisted Troost needed to be "vetted." He then staged a sham "assessment" by Nicolas Bravard—presented as "the FBI's man in Swiss banking." The objective was simple: create fear, then offer immunity—at a price.

55. In early June 2022, at Srivastava's direction, Bravard flew to Switzerland to interrogate Troost about Russia, sanctioned oligarchs, terrorism, and Ukraine, presenting himself as a U.S. government risk assessor and suggesting they meet in a "quiet place." He warned Troost that "they"— Troost understood that meant the U.S. government and Srivastava—needed honesty before taking him into the Program.[11] When they met again the next day, Bravard accused Troost of lying about Russian connections and threatened to send a damaging report directly to the FBI Director.

56. Troost confided in his colleague Camara immediately afterward that he was terrified. He believed he had just been interviewed by actual U.S. intelligence officers and feared the consequences of a negative FBI report. Srivastava then called Troost to

[11] Srivastava later admitted that he told Troost that Bravard was a "hard-nosed guy," "I trust him completely and he's going to meet you," and "He's going to ask you some really tough questions and please be honest with him. Don't give stories." Srivastava said, "I do it all the time in other businesses. I say, you've got to vet." Srivastava admitted that he called Bravard in Spain and asked him to meet Troost. Srivastava said he thought Troost rented a plane to pick up Bravard and "I wanted to see how far he was going to go," "Will he put his money where his mouth is." Srivastava said, "That showed commitment to me." In other words—Srivastava was sizing up his mark to determine how big of a fraud Troost would be susceptible to. Logan Podcast (31:43 to 33:44).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



"reassure" him—claiming he had spoken to the FBI Director and that the Bureau had "cleared" Troost to work with the U.S. government.

**2. The Bali Interrogations**

57. Srivastava next invited Troost to Bali, where he claimed to lead special operations and to be preparing for the U.S. delegation ahead of the G20 Summit. Believing this was part of a legitimate intelligence process, Troost traveled to Indonesia three times during the summer of 2022, staying with Srivastava. Camara accompanied Troost on a trip in late July 2022 and heard Srivastava imply he was a CIA operative, stating: "If I tell you I am, then I can't be; but if I don't tell you, then you'll know that I am."

58. Over multiple days and nights, Srivastava interrogated Troost at length, repeatedly invoking "Homeland Security," "the Agency," "the Bureau," and his supposed CIA training at "the Farm," referring to the CIA training camp in Virginia. Troost, believing he was speaking to a senior U.S. intelligence officer, disclosed details about his business, his dispute with a debtor who himself claimed to be with the CIA, and his fears about false allegations tying him to Russia. While swimming, Srivastava claimed scars on his torso were wounds from special missions he carried out for the U.S. Government.

59. In turn, Srivastava confirmed that he could help Troost and Paramount in this area through his privileged contacts with U.S. government agencies. Srivastava claimed that he could not only ensure that the debtor stopped bothering Troost and "take care" of the purported FBI file and avoid OFAC targeting, but also explained how he could help Troost with Paramount's trading activities, which were then under attack by the media, particularly with respect to African commodities that Srivastava said he was being paid in.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

60. He claimed the CIA and other U.S. government agencies had approved the Program and that OFAC would issue special licenses to participants. To reinforce the deception, he handed Troost the business card of Evan Seltzer, "Special Assistant to U.S. Terrorism and Financial Intelligence" with the U.S. Treasury Department, claiming Seltzer was working with him:

61. Sharon Srivastava at various times was present when Gaurav Srivastava made false claims about his background. For example, in or about July or August 2022, in the lobby of the Raffles Hotel Bali, Gaurav Srivastava, in front of Sharon, explained to Troost, his wife, and owners of the hotel that he owned two companies with over two thousand employees (false) that took government helicopters and refitted them for special missions. Gaurav Srivastava also showed Mrs. Troost a video of a person on a moving motorcycle climbing onto a flying helicopter, suggesting this was one such special mission.

**3. Troost is "Accepted" into the Program**

62. After Srivastava finished interrogating Troost, he told Troost that he had "great news." Srivastava claimed he had spoken with then-CIA Director William Burns, who had personally given the "go-ahead" for the CIA to partner with Troost and Paramount.[12] He warned Troost not to speak about his CIA-affiliation and the Program with anyone but him.

[12] Srivastava was recorded on May 6, 2023, again falsely claiming he was speaking with Director Burns. *Troost v. Arkin*, Dkt. No. 14 at 2:21-3:8.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

63. Srivastava then arranged a Zoom call with retired General Wesley Clark, whom he presented as a senior Program participant[13]:

Srivastava introduced Troost to General Clark as his "latest recruit." They discussed Troost's potential ability to trade sugar that Clark said he was getting from a Latin-American country. Before the call, Srivastava told Troost that he and Clark had carried out a special operation and were getting paid in sugar. Troost was impressed with General Clark. And it reinforced the impression that Troost was entering a real intergovernmental operation.

64. On another of Troost's trips to Indonesia, Srivastava took Troost by motorcade to the estate of Indonesia's then-Defense Minister, Prabowo Subianto, and his brother, Hashim Djojohadikusumo ("Hashim"). Srivastava claimed he had lived on the compound while conducting a covert CIA mission. Their apparent familiarity with Srivastava deepened the illusion that he was operating with official sanction.

65. Camara also believed Srivastava's false claims that he was with the CIA. Srivastava falsely claimed that he was overseeing efforts to catch people in African countries with substantial mineral and energy resources who were wanted by the U.S. government and that he needed assistance from local governments to carry out the operation. He claimed that, in exchange, he could secure U.S. government support for those countries' presidents. Srivastava instructed Camara to set up a call between Srivastava and the president of a particular African country. Camara was physically present with the

[13] Screenshots from a *later*, similar zoom call led by Srivastava (left in Captain America t-shirt) and General Clark (right) conducted with Troost's agribusiness partner.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

president when the call occurred and translated for Srivastava, who spoke over speakerphone. During the call, Camara heard Srivastava tell the president that he was with the CIA and that he could help the president and his country on behalf of the U.S. government. He falsely claimed he could provide U.S. security assistance to the country, and that he would personally bring then-President Biden and a U.S. Senator to meet with the president. Later, Camara learned that Srivastava had dispatched a so-called "security advisory team" to the country—one that included a retired four-star U.S. general—further lending credibility to Srivastava's fabricated intelligence persona and strengthening the deception he had constructed around his purported CIA ties.

**4. Srivastava's Fraudulent Efforts to Obtain Liberian Oil and Mineral Concessions**

66. Srivastava invited Troost to the Atlantic Council's 2022 Global Citizen Awards Gala on September 19, 2022—a high-profile event in New York City led by Frederick Kempe at a prestigious American think tank focused on international security and global economic prosperity. Srivastava served as co-chair of the gala, and an advertisement for his Foundation appeared in the program touting its sponsorship of the gala, even though it did not yet exist as a legal entity.

67. At the gala, Srivastava arranged for Troost to sit with him, General Clark, and Mary Beth Long, a former Assistant Secretary of Defense and former CIA operations officer. Srivastava described Long as a "former black-ops CIA operative who is not actually retired" and told Troost she would be "vetting" him. Long asked a series of innocuous questions about Troost's background and business, but after roughly 90 minutes abruptly left the table and did not return. When Troost asked why she had departed, Srivastava claimed she had been called away for a "CIA emergency."[14] Srivastava also used the event to introduce Troost to various major business leaders and re-connect with various

[14] Unbeknownst to Troost at the time, Long had been involved in *U.S. v. Marshall*, where Matthew Marshall posed as a CIA officer to defraud a Montana businessman. Long, working with Srivastava Enterprise member, John Maguire, falsely vouched for Marshall's bona fides, and Marshall was ultimately convicted of crimes and sentenced to prison. *See, infra* ¶ 149 & nn. 24-25.



Indonesian officials—further burnishing the illusion that Troost had entered a U.S. intelligence-sanctioned circle.

68. While in New York City with Troost to attend the gala, Srivastava continued presenting himself to Troost as a CIA officer and asked Troost to arrange an in-person meeting with Ousmane Bamba, a friend of then-President George Weah of Liberia. Troost coordinated the meeting with Bamba via WhatsApp, and the three met for breakfast at the Southgate Restaurant in the Marriot Essex Hotel on Central Park South in Manhattan. During that meeting, Srivastava falsely told Bamba that he worked for the CIA and claimed that the U.S. Government could help President Weah win re-election. Srivastava stated that he could damage Weah's political opponents by arranging to plant drugs and weapons in their homes, provide voting machines capable of manipulation, and ensure that U.S. election observers would validate the election's results. In exchange, Srivastava said the U.S. government wanted a petroleum block and assistance locating terrorists in Liberia. To bolster the deception, Srivastava lifted his shirt to display scarring he falsely claimed came from combat.[15] Bamba rejected Srivastava's proposal.

69. In November 2022, Srivastava resumed the scheme. By international telephone call, he asked Bamba to introduce him to the Liberian National Security Agency. Relying on Srivastava's representations, Bamba connected him with the NSA's Deputy Director, Gerald Smith.

70. Srivastava and Smith subsequently spoke several times by interstate and international wire communications. In those conversations, Srivastava again pretended to be a CIA operative and claimed he could help President Weah secure re-election. He further asserted that the CIA and the Liberian NSA could work together through him to form a joint intelligence team, that he had access to CIA-level intelligence which he would share with Liberia, and that he could arrange for CIA training for Liberian intelligence personnel. Srivastava also claimed he could obtain CIA funding to track terrorists he would identify.

[15] Srivastava claimed on the Logan Podcast that he had a serious kidney operation when he was a child and "I had tubes hanging out of me." On information and belief, that was the cause of Srivastava's scars, not any CIA mission or battle action, as he told multiple people during his frauds.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Based on these representations, Smith agreed to meet Srivastava in the United States.

71. Between December 2022 and January 2023, Srivastava and Smith exchanged messages on WhatsApp and Signal to coordinate their communications and the anticipated meeting. The meeting was scheduled for January 6, 2023, in Washington, D.C. However, after Smith traveled to the United States, Srivastava abruptly canceled the meeting. The meeting never occurred. Troost was unaware of these communications at the time.

**5. Srivastava Uses Stolen Funds To Buy Political Access to Create the Illusion of U.S. Government Support**

72. To elevate his profile and cement the impression of U.S. government backing, Srivastava's Foundation co-hosted the Atlantic Council's Global Food Security Forum in Bali in November 2022. Invitations to world leaders—including the Prime Ministers of the UK and Japan—listed the Foundation as a sponsor.

73. The event opened with remarks by the Atlantic Council's President and CEO and Srivastava. The second day featured video messages from then-Senate Majority Leader Chuck Schumer, Senator Debbie Stabenow, and Representative Pat Ryan, who publicly thanked Srivastava and the Foundation "for hosting and convening such a timely and important conversation."

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

74. Srivastava told Troost that this access to U.S. political leaders flowed from his CIA role and their support for the Program. In reality, Srivastava was buying access: in the months preceding the forum, he and his company, Orbimo, secretly contributed more than $1.6 million to political organizations and campaigns, including those of officials whose names he used to bolster his fabricated intelligence credentials. Troost had no knowledge of these contributions. On information and belief, the Enterprise obtained a significant amount of the money used to fund the donations through Owen Onouye's firm Global Energy Law Group, to which the Enterprise defrauded the Plaintiffs into sending money under the false pretenses that the firm was approved by Speaker Pelosi to receive money to fund official Program-related operations by Homeland Security, as alleged below.

| **Date** | **Recipient** | **Amount** |
|---|---|---|
| October 4, 2022 | Democratic Congressional Campaign Committee (DCCC) | $36,500 |
| October 4, 2022 | DCCC | $109,500 |
| October 4, 2022 | DCCC | $104,000 |
| October 22, 2022 | Stabenow Victory Fund | $20,800 |
| October 23, 2022 | Pat Ryan Victory Fund | $12,900 |
| October 24, 2022 | Pat Ryan for Congress | $2,900 |
| Oct. – Nov. 2022 | VoteVets | $800,000 (*aggregate*) |
| November 2, 2022 | Stabenow for US Senate | $2,900 |
| November 2, 2022 | Stabenow for US Senate | $2,900 |
| November 2, 2022 | Great Lakes PAC | $5,000 |
| November 7, 2022 | Senate Majority PAC ("SMP") | $500,000 |
| November 8, 2022 | Sean Patrick Maloney for Congress | $2,900 (aggregate) |
| **Total:** | | **$1,600,300** |

## C. The Fake Program's Actual Goal: Control Over Paramount and Troost's Assets

75. Once Troost believed he had been "accepted" into the Program and was dealing with a legitimate covert U.S. intelligence operative, the Srivastava Enterprise shifted from manipulation to execution. Srivastava immediately launched three parallel tracks, each designed to secure control over Paramount and its assets: (1) seizing beneficial ownership of PECSA, (2) siphoning tens of millions of dollars into accounts and companies Srivastava and the Enterprise controlled under the phony guise of "Program" operations, and (3) executing a corporate "inversion" that would redomicile the business under a U.S.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

parent the Srivastava Enterprise controlled.

**1. The Srivastava Enterprise Fraudulently Obtains Beneficial Ownership of 50% of PECSA**

76. When Troost first encountered Srivastava, the ownership structure of his companies was simple and secure: Troost personally owned 100% of EZI; EZI owned 100% of PECSA; and PECSA owned 100% of PDMCC. PECSA and PDMCC were highly profitable businesses at the time.

77. Srivastava quickly set out to dismantle that structure and fraudulently obtain control over these extremely valuable companies. He convinced Troost that the U.S. government could not license Paramount to continue trading Russian oil so long as it remained 100% foreign owned. According to Srivastava, U.S. policy required him—acting as a CIA asset—to hold meaningful control of Paramount from within the United States.

78. Srivastava told Troost that, to satisfy these purported U.S. requirements, PECSA needed to be restructured so that: (1) Srivastava—as a purported U.S. citizen, as he claimed—would own 50% of PECSA through a Swiss front company held by Bravard; and later (2) PECSA would ultimately be redomiciled in the United States under a new U.S. parent entity that, unbeknownst to Troost at the time, Srivastava and the Enterprise intended to assume total control of. Srivastava repeatedly emphasized that Paramount's "acceptance" into the secret Program—and with it, the OFAC licenses necessary to demonstrate PDMCC's bona fides to be exempted from Western sanctions—depended on his becoming a 50% shareholder and, later, total restructuring.

79. Srivastava also represented that PECSA would function as a CIA front company and that its operations, transactions, and tax payments had to appear free from U.S. government involvement to preserve his "non-official cover." He claimed the arrangement would benefit Troost personally and commercially: Troost would be helping Western and African strategic interests, avoiding the risk of sanctions, and partnering with the U.S. government to expand his business opportunities. Srivastava further asserted that the U.S. Treasury would invest $2 billion into the project once the restructuring was

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



complete, a claim he repeated to others such as Kagimu.

80.     Srivastava's deception was so convincing, and the time-pressure he exerted was such, that in late July 2022, Troost wrote to PECSA personnel that "the survival and future of the company depends" on transferring 50% of PECSA, describing the matter as "extremely important and urgent."

81.     In July 2022, while Troost was in Indonesia meeting with Srivastava, Troost called Robin Luisier, the director of EZI. Troost explained he was selling 50% of his corporate assets to an unnamed buyer for a nominal value. Alarmed, Luisier questioned why Troost would give away half of a highly profitable company for essentially nothing. Troost responded that his new business partner was "active CIA" and that the transfer was necessary to avoid U.S. sanctions and ensure government support for continued Russian oil trading. Luisier relayed this conversation at the time to another tax advisor, Jean-Marc Wasem.

82.     That same month, Bravard—who, as an essential participant in the Enterprise, would hold Srivastava's interest as a proxy—pressed Troost to act quickly. On July 14, 2022, he texted Troost: "Let's talk when u have 5 mn. **I am under Pressure to deliver a deal**. […] Let's work under the assumption I will through a newco or directly acquire 50 pct of your shares… We need to move fast." (emphasis added). Troost responded that "I know G likes to put pressure." Bravard replied, "we need to move to the next step tomorrow. Sorry, but we can't wait at this point":



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

#2057337v1

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

83. On July 18, 2022, in reliance on Srivastava's false representations and in response to the Enterprise's pressure, Troost emailed the directors of EZI and PECSA, as well as Bravard (at his Gmail address), to initiate the transfer of control. He introduced Bravard as his "new partner" with whom he would equally split ownership, while omitting Srivastava's role to preserve Srivastava's purported CIA anonymity; Srivastava had instructed Troost not to talk about the Program or Srivastava's CIA connection.

84. That same day, Wasem and Luisier exchanged messages expressing grave concerns. Luisier speculated that Bravard might be connected to the threatening Paramount debtor. Both men noted that the situation appeared "crazy." When they flagged potential Swiss tax consequences, Troost reassured them that his partner was connected with OFAC, the Swiss Secret Service, and SECO, and that "there would be no Swiss tax issue."

85. On July 20, 2022, distressed by the pressure campaign, Troost told Bravard via Signal: "I kindly ask you to stop putting pressure and try to rush things… This is a long-term strategic partnership… it's best to do everything right instead of in a rush." But Srivastava and Bravard intensified their push.[16]

86. A few days later, on July 23, 2022, Srivastava and Bravard coordinated to manufacture the false impression that U.S. officials were displeased with Troost for not completing the transfer after "[a] lot of structures have been put in place to continue operations for" Paramount. Srivastava messaged Troost that his U.S. intelligence colleagues—"my guys"—had told him that the Executive Branch ("EB") and Department of Homeland Security ("HS") were upset with Troost for "renegotiat[ing]" and warned that "[t]his is not how to build a friendship."

[16] Srivastava later claimed in various forums that Troost pressured him into the deal, citing Troost's urgent-sounding emails to Paramount staff. But, it was the Enterprise that always pressured Troost, first to sign the documents transferring them 50%, then to not wind up PDMCC's Russian-oil marketing, and then to sign documents inverting the Swiss-held organization and its assets into a U.S. company, Unicom Worldwide, under the Enterprise's total control.

July 23, 2022
21:50
Edit

You called X · 23 Jul 17:01
Call Again

G, We need to really understand this . A lot of structures have been put in place to continue operations for NT. June first week . This won't work . EB doesn't understand, when there is so much outreach . If this is how this is reciprocated we need to think this through .
We agreed with the two CPAC on the numbers of 12 per month. Nothing on that. And we are discussing of changing that. Please call to discuss this. If NT wants to renegotiate this. This is not how to build a friendship. I am sorry . EB & HS calling now .
18:25

X
G, We need to really understand this . A lot of structures have been put in plac...
From my guys on your proposal. Call after speaking to them
18:26

On information and belief, Srivastava fabricated this message purportedly from U.S. officials and sent it to Troost for the purpose of convincing him to sign over 50% of the shares of his companies to Srivastava.

87. Meanwhile, Wasem and Luisier exchanged additional messages on July 28, 2022, expressing fear that Troost was being conned and that the deal could lead to a complete corporate takeover. Wasem speculated (presciently, as it turned out) that Bravard—acting as Srivastava's front—could steal $250 million from Troost and then get him sanctioned. Luisier responded, "**we are fine, Joe Biden is behind this**," reflecting his understanding at the time from what Troost had told him that the arrangement was supported by the U.S. government.

88. On July 30, 2022, Troost—fully deceived by Srivastava's elaborate scheme—caused EZI to enter into the Share Purchase Agreement ("SPA") with 1234 Holding, transferring 50% of PECSA to the Enterprise for a token CHF 50,000, while the company was valued in the SPA itself at around US $350 million.[17] In March 2025, the Dubai Chief

[17] Bravard, a critical Enterprise member, acted as the face of Srivastava's 50% interest in the business, and Bravard, not Srivastava, was recorded in PECSA's official share registry as the beneficial owner of 50% of the shares. 1234 Holding was a Switzerland entity Bravard had incorporated for that purpose on or about July 26, 2022. Bravard held 100% of 1234 Holding

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Prosecutor's investigation found that the Enterprise's "completing the acquisition of half of [PECSA]'s shares for [that] amount does not comply with accounting standards or customary commercial practices in ownership transfer operations," particularly as PECSA's wholly owned subsidiary PDMCC's "total recent transactions according to the documents reviewed during the examination period exceed 56.7 billion UAE dirhams [US $15.4 billion]."[18]

89. Under the agreement, PECSA's director Maurice Taylor would remain its sole director, and Troost retained rights to dividends accrued through May 31, 2022—worth hundreds of millions at the time. Meanwhile, Srivastava would be entitled to 50% of the profits generated since June 1, 2022, two months before the contracts were signed, which Bravard had valued at the time at $150 million.

90. After the agreement was signed, Troost introduced Luisier and Wasem to Bravard. Later, Bravard finally acknowledged to Luisier and Wasem that Srivastava was the true party behind the transaction and claimed Srivastava had CIA connections. When the advisors raised potential tax concerns, Bravard dismissed them, saying Srivastava would "take care of it" with OFAC, SECO, and Swiss tax authorities. Bravard even displayed a photograph on his phone of Srivastava standing with President Joe Biden as supposed proof of his government ties.

through a company called Waterfall Holding Suisse SA, of which Bravard also was the sole director and 100% shareholder.

[18] *Troost v. Arkin*, Dkt. 44.



91. Once Srivastava and Bravard had secured 50% of PECSA and a shareholders' agreement granting them significant rights, the Enterprise advanced to the next phase: ensuring they could seize total control of PECSA and its assets. They devised a plan to move PECSA into a U.S.-based corporate structure to be controlled entirely by Srivastava—a restructuring they called the "Inversion." In internal email correspondence, Bravard had told Srivastava and Onouye by international email that the Enterprise would "create a US subsidiary" that would "take over all compliance [and] control of the group," and Srivastava intended to use Defendant Unicom Worldwide, Inc. as the U.S. vehicle.

**2. The Srivastava Enterprise Fraudulently Siphons Tens of Millions of Dollars from Troost's Businesses**

**i. Wire Fraud and Money Laundering Involving Defendant Global Energy Law Group**

92. In or around July 2022, after Troost's purported "acceptance" into the Program, Srivastava informed Plaintiffs that it was time to make their first financial commitment. The funds, he claimed, were required to support activities allegedly run by the Department of Homeland Security and the U.S. Executive Branch. He began pressuring Troost and PECSA to send millions of dollars to a law firm called Global Energy Law Group, which he represented as a firm closely associated with then-Speaker of the House Nancy Pelosi and used by senior national-security officials. As was his pattern and practice to continuously reinforce his bona fides as a CIA operative by showing photographs of himself with top U.S. government officials, Srivastava sent Troost a photo of himself with Speaker Pelosi:

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245





93. In reality, Global Energy Law Group had no association with the U.S. government or Speaker Pelosi; it was controlled by Defendant Onouye, Srivastava's personal attorney. Onouye, a California lawyer, had been suspended in 2011 and 2012 after serving more than two years in a Nebraska state penitentiary for a drug-trafficking conviction. Plaintiffs knew none of this. They were instead told that Global Energy Law Group was part of a government-approved network of front entities.

Owen Riki Onouye #174580
License Status: Active

Address: Global Energy Law Group 5901 W Century Blvd, Ste 750, Los Angeles, CA 90045-5443
Phone: 310-348-2969 | Fax: Not Available
Email: owen.esq@protonmail.com | Website: Not Available

| Date | License Status | Discipline | Administrative Action |
| --- | --- | --- | --- |
| Present | Active | | |
| 8/26/2012 | Active | | |
| 6/21/2012 | Not eligible to practice law in CA | Discipline w/actual suspension 11-C-13340 | |
| 8/26/2011 | Not eligible to practice law in CA | Interim suspension after conviction 11-C-13340 | |
| 7/7/2011 | | Conviction record transmitted to State Bar Court 11-C-13340 | |

94. To preserve that illusion of government compartmentalization, the funds were to be routed through an intermediary in the United Arab Emirates—BAB Global LTD ("BAB Global"), chaired and operated by Sultan Saleem Hassan Khalifa Abu Sultan.

95. On June 30, 2022, PDMCC and BAB Global executed a written shared-services agreement under which PDMCC agreed to make an advance payment of $11,999,975 to be "settled to the legal firm that [BAB Global] will assign" to provide legal drafting, review, and consulting services related to the "Business."

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



| SERVICES AGREEMENT | اتفاقية خدمات |
|---|---|
| This Services Agreement (**"Agreement"**) is entered on June 30,2022 (**"Effective Date"**), by and between: | ت اتفاقية الخدمات هذه ("**الاتفاقية**") في تاريخ 2022/06/ ("**تاريخ السريان**") بين كل من: |
| 1- **Paramount Energy and Commodities DMCC**, a company incorporated and registered in Dubai under number DMCC - 798151, having its registered address at Office 4202, JBC1 Building, Cluster G, Jumeirah Lakes Towers, Dubai, United Arab Emirates, and represented by its manager Mr. Francois Mauron. | 1- **شركة بارامونت إنرجي أند كوموديتيز م.د.م.س، شركة منطقة حرة**، شركة مؤسسة وسجلة في دبي تحت رقم DMCC - 798151، عنوانها المسجل هو مركز الأعمال م.د.م.س، طابق رقم 1، مبنى جوبلاري وجيمبلكس 3 دبي، الإمارات العربية المتحدة، وممثلة بمديرها السيد فرانكويس ادوارد ماورون. |
| Hereinafter referred to as the **"Client"** | يشار إليها فيما يلي بـ "**العميل**" |
| And | و |
| 2- **BAB Global LTD.**, a company incorporated and registered in RAKOFFSHORE, under certificate No. A002/02/14/8033, having its registered address at Al Jazeera Al Hamra, Ras Al Khaimah, United Arab Emirates, and represented by its manager Mr. Sultan Abu Sultan. | 2- **شركة بي آي بي غلوبال ليميتد**، شركة مؤسسة ومسجلة في راك افشور بترخيص رقم A002/02/14/8033، عنوانها المسجل في الجزيرة الحمراء، راس الخيمة، الامارات العربية المتحدة، وممثلة بمديرها السيد سلطان أبو سلطان. |
| Hereinafter referred to as the **"Service Provider"** | يشار إليها فيما يلي بـ "**مقدم الخدمات**" |
| Both Client and Service Provider shall be collectively referred to as the **"Parties"** and individually as the **"Party"**. | يشار فيما بعد الى كل من العميل ومقدم الخدمات متحدين "**بالطرفين**" ومنفردين "**بالطرف**". |

| | خدمة. |
|---|---|
| 5.2 The Parties have agreed that Client shall transfer to the bank account of Service Provider an advance payment (**"Advance Payment"**) amounting to US$ 11,999,975.00, to be settled to the legal firm that will be assigned by Service Provide and which shall handle drafting and reviewing all the requested legal agreements and providing all necessary legal consultancy pertaining to the Business. | اتفق الطرفان على أن يقوم العميل بتحويل دفعة مسبقة ("**الدفعة المسبقة**") تبلغ قيمتها 11،999،975.00 دولارًا أمريكيًا إلى الحساب المصرفي العائد لمقدم الخدمات، وذلك لكي يتم تسديدها لصالح مكتب المحاماة الذي سوف يتم تعيينه من قبل مقدم الخدمات والذي سوف يتولى مهمة تحرير ومراجع العقود المطلوبة واعطاء الاستشارات القانونية اللازمة والمتعلقة بالنشاط. |

| 13. **PREVAILING LANGUAGE** | 13. **اللغة الواجبة الاعتماد** |
|---|---|
| This Agreement was drafted in both, Arabic and English languages. In the event any discrepancy appears between the Arabic and English texts, the Arabic version shall prevail for the purpose of interpreting any clause of this Agreement. | تم تحرير الاتفاقية الحاضرة باللغتين العربية والانجليزية. في حالة تعارض النصين، يكون النص باللغة العربية هو الأساس لتفسير أي بند من بنود هذه الاتفاقية. |
| **IN WITNESS WHEREOF,** and intending to be legally bound, the Parties have each caused this Agreement to be signed as of the date first set forth above. | وإثباتًا لما تقدم، وبقصد الالتزام قانونًا، وقع كل طرف الاتفاقية الحاضرة في التاريخ المحدد أولًا أعلاه. |
| **SIGNED**<br>**For and on behalf of Paramount Energy and Commodities DMCC**<br>**Name**: Francois Mauron<br>**Signature**: | **SIGNED**<br>**For and on behalf of BAB Global LTD.**<br>**Name**: Sultan Abu Sultan<br>**Signature**: ____________ |

96. On or about July 8, 2022, in reliance on Srivastava's representations, PDMCC transferred $11,999,975 to BAB Global pursuant to that agreement—funds Srivastava had orchestrated and directed.

FAB First Abu Dhabi Bank

```
PARAMOUNT ENERGY AND
                                        DATE        :08 JUL 2022
PO BOX 449921
UNIT NO BA 1098 DMCC BUSINESS           REFERENCE:   FT22189F61JB
DUBAI
                                        CUSTOMER :   4784950

-----------------------------------------------------------------
                          DEBIT ADVICE
-----------------------------------------------------------------
WE HAVE TODAY EXECUTED THE FOLLOWING Account Transfer
INSTRUCTION FOR VALUE  08 JUL 2022

BENEFICIARY              : BAB GLOBAL LTD
PAYMENT DETAILS          : As per agreement
DEBIT REFERENCE          : BabGlobalLtd

WE HAVE DEBITED YOUR  USD ACCOUNT NO. [redacted]
(IBAN  - AE850351191324784950002)   VALUE 08 JUL 2022  AS FOLLOWS :
         TRANSFER AMOUNT              USD     11,999,974.58
                                      -------------------
         AMOUNT DEBITED               USD     11,999,974.58

THIS IS A COMPUTER GENERATED  ADVICE AND HENCE NO SIGNATURE REQUIRED
```

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

97. Shortly thereafter, Defendants Srivastava, Onouye, and Global Energy Law Group also attempted to cause PECSA to transfer an additional approximately $6.2 million from outside the United States to the bank account of Global Energy Law Group ending in x4608 at Bank of America in California.

GLOBAL ENERGY
LAW GROUP

INVOICE

202-982-2817

9501 West Century Blvd
Los Angeles, California
90045

Attention:

Paramount Energy & Commodities S.A.
21. rue de Villereuse
1207 Geneva
Switzerland
Attn: Maurice Taylor
Director

Date: JULY 7, 2022

Project Title: Legal Services
Project Description: Legal Retainer Invoice
P.O. Number: GBLG152526A
Invoice Number: 6272772

| Description | | | Price |
|---|---|---|---|
| Legal Services Retainer Agreement | | | $5,700,000.00 |
| | | Subtotal | $5,700,000.00 |
| | Tax | 8.25% | $470,250.00 |
| | | Total | $6,170,250.00 |

Wiring Instructions
Account Number: [redacted]
Account Name: Global Energy Law Group
Routing Number: 026009593
Swift Code: BOFAUS3N
Bank: Bank Of America
Band Address: 1255 Sartori Ave, Torrance, California 90501 USA
Beneficary Phone: +1 202 982 2817
Beneficary Email: mark.elders@gblglaw.com

Sincerely yours,

Mark Elders

GLOBAL ENERGY
LAW GROUP

July 7, 2022

Paramount Energy & Commodities S.A.
21. rue de Villereuse
1207 Geneva
Switzerland
Attn: Maurice Taylor
Director
Re: Legal Services

Dear Sir / Mam:

Introduction. We are pleased that you have asked Global Energy Law Group ("GBLG") to serve as counsel to your firm and its clients. This letter governs the terms of our engagement. If these terms are acceptable to you, please sign in the space provided below and return it to me.

Scope of Representation. The scope of our representation ("Representation") is expected to be advice and counsel regarding contract law involving international tradeand compliance arising out of potential business opportunities in various countries. Either you or GBLG may terminate our Representation at any time for any reason by written notice for minimum of 60 days, subject on our part to applicable rules of professional conduct.

**Hourly Rates**

| Category | Rate |
|---|---|
| Partner | $5000.00 |
| Senior Associate | $3000.00 |
| Associate | $1500.00 |
| Paralegal | $995.00 |

98. On July 14, 2022, PECSA's then-director Maurice Taylor received an email from "Mark Elders," Global Energy Law Group's purported finance director, attaching a sham engagement letter (with individual lawyers charging $5,000 per hour) and demanding an initial retainer of $6,170,250. Because the email from "Mark Elders" to Maurice Taylor was *also purportedly signed by* "Maurice Taylor," on information and belief, the person "Mark Elders" did not exist at Global Energy Law Group and it was instead Srivastava and Onouye working together to extract cash from Paramount by fraud to benefit the Enterprise.



**De :** Mark Elders <mark.elders@gblglaw.com>
**Envoyé :** jeudi, 14 juillet 2022 02:45
**À :** Maurice Taylor <mtaylor@parencom.ch>; Bernard Fellay <bfellay@parencom.ch>; mianskovskaia@parencom.ch <mianskovskaia@parencom.ch>
**Objet :** Letter_of_Engagement_ref.PARAMOUNT

Dear Maurice

Attached please find the executed engagement letter for your counter signature and execution.

Thank You

Kind Regards
Maurice Taylor
Finance Director

99. When PECSA attempted to execute the transaction, its Swiss bank's compliance department rejected it, citing a lack of required information "in order to understand the underlying transactions/services linked to this mandate, in line with the size of the retainer fees paid to the law firm."

100. Later, in Fall 2022, the Enterprise succeeded in profiting from its fraud, causing PDMCC to send around $6 million through to Global Energy Law Group.

**ii. Wire Fraud and Money Laundering Through Arsari Promissory Notes and Defendant Birdsong**

101. As a mere 50% shareholder of PECSA, Srivastava had no legal right or direct mechanism to draw money from PDMCC, PECSA's UAE-based subsidiary. Nor did Srivastava hold any position of authority at PDMCC. Undeterred, in November and December 2022, Srivastava engineered a fraudulent workaround that would give him immediate access to cash to fund his lavish lifestyle: a $51 million "loan" from PDMCC to an Indonesian conglomerate, Arsari Group ("Arsari"), operated by a politically exposed person, Hashim—the brother of then-Minister of Defense (and now President) Prabowo Subianto.

102. Srivastava arranged for Arsari to paper over the transaction as a sham loan from PDMCC for "working capital and other business operations," and Srivastava simultaneously arranged to siphon roughly half of those funds to the Enterprise for his personal use. His objective was simple: to finance the purchase of a $24.5 million mansion at 14180 W. Sunset Blvd., Pacific Palisades, California.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

103. Srivastava orchestrated the transaction personally. The following are text messages from November 18 and November 23, 2022, among Maria Foley, Arsari's representative, and Brian Manuel, Srivastava's Indonesian representative, setting up the sham loan during which Manuel explains that he "confirmed the instruction from G," that "In essence, G is fine with your proposed terms," "just need to get a hold of G to advise the signatory from Paramount," and "I am on standby to release the final execution version to the parties, once instructed by G" (Foley – right; Manuel – left)[19]:

17:36
Brian Manuel
18 Nov 2022
Messages and calls are end-to-end encrypted. No one outside of this chat, not even WhatsApp, can read or listen to them. Tap to learn more.
Hi, good to speak with you. Pls take instructions and look forward to proposed loan document. My mobile:
email:
Best, Maria 08:58
Hi Bu, nice speaking to you too. Yes, will proceed accordingly and revert back once I got the instructions. 09:13
20 Nov 2022
Hi Bu Maria, I have confirmed the instruction from G; I also

[19] Arsari allowed Plaintiffs to use in litigation the underlying communications with the Srivastava Enterprise per an agreement in which Arsari agreed to enforce its rights against Srivastava as to $25 million on trust for PDMCC. So far, Arsari refuses to proceed, and Hashim continues to hold $26 million he now knows he obtained through a fraud orchestrated by Srivastava, despite requests from PDMCC for its return. Plaintiffs reserve all rights as to Arsari and Hashim.

104. At the time, PDMCC's director, Francois Mauron, received a Signal call in which Srivastava instructed him to lend $51 million to Arsari. When Mauron noted that such a transaction would ordinarily take the form of a joint venture, Srivastava insisted that the structure had already been "decided" at the highest levels and invoked the political power of the Subianto family. To Troost, Srivastava claimed that the funds were necessary to support the secret "Program." PDMCC's and Paramount's counsel were intentionally excluded; Mauron was put in direct contact with Arsari's counsel.

105. On November 26, 2022, Mauron signed a 15-year loan agreement on PDMCC's behalf. On or about December 2, 2022, Srivastava and others willfully and knowingly conspired to cause PDMCC to wire the Indonesian Rupiah (IDR) equivalent of

BANK BUKOPIN

R/K STATEMENT
Transaksi Hari Ini

KEPADA YTH : ARSARI PRADANA UTAMA, PT

NO.REK.GIRO [redacted]

ALAMAT : MID PLAZA 2 LT.6, JL. JEND SUDIRMAN
KARET TENGSIN, TANAH ABANG
JAKARTA PUSAT

CURRENCY : RUPIAH
NPWP : 01.367.605.1.091.000
SALDO AWAL : 4,890,000.00

| TGL | KETERANGAN | DEBET | KREDIT | SALDO |
|---|---|---|---|---|
| 02/12 | PB PARAMOUNT DMCC TO PT ARSARI PRADANA | 0.00 | 755,090,000,000.00 | 755,094,890,000.00 |

SALDO AKHIR : 755,094,890,000.00

PT BANK MANDIRI, TBK
12206 KCP Jakarta Mid Plaza

Jakarta Pusat , 2/12/22

CREDIT ADVICE

Our Reference : 77-99000-7108838-01

Kepada/To : PT ARSARI PRADANA UTAMA
JAKARTA

Uraian/Descrption :
Kami telah mengkredit rekening Saudara sebagai berikut : / We have credited your account as
Tanggal Valuta/Value Date : 2/12/2022
Nomor Rekening / Account Number : [redacted]
Cabang/Branch : 122-06 KCP Jakarta Mid Plaza
Nilai Kredit/Credited Amount : IDR 30,820,000,000.00
Nilai Transfer/Transfer Amount : 30,820,000,000.00 IDR
Kurs Jual/Exc Rate Sell : .000000
Kurs Beli/Exc Rate Buy : .000000
Nama Pengirim/Sender Name : PARAMOUNT DMCC
OFFICE 4202 JBCI CLUSTER G JUMEIRAH
, DUBAI , DUBAI
[redacted]
Bank Pengirim/Sender Bank : BBUKIDJA PT. BANK KB BUKOPIN, TBK

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

US $51 million to Arsari in two tranches: IDR 755,090,000,000 to Arsari's account at Bank Bukopin in Indonesia (equivalent to approximately $49 million) and IDR 30,820,000,000 to Arsari's account at Bank Mandiri in Indonesia (equivalent to approximately $2 million).

106. However, unbeknownst to plaintiffs, immediately after Arsari received the $51 million in loan proceeds from PDMCC, Srivastava convinced Hashim to give him immediate access to roughly half of the funds for his personal use. Srivastava had enlisted Thomas Giordano-Lascari—then at Karlin & Peebles and trustee of the Aurora Point Trust (beneficial owners: Gaurav and Sharon Srivastava)—to build the legal architecture needed to launder the funds into the United States by concealing the U.S. side of the transaction. The trust included two Delaware entities controlled by Lascari for the Enterprise: Aurora Point and Birdsong. Srivastava then funneled $25 million of the PDMCC loan to Defendant Birdsong.

107. On December 6, 2022, days after PDMCC sent the $51 million to Arsari, Lascari and Arsari's representative, Maria Foley, exchanged international WhatsApp messages to coordinate the Enterprise's receipt of $25 million as quickly as possible. Lascari said, "We will definitely need the funds transferred in full by Friday, G asked that H [referring to Hashim, President Subianto's brother] do what needs to be done to ensure no issues with the banking" (Foley – green; Lascari – white):

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245
#2057337v1



108. On or about December 7, 2022, Lascari executed three promissory notes (two for $10 million and one for $5 million) between Birdsong and Arsari's principal, Hashim. The notes memorialized a $25 million loan from Arsari to Birdsong that was secured by the luxury mansion Srivastava intended to buy at 14180 West Sunset Boulevard, Pacific Palisades, California 90272.

BIRDSONG CENTRAL, LLC

December 9, 2022

*Sent by Electronic Mail*

PT Arsari Pradana Utama
c/o Maria Foley
mfoley@a[redacted]g

Dear Maria,

I refer to those certain promissory notes entered into between Birdsong Central, LLC and PT Arsari Pradana Utama dated December 16, 2022, December 23, 2022 and December 29, 2022 in the amounts of $10,000,000, $5,000,000 and $10,000,000, respectively.

By this letter, I hereby direct that the loan proceeds be funded to the law firm trust account of Karlin & Peebles, LLP. Enclosed herewith are wire instructions for that account. I can confirm that Birdsong Central, LLC is a client of Karlin & Peebles, LLP, which has agreed to hold the funds in trust for Birdsong Central, LLC.

I further confirm that Karlin & Peebles, LLP has been instructed to use the proceeds to acquire that certain property located at 14180 W. Sunset Blvd., Pacific Palisades, California 90272 upon the closing of the purchase process.

I trust this is sufficient to authorize payment of the loan proceeds as set forth above

Sincerely,

Thomas M Giordano-Lascari
Manager

109. The scheme soon encountered an obstacle: Arsari's bank refused to process the outgoing transfer, flagging the nature of the transaction as suspicious, the fact of which Foley emailed to Lascari in California:

**mfoley@[redacted]**

**From:** mfoley@[redacted]
**Sent:** Friday 16 December 2022 16:41
**To:** 'Thomas Giordano'
**Subject:** Birdsong transfer
**Attachments:** PBI_181916-EN.pdf

Dear Thomas

I am informed by our team in Jakarta that the Bank had processed the request, but the transfer has been held up by the Bank's treasury and compliance team because a loan is not an acceptable underlying transaction.

I attach Bank Indonesia regulation number 18/19/PBI/2016 for your consideration. I propose that we mention the underlying transaction as an investment for shares (and not a loan). Please discuss with your client and let me know if acceptable. Alternatively, you can propose another solution.

Regards
Maria

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

110. Srivastava ramped up pressure to get the money, notwithstanding that the Indonesian bank's compliance department refused, telling Foley over international WhatsApp message, "Maria, this is Gaurav. Please call me," and shortly thereafter, "Maria, please get it done." Foley responded that she would work with Lascari to "sort out the underlying transaction."

111. Under pressure to move funds quickly so Srivastava could close on the mansion, Lascari created a false paper trail designed to deceive financial institutions and obscure that the money originated from PDMCC. He backdated an engagement letter between his law firm and a British Virgin Islands entity associated with Arsari—New Kapital Limited ("NKL")—making it appear the transfer was merely repayment of an inter-company loan between two Arsari-affiliated entities, and unrelated to Birdsong or Srivastava.[20] Lascari (white) and Foley (green) arranged it all via international WhatsApp

[20] On information and belief, including statements by Foley, there are no agreements between NKL and Birdsong supporting the transfer of $25 million from NKL to Birdsong in Karlin & Peebles IOLTA account—it is a fiction designed by Lascari to accomplish the international transfer of criminal fraud proceeds and conceal Srivastava's personal connection to them.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

texts and emails:

15:12
Thomas Giordano
last seen today at 07:53
20 Dec 2022
Can you provide bank account to receive the funds? 08:37
I need to provide for Central Bank approval. 08:38
My accounts lady in Calgary is away and I am told that Wells Fargo account closed. 08:39
I won't be able to open an NRI account and it will take time to reactivate company 08:40
I just need a bank account to transfer moneys from Jakarta to you by tomorrow Jakarta morning. If necessary shall we use client trust account ... They will submit to Bank Indonesia .. get approval for transfer of 25m .. and transfer will be done. We can paper after .. 08:42

112. On December 20, 2022, Lascari emailed Foley enclosing a letter on behalf of NKL stating: "We represent NKL with respect to a transaction. In furtherance of that transaction, we request that the repayment of that certain loan from NKL to [Arsari] be repaid and the funds be deposited in our firm trust account."

113. The next day, December 21, 2022, he sent an engagement letter from his firm purporting to act for NKL, backdated to December 1, 2022. Foley signed and dated it December 2, 2022, and returned it to him.

**From:** mfoley[redacted]
**Sent:** Wednesday 21 December 2022 15:49
**To:** 'Thomas Giordano'
**Subject:** New Kapital Limited - Karlin & Peebles engagement letter
**Attachments:** Scan 21 Dec 2022 at 15.41.pdf

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Dear Thomas

Attached please find the executed engagement letter. Arsari finance team has submitted the paperwork to Bank Indonesia for consent and the compliance team at Bank Mandiri for processing. I will be travelling tomorrow to Bali for the holidays and will have intermittent access to emails.

Regards
Maria

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



KARLIN & PEEBLES, LLP
ATTORNEYS AT LAW

December 1, 2022

**Via email:** [redacted]

New Kapital Limited
Attention: Maria Foley, Manager
Wickhams Cay II
Road Town Tortola VG 1110
British Virgin Islands

**Re: Engagement for Legal Services**

Dear Ms. Foley:

Karlin & Peebles, LLP ("we" or "the Firm") appreciates the opportunity to provide legal services to you. In accordance with Firm policy, the purpose of this letter is to set forth our understanding as to the terms upon which we have been retained. Our engagement will relate back to the earliest date on which services were rendered. We look forward to working with you.

***Scope of representation***. Our representation will cover the following, which we will refer to as "the Matter":

*Assistance with documenting that certain loan between New Kapital Limited and Birdsong Central, LLC related to the acquisition of 14180 W. Sunset Blvd., Pacific Palisades, California, and any other such matters related to that acquisition.*

Please review this letter carefully, and raise and discuss with me any questions which you may have. **If this letter accurately reflects your understanding of our attorney-client relationship, please indicate your approval and acceptance by dating and signing a copy of this letter and returning it to us.** Your signature indicates your authority to act on your behalf.

Sincerely,

Thomas M. Giordano-Lascari, for
KARLIN & PEEBLES, LLP

New Kapital Limited

**MARIA FOLEY, Manager** Date: 2/12/2022

114. Even this revised fabricated structure drew bank scrutiny. On December 22, 2022, Foley wrote to Lascari that "bank compliance [is] being difficult" and asked him to prepare yet another letter from his law firm to Arsari's Chief Financial Officer stating that NKL had retained him and instructing that the funds be transferred to his firm's trust account—specifically directing him "not [to] mention Birdsong."

115. Lascari complied, providing wiring instructions for his firm's attorney trust account in California. On December 28, 2022, Arsari wired $25 million into the bank account of Lascari's law firm, Karlin & Peebles in the United States at First Republic Bank

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ending in x1869.

Fwd: Transfer from APU to NKL

MF Maria Foley <mfoley@[REDACTED]
To mfoley@[REDACTED]

Wiring Instructions_First_Republic_IOLTA.pdf
.pdf File

---------- Forwarded message ---------
From: **Thomas Giordano** <tgiordano@karlinpeebles.com>
Date: Sat, Dec 24, 2022 at 3:04 AM
Subject: RE: Transfer from APU to NKL
To: Bambang S Atmadja <bsa@arsari.co.id>
Cc: Maria Foley <mfoley@newkapital.com>

Dear Mr. Atmadja,

Thank you for your response. Attached please find the wire instructions for our firm's trust account.

plikasi setoran/transfer/kliring/inkaso
eposit/transfer/clearing/collection form

mandiri

ada to PT Bank Mandiri (Persero) Tbk — tanggal date 28/12/2022
PENGIRIM (wajib diisi) applicant
NIK/Paspor (WNA) / NPWP (Perusahaan) ID number [REDACTED]
Status kependudukan resident status: penduduk resident ✓

12206 1220661 1220601 64 04 28/12/2022 10:20:53 AM 8032
122-00-0741367-0 ARSARI PRADANA UTAMA IDR 393,250,000,000.00 DR
09-12206-0056769-02 USD 25,000,000.00 CR
NO: CEK CK 870669 1.0000000 15,730.0000000
NKL REPAYMENT
TANGGAL EFEKTIF 28/12/2022
20

Nama name: PT Arsari Pradana Utama.
Alamat & nomor telepon address & telephone number: Mid Plaza ... 6

METODE TRANSAKSI (wajib diisi) method of transaction [REDACTED]

PENERIMA (wajib diisi) beneficiary: perusahaan company ✓
Nama: Karlin & Peebles, LLP IOLTA Account
Nomor rekening account number: [REDACTED]; Swift Code: FRBBUS6S
ABA Routing No. 321081669.
Bank: First Republic Bank.
Alamat & telp penerima beneficiary address & phone no: 111 Pine Street. San Francisco CA 94111

Bank Tertarik drawee bank: Mandiri — Nominal amount: USD 25,000,000

Jumlah setoran/transfer/kliring/inkaso deposit/transfer/clearing/collection amount
Terbilang in words: US twenty five million dollars

TUJUAN TRANSAKSI purpose of transaction: Pembayaran payment ✓
SUMBER DANA TRANSAKSI source of fund: Hasil usaha business proceed ✓
BERITA TRANSAKSI transaction remarks: NKL Repayment

CABANG JAKARTA ... 28 DEC 2022

Nama: Hadi
Alamat & nomor telepon: [REDACTED]
NIK/Paspor (WNA) ID number: [REDACTED]

116. By routing the funds through his firm's IOLTA account, Lascari was able to obscure the connection between Arsari and Birdsong.[21] The obfuscation worked. Arsari successfully moved $25 million from Arsari's account in Indonesia into Lascari's IOLTA account in California undetected, from which, upon information and belief, Birdsong used

[21] To be clear: Lascari arranged for $25 million to be received in his firm's attorney trust account on behalf of one client (NKL, associated with a politically exposed person), but then used that clients' funds for another, unrelated client (Srivastava, who had stolen them from PDMCC), without any documented written agreement between the two clients.



to close on the mansion shortly thereafter.

117. The deed to the Pacific Palisades property was recorded in California on January 5, 2023. With Lascari's assistance, Srivastava not only funneled funds fraudulently obtained from PDMCC into the United States but also concealed his receipt of those funds by routing them through offshore companies and using Birdsong as the nominal purchaser.

118. From there, Lascari attempted to extinguish the security interest in the Pacific Palisades property. First, on November 16, 2023, Lascari transferred the mansion from Birdsong to Aurora Point for no value. Then, on December 16, 2023, Lascari caused Aurora Point to extract $4,995,000 in cash from the equity of the criminally funded mansion in the form of a private mortgage loan from a hard money lender in Los Angeles, Jeffry Scapa. These transactions were fraudulent as Lascari, who personally executed the promissory notes on behalf of Birdsong, knew full well that the property was already encumbered by a lien documented in the promissory notes.

119. Initially, while extracting the initial $25 million in December 2022, Srivastava, through Lascari, also sought an additional $2 million from Arsari. Hashim refused. Maria Foley wrote to Lascari: "I am instructed that the total amount agreed was $25M. I am waiting for execution copies and will revert when the same comes to hand."

**From:** Thomas Giordano <tgiordano@karlinpeebles.com>
**Sent:** Thursday 8 December 2022 18:28
**To:** mfoley@[redacted]
**Subject:** RE: Promissory Notes

Dear Maria,

I approve the PNs, but can we make the 3rd PM for $12M for a total of $27M? G requested a higher amount.

Attached are the Birdsong company documents.

Finally, attached are the wire instructions.

I am happy with a scan. I can send the original of my signature page as instructed.

I will follow up separately with the deeds of trust.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

From: mfoley@a[redacted]
Sent: Friday 9 December 2022 14:48
To: 'Thomas Giordano'
Subject: RE: Promissory Notes

Dear Thomas

I am instructed that the total amount agreed was $25M. I am waiting for execution copies and will revert when same comes to hand.

As you have requested for the funds to be wired to your firm's trust account, we will require an affidavit from you confirming the UBO before funds can be remitted. Our bank requires separate remittance instructions from Birdsong. Kindly forward Birdsong's remittance instructions duly signed by authorised representative for our bank transfer purposes.

Regards,
Maria

120. On information and belief, Srivastava was attempting to secure $2 million more in cash at the time for the Foundation to meet a pledge to the Atlantic Council to promote the Srivastava Enterprise's reputation and standing by setting up a foreign policy institute in his name, like the Scowcroft Center for Strategy and Security, part of the Atlantic Council. The Foundation entered into a Gift Agreement by which the Foundation pledged $2 million to the Atlantic Council for the fiscal year 2023, with the intention to renew annually for four additional years beginning April 1, 2024, for a total of $10 million.

121. On February 9, 2023, Defendants Srivastava, Lascari, and the Foundation also knowingly conspired to transfer and did transfer the remaining $500,000 from the $25 million in criminal proceeds stolen from PDMCC, which Lascari's law firm, Karlin & Peebles, had received in its First Republic Bank account ending in x1869 from Arsari's bank accounts in Indonesia, from Karlin & Peebles bank account to the Atlantic Council.

**Gift Agreement Amendment**

This Amendment to the Atlantic Council Gift Agreement dated May 1, 2023 (hereinafter referred to as "**Amendment**") is entered into on the date of execution set forth below between;

1. Atlantic Council of the United States, Inc., having its registered offices at 1030 15th Street, NW, 12th Floor, Washington, DC 20005, USA (hereinafter referred to as the "**Council**")

2. Gaurav & Sharon Srivastava Family Foundation, (hereinafter referred to as the "**Partner**"),

B. **AMOUNT AND PAYMENT SCHEDULE:** Upon termination of the Agreement per the execution of this Amendment, the Partner's pledge of $2,000,000 to the Council for fiscal year 2023 with an effective date of April 1, 2023, with the intention to renew annually for four additional years beginning April 1, 2024, with the intention of giving an additional $8,000,000, will be written off.

The first installment of **$500,000** paid by the **Partner** via wire from Karlin & Peebles, LLP Attorney CLI on February 9, 2023 will be refunded via wire from the Council to the Partner within 30 days of executing this Amendment.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**iii. Wire Fraud and Money Laundering Through Paramount Inc.**

122. While Srivastava and the Enterprise were siphoning tens of millions from PDMCC and using it for Srivastava's own personal benefit and to fund the Enterprise's efforts to maintain and improve its reputation to enable their frauds, they simultaneously launched a parallel scheme to extract funds from PECSA in Switzerland. To do so, they used a newly formed U.S. affiliate, Paramount Inc., for which Lascari served as incorporator and director, and they looted that entity.

123. In late October 2022, PECSA explored a potential $350,000 investment in a company with exploration rights in Liberia, one of the regions Srivastava claimed was relevant to his purported government "Program." Srivastava also suggested that the investment be held through a newly formed U.S. entity.

124. On November 9, 2022, Lascari incorporated Paramount Inc. in Wyoming, listing his then-law firm, Karlin & Peebles, LLP, as its principal office. PECSA wholly owned Paramount Inc. Lascari was installed as director of Paramount Inc. He also controlled its bank account. Thereafter, he operated Paramount Inc. and its bank account at Bank of America to the benefit of the Enterprise.[22]

[22] As part of due diligence on the gold investment, a draft proposed disclosure on November 24, 2022 omitted PDMCC's Russian oil trading activities was circulated. Srivastava responded, "I am okay with this." Troost, copying Srivastava, insisted on transparency, clarifying that "Paramount DMCC is engaged in business with Russia, which is fully compliant with all applicable regulations. Want to be clear on that." When counsel asked whether Paramount should affirmatively disclose this to the counterparty, Troost replied, "I believe so yes. Would prefer to be transparent. G?" This exchange disproves Srivastava's after-the-fact false narrative that Troost made up Srivastava's CIA claims because Srivastava discovered to his surprise that PDMCC marketed Russian-origin oil; he always knew the business.

125. Srivastava and Lascari demanded $6 million be sent to Paramount Inc. On December 29, 2022, PECSA wired $6 million from Switzerland (via its correspondent account at Bank of New York Mellon) into Paramount Inc.'s newly opened Bank of America account.

**MT103 SINGLE CUSTOMER CREDIT TRANSFER**

| Message data | |
|---|---|
| (20 ) SENDER'S REFEFERENCE | 768626TRC110998 |
| (23B) BANK OPERATION CODE | CRED |
| (32A) VALUE DATE/CURR./INTERBANK SETTLED AMOUNT | |
| DATE | 29.12.2022 |
| CURRENCY CODE | USD |
| AMOUNT | 6,000,000.00 |
| (33B) CURR./INSTRUCTED AMOUNT | |
| CURRENCY CODE | USD |
| AMOUNT | 6,000,000.00 |
| (50K) ORDERING CUSTOMER - NAME & ADDRESS | /CH[redacted] PARAMOUNT ENERGY + COMMODITIES SA 22 RUE DE VILLEREUSE CH/GENEVA,1207 |
| (52A) ORDERING INSTITUTION | |
| (53A) SENDER'S CORRESPONDANT | |
| (54A) RECEIVER'S CORRESPONDENT | |
| (55A) THIRD REIMBURSEMENT INSTITUTION | |
| (56A) INTERMEDIARY INSTITUTION | |
| (57A) ACCOUNT WITH INSTITUTION | BOFAUS3NXXX |
| (59 )BENEFICIARY CUSTOMER | /1453951449 PARAMOUNT ENERGY AND COMMO. INC. 5900 WILSHIRE BLVD SUITE 500 LOS ANGELES, CA 90036 |
| (70 ) REMITTANCE INFORMATION | LOAN AGREEMENT PARSA/INC 12202 DATED 13.12.2022 |

| Date Posted | Customer Reference | Amount | Description | Bank Reference |
|---|---|---|---|---|
| 12/29 | | 5,999,962.00 | WIRE TYPE:WIRE IN DATE: 221229 TIME:0709 ET TRN:2022122900248964 SEQ:F9S2212290523100/300545 ORIG:PARAMOUNT ENERGY + COMMOD ID:CH27086291051823 SND BK:THE BANK OF NEW YORK MELLON ID:0001 PMT DET:768626TRC110998 LOAN AGREEMENT PARSA/INC 1 | 644800370248964 |

126. That same day, Lascari confirmed receipt of $5,999,962 after bank fees. Troost sent the wire confirmation to Srivastava at his Gmail address.

127. Immediately thereafter, Srivastava and the Enterprise moved to divert the funds. On January 2, 2023, Srivastava's assistant at Unity Resources Group emailed Troost and Lascari requesting authorization to "release USD 5.2m from Paramount Inc. Account," signing as "Personal Secretary to the Chairman," referring to Srivastava. On January 4, 2023, Srivastava—using his email address g@unityresourcesgroup.com and signing as "Chairman"— again demanded release of $5.2 million for unspecified "Paramount related expenses." Troost never would have consented if he had known that Srivastava and the others were defrauding him and Paramount, and he consented only on the condition that an invoice be presented documenting legitimate Paramount-related expenses. No invoice was ever provided.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

128. Despite Troost's explicit condition, Lascari transferred $5.2 million from Paramount Inc.'s Bank of America account to his law firm's IOLTA account at First Republic Bank on January 17, 2023, and then transmitted the funds to Srivastava personally.

**Withdrawals and Debits**

Other Debits

| Date Posted | Customer Reference | Amount | Description | Bank Reference |
|---|---|---|---|---|
| 01/17 | | 5,200,000.00 | WIRE TYPE:WIRE OUT DATE:230117 TIME:1706 ET TRN:2023011700834376 SERVICE REF:023699 BNF:KARLIN AND PEEBLES LLP TRU ID:[redacted] BNF BK:FIRST REPUBLIC BANK ID:[redacted] PMT DET:23 1HH0452LT42J56 | 00370834376 |

129. A Paramount Inc. bank-reconciliation statement prepared by Lascari on May 2, 2023 falsely listed the $5.2 million transfer as "REIMBURSEMENT TO GS (APPROVD BY NT) [sic]." Troost never approved any personal payment to Srivastava, and the prerequisite invoice explaining the nature of the alleged Paramount-related expenses was never provided.

TRANSACTION,DATE,AMOUNT,NOTES

...

Deposits Credits,29-Dec,"5,999,962.00",INITIAL DEPOSIT

...

Deposits Credits,30-Dec,88.76,INTEREST PAID

...

Deposits Credits,31-Jan,585.04,"INTEREST PAID ON 31 DAYS AVERAGE COLLECTED BALANCE OF $3

...

Withdrawals Debits Other,17-Jan,"5,200,000.00",REIMBURSEMENT TO GS (APPROVD BY NT)

130. The reconciliation report reflected a second unauthorized transfer: a $50,000 payment on March 6, 2023, also falsely labeled "REIMBURSEMENT TO GS (APPROVD BY NT)." In reality, the $50,000 was sent without approval to Orbimo, a company with no connection to Paramount, but connected to Srivastava and Onouye.

**Withdrawals and Debits**

Other Debits - Continued

| Date Posted | Customer Reference | Amount | Description | Bank Reference |
|---|---|---|---|---|
| 03/06 | | 50,000.00 | WIRE TYPE:BOOK OUT DATE:230306 TIME:0949 ET TRN:2023030600347980 RELATED REF:Reimbursement BNF:ORBIMO CORPORATION ID:32[redacted] | 00370347980 |

...

Withdrawals Debits Other,06-Mar,"50,000.00",REIMBURSEMENT TO GS (APPROVD BY NT)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

131. On or around April 19, 2023, Bravard requested that Plaintiffs send another $2,000,000.00 to Paramount, Inc. describing it as an "increase" to the "existing loan." The request fit the pattern: by this point, the Srivastava Enterprise viewed Paramount Inc. as its own personal piggybank, a U.S.-based account from which it could extract cash at will under the guise of "corporate operations."

> From: N. Bravard <nbravard@parencom.ch>
> Sent: Wednesday, April 19, 2023 2:25 AM
> To: Niels Troost <ntroost@parencom.ch>
> Cc: Thomas Giordano <tgiordano@karlinpeebles.com>
> Subject: Usd 2mm to paramount us
>
> Dear Niels,
>
> Can we proceed with the USD 2 MM transfer to paramount USA. We should just increase the existing loan by USD 2 MM.

132. Throughout early 2023, funds transferred from PECSA to Paramount Inc. were diverted to individuals and expenses related to the Srivastava Enterprise.

133. By May 2023, the theft could no longer be concealed. On May 3, 2023, Troost spoke by phone with Bravard after receiving Lascari's reconciliation report, which purported to explain Paramount Inc.'s outgoing transfers. During that call, as the discrepancies became undeniable, Bravard admitted the truth—that Srivastava had stolen the funds:

> **Troost**: That is fraud.
>
> **Bravard**: I know it's fraud. … A shareholder cannot take money.
>
> **Troost**: Absolutely. And 5.2 million and 50,000 G paid to himself. But you understand that this is not correct, right?
>
> **Bravard**: Yes. I agree with you.

* * *

**iv. Wire Fraud and Money Laundering through Cedar West**

134. In or around February 2023, Srivastava, Bravard, Lascari, Cedar West Ventures, and 1234 Holding SA willfully and knowingly conspired and attempted to transfer $3,000,000 and, on information and belief, transferred $500,000 from a bank account in the United States to an account ending in x45-92 at UBS (then Credit Suisse) in Switzerland belonging to Dorsay Services Sàrl, Bravard's Swiss company:

DORSAY SERVICES Sàrl

CEDAR WEST, LLC
5900 WILSHIRE BLVD,
LOS ANGELES, CA, 91423, US

Geneva, 3rd of February 2023

Invoice No. F02230302-1

Ref : Commercial Agreement - 2022

| Service | Qty | Amount | Total in USD |
|---|---|---|---|
| - Negotiation, execution, and closing of the acquisition of Paramount Energy & Commodities SA shares and Harvest commodities SA shares on behalf of 1234 and its shareholder.<br>- Incorporation and administration, as a sole director of 1234 Holding SA, for 2022.<br>- Payment schedule : $500,000 within 48h, $2,500,000 when the dividend from Paramount Energy & Commodities SA, for fiscal year 2022, is paid to 1234 Holding SA bank account. | 1 | $ 3,000,000 | $ 3,000,000 |

Terms of payment: Bank transfer
All charges and bank fees incurred by the remitter

**Total in USD : $ 3,000,000**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**2. Srivastava Uses PECSA Funds to Hire a Personal Chief of Staff**

135. After forming the Paramount Inc. U.S. subsidiary, Srivastava built out a Los Angeles office designed to impersonate an official U.S. government workspace to carry out the Enterprise's schemes. The office displayed the Great Seal of the United States and custom-engraved ceremonial swords bearing Srivastava's name—objects he falsely claimed were gifts from senior government officials, but that he, himself, had ordered and had engraved. Though Paramount Inc. paid the rent and other expenses, when Troost traveled to Los Angeles in 2023, Srivastava instructed others in the Enterprise to keep Troost away from the Paramount Inc. office, further underscoring that its appearance was part of the fraud.

136. Around January 6, 2023, Srivastava recruited Jim Reese as his "Chief of Staff." Reese is a retired U.S. Army Lieutenant Colonel and former Delta Force operator who left the military in 2007 and who had previously done business with Troost. Troost introduced the two in late 2022. Reese understood he was being retained solely by Paramount Inc. as an independent consultant.

137. In reality, Srivastava used Paramount Inc.—and Paramount Inc.'s funds—to deploy Reese as a key operative for the Enterprise. Although Reese believed he worked for

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Paramount Inc., Srivastava had him performing work for entities Srivastava owned or controlled, including Defendants Unity Resources Group and Unicom Worldwide. Reese was even assigned email addresses for Unity and Unicom, which were housed on Paramount Inc.'s servers, despite those entities having no connection to Paramount's business.

138. As "Chief of Staff," Reese became deeply involved for a time during January to May 2023[23] in advancing the Enterprise's objectives, using Paramount resources to do so. His responsibilities included:

- Coordinating with Lascari to handle personal arrangements for Srivastava and his family;
- Setting up and furnishing the Enterprise's Los Angeles office using Paramount Inc. funds, which Lascari leased in his capacity as Paramount Inc.'s sole director;
- Helping Srivastava leverage the Atlantic Council relationship, financed with Troost's and Paramount's money, to enhance the Enterprise's credibility;
- Assisting Srivastava in attempting to build philanthropic and public-relations visibility for the Enterprise;
- Arranging and attending meetings with public officials that Srivastava used to inflate his perceived stature and to lull Troost into remaining in the "Program"; and
- As discussed in further detail below, participating in the Enterprise's early efforts to attack Troost in mid-May 2023 after Troost discovered the fraud and rescinded Srivastava's ownership of PECSA.

139. Srivastava further attempted to bolster his fabricated intelligence persona by feeding Reese false information. Srivastava falsely claimed that XP Services, a helicopter refitting company in Nashville he claimed to own (he did not), had contracts to refit C-130

[23] In around late May and early June 2023, Reese concluded Srivastava was a fraud and withdrew from his association with him.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



aircraft for Indonesia, even though the company's CEO had expertise only in helicopters. Srivastava also misrepresented that he was born in Ohio (which would have made him a U.S. citizen), and that he graduated from USC—claims contradicted by USC's records. He asked Reese whether he knew General Clark, implying closeness with U.S. military leadership; Reese did know General Clark from his service in the Balkans.

140. In February 2023, Srivastava invited Reese to his California mansion, where Reese observed first-hand the Enterprise's efforts to manipulate its online reputation. Sharon Srivastava introduced Reese to a team of search-engine-optimization ("SEO") contractors as "our family office chief of staff," a title he had never agreed to and did not hold. Reese saw Sharon attempting to have online reports about their civil frauds and unpaid bills removed while boosting favorable stories about the Foundation. When Sharon asked if the negative stories could be deleted, the SEO consultants said they could not, though they might be buried with effort. Soon after, the SEO firm contacted Reese for overdue payments of $60,000-$80,000. Builders who had renovated the mansion also later contacted Reese seeking payment, explaining that the Srivastavas had never paid them.

141. Srivastava also directed Reese to conduct a "threat assessment" on the family. When Reese—based on his extensive counterterrorism experience—concluded the threat level was low, Sharon became angry and insisted it must be higher because Srivastava had allegedly been "held hostage by ISIS in the Democratic Republic of the Congo in 2008." This was impossible: ISIS did not operate in the DRC in 2008, nor did any ISIS-affiliated group exist in that region at that time.

**3. The Srivastava Enterprise Continues to Gather Political Clout**

142. Meanwhile, Srivastava continued to work to bolster his image as someone deeply connected to U.S. intelligence agencies. Srivastava hired real ex-CIA operatives, including former Station Chief Defendant John Maguire, to lend credibility to his claims of being a CIA operative.

143. In around February 2023, Maguire travelled with Srivastava and Troost to a meeting with the National Security Advisor of Iraq in the private wine cellar of the dining

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



room at the Armani Hotel inside the Burj Khalifa in Dubai.

144. Srivastava and Maguire told the National Security Advisor that they were there on behalf of the FBI and CIA as part of a program offering U.S. Government assistance to locate and capture terrorists for the U.S. Government. At one point, Srivastava claimed that Maguire would replace Secretary of State Anthony Blinken when he resigned. Maguire passed a handwritten note to the National Security Advisor containing names of supposedly wanted terrorists. For this and other meetings in the UAE, Srivastava had arranged for Paramount Inc. to pay over $15,000 for private security officers and multiple large SUVs with drivers, which Srivastava used to create the façade that he and Maguire were on official U.S. business.

145. Following the meeting, the National Security Advisor privately warned one of the attendees to stay away from Srivastava and Maguire, describing them as "dangerous" and not to be trusted. Maguire later (while still participating in the Enterprise) admitted to a former Department of Homeland Security official, Chris Hinn—who had previously worked for Srivastava—that he had been falsely posing as an active-duty CIA officer during meetings with officials in Dubai.

146. During early 2023, Srivastava told Hinn he had worked with the FBI.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Srivastava claimed he handled a lot of cases, and that he was very close to leadership at FBI headquarters, stating "I go right to the top." Srivastava also claimed to have recruited for the CIA. Hinn asked Srivastava whom he supposedly worked for within the U.S. government, but Srivastava said it was "Top Secret." Hinn responded that Maguire had security clearance and therefore could hear the answer, but Srivastava claimed it was "extremely" secret and still would not tell him. In Hinn's presence Srivastava at various points referred to his status as a CIA operative.

147. In mid-November 2023, Srivastava called one of the attendees of the meeting with the National Security Advisor of Iraq via international wire communication about trying to conduct Iraqi business under fraudulent pretenses. Srivastava said that he had warned Troost that there was a saying in the U.S., "if you draw the sword against the king, you must kill the king." Srivastava took credit for getting Paramount sanctioned and said that the UK, the EU, and the U.S. were also going to sanction Troost. Srivastava said that if a person is his friend, he will do anything for them, but if you go against him, it is not good for that person.

148. After this call with Srivastava, Maguire also called that meeting attendee via international wire communication to ask to be re-connected to the Iraqi National Security Advisor. Maguire said he wanted to discuss expanding oil operations with a new company in Iraq. Maguire falsely claimed they had a company registered in Geneva, Switzerland and California, apparently referring to the Paramount companies in which the Enterprise no longer had any ownership interest. Maguire falsely claimed they were working on the project with the "Deputy Director" of the CIA. Maguire claimed to have financial records supporting four years of the company's operations and that they were a $16.5 billion company, which was also false—PECSA had ceased any Russian-related activity and reduced its other activities since the fall of 2022 and PDMCC had ceased all activities as of August 2023. Maguire also told the person that Troost was a fugitive (false), that he was being targeted by the U.S. (false), and that multiple countries were looking for him (false). He warned the person not to speak to Troost.

149. Maguire and former CIA officer Mary Beth Long (who questioned Mr. Troost at the New York gala after Srivastava told him she still worked for the CIA) also had been previously involved in working together to vouch for another fake CIA officer, Matthew Marshall, who defrauded a Montana billionaire. Their scam was covered by the press and the subject of a multi-episode podcast.[24] During early episodes of the podcast, Long and Maguire vouched for the fake agent's bona fides.[25] Between episodes, however, Marshall pleaded guilty in a U.S. federal court to fraud. Nonetheless, Maguire and Long then wrote letters to the judge supporting Marshall at sentencing. On February 27, 2022, Maguire, signing as a retired CIA officer, wrote that Marshall was his "trusted warrior-brother" and "If I had to define him with one word it would be honorable." *U.S. v. Marshall*, Dkt. No. 191-2. Long, describing herself as "The Honorable Mary Beth Long," wrote that Marshall was "a dedicated patriot" "with a deep sense of right and wrong" who was vouched for by "a former senior-most member of the Department of Defense's Intelligence organization." *Id.* She wrote that Marshall "is a wonderful friend," and "I wish to assure the Marshall family and this Court that I intend to remain a supporter of the family and of [Marshall] when he returns to society." *Id.* Their letters to the judge were apparently unpersuasive; Marshall was sentenced to six years in federal prison. Maguire and Long

---

[24] Ken Silverstein, *Seed Money*, New York Magazine (Nov. 22, 2022); Rosin, H, Nov. 29, 2022, Episode 6 *All the Voids*, Cover Story, Season 2. Mary Beth Long met with Srivastava and Maguire in mid-April 2023, and was paid through her company, Askari Defense & Intelligence, LLC.

[25] According to Mark Seyler, the FBI Special Agent in charge of the Marshall criminal investigation, when the victim reported Marshall's fraud to the FBI in November 2018, Mary Beth Long contacted the victim's team and told them "he might want to stop digging around and questioning Marshall's CIA background," she was "sure Marshall had been in the CIA, and to suggest someone like John Maguire would be mistaken about something like that was ridiculous." Seyler, *Go Big or Go Home: Spies, Cops, and Oath Keepers Under the Big Sky* 57, 167 (2024). Maguire and Long then participated in what they called "Operation Lima" to defend Marshall by destroying the victim's reputation; Marshall emailed Long to say they needed to "start taking a body count" and "destroy" the victim, lamenting that his lawyer was too ethical and that he needed Maguire and Long to "blur those lines a bit to get some shit done quickly and effectively." *Id.* 167-68. Long emailed someone who was blackmailing the victim to suggest they "meet to discuss a 'common interest' in 'bringing to heal [*sic*]'" the victim, whom she described as "'a piece of shit.'" *Id.* at 184-85. In June 2021, however, the judge (who had taken testimony from Long and Maguire—the latter of whom the judge described as "combative"—during a classified hearing) found that neither Maguire nor Long had any personal knowledge that Marshall worked for the CIA. *U.S. v. Marshall*, Dkt. No. 121. On information and belief, Maguire and Long ran the same playbook against Troost for the Enterprise, with Srivastava substituting for Marshall.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

appeared on a later episode of the podcast singing a different tune from their supportive sentencing letters; Long called Marshall a "con man," saying "John [Maguire] and I laughed, we laughed about it the other day, finally after drinking, 'Well, it happens once in everybody's life,' and 'this guy is a master liar, master liar.'" Maguire, for his part, claimed that he got "played by a grifter" and that he wanted "to go back to headquarters and talk to personnel. I want to know what the fuck the truth is." As to Srivastava, however, Maguire did not get played—Maguire knew full well that Srivastava was not a CIA operative and knew that Srivastava would pay him handsomely for helping him appear to be one and, later, to wage a vicious disinformation campaign against the Troost family.

150. On May 20, 2023, after Srivastava had been expelled from Troost's companies, Maguire (texting in gray) texted Srivastava's chief of staff (Jim Reese-in blue) by Signal and claimed that Srivastava used Amos Hochstein, special advisor to President Biden, to get the Biden White House to remove Murtaza Lakhani, a Pakistani-Canadian oil trader from the U.S. sanctions list and that the White House would keep Lakhani off the sanctions list if Lakhani continued to do business with Srivastava and Maguire ("he was on ofac list but he's been pulled off the list for this meeting." "The WH adjusted the list." "If he helps us he can stay off the list"):

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

151. On information and belief, this was another wire fraud being committed by the Srivastava Enterprise, this time targeting Lakhani and his companies with false assurances that Srivastava and Maguire could use their CIA affiliation to keep Lakhani off the U.S. sanctions list.[26] Indeed, in May 2023, Srivastava mentioned his dealings with Lakhani to Troost, falsely associating them with the Program. During an international call on May 8, 2023, Srivastava claimed that Paramount was still in its "extended favor time" with the U.S. government, that he was going to meet Lakhani ("Murtaza") in Dubai, that he was considering whether to fly to Dubai with UAE Ambassador Yusef Otaiba ("Yusef") to meet Lakhani, and that the Program for marketing Russian-origin oil would involve starting to work with the UAE:

```
          MR. GAURAV SRIVASTAVA:  But, you know, we -- we
need to -- we really need to get, you know, we really need
to get everything sorted and in gear because, you know,
we're getting at the -- we're getting at the end of our
extended favor time, so I -- I want to sort this out as
quickly as possible.
          MR. NIELS TROOST:  Right, but right now we still
have, let's say, their support and their protection because
of you, right, in the --
          MR. GAURAV SRIVASTAVA:  Correct.
          MR. NIELS TROOST:  Yeah.
          MR. GAURAV SRIVASTAVA:  Yes.
          MR. NIELS TROOST:  Yeah.
```

[26] The UK and the EU sanctioned Murtaza Lakhani in December 2025. Srivastava's post-Paramount fraudulent dealings with Lakhani again shows Srivastava is lying when he now claims he did not want to be associated with the Russian oil business (*see, e.g.*, Logan Podcast, 41:03 to 41:51) as part of his false narrative that he discovered in a Spring 2023 audit that PDMCC was trading Russian oil and that discovery caused Troost to make up a defensive fake spy story against Srivastava. Indeed, Lakhani's association with Russian oil has been widely reported. *See, e.g.*, *The Largest Oil Trader: What Is Known About Murtaza Lakhani*, Business Matters (Jul. 8, 2025) ("According to a Bloomberg investigation published in 2023, Rosneft's president, Mercantile & Maritime, and one of Putin's closest allies — Igor Sechin — celebrated New Year in Dubai on a luxury yacht docked near the Palm Jumeirah islands. One of the most important guests on board was Lakhani. The Bloomberg report stated that in 2022, Sechin devoted much time to developing schemes to circumvent oil sanctions, and Lakhani was one of those actively helping him. Lakhani created an entire network of oil trading and shipping companies in Dubai to distribute Russian oil worldwide."), available at https://bmmagazine.co.uk/business/the-largest-russian-oil-trader-what-is-known-about-murtaza-lakhani/.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

#2057337v1

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

```
14          MR. GAURAV SRIVASTAVA:  Yes, but I'm not -- I'm
15 here, man. I'm -- by the way, Murtaza wants to meet in
16 Dubai so I'm thinking whether I should directly come from
17 DC or I come back to LA then go to Dubai but Murtaza wants
18 to meet in Dubai and then I will either -- so Yousef will
19 probably fly back --
20          MR. NIELS TROOST:  Okay.
21          MR. GAURAV SRIVASTAVA:  -- with me.
22          MR. NIELS TROOST:  Okay.
23          MR. GAURAV SRIVASTAVA:  And then -- because the
24 way this program will start, this program will start as a
25 collaboration between the U.S. and UAE, which is great.
```

**4. The Srivastava Enterprise Attempts to Gain 100% Control of Paramount Through the "Inversion"**

152. In late 2022, the G7 countries imposed a price cap. While it did not affect the legality of PDMCC's oil marketing operations (provided it did not use G7 services – which it did not), the cap did make it appear that the U.S. government did not approve of such business. Srivastava then fraudulently induced Plaintiffs not to wind up PDMCC's Russian-origin oil operations by falsely representing that the U.S. government actually wanted PDMCC to keep trading as part of the supposed CIA program Troost had joined, that OFAC would be issuing a special license formalizing on paper this arrangement, and that Srivastava and his team (including members of the U.S. government) had even cleared this with Swiss regulators. Srivastava did this so the Enterprise could take benefit from 50% of PDMCC's profits from continuing Russian-origin oil marketing that otherwise would have stopped in December 2022.[27]

153. Troost was inclined to wind up Paramount's operations (which, again, remained lawful but publicly politically disfavored). At the time, he told Maurice Taylor,

[27] Indeed, on April 17, 2023, Bravard wrote to Troost (copying Srivastava and others), "We must dividend up the profit from DMCC into [PEC]SA … This is a very urgent matter, we need to move forward on this, so that we can … declare the dividend, agree on asymmetric split, and execute the inversion … As shareholder, we will need to receive a cash dividend for 2022."



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

PECSA director, that he was increasingly uncomfortable with the Russian oil sector and was under family pressure to exit the industry altogether. He had similar discussions at the end of 2022 with Francois Mauron, then the director of PDMCC. The situation caused Troost significant emotional distress. Despite Troost's growing unease, Srivastava pushed him not to wind up the business. Troost even told Taylor that he felt Srivastava was coercing him, to the point that he feared for his and his family's safety.

154. In late 2022, Srivastava met with Mauron, Bravard, and Troost at the Four Seasons in Megève, France, where he falsely assured them that he "controlled" U.S. law enforcement and OFAC. Srivastava claimed that "everything was fine" with respect to U.S. regulators, boasted of having "a lot of friends" in U.S. law enforcement, and said he had personally donated "a lot of money" to politicians. To bolster the deception, displayed a photograph on his phone showing him and Sharon Srivastava posing with President Biden.

He insisted he could obtain an OFAC license because, he said, "I control this." He also claimed he was speaking "with the lady at SECO"—referring to Helene Budliger Artieda, the Director of Switzerland's sanctions regulator—who allegedly supported the alleged Program as well as his restructuring plan.

155. While in Megève in or around December 2022, Troost and members of his family took Gaurav and Sharon Srivastava and a friend of theirs to a Japanese restaurant for dinner. During the dinner and in front of Sharon, Gaurav Srivastava spoke about his supposed secret missions for the U.S. Government in the Middle East, particularly in

Afghanistan, and how he had become involved in dangerous situations there. For her part, Sharon claimed to be from royal Japanese descent; Gaurav added that they often visited the Emperor at the Tokyo Imperial Palace and would stay there.

156. On or about March 23, 2023, the Srivastavas and Troosts dined at another Japanese restaurant in Los Angeles. While the Troosts were in Los Angeles, Gaurav and Sharon Srivastava had promised to take them to Nobu in Malibu, a famously exclusive and fancy restaurant where it was notoriously difficult to get a last-minute reservation. Srivastava explained that he could book a table through "the Agency," referring to the CIA. When it was time to meet, Srivastava changed plans and told the Troosts to take a taxi to a nondescript sushi place on Wilshire Boulevard in West Los Angeles. Gaurav explained in front of Sharon that other guys from "the Agency" were eating in Nobu that evening and that they could not be seen with the Troosts there. A Troost family member asked Sharon why they had picked this place as an alternative to Nobu. Sharon responded that they often went to this sushi restaurant because the "boys from the Agency" liked it because it is low key and therefore was a good place for "the Agency guys" to get together. Sharon also said that it was Gaurav's favorite spot to meet with the "boys from the Agency" and discuss whatever they needed to discuss. Gaurav then promised to get the Troost family a Nobu reservation in Los Angeles the next day, but Troost later asked him to cancel it and they went to another restaurant recommended by Srivastava closer to their hotel. After their family dinner, Srivastava picked up Troost and they went to a cigar bar together.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

157. That same month, Troost had an exchange with Ken Frydman, a public relations professional retained by Srivastava. In discussing a forthcoming article being written by Financial Times journalist Tom Wilson, Frydman was adamant that Paramount tell Wilson that "Niels and Paramount are operating with the knowledge and consent of the U.S. government" because "[i]f he insists on pursuing this story, Wilson needs to know and publish that. He 'doesn't want to get it wrong.'" Troost agreed, as this is precisely what Srivastava had been telling him all along. Srivastava, however, vetoed the suggestion because he knew that his purported connections with the U.S. government were fake and unsupported and that divulging his supposed dealings with the U.S. government to a reputable journalist would invite further scrutiny and expose his fraud.

158. On January 31, 2023, Srivastava led a conference call with Mauron and other PECSA and PDMCC personnel announcing that the companies would be restructured under U.S. control (the "inversion"). For the first time, he introduced himself to the staff as PECSA's other shareholder, claiming he was an American investor and asserting that all new policies would flow through a U.S. lawyer, Jeffrey Berg, then a Partner at BakerHostetler. He instructed employees that the restructuring was mandatory and that anyone unwilling to comply "could exit the company."

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

159. Mauron questioned the strategy, noting that U.S. sanctions already did not apply to a UAE-based entity owned by a Swiss company and that bringing the structure under U.S. jurisdiction could unnecessarily expose the business to the G7 price cap. To address these concerns, Srivastava and Berg traveled to Dubai to meet with Mauron and PDMCC staff on or about February 17, 2023. They reviewed PDMCC's contracts related to Russian ESPO oil trading and claimed their goal was to ensure compliance with U.S. law. Srivastava and Berg reassured Mauron that the inversion was not a problem because an OFAC license was forthcoming and that their U.S. contacts would secure approval. They told Mauron they understood "how this works" better than he did. Berg ultimately assured Mauron and others that PDMCC legally could continue trading Russian ESPO oil above the price cap and that an OFAC license was "in the works."

160. By spring 2023, as the inversion remained stalled, Srivastava intensified his pressure campaign on Troost. He told Troost he had a meeting scheduled with President Biden and that foreign governments supported PDMCC's continued Russian oil trading. In a text message, Srivastava claimed he had spoken with the Dutch ambassador, who—despite disagreeing with the United States—would ultimately "comply" with the United States' decision to work with Paramount.

161. Srivastava further claimed that unless Troost completed the Inversion, he would give Paramount's spot in the purported "Program" to Murtaza Lakhani, leaving Troost and his businesses exposed. He warned that if PDMCC did not maintain U.S. government "cover" through Srivastava, regulators would view Troost as having acted unilaterally and would impose secondary sanctions for its otherwise lawful marketing post-December 2022.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

162. In the same time period, to increase pressure and lend credibility to his fabricated authority, Srivastava enlisted senior elected officials to contact OFAC. He persuaded then–Senate Majority Leader Chuck Schumer and Congressman Pat Ryan to ask OFAC to speak with Paramount's legal counsel. As a result, on April 12, 2023, OFAC Assistant Director for Compliance Claire McCleskey emailed Berg, stating that OFAC's Legislative Affairs team had received outreach from Congressman Ryan's office about the Russian oil price cap and inviting discussion.

**From:** Ricotta, Jill (Schumer) <Jill_Ricotta@schumer.senate.gov>
**Sent:** Monday, March 27, 2023 11:07:11 AM
**To:** Jim Reese <JR@unityresourcesgroup.com>
**Cc:** Bodian, Lane (Schumer) <Lane_Bodian@schumer.senate.gov>; Kuiken, Michael (Schumer) <Michael_Kuiken@schumer.senate.gov>
**Subject:** RE: Follow up from last week and New Ambassador to India discussion

Hi Jim,

We've reached out to OFAC a few times and they have explained to us that they cannot receive information verbally/through a meeting. All new information has to be received through this email: OFAC_Feedback@treasury.gov. If someone from URG can email that address and copy me, I can reach back out to OFAC and make sure it gets reviewed.

Best,
Jill

**From:** Claire.McCleskey@treasury.gov <Claire.McCleskey@treasury.gov>
**Sent:** Wednesday, April 12, 2023 8:43 AM
**To:** Berg, Jeffrey <jberg@bakerlaw.com>
**Subject:** Price cap OFAC outreach

[External Email: Use caution when clicking on links or opening attachments.]

Hi Jeff,

I received your name from OFAC's Leg Affairs team, who got some outreach from Congressman Pat Ryan's office on the Russian oil price cap. The Congressman's Chief of Staff said you have some information or views to share on the Russian oil price cap sanctions regime. I'd be happy to discuss this with you if you are interested.

Best,
Claire

***Claire O'Neill McCleskey***
Assistant Director, Compliance
Office of Foreign Assets Control (OFAC)
U.S. Department of the Treasury
Desk: 202-622-2376
Cell: 240-738-0194
claire.mccleskey@treasury.gov

163. Srivastava also instructed his lawyers to interact directly with OFAC officials to request a special license so that PDMCC could continue its business and Srivastava could continue to take 50% of the profits from PDMCC's Russian-origin oil marketing once the company was under his total control in the United States. On April 28, 2023, Berg and others from BakerHostetler met by video with the Assistant Director at OFAC. At Srivastava's direction, the meeting was intended "to introduce Paramount SA and its wholly owned subsidiary [in Dubai] to OFAC for several reasons, including [Paramount's] impending inversion and to address policy concerns with the price cap sanction on Russian-origin crude oil and petroleum products":

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

***Outline for April 28 Meeting with OFAC***
***Mannino, Berg, Sferrazza***
***Claire McCleskey***

Initial introductory remarks:
Thanking Claire for meeting us today. Here on behalf of one of Jeff's clients of more than a decade - a U.S.-person with significant multinational interests in energy commodities (the "Client"). Purpose of meeting is to brief on our client's energy businesses, compliance with U.S. sanctions and client's plans to bring a number of his foreign businesses under US ownership and potentially US control, including transactions that could be subject to the price cap on Russian crude oil.

***Facts***
Our client is currently in the process of bringing those interests into the U.S. by moving multiple companies under a U.S. holding company ("Holdco"). At this, most of his interests in the energy sector are not subject to US jurisdiction; we know that our client is subject to US jurisdiction.

DMCC's business focuses on oil and gas trading and transportation of oil products between Russian and China, where such trades are conducted at prices exceeding the price caps implemented by G7 member countries (Canada, France, Germany, Italy, Japan, UK, US, and EU). DMCC's operations are conducted and overseen within DMCC. Importantly, DMCC is not engaged with Russian state-owned entities. Our client buys from small upstream operators that are not so uniquely tied to the Russian Government. It is our understanding that our client's competitors are doing the opposite.

DMCC is selling to downstream refineries in China, India, and some other regions that would otherwise be buying from other major traders, directly or indirectly, involved in oil and gas projects in Russia that have ultimate beneficial owners tied to Putin and the Russian Government. Paramount DMCC is currently a small player in the mid-stream sector of the Russian crude oil industry in comparison to its competitors.

[If asked: DMCC's recurring business revolves around selling and transporting oil sourced from the Eastern Siberian Pacific Ocean ("ESPO") Pipeline. Such oil and gas products are compiled and loaded onto ships at the Kozmino port in Russia, typically for delivery to China's Qingdao port. DMCC's customer base includes but is not limited to Ocean Energy, Shandong Port International Trading Group Co. Ltd, and CNOOC Trading (Singapore) PTE. Ltd. Trade frequency amounts to roughly one full vessel per day, sometimes two, leaving the Kozmino port, which yields a growing monthly revenue measured in the billions of U.S. dollars, exceeding $19 billion annually. For context, it is estimated that DMCC is responsible for roughly one-third of the Kozmino exports. ]

164. Unbeknownst to Plaintiffs, Srivastava's representations that the U.S. government approved of Paramount's business at the highest levels, including OFAC, were false, and Srivastava, who was not a CIA operative as he had claimed, lacked any ability to change that. According to the BakerHostetler attorneys present, the meeting did not go well.[28] In fact, the meeting with OFAC was a colossal disaster; the OFAC official "almost

[28] Berg and his team memorialized the meeting in a memorandum that was originally hidden from Troost and Paramount. The memo was only obtained after PECSA initiated a lawsuit against Berg and BakerHostetler that sought client files required to be handed over to PECSA under California law.

fell off her chair" when she realized that they were asking for a license for PDMCC's above-price-cap marketing, she "was amazed that any company would even have the guts to ask for such a license" and "she did not believe that any such license would be issued." In fact, she stated that PDMCC was exactly the type of company for which OFAC "is getting calls to impose secondary sanctions." The lawyers noted that OFAC "clearly did not support [PDMCC's] activities." OFAC had no intention of changing the price cap or authorizing specific companies to trade above the price cap, "particularly, with respect to the ESPO pipeline" that PDMCC specialized in:

BakerHostetler

**ATTORNEY-CLIENT PRIVILEGED AND ATTORNEY WORK PRODUCT**

**TO:** **File of Paramount Energy & Commodities SA**

**FROM:** Jeffrey P. Berg
Melissa B. Mannino

**DATE:** May 1, 2023

**SUBJECT:** *April 28, 2023 OFAC Meeting*

This memo summarizes our April 28, 2023 meeting with Claire O'Neill McCleskey of the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"). Claire is the Assistant Director of Compliance at OFAC. The meeting was requested by our client, who is an indirect 50% owner of Paramount Energy & Commodities SA ("Paramount SA"). The origin of the meeting was laid out in Claire's April 12 email to Jeff; the email stated "I received your name from OFAC's Leg Affairs team, who got some outreach from Congressman Pat Ryan's office on the Russian oil price cap. The Congressman's Chief of Staff said you have some information or views to share on the Russian oil price cap sanctions regime. I'd be happy to discuss this with you if you are interested." Per our client's direction, the meeting was supposed to introduce Paramount SA and its wholly owned subsidiary, Paramount Energy & Commodities DMCC ("Paramount DMCC") to OFAC for several reasons, including the impending inversion and to address policy concerns with the price cap sanction on Russian-origin crude oil and petroleum products. In preparation for the meeting, we meet with our client, drafted questions for the client, drafted talking points, and had internal prep meetings. Jeff shared the talking points with the client and reviewed the questions with the client. The client was clear that we were discuss DMCC's business, which consists almost exclusively, if not exclusively, of trading in Russian-origin ESPO pipeline oil about the price cap.

During the meeting, we made clear that Paramount SA focuses on energy trading in Africa and other parts of the world, but not Russia, and that DMCC's business is trading in Russian-origin crude oil above the price cap. We also made clear that we understand Paramount SA's and Paramount DMCC's businesses are in compliance with all applicable sanctions laws and regulations. We stressed that no U.S. person directs or controls the day-to-day operations of the Paramount companies and no U.S. person has any involvement in the trading activities of the Paramount companies. We did not detail that Paramount DMCC's business is trading in ESPO pipeline oil from the Kozmino port. During the factual overview, Claire asked questions regarding why our client, a U.S. person, did not own 50% of Paramount DMCC. Jeff explained why our client did not own 50% of DMCC from a legal perspective. Claire did not appear to be convinced by the explanation and agreed to we move on to the policy discussions. Claire was taking notes during the meeting; she seemed be familiar with the Paramount companies and seemed a surprised when she learned that we were meeting with her to discuss them.

As to the policy issues, Melissa explained that our client does not believe the price cap is serving its intended purpose as Russian-origin oil continues to be traded above the price cap, and the persons and countries that are immensely profiting from trading in Russian-origin crude oil are those that are adverse to U.S. national security and foreign policy interests (Russia, China, Iran, and sanctioned persons). Claire was clear that OFAC and our allied nations believe the price cap is working. Claire explained that the price cap was not intended stop the flow of Russian oil as nations need it; it was to stabilize the energy markets, reduce the monies going to Russia to fund its war on Ukraine, and ensure no Russian crude oil is imported into the United States. Claire mentioned a "Q School" article on the Russian price cap sanction; she said that article discussed the effectiveness of the price cap. Claire also said that she believed the purpose of the meeting was for us to share information about third persons who were violating the price cap. As mentioned above, the content of meeting caught her off guard. Claire stated that she receives calls from Senators and representatives about sanctioning companies, such as Paramount DMCC, it was not clear whether she has received any specific calls about sanctioning Paramount DMCC or other Paramount companies. She was definitely familiar with the Paramount companies. Claire asked if we had ideas on a new policy or how to improve the policy; we said that we had not dug that deep yet.

We proposed several questions to Claire about the likelihood of OFAC issuing a license to Paramount DMCC if its Russian-origin oil activities become subject to U.S. jurisdiction. Initially Claire did not seem to understand the question. She then asked if we were asking if OFAC would issue DMCC a license to engage in trading in Russian-origin crude oil above the price cap; she almost feel off her chair when she realized that was the question. Claire said no one has asked for such a license and she did not believe that any such license would be issued. She seemed amazed that any company would even have the guts to ask for such a license. She reiterated that the U.S. and G7 nations believe the price cap is working.

The meeting lasted about 45 minutes (1:00 pm ET to 1:43 ET). We do not think the meeting went well. OFAC clearly does not support DMCC's activities and DMCC is the type of company that OFAC is getting calls to impose secondary sanctions on. Further, OFAC has no current intent to change the price cap or authorize companies to engage in activities above the price cap, particularly, with respect to ESPO pipeline oil from the Kozmino part. We did not disclose that DMCC's Russian-origin crude oil trading is of the ESPO pipeline oil from the Kozmino port, but Claire already likely knows that fact. To the extent the meeting was helpful, OFAC now knows to reach out to us and understands that the Paramount companies are being proactive and transparent with OFAC.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



165. Instead of disclosing to Troost the discussion that took place during this meeting (which would have stopped the Enterprise's fraud in its tracks), Berg and Srivastava lied about it. On May 1, 2023, Berg emailed Troost and Srivastava claiming that "the dialog with OFAC" had "momentum." During a call on May 5, 2023, Berg told Troost it was a "good conversation," when Troost asked how the meeting with OFAC went. Berg added that "the meeting itself, I would consider to be good. We certainly didn't hear anything new or alarming or that would cause us to suspect that the company was a target of OFAC" and that "the companies are not doing anything wrong. In our opinion it is not violating U.S. sanctions. That's our position and it hasn't changed. You know, it took a while to get all the facts. . . . We have a view based upon a set of facts which we think is accurate." And Srivastava continued to pressure Troost to complete the inversion, even though Srivastava and his lawyers knew that inverting Paramount was likely to trigger significant issues with OFAC.

166. During a call on May 6, 2023, Srivastava lied to Troost and told him that OFAC confirmed during their call with the lawyers that he and Paramount were "okay" because it was part of the secret "program":

> MR. GAURAV SRIVASTAVA: Well, because -- because they were -- because there is a list. I've told this to you five times, there's a list the Ukrainian government is circulating that is -- has your name and Paramount name on it. It has been sent to SECO, it's been sent to EU, that they've sent to Dubai, that they have sent to U.S. Everybody has that list and you are featured on that list so I needed Jeff to talk to them to make sure that he explains to everybody and OFAC and OFAC was then going to relay to other agencies that you're okay. Otherwise, there was going to be not -- there was going to be five investigations happening at the same time and that will for sure bury the company.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

MR. NIELS TROOST: But did OFAC then confirm that we're okay?

MR. GAURAV SRIVASTAVA: Yes. They want to collaborate on working -- on different state -- on the state actors.

MR. NIELS TROOST: And this is because they understand that this is part of this program or --

MR. GAURAV SRIVASTAVA: They understand that I am part of this company.

MR. NIELS TROOST: And that there is --

MR. GAURAV SRIVASTAVA: The program -- the program did -- they know that this is run out of Los Angeles by me and that's what they told Jeff and that was that. You're okay. And that's what -- and it wasn't only Jeff. It was Melissa Mannino; it was the full Baker team. It was six people or four people from their side on that -- on that call, you know? Even O -- Melissa used to work for OFAC. Melissa said that in her entire time there, OFAC has never made an outreach call to build a relationship with a company. Ever. Period.

MR. NIELS TROOST: So that would -- that's highly unusual then.

MR. GAURAV SRIVASTAVA: Absolutely. Forced. I forced OFAC to do it because I don't want shit to happen. I want to do this business with you and just -- just -- and the company. So it's very unusual. It's very unusual. It never happens. That they reach out --

MR. NIELS TROOST: But then -- but --

MR. GAURAV SRIVASTAVA: -- (inaudible) Jeff --

MR. NIELS TROOST: But Jeff and Melissa -- but Jeff and Melissa understand then why -- why it's happening or --

MR. GAURAV SRIVASTAVA: Of course. Of course.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

MR. GAURAV SRIVASTAVA: Some day, I will, you know, talk -- we're going to talk and I'll tell you the whole story from top to bottom. But there is a lot of stories.
MR. NIELS TROOST: The story -- the -- the story of what?
MR. GAURAV SRIVASTAVA: The story of why people listen, how they listen, how this whole thing works. There is a system. There -- there is a system. It works. And we just need to -- we -- if we work with system, we'll grow with the system. And that's -- you know, and because -- you know, I think you and I care about the same thing, which is to maintain the -- the way of western life.
MR. NIELS TROOST: I want to do what's best for the western world, yeah. Absolutely.
MR. GAURAV SRIVASTAVA: Exactly.

MR. NIELS TROOST: Yeah.
MR. GAURAV SRIVASTAVA: So and that's, you know, it's not idealism. We can't -- okay --
MR. NIELS TROOST: Okay, Sir.
MR. GAURAV SRIVASTAVA: But -- but O -- but OFAC is, you know, that was, you know, that wasn't the call that Baker Hostetler requested. OFAC reached out to Jeff to set up a call with him, to have a chat with him.
MR. NIELS TROOST: Mmm.
MR. GAURAV SRIVASTAVA: And in the end of the call, they told Jeff we would love to collaborate with you on figuring out who the other bad -- who the bad state actors are. That's not normal. OFAC's job is to prosecute; not to be -- not to be --
MR. NIELS TROOST: No, I don't understand how any of this works but that's --
MR. GAURAV SRIVASTAVA: But it's working so why don't you just enjoy the fruit rather than trying to understand it. This is what I don't understand.

167. The OFAC meeting was just the tip of the iceberg. On May 1, 2023, PECSA received an unexpected letter from SECO, the Swiss sanctions regulator, requesting

information about Paramount's operations. This surprised and alarmed Troost because Srivastava had repeatedly claimed he had been in direct contact with SECO and that SECO had already approved of Paramount's business. Believing Srivastava's prior representations, Troost forwarded the inquiry to Srivastava, Bravard, and Berg, expressing confusion that SECO was asking for information if the approvals Srivastava had described were real.

| | |
|---|---|
| **From:** | Niels Troost[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C796365B1BC54B45AA3BE868ABB79BEE-NTROOST] |
| **Sent:** | Mon 5/1/2023 11:16:48 AM (UTC+02:00) |
| **To:** | Gaurav Sri[ggksrivastava@gmail.com]; N. Bravard[nbravard@parencom.ch]; Jeffrey Berg[jberg@bakerlaw.com] |
| **Cc:** | Jevgeni Barasev[jbarasev@parencom.ch]; Maurice Taylor[mtaylor@parencom.ch] |
| **Subject:** | Fwd: letter from SECO |
| **Attachment:** | 4623_001.pdf |

Dear Jeff and G,
Please see attached! I'm very confused because I was constantly informed that G was speaking directly to the top person at SECO, Helen, and dealing with this and that we got the all clear from SECO.

Please call me urgently and let me know how we proceed.

168. The next day, May 2, 2023, Troost wrote to Swiss counsel—copying Srivastava and Bravard—and repeated his understanding based on Srivastava's fabricated narrative. Troost told Swiss counsel that BakerHostetler had been engaged in ongoing discussions with OFAC and that a "representative of Paramount" (i.e., Srivastava) had been speaking with senior SECO officials. Troost asked Swiss counsel to incorporate those supposed contacts into PECSA's response to SECO, "especially when SECO asks what steps Paramount has taken to be compliant with the regulations."[29]

169. When confronted with SECO's inquiry, Srivastava escalated his fabricated intelligence narrative. He used his Chief of Staff, Jim Reese—whom he had manipulated—

[29] Later, after Paramount expelled Srivastava, Berg and Srivastava were concerned that Paramount was going to tell SECO what the two of them had been telling Troost and Paramount about their OFAC interactions—because it was all false. On May 14, 2023, Berg wrote to Paramount's Swiss lawyers, copying Bravard, "In connection with your preparation of the responses to SECO's request for information, we are advising you that the US shareholder [Cedar West for Srivastava] and its fiduciary [1234 Holding/Bravard] demands the opportunity to review and comment on any and all proposed responses to SECO, as well as any information related to such shareholder and information shared by BakerHostetler, *including but not limited to our conversations with OFAC.*" (emphasis added).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

to corroborate his lies. That evening, Srivastava and Reese made international phone calls to Troost to reassure him that Paramount was part of a secret CIA program allegedly approved "at the highest levels."

170. On one of those calls, Troost asked, referring to Srivastava, "You don't think he's a charlatan that just wants to take my money and suck me dry[?]" Reese responded, "I don't." Later in the conversation, when Troost asked Reese whether the CIA Director knew Srivastava, Reese answered "yes." When asked whether Paramount was "really building a program here with the Agency," Reese again said "yes," claiming he had attended meetings with Srivastava and senior officials, including Senator Mark Warner, Chairman of the Senate Intelligence Committee.

171. Reese further told Troost that Srivastava was a "NOC" and that the alleged Program had an official codename he could not reveal. Reese claimed he was "breaking his clearance" by discussing it and asserted that there had been no regulatory backlash against PECSA because of Srivastava's "influence" and because Troost's involvement was part of a "covert action." Reese explained to Troost how the NOC program worked in substantial detail.

172. Later that evening, Reese again spoke on the phone with Troost, in part about the U.S. government's approval of Paramount trading ESPO, Srivastava's involvement with the CIA, and Srivastava wanting Troost to participate in a program with the U.S. government or else he would use a different company. Reese said, "I just sat with Ben Harris from the U.S. Department of Treasury.[30] The guy who wrote the entire sanctions program. Not a word about it [Paramount]. He even talked about ESPO. He's like "Hey, we got no issues with ESPO," which was the focus of PDMCC's Russian-origin oil marketing business. When Troost asked what the U.S. government's reaction was when they brought up Paramount, Reese said, "He [Harris] says, '[Paramount], we see no issues with." Troost asked specifically about PDMCC. Reese said, "DMCC, in Dubai? Yes, 'We give Dubai a pass.'" In fact, Srivastava, Reese, and others participated in an interstate video call with

[30] Ben Harris is a former Assistant Treasury Secretary for Economic Policy and Chief Economist.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Ben Harris, earlier that day:

| | |
|---|---|
| **From:** | Jim Reese[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F8D096A3E58042B79680099FA2175A2A-FABB4692-2C] |
| **Sent:** | Mon 5/1/2023 5:06:51 PM (UTC-07:00) |
| **To:** | James Reese[james.p.reese.5@gmail.com] |
| **Subject:** | zoom call |

JR is inviting you to a scheduled Zoom meeting.

Topic: G, Ankit, Ben, Greg and Jim
Time: May 2, 2023 13:30 Eastern Time (US and Canada)

Join Zoom Meeting
https://us02web.zoom.us/j/81594419409?pwd=UTYzVUx6MXViOTR0YUYzcmZqSXBCZz09

173. Despite these claims of U.S. Government approval, Srivastava could produce no proof. Paramount staff—particularly Mauron—remained skeptical. Mauron had seen a March 2023 report that Srivastava purchased an expensive mansion in California and started putting two and two together (that is, started suspecting that the $51 million PDMCC loaned to Arsari actually was a pass-through to Srivastava):

HOME / MOGULS / POWER PLAYERS

Gracious Palisades Estate With Its Own Bomb Shelter Sells for $24 Million

By James McClain March 10, 2023 9:46 pm PT

Ryan Lahiff; PR Newswire/Harvest Commodities

| | | | |
|---|---|---|---|
| Seller | Rita DeLeone | Year | 1952; rebuilt 2012 |
| Buyer | Gaurav & Sharon Srivastava | Architect | Marc Appleton |
| Location | Pacific Palisades, Los Angeles, Calif. | Specs | Multiple structures totaling 10,000 square feet, 7 bedrooms, 11 bathrooms |
| Price | $24.5 million | Lot Size | 1.12 acres |

When Troost told Srivastava that Mauron believed Srivastava was scamming Troost, Srivastava became enraged. On May 3, 2023, he threatened Troost that he would "fucking destroy everything in three seconds" and that Troost "ha[d] no fucking idea."

174. Also that day, on a call with Troost, Srivastava claimed that Democratic

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Senator Mark Warner, the Chairman of the U.S. Senate Intelligence Committee, supported PDMCC's Russian oil business. Srivastava said he could not give details because he was in a CIA program, which was false. Srivastava instructed Troost to "ask Jim [Reese]," noting "I cannot say things because of the programs I am a part of, but he can. He can talk to you. Under law, he can speak to you because as a friend or whatever, but I can't speak to you, when I'm part of a program that I cannot tell you about all this stuff, but he can." Troost then called Reese and they discussed Srivastava's supposed affiliation with the CIA. During that call, Reese said "G is a NOC . . . a non-official cover operative." Reese explained the background and history of the NOC program and how it works, and confirmed that Troost was a "P3" source for the CIA under Srivastava. After that call, Troost spoke again with Srivastava by phone and said "I had a good chat with Jim, and I understand a lot more now. You probably know what I mean because you told me that I can ask him." Srivastava replied, "Yes, ask him. That's why I told you, because I cannot tell you certain things."

175.    The pressure campaign continued, with Srivastava insisting the Inversion was the only way Troost could speak to U.S. authorities. He told Troost that because the company was not yet under "U.S. control," Srivastava could not issue any documentation. When Troost challenged him—asking, "But even if I'm your asset, you cannot do that?"—Srivastava responded: "I can write so I can make sure there's nothing harmful that happens to you from the U.S., and the U.S. can reach out to its counterparts to make sure that they don't do anything to you that is going to be ultimately affecting you." Srivastava then went further, reconfirming that the Inversion would transform PECSA into a shielded proxy for U.S. operations: "[O]nce you are a U.S. company, you're acting on U.S. behalf. The U.S. ain't going to do shit. I know that. They're fucked. They have given us carte blanche on whatever I want to do. Carte blanche; do whatever you want to do, okay? That's basically it."

176.    On May 4, 2023, Troost again questioned why everything "had to become American." Srivastava responded that the U.S. government cared only about "a pure American enterprise with an American mindset," and that Troost's daughter living in New

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

York was the only reason officials allowed Troost to remain involved.

177. When Troost requested written proof that Srivastava could protect him from U.S. and Swiss regulators, Srivastava claimed Troost was an "MX-1 asset," but admitted no documentation existed. On information and belief, no such classification exists. Srivastava claimed providing anything in writing would "breach[] the law," but assured Troost that "the U.S. is not going after [him]."

178. On May 5, 2023, Srivastava resumed pressuring Troost, who voiced concerns about violating sanctions if PDMCC operated under a U.S. parent. Srivastava warned Troost that hesitation might make U.S. officials question whether he was deceiving them and threatened that "by tomorrow morning, it will be fucking pandemonium in your life." Srivastava added, "I don't think you understand who you're dealing with ... I can call, it's not a joke man, call eight Senators in a day and the President in the White House and the ambassador of this country. This is not monkey business. This is very serious shit."

179. Srivastava claimed this reach was possible because he was "part of a program, I've told this to you before, in which there is only 30 people," insisting he could "call anybody" because he operated as a "NOC," and that Troost was "not supposed to even be privy to this information":

> MR. GAURAV SRIVASTAVA: -- you -- but you -- but -- but you have to understand this by now. The fact that I can reach all these people, I can call -- it's not a joke, man, to call eight senators in a day and full thing and the president in the White House and the -- you know, the ambassador of this country and -- this is not monkey business; this is very serious shit --
>
> am part of the program so I can call anybody, can reach out to any state, any agency, anybody, but in non -- but it is called Non-Official Cover, NOC, okay? But you're not supposed to know all this; you're not supposed to even have privy to this information. For your intent and purposes, I am your friend, I'm your partner, I'm a business, whatever. You're not supposed to know this. And then you say, "Well, give me a piece of paper." Well, probably not supposed to know that and how am I supposed to show you a piece of paper? It's like it's counterintuitive. Either you --

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



180. To reinforce that Troost had no choice but to proceed with the inversion, Srivastava claimed responsibility for Sam Bankman-Fried's prosecution because Bankman-Fried "fucked with" Srivastava.

181. On May 6, 2023, Srivastava sent by international wire texts to Mr. Troost accusing him of lying and telling him "most importantly, the inversion has to happen," otherwise, Srivastava threatened, he would tell U.S. authorities that Mr. Troost was a Russian agent ("I do think that there is someone else controlling things. I just a got a call from DC."), he would get Mr. Troost sanctioned ("I am personally going to write to SECO [the Swiss sanctioning authorities] & OFAC about the deception."), and he would block Paramount's assets—a clear extortion attempt by Srivastava[31]:

182. Troost called Srivastava and asked, "What lie are you talking about?" Srivastava replied that he could not talk. Troost then called Reese who said, "G just wanted me to tell you that he's with [then-Speaker of the House] Nancy Pelosi and can't talk right now, so he needs a couple of hours." When Troost spoke with Srivastava by phone later that same day, Srivastava recounted purported conversations he had with members of CIA

[31] These texts violated Title 18, United States Code, Sections 1343, 1951, and 1952(a)(3).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

leadership, including the actual Director of the CIA, Bill Burns, whom he claimed were upset with Troost for delaying the inversion and were therefore considering that Troost might actually be a Russian agent. He also claimed to have gotten Subianto of Indonesia off of the U.S. no-fly list and to have kept General Dagalo of the Sudanese Rapid Response Forces off of the sanctions list. He also mentioned Troost's daughter in New York and confirmed that he was one of about thirty NOCs who all know each other. They also discussed the April 28, 2023 call the lawyers had with OFAC, as arranged by Srivastava through members of Congress. Srivastava falsely represented that the meeting went well and that OFAC approved of Paramount's businesses. Troost asked for the memo noting what happened during the call. Srivastava responded, "Yeah, I don't want him [Jeff Berg] to send that memo because it's not necessary. You asked me about it. I don't think it's necessary to send." Srivastava claimed that he had "forced" OFAC to contact the lawyers to set up the call. Troost asked, "But did OFAC then confirm that we're okay?" Srivastava replied, "Yes. They want to collaborate on working on different, on other state actors." Troost asked, "This is because they understand that this is part of this Program?" Srivastava replied, "They understand that I am part of this company. The Program, they know that this is run out of Los Angeles by me. And that's what they told Jeff. And that was that. And you're okay."

183. In the days that followed, Srivastava continued pressing Troost. He even deployed BakerHostetler to write legal opinions supporting the legality of PDMCC's continued operations and Srivastava's extraction of those profits from the Paramount companies for himself. One such opinion, dated May 8, 2023, stated, "Notwithstanding the origin of the funds for the Dividend (i.e., [PDMCC]'s trading in Russian-origin crude oil above the price cap), we believe that the issuance of the Dividend and receipt of it by the U.S. Shareholder [Srivastava] and the others does not fall within any U.S. sanctions prohibitions."[32]

[32] These May 2023 memos justifying Srivastava's receipt of Russian-origin oil marketing profits destroy Srivastava's after-the-fact claims that he was surprised to learn that PDMCC marketed billions' worth of Russian-origin oil, and his discovery of that supposedly damaging fact is why



BakerHostetler

ATTORNEY-CLIENT PRIVILEG
CONFIDENTIAL

Notwithstanding the origin of the funds for the Dividend (i.e., DMCC's trading in Russian-origin crude oil above the price cap), we believe that the issuance of the Dividend and receipt of it by the U.S. Shareholder and the others does not fall within any U.S. sanctions prohibitions. As stated above, we understand that DMCC's business is in compliance with all applicable laws. The U.S. Shareholder is not involved in any trading activities of any Paramount entity and is not involved in the day-to-day operations of Paramount SA or DMCC. He would simply be receiving funds from a non-Russian person as a result of being a 50% shareholder of Paramount SA.

TO: Paramount Energy & Commodities SA

FROM: Baker & Hostetler LLP

DATE: May 8, 2023

SUBJECT: U.S. Sanctions Analysis for DMCC's Dividend Distribution

The Russian Price Cap sanctions do not permit SA or any other persons from Implementing Countries to be involved in, or otherwise support or assist, DMCC's operations. It is our understanding that DMCC is not subject to the Implementing Countries' Russian Price Cap[2] and may continue to engage in its business operations under the current laws and regulations. SA has compliance policies and procedures in place for its employees and keeps its business operations separate from DMCC to comply with the Russian Price Cap.

184. That same day, Srivastava again assured Troost that SECO's inquiry was merely due to "a government disconnect" and that SECO was receiving press criticism for not acting against PECSA. He claimed SECO had told him that if PECSA wanted to avoid enforcement action, it must complete the Inversion into a U.S. company.

### D. After Uncovering Srivastava's Deceptions, Troost Rescinds the Agreements and Expels Him from the Company

185. As doubts about Srivastava mounted among PECSA personnel around this time, Taylor, on behalf of PECSA, commissioned a private investigator, Jonas Rey, to look into Srivastava's past. The investigator's report revealed a documented history of fraudulent behavior. As a result, PECSA began resisting further attempts by Srivastava to exert control, particularly in regard to the inversion. Srivastava's previous fraudulent behavior included:

- In January 2021, a California plaintiff sued Srivastava, alleging that "Gaurav and Sharon Srivastava used a convicted, drug smuggling felon to incorporate a shell corporation (Unity Resources Group, Inc.) which Gaurav and Sharon then used to lease a luxury residence." They allegedly "then stole in excess of $100,000 in wine from a locked wine cellar in the leased home . . . and caused other damages to the home."

Troost supposedly fabricated a fake-spy narrative against him.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

- In March 2019, another California plaintiff sued Gaurav and Sharon Srivastava for failing to pay over $100,000 in rent for a private residence, which they allegedly continued to live in. In February 2019, a collection agency sued Gaurav Srivastava after he had agreed to pay hospital expenses for his father and given it checks for $14,850 and $67,238, then allegedly stopped payment on the checks.
- Also in February 2019, Gaurav and Sharon Srivastava signed a settlement agreement in which they admitted that they "knowingly and intentionally made misrepresentations" to a woman to take $100,000 from her when the Srivastavas "knew that their financial condition would not allow them to pay back" the money, they "knew that their representations were false," and they "had no intention to repay [her] any portion of the amount borrowed."
- And, in February 2017, Srivastava was sued for fraud, agreeing to settle the case for $30,000, but he never paid, as is set out by the court in its judgment in *Khoudari v. Davalos*, B298628, 2020 WL 6053398 (Cal. Ct. App., filed Oct. 14, 2020).

186. Initially shocked by these discoveries, Troost finally decided he'd had enough. On May 10, 2023, his holding company, EZI, rescinded the SPA (and the Shareholder Agreement) with 1234 Holding that had given Srivastava a stake in PECSA. EZI cited "tangible evidence that it was misled into entering into the SPA due to intentional deceit and fundamental error by various parties including [Srivastava]."

187. However, the damage the Srivastava Enterprise inflicted was far from over. Eventually, Troost was sanctioned by the UK, the EU, and the Swiss, and PECSA and PDMCC by the UK because of PDMCC's lawful but politically disfavored business. Srivastava has publicly taken credit for causing this. The United States government, however, which learned in detail about Srivastava's fraud, and whose U.S. Treasury sanctioning process is unique in the higher level of evidence required to sanction a person or entity than in the UK, EU, or Switzerland, has rightfully not sanctioned any of them.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

This, despite Srivastava, Maguire, and others attempting to persuade U.S. officials to sanction them, on information and belief.

**E. The Srivastava Enterprise Continues Its Racketeering Activities After Troost Cuts Ties**

**1. Following Srivastava's Removal from PECSA, the Enterprise Launches an Extortionate Scheme Targeting Troost**

188. Following his expulsion from PECSA on May 10, 2023, Srivastava immediately texted Troost, "Are you kidding me?" What followed was a coordinated effort by Srivastava and his associates to reestablish contact, directly and indirectly, including through Troost's wife and daughter. As Srivastava had repeatedly threatened, his removal triggered a wave of "pandemonium" in Troost's personal and professional life.

189. Reese was present when Srivastava learned he had been removed from PECSA. Srivastava reacted with anger and immediately arranged a meeting in Washington, D.C. with the Turkish Ambassador to the U.S. for the next day. Srivastava, Bravard, Lascari, Berg, and Cedar West then worked together to email letters to officials in various countries, including Switzerland, the United States, Turkey, and the UAE in an attempt to freeze Paramount's assets on the false pretext that Troost had stolen $47 million from Paramount relating to a Turkish terminal and then shut Srivastava out of the companies so Troost could take all the assets. The truth, as Defendants well knew, was that Plaintiffs removed Srivastava after discovering that he had been defrauding them since he was introduced to Troost in May 2022, a fraud through which Srivastava successfully stole tens of millions of dollars. Defendants omitted these material facts which rendered their correspondence to public officials fundamentally false.[33]

[33] And, as noted above in ¶12 n.6, the Dubai Chief Prosecutor's investigation found that their accusations were based on doctored evidence. Srivastava later claimed that he also complained in the same correspondence about the Russian-origin oil marketing he supposedly had just discovered to these officials. But that is completely false; the various letters not only fail to complain about PDMCC's business, they inform the officials that the business was legal.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

KARLIN & PEEBLES, LLP
ATTORNEYS AT LAW

May 10, 2023

Yousef Al Otaiba
Ambassador
Embassy of the United Arab Emirates
Email: Alotaiba@UAEembassy-USA.org.

Re: Termination of Representation
Regarding International Tax Advice

Your Excellency,

My name is Thomas Giordano-Lascari, and I am contacting you in my capacity as manager of Cedar West Ventures, LLC, a Delaware limited liability company ("Cedar West"). I am honored to make your acquaintance and I thank you in advance for your consideration.

KARLIN & PEEBLES, LLP
ATTORNEYS AT LAW

May 10, 2023

Dr. H. Murat Mercan
Ambassador
Embassy of Turkey
Email: murat.mercan@mfa.gov.tr

Re: Willful and Malicious Criminal Theft Scheme against a US Stakeholder in Tureky

Your Excellency,

My name is Thomas Giordano-Lascari, and I am contacting you in my capacity as manager of Cedar West Ventures, LLC, a Delaware limited liability company ("Cedar West"). I am honored to make your acquaintance and I thank you in advance for your consideration.

190. On May 11, 2023, Troost received threatening WhatsApp messages from a Colorado number, written in French, warning that the sender would disclose purportedly embarrassing personal information about Troost to Troost's family.

191. That same day, Srivastava and Reese visited the Turkish embassy in Washington, D.C. They later met the Ambassador in a nearby park, where Srivastava falsely accused Troost of working for the Russians and asked for help severing Troost's relationships with Turkish business partners. These accusations directly contradicted Srivastava's comments to the Ambassador just two days earlier, during a May 9 meeting, when he lauded Troost's operations and described himself as an American businessman who owned Paramount.

192. On information and belief, Srivastava or his associates provided Turkish officials—either at this meeting or a subsequent one—with a document containing false and

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

defamatory accusations against Troost and his family, including the fabricated claim that they were funding the Wagner Group.

193. On the evening of May 11, 2023, Srivastava again texted Troost: "We need to talk." The following day, on May 12, an Iranian number, +98 992 084 2035, sent Troost a video via WhatsApp. Troost did not open it for security reasons, and the sender later deleted it. According to Financial Times journalist Tom Wilson, "At the same time, the [same Iranian] number started to message me at the FT, offering information about Troost's operations."

194. On May 13, 2023, Srivastava again messaged Troost: "Please call me." Later that day, the Iranian number messaged Troost stating, "48 hours to wire USDT 10 million or your un-blurred confession video will go public." Hours later, Srivastava repeated, "We need to talk. Really."

195. That evening, Troost's daughter received a message from a California number identifying the sender as a Wall Street Journal reporter requesting a call about "the relationship [a Russian oligarch] has with your father, Niels?" This same number had been shared with Srivastava by Troost on March 20, 2023.

196. On May 15, 2023, the Iranian number again messaged Troost: "Looks like we're gonna do this the hard way."[34]

[34] Each of these international text messages violates Title 18, United States Code, Sections 1951

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

197. Shortly thereafter, Berg—still acting on Srivastava's instructions—emailed letters to the Swiss ambassador to the United States, copying the U.S. Ambassador to Switzerland, repeating the fabricated allegations the Enterprise had brought to the UAE and Turkish ambassadors and informing them that his client, Cedar West, had been expelled from PECSA. Notably, Berg continued to take the (correct) position that PDMCC was ***not*** subject to the G7 sanctions and reinforced that "no persons from Implementing Countries provide services to Paramount DMCC relating to Sanctioned Activity." In other words, they confirmed to authorities that neither Paramount, nor Troost, violated sanctions in any way.

198. Reese, still serving as Srivastava's de facto Chief of Staff, also wrote to the U.S. Embassy in Bern, Switzerland, seeking a meeting. He subsequently met with Special Agent Glen Moffat of the U.S. State Department Diplomatic Security Service.

**2. The Srivastava Enterprise Attempts to Seize the Remaining $26 Million of PDMCC Funds Held by Arsari**

199. From February through September 2023, Srivastava, Lascari, and Maguire repeatedly attempted to extract the remaining $26 million of PDMCC's loan proceeds held by Arsari. Srivastava and Lascari provided various fictitious pretexts to justify on paper to banks why Arsari should send Srivastava more money, including a phony consulting agreement dating to 2018 for which Lascari offered to generate `documentation (5 years after-the-fact) showing that Arsari owed Srivastava money:

and 1952(a)(3).

#2057337v1

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



200. On May 11, 2023, Lascari messaged Maria Foley of Arsari: "We need to start repayment of the remaining funds. How best to proceed?" The next day he pressed again: "Were you able to discuss? We need the first tranche first week of June as I understand was previously agreed."

201. By that time, Arsari had become increasingly cautious in its dealings with Srivastava and insisted that the $51 million loan from PDMCC be forgiven before any disbursement of funds could take place. In response, Lascari claimed that the $51 million had not originated from PDMCC. Instead, he falsely asserted that Srivastava had "performed consulting services" back in 2018 for that amount, had "agreed to lend those funds back at an interest rate of 5%," and was now in the process of preparing documentation for that supposed 2018 consulting services loan. Essentially, Lascari claimed to understand that those undocumented personal services had been worth $51

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

million, that Srivastava had loaned (without documentation) 100% of those proceeds back to Arsari, and that Srivastava was now collecting them back.

202. This explanation was implausible. If Srivastava had truly agreed to such terms in 2018 for Srivastava's "consulting services," it made no sense for his lawyer to only now be preparing the documentation—five years later. Maria Foley, who had worked with the company's principal since before 2018, responded skeptically on May 15, 2023: "First time I heard about a consulting service performed in 2018. Pls provide evidence. No such transaction booked from our side." Lascari had no evidence to provide because the justification was entirely fabricated. Foley further clarified, "What has been booked is loan between paramount and arsari for 51m dated November 26, 2022. This loan has been legalised and apostilled and reported to [the bank] as per G's request."

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

203. Per Lascari, the $26 million transfer was to be backed by a supposed personal guarantee Srivastava proposed but had no intention of honoring:

**From:** Giordano-Lascari, Thomas <tgiordano@greenbergglusker.com>
**Sent:** 29 June 2023 21:12
**To:** m[redacted]
**Subject:** RE: Cheers to New Beginnings at Greenberg Glusker
**Attachments:** Guarantee_ Arsari_Srivastavas(4865830.1).docx

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

Hi Maria,

Please see attached. Please call me to discuss once you have reviewed.

Kind regards,
Thomas

Thomas Giordano-Lascari
Attorney at Law
Biography | vCard
310.201.7530 Direct
tgiordano@greenbergglusker.com

Greenberg Glusker LLP
2049 Century Park East, Suite 2600
Los Angeles, CA 90067
GreenbergGlusker.com

INDIVIDUAL GUARANTEE

1. Parties.

This Guarantee is entered into as of the 1st day of July, 2023, by and between Arsari Capital ________, an Indonesian company ("Borrower"), and Gaurav and Sharon Srivastava, individually (collectively, "Guarantor"), with reference to the following facts:

2. Recitals.

2.1 Borrower has previously borrowed the amount of USD $51 million for the benefit of Guarantor (the "Funds"), which funds have been held by Borrower to be distributed to Guarantor at Guarantor's direction.

2.2 Borrower has sent the amount of USD $25 million from the Funds to Guarantor on or about January 5, 2023 leaving a balance of the Funds of $26 million.

The supposed personal guarantee that Lascari drafted and sent by email is a smoking gun document confessing that the $51 million Arsari borrowed from PDMCC was "for the benefit of" "Gaurav and Sharon Srivastava" and that Arsari had sent "the amount of USD $25 million from" those funds to the Srivastavas in January 2023. That $25 million had

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

been siphoned from the PDMCC-Arsari loan and laundered through Lascari's IOLTA account to purchase Srivastava's Pacific Palisades mansion.

204.    On June 9, 2023, Foley again requested proper paperwork for repayment of the actual PDMCC-Arsari loan executed on November 26, 2022.

205.    On June 26, 2023, still pressing for funds, Lascari told Foley: "It is critical we receive at least the $3 MM on July 1. As mentioned, G will provide an indemnity/guarantee while we work out assigning the other loan to a new structure." She replied, "It is also critical for us to receive acknowledgment from [PDMCC] as to reduction of loan and subsequent transfer." Lascari responded, "G is happy to acknowledge internally as we discussed." Foley was unsatisfied, responding, "Need to understand how G acknowledgment linked to P [PDMCC] acknowledgment." Lascari replied, "G will personally indemnify Arsari for the entire amount." Foley rejected this stating, "G told H [Arsari's principal] he has no asset in his name..so personal indemnity will not work."



COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



#2057337v1

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

206. On July 2 and July 3, 2023, the pressure campaign intensified. Maria Foley received escalating demands from both Lascari and Srivastava urging immediate transfer of the remaining funds. Lascari insisted: "Any later than the 5th will not work, so this must be resolved by then. G said that is the expectation." The next day, he pressed again: "H told G we would get 1.5m on the 5th. Please confirm. Do you have our wire instructions?" At the same time, Srivastava sent his own barrage of messages, pleading and applying pressure in equal measure: "we cannot wait any longer…I cannot stress enough the importance of keeping the schedule as agreed. It is really important…we really need this resolved…I am at a loss of words here, I really feel that this is not right…" Foley responded, "Gaurav, I am trying to contact Jakarta and get instructions. My hands are tied." Despite her refusal, she continued receiving texts and calls from Srivastava for months afterward.

207. On July 4, 2023, Lascari followed up yet again, this time directing Foley to transfer the funds to "Echo Grove LLC." She immediately questioned the request, responding: "who is Echo Grove and what connection with original lender, Paramount? We require an acknowledgement from Paramount that the original loan amount to Arsari was 50% repaid in Dec 2022 and any subsequent transfers to Echo Grove will also reduce the

outstanding amount owed to Paramount." Rather than address the discrepancy, Lascari replied by again falsely asserting that he had no knowledge of any loan between Paramount and Arsari.

From: Giordano-Lascari, Thomas [tgiordano@greenbergglusker.com]
To: mfoley@a

Dear Maria,

I am not aware of a Paramount/Arsari loan. You/H and G will have to sort this out as this is beyond my understanding of the transaction.

Kind regards,
Thomas

208. When Arsari continued to refuse to send the $26 million, Srivastava and Maguire tried to persuade Arsari to do so by falsely claiming that Troost was under criminal investigation for stealing $1.6 billion dollars and subject to an impending Interpol Red Notice. But, Arsari's team checked with Indonesian authorities, who confirmed there was no Red Notice on Troost. Srivastava and Maguire also falsely claimed to Arsari's principal that PDMCC had been incapacitated. They presented a letter from a UAE law firm alleging that they had filed a criminal case in Dubai and instructing Arsari that all business involving PDMCC "should exclusively originate from Giordano-Lascari." In fact, Lascari never held any position within or authority over PDMCC. And Foley learned from a UAE lawyer that there is no such thing as a company being incapacitated in the way that Srivastava and Maguire had claimed. Moreover, as the Dubai Chief Prosecutor's investigation later found, their complaint was based on doctored evidence. On information and belief, Srivastava's attorneys at respected Dubai firm, Al Tamimi & Co., ultimately withdrew from representing the Enterprise.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Bahrain • Egypt • Iraq • Jordan • Kuwait • Morocco • Oman • Qatar • Saudi Arabia • UAE

التميمي و مشاركوه
AL TAMIMI & CO.

**Private and Confidential**
**By Email**
**Mr. Brian Manuel**
Macalloharlin Mendrofa Advocates
Graha CIMB Niaga, 2nd Floor,
Jl. Jend. Sudirman Kav. 58,
RT.5/RW.3, Senayan,, Kby. Baru
Kota Jakarta Selatan, Jakarta
Daerah Khusus Ibukota Jakarta 12190
Indonesia

**In Reply Please Quote** EAT 213471

**Date** 01 September 2023

brian.manuel@mhma

We hereby highlight that all communications and instructions related to business matters should exclusively originate from Mr. Thomas Giordano-Lascari. Any acts according to instructions received from alternative individuals or entities will be regarded as providing assistance to the parties under investigation and treated accordingly.

Dear Mr. Manuel,

**Re: Criminal Investigations in the United Arab Emirates (UAE) - Mr. Niels Troost, Mr. Francois Mauron, Mr. Ishan Sharma and Others.**

We write to you in our official capacity as the legal representatives of Cedar West Ventures LLC, with Mr. Thomas Giordano-Lascari acting as the designated principal of our client. Cedar West Ventures LLC is the 50% Ultimate Beneficiary Owner (UBO) of Paramount Energy & Commodities DMCC. We wish to formally notify you of recent developments in ongoing criminal investigations in the United Arab Emirates (UAE) pertaining to criminal charges against Mr. Niels Troost, Mr. Francois Mauron, and several other individuals. As a result of these investigations, significant legal actions have been taken,

209. Undeterred, Srivastava and Maguire continued pressing for the money. On September 26, 2023, Lascari circulated a draft novation agreement purporting to transfer the entire $51 million loan from Arsari to Cedar West, a company he operated but which was controlled by Srivastava. In parallel, a side letter to the novation agreement sought to secure the immediate transfer of the remaining $26 million to Cedar West, structured as monthly "installments" of $2 million —an attempt to create a fictional repayment structure that would mask the fraudulent diversion of funds.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

SIDE LETTER TO NOVATION AGREEMENT

This Side Letter to Novation Agreement ("Letter") is entered into as of [insert date], 2023, between PT ARSARI PRADANA UTAMA, a company duly organized and existing under the laws of the Republic of Indonesia and situated at MidPlaza 2, Level 6, Jl Jend Sudirman Kav 10-11, Jakarta 10220 Indonesia ("Borrower") and [insert name], a company duly organized and existing under the laws of [insert jurisdiction] ("New Borrower") with respect to that certain Novation Agreement (the "Agreement") also dated as of [insert date], 2023 entered into between Borrower and New Borrower concerning Paramount Loan Agreement. Capitalized terms not defined in this Letter shall have the meanings ascribed to them in the Agreement.

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are acknowledged, Borrower and New Borrower agree that, notwithstanding anything to the contrary in the Agreement, the following shall apply:

1. Payment Schedule. Borrower agrees to transfer the Loan Amount to New Borrower pursuant to the payment schedule set forth hereto as Exhibit A, which amounts to USD twenty-six million United States Dollars. New Borrower agrees to treat an unrelated transfer of USD twenty-five million United States Dollars Borrower made to Birdsong Central LLC in December 2022 as a credit against the remaining Loan Amount and in full satisfaction of its obligations under the Agreement.

**EXHIBIT A**

**Payment Schedule**

| | |
|---|---|
| 30 September 2023 | USD 2,000,000 |
| 31 October 2023 | USD 2,000,000 |
| 30 November 2023 | USD 2,000,000 |
| 31 December 2023 | USD 2,000,000 |
| 31 January 2024 | USD 2,000,000 |
| 29 February 2024 | USD 2,000,000 |
| 31 March 2023 | USD 2,000,000 |
| 30 April 2024 | USD 2,000,000 |
| 31 May 2024 | USD 2,000,000 |
| 30 June 2024 | USD 2,000,000 |
| 31 July 2024 | USD 2,000,000 |
| 31 August 2024 | USD 2,000,000 |
| 30 September 2024 | USD 2,000,000 |
| **TOTAL** | **USD 26,000,000** |

210. At around this same time, Srivastava and Maguire personally attempted to blackmail Arsari's principal (Hashim)—the brother of now-President Subianto—by threatening to falsely accuse him of financing terrorism if he did not transfer the funds. The threat was made in front of others and was especially alarming because it occurred during the lead-up to Indonesia's presidential election. Despite this pressure campaign, Arsari refused to transfer the remaining loan proceeds, and President Subianto ultimately won the election.

**3. The Srivastava Enterprise Organizes a Smear Campaign Against Troost in an Attempt to Conceal Its Fraud**

211. To discredit Mr. Troost so that (1) no one would believe him should he go

public to expose the Srivastava Enterprise's crimes; (2) the U.S. and other governments would sanction him, which would effectively freeze the assets they were trying to take and further discredit Troost; and (3) they could convince a government authority or a court to issue an order giving them control over all of Paramount's assets, in May 2023, the Srivastava Enterprise—using interstate and international wires—launched an aggressive and malicious smear campaign designed to destroy Troost's personal and professional reputation, which continues to this date.

212. Srivastava orchestrated and financed a deceptive media operation by paying individuals posing as journalists to publish fabricated stories about Troost. He enlisted Maguire to help manage the campaign. Together, they generated and promoted articles alleging that Troost had criminal ties to Russia, including claims that he acted as a front for a sanctioned Russian oligarch. They even fabricated criminal accusations against Troost's wife and children. Maguire told Srivastava he could have the NYPD pick up Mr. Troost's daughter for questioning.

213. One such article, on May 16, 2023, appeared on the blog, "Thyblackman.com," which "address[es] the culture and concerns of the black community." The article, entitled "President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate," contained Srivastava and Maguire's allegations. It accused Troost of being "a front for" a sanctioned Russian oligarch. It said that "you see [the oligarch's] fingerprints all over the oil deals passed through Troost's Switzerland-based" PECSA. It alleged that Troost created PDMCC "to evade these sanctions," even though PDMCC was created years before the Price Cap. The article accused Troost's wife and daughters of committing crimes. It also accused PDMCC's finance director and his executive assistant of being Troost's "mistresses." And it falsely claimed "Troost, at Putin's urging, is one of the largest clandestine funders of the Wagner Group" and that "Troost, simply put, is the ringleader of a global covert criminal enterprise."

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

214. Srivastava had arranged to pay Armstrong Williams, an American political commentator and talk show host, to place the article on Thyblackman.com, on information and belief. In late April and early May, Srivastava and Mr. Reese had employed Mr. Williams to attempt to persuade New York Times Magazine reporter, David Marchese, to interview Srivastava and publish a story about "[t]he failure of the USG to engage and leverage US companies abroad." On June 3, 2023, Mr. Marchese turned down the interview, saying "I think Gaurav is an interesting guy, with a smart perspective. The hitch on my end is that he A: has no public profile and B: works in a business and on issues that are somewhat opaque to the general reader."

**From:** David Marchese[david.marchese@nytimes.com]
**Sent:** Sat 6/3/2023 6:54:35 AM (UTC-07:00)
**To:** Jim Reese[jr@u-ww.com]
**Subject:** Re: Delay 30 minutes

Hi Jim,
I realize I forgot to reply to this email. Thank you for the further explanation. I think Gaurav is an interesting guy, with a smart perspective. The hitch on my end is that he A: has no public profile and B: works in a business and on issues that are somewhat opaque to the general reader. Which makes him a bit of a tough sell to my editors as a subject. But perhaps you could keep me in the loop moving forward and if there are any newsworthy events or projects coming, we could maybe peg an interview to one of those.

Alright, thank you for your time and my apologies for being slow to respond.

Best,
David

215. In a spreadsheet of past due expenses Mr. Reese prepared on May 26, 2023, he listed "armstrong $25,000" and "armstrong article $10,000."[35] The website for Thyblackman lists Armstrong Williams as a contributor.

[35] The document also showed amounts due to others such as Srivastava's then-lobbyist Ankit Desai, Maguire, Mary Beth Long, General Wesley Clark, former Australian SAS operator Gordon Conroy, and Greg Schultz (Biden's former campaign adviser).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

| Invoice date | Vendor | cost |
|---|---|---|
| 5/20/2023 | Office insurance | $1,690 |
| 3/3/2023 | Eco Green Painters | $2,710 |
| 3/9/2023 | Eco Green Painters | $9,980 |
| 3/20/2023 | Westway Electirc Systems | $26,605 |
| 5/1/2023 | Eric Pluies | $15,000 |
| 5/15/2023 | Eric Plues | |
| 5/13/2023 | Arch Angel due diligence | $5,000 |
| 4/15/2023 | John Carafella IT office | $31,000 |
| 5/1 23 | John Carafella IT office | $15,000 |
| 5/1/2023 | JR | $69,071 |
| 5/1/2023 | Hunt | $35,000 |
| 6/1/2023 | office rents | $25,000 |
| | | $236,056 |
| | | |
| | armstrong article | $10,000 |
| | armstrong | $25,000 |
| | Ankit | $15,000 |
| | Greg | $15,000 |
| | Mcguire | $15,000 |
| | Mary beth | $20,000 |
| | Gen Clark | $136,000 |
| | Gordon Conroy | |

216. Srivastava instructed Reese to email this false article to a U.S. Government official at the State Department:

**From:** Jim Reese[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f8d096a3e58042b79680099fa2175a2a-fabb4692-2c]
**Sent:** Wed 5/17/2023 12:33:13 PM (UTC)
**To:** moffatga@state.gov[moffatga@state.gov]
**Subject:** Fwd: President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate.

Glenn
Thanks for coming down and meeting us. Appreciate you passing this to the Legat.
See article below which just came out on our partner

all the Best
Jim

James Reese
Chief of Staff

Get Outlook for iOS

**Subject:** President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate.

https://thyblackman.com/2023/05/16/president-of-russia-vladimir-putins-hidden-war-niels-troost-crime-syndicate/

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

217. Srivastava also directed Berg to send a copy to Plaintiffs' Swiss counsel in an effort to intimidate Plaintiffs into entering settlement discussions:

**From:** Berg, Jeffrey[jberg@bakerlaw.com]
**Sent:** Tue 5/16/2023 9:23:33 PM (UTC+02:00)
**To:** [redacted]
**Cc:** N. Bravard[nbravard@parencom.ch]; Sferrazza, Matthew[msferrazza@bakerlaw.com]
**Subject:** RE: Paramount SA
**Attachment:** 230516 President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate-ThyBlackMan.com.pdf

Marc and Marc:

I had hoped to speak with you. We have been monitoring media ever since the Financial Times situation began a month or more ago. I just received the attached through that service and thought you should be aware of it. I would appreciate an opportunity to speak, now even more so.

Regards,

**Jeffrey P. Berg**
Partner

218. Reese, who had direct knowledge of the operation, was present for conversations in which Maguire and Srivastava discussed methods to damage Troost's reputation and drafted articles containing knowingly false allegations about Troost and his company. Reese was alarmed when Srivastava and Maguire began targeting Troost's 24-year-old daughter living in New York.

219. Maguire attempted to weaponize law enforcement by contacting individuals within the New York City Police Department, sending them photographs of Troost's daughter, and falsely claiming she was part of an international criminal network linked to Gennady Timchenko. According to Reese, Maguire told Srivastava that having the NYPD question Troost's daughter about fabricated allegations would pressure Troost into transferring money to Srivastava.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245





220. In December 2023 through at least February 2024, Srivastava, Maguire, and others also targeted Troost's New York-based daughter via interstate emails to her employer falsely claiming she was a Russian spy and urging the employer to report her to the police for the purpose of pressuring Troost and to generate a negative outcome about the Troost family that could then be publicly reported to discredit Troost and to gain litigation advantages against the Plaintiffs so the Enterprise could obtain more money from Plaintiffs.

221. For example, on December 17, 2023, ukrainewomen.mother@proton.me sent an email to Mr. Troost's daughter's boss, copying "FCPA.fraud@usdoj.gov," subject, "URGENT: RUSSIAN OLIGARCH IS [employer's] INVESTOR," stating in part: "It is quite disturbing to know that you have been funded by [Ms.] TROOST, the daughter of a wanted fugitive,/criminal . . . . I have reported all of your companies and your network to law enforcement and I would advise you sincerely "selfreport" to appropriate law enforcement agencies on your interactions with [Ms.] TROOST. From our research, she([Ms.] TROOST) is a trained Russian spy who is trying to infiltrate into America on behalf of her father NIELS TROOST & GENADY TIMCHENKO. . . . I hope you see the light and do the right thing and report [Ms.] TROOST to law enforcement. Do the right thing. God Bless." The email also linked to articles about Mr. Troost planted by Srivastava and Maguire.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

222. The same day, "ukrainewomen.mother@proton.me" sent another email to Mr. Troost's daughter's employer, copying, among others, reporters Joe Wallace (*The Wall Street Journal*) and Tom Wilson (*The Financial Times*). The subject line was "RUSSIAN CRIMINAL: DAUGHTER NIELS TROOST – [employer]," and it said, "Attached are pictures of RUSSIAN AGENTS/employees of [Ms.] TROOST & RUSSIAN OLIGARCH CRIMINAL DAUGHTER NIELS TROOST, [Ms. NAME] TROOST." The remainder of the email contained photographs of the Troost daughter and others pulled from her and others' public social media accounts.

223. On February 22, 2024, the email address "Ukraine.freedom112233@proton.me" emailed Mr. Troost's daughter's employer in New York, with the subject line, "US/UK SANCTION: [Ms. Troost] NIELS TROOST," stating in part: "How can your company pretend to care about women and children when you supporting Russian criminal financier NIELS OSCAR TROOST and his daughter [Ms.] TROOST."

224. That same day, Srivastava and his team unleashed further attacks on Troost and his family, on information and belief. Srivastava sent the following messages to Arsari's representative, Maria Foley, cutting and pasting the UK designation announcement, and attaching a particular FT article, "UK Sanctions Dutch Oil Trader Over Russia Links":

225.   Also that day, Srivastava's team, on information and belief, using the email address "Ukraine.freedom112233@proton.me" sent another email to Ms. Troost's boss, subject line, "US/UK SANCTION: [Ms.] TROOST": How can your company pretend to care about women and children when you supporting Russian criminal financier NIELS OSCAR TROOST and his daughter [Ms.] TROOST. See the Below, so you can do the right thing and cut ties to funding going to killing of innocent Ukrainian women and children. Attached is a Financial Times article that was published today about the NIELS OSCAR TROOST. PLEASE NOTE [Ms.] TROOST IS IN POSSESSION OF SANCTIONED MONEY FROM HER FATHER CRIMINAL NIELS OSCAR TROOST.

226.   It attached the same FT article and cut and pasted the same portion of the sanction designation announcement that Srivastava simultaneously sent to Maria Foley:

**Unique ID:** RUS2086 - Individual

**Regime Name:** The Russia (Sanctions) (EU Exit) Regulations 2019 **Sanctions Imposed:** Asset freeze|Travel Ban|Trust Services Sanctions **UK Statement of Reasons:** Niels Oscar TROOST is an involved person under the Russia (Sanctions) (EU Exit) Regulations 2019 based on the following grounds: (i) Niels Oscar TROOST is associated with PARAMOUNT ENERGY & COMMODITIES SA, which is or has been involved in obtaining a benefit from or supporting the Government of Russia and (ii) Niels Oscar TROOST is or has been involved in obtaining a benefit from or supporting the Government of Russia by owning or controlling directly or indirectly PARAMOUNT ENERGY & COMMODITIES DMCC.

**DOBs:** 27/11/1969
**Nationalities:** Netherlands
**Genders:** Male

**Name:** Niels Oscar TROOST **Name Type:** Primary Name

**Address:** 44A ROUTE DE SOUS-MOULIN THONEX**Address Postal Code:** 1226 **Address Country:**Switzerland
**Designation Source:** UK **Date Designated:** 22/02/2024**OFSI Group ID:** 16413

227.   Overall, the anonymous attacks against Ms. Troost, aimed at her employer, bore Srivastava's hallmarks, on information and belief: (1) they directly targeted Ms. Troost, consistent with the tactics Srivastava and Maguire discussed in front of Jim Reese; (2) they included allegations similar to those Srivastava and Mr. Maguire were perpetuating in the media; (3) they, at times, contained extra spaces around punctuation marks like Mr. Reese had observed Srivastava write and are observed in other Srivastava messages; (4) one ended "God Bless," just as Srivastava sometimes ended his communications; (5) one copied "FCPA.fraud@usdoj.gov," the same email address Lascari had contacted on Srivastava's behalf on June 14, 2023[36]; and (6) the last one was sent out in tandem with and was identical

---

[36] The DOJ acknowledged receipt on July 10, 2023, and Srivastava sent it to Maria Foley. This is an unusual use of the DOJ email public tipline for reporting violations of the Foreign Corrupt Practices Act. The FCPA generally does not apply to Troost as a non-U.S. person. Also, reporting to the DOJ tipline is not often effective in starting a criminal investigation. Their tactic appears to



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

in all material respects to what Srivastava personally sent to Maria Foley.

228. The Srivastava Enterprise orchestrated a similar scheme targeting Troost's son. In September 2024, Srivastava, Maguire, and others caused international email communications to be sent from fake journalists, "emma.kleinish@gmail.com" and "lisa.hagenn@gmail.com" to Troost's son's university in the United Kingdom in an attempt to cause the school to expel his son for the purpose of pressuring Troost and to generate a negative outcome about the Troost family that could then be publicly reported to discredit Troost and to gain litigation advantages against the Plaintiffs so the Enterprise could obtain more money from Plaintiffs.

229. Srivastava and Maguire also planted fabricated stories in online media Intelligence Online, claiming that Srivastava had uncovered illegal Russian dealings by Troost. For example, Srivastava and Maguire planted an article on www.intelligenceonline.com on May 31, 2023,[37] that contained a number of false allegations, including that "Troost has largely gone underground"; Mr. Troost "recently cancelled a trip to New York"; Mr. Troost "secretly co-owned a California-based shell company"; "Troost's former partner provided information to law enforcement in the US and abroad about his alleged sanctions busting"; "Troost cancelled a scheduled visit to New York to attend his daughter's 17 May college graduation"; that Srivastava commissioned an audit "after he became concerned Troost was defrauding the California company"; "Troost falsely established himself as the sole owner of the California company and used its account to conduct international business"; and that an audit showed that Mr. Troost had "extensive, ongoing dealings" with a U.S.-sanctioned oligarch. Maguire, on information and belief, communicated much of the substance of these false allegations to the Intelligence Online "reporter" via international wire communications. The reporter was the same one to whom Maguire had fed negative information about fake CIA officer Matthew

---

have been to generate a return receipt from the DOJ that Srivastava could use to claim that the DOJ was investigating Troost. To date, there is no indication that Troost is the subject of a U.S. investigation.

[37] *See [FBI alerted of Russian oil trader Niels Troost's secret US business interests](#)*, Intelligence Online (May 31, 2023).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Marshall's fraud victim for Marshall.

230. In or about June 5, 2023, Srivastava and others caused Berg, who had formerly represented PECSA and PDMCC, to draft a letter to be circulated to third parties via email and text and used as a court exhibit against the Plaintiffs that falsely portrayed the events involving the Plaintiffs and Defendants, materially omitted facts about the Srivastava Enterprise's crimes against the Plaintiffs, and attached a resume of Srivastava that claimed he is "an American businessman" (false) who graduated from the University of Southern California at age 18 with a B.S. in Aeronautical Engineering (false) and joined Paramount in 2019 (false):

BakerHostetler

Baker&Hostetler LLP
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025-0509

T 310.820.8800
F 310.820.8859
www.bakerlaw.com

Jeffrey P. Berg
direct dial: 310.442.8850
jberg@bakerlaw.com

June 5, 2023

To Whom it May Concern:

Please accept this explanation pertaining to how Gaurav Srivastava[1] ("Mr. Srivastava") became business partners with Niels Troost ("Mr. Troost"). I have represented Mr. Srivastava and his multiple business interest for more than a decade. Mr. Srivastava indirectly acquired from Mr. Troost's personal holding company, EZI-Diaroc Holding SA ("EZI"), half of the issued and outstanding equity securities of Paramount Energy & Commodities SA ("Paramount SA").

As illustrated below, Mr. Troost specifically sought out and targeted Mr. Srivastava for the perceived benefit that partnering with him would bring Mr. Troost, and Mr. Troost abruptly rescinded Mr. Srivastava's interest in Paramount SA (the "Breakup") when such benefit was no longer perceived to be significant. By that time, Mr. Srivastava had already expended significant time and resources into the venture that Mr. Troost induced him to join as a 50% shareholder.

[1] See CV of Mr. Srivastava attached hereto as Exhibit 1.

Atlanta Chicago Cincinnati Cleveland Columbus
Los Angeles New York Orlando Philadelphia San Fran

# Gaurav Srivastava

100 Wilshire Boulevard, Santa Monica, CA 90401

Phn: ( 8 Email: g@unitysourcesgroup.com

## EDUCATION

University of Southern California
BS Aeronautical Engineering – 2008

## PERSONAL EXPERIENCE

Gaurav Srivastava is an American businessman and entrepreneur based out of Los Angeles, California. Mr. Srivastava comes from a multi-generational family who have been involved in various successful business ventures across the globe. Mr. Srivastava is known for being an architect of complex financial and security related challenges. His business organizations include, but are not limited to, defense security, maintenance, repair and overhaul for military/civilian aircraft, commodities trading, including oil and gas as well as agricultural commodities. Mr. Srivastava leadership guidance and strategic drive continue to sustain the steady growth of all his companies. Most recently, Mr. Srivastava was instrumental in shipping wheat and corn from the "grain corridor." This was instrumental in helping to address the food crisis caused by the war in Ukraine.

Mr. Srivastava also has a joint venture for Asia with Arsari Group and its chairman, Hashim Djojohadikusumo.

Mr. Srivastava is involved in many philanthropic endeavors through his foundation for animal conservation across Asia and Africa. He also has several education programs for education of 14,000 children across Asia and Africa.

## PRIMARY BUSINESS ACTIVITIES

PARAMOUNT

In 2019, Mr. Srivastava acquired an ownership stake and a senior management role in Paramount Energy and Commodities S.A. ("Paramount"). Paramount is a privately held commodities trading

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

231. Srivastava escalated the smear campaign by creating anonymous websites, including "sanctionnielstroost.com," which falsely portrayed Troost as a criminal, as well as his family. In doing so, on information and belief, Srivastava and others caused interstate and international emails to be exchanged with the website hosting company in Arizona and also coordinated these activities via interstate wire amongst themselves.

**4. The Srivastava Enterprise Launches a Coordinated Effort to Deflect Responsibility and Continue the Enterprise**

232. Srivastava's scheme seemingly began to unravel when reputable journalists exposed his own misconduct. On October 10, 2023, Project Brazen published an expose of the Srivastava Enterprise's crimes, titled *The Old 'I'm a Secret Spy, Pay Me' Con*.[38] Defendants Srivastava, Maguire, and others made the damaging (but factually accurate) article disappear from Internet searches by issuing a Digital Millenium Copyright Act notice under the name "Sherrie Hagen." "Hagen" claimed she published the content of the article first on Tumblr and that Project Brazen had violated her copyright by plagiarizing it. But this was false. The post by "Hagen" purporting to be the original article was created in November, *after* the Project Brazen article. On information and belief, these defendants used interstate wire communications to coordinate and to submit the false copyright claim for the purpose of avoiding detection, investigation, and prosecution, and to protect the Enterprise's reputation as they attempted to complete their fraud scheme by obtaining control over all of Paramount's assets.

233. In February 2024, the Atlantic Council severed all ties with Srivastava, despite his donations exceeding $1 million, after discovering that he had lied about properly registering his foundation as a 501(c)(3) and could not verify other basic aspects of his background.[39]

234. Democratic political figures later froze or returned Srivastava's donations,

[38] Soobin Kim and Bradley Hope, *The Old 'I'm a Spy, Pay Me' Con*, Project Brazen (Oct. 10, 2023).
[39] Caitlin Oprysko, *The China lobbying terminations continue*, Politico (Feb. 23, 2024); *see also* David Lippman, X, @dlippman (Feb. 23, 2024).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



after learning he was not credible.

235. Additional exposure followed in late 2024, when *The Wall Street Journal* published a detailed investigative article supported by messages, financial records, affidavits, and recorded calls. The article dismantled Srivastava's public persona and confirmed his fraudulent conduct. With further scrutiny pending—particularly from *The Financial Times*—Srivastava attempted to deflect blame.[40]

236. Srivastava and the Enterprise responded by hiring The Arkin Group, an investigative firm with real ex-CIA ties, and Victoria Kataoka, a former NYPD intelligence specialist, to push a false counter-narrative accusing Troost of running a disinformation campaign. This was another deliberate attempt to obscure Srivastava and the Enterprise's misconduct.

237. As *The Financial Times* prepared its exposé, Srivastava, Arkin, and their associates crafted and publicly promoted a story portraying Srivastava as a wealthy American businessman betrayed by Troost. *The Financial Times* conducted a substantial investigation. They reviewed sworn affidavits and business records, conducted multiple interviews, and listened to recordings of Srivastava himself falsely claiming CIA ties. *The Financial Times* found that Srivastava did not produce any credible witnesses or evidence to substantiate his narrative.[41]

238. Despite these findings, the enterprise continued to push its disinformation campaign through pay-to-publish outlets such as *TechBullion* and *EU Policies*.[42] These sites, which accept paid submissions, published articles portraying Srivastava as the victim of a global conspiracy led by Troost. These stories mirrored the themes Arkin and Kataoka promoted and served to amplify the false narrative.

239. Srivastava's team also created additional websites, including

[40] Joe Wallace, *A Fake Spy, Russian Oil and $1 Million Funneled to Democrats*, Wall Street Journal (Aug. 27, 2024).
[41] Tom Wilson, *Niels Troost has a staggering story to tell about how he got sanctioned*, Financial Times (Dec. 14, 2024).
[42] Luke Wright, *The Weaponization of Lies: How Gaurav Srivastava's Life Became a Battlefield*, TechBullion (Dec. 23, 2024); Editor Team, *How a Shadowy Disinformation Campaign Targeted Gaurav Srivastava*, EU Policies (Dec. 5, 2024).

"officialgauravsrivastava.com" and "gauravsrivastavascandal.com," that falsely accused Troost and his advisors of running a disinformation operation. These sites included videos featuring Kataoka and other content intended to discredit Troost.

240. The Enterprise expanded its campaign onto video and audio platforms, launching a YouTube channel and later sponsoring a podcast titled Targeted, produced by Next Chapter Podcasts in California. On information and belief, this podcast was a contrivance by Vantage and Aron Shaviv (a personal friend of the host), working with The Arkin Group. Although marketed as a show about victims of disinformation, the episodes concerning Srivastava—released in March 2025—served primarily as a promotional tool for his false narrative. These episodes incorporated scripted storylines and manufactured "digital artifacts" to lend credibility to the lies.

241. In the podcast, host Zach Abramowitz interviewed Kataoka, who repeated her earlier claims and emphasized her firm's supposed due diligence of Srivastava. She was presented as a credible investigator who had independently validated Srivastava's story. The podcast was distributed widely and accumulated more than 1.2 million views, becoming a central component of Srivastava's strategy to recast himself as a victim.[43]

242. For her part, Sharon Srivastava also spread press articles falsely claiming to be the victim of a disinformation campaign waged by Troost.[44]

[43] Podcasting Today, *Targeted Podcast hits 1.2 million listeners in three months*, (July 2, 2025).

[44] *See, e.g.*, *The Woman in the Crossfire: How Sharon Srivastava's Life Was Shattered by a Manufactured Scandal*, Canyon News (May 20, 2025), available at https://www.canyon-news.com/the-woman-in-the-crossfire-how-sharon-srivastavas-life-was-shattered-by-a-manufactured-scandal/; Chris Bates, *Sharon Srivastava and the High Cost of Online Misinformation*, BreakingAC.com (June 6, 2025), available at https://breakingac.com/news/2025/jun/06/sharon-srivastava-and-the-high-cost-of-online-misinformation/; Rana Maqsood, *Sharon Srivastava and the Human Cost of a Digital Disinformation Campaign*, The Financial (June 11, 2025), available at https://finchannel.com/sharon-srivastava-and-the-human-cost-of-a-digital-disinformation-campaign/126392/b-schools-2/2025/06/.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

243. Parallel to this media offensive, Guarav Srivastava sought to rebuild political influence. After long aligning with Democratic figures, Srivastava shifted toward Republican circles following his exposure. He appeared on conservative podcasts. He presented a speech to a conservative audience at a political convention in Las Vegas. And, in June 2025, he even posted a photograph with Vice President J.D. Vance, claiming to be working with him. Srivastava did this to regain political clout and potentially use governmental contacts to retaliate further against Troost and perpetuate the scheme. However, Srivastava still maintained his close ties with the Biden family:[45]

Hunter Biden lunched with a Democrat mega-donor accused in lawsuits of pretending to a be a CIA agent, defrauding associates and even allegedly stealing his landlord's furniture

244. This effort to restore political capital was only one facet of the Enterprise's attempt to survive exposure. Even after losing access to Troost and PECSA, the Enterprise adapted and continued its racketeering activities through new schemes built on the same false CIA persona.

**5. After Failing with Troost, Srivastava and the Enterprise Continue Running New Fraud Schemes**

245. After Troost expelled Srivastava from PECSA—cutting off the Enterprise's ability to exploit Plaintiffs for financial gain—the Srivastava Enterprise did not disband. Instead, it continued operating and, on information and belief, engaged in at least two

[45] Josh Boswell, *Desperate, broke and his meal ticket dad powerless, Hunter Biden is caught in a cozy lunch with a controversial guest…*, DailyMail.com (Mar. 30, 2025). In fact, Hunter Biden's daughter, Naomi Biden, lives in a house owned by Sharon Srivastava. *See Vance's Link to the Dems Donor Who Is a Friend of the Bidens*, The Daily Beast (Oct. 17, 2025), *available at* https://www.thedailybeast.com/did-vances-new-friend-tell-vp-hes-a-biden-landlord.

additional schemes in which Srivastava once again posed as a well-connected CIA "NOC" to pursue profit and influence.

246. As alleged above in paragraphs 150 to 151, the Enterprise targeted Murtaza Lakhani, a well-known and prolific Russian oil dealer in late May 2023.

247. And, in or around November 2023, a person who had attended the Dubai meeting with the National Security Advisor for Iraq received a phone call from Srivastava. During the call, Srivastava discussed the falling-out with Plaintiffs and proposed additional business opportunities. Srivastava explained what allegedly happens "when he is crossed." He claimed that Paramount had been sanctioned and effectively shuttered, that Troost's phone was being monitored, and that INTERPOL would soon issue a Red Notice for Troost. Srivastava then underscored the point with a threat he had previously made to Troost: "If you come at the king, you best not miss." Srivastava said he had warned Troost that if Troost "puts a sword" to him, he should make sure Srivastava was dead and not merely hurt.

248. Srivastava asked whether the National Security Advisor for Iraq they had met in Dubai had followed up with him about the supposed terrorists. When he said no, Srivastava abruptly shifted topics, asking whether he could connect him with a source who would sell high-sulfur diesel for cash out of the Ceyhan port in Turkey.

249. The next day, Srivastava called again. He said that because Troost had "turned against" him, the U.S. government—specifically the U.S. Treasury Department—was now scrutinizing PECSA and its oil-trading activities. He also claimed he was engaged in various unspecified "government things" in a Middle Eastern country in which the U.S. government purportedly had business interests.

250. After Srivastava's calls, Maguire contacted the person. Maguire asked him to reconnect Maguire and Srivastava with the Iraqi National Security Advisor, claiming they wished to discuss expanding oil operations in Iraq through a new company allegedly registered in both Geneva and California. Maguire also represented that he was working on this project with the "Deputy Director of the CIA."

251. Maguire used the call to disparage Troost, alleging falsely that Troost had

"stolen all of Plaintiffs' money," that the UAE government had frozen Troost's funds and would transfer them to Srivastava to support the new company, and that Troost was a fugitive on sanctions lists and being pursued by multiple countries.

252. On information and belief, Srivastava traveled to Iraq as part of this scheme in November 2023, January 2024, June 2024, and October 2024.

253. Also in or about November 2023, months after Srivastava was expelled from Paramount, Srivastava and Bravard attempted to defraud a new victim—the majority owner of Swiss Bank. The intended victim's bank, at that time, had been subject to U.S. sanctions because of its past as the Swiss subsidiary of a Russian Bank, even though the takeover of the Swiss Bank had been approved in advance by Swiss and U.S. authorities. Bravard contacted the banker in Switzerland and falsely represented that he and Srivastava could convince OFAC to remove the Swiss Bank from the U.S. sanctions list in exchange for a 10% ownership stake in the bank. On information and belief, Srivastava and Bravard coordinated this scheme through international wire communications, with Srivastava in the U.S. and Bravard in Switzerland, and elsewhere.

254. In August 2025, Srivastava spoke at the America First-Ground Zero conference in Las Vegas, Nevada, introduced by famous conservative podcaster Laura Logan. The speech is available here. He introduced himself as "an energy investor from California"; his official website claims his speech "addressed the urgent need for America to defend its strategic and economic interests both at home and abroad. From the power of oil as an intelligence tool to the corrosive influence of entrenched networks in Washington, he outlined how policy sabotage weakens US security and prosperity, and called for unity in safeguarding America's leadership on the world stage." Through his prominent appearance at the conference, as well as recent efforts to infiltrate those close to the current administration, Srivastava was continuing his Enterprise, attempting to fortify its reputation, and trying to meet and impress wealthy potential new victims.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**FIRST CAUSE OF ACTION**

**Violation of RICO, 18 U.S.C. § 1962(c)**

**(Against All Defendants)**

255. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 254 in this Complaint as if fully set forth at length herein.

256. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

257. At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3), being capable of holding "a legal or beneficial interest in property."

258. The Srivastava Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Defendants did not operate as isolated or independent actors; they acted as coordinated and interdependent participants in a single, ongoing criminal organization with a common illicit purpose. That purpose was designed to con and extort individuals and legitimate businesses—including and principally Plaintiffs—out of tens of millions of dollars, and to launder the proceeds to conceal their source and to promote the criminal schemes.

259. The Enterprise executed its fraud by misrepresenting its connections, relationships, and access to U.S. government officials; falsely claiming that certain key members—particularly Srivastava—were deep-cover "non-official cover" CIA operatives or worked for the FBI or other intelligence agencies; and fabricating a covert "Program" that Srivastava allegedly ran and that Defendants falsely claimed would ensure U.S. government protection, prevent sanctions, and provide privileged access to high-level officials. These misrepresentations were designed to gain the trust of unwary victims, including Plaintiffs, and to coerce them into entrusting Defendants with corporate control and tens of millions of dollars, which Defendants then stole. To cover their tracks and maintain leverage over victims, the Enterprise laundered its ill-gotten gains and engaged in

campaigns of intimidation, defamation, and extortion, all to conceal the scheme, silence exposure, and sustain its ongoing criminal operations.

260. At all relevant times, the Srivastava Enterprise engaged in, and its activities affected, interstate and foreign commerce. These activities were carried out through coordinated use of interstate and international electronic communications, financial institutions, law firm trust accounts, and a network of corporate vehicles designed to obscure beneficial ownership, fabricate legitimacy, and facilitate the movement of illicit proceeds.

261. At the center of the Enterprise was Gaurav Srivastava, who posed as a clandestine "non-official cover" CIA operative and repeatedly claimed privileged access to senior U.S. officials, law-enforcement authorities, and regulators. Other Defendants and Enterprise associates knowingly propagated, reinforced, and legitimized this false narrative; executed corporate and financial maneuvers to obtain, divert, or seize Plaintiffs' property; and defended the scheme through intimidation, defamation, misdirection, and obstruction.

262. Defendants Cedar West, Unity Resources Group, Orbimo, Unicom Worldwide, 1234 Holding, Birdsong, Aurora Point, and the Foundation were incorporated, controlled, used, or manipulated by members of the Enterprise to hold, move, and launder illicit proceeds; to mask ownership and the flow of funds; and to create the false appearance of legitimate business activity.

263. The Enterprise possessed an ascertainable structure and functioned continuously over a multi-year period. Srivastava devised strategy, directed operations, and served as the public face of the fraudulent intelligence narrative. Defendant Bravard acted as a proxy and shareholding front in Switzerland, helping to secure and disguise control of companies targeted by the Enterprise.

264. Defendants Onouye and Lascari—both attorneys—formed companies for the Enterprise, drafted sham agreements, and opened and managed bank accounts through which the Enterprise received, transferred, and dispersed the illicit proceeds in order to conceal the schemes and promote their activities.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

265. Defendant Maguire was deployed as a purported intelligence and national-security expert to lend credibility to the narrative, to communicate with foreign officials, and to reinforce the deception that the Enterprise was operating under U.S. government authority.

266. Defendant Global Energy Law Group and various law-firm trust (IOLTA) accounts were used to receive and transfer funds and transfer funds in a way that created the appearance of legitimate legal activity and concealed the unlawful nature and destination of the money.

267. Other members of the Enterprise performed operational tasks such as managing internal communications, sending documents, coordinating with foreign intermediaries, "vetting" potential victims; initiating wire transfers; and maintaining ongoing interstate and international communications via email, secure messaging platforms, and phone or video calls.

268. At all relevant times, the Srivastava Enterprise: (a) functioned as a continuing unit with an ascertainable structure separate and distinct from the individual predicate acts; (b) shared a common purpose of executing and expanding the fraudulent and extortionate scheme to obtain millions of dollars from victims; (c) maintained systematic linkages among members through interpersonal and contractual relationships, financial ties, shared communications, and ongoing coordination; and (d) possessed sufficient longevity to permit the Enterprise to pursue, adapt, and continue its unlawful objectives.

269. The Enterprise existed and operated with longevity independent of any single transaction. Its formation predated its approach to Plaintiffs, and its activities continued long after Plaintiffs terminated their contractual relationship with the Enterprise. Even after the fraud was exposed, Enterprise members shifted to new victims, continued efforts to extract funds from individuals and entities associated with the original schemes, and persisted in using the same fabricated intelligence narrative, the same methods of moving and hiding funds, and the same tactics for spreading false and misleading information.

270. The Srivastava Enterprise is distinct from the pattern of racketeering activity

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

described herein. Its existence is demonstrated by its recruitment, coordination, oversight, and deployment of numerous individuals who performed ongoing administrative, financial, and professional tasks beyond the individual predicate acts of wire fraud, extortion, and money laundering—including creating and maintaining business records, negotiating and executing agreements, managing corporate structures, and handling the bookkeeping and accounting necessary to receive, distribute, and disguise the proceeds of the fraudulent scheme.

271. The Enterprise engaged in a pattern of racketeering activity comprised of repeated violations of federal wire fraud, extortion, Travel Act, and money laundering statutes, including 18 U.S.C. §§ 1343, 1951, 1952, 1956, and 1957. These predicate acts—which began no later than 2019 and have occurred continuously and systematically to the present day—included, but were not limited to:

- manufacturing and disseminating false claims of CIA affiliation, OFAC authorization, and U.S. government backing to induce victims to enter into relationships with Srivastava for monetary gain and to induce Plaintiffs to restructure their companies and cede control of corporate assets;
- fraudulently obtaining a 50% stake in PECSA and positioning Srivastava-controlled entities to seize the remainder of Plaintiffs' business operations;
- directing multi-million-dollar transfers under sham "legal services," fabricating "Program operations," and falsifying consulting arrangements;
- diverting and laundering proceeds through law-firm trust accounts, U.S. and foreign shell entities, and real-estate acquisitions—including the purchase of a $25 million Los Angeles mansion using proceeds of the scheme;
- engineering cross-border loan and note structures to access Plaintiffs' liquid funds;
- deploying political donations, staged public-relations events, and promotional appearances to lend credibility to the fabricated intelligence persona; and
- conducting disinformation, smear campaigns, intimidation, and threats—

including threats directed at Plaintiffs' children—to preserve leverage, suppress exposure, obstruct investigations, and coerce continued payments.

These acts were related in purpose, participants, method, victims, and results, and they pose a continuing threat of ongoing criminal activity.

272. Defendants aided and abetted others in the violations of the above federal laws, rendering them indictable as principals in the 18 U.S.C. §§ 1343, 1951, 1952, 1956 and 1957 offenses.

273. Each Defendant participated, directly or indirectly, in the conduct of the Enterprise's affairs, shared in its illicit proceeds, and knowingly furthered the scheme by incorporating and managing shell entities; drafting, circulating, and executing sham instruments; opening and controlling bank and trust accounts; initiating, approving, or processing wire transfers; misrepresenting government positions and intelligence "Programs"; organizing political and public-relations fronts; and disseminating false narratives, threats, and defamatory materials.

274. Defendants knew their actions would cause harm to Plaintiffs. Nevertheless, they knowingly participated in the Enterprise and engaged in schemes of deception that utilized the internet and wire transfers as part of their fraud, extortion, and money laundering activities in order to steal funds from Plaintiffs by means of false pretenses, misrepresentations and omissions, and extortion.

275. As a direct and proximate result of the Enterprise's conduct, Plaintiffs suffered substantial damages, including loss of funds, coerced transfers of corporate control, regulatory exposure, reputational harm, impairment of business operations, and significant investigation and remediation costs.

276. By reason of their injury, Plaintiffs are entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**SECOND CAUSE OF ACTION**

**Violation of RICO, 18 U.S.C. § 1962(d)**

**(Against All Defendants)**

277. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 276 contained in this Complaint as if fully set forth at length herein.

278. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

279. The Srivastava Enterprise is an enterprise engaged in and whose activities affect interstate commerce for the purpose of stealing and defrauding funds from Plaintiffs.

280. Defendants are employed by and/or associated with the Srivastava Enterprise, as applicable.

281. The Defendants and the Srivastava Enterprise have knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Srivastava Enterprise's affairs, as applicable, through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud, extortion, Travel Act, and money laundering statutes in violation of 18 U.S.C. §§ 1343, 1951, 1952, 1956, and 1957.

282. Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to steal funds from Plaintiffs) by: (1) misrepresenting their connections, relationships, and access to U.S. government officials and national security leaders; (2) falsely representing that Srivastava was a deep-cover "non-official cover" operative for the CIA; (3) fabricating a covert "Program" purportedly run by Srivastava that would supposedly ensure that Defendants would be protected by the U.S. government; and (4) falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government, all for the purpose of gaining the trust of their victims and coercing them to entrust Defendants with their assets, which Defendants ultimately stole.

283. The Srivastava Enterprise's fraudulent conduct and participation in the racketeering activity described herein has directly and proximately caused Plaintiffs several

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



millions of dollars in damages.

284. By reason of their injury, Plaintiffs are entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**

**Fraudulent Misrepresentation**

**(Against All Defendants)**

285. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 284 contained in this Complaint as if fully set forth at length herein.

286. Defendants knowingly and willfully executed the schemes described herein with the intent to defraud Plaintiffs by, among other things: (1) misrepresenting their connections, relationships, and access to U.S. government officials and national security leaders; (2) falsely representing that Srivastava was a deep-cover "non-official cover" operative for the CIA; (3) fabricating a covert "Program" purportedly run by Srivastava that would supposedly ensure that Defendants would be protected by the U.S. government; and (4) falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government.

287. Defendants' representations were false.

288. Defendants made these false representations with full knowledge of their falsity.

289. Defendants made these false representations with the intent that Plaintiffs rely on them. More specifically, Defendants made these false representations for the purpose of gaining Plaintiffs' trust and coercing them to entrust Defendants with their assets, which Defendants ultimately stole.

290. Plaintiffs reasonably, foreseeably, and justifiably relied on Defendants' misrepresentations.

291. As a direct and proximate result of these misrepresentations by the Defendants, Plaintiffs have suffered substantial damages.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



292. Defendants, and each of them, knowingly and willfully conspired and entered into an agreement among themselves to engage in this fraud, and in furtherance of that agreement, engaged in each of the acts alleged herein.

293. Furthermore, on information and belief, this conspiracy remains ongoing as Defendants continue to attempt to conceal their fraud through defamatory and extortionate acts.

294. As set forth in detail above, Defendants acted maliciously, fraudulently, and oppressively within the meaning of those terms as set forth in California Civil Code Section 3294, and as such, Plaintiffs are entitled to recover punitive damages from Defendants.

**FOURTH CAUSE OF ACTION**

**Conversion**

**(Against All Defendants)**

295. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 294 contained in this Complaint as if fully set forth at length herein.

296. Plaintiffs owned and had the right to possess its assets, including the funds they obtained through their legitimate business activities.

297. Defendants substantially interfered with Plaintiffs' property by knowingly or intentionally taking possession of Plaintiffs' funds.

298. Defendants took possession of Plaintiffs' funds by (1) misrepresenting their connections, relationships, and access to U.S. government officials and national security leaders; (2) falsely representing that Srivastava was a deep-cover "non-official cover" operative for the CIA; (3) fabricating a covert "Program" purportedly run by Srivastava that would supposedly ensure that Defendants would be protected by the U.S. government; and (4) falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government, all for the purpose of gaining Plaintiffs' trust and coercing them to entrust Defendants with their assets, which Defendants ultimately stole. Although Plaintiffs voluntarily transferred funds to Defendants, Plaintiffs were defrauded and coerced into doing so, and thus Defendants did not obtain consent.



299. As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered substantial damages.

300. Defendants, and each of them, knowingly and willfully conspired and entered into an agreement among themselves to engage in this conversion, and in furtherance of that agreement, engaged in each of the acts alleged herein.

301. Furthermore, on information and belief, this conspiracy remains ongoing as Defendants continue to attempt to conceal their conversion and publicly promote the image of Srivastava through defamatory and extortionate acts, and fraudulent conveyances.

302. As set forth in detail above, Defendants acted maliciously, fraudulently, and oppressively within the meaning of those terms as set forth in California Civil Code Section 3294, and as such, Plaintiffs are entitled to recover punitive damages from Defendants.

**FIFTH CAUSE OF ACTION**

**Violation of Cal. Bus. & Prof. Code § 17200 et seq.**

**(Against All Defendants)**

303. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 302 contained in this Complaint as if fully set forth at length herein.

304. Defendants engaged in unlawful, unfair, and fraudulent business acts or practices by misrepresenting information to Plaintiffs, including by (1) misrepresenting their connections, relationships, and access to U.S. government officials and national security leaders; (2) falsely representing that Srivastava was a deep-cover "non-official cover" operative for the CIA; (3) fabricating a covert "Program" purportedly run by Srivastava that would supposedly ensure that Defendants would be protected by the U.S. government; and (4) falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government, all for the purpose of gaining Plaintiffs' trust and coercing them to entrust Defendants with their assets, which Defendants ultimately stole.

305. The actions of Defendants violated 18 U.S.C. § 1962 et seq. and 18 U.S.C. § 1343 et seq.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



306. As a result of these unlawful, unfair, and fraudulent practices, Plaintiffs have suffered substantial harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Award compensatory, punitive, and treble damages;

b. Order the return of funds wrongfully obtained by Defendants;

c. Award costs, attorney's fees, and interest;

d. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: January 21, 2026

ROSEN ✧ SABA, LLP

By: ______________________________

RYAN D. SABA, ESQ.
ALLISON OWENS, ESQ.
Attorneys for Plaintiffs

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245