ROSEN ✧ SABA, LLP
RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY ST. MARTIN, ESQ. (State Bar No. 260966)
lstmartin@rosensaba.com
ALLISON OWENS, ESQ. (State Bar No. 347908)
aowens@rosensaba.com
2310 Rosecrans Ave, Suite 3180
El Segundo, CA 90245
Telephone:   (310) 285-1727

JASON A. MASIMORE, ESQ. (*pro hac vice*)
jason.masimore@brodbeckslaw.com
BRODBECKS LAW, PLLC
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (347) 804-1093
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

NIELS TROOST; PARAMOUNT ENERGY & COMMODITIES SA, in liquidation; PARAMOUNT ENERGY AND COMMODITIES DMCC; PARAMOUNT ENERGY & COMMODITIES, INC.; and EZI-DIAROC HOLDING SA,

Plaintiffs,

vs.

GAURAV SRIVASTAVA a/k/a "G"; SHARON SRIVASTAVA; NICOLAS BRAVARD; CEDAR WEST VENTURES, LLC; UNITY RESOURCES GROUP, INC.; ORBIMO CORPORATION; UNICOM WORLDWIDE, INC.; 1234 HOLDING SA; BIRDSONG CENTRAL LLC; AURORA POINT LLC; THE GAURAV SRIVASTAVA FOUNDATION f/k/a The Gaurav and Sharon Srivastava Family Foundation; GLOBAL ENERGY LAW GROUP PC; OWEN ONOUYE; THOMAS GIORDANO-LASCARI; and JOHN MAGUIRE,

Defendants.

Case No.: 2:26-cv-00631-AH-MAR
*Hon.  Judge Anne Hwang*
*Courtroom 9C*

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

1

FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................... 1

II.   THE SRIVASTAVA ENTERPRISE ........................................................ 15

III.  THE PARTIES ........................................................................................ 25
      A.   PLAINTIFFS ................................................................................. 25
      B.   DEFENDANTS .............................................................................. 26

IV.   JURISDICTION AND VENUE ............................................................ 33

V.    FACTUAL ALLEGATIONS ................................................................ 34
      A.   THE ORIGINS OF SRIVASTAVA'S FAKE CIA PLAYBOOK ...................... 34
           1.   HABIB KAGIMU AND AFRICA ................................................. 34
           2.   THE UNITED KINGDOM ........................................................ 38
           3.   SOUTHEAST ASIA ................................................................. 46
      B.   THE TROOST CON BEGINS: SRIVASTAVA FALSELY CLAIMS TO WORK FOR THE CIA AND THAT HE CAN USE HIS INFLUENCE TO HELP TROOST ........................ 54
           1.   The Fake FBI Investigation and the "Vetting" of Troost for the "Program" ... 54
           2.   The Country-1 Interrogations ................................................. 62
           3.   Troost is "Accepted" into the Program ..................................... 66
           4.   Srivastava's Fraudulent Efforts to Obtain Liberian Oil and Mineral Concessions ......................................................... 68
           5.   Srivastava Uses Stolen Funds to Buy Political Access to Create the Illusion of U.S. Government Support ......................... 70
      C.   THE FAKE PROGRAM'S ACTUAL GOAL: CONTROL OVER PARAMOUNT AND TROOST'S ASSETS ............................................................... 73
           1.   The Srivastava Enterprise Fraudulently Obtains Beneficial Ownership of 50% of PECSA .................................... 74
           2.   The Srivastava Enterprise Fraudulently Siphons Tens of Millions of Dollars from Troost's Businesses ........................... 80
           2.   Srivastava Uses Paramount Inc. Funds to Hire a Personal Chief of Staff ...... 103
           3.   The Srivastava Enterprise Continues to Gather Political Clout ..................... 106
           4.   The Srivastava Enterprise Attempts to Gain 100% Control of Paramount Through the "Inversion" ...................................... 111
      D.   AFTER UNCOVERING SRIVASTAVA'S DECEPTIONS, TROOST RESCINDS THE AGREEMENTS AND EXPELS HIM FROM THE COMPANY ........................ 131
      E.   THE SRIVASTAVA ENTERPRISE CONTINUES ITS RACKETEERING ACTIVITIES AFTER TROOST CUTS TIES ........................................................... 133
           1.   Following Srivastava's Removal from PECSA, the Enterprise Launches an Extortionate Scheme Targeting Troost ...................... 133
           2.   The Srivastava Enterprise Attempts to Seize the Remaining $26 Million of PDMCC Funds Held by the International Company ...... 136
           3.   The Srivastava Enterprise Organizes a Smear Campaign Against Troost in an Attempt to Conceal Its Fraud ............................ 143
           4.   The Srivastava Enterprise Launches a Coordinated Effort to Deflect Responsibility and Continue the Enterprise ......................... 151
           5.   After Failing with Troost, Srivastava and the Enterprise Continue Running New Fraud Schemes ...................................... 154

FIRST CAUSE OF ACTION ......................................................................... 157

SECOND CAUSE OF ACTION ..................................................................... 183

THIRD CAUSE OF ACTION ......................................................................... 184

FOURTH CAUSE OF ACTION ..................................................................... 186

FIFTH CAUSE OF ACTION .......................................................................... 187

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT



**PRAYER FOR RELIEF** ..................................................................................... 189

**JURY DEMAND**............................................................................................... 189

Plaintiffs Niels Troost ("**Troost**"), Paramount Energy & Commodities SA, in liquidation ("**PECSA**"), Paramount Energy and Commodities DMCC ("**PDMCC**"), Paramount Energy & Commodities, Inc. ("**Paramount Inc.**" and together with PECSA and PDMCC, "**Paramount**"), and EZI-Diaroc Holding SA ("**EZI**"), by undersigned counsel, hereby allege against Defendants Gaurav Srivastava, aka "G," Sharon Srivastava, Nicolas Bravard, Cedar West Ventures, LLC, Unity Resources Group Inc., Orbimo Corporation, Unicom Worldwide, Inc., 1234 Holding SA, Birdsong Central, LLC, Aurora Point LLC, The Gaurav Srivastava Foundation, formerly known as The Gaurav and Sharon Srivastava Family Foundation, Global Energy Law Group PC, Owen Onouye, Thomas Giordano-Lascari, and John Maguire (collectively, the "**Defendants**" and members of the "**Srivastava Enterprise**"), upon knowledge as to themselves and their own acts and upon information and belief as to all other matters, as follows:

## I.    INTRODUCTION

1.    Since at least 2019, defendant Gaurav Srivastava ("**Srivastava**") has led a criminal enterprise that makes money through fraud. His biggest and most successful fraudulent scheme, netting tens of millions of dollars from Plaintiffs, has been posing as a spy with the U.S. Central Intelligence Agency ("**CIA**"). He claims to be carrying out clandestine missions for the U.S. Government under non-official cover ("**NOC**") through companies he controls. Using that hook, displays of apparent wealth and success, and colorful stories of missions involving him jumping out of military aircraft camouflaged as commercial cargo planes, assassinating targets, being held hostage by ISIS, and even meeting with cannibals, he perpetuates this false persona and targets individuals in distressed positions who might need U.S. Government assistance badly enough to take the bait.

2.    It was all a complete fiction. Srivastava is not a CIA operative, or an agent of any other U.S. agency, and he never has been. He is not even a U.S. citizen. He is a brazen con man of remarkable skill—a gifted mimic and charlatan who has

1

fooled sophisticated world leaders, think tanks, ex-military and intelligence officials, politicians, and the Plaintiffs alike.

3. After defrauding Troost, Plaintiffs, and others with the fake CIA fraud scheme and stealing tens of millions of dollars, Srivastava's attorneys and agents have been forced to admit that Srivastava "does not work for the CIA" and never worked for the CIA at all. Srivastava's attorneys and agents now incredibly say that Srivastava "never claimed that he worked for the CIA" to Troost or anyone else. That is laughable lie; besides that Plaintiffs have recordings where Srivastava repeatedly claimed that he worked for the CIA, many other witnesses described herein have heard Srivastava, his wife Sharon Srivastava, and other members of the Enterprise claim again and again that Srivastava was a CIA agent.

4. Srivastava made this bald faced lie believable by surrounding himself with people who appeared highly credible, including former U.S. military and intelligence officers, an ex-banker, and U.S. lawyers, who reinforced Srivastava's carefully curated false persona. Some of these individuals were knowing and intentional members of the Srivastava Enterprise, while others, including noted and respected national security leaders like retired General Wesley Clark, the former NATO Supreme Allied Commander, were duped by Srivastava, and used to unwittingly vouch for Srivastava's supposed status as a secret CIA operative. Gaurav and Sharon Srivastava simultaneously promoted the Enterprise through their purported charitable foundation, using millions of dollars fraudulently obtained from Plaintiffs to become major benefactors to the Atlantic Council, a prestigious American think tank focused on international security, to promote their image and connections with the Intelligence Community, and to cultivate relationships with prominent world business and political leaders who could vouch for them as they sought more opportunities to profit from their scheme. They attempted to establish the "Srivastava Institute for National Security and Intelligence," which purportedly would form a "partnership with DOJ, congress, senate & CIA" to "apply non-kinetic

forms of soft power in the prosecution of a global competition for influence." Gaurav and Sharon Srivastava were also featured as keynote speakers at a food security conference with prominent world leaders during the November 2022 G20 Summit, an event they hosted with the Atlantic Council and funded with millions stolen from Plaintiffs.

5.      The scheme generated and relied on incredible access to politicians around the world, including in Africa, Southeast Asia, and the United States. In Africa, Srivastava falsely told officials with the Rapid Support Forces in Sudan (a paramilitary group that the U.S. Government alleges committed war crimes) that he was a CIA operative and could prevent the U.S. Government from sanctioning its supreme commander, Mohamed Hamdan Dagalo. For that, Srivastava was supposed to net $3 million, though he later wrote in June 2022 to General Dagalo, "With deep grief, I would like to inform you of the 3 million you have given to [one of the Enterprises' companies], only 1.2 million was ever received by us." In January 2025, the U.S. Government sanctioned General Dagalo.

6.      In Southeast Asia, Srivastava established deep contacts in 2020 with high-level officials of one country's government ("**Country-1**") by claiming that through a close relationship he had through his service with the CIA, Srivastava could cause the President to remove Country-1's high-level official from a travel ban, allowing him to travel to meet with important officials in the U.S. Government. Srivastava met with Country-1's officials alongside prominent U.S. Government officials, such as then-Acting U.S. Secretary of Defense (himself a former Special Forces colonel), and the Principal Deputy Special Presidential Envoy for Hostage Affairs with the U.S. State Department. Country-1's military rewarded Srivastava by granting letter agreements with his companies (some of which did not yet legally exist) to supply military aircraft, including 30 American Black Hawk helicopters and 36 American F-15EX fighter jets. These deals were potentially worth billions of dollars and were used to bolster his false claims that his front companies conducted

3

U.S. Government business.

7.    In the United States, the Enterprise used funds stolen from Plaintiffs to contribute at least $1.6 million to politicians. This allowed Srivastava to burnish his reputation and credibility through photo-ops with then-President Biden and then-Speaker of the House Nancy Pelosi, official videos from then-Senate Majority Leader Chuck Schumer and other high-level members of Congress, and in some cases, official letters. Srivastava claimed that his CIA work gave him high-level U.S. Government access and influence over key decision-makers, when in reality, Srivastava had secretly bought access with the money he fraudulently took from Plaintiffs.

8.    In early May 2022, Srivastava identified a new target: Plaintiff Niels Troost, a successful Dutch oil trader living in Switzerland. Troost, through his companies, had built a profitable oil marketing business, including long-term supply contracts for Russian-origin crude to Chinese refineries. After Russia invaded Ukraine in February 2022, worldwide public pressure began mounting against the Russian oil economy. It became a sensitive time for Troost's businesses.

9.    At the same time, Troost came under pressure from a previous business associate who owed Troost money. This debtor (who, himself, had claimed to be affiliated with the U.S. Intelligence Community) told Troost he would destroy him and suggested he would use his supposed media contacts to launch a public smear campaign against Troost, leveraging the rising public and political sentiment against Russian oil to falsely accuse Troost of being close with Russians connected with the Kremlin, which could potentially generate investigations targeting Troost. It was an attempted extortion that put Troost and his otherwise successful businesses into a distressed position.

10.    Troost confided in a well-connected business acquaintance, a Malaysian diplomat in Uganda, about his problem with the extortionate debtor who claimed affiliation with the U.S. Intelligence Community. The diplomat said he could connect

4

Troost with the right person to help resolve such a sensitive U.S.-based problem. The diplomat then introduced Troost to Los Angeles-based Gaurav Srivastava, known to the diplomat as "Mr. G"—a man the diplomat genuinely believed to be a U.S. intelligence operative. In fact, Srivastava had been deceiving this diplomat for years as part of his fraudulent schemes. At the time, Srivastava was using the diplomat to assist in a supposed U.S. Government operation in Sudan.

11.    After their first introduction by phone on May 9, 2022, Troost began regularly communicating with Srivastava—then in California—about his problem with the extortionate debtor. During a series of phone conversations through the end of June, Srivastava represented that he worked for the U.S. Intelligence Community and offered to help resolve the developing threat to Troost and his companies. Srivastava told Troost that he had confirmed with his U.S. Government colleagues that the FBI had compiled a lengthy report on Troost. Srivastava said that the debtor was a powerful adversary, but assured Troost that he could convince his colleagues at the top of "the Agency" to clear him. Both representations were false—there was no FBI report on Troost, and Srivastava had no colleagues in the CIA. Srivastava had never been contracted by the CIA for any purpose. In fact, Srivastava had never even met anyone, to his knowledge, who worked for the CIA.

12.    Srivastava also told Troost that he ran a clandestine CIA operation (which he referred to as the "**Program**") monitoring Russian oil flows for U.S. national security. Srivastava promised Troost that even if countries ultimately imposed sanctions restricting Russian-origin crude oil—Troost's primary business— Troost and his companies could join the Program through Srivastava and continue marketing Russian-origin crude oil in support of U.S. national interests under a confidential U.S. Government license. Under this arrangement, neither Troost nor his companies would face crippling secondary sanctions, which are political financial restrictions imposed by the Executive Branch of the U.S. Government on those engaging in lawful but politically disfavored business. But this, too, was false.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Srivastava was not managing such a Program, nor did he have any authority or influence within the U.S. Government. There was no such Program, and the U.S. Government was never going to grant Troost or his companies any license.

13.    To demonstrate Troost's good faith to the U.S. Government, resolve the threat from the extortionate debtor, and begin building the long-term intelligence partnership Srivastava had described, Srivastava told Troost he needed use the business proceeds derived from marketing Russian-origin crude oil to fund U.S. Government operations. Srivastava claimed he used a California-based law firm, Defendant Global Energy Law Group, to facilitate clandestine funding of U.S. Government operations, supposedly approved by Nancy Pelosi, then Speaker of the House of Representatives. Srivastava gave Troost the law firm's U.S. bank account information. Troost, believing Srivastava's representations and that he was supporting legitimate U.S. Government operations, arranged for $785,000 to be wired from a Singapore bank to Global Energy Law Group in California on June 21, 2022. Srivastava also directed Troost to send $12 million more to fund operations of the U.S. Department of Homeland Security and, he said, the "Executive Branch," referring to the President.

14.    But Srivastava had lied. Global Energy Law Group was not affiliated with the U.S. Government in any way. It did not fund clandestine operations for the Department of Homeland Security or the Executive Branch. It was a one-man law firm run by a lawyer who had previously served prison time for narcotics trafficking, with an attorney trust account coopted by the Srivastava Enterprise to misappropriate and launder funds.

15.    Srivastava's balance in Global Energy Law Group's account from prior frauds had dwindled to just over $10,000 by June 20, 2022. The Srivastava Enterprise immediately began misappropriating funds from its new victim. Of the initial $785,000 sent to the Global Energy Law Group IOLTA account in California, Srivastava directed Onouye to wire over $210,000 to pay the Los Angeles County

6

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Sheriff for a lien against Sharon Srivastava's house on Micheltorena Street in Los Angeles (a relic of one of their earlier frauds). Srivastava directed Onouye to send another $125,000 to one of Srivastava's companies that was part of the Enterprise, wire $10,000 to Srivastava's brother, Pankaj Srivastava, in India, and wire over $150,000 to several luxury resorts in Country-1. None of these transfers funded U.S. Government operations as Srivastava had represented; they funded the Enterprise's operations and the Srivastava family's opulent lifestyle.

16.     To celebrate reaping their first profits from Troost, Gaurav and Sharon Srivastava set off across the Pacific to Country-1 in Southeast Asia for a luxury vacation funded by fraud. This was no mere holiday; investing some of the fraud proceeds into this extravagant trip created the setting through which to extract an even larger payment from Troost, who had already demonstrated his willingness and ability to fund what he believed were U.S. Government operations.

17.     Having established what Troost reasonably understood to be a long-term intelligence partnership with the U.S. Government, Srivastava needed to maintain a plausible image of success, wealth, high-level political connections, and official U.S. Government backing. With the stage set, Srivastava invited Troost to visit him in Country-1, where he claimed to be leading special operations for the U.S. Government and preparing for the U.S. delegation ahead of the G20 Summit.

18.     Troost visited Srivastava a few times in Country-1 that summer. Srivastava took him to visit top-level officials who knew him well and with whom Srivastava claimed to have conducted clandestine operations. Over multiple days and nights, Srivastava interrogated Troost at length, repeatedly invoking "Homeland Security," "the Agency," "the Bureau," and his supposed CIA training at "the Farm," referring to the CIA training camp in Virginia. Troost, believing he was dealing with a senior U.S. Intelligence officer, disclosed details about his business, his dispute with the extortionate debtor who had also claimed to be with U.S. Intelligence, and his concerns about false allegations that he was a Russian intelligence agent.

FIRST AMENDED COMPLAINT

19.    Srivastava persuaded Troost he could partner with Srivastava to continue marketing Russian-origin oil as part of a special CIA "Program" operated by Srivastava and approved at the highest levels of the U.S. Government, and with the support of European governments. But Troost had to transfer 50% of his ownership shares in his companies to Srivastava and "his people," who would receive half of the Russian-origin oil marketing profits starting from June 1, 2022. It was all false, but extremely profitable for the Srivastava Enterprise.

20.    While Troost was meeting Srivastava in person for the first time from June 30 to July 5, 2022, Troost started making arrangements for PDMCC to send over $6 million more to fund Srivastava's U.S. Government operations via Global Energy Law Group in California. To paper the transaction, Srivastava forged and sent Troost a sham Global Energy Law Group engagement letter demanding a hefty $6,170,250 retainer. Srivastava also tried to get *another* $6 million from PECSA through another sham Global Energy Law Group engagement letter.

21.    On July 20, 2022, $6,170,250 of PDMCC's funds made their way through to Global Energy Law Group's U.S. bank account in California. A few months later, in early November 2022, Troost arranged for PDMCC to send another $6 million to fund U.S. Government operations through Global Energy Law Group, with yet another sham legal engagement agreement prepared by Srivastava. By the end of July 2022, Troost had sent Srivastava almost $7 million.

22.    On July 30, 2022, Troost transferred 50% ownership of his Paramount companies and the right to receive 50% of future profits made after June 1, 2022 from marketing Russian-origin crude oil in exchange for a token payment of 50,000 Swiss Francs (just over $50,000). Unknown to Troost at the time, the Enterprise used money he previously sent to Global Energy Law Group in California to make that payment. In other words, the Enterprise stole money from Troost and then secretly used it to "buy" half of his companies from him.

23.    Over the next months, Srivastava attempted to carry out fraud schemes

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

8

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

against Troost's contacts. For example, in September 2022, while in New York City with Troost to attend an Atlantic Council gala (which Srivastava's foundation had sponsored with $50,000 taken from Troost), Srivastava had Troost introduce him to the friend of the president of an African country. During their meeting in New York, Srivastava falsely claimed to the friend that he worked for the CIA and that the U.S. Government could help the African president win re-election. Srivastava said that he could damage the African president's political opponents by planting drugs and weapons in their homes, providing voting machines capable of manipulation, and ensuring that U.S. election observers would validate the election's results. Srivastava said the U.S. Government wanted a petroleum block and assistance locating terrorists in exchange. Srivastava then followed up on this scheme through text messages with that country's Deputy National Security Advisor in November 2022 through January 2023. But Srivastava's claims were a fiction.

24. On November 3 to 4, 2022, Troost had another $6 million sent to Global Energy Law Group in California, which he thought was funding U.S. Government operations. But a total of $13 million of cash and the prospect of 50% of ongoing profits from Russian-origin oil marketing was not enough for Srivastava. So, at the end of 2022 into early 2023, Srivastava arranged for PDMCC to send $51 million to a company owned by someone Srivastava had introduced to Troost, to be used for funding U.S. Government special operations. Instead, Srivastava immediately laundered $25 million of it through an attorney trust account in California to buy himself and Sharon Srivastava a $24.5 million Pacific Palisades mansion, paid for in cash.

25. Srivastava then took an additional $5.25 million in cash from the Bank of America account of one of Troost's companies, Plaintiff Paramount Inc., a Wyoming corporation, whose sole director and signatory on its U.S. bank account at the time, Defendant Thomas Giordano-Lascari ("**Lascari**"), was a member of the Srivastava Enterprise.



26.     In total, the Srivastava Enterprise fraudulently obtained over $43 million in cash from Plaintiffs, plus a claim to 50% of the Russian-origin crude oil marketing profits generated by Troost's companies from June 2022.

27.     On December 5, 2022, the U.S. and other countries in the West imposed a price cap of $60 per barrel on Russian-origin seaborne crude oil (the "**Price Cap**"). PDMCC specialized in marketing a high-quality type of Russian-origin crude (called "ESPO") that routinely traded over $60 per barrel. The UAE, like most countries in the world, did not adopt the Price Cap. The legal effect was that businesses based in countries that imposed the Price Cap could not lawfully trade oil above that cap. But businesses based in countries without the Price Cap (like PDMCC in the UAE) could lawfully do so. On behalf of the U.S. Treasury, then-Assistant Secretary for Economic Policy Ben Harris publicly stated on February 16, 2023, "about 75 percent of the trade of Russian seaborne oil occurs outside of the price cap. That means no Western services are involved in the transaction and, therefore, *these trades do not violate or evade sanctions*" (emphasis added).

28.     Srivastava was eager to continue earning profits from PDMCC marketing Russian-origin crude oil and, at the same time was seeking a way to gain greater control over Troost's businesses. So, in early January 2023, Srivastava proposed re-domiciling Troost's companies in the United States where the companies would be under his control and supposedly receive a license from the Office of Foreign Assets Control ("**OFAC**") of the U.S. Department of Treasury. Srivastava assured Troost that the U.S. Government wanted the businesses to continue marketing Russian-origin crude, but the U.S. Government needed the companies to restructure under a U.S. parent, called an "inversion." He also claimed to have cleared this with others, including the EU and the Swiss sanctions regulator, the State Secretariat for Economic Affairs ("**SECO**").

29.     The mechanics of the U.S. inversion were complicated. There were potential tax complications because of the multiple jurisdictions involved. And,

ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

10

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

people within Troost's companies did not understand why they would take a profitable business that was lawful precisely because it was not located in a country that adopted the Price Cap, and move it to a country that did, like the U.S. Troost and the Plaintiff companies resisted the U.S. inversion over the next weeks and months. By the end of April 2023, Srivastava was angry because the U.S. inversion had not yet been complete, and he kept pressuring Troost to sign the papers necessary to complete it. Srivastava was also getting upset because he wanted to be paid a dividend of 50% of the companies' Russian-origin oil marketing profits, which he believed would net him over $100 million, and he felt that Troost was holding that process up. In May 2023, everything changed.

30.    On May 1, 2023, PECSA received an information request from SECO, the Swiss sanctions regulator, about PDMCC's activities marketing Russian-origin oil. Troost wrote to Srivastava and others that he was "very confused," because he had understood from Srivastava that he "was speaking directly to the top person at SECO," and they had "got the all clear" to market Russian-origin crude through PDMCC. This regulatory scrutiny contradicted Srivastava's representations for months that the U.S. and other world governments wanted Troost and his companies to continue marketing Russian-origin crude oil as part of the clandestine "Program."

31.    Troost began to worry Srivastava had been defrauding him, and so during the first week of May 2023, Troost bluntly confronted him regarding whether he was truly a CIA operative and whether the "Program" was real in a series of international calls over Signal, an app for secure internet-based communications. Troost recorded the calls.[1] For hours over several days, Srivastava (in the U.S. at the time) repeatedly tried to lull Troost into ignoring mounting doubts and complete the

---

[1] Audio of the some of the calls (the "Srivastava Recordings") were filed in *Troost v. The Arkin Group DE LLC d/b/a The Arkin Group et al.*, Index No. 150236/2026 (N.Y. Sup. Ct. Jan. 6, 2026) ("*Troost v. Arkin*"), and are available at https://troostvarkincomplaint.com/; transcripts are available here, along with sworn witness statements. We incorporate by reference the Srivastava Recordings and their transcripts fully herein as if attached.

FIRST AMENDED COMPLAINT



inversion, repeating claims that he was "NOC" for the CIA, that he had top security clearances, that he was regularly in direct contact with the Director of the CIA ("**DCI**"), and that he had the ability to control politicians at the highest level of the United States Government. Srivastava's recorded lies—criminal wire fraud violations—included, but were not limited to, the following:

- "Because **I am part of a program**. **I told this to you before**, in which **there's only 30 people part of that program that has been opened and shut over the years by the American government.** It was shut off for some time. We opened it up again and we open it when we want to open it. I am part of the program so I can call anybody. I can reach out to any state, any agency, anybody. But, **it is called 'non-official cover,' 'NOC.' But you're not supposed to know all this.** You're not supposed to even be privy to this information."

- "**I have had the DCI calling me**. I have had the DO [Director of Operations] calling me. I had the CDI [sic] with the clandestine—**DCI is the head of operations. Bill Burns. He's the head of the CIA**. It's been crazy[.]"

- "I had one of the most powerful people in the United States, [Senator] Mark Warner, sit across me for basically an hour and a half, and then they've been calling me every day … **He's the Chairman of the Intelligence Committee. He's the most powerful, number four in the whole [Biden] administration**[.]"

- "I am under, **I have so many obligations where I cannot say stuff to you because of my clearances and stuff I hold**. But you have to understand this by now. The fact that I can reach all these people. I can call, it's not a joke man, call eight Senators in a day and the President in the White House and the ambassador of this country."

- "When you are an asset, you have to be able to morph into anything you want to be at any given time. And you don't want a footprint. You don't want an asset print unless you want to create an asset print, finally. I have created many different asset prints different places in the world[.]"

32.     During these calls, Srivastava also actively attempted to extort Troost, threatening that he would convince U.S. intelligence and law enforcement that Troost was a Russian spy (false) and cause him and his companies to be sanctioned if he failed to comply. In fact, Srivastava promised Troost it would be "**fucking**

Rosen ✦ Saba, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**pandemonium in your life**" if Troost did not complete the transfer of his companies giving the Enterprise total control over and access to all of Paramount's assets.

33.     These recordings document Srivastava's own words—his *lies*—and they are admissible evidence against him in this case, having been recorded in a manner consistent with applicable U.S. federal law.[2] Moreover, they are corroborated by more than a dozen victims and witnesses, many of whom have provided sworn declarations regarding Srivastava's fake CIA operative claims, and some of whom had never even met or heard of the Plaintiffs.[3]

34.     Troost ultimately expelled Srivastava from Paramount on May 10, 2023, after they discovered there was no such Program and Srivastava was a con man. PDMCC quickly stopped marketing Russian-origin crude oil.

35.     True to his word for once, Srivastava unleashed the "pandemonium" he had promised. Srivastava and his co-conspirators illegally attempted to extort Troost—including via an anonymous Signal message demanding $10 million in cryptocurrency—and, when that didn't work, targeted him and his family with a negative smear campaign on anonymous websites, in disturbing anonymous emails to his daughter's employer, and in Internet publications to discredit and destroy Troost and his entire family. The Enterprise began its public reputation onslaught against Troost, his family, and his associates immediately, with the first article appearing on May 16, 2023, falsely accusing Troost, his wife, and his daughters of funding a terrorist organization, followed by another on May 30, 2023. The Enterprise continued and escalated its public attacks on the Troost family online from there.

36.     Details of the Defendants' fraud scheme against Troost were exposed in major press reports published in October 2023, August 2024, and December 2024. The Atlantic Council publicly returned money to Srivastava and publicly disavowed

---

[2] *See, e.g.*, *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003); 18 U.S.C. § 2511(2)(d).
[3] *See, e.g.*, *Troost v. Arkin*, Dkt. Nos. 1, 23-31, and 36-37.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

him. So did U.S. politicians who had received money from him.

37.     Yet, Srivastava continues to fool prominent people and troll for new victims. In June 2025, long after his fake-CIA operative frauds had been publicly exposed, Srivastava convinced the John F. Kennedy Center for the Performing Arts to accept a $10 million donation commitment from him ($2 million paid up front, most likely out of proceeds stolen from the Plaintiffs). In exchange, a prestigious reception room for dignitaries within the Kennedy Center now bears a prominent plaque with Srivastava's name on it ironically "dedicated to the U.S. intelligence community." Richard Grenell, former Acting Director of National Intelligence, and former President and Executive Director of the Kennedy Center, continues to support Srivastava (including, on information and belief, contacting U.S. law enforcement on his behalf), along with Lisa Dale, the former Senior Vice President of Development for the Kennedy Center. On information and belief, they have been working with Srivastava and others on potential projects relating to Venezuelan oil. The Srivastava Enterprise continues.

38.     This action seeks to dismantle the Srivastava Enterprise, recover the stolen money, repair the financial and reputational damage the Enterprise caused Plaintiffs, hold Srivastava and the Enterprise members accountable for stealing and extorting tens of millions of dollars from Troost and the other Plaintiffs, and make a public record of the truth so that Srivastava can never defraud anyone else.

39.     Plaintiffs bring claims against the Defendants for: (1) violations of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. § 1962(c); (2) violation of the RICO conspiracy statute, 18 U.S.C. § 1962(d); (3) fraudulent misrepresentation; (4) conversion; and (5) violations of California Business & Professional Code § 17200, et seq., Plaintiffs seek compensatory, punitive, and treble damages; return of all funds wrongfully obtained by Defendants; costs, attorney's fees, and interest; and any other and further relief as the Court deems proper.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT

## II.   THE SRIVASTAVA ENTERPRISE

40.   It takes many components working together to manufacture, maintain, and monetize a fraud scheme this bold and brazen. For years, Srivastava has used a fairly consistent system—the Srivastava Enterprise—to make his exaggerations and lies plausible and profitable. The Enterprise comprises people and entities, all associated in their common purpose to monetize opportunities with Srivastava.

The "Chairman"

41.   At the center of the Enterprise is Gaurav Srivastava, a charismatic 35-year-old exuding main character energy who posed as a clandestine "non-official cover" CIA operative and repeatedly claimed privileged access to senior U.S. officials, law-enforcement authorities, and regulators. He calls himself the "Chairman." He is the man supposedly putting his life in harms' way running secret operations for the U.S. Government. He shows people the battle scars to prove it. He is always cooking up schemes, looking for new opportunities and victims, and running the Enterprise:



42.   Srivastava helpfully summarized facets of the Enterprise in a sworn declaration he filed in November 2022 in one of the civil fraud cases brought against him by an earlier fraud victim from whom he and Sharon Srivastava took $100,000:

> My business dealings involve the exchange of confidential and secret information necessary to meet or satisfy the national

15

security needs of my clients. I meet with and have obtained the confidence of many world leaders and national dignitaries that enable me to function and work in this world because of my abilities, special information, and knowledge. … My wife and I, both as officers of our charitable foundation and in private business matters with nation states, meet with dignitaries of many nations, including President Biden and others. My wife Sharon and I met with national leaders, including President Biden and U.S. Secretary of State Anthony Blinken.

He also claimed that "in our important endeavors working alongside world leaders," they placed "trust and confidence … in me and my wife."

<u>"Mrs. Smith"</u>

43.    His now soon-to-be-ex-wife, Sharon Srivastava, worked by his side. She helped reinforce his secret agent persona by affirming his secret mission stories in front of others (one time even claiming ISIS took Srivastava hostage while on a mission); serving as corporate officer on some of their companies; directing the distribution of some of the Enterprise's fraudulent proceeds to enrich herself and her family; curating their lavish lifestyle to keep up the façade of legitimate success; name-dropping supposed connections to Japanese royalty, U.S. Presidents, and First Ladies; pretending to engage in legitimate philanthropy; and liaising with professional consultants to manage their online reputation to cover the Enterprise's tracks when their frauds started receiving damaging publicity.

44.    Sharon Srivastava profited personally from the fraud proceeds taken from Plaintiffs, including but not limited to using more than $210,000 on June 22, 2022 to pay off a lien on her house, and receiving $1,000,000 on September 12, 2022, and $100,000 on December 6, 2022, in her personal Citibank account.

45.    As one person who spent a lot of time with the couple in Los Angeles puts it, Gaurav and Sharon Srivastava present themselves as a real-life "Mr. and Mrs. Smith," referring to the film in which Brad Pitt and Angelina Jolie portrayed married secret agents:

16

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245





## Philanthropic/Non-Profit Organizations

46. The Enterprise established a purported philanthropic foundation, The Gaurav and Sharon Srivastava Family Foundation, now known as the Gaurav Srivastava Foundation, and used non-profit civic organizations to bolster Srivastava's credibility and reputation and to create a network of connections to important government officials, dignitaries, and business leaders that the Enterprise used to maintain the fraudulent pretences of legitimate wealth, identify new targets, and to conceal the source of the huge amounts of money that the Enterprise was spending, which it had fraudulently taken from Plaintiffs.

## The Companies

47. The Srivastava Enterprise included legal entities established, owned, and controlled by Srivastava that carried out the Enterprise's affairs. There were two general types: "front" companies and asset protection/concealment companies.

### *The "Front Companies"*

48. Srivastava used front companies to maintain the appearance of someone operating for the U.S. Government under commercial cover and to keep his name off of documents and assets. Unemployed during all times relevant to this Complaint, he portrayed himself as a businessman and awarded himself the title "Chairman" to increase his stature and credibility.

49. Generally, Srivastava tended to portray his front companies as part of a group contracted by the U.S. Government and other foreign governments to provide

FIRST AMENDED COMPLAINT

operational support to clandestine or military operations, aircraft, weapons, and security—sort of a private military company akin to the famous Blackwater run by Erik Prince, who Srivastava claimed was his rival. The Enterprise's main front company was called Unity Resources Group.

50. Founded in around 2000, the original Unity Resources Group was a real non-U.S.-based private military company (the "**Original Unity Resources Group**"), affiliated with Gordon Conroy, a former Australian special forces (SAS) commander. It did real work in Iraq (controversially killing civilians while running security for an embassy, as reported by PBS in October 2007). Conroy met Srivastava in the United Kingdom in late 2019. Srivastava had heard of Unity at the time. Srivastava claimed to Conroy that he was a "NOC" with the CIA. He claimed that Erik Prince, the founder of Blackwater, was his nemesis, and so Srivastava wanted to set up a security company to replace Blackwater. For a time, Conroy and Srivastava partnered together to try to carry out some military deals under Srivastava's false pretenses.

51. Srivastava then used the Unity name to set up his own companies in the United States. In 2020, the Enterprise established Defendant Unity Resources Group, Inc. ("**Unity Resources Group**"), incorporated in Wyoming with offices in California. Unity Resources Group had its own letterhead, marketing materials, and email addresses. Srivastava owned it. He used an @unityresourcesgroup.com email address and called himself "Chairman." The Enterprise used Unity Resources Group, Inc. to enter into a lease agreement for a luxury house in California that Gaurav and Sharon Srivastava lived in before they were evicted. Had anyone looked into this company after meeting Srivastava, it would have appeared to be part of the identically named private military company that had conducted related businesses for decades. Srivastava's own resume falsely claimed that he "acquired Unity Resources in 2015."

52. Unity Intelligence Group and Unity Accipiter Corporation were two more components of the Unity group of companies, which Srivastava controlled in the United States. For Unity Intelligence Group, Srivastava partnered with a person

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

18

FIRST AMENDED COMPLAINT

he claimed was an ex-CIA operative, who worked for a private intelligence firm. Sharon Srivastava was Unity Accipiter's president, treasurer and secretary. It engaged in two deals involving aircraft maintenance for the defense ministry of Country-1, but those deals collapsed before services were provided.

53.   The Enterprise had used Unity companies as supposed front companies in conducting its frauds for about at least years before Srivastava and Troost were introduced in May 2022.

54.   The Enterprise also included the U.S. front companies Defendant Orbimo Corporation ("**Orbimo**"), Zegasus Corporation, and Constentis Corporation, all of which received letters of authorization for military aircraft supply contracts in December 2020 with Country-1, after Srivastava claimed to have used his CIA colleagues to remove one of Country-1's public officials from a U.S. travel ban. The Enterprise used Orbimo to collect money from Global Energy Law Group and from Plaintiff Paramount Inc. in California. Srivastava drove a luxury SUV registered to Orbimo. The Enterprise also used Orbimo to secretly funnel $800,000 of money taken from the Plaintiffs to Vote Vets, a political action committee supporting Democratic political candidates who had served in the U.S. military.

55.   Many of these companies had no real employees—they were simply legal entities that could have U.S. bank accounts through which they could receive money. They could enter into agreements, pay others, and conduct transactions amongst themselves to hide assets. Srivastava owned some of the companies directly, others he owned through people holding them on his behalf.

56.   The Enterprise formed other legal entities as needed to carry out specific components of their schemes.

*Asset Protection Companies*

57.   The Enterprise also used companies to hold, conceal, move, and launder illicit proceeds obtained by fraud. The Enterprise also used them to hire lawyers, intelligence firms, crisis communications firms, and reputation management firms in

19

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

an attempt to hold onto fraudulent profits after the schemes unraveled and to publicize counternarratives designed to avoid criminal prosecution.

58.     The Enterprise used Defendant 1234 Holding SA ("**1234 Holding**"), a Swiss company, as a strawman for Srivastava to obtain 50% of PECSA's shares from Troost. Defendant Nicolas Bravard ("**Bravard**") owned 1234 Holding but Srivastava always was the ultimate beneficial owner.

59.     The Enterprise used Defendant Cedar West Ventures LLC ("**Cedar West**") to hold and conceal Srivastava's 50% interest in Troost's companies, which he procured by fraud, for the benefit of the Enterprise and to conceal Srivastava's connection to the assets. The Enterprise later used Cedar West to take various actions, including filing a criminal complaint in Dubai attempting to take all of Paramount's assets, the Chief Prosecutor rejected based in its findings that the Enterprise relied on doctored financial evidence. The Enterprise also used Cedar West to pay other organizations such as The Arkin Group, an investigative firm with real ex-CIA ties, to legitimize Srivastava, his false persona, and his false denials, and various law firms to help the Enterprise evade responsibility and get away with taking $43 million in cash from Plaintiffs and pursue 50% of Plaintiffs' profits.

60.     The Enterprise established and used Srivastava's company, Defendant Birdsong Central LLC ("**Birdsong**"), to buy the $24.5 million mansion in Pacific Palisades with cash stolen from PDMCC and laundered through Country-1. Later, the Enterprise transferred the mansion from Birdsong to Defendant Aurora Point LLC ("**Aurora Point**"), another company it established to conceal Srivastava's connection to assets, and had Aurora Point take out a $5 million mortgage on the mansion to strip out fraudulently obtained cash.

61.     The Enterprise used Defendant Unicom Worldwide, Inc. ("**Unicom**"), a Delaware corporation formed by Lascari on February 28, 2023, as the intended U.S. parent company through which the Enterprise planned to gain total control over all of Paramount's assets via the U.S. "Inversion." Unicom was beneficially owned by

20

Srivastava and was to serve as the corporate vehicle through which the Enterprise would redomicile Plaintiffs' businesses under Srivastava's exclusive control within the United States.

The Law Firms and Lawyers

62.     The Enterprise could not have successfully carried out its scheme without collaborating with lawyers, who served several functions for the Enterprise.

63.     First, the Enterprise associated itself with major law firms to project credibility and the appearance that its operations were legitimate and approved by the U.S. Government. Businesspersons who might be targets for the Enterprise understand that major law firms conduct KYC (know-your-client) and due diligence on clients prior to taking on engagements. It was important for Srivastava that he be represented by reputable firms so that people believed he was carrying out clandestine work for the U.S. Government and disbelieved any reports that he was a con man.

64.     For example, Law Firm-1 is a major U.S. law firm with over 1,000 lawyers across 18 offices in the U.S. It is well respected and well known for employing former U.S. Government lawyers. Srivastava used Law Firm-1 to advise the Enterprise on various international issues. He also claimed to Troost that Law Firm-1 was closely affiliated with the U.S. Government and that its lawyers helped carry out covert operations on behalf of the U.S. Government. Srivastava caused Plaintiffs to hire Law Firm-1, which also was assisting the Srivastava Enterprise, to re-structure Troost's companies as part of the so-called U.S. "inversion."

65.     Second, the Enterprise needed lawyers willing to allow the Enterprise to use their attorney trust accounts (commonly called IOLTA, or interest on lawyers' trust accounts) as conduits through which the Enterprise could receive, misappropriate and distribute fraud proceeds undetected. Attorney trust accounts were particularly useful to the scheme, because they gave the Enterprise a credible place to receive funds from defrauded victims, permitted misappropriation of the

21

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



funds from the victims therefrom, and could be used for money laundering. The trust accounts concealed the origin of the proceeds obtained from the fraud scheme and allowed the funds to be used to further promote the scheme.

66.    In around late 2019, the Enterprise coopted Defendant Global Energy Law Group, operated in California by Defendant Owen Onouye ("**Onouye**").

67.    Srivastava met Onouye before the COVID pandemic. Srivastava said he owned Unity Resources Group and, through it, worked with the CIA under what he called "commercial" cover. According to Srivastava, a professor at University of Southern California had recognized Srivastava's talent and referred him to the CIA. After that, he trained at "The Farm," which was the CIA's training facility. Srivastava told Onouye about a mission he carried out in the Middle East or Libya where he was inserted directly into a war zone to meet with a target, which Srivastava claimed to have shot and killed for the CIA. Srivastava also used cellphones to demonstrate to Onouye how he had covert technology that allowed him to acquire information from other peoples' phones, which he referred to as "triangulation."

68.    The Enterprise primarily used Onouye as a "facilitator" and a money laundering vehicle. Beginning in June 2020, Global Energy Law Group began receiving funds into its IOLTA account on behalf of the Srivastava Enterprise. Srivastava told Onouye that the money coming in was money owed to him from carrying out operations. Srivastava would instruct Onouye where to send the proceeds. When Onouye would ask about the source of funds and purposes of transactions, Srivastava would tell him they were part of "black ops budgets" or for "commercial cover" and that Onouye lacked sufficient security clearance to be told the details. Srivastava referred Onouye to a specific section of U.S. law he claimed governed his official activity. This all was false; Srivastava was using Onouye to engage in transactions that helped Srivastava launder fraud proceeds.

69.    In 2020, Srivastava instructed Onouye to distribute funds to a father/son team who were supposedly going to cause President Trump to remove a public

official of Country-1 from a U.S. travel ban. He also instructed Onouye to distribute money to various others who were supposedly consultants and partners with Srivastava, including the CEO of a publicly traded company involved in a deal with the Enterprise and a former member of Country-1's House of Representatives. Srivastava also showed up repeatedly at Onouye's office and instructed him to take Srivastava to the ATM and withdraw cash for him from the IOLTA account.

70.    The Enterprise also used Global Energy Law Group as a supposed front company for its operations in its scheme against Troost. Troost ultimately directed more than $13 million in cash to Global Energy Law Group in California through third-party intermediaries, believing he was funding U.S. Government operations. Srivastava checked in on the status of receiving these funds and directed Onouye where to distribute them.

71.    The Enterprise used a law firm in Country-1 to negotiate a deal with a third party for PDMCC to loan it $51 million so that the Enterprise could take half and use it to purchase a mansion in the Pacific Palisades.

72.    The Enterprise also recruited Defendant Thomas Giordano-Lascari ("**Lascari**") in late 2022 when the Enterprise's transactions were increasing in size and complexity. Lascari is an experienced California-based lawyer for high-net-worth individuals and assisted Srivastava in setting up opaque structures to hold and move the Enterprise's assets. Lascari was the director of these companies and even became the sole director of Plaintiff Paramount Inc., even though he was the Enterprise's lawyer and acting in its interests at the time.

73.    In late 2022 and early 2023, Lascari knowingly allowed the Enterprise to use his attorney trust accounts in California to conceal the receipt of $25 million in funds from Country-1 Asia that had been taken from PDMCC by fraud. He then arranged for those funds to be deployed by Birdsong to purchase a $24.5 million mansion in the Pacific Palisades for the Srivastava family, again concealing the ties to the fraudulently obtained proceeds within the attorney trust account. Lascari then

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT



repeatedly over several months tried to acquire for Srivastava the remaining $26 million out of the original $51 million that PDMCC had loaned to another company. Lascari was to be fronted as the person in charge of operations for Plaintiffs' companies once they completed the U.S. inversion, but in reality, the Enterprise had intended to take over Plaintiffs' companies and coopt them into the Enterprise, and Srivastava was going to direct all of its activities.

74.     The Enterprise later used various law firms and other professionals to attempt to obtain the 50% profits of Russian-origin crude oil marketing, and to attempt to damage Plaintiffs by filing false reports with governmental authorities accusing Troost of defrauding Srivastava and worse. Some of these attempts to continue to monetize the fraud against Plaintiffs continue today.

## The Legitimizers

75.     Another core component of Srivastava's system is credible third parties who can vouch for him to others. Srivastava gains access to various important people. In turn, those people introduce him to others. He then fraudulently claims to have had long-standing relationships with them through his service with the U.S. Intelligence Community. While these people confirm to others that they know Srivastava, covering him with a veneer of apparent legitimacy, his fundamental claims are false.

76.     Srivastava sought to interact with people who formerly worked in various governmental capacities, such as former political aides, former military officials, former intelligence operatives, and former U.S. Secret Service and FBI agents. He listens to them speak about their former jobs and areas of expertise. And then he mimics their lingo and the way they speak about these issues, credibly fabricating his own fictional stories patterned on real events told to him by others to make himself seem like he is closely connected to the U.S. Government. The Enterprise used many people in this manner—engaging in business opportunities or potential business opportunities with some, to cultivate appearances of legitimacy and to be able to introduce people to his fraud victims.

FIRST AMENDED COMPLAINT

77. The Enterprise's deception was sufficiently sophisticated to fool, among others: retired General Wesley Clark, former Supreme Allied Commander of NATO; Jim Reese, a retired U.S. Army Lieutenant Colonel and former Delta Force operator; a former CIA trainee who worked alongside Srivastava for a few months before recognizing the deception; the Deputy Director of Liberia's National Security Agency; officials of Country-1 who signed billions of dollars in defense project authorizations with shell companies; and a Malaysian diplomat in Uganda who had thought he was helping Srivastava carry out U.S. government business and introduced Troost to him. The stature of these individuals underscores the extraordinary quality of the deception apparatus Defendants constructed.

78. Defendant Maguire, a genuine former CIA Deputy Station Chief, functioned as the Enterprise's most notable legitimizer. By his mere presence and active participation in meetings alongside Srivastava, including with foreign officials and Troost himself, Maguire communicated to those he encountered that Srivastava's claims of intelligence affiliation were authentic. Maguire knew that Srivastava was not a CIA operative and was paid to lend his authentic intelligence credentials to sustain the false CIA narrative. His participation made the Enterprise's deception virtually impossible to detect for those who encountered it.

## III. THE PARTIES

### A. Plaintiffs

79. Plaintiff Niels Troost ("**Troost**") is an individual. At all times relevant to the Complaint, he was a Dutch citizen residing in Geneva, Switzerland.

80. Plaintiff Paramount Energy & Commodities SA, in liquidation ("**PECSA**"), founded by Troost, is a Swiss company based in Geneva. It is currently in liquidation proceedings in Switzerland, largely as a consequence of Defendants' fraudulent conduct.

81. Plaintiff EZI-DIAROC Holding SA ("**EZI**"), is a Swiss holding company owned 100% by Troost. At all times relevant to the Complaint, Troost held

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT

his shares of PECSA through EZI.

82.    Plaintiff Paramount Energy and Commodities DMCC ("**PDMCC**"), a wholly owned subsidiary of PECSA, is a UAE company based in the Dubai Multi Commodities Centre, a Free Trade Zone located in the Jumeirah Lake Towers district of Dubai. PDMCC was established in December 2020.

83.    Plaintiff Paramount Energy & Commodities, Inc. ("**Paramount Inc.**") is a Wyoming corporation formed in November 2022 and is a 100% subsidiary of PECSA. Its principal bank account was held at Bank of America in the United States. Defendant Lascari was Paramount Inc.'s sole director and the sole signatory on its U.S. bank account, at the times relevant to this Complaint, and in that capacity owed a fiduciary duty and a duty of loyalty to Paramount Inc. Paramount Inc. maintained assets in the United States, including funds on deposit at Bank of America, and suffered injury to those U.S.-located assets as a direct result of the racketeering activity alleged herein.

## B.    Defendants

84.    Defendant Gaurav Srivastava ("**Srivastava**") is an Indian citizen born in 1990 with lawful permanent resident status in the United States. As last reported, he lives in Los Angeles, California. In around 2019 to 2020, Srivastava resided in the United Kingdom, for a time renting a residence in Gloucestershire. At all other relevant times to the Complaint, Srivastava resided in California, from where he led the Srivastava Enterprise.

85.    Defendant Sharon Srivastava ("**Sharon**"), on information and belief, was born in Indonesia in 1978, received a U.S. social security number in or about 2001, and publicly claims to be a U.S. citizen. Sharon was formerly known as Pandita Johnson. On information and belief, Sharon lived with Srivastava at all times relevant to the Complaint. As a member of the Enterprise, Sharon participated in perpetuating the essential fraudulent pretenses that Gaurav Srivastava worked for the U.S. Government, exerting authority over the distribution of fraudulent proceeds, and

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

managing their reputation which was essential to the continued success of the Enterprise's fraud.

86.    Defendant Nicolas Régis Christian Bravard ("**Bravard**") is a Swiss and French citizen residing in Switzerland. Srivastava introduced Bravard to Troost as the FBI's "inside man" in Swiss banking. Bravard helped pressure Troost to convey assets to the Srivastava Enterprise and held assets belonging to the Enterprise in various corporate structures as a proxy for Srivastava. Bravard also told various Paramount/EZI-affiliated people in Geneva that Srivastava was with the CIA and showed them photos of Srivastava and then-President Biden. Bravard received money for his participation in the Enterprise through one of his Swiss companies, Dorsay Services, Sàrl. Bravard also actively looked for new victims for the Enterprise, including identifying the owner of a distressed bank in Switzerland in late 2023 and attempting to convince him that Srivastava could help with a sanctions-related issue in exchange for a large stake in the bank.

87.    Defendant Cedar West Ventures LLC ("**Cedar West**") is a Delaware limited liability company initially formed as Lothian Road Ventures, LLC on May 25, 2022. On December 8, 2022, Defendant Lascari, its sole director, changed its name to Cedar West. Cedar West was one of the Srivastava Enterprise's shell companies which held its illegally obtained assets for the benefit of the Enterprise and to conceal Srivastava's connection to the assets. The Enterprise also used Cedar West to take various actions to attempt to file a false criminal complaint in Dubai against Plaintiffs attempting to take all of Paramount's assets, which relied on doctored evidence and was ultimately rejected by the Chief Prosecutor. The Enterprise also used Cedar West to pay other organizations to assist the Enterprise, such as The Arkin Group and law firms.

88.    Defendant Unity Resources Group Inc. ("**Unity Resources Group**") was a Wyoming corporation formed by Srivastava on August 18, 2020. Its listed address was 1609 Cravens Avenue, Torrance, CA 90501. Srivastava was its

27

President/Director, Treasurer and Secretary. Unity Resources Group was the primary company within the Enterprise that Srivastava falsely portrayed as a front company that carried out CIA operations as part of his involvement in the NOC program.

89. Defendant Orbimo Corporation ("**Orbimo**") was a Wyoming corporation formed by Defendant Onouye on December 22, 2020 and beneficially owned by Srivastava. Its listed address was 1609 Cravens Avenue, Torrance, CA 90501. Srivastava was its President/Director, Treasurer and Secretary. Orbimo was used by the Srivastava Enterprise to steal money from Paramount Inc. and to secretly make massive political contributions to Democratic causes to enhance the Enterprise's reputation and to gain access to important Democratic U.S. politicians, thereby making Srivastava's claims that he was a powerful covert CIA operative appear legitimate. Gaurav and Sharon Srivastava both operated a late model luxury SUV registered to Orbimo.

90. Defendant Unicom Worldwide, Inc. ("**Unicom**") is a Delaware corporation formed by Defendant Lascari on February 28, 2023 and beneficially owned by Srivastava. The Srivastava Enterprise tried to situate Unicom, a U.S.-based vehicle, as Paramount's parent company for the Enterprise to gain total control over Paramount's assets. On or about May 4, 2023, Defendants tried to force Troost to sign a purchase agreement with Unicom on behalf of EZI for the purpose of the Srivastava Enterprise taking over all of Paramount's assets.

91. Defendant 1234 Holding SA ("**1234 Holding**") is a Switzerland-based entity, incorporated by Bravard as a strawman for Srivastava in or about August 2022. The Srivastava Enterprise used 1234 Holding to obtain a half interest in Troost's Russian-origin crude oil marketing business and half its profits from marketing Russian-origin crude for a nominal payment of 50,000 CHF (Swiss francs), which was not remotely reflective of PECSA's true economic value.[4] And,

---

[4] In March 2025, the Dubai Chief Prosecutor's investigation found that the Enterprise's "completing the acquisition of half of [PECSA]'s shares for [that] amount does not comply with accounting standards or customary commercial

FIRST AMENDED COMPLAINT



it paid the 50,000 CHF out of proceeds fraudulently obtained from Plaintiffs (on July 20, 2022, Global Energy Law Group received $6,170,250 indirectly from PDMCC and sent $150,000 to Bravard's company, Dorsay Services, the next day). Bravard formally held 1234 Holding through his Swiss company, Waterfall Holding Suisse SA, but Srivastava is 1234 Holding's ultimate beneficial owner.

92.    Defendant Birdsong Central LLC ("**Birdsong**") is a Delaware limited liability company formed by Defendant Lascari on October 17, 2022 and beneficially owned by Srivastava. The Srivastava Enterprise used Birdsong to funnel fraudulently obtained money from PDMCC through Country-1 into the United States and ultimately to fund the purchase of Srivastava's $24.5 million mansion thereby concealing Srivastava's involvement.

93.    Defendant Aurora Point LLC ("**Aurora Point**") is a Delaware limited liability company formed by Defendant Lascari on October 12, 2022 and beneficially owned by Gaurav and Sharon Srivastava. Aurora Point owns all the shares of Birdsong. In November 2023, ownership of Srivastava's $24.5 million Pacific Palisades mansion was transferred from Birdsong to Aurora Point. The Enterprise later used Aurora Point to extract almost $5 million from the illegally purchased mansion through a private mortgage loan.

94.    Defendant The Gaurav Srivastava Foundation (the "**Foundation**") is a Delaware nonprofit corporation incorporated as "The Gaurav and Sharon Srivastava Family Foundation" on October 12, 2022, which was its name at all times relevant to the Complaint. Gaurav and Sharon Srivastava controlled the Foundation and used it to promote their reputation and social status. Around the time Sharon Srivastava filed for divorce against Srivastava in June 2025, the Foundation changed its name

---

practices in ownership transfer operations" *Troost v. Arkin*, at Dkt. 44. In June 2025, Srivastava falsely claimed he invested millions in Paramount. Lara Logan, *Going Rogue with Lara Logan, One on One with Gaurav Srivastava*, Episode 20 (Lara Logan TV June 7, 2025) ("Logan Podcast"), available at https://laralogan.com/episode/reputation-warfare-part-1-one-on-one-with-gaurav-srivastava-episode-20/ (42:00-42:11).

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

to "The Gaurav Srivastava Foundation" to exclude hers. The Srivastava Enterprise used the Foundation to engage in financial transactions, develop networks of important contacts, and to bolster the Srivastava family's public standing by conspicuously sponsoring events and hosting a website, all in furtherance of the Enterprise's goals.

95. Defendant Owen Onouye ("**Onouye**") is an attorney licensed in California who served two and a half years in a Nebraska penitentiary after a drug trafficking conviction, before being suspended from legal practice for a period of time. At times relevant to the Complaint, Onouye served as counsel to the Srivastava Enterprise and provided assistance to various affiliated corporations, including by forming Orbimo and serving as its Vice President. Onouye operated Global Energy Law Group and allowed Srivastava to use its attorney trust account to receive, hold, misappropriate and distribute tens of millions of dollars pursuant to the fraud scheme within the United States.

96. Defendant Global Energy Law Group PC ("**Global Energy Law Group**") is a California professional corporation formed on April 18, 2019 and located at 5901 W. Century Blvd., Suite 750, Los Angeles, California. At all times relevant to the Complaint, it was owned and operated by Defendant Onouye. The Srivastava Enterprise used a U.S. bank account held by Global Energy Law Group to receive, misappropriate and distribute fraud proceeds obtained from Plaintiffs, citing sham engagement letters with exorbitantly high legal fees. Global Energy Law Group purported to have lawyers charging $5,000 an hour, and at one point sought a $6 million retainer as part of the Enterprise's scheme. More than $13 million of Plaintiffs' funds were deposited into Global Energy Law Group's attorney trust account in California, where those funds were converted by the Enterprise to unauthorized personal uses.

97. Defendant Thomas Giordano-Lascari ("**Lascari**") is an attorney licensed in California (SBN# 244485). At various times relevant to the Complaint,

FIRST AMENDED COMPLAINT

Lascari assisted Srivastava and the Enterprise, applying his expertise in setting up opaque corporate structures and serving as director to knowingly facilitate international money laundering transactions and conceal the Enterprise's illegally obtained assets, including by forming Defendants Birdsong, Aurora Point, the Foundation, and Unicom. At various times, Lascari also held director, officer, and/or manager positions at these companies. As the sole owner of the General Partner of Maple Trees LP, Lascari, not Srivastava, wielded legal authority over Cedar West in 2023. Lascari functioned as an Enterprise lawyer and possessed the authority within the Enterprise to make decisions concerning the structuring of assets comprising fraudulent proceeds. Lascari allowed the Enterprise to use his firm's attorney trust account as a pass through to facilitate the purchase of the $24.5 million Pacific Palisades mansion and the extraction of $5.2 million from Plaintiff Paramount Inc. and distribution to benefit the Srivastava family while Lascari was also Paramount Inc.'s sole director.

98.    Defendant John Maguire ("**Maguire**") is a former Deputy Station Chief in Iraq for the CIA who, after he left government service, provided private consulting services for money. In the past, he has been associated with vouching falsely for the alleged U.S. intelligence bona fides of an individual, Matthew Marshall, who was convicted of defrauding an ultra-high net worth individual in the United States of over $2 million by fraudulently claiming to be a CIA operative.[5] Maguire, who is in the business of making money by vouching for fake CIA operatives was, at various times, employed by the Srivastava Enterprise to help maintain Srivastava's false pretenses that he was working for the CIA and to use his connections in the media and in law enforcement to wage a vicious disinformation campaign targeting Troost and Troost's family. Maguire made false representations to the New York Police

_____

[5] *See, e.g.*, Ken Silverstein, *Seed Money*, New York Magazine (Nov. 22, 2022); *Press Release*, U.S. Attorney's Office for the District of Montana (Mar. 3, 2022). Marshall admitted at his guilty plea to defrauding his victim out of $255,000, $132,000 of which he sent to John Maguire. *U.S. v. Marshall*, No. Cr. 20-32-M-DWM (D. Mont. Jul. 22, 2020) ("*U.S. v. Marshall*"), Dkt. No. 185 at 9-10.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

31

Department and to journalists in May 2023 for the purpose of destroying Troost's credibility and to retaliate. Maguire received money from the Enterprise via his Williamsburg, Virginia-based company, Xenophon Group. Maguire carried out some of the Enterprise's activities from California, meeting there with Mary Beth Long, Srivastava and others on or about April 13, 2023. He also met with Srivastava at the Paramount Inc. office in California on May 18, 2023 while they were on the offensive against Plaintiffs, attempting to assure that the Enterprise successfully got away with the proceeds of fraud and were attempting to defraud Murtaza Lakhani by persuading him they could help him with U.S. sanctions issues. Here is a screenshot from Paramount Inc.'s security system from that day showing Maguire, right, and Srivastava, bottom-left, meeting in Paramount Inc.'s Los Angeles office:



99. On information and belief, Maguire and Srivastava continue to work together in Iraq, Turkey, and other places, attempting to carry out the Enterprise's fraudulent schemes. Maguire and Srivastava attempted to conduct Russian-origin oil business with Murtaza Lakhani, who has been sanctioned by the UK and the European Union after Srivastava was separated from Paramount. Maguire, a prominent ex-CIA officer with a known reputation, functioned as a legitimizer and also possessed authority within the Enterprise to make tactical decisions concerning the Enterprise's offensive reputation attacks against Troost and his family to discredit them for the purpose of enabling the Enterprise to get away with fraudulently

32

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

obtaining proceeds and in an attempt to obtain much larger sums of money that were profits of Plaintiffs' business activities from June 1, 2022 through May 2023.

100. On November 16, 2023, Maguire claimed to a third party that he and Srivastava had a new company registered in California. Although it was new, it supposedly maintained the same banking relationships that demonstrated four years of financial records showing they were a $16.5 billion company. During the call, Maguire was trying to make arrangements for this California company to do business with the Iraqi state-owned oil company. Maguire said their company had access to a refinery. On December 5, 2023, while Maguire was in California, he falsely told Srivastava's former Chief of Staff (Jim Reese) that Troost was sanctioned in the United States (he has never been sanctioned in the U.S.), and Maguire falsely claimed that UK authorities were after Troost because he supposedly sold a stolen airplane, which was not remotely true.

## IV. JURISDICTION AND VENUE

101. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c), which gives federal district courts jurisdiction over civil RICO actions. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under federal law, and has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

102. Venue is proper in this District under 28 U.S.C. § 1391 because: (i) a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this District; and (ii) one or more of the Defendants reside here. Venue is also proper under 18 U.S.C. § 1965.

103. The pattern of racketeering activity alleged in this Complaint was conceived of, largely directed from, and in substantial part carried out within the United States, and specifically within this District. Gaurav and Sharon Srivastava have resided in Los Angeles, California since at least 2020 and Srivastava directed the Enterprise's activities from California throughout the relevant period. Defendants

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT

formed and operated numerous Enterprise entities in California, Wyoming, and Delaware—including Unity Resources Group, Orbimo, Birdsong, Aurora Point, Cedar West, the Foundation, Unicom, and Paramount Inc.—and used California-based attorney trust accounts at Global Energy Law Group and Karlin & Peebles LLP (and successor firms) to receive, misappropriate, conceal, and distribute tens of millions of dollars in fraud proceeds within the United States. The Enterprise used Plaintiff Paramount Inc.'s Bank of America account in the United States as a vehicle to extract and launder stolen funds, and converted over $24.5 million in fraud proceeds into U.S. real property located in this District. These domestic activities were not incidental to the scheme; they were the mechanism through which the Enterprise obtained, laundered, and concealed the proceeds of its fraud.

## V. FACTUAL ALLEGATIONS

### A. The Origins of Srivastava's Fake CIA Playbook

104. Srivastava's CIA-operative scheme was already well-developed before he targeted Troost. For years, he had perfected the same elaborate ruse: present himself as a covert CIA officer, fabricate intelligence missions, and use those staged "operations" to extract money, access, and influence.

#### 1. Habib Kagimu and Africa

105. One of Srivastava's many early targets was Alhaj Habib Kagimu, a Ugandan businessman and Honorary Consul for Malaysia. In or about late 2020, a business associate in the UK introduced Kagimu to Srivastava as someone who worked for the CIA and wielded substantial influence. Kagimu's associate arranged for them to speak on the phone.

106. Srivastava (in the UK at the time, on information and belief) spoke with Kagimu (in Uganda) on the phone and told Kagimu he was working with the CIA to help the U.S. Government secure the release of Paul Rusesabagina, a human-rights activist detained in Rwanda. Rusesabagina, who was awarded the Presidential Medal of Freedom by President George W. Bush, had been kidnapped in August 2020.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



Srivastava asked Kagimu to contact Rwandan President Paul Kagame, whom Kagimu knew personally, to request Rusesabagina's release. When Kagimu raised the issue, Rwandan officials expressed confusion about why such a communication would come through a private citizen rather than through the U.S. Embassy. Srivastava then told Kagimu that the matter fell under his authority within the CIA's "special operations division," not ordinary diplomatic channels. This was false, and the Rwandan government declined to assist.

107.   After the supposed operation to rescue Rusesabagina failed in 2020, Srivastava, based first in the UK in 2020, then in California, began repeatedly contacting Kagimu, based primarily in Uganda, by phone. Srivastava repeatedly asked for introductions to high-level African officials and access to Kagimu's network of contacts, claiming he needed this access to conduct further CIA "operations" and intelligence missions for the U.S. government across Africa. They also met in person on several occasions in 2021 and 2022.

108.   During the course of their dealings, Srivastava told Kagimu that he had been recruited by the CIA at age 16 after responding to a roadside advertisement and that he later received military and special operations training to conduct missions in Afghanistan. Srivastava further claimed he had saved former Herat governor Abdul Quayom Rahimi during a CIA operation and arranged a phone call in which the person purporting to be Governor Rahimi described Srivastava as his "savior" who had extracted him from danger. Srivastava also showed him abdominal scars he claimed were wounds from CIA missions. These were lies. Srivastava was never affiliated with the CIA, and his scars were from a childhood kidney operation.

109.   In or about August 2021, while Srivastava was in California, and Kagimu was in Sudan, on information and belief, Kagimu was present with Sudanese officials and heard Srivastava tell them by phone that he was a U.S. CIA operative with experience carrying out special operations. He falsely claimed that he could prevent OFAC from sanctioning Mohamed Hamdan Dagalo (also known as

35

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

"Hemedti"), commander of the Rapid Support Forces in Sudan (a group that the U.S. government has publicly alleged committed war crimes). Srivastava also claimed that through his work on behalf of the CIA, he had been able to remove a public official of Country-1 from a U.S. travel ban. Srivastava claimed to have a personal relationship with then-Vice President Harris, saying that Sharon Srivastava, was the financial controller of Vice President Harris's campaign funds. Srivastava also falsely claimed he was in frequent official contact with then-President Biden and was able to make demands of the President to help U.S. security because Srivastava was with the CIA. Srivastava previously claimed to Kagimu that he had obtained authorization from the government of Country-1 on behalf of the CIA that allowed him to use a fishing company to deploy hundreds of fishing vessels into the South China Sea. He told Kagimu these boats were outfitted with special equipment to spy on China for the CIA. Kagimu personally heard Srivastava describe this alleged operation to the Sudanese officials, whom he asked to financially invest in the "operation."

110.   Srivastava falsely represented to Sudanese officials that OFAC issued a license to his company, Unity Resources Group, through which he could arrange for approximately 10 former U.S. intelligence operatives to provide security and intelligence training to members of the Rapid Support Forces in Sudan. On information and belief, neither Unity Resources Group, nor any company operated by Srivastava, carried out business under an OFAC license nor under any other authority of the U.S. Government as he misrepresented. In around the summer of 2022, Srivastava told Kagimu and showed him purported contractual documentation that his alleged CIA front company, Unity Resources Group, had provided training and support to the Sudanese Rapid Support Forces.

111.   As part of his ongoing effort to keep Kagimu convinced that he was a high-level CIA asset with direct access to senior U.S. officials so he would introduce him to potential fraud targets in Africa, Srivastava claimed to have a close

ROSEN ✦ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

36



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

relationship with then-National Security Advisor Jake Sullivan, said that then-President Biden had to listen to him on national security matters, and claimed to speak with Sullivan by telephone in Kagimu's presence one time when they were on a boat together in or around 2022.

112. In or about May 2022, Srivastava told Kagimu that he had previously worked in Libya to sell inferior-quality weapons to General Khalifa Haftar with the U.S. Government's permission as part of a CIA effort to get close to the Wagner Group. He showed Kagimu photographs of himself with individuals he said were General Haftar's relatives. Srivastava then gave Kagimu a phone number for an associate of Libyan officials and instructed him to arrange a meeting. Kagimu met that associate at the Four Seasons Hotel in Dubai, where they discussed contracts for crude oil and oil-product exports from Libya. Srivastava asked Kagimu to listen for any other needs Libyan officials might have and to report back to him, which Kagimu did by international communications.

113. In or about 2022, Srivastava told Kagimu that someone owed money to Unity Resources Group and that he wanted to receive a gold-mining concession as payment. He claimed Unity Resources Group had the resources and an affiliated mining company capable of extracting large quantities of gold and that he would sell this gold to "Fort Knox," again invoking purported U.S. government ties. To give this plan an air of legitimacy, Srivastava arranged for Kagimu to meet retired General Wesley Clark and used his collaboration to reinforce the impression that Srivastava was operating as a U.S. intelligence contractor.

114. On or about June 7, 2022, Srivastava also transmitted by international wire to Kagimu and Troost a letter he had written to Sudanese General Dagalo on Unity Resources Group stationary about a monetary dispute relating to having provided the Rapid Support Forces with training; Srivastava said they had received $1.2 million of the $3 million they were owed.

115. Srivastava also sent Kagimu texts on or about June 7, 2022 revealing

37

that Srivastava was using wire transfers to receive proceeds of his fraud ("No money. Just checked, no incoming wires.") and outlined his collection strategy of writing to General Dagalo.

116.    Having successfully convinced Kagimu that he was a CIA operative and that Unity Resources Group was a CIA front, Srivastava later leveraged this relationship in support of the fraud targeting Plaintiffs. As alleged elsewhere in the Complaint, Srivastava used his prior "CIA" operations with Kagimu in Africa and Libya, and Unity Resources Group's supposed government work, to bolster his claims to Troost that he was a CIA "NOC" and to make his fabricated intelligence persona appear credible.

## 2.  The United Kingdom

117.    In late 2019 and early 2020, Srivastava trolled for victims of the fake-CIA fraud while living in England.

118.    Just before the COVID-19 pandemic, Gordon Conroy, a former commander with the Australian Special Air Service (SAS) ("**Conroy**" or the "**SAS Commander**"), met Srivastava in the UK. Srivastava was living in Mayfair, London. The SAS Commander had operated the Original Unity Resources Group for years; it had done private military contracting work, including in Iraq. When they first met, Srivastava already knew of the Original Unity Resources Group's work and that the SAS Commander was affiliated with it. Srivastava claimed he was a "NOC." He said he wanted to set up a security company to replace Blackwater; he said his nemesis was Erik Prince, Blackwater's founder. Srivastava said he wanted to get involved with the Original Unity Resources Group, and the SAS Commander and Srivastava agreed to try to generate business together.

119.    One of the SAS Commander's best friends who had served with him in the Australian Army ("**UK Witness-1**") also lived in the UK, along with his wife ("**UK Witness-2**"). Just before the COVID-19 pandemic, UK Witness-1 and -2 were at the Connaught Hotel in London meeting clients; they operated a firm that focused

38

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

on strategic advice for governments and high-level officials in the Middle East. The SAS Commander was also at the hotel at the time with Srivastava and brought Srivastava over to speak with UK Witness-1 and -2. The SAS Commander had told UK Witness-1 that he was doing business with Srivastava.

120.   Later, just after the COVID restrictions took effect in around March 2020, the SAS Commander told UK Witness-1 that Srivastava was looking to move out of central London with his family. UK Witness-1 helped the Srivastava family find a rental residence at Tickmorend Farm in Gloucestershire, England. It was owned by a friend of UK Witness-1 ("**UK Witness-3**"), and Srivastava rented it:



121.   While the Srivastavas lived at Tickmorend Farm, they went to UK Witness-1 and -2's house. Srivastava went on a walk with UK Witness-1 (the husband). Srivastava told UK Witness-1 that he worked for the U.S. Government in a clandestine role. He said he worked with a lot of U.S. Government agencies, that he was involved in Washington, that he was politically connected, and that he was connected to security services such as the CIA. UK Witness-1 spoke with the SAS Commander after this, who confirmed that Srivastava had a clandestine role with U.S. national security and the intelligence services and that he was connected politically in the U.S. The SAS Commander also told UK Witness-2 (the wife) that he had overheard Srivastava speaking on the telephone with very senior people in the CIA and with high-level U.S. politicians. The SAS Commander said that Srivastava was using those connections to generate business.

122.   While inside their house, Srivastava repeatedly asked UK Witness-2

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(the wife) if he could use their computers and cell phones. She observed that he kept pretending that his did not work. She refused, believed he was trying to learn their business contacts.

123. Another time, in early 2020 during the COVID restrictions between April and June 2020, Gaurav and Sharon Srivastava visited the Srivastavas' landlord, UK Witness-3, along with UK Witness-2 and a young man in his twenties. While they were there, Srivastava told UK Witness-2 and -3 in front of Sharon Srivastava that both of the young man's parents were senior members of the CIA, and that Srivastava met them when they all served together at the CIA. Srivastava claimed that he had gone on secret missions to Africa for the CIA. He said he had recruited the young man for the CIA and was then training him for the CIA. Srivastava said the family had been fundraisers for President Trump and were close to Steve Bannon. UK Witness-2 asked Srivastava why he was in the UK if he worked for the CIA and for President Trump as he claimed during the conversation. Srivastava said that he liked the English way of life and that he had a lot of business contacts in England.

124. The young man (the "**CIA Trainee**") was not part of the CIA. He had met Srivastava a few months earlier in Washington D.C. at an event. He thought Srivastava was interesting and engaging. He spoke with his father, who was a prominent D.C. lobbyist and member of President Trump's first transition team, and suggested they help Srivastava.

125. While the "CIA Trainee" and Srivastava were together in the UK at Tickmorend Farm, the "CIA Trainee" (then in his twenties) would cook and play with the Srivastavas' kids. Gaurav and Sharon Srivastava together told him about what was supposedly their blood-testing company called Numotech. Sharon Srivastava talked on a technical level about the testing and how it worked and said they had done the research into this technology together. Srivastava asked him for advice on how things worked in political circles. They disagreed on this; the "CIA Trainee" believed that politics represents one's principles, but Srivastava said he

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT

believed "money is more important than politics," and if you have enough money, you can control the politics.

126. One evening in around April to June 2020, the two sat and talked by a fire pit at Tickmorend Farm. Srivastava was discussing various operations he supposedly carried out for the U.S. Government. The "CIA Trainee" grew up in Northern Virginia and had encountered plenty of legitimate U.S. Government employees and did not think Srivastava knew what he was talking about. When "CIA Trainee" challenged some of what Srivastava was claiming. Srivastava told him he was a NOC, meaning a non-official cover operative of the CIA.

127. Later in 2020, the "CIA Trainee" flew to Country-1 to help Srivastava with meetings between Country-1's officials and U.S. officials, like the Acting U.S. Secretary of Defense. Srivastava asked the "CIA Trainee" for advice on the best political strategy to advance deals on fighter jets and helicopters and how to handle military sales. They also discussed a potential deal in which the U.S. Government was going to purchase some land from the public officials to be used for a hardened military base. At one point during his time with Srivastava in Country-1 in late 2020, Srivastava repeated his claim to the "CIA Trainee" that he was a NOC. Unbeknownst to the "CIA Trainee," Srivastava listed the "CIA Trainee" as the Director of Orbimo on the letter agreement with Country-1's military to supply Black Hawk helicopters.

128. The "CIA Trainee" helped Srivastava on and off for two years. At the end, the "CIA Trainee" called his father about Srivastava and said, in sum and substance, "I think he has been lying to all of us." In around November 2024, right around the election when it became clear that President Trump was to serve a second term, Srivastava called the "CIA Trainee" and said he wanted to donate money to help President Trump. The "CIA Trainee" responded, "absolutely not." When he hung up, he called the major Republican PAC's and warned them not to accept any donations from Srivastava.

129. At various times during the Srivastavas' 2-3 month stay at Tickmorend

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

41

Farm, UK Witness-2 (the wife) observed Srivastava carrying around weapons and arms catalogues, and heard the SAS Commander and Srivastava speak about trying to get gold out of a country in Africa.

130.    UK Witness-3 was the owner of Tickmorend Farm and the Srivastavas' landlord in the spring of 2020. On March 20, 2020, Srivastava sent a copy of his California driver license to UK Witness-3 from the email address "Chairman.G@numotech.com." Srivastava told UK Witness-3 that Numotech was a company that created inflatables for use in the military for limb injuries and for diabetes treatment. He claimed to run an online pharmacy business. He said he could obtain some of the COVID drugs available in the U.S., and he gave UK Witness-3 a sample. Srivastava also told UK Witness-3 that he was looking to buy a riverfront property along the Thames in Windsor, which was the most expensive riverfront property on the market. This was not true; Srivastava was pretending to be extremely wealthy and successful in his businesses. In reality, he even owed money on the flat he rented in London.

131.    Srivastava paid two weeks' rent for Tickmorend Farm up front and he and his family moved in, along with an *au pair*. UK Witness-3 often observed Srivastava walking around the garden speaking on the cell phone and meeting with people. After such meetings, Srivastava would often brag to UK Witness-3 that he had been meeting with a former military person, or a former special forces operator, or someone similar. Everyone he met, according to Srivastava, was someone important. While Srivastava was living at Tickmorend Farm, UK Witness-3 found some documents left in the garden that appeared to be a tender for some military vehicles being sold to a Southeast Asian country, as well as a business card for someone from a drone manufacturer.

132.    Srivastava was supposed to pay rent every two weeks, but he kept missing payments. UK Witness-3 told Srivastava that if he did not pay, they would have to leave. UK Witness-3 could not understand why Srivastava was having trouble

42

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

paying rent when he claimed to have been involved in several successful businesses. Srivastava kept offering different excuses. One time, Srivastava told UK Witness-3 that he was going to have a check sent over from the U.S. embassy in London via motorbike. He said that even though the check was coming from the U.S. embassy, it would not actually be issued by the embassy, but rather by a cover company that was secretly connected to the U.S. Government.

133.    Another time, on April 24, 2020, UK Witness-3 received an email from "Philip Johnson" at "Philip.Johnson@numotech.com" claiming that Srivastava had instructed him to make a rent payment:

On 24 Apr 2020, at 20:17, Philip Johnson <philip.johnson@numotech.com> wrote:

Dear Matt

I just received message from Mr. Srivastava to be in touch with you. From my understanding, you have received the £4000.00 we sent and have not received the £2000.00 we had sent.
I am waiting on receipt of these funds but should be in your account over weekend or Monday.
Matt, please be assured that we are extremely concerned about this wire as it directly relates to Mr. Srivastava temporary residence. I am on top of this & will keep you posted.

Thank You

Kind Regards
Philip Johnson

When the money did not arrive within a few days, Srivastava arranged for UK Witness-3 to speak to "Philip Johnson" by telephone. It was an odd exchange. "Johnson," had a strong Bronx accent—at first. He explained that there was a delay in making the payment. During the call, "Johnson" fell out of his Bronx accent and slipped into a slightly Asian accent. UK Witness-3, who was familiar with Srivastava's voice, asked "Gaurav is that you?" and "Johnson" abruptly hung up. Srivastava also copied "Robert.Greenberg@fitzgeraldkushner.com" on correspondence with UK Witness-3 about late rental payments, but when UK Witness-3 investigated that person and firm online, he could not find anything, nor did that purported firm's domain appear in the Whois database. On information and belief, "Philip Johnson" and "Robert Greenberg" were fictitious people used by Srivastava to evade paying rent.

134.    Srivastava and "Philip Johnson" had committed frauds before. In around August 2019, they used the same purported "Numotech.com" email addresses to impersonate officers of a company called Numotech, Inc., which manufactured

43

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

medical devices. Numotech, Inc. did not, in fact, use that domain name for its emails. Using these email addresses from California, Srivastava defrauded victims in Texas and Florida by falsely claiming that Srivastava was authorized to obtain a private $500,000 loan on behalf of Numotech, Inc. as its Chairman. He was not. On August 15, 2019, the victims thought they agreed to lend Numotech, Inc. $500,000 to be paid back within 60 days, executing a promissory note to that effect.

135. On August 22, 2019, Srivastava, using the email address "chairman.g@numotech.com," wrote to the victims "Please let me know when would the wire credit in our account. Thank you very much for this kind assistance and support. Kind Regards Gaurav Srivastava." In fact, Srivastava was not authorized to obtain loan proceeds for Numotech, Inc. and he had no intention of paying the victim back. On September 6, 2019, in reliance on Srivastava's false representations, the victims wired $500,000 from an account at Chase Bank to the attorney trust account of a law firm in California, which received it for Srivastava on his personal behalf, not on behalf of Numotech, Inc.

136. This was the Srivastava Enterprise at work in 2019, using its typical system of (1) Srivastava acting as the main man; (2) using a company and claiming a high position within it (Chairman of Numotech, Inc.) to give himself apparent legitimacy; and (3) directing the interstate wire transmission of funds into an attorney trust account to conceal the onward movement of funds to himself. When the victims' lawyers started pursuing Srivastava in connection with a lawsuit against him to recover the funds, not only did he evade service of the lawsuit, he also "openly mock[ed] and ridicule[d]" the victims' lawyers by repeatedly calling them to tell them they "will never find him." Srivastava bragged to Troost in May 2023 about his ability to remain hidden from people trying to find him:

FIRST AMENDED COMPLAINT



> MR. GAURAV SRIVASTAVA:  I mean, I don't need to do any of this, right? You know that for a fact. I could walk away -- by the end of this call, I could hang up the phone and then walk.  I'm out.  You won't ever find me.  I can do that, too, and neither can any of your big crew.  I know what I am doing.

137.    Returning to the events of April 24, 2020, later that day of the odd telephone call with Srivastava pretending to be "Philip Johnson" from the Bronx, UK Witness-3 was performing maintenance work outside when Srivastava joined him and helped shovel stones. While they worked together, Srivastava told UK Witness-3 a story about a mission in which he had jumped out of a U.S. military plane camouflaged to resemble a FedEx or UPS commercial cargo aircraft so that it could fly over Afghanistan surreptitiously for him to parachute out. He said that UK Witness-3 could "probably read some of the stories of what we got up to there." From their conversation, UK Witness-3 formed the impression that Srivastava was claiming to have worked for the U.S. military or carried out some sort of black ops.

138.    In March or April 2020, while in the UK, Srivastava arranged for a private jet to take the SAS Commander, himself, and others to Libya, where they met with officials and discussed military supplies. When they returned, the plane was met by UK intelligence and law enforcement officials, who interviewed them.

139.    On June 24, 2020, the Srivastava family left the UK abruptly, taking a private jet with the SAS Commander and others to Country-1. This is a photo of the jet taken by the SAS Commander after they landed the next day in Country-1:

45

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245





On information and belief, Global Energy Law Group paid Qatar airways $188,000 to charter this long-range Gulfstream 650ER.

140.    When he left the UK for Country-1, hundreds of unpaid bills addressed to Srivastava kept coming to Tickmorend Farm, along with bailiffs looking for him. Srivastava abandoned two cell phones there in 2020, a BlackBerry and a mini cell phone that was just over an inch wide and around two inches long, which he had used to carry out the Enterprise's activities, on information and belief:



141.    Srivastava remained in Country-1 for several months and met with officials. The Enterprise's fraud continued.

### 3. Southeast Asia

142.    In 2020, Srivastava, through his fraudulent scheme, established lasting, deep contacts with high-level government officials of Country-1 in Southeast Asia. Srivastava claimed that through a close relationship he had with a member of

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



46

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

President Trump's first transition team who supposedly had served with Srivastava in the CIA and whose son Srivastava was supposedly training for the CIA, Srivastava could have the President remove Country-1's high-level official from a travel ban, allowing him to travel to meet with important officials in the U.S. Government.

143.   At various times in late 2020, Srivastava met with Country-1 officials alongside prominent U.S. Government Officials, such as the Acting U.S. Secretary of Defense (himself a former Special Forces colonel) and the Principal Deputy Special Presidential Envoy for Hostage Affairs with the U.S. State Department. On information and belief, Srivastava inserted himself into a private meeting with the Acting Secretary of Defense and the Defense Minister of Country-1, during which they discussed the prospect of the U.S. Government authorizing the sale to Country-1 of American fighter jets, which was not even attended by senior members of the Acting Secretary's staff. This set off alarm bells within the Department of Defense; they had no idea who he was. Below is a redacted photo of the Acting Secretary, on the right with the microphone, along with Srivastava, left, during a public part of the meeting with Country-1's official (cropped out of the photo on the left; another individual in the middle has been redacted):



FIRST AMENDED COMPLAINT



144.   On or about December 22 and 23, 2020, Country-1's military rewarded Srivastava by entering into letter agreements with his companies to supply military aircraft—including 30 American Black Hawk helicopters and 36 American F-15EX fighter jets. These deals were potentially worth billions of dollars and could be used to bolster his false persona of a CIA operative using front companies to conduct U.S. Government business. Some of these were awarded to the Enterprise's companies that did not even legally exist at the time, like Srivastava's Zegasus Corporation.

145.   For example, Country-1 entered into a Letter Agreement to buy 36 F-15-EX fighter jets (each of which costs over $90 million) from Zegasus on December 22, 2020. But Zegasus Corporation ("Gaurav Srivastava Chairman") did not even legally exist until the following day:[6]



146.   The same thing happened with Orbimo. Country-1 entered into a letter agreement for Orbimo to sell it 30 Black Hawk helicopters on December 22, 2020,

---

[6] Country-1's time zone is 13 hours ahead of Wyoming, and so Zegasus did not become a legal entity until it was December 23 in Country-1.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



but Orbimo did not exist until the next day when it was incorporated in Wyoming. Srivastava listed the "CIA Trainee" as its director on that agreement.

147.   On information and belief, one reason that Country-1 entered into agreements worth billions of dollars with companies that did not even legally exist at the time is because Srivastava had fraudulently convinced its officials by the removal of Country-1's Defense Minister from the U.S. travel ban supposedly through Srivastava's fellow CIA contacts, and other seemingly official connections to the U.S. Government that he was working for the U.S. Government. On information and belief, Country-1 officials believed they were entering into contracts with CIA front companies.

148.   On information and belief, Srivastava used international wires to communicate with others in furtherance of this scheme to obtain money from Country-1 through fraudulent pretenses. Moreover, a member of the Enterprise sent wire communications from outside Wyoming into Wyoming to incorporate Zegasus and Orbimo in furtherance of the scheme to defraud.

149.   In the summer and fall of 2020, the Enterprise, through Unity Resources Group, also had obtained documentation about supplying Country-1 with ammunition, and a potential deal for a shipyard in Country-1—a kernel of truth around which Srivastava built the lie he told to others that he had been working on a deal with Country-1 to send out fishing vessels equipped with surveillance gear to spy on China for the United States.

### 4.  Los Angeles

150.   Gaurav and Sharon Srivastava returned to Los Angeles from the United Kingdom around late summer 2020, on information and belief. There, they continued their "Mr. and Mrs. Smith" spy routine, looking for victims and climbing the social ladder. There, they spent time with a husband and wife ("**LA Husband-1**" and "**LA Wife-1**"), one of whose kids attended the same preschool as one of the Srivastavas' children.

49

151. Gaurav and Sharon Srivastava often had family dinners with LA Husband-1 and LA Wife-1. During those dinners, they would openly talk about Srivastava's work for the U.S. Government.

152. Sharon told LA Wife-1 that she and Gaurav started dating when Sharon was working at a prestigious Los Angeles art gallery. She said that Gaurav "broke in" to the gallery, sneaking in "like a spy," like in the movie, *The Thomas Crowne Affair*, and it impressed her because it was romantic.

153. Gaurav Srivastava often spoke with LA Husband-1, a documentarian, about Srivastava's work. Srivastava claimed he ran the largest private security company in the world and that he had acquired Blackwater and was its current owner. He claimed that his business contracted with the U.S. Government. In particular, he mentioned that when the U.S. military pulled out of Afghanistan under President Biden, he had sent a large team there to provide security. He often told parts of stories about times he spent in war zones and implied that he had killed people on U.S. Government missions, but then he would say that if he told LA Husband-1 more, he would have to kill him (implying that the information was classified).

154. LA Husband-1 asked Srivastava if he could feature his work in a film and follow him with a small camera crew. Srivastava said this was not a good idea because it would put the crew in danger. Srivastava explained how he and his team had been tasked with meeting a cannibal warlord in Africa. According to Srivastava, he and his team went to meet with the cannibal warlord who tried to kill him. Srivastava insinuated that he and his team had to kill the cannibal warlord and his fighters to escape. Based on this supposed mission, Gaurav and Sharon told the couple that if there was ever a kidnapping, the LA couple need not worry. They said that Gaurav could negotiate with anyone from Hamas to LA street gangs. They said he had international reach to "underground elements," and that he could fix anything.

155. Srivastava openly talked about his supposed secret CIA missions in front of Sharon. He told LA Wife-1 that he was specifically selected to work for the



ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

CIA by President George W. Bush and the Bush family. He said he was really good at his job and that the Bush family liked him. Srivastava said that the Bush family's affinity for him created tension with his supervisor in the CIA, who found it professionally threatening. Srivastava said his CIA supervisor tried to force him out, but the Bush family saw his potential and interceded on his behalf. The supervisor, according to Srivastava, was let go, and he took over working directly for then-President Bush. President Bush served from 2001 to 2009 (during which time Srivastava was 11 to 18 years old).

156.    Srivastava told the couple another story where supposedly the U.S. military dispatched a Black Hawk helicopter from Fort Pendleton to pick him up to attend a secret meeting. He said he took his dog Romeo in the helicopter with him. Once when he returned from a trip, Srivastava told LA Wife-1 that he had been in Iraq. She asked how the trip went. Srivastava laughed and said, "there's no Four Seasons in Iraq" and that "of course, I had to stay in my safehouse."

157.    Srivastava told the couple that he had "special" phone calls with Russian President Valdimir Putin. Separately, Sharon told LA Wife-1 that Gaurav and President Putin had a "special bond."

158.    Srivastava told them that he and Sharon were both recruited by the CIA out of Harvard. Even the director of the preschool where the LA couple's and the Srivastavas' children attended told LA Huband-1 that he thought Gaurav and Sharon Srivastava were spies.

159.    After LA Husband-1 and Wife-1 split up, the Srivastavas invited LA Wife-1 to travel with them over the Christmas holiday. LA Wife-1 suggested some places in the U.S. or Canada. The Srivastavas suggested Megève, France. They claimed to own a hotel in Europe, which they had never visited, as well as a hotel and a farm in Cotswolds, England (apparently referring to Tickmorend Farm, which they falsely claimed to own). They also said they had friends to visit in Megève, Niels Troost and his wife. They said they were going to rent a Swiss chalet that cost

FIRST AMENDED COMPLAINT

€100,000 per week. LA Wife-1 was to pay for airfare for herself and her child and they would cover the chalet.

160. When they got to LAX airport, they had a private suite where they all ate caviar and had other food and drink. Then, a private car took them down the tarmac to the plane. They connected through Switzerland. When they arrived at the airport, they all went through security quickly, except for Srivastava, who was held up. When he finally got through, he claimed that the U.S. ambassador to Switzerland had called him to ask whether he was free to meet since he had learned that Srivastava was traveling through Switzerland.

161. When they arrived in Megève, Srivastava told LA Wife-1 that there had been a change of plans and they were no longer staying at a chalet, but the Four Seasons instead. He claimed that the Four Seasons had been fully booked, but because he was in the CIA, he was able to get them to open up some rooms for him. The Srivastava family stayed in a suite, and even had a Christmas tree brought up for themselves.

162. Back in LA, Sharon Srivastava asked LA Wife-1 to help get their child admitted by the same private school as LA Wife-1's. Sharon texted LA Wife-1 asking if it would be helpful to have the Bush family send in a letter of recommendation:

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



Sharon's (whose texts are on the left) reference to the "rec letter" was to a sample recommendation letter LA Wife-1 had sent her for reference. Sharon's reference to "Do you think a rec from GB and Laura would actually be helpful" meant former President Bush and former First Lady Laura Bush. Her reference to "He won't do it if B does tho" was to President Biden, and she was claiming that President Bush would be willing to write a letter for them, but only on the condition that then-President Biden did not. Gaurav Srivastava later told LA Wife-1 that former First Lady Jill Biden called the private school and put in a good word for them.

163. Ultimately, the Srivastava child was not accepted. They failed the vetting process after the school spoke to their former landlord in LA who had explained how the Srivastavas' wrecked property at the house and failed to pay rent. Sharon told LA Wife-1 that the landlord had lost a lot of money and split with his wife and that is why he made up the negative story about the Srivastava family. Sharon claimed they were racially targeted and that local neighbourhood kids put threatening letters on their door.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**B.    The Troost Con Begins: Srivastava Falsely Claims to Work for the CIA and That He Can Use His Influence to Help Troost**

164.    In early 2022, Russia's invasion of Ukraine disrupted global commodity markets and complicated financing for any firm touching Russian-origin crude. Troost's business, PECSA, had historically lawfully marketed Russian-origin ESPO crude in Asia, and PDMCC lawfully operated under applicable UAE law even after the G7 Price Cap took shape in December 2022. Nonetheless, financing pressure and a smear campaign by a debtor falsely tying Troost to the Kremlin through public articles that had begun appearing created potential vulnerability.

165.    Concerned about the debtor's threats to spread these false claims, particularly during a very negative public climate for marketing Russian oil even though it was entirely lawful, Troost confided in his close business partner, African businessman Ibrahima Camara. Camara believed that their mutual associate, Habib Kagimu, could connect Troost with an individual referred to as "Mr. G," who was purported to work for the CIA and might be able to help protect Troost. Srivastava's supposed links to the CIA made him appear potentially helpful in the situation, given that the debtor had made claims of association with the CIA when entangling himself with Troost.

**1.    The Fake FBI Investigation and the "Vetting" of Troost for the "Program"**

166.    On May 9, 2022, Kagimu set up a three-way call to introduce Troost to Srivastava ("Mr. G"). In advance of the call, Kagimu had told Troost many of his observations of Srivastava's claimed connection to the CIA, as set out in Paragraphs 105 to 116, above. Troost reviewed a Unity Resources Group brochure, which plainly portrayed it as a legitimate defense contractor.

167.    From his first conversation with Troost, Srivastava claimed to work with the U.S. Government, which was false. He claimed to be extremely busy on many important projects for the U.S. Government, but that he was speaking to Troost as a

54

favor to his "good friend" Kagimu, for whom Srivastava said he would "do anything." They discussed, among other things, a supposed operation Unity Resources Group was conducting in Sudan with Kagimu on behalf of the U.S. Government. Troost discussed his general business operations and explained that the debtor was trying to generate a damaging U.S. law enforcement investigation against Troost and his companies based on false allegations, and alarming recent inquiries from journalists with major publications that, in Troost's estimation, were initiated by the debtor against him. Srivastava asked Troost to write up a detailed account of his history with the debtor so Srivastava could check with his colleagues within the U.S. Government whether the debtor had reported Troost.

168.   On May 16, 2022, Srivastava, from California, texted Troost, who was outside the United States at the time, via WhatsApp to ask him for the written history of his interactions with the debtor and the debtor's claims of CIA affiliation: "Will you be sending the timeline as discussed?" In response, Troost texted him a copy of the memo the next day. The following day, Srivastava texted back to recommend a particular public relations group who could help him manage the incoming barrage of mal-informed questions from journalists.

169.   Within days, Srivastava reported back to Troost by telephone that he had purportedly asked his U.S. Government colleagues about Troost and discovered that the debtor, who Srivastava said was a powerful adversary, had given the FBI a multi-hundred-page report against Troost indicating that he was an agent of the FSB (the Russian secret services) who had been working for a sanctioned Russian oligarch in Russia for over 20 years. Srivastava told Troost that he had confirmed the FBI was investigating him.

170.   The good news, according to Srivastava, however, was that he had convinced "the Agency," referring to the CIA, that the FBI report was false. Srivastava also said that in addition to solving the supposed problem with the FBI, he wanted to work with Troost on behalf of the U.S. Government. Srivastava said

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT

that having actors aligned on believing in Western ideals well-positioned within the Russian oil market was in the U.S. Government's interest. He claimed that the U.S. Government was concerned that the profits of "pop-up" oil traders that had emerged since Russia's invasion of Ukraine might be funding weapons purchases for Russia and terrorist activities. Srivastava proposed they could work together as part of a secret U.S. Government program, which Srivastava referred to as "the Program." Srivastava claimed that Unity Resources Group already had a license from OFAC and they wanted to partner with a trader. None of it was true.

171. Troost was persuaded that Srivastava's plan of continuing to market Russian-origin oil in partnership with U.S. intelligence served Western security interests, because (1) such business supported the U.S. Dollar, which otherwise might be weakened by the mass migration of Russian-origin oil trading to Chinese or other currencies, and (2) bad actors affiliated with Putin and his cronies would otherwise take over Paramount's oil supply and funnel the profits into the Russian war machine, whereas Troost intended for Paramount to use profits to fund special U.S. programs, food security initiatives in Africa, and to support Ukraine. Srivastava exploited these legitimate commercial and geopolitical concerns to reinforce the false narrative that Troost was partnering with the U.S. Government.

172. Srivastava asked to meet Troost as quickly as possible to personally vet him to satisfy "the Agency" that Troost should take part in the Program. He first asked Troost to go to California. Troost texted Srivastava his Dutch passport information on May 31, 2022. To assist with Troost's visa application, on June 1, 2022, Srivastava directed Onouye to send a letter on Global Energy Law Group's letterhead on behalf of Unity Resources Group, Srivastava's supposed front company for the CIA, purportedly formally inviting Troost to the U.S. to finalize commercial

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

contract discussions in connection with Unity's business:



173.    Troost sought expedited entry into the United States, but it was denied (the U.S. later granted Troost a travel visa, and he has traveled back and forth to the U.S. repeatedly from September 2022 to the present without ever being stopped for questioning or denied entry).

174.    Srivastava then staged a sham "assessment" by Nicolas Bravard—presented to Troost by Srivastava as "the FBI's man in Swiss banking." The objective was simple: create fear, then offer immunity—at a price. On June 1, 2022, Bravard, from Spain, introduced himself by WhatsApp to Troost, in Switzerland, suggesting "it is better if we meet in a quiet place." They made arrangements to meet on June 6.

FIRST AMENDED COMPLAINT

175.  On June 4, 2022, prior to meeting Bravard, Kagimu reinforced the perception that Srivastava was the chairman of a U.S. Government contractor, Unity Resources Group, in a text message to Troost, "The Founding Chairman of this US Defence contracting Group is Mr. Gaurav Srivastava!":



176.  As planned, on June 6, 2022, Troost chartered a jet to fly Bravard from Spain to Switzerland to interrogate Troost about Russia, sanctioned oligarchs, terrorism, and Ukraine, presenting himself as a U.S. Government risk assessor. He warned Troost that "they"—whom Troost understood to mean the U.S. government and Srivastava—needed honesty before taking him into the Program.[7]

177.  Troost was anxious, and later that night at around 9 p.m. Bravard texted, "Good evening. I haven't talked to him [Srivastava] yet. What time u leave tomorrow. If needed can we meet same place [at the airport] before u go?" Troost was flying to Dubai the next morning with Ibrahima Camara. Bravard and Troost met again at the

---

[7] Srivastava later admitted that he told Troost that Bravard was a "hard-nosed guy," "I trust him completely and he's going to meet you," and "He's going to ask you some really tough questions and please be honest with him. Don't give stories." Srivastava said, "I do it all the time in other businesses. I say, you've got to vet." Srivastava admitted that he called Bravard in Spain and asked him to meet Troost. Srivastava said he thought Troost rented a plane to pick up Bravard and "I wanted to see how far he was going to go," "Will he [Troost] put his money where his mouth is." Srivastava said, "That showed commitment to me." In other words—Srivastava was sizing up his mark to determine how big of a fraud Troost would be susceptible to. Logan Podcast (31:43 to 33:44).

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

airport the next morning just after 10:30 a.m. On their way to the airport, Troost told Camara that he was meeting with Srivastava's agent in Europe who was interviewing him on behalf of the U.S. Government. This second meeting was hostile. Bravard accused Troost of lying about Russian connections and threatened to send a damaging report directly to the FBI Director.

178.    Troost confided in Camara immediately afterward that he was terrified. He believed he had just been interviewed by actual U.S. intelligence officers and feared the consequences of a negative FBI report.

179.    Srivastava called Troost later to "reassure" him, claiming he had spoken to the FBI Director and that the Bureau had "cleared" Troost to work with the U.S. government. None of this was true.

180.    In the upcoming weeks, they discussed by phone that Troost had to show his good faith to the U.S. Government, make sure that the problem with the debtor was fully resolved, demonstrate that he was not a Russian spy before entering the Program, and start building a long-term mutually beneficial business relationship with the U.S. Government. Srivastava told Troost he needed to start funding Srivastava's U.S. Government operations.

181.    Srivastava claimed that his CIA front company, Unity Resources Group, used a California-based law firm, Global Energy Law Group, to facilitate clandestine funding of U.S. Government operations. He claimed this law firm was approved to conduct such business by Nancy Pelosi, then Speaker of the House of Representatives. Srivastava gave Troost the law firm's U.S. bank account information. Troost, believing Srivastava's fraudulent claims that he was partnering with the U.S. Government and supporting Srivastava's clandestine operations, quickly made sure that an entity with which he was affiliated wired $785,000 from a Singapore bank to Global Energy Law Group's U.S. bank account ending x4606 on June 21, 2022:

**Your Public Service Trust Account**

for June 1, 2022 to June 30, 2022                Account number: [REDACTED] 4608

CALIFORNIA IOLTA TRUST ACCOUNTS    GLOBAL ENERGY LAW GROUP, P.C.

**Deposits and other credits**

| Date | Transaction description | Customer reference | Bank reference | Amount |
|---|---|---|---|---|
| 06/21/22 | WIRE TYPE:INTL IN DATE:220621 TIME:0440 ET TRN:[REDACTED] SEQ:[REDACTED] ORIG:INTEROIL TRADING ASIA PTE ID:[REDACTED] PMT DET:INVOICE [REDACTED] | | 903706210302892 | 784,989.45 |

Srivastava also asked Troost to send $12 million to fund operations of the U.S. Department of Homeland Security and, he said, the "Executive Branch," referring to the President.

182.   But Srivastava had lied. Global Energy Law Group was not affiliated with the U.S. Government or then Speaker of the House Nancy Pelosi. And it did not fund clandestine operations for the Department of Homeland Security or the Executive Branch. It was a one-lawyer firm with an attorney trust account coopted by the Srivastava Enterprise to steal funds from Plaintiffs and then launder the proceeds of fraud.

183.   By June 20, 2022, Srivastava's balance in Global Energy Law Group's account from prior frauds had dwindled down to just over $10,000. So, the Srivastava Enterprise immediately started distributing the first profits illegally obtained from their new fraud victim, Troost. Of that $785,000, Srivastava directed Onouye to immediately use over $210,000 to pay the LA County Sheriff for a lien against Sharon Srivastava's house on Micheltorena Street in LA:



FIRST AMENDED COMPLAINT



Srivastava also directed Onouye to send:

- $125,000 to Canopus Corporation, one of Srivastava's companies that was part of the Enterprise;

- $200,000 to the U.S. bank account of Unity Intelligence Group, another of Srivastava's companies that was part of the Enterprise;

- $10,000 to Srivastava's brother, Pankaj Srivastava, in India; and

- $152,000 to several luxury resorts in Country-1.

Of course, none of these transfers funded U.S. Government operations as Srivastava had claimed; instead, they funded the Enterprise's operations and the Srivastava family's opulent lifestyle.

184.  To celebrate reaping their first profits from Troost, Gaurav and Sharon Srivastava traipsed across the Pacific to Country-1 in Southeast Asia for an epic luxury vacation funded by fraud. This was no mere holiday, however; investing some

61

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

of the fraud proceeds into this extravagant trip created the perfect scenario through which to extract an even bigger payday from Troost.

## 2.    The Country-1 Interrogations

185.    Srivastava invited Troost to meet him for the first time in Country-1, where he claimed to lead special operations and to be preparing for the U.S. delegation ahead of the G20 Summit. Troost flew there to meet him on June 30, 2022, staying through the night of July 5, 2022.

186.    Over multiple days and nights during that trip, Srivastava interrogated Troost at length, repeatedly invoking "Homeland Security," "the Agency," "the Bureau," and his supposed CIA training at "the Farm," referring to the CIA training camp in Virginia. Troost, believing he was speaking to a senior U.S. intelligence officer, disclosed details about his business, his dispute with the debtor, and his fears about false allegations tying him to Russia. While swimming, Srivastava claimed to Troost that scars on his torso were wounds from special missions he carried out for the U.S. Government.

187.    Srivastava also reaffirmed that he could help Troost and Paramount through his privileged contacts with U.S. Government agencies. Srivastava claimed that he could not only ensure that the debtor stopped bothering Troost and "take care" of the purported FBI file and avoid OFAC targeting, but also explained how he could help Troost with Paramount's trading activities, which were then under attack by the media, particularly with respect to African commodities in which Srivastava claimed he was being paid.

188.    Srivastava claimed the CIA and other U.S. Government agencies had approved the Program and that OFAC would issue special licenses to participants. To reinforce the deception, he handed Troost the business card of Evan Seltzer, "Special Assistant to U.S. Terrorism and Financial Intelligence" with the U.S. Treasury Department, claiming Seltzer was working with him.

189.    Srivastava also repeatedly questioned Troost about Russian oil traders,

62

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

claiming to be interrogating him on behalf of the U.S. Government. On July 6, 2022, Srivastava texted Troost, who had just left Country-1, requesting information about a large trading company run by an oil magnate (now sanctioned) and the sanctioned Russian oligarch the magnate reports to:



Srivastava created this text to look like it was an information request from third parties within the U.S. Government ("Information requested from you:"), it said the information was "to shape our first steps," and it also referred to the individuals as "targets." On or about July 21, 2022, over an international wire communication, Srivastava shared a chart of Russian oil trading businesses he developed from information he extracted from Troost:

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

63





190.    Srivastava also later commissioned an artist to prepare a political caricature criticizing a Kremlin-connected oligarch who controls certain Russian oil exports, drafts of which he sent to Troost and said that he was trying to have it published in the *Washington Post* and the *New Yorker* in order to attack those networks on behalf of the U.S. Government as part of the Program:



These episodes reinforced Troost's perception that he was partnering with the U.S. Government on a Program run by Srivastava relating to Russan-origin oil. But he was not.

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

64

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

191.   Troost traveled back to Country-1 from July 16 to 18, 2022, this time accompanied by his wife, who Srivastava said also needed to be vetted as part of his entry into the Program. Srivastava understood that maintaining the confidence of Troost and his wife was essential to the success of the fraud. Accordingly, Gaurav and Sharon Srivastava engaged in a coordinated effort to lend credibility to Srivastava's false claims. On multiple occasions, Sharon was present when Srivastava made false representations concerning his background. For example, in the lobby of the Raffles Hotel, Srivastava, in front of Sharon, explained to Troost, his wife, and owners of the hotel that he owned two companies with over two thousand employees (false) that took government helicopters and refitted them for special missions (also false). Srivastava also showed Mrs. Troost a video of a person on a moving motorcycle climbing onto a flying helicopter, suggesting this was one such special mission. This photo shows them that night; the Troosts are top-left, the Srivastavas top-right, and hotel owners in front:



192.   While Troost was with Srivastava during these two trips, Srivastava repeatedly claimed he ran a CIA "Program" involving monitoring Russian oil flows for U.S. national security and promised Troost that OFAC (and its European counterparts, including SECO) would allow his businesses to continue trading Russian-origin oil even if Western sanctions were imposed restricting the oil trade. He also claimed that without Srivastava's help, Troost and his companies ran the risk of being sanctioned by OFAC.

193.   Around this time, Srivastava also arranged a Zoom call with retired

65

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

General Wesley Clark, whom he presented as a senior Program participant. Srivastava introduced Troost to General Clark as his "latest recruit." They discussed Troost's potential ability to trade sugar that General Clark said he was getting from a Latin-American country. Before the call, Srivastava told Troost that he and General Clark had carried out a special operation and were getting paid in sugar. Troost was impressed with General Clark. And it reinforced the impression that Troost was entering a legitimate U.S. Government operation.

194.    On July 24, 2022, Srivastava sent Troost a photo of himself inspecting a military hanger (you can see the tip of a fighter jet to the far left), the scene reinforcing the perception that Srivastava worked for the U.S. Government:



### 3.    Troost is "Accepted" into the Program

195.    After Srivastava finished interrogating Troost in Country-1, he told Troost that he had "great news." Srivastava claimed he had spoken with then-CIA Director William Burns, who had personally given the "go-ahead" for the CIA to partner with Troost and Paramount.[8] He warned Troost not to speak about his CIA-

---

[8] Srivastava was recorded on May 6, 2023, again falsely claiming he was speaking

FIRST AMENDED COMPLAINT

affiliation or the Program with anyone but him.

196.    On another Troost trip to Country-1 in or around August 2022, Srivastava took Troost by motorcade to the estate of a public official of Country-1. Srivastava claimed he had lived on the compound while conducting a covert CIA mission. Their apparent familiarity with Srivastava deepened the illusion that he was operating with official sanction.

197.    Camara also traveled with Troost to see Srivastava in Country-1. Camara at the time had believed Srivastava's false claims that he was with the CIA. Srivastava falsely claimed that he was overseeing efforts to catch people in African countries with substantial mineral and energy resources who were wanted by the U.S. Government and that he needed assistance from local governments to carry out the operation. He claimed that, in exchange, he could secure U.S. government support for those countries' presidents.

198.    Srivastava instructed Camara to set up a call between Srivastava and the president of a particular African country. Camara was physically present when the call occurred and translated for Srivastava, who spoke over speakerphone. During the call, Camara heard Srivastava tell the African president that he was with the CIA and that he could help the president and his country on behalf of the U.S. Government. He falsely claimed he could provide U.S. security assistance to the country, and that he would personally bring then-President Biden and a U.S. Senator to meet with the African president. Later, Camara learned that Srivastava had dispatched a so-called "security advisory team" to the country—one that included a retired four-star U.S. general—further lending credibility to Srivastava's fabricated intelligence persona and strengthening the deception he had constructed around his purported CIA ties.

---

with Director Burns. *Troost v. Arkin*, Dkt. No. 14 at 2:21-3:8.

FIRST AMENDED COMPLAINT

**4.      Srivastava's Fraudulent Efforts to Obtain Liberian Oil and Mineral Concessions**

199.    Srivastava invited Troost to the Atlantic Council's 2022 Global Citizen Awards Gala on September 19, 2022—a high-profile event in New York City led by Frederick Kempe at a prestigious American think tank focused on international security and global economic prosperity. Srivastava served as co-chair of the gala, and an advertisement for his Foundation appeared in the program touting its sponsorship of the gala, even though the Foundation did not yet exist as a legal entity.

200.    It turns out that Srivastava paid for this publicity and prestigious spot at the gala out of cash Troost had sent to Global Energy Law Group's U.S.-based IOLTA account to fund U.S. Government operations:



201.    At the gala, Srivastava arranged for Troost to sit with him, General Clark, and Mary Beth Long, a former Assistant Secretary of Defense and former CIA operations officer. Srivastava described Long as a "former black-ops CIA operative who is not actually retired" and told Troost she would be "vetting" him. Long asked a series of innocuous questions about Troost's background and business, but after roughly 90 minutes abruptly left the table and did not return. When Troost asked why she had departed, Srivastava claimed she had been called away for a "CIA emergency."[9] Srivastava also used the event to introduce Troost to various major business leaders and re-connect with various Country-1 officials—further burnishing the illusion that Troost had entered a U.S. intelligence-sanctioned circle.

---

[9] Unbeknownst to Troost at the time, Long had been involved in *U.S. v. Marshall*, where Matthew Marshall posed as a CIA officer to defraud a Montana businessman. Long, working with Srivastava Enterprise member, John Maguire, falsely vouched for Marshall's bona fides, and Marshall was ultimately convicted of crimes and sentenced to prison. *See, infra* ¶ 299 & nn. 15-16.

ROSEN ✦ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

202.   The Atlantic Council also announced that Gaurav Srivastava would be sponsoring the upcoming food security conference in Country-1 in November. This too, Srivastava paid for with cash Troost sent to Global Energy Law Group's U.S.-based IOLTA account to fund U.S. Government operations, transferring $800,000 to the Atlantic Council that day:



203.   While in New York City with Troost to attend the gala, Srivastava continued presenting himself to Troost as a CIA officer and asked Troost to arrange an in-person meeting with Ousmane Bamba, a friend of then-President George Weah of Liberia. Troost coordinated the meeting with Bamba via WhatsApp, and the three met for breakfast at the Southgate Restaurant in the Marriot Essex Hotel on Central Park South in Manhattan. During that meeting, Srivastava falsely told Bamba that he worked for the CIA and claimed that the U.S. Government could help President Weah win re-election. Srivastava stated that he could damage Weah's political opponents by arranging to plant drugs and weapons in their homes, provide voting machines capable of manipulation, and ensure that U.S. election observers would validate the election's results. In exchange, Srivastava said the U.S. Government wanted a petroleum block and assistance locating terrorists in Liberia. To bolster the deception, Srivastava lifted his shirt to display scars he falsely claimed came from combat.[10] Bamba rejected Srivastava's proposal but offered to help the U.S. obtain the petroleum block.

204.   In November 2022, Srivastava resumed the Liberia scheme. By international telephone call, he asked Bamba to introduce him to the Liberian National Security Agency. Relying on Srivastava's representations, Bamba

---

[10] Srivastava claimed on the Logan Podcast that he had a serious kidney operation when he was a child and "I had tubes hanging out of me." On information and belief, that was the cause of Srivastava's scars, not any CIA mission or battle action, as he told multiple people as part of his frauds.



ROSEN ✦ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

connected him with the NSA's Deputy Director, Gerald Smith.

205. Srivastava and Smith subsequently spoke several times by interstate and international wire communications. In those conversations, Srivastava again pretended to be a CIA operative and claimed he could help President Weah secure re-election. He further asserted that the CIA and the Liberian NSA could work together through him to form a joint intelligence team, that he had access to CIA-level intelligence which he would share with Liberia, and that he could arrange for CIA training for Liberian intelligence personnel. Srivastava also claimed he could obtain CIA funding to track terrorists he would identify. Based on these representations, Smith agreed to meet Srivastava in the United States. On December 11, 2022, Srivastava (on information and belief, from California) texted Smith (in Liberia) "Pls text me on Signal. Your full name and title." Smith responded the same day and asked for Srivastava's. Srivastava replied, "Gaurav Srivastava UNITY RESOURCES GROUP."

206. Between December 2022 and January 2023, Srivastava and Smith exchanged messages on WhatsApp and Signal to coordinate their communications and the anticipated meeting. The meeting was scheduled for January 6, 2023, in Washington, D.C. However, after Smith traveled to the United States, Srivastava abruptly canceled the meeting. The meeting never occurred.

### 5. Srivastava Uses Stolen Funds to Buy Political Access to Create the Illusion of U.S. Government Support

207. To elevate his profile and cement the impression of U.S. Government backing, Srivastava's Foundation co-hosted the Atlantic Council's Global Food Security Forum in Country-1 in November 2022. Invitations to world leaders, including the Prime Ministers of the UK and Japan, listed the Foundation as a sponsor. In addition to the $800,000 he sent to the Atlantic Council on September 19, 2022 via Global Energy Law Group, he sent another $1.7 million to the Atlantic

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Council on November 4, 2022 (also from cash fraudulently obtained from Troost):

| 11/04/22 | WIRE TYPE:WIRE OUT DATE:221104 TIME:1523 ET | 903711040421142 | -1,700,000.00 |
| | TRN:▮▮▮▮▮▮▮▮ SERVICE REF:▮▮▮▮▮ | | |
| | BNF:ALANTIC COUNCIL OF THE UNT | | |
| | ID:▮▮▮▮▮▮ BNF BK:CITIBANK, N.A. | | |
| | ID:2▮▮▮▮▮▮▮ PMT DET:▮▮▮▮▮▮▮ / Other | | |
| | INVOICE NO. 5356 | | |

208.   The event opened with remarks by the Atlantic Council's President and CEO and Srivastava. The second day featured video messages from then-Senate Majority Leader Chuck Schumer, Senator Debbie Stabenow, and Representative Pat Ryan, who publicly thanked Srivastava and the Foundation "for hosting and convening such a timely and important conversation."



209.   Srivastava told Troost that this access to U.S. political leaders flowed from his CIA role and their support for the Program. In reality, Srivastava was buying access: in the months preceding the forum, he and his company, Orbimo, secretly contributed more than $1.6 million to political organizations and campaigns, including those of officials whose names he used to bolster his fabricated intelligence credentials. Troost had no knowledge of these contributions.

210.   The Enterprise funneled money to the Democratic candidates via Global Energy Law Group. As alleged in paragraphs 230 to 245, PDMCC transferred over $6 million to Global Energy Law Group's U.S.-based IOLTA account in July 2022 on Troost's understanding from Srivastava that the money was funding operations

71

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

by the Department of Homeland Security and the Executive Branch; Srivastava prepared a sham engagement letter to paper over the transfer. On October 20, 2022, at the direction of Srivastava, Global Energy Law Group wired $250,000 of those proceeds to the bank account ending in x9046 of Vote Vets, a political action committee supporting Democratic political candidates who had served in the U.S. military:



According to official U.S. Government records, this contribution was attributed to Orbimo:

| | An official website of the United States Government 🇺🇸 |
|---|---|
| **Federal Election Commission** UNITED STATES —of— AMERICA | |

| Contributor name | Recipient | State | | Receipt date | Amount |
|---|---|---|---|---|---|
| ORBIMO CORPORATION | VOTEVETS | CA | | 10/20/2022 | $250,000.00 |

211.  As alleged below in paragraphs 246 to 253, in a series of four transactions over November 3 and 4, 2022, Plaintiffs sent approximately $6 million more to Global Energy Law Group in California, again on Troost's understanding from Srivastava that the money was funding operations by the Department of Homeland Security and the Executive Branch; Srivastava prepared a sham engagement letter to paper over this transfer, too. On November 5, Srivastava directed Global Energy Law Group to wire $550,000 of those proceeds to the Vote Vets bank account ending in x9046, saying it was "urgent":

| 11/07/22 | CA TLR transfer to CHK 9046 Banking Ctr SANTA MONICA    #0000218 CA Confirmation# 2867181415 | 957611077503563 | -550,000.00 |
|---|---|---|---|

According to official U.S. Government records, this contribution was also attributed to Orbimo:

| Contributor name | Recipient | State | Employer | Receipt date | Amount |
|---|---|---|---|---|---|
| ORBIMO CORPORATION | VOTEVETS | CA | | 11/07/2022 | $550,000.00 |

First Amended Complaint

212. Also on November 7, Srivastava, on behalf of the Enterprise, directed Global Energy Law Group to wire $500,000 of those proceeds to the Senate Majority political action committee:



```
11/07/22   WIRE TYPE:WIRE OUT DATE:221107 TIME:1518 ET            903711070480400            -500,000.00
           TRN:▮▮▮▮▮▮▮▮▮▮) SERVICE REF:012985
           BNF:SENATE MAJORITY PAC ID:8▮▮▮▮▮▮▮ BNF
           BK:AMALGAM ATED BANK ID:▮▮▮▮▮▮▮ PMT
           DET:▮▮▮▮▮▮2 DONATION
```

213. Srivastava also used Global Energy Law Group to pay approximately $1.2 million to book superstar entertainer John Legend to perform, as well as $295,000 to charter him a private jet to Country-1. The founder of the company through which Mr. Legend was booked ("**Event Producer-1**") had spoken with the president of the Atlantic Council, who said that Srivastava was paying for the conference, and he also participated in a zoom call with Srivastava, General Wesley Clark, and others. They told Event Producer-1 that Srivastava was involved in the oil and gas industry and had done work for various governments. Event Producer-1 had several calls and texts with Gaurav and Sharon Srivastava. As the event came closer, Mr. Legend's attendance had not been paid for. Event Producer-1 texted Srivastava and said, "I need the funds." Srivastava said that he would have the funds in three minutes, and the funds arrived about three minutes later. Event Producer-1 also helped employ a communications firm in New York City to write Sharon Srivastava's speech for the conference.

## C. The Fake Program's Actual Goal: Control Over Paramount and Troost's Assets

214. Once Troost believed he had been "accepted" into the Program and was dealing with a legitimate covert U.S. intelligence operative, the Srivastava Enterprise shifted from manipulation to execution. Srivastava immediately launched three parallel tracks, each designed to secure control over Paramount and its assets: (1) seizing beneficial ownership of PECSA, (2) siphoning tens of millions of dollars into accounts and companies Srivastava and the Enterprise controlled under the phony

73

FIRST AMENDED COMPLAINT

guise of "Program" operations, and (3) executing the U.S. "inversion" that would redomicile the business under a U.S. parent the Srivastava Enterprise controlled.

### 1. The Srivastava Enterprise Fraudulently Obtains Beneficial Ownership of 50% of PECSA

215. When Troost first encountered Srivastava, the ownership structure of his companies was simple and secure: Troost personally owned 100% of EZI; EZI owned 100% of PECSA; and PECSA owned 100% of PDMCC. PECSA and PDMCC were highly profitable businesses at the time.

216. Srivastava quickly set out to dismantle that structure and fraudulently obtain control over these extremely valuable companies. He convinced Troost that the U.S. government could not license Paramount to continue trading Russian oil so long as it remained 100% foreign owned. According to Srivastava, U.S. policy required him—acting as a CIA asset—to hold meaningful control of Paramount from within the United States.

217. Srivastava told Troost that, to satisfy these purported U.S. requirements, PECSA needed to be restructured so that: (1) Srivastava—as a purported U.S. citizen, as he claimed—would own 50% of PECSA through a Swiss front company held by Bravard; and later (2) PECSA would ultimately be redomiciled in the United States under a new U.S. parent entity that, unbeknownst to Troost at the time, Srivastava and the Enterprise intended to assume total control of. Srivastava repeatedly emphasized that Paramount's "acceptance" into the secret Program—and with it, the OFAC licenses necessary to demonstrate PDMCC's bona fides to be exempted from Western sanctions—depended on his becoming a 50% shareholder and, later, total restructuring.

218. Srivastava also represented that PECSA would function as a CIA front company and that its operations, transactions, and tax payments had to appear free from U.S. government involvement to preserve his "non-official cover." He claimed the arrangement would benefit Troost personally and commercially: Troost would be

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



helping Western and African strategic interests, avoiding the risk of sanctions, and partnering with the U.S. government to expand his business opportunities. Srivastava further asserted that the U.S. Treasury would invest $2 billion into the project once the restructuring was complete, a claim he repeated to others such as Kagimu.

219.   Srivastava's deception was so convincing, and the time-pressure he exerted was such, that in late July 2022, Troost wrote to PECSA personnel that "the survival and future of the company depends" on transferring 50% of PECSA, describing the matter as "extremely important and urgent."

220.   In July 2022, while Troost was in Country-1 meeting with Srivastava, Troost called Robin Luisier, the director of EZI, which owned PECSA. Troost explained he was selling 50% of his corporate assets to an unnamed buyer for a nominal value. Alarmed, Luisier questioned why Troost would give away half of a highly profitable company for essentially nothing. Troost responded that his new business partner was "active CIA" and that the transfer was necessary to avoid U.S. sanctions and ensure government support for continued Russian oil trading. Luisier relayed this conversation at the time to another tax advisor, Jean-Marc Wasem.

221.   That same month, Bravard—who, as an essential participant in the Enterprise, would hold Srivastava's interest as a proxy—pressed Troost to act quickly. On July 14, 2022, he texted Troost: "Let's talk when u have 5 mn. **I am under Pressure to deliver a deal**. […] Let's work under the assumption I will through a newco or directly acquire 50 pct of your shares… We need to move fast." (emphasis added). Troost responded that "I know G likes to put pressure." Bravard replied, "we need to move to the next step tomorrow. Sorry, but we can't wait at this point":





222.   On July 18, 2022, in reliance on Srivastava's false representations and in response to the Enterprise's pressure, Troost emailed the directors of EZI and PECSA, as well as Bravard (at his Gmail address), to initiate the transfer of control. He introduced Bravard as his "new partner" with whom he would equally split ownership, while omitting Srivastava's role to preserve Srivastava's purported CIA anonymity; Srivastava had instructed Troost not to talk about the Program or Srivastava's CIA connection.

223.   That same day, Wasem and Luisier exchanged messages expressing grave concerns. Luisier speculated that Bravard might be connected to the threatening Paramount debtor. Both men noted that the situation appeared "crazy." When they flagged potential Swiss tax consequences, Troost reassured them that his partner was connected with OFAC, the Swiss Secret Service, and SECO, and that "there would be no Swiss tax issue."

224.   On July 20, 2022, distressed by the pressure campaign, Troost told Bravard via Signal: "I kindly ask you to stop putting pressure and try to rush things … This is a long-term strategic partnership … it's best to do everything right instead

76



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

of in a rush." But Srivastava and Bravard intensified their push.

225.   A few days later, on July 23, 2022, Srivastava and Bravard coordinated to manufacture the false impression that U.S. officials were displeased with Troost for not completing the transfer after "[a] lot of structures have been put in place to continue operations for NT," which Troost understood meant they were making plans to admit him into the Program. Srivastava messaged Troost that his U.S. intelligence colleagues—"my guys"—had told him that the Executive Branch ("EB") and Department of Homeland Security ("HS") were upset with Troost for "renegotiat[ing]" and warned that "[t]his is not how to build a friendship." The "12 per month" referred to the cash that Srivastava told Troost he needed to contribute each month to fund U.S. Government operations through Global Energy Law Group. The text concluded "EB & HS calling now," and "From my guys on your proposal. Call after speaking to them," which Troost understood from Srivastava referred again to the Executive Branch and Homeland Security:



FIRST AMENDED COMPLAINT

On information and belief, Srivastava fabricated this message purportedly from U.S. officials and sent it to Troost for the purpose of convincing him to sign over 50% of future profits of his companies to Srivastava and to keep sending more cash purportedly for U.S. Government operations.

226. Meanwhile, Wasem and Luisier exchanged additional messages on July 28, 2022, expressing fear that Troost was being conned and that the deal could lead to a complete corporate takeover. Wasem speculated (presciently, as it turned out) that Bravard, acting as Srivastava's front, could steal $250 million from Troost and then get him sanctioned. Luisier responded, "**we are fine, Joe Biden is behind this**," reflecting his understanding at the time from what Troost had told him that the arrangement was supported by the U.S. Government.

227. On July 30, 2022, Troost transferred 50% of his interest in PECSA to the Enterprise, through Bravard's 1234 Holding, for a token CHF 50,000, while the company was valued in the SPA itself at around US $350 million.[11] In March 2025, the Dubai Chief Prosecutor's investigation found that the Enterprise's "completing the acquisition of half of [PECSA]'s shares for [that] amount does not comply with accounting standards or customary commercial practices in ownership transfer operations."[12] Worse yet, the token fee paid for the shares was from cash Troost had sent to Global Energy Law Group to fund U.S. Government operations; on July 21, 2022, Global Energy Law Group wired $150,000 of those proceeds to Bravard's company, Dorsay Services in Switzerland, before Bravard paid just over $50,000 on

---

[11] Bravard, a critical Enterprise member, acted as the face of Srivastava's 50% interest in the business, and Bravard, not Srivastava, was recorded in PECSA's official share registry as the beneficial owner of 50% of the shares. 1234 Holding was a Switzerland entity Bravard had incorporated for that purpose on or about July 26, 2022. Bravard held 100% of 1234 Holding through a company called Waterfall Holding Suisse SA, of which Bravard also was the sole director and 100% shareholder. Troost also transferred half his ownership in Harvest Commodities SA to Srivastava based on the same fraudulent pretenses.
[12] *Troost v. Arkin*, Dkt. 44.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

July 30 for the shares:

| 07/21/22 | WIRE TYPE:INTL OUT DATE:220721 TIME:1728 ET TRN:▮▮▮▮▮ SERVICE REF:4▮▮▮ BNF:DORSAY SERVICES SARL ID:CH▮▮▮▮▮▮ BNF BK:CREDIT SUISSE (SWITZERL ID:0▮▮▮▮ DET:▮▮▮▮ CONSULTING SERVICES POP SERVICES | 903707210477098 | -150,000.00 |

228.    After the agreement was signed, Troost introduced Luisier and Wasem to Bravard. Later, Bravard finally acknowledged to Luisier and Wasem that Srivastava was the true party behind the transaction and claimed Srivastava had CIA connections. When the advisors raised potential tax concerns, Bravard dismissed them, saying Srivastava would "take care of it" with OFAC, SECO, and Swiss tax authorities. Bravard even displayed a photograph on his phone of Srivastava standing with President Joe Biden as supposed proof of his government ties.



229.    Once Srivastava and Bravard had secured 50% of PECSA, the Enterprise advanced to the next phase: ensuring they could seize total control of PECSA and its assets. They devised a plan to move PECSA into a U.S.-based corporate structure to be controlled entirely by Srivastava and the Enterprise—a restructuring they called the U.S. "Inversion." In internal email correspondence, Bravard had told Srivastava and Onouye by international email that the Enterprise would "create a US subsidiary" that would "take over all compliance [and] control of the group," and Srivastava intended to use Defendant Unicom Worldwide as the U.S. vehicle.

79

**2.    The Srivastava Enterprise Fraudulently Siphons Tens of Millions of Dollars from Troost's Businesses**

**i.    Wire Fraud and Money Laundering Involving Global Energy Law Group**

230.   During Troost's visit to Country-1 to meet Srivastava from June 30 through July 5, 2022, in connection with Troost's purported "acceptance" into the Program, Srivastava pressed Troost to send more cash supposedly to support activities allegedly run by the Department of Homeland Security and the U.S. Executive Branch via Global Energy Law Group, which he represented as a firm closely associated with then-Speaker of the House Nancy Pelosi and used by senior national-security officials. Troost had already sent a smaller payment of $785,000 a few weeks before. As was his pattern and practice to continuously reinforce his bona fides as a CIA operative by showing photographs of himself with top U.S. government officials, Srivastava sent Troost a photo of himself with Speaker Pelosi in October:



231.   In reality, Global Energy Law Group had no association with the U.S. government or Speaker Pelosi; it was controlled by Onouye, Srivastava's facilitator and personal attorney on limited, select matters. Onouye, a California lawyer, had been suspended in 2011 and 2012 after serving more than two years in a Nebraska state penitentiary for a drug-trafficking conviction. Onouye believed at the time that Srivastava was running CIA operations and therefore was willing to accept and send cash on Srivastava's behalf with few questions, since he lacked the same security

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT

clearances that Srivastava said he had. Plaintiffs knew none of this. They were instead told that Global Energy Law Group was part of a government-approved network of front entities.

232.   To preserve the illusion of government compartmentalization, the funds were to be routed through an intermediary in the United Arab Emirates—BAB Global LTD ("**BAB Global**"), chaired and operated by Sultan Saleem Hassan Khalifa Abu Sultan. They spoke with Abu Sultan while Troost was with Srivastava in Country-1. On June 30, 2022, PDMCC and BAB Global executed a written shared-services agreement under which PDMCC agreed to make an advance payment of $11,999,975 to be "settled to the legal firm that [BAB Global] will assign" to provide legal drafting, review, and consulting services related to the "Business." This was to start the process of moving money from PDMCC to Srivastava in the U.S. as Srivastava had directed.

233.   On July 5, 2022, Troost texted Abu Sultan, "can you please send your company details for the invoice from the law firm we spoke about. It needs to be settled urgently." On July 7, 2022, Troost sent Abu Sultan an unsigned copy of the Global Energy Law Group engagement letter and an invoice, which he had received from Srivastava. The engagement letter had a signature block in Onouye's name, but his last name was misspelled in the same way it appeared in Srivastava's phone contacts for Onouye. The agreement said that Virginia law applied.

234.   These were sham documents; the letterhead was not the same letterhead that Global Energy Law Group actually used, there was D.C. area code phone number on the invoice even though the firm was in California, the address was wrong, and the person who supposedly signed off on the invoice, "Mark Elders," did not exist. Srivastava lifted the text of the sham engagement letter from an engagement letter of the Virginia law firm FH+H.[13] On July 8, 2022, Abu Sultan sent the draft engagement

---

[13] FH+H was copied on the December 2020 letters from Country-1 agreeing to purchase F-15 fighter jets and Black Hawk helicopters from the Srivastava Enterprise. On October 10, 2022, Srivastava had PDMCC retain FH+H in a legal

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



letter back with a slight modification to say the engagement was between Global Energy Law Group and Bab Global and its clients—meaning PDMCC—and that London law applied, not Virginia. Troost sent that back to Srivastava.

235.  On July 8, 2022, in reliance on Srivastava's representations, PDMCC transferred $11,999,975 to BAB Global to start the process of sending funds to Global Energy Law Group.

236.  On June 11, 2022, Troost sent Srivastava's final version of the engagement letter between Bab Global and Glob al Energy Law Group to Abu Sultan:



The agreement prepared by Srivastava was a sham. The signatory, "Anthony Feldman," did not exist, and the hourly rates listed—$5,000 per hour for partners and $995 per hour for paralegals—are well above even the highest rates charged by top worldwide law firms.

237.  Shortly thereafter, Srivastava also attempted to cause PECSA to transfer an additional approximately $6.2 million from outside the United States to the bank account of Global Energy Law Group ending in x4608 at Bank of America in California.

---

dispute. Those engagement terms largely mirror the sham letters, including the rate chart, except that he took the top lawyer rate of $995/hr and made it the paralegal rate while inflating the partner rate to $5,000/hr.

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

238. On July 14, 2022, PECSA's then-director Maurice Taylor received an email from "Mark Elders," Global Energy Law Group's purported finance director, attaching a sham engagement letter (with individual lawyers charging $5,000 per hour) and demanding an initial retainer of $6,170,250:




239. Because the email from "Mark Elders" to Maurice Taylor was *also purportedly signed by* "Maurice Taylor," on information and belief, the person "Mark Elders" did not exist at Global Energy Law Group and it was instead Srivastava trying to extract cash from Paramount by fraud to benefit the Enterprise:



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

83

240.   Global Energy Law Group shared office space with a firm called "Elder Law," and on information and belief, that is where Srivastava came up with the fictitious name, "Mark Elders."

241.   When PECSA attempted to execute the transaction, its Swiss bank's compliance department rejected it, citing a lack of required information "in order to understand the underlying transactions/services linked to this mandate, in line with the size of the retainer fees paid to the law firm."

242.   By July 19, 2022, Global Energy Law Group still had not received the $6,170,250 from Bab Global.  That day, Abu Sultan texted Troost "I don't have the banking details of the law firm can you share it please." Troost responded about 30 minutes later by sending a photo of the wire instructions for Global Energy Law Group he received from Srivastava, which included the D.C. phone number and the email, "mark.elders@gblglaw.com" contact information.

243.   The next day, Srivastava was anxious to confirm that the money was on its way. Troost texted Abu Sultan to send the wire transfer instructions, saying "I need a copy of the transfer instructions now please." Abu Sultan sent a screenshot of them, showing that First Abu Dhabi Bank in the UAE sent $6,170,250 to JPMorgan Chase Bank in New York City from Bab Global to "Global Energy Law Group" for "Legal Services Retainer Agreement Inv 6272772":



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

244.    The listed invoice number matched the phony invoices Srivastava had sent. Troost forwarded the transfer instructions to Srivastava. On July 20, Srivastava made sure that Global Energy Law Group received the money, texting that same screenshot to Onouye of Global Energy Law Group, and asked him to "Pls confirm," after which Onouye sent him a screen shot of the IOLTA account balance, reflecting that it risen to over $6.4 million after receiving the funds:



245.    Starting the next day, Global Energy Law Group began distributing these funds as directed by Srivastava, including but not limited to:

    a.  $150,000 to Bravard's Dorsay Services in Switzerland on July 21.

    b.  $50,000 to Wesley Clark's consulting company on July 25.

    c.  $25,000 to a luxury home staging company on August 2.

    d.  $28,934 to Luxury Travel Services LLC on August 3.

    e.  $49,000 to a luxury resort in Country-1 on August 4.

    f.  $6,752 to a JPMorgan Account, reference "Sharon Johnson



FIRST AMENDED COMPLAINT

[defendant Sharon Srivastava] 2242 Micheltorena St" on August 9.

g.  $25,000 to Srivastava's brother, Pankaj in India on August 10.

h.  $25,000 to Srivastava's company, Canopus Corporation on August 23.

i.  $25,000 to Srivastava's company, Orbimo on August 23.

j.  $200,000 to Srivastava's company, Orbimo on September 6.

k.  $100,000 to Srivastava's company, Canopus Corporation on September 6.

l.  $100,000 to Srivastava's company, Orbimo on September 16.

m.  $100,000 to Srivastava's company, Canopus Corporation on September 16.

n.  $1 million to Sharon Srivastava's personal Citibank account on September 16:



| 09/16/22 | WIRE TYPE:WIRE OUT DATE:220916 TIME:1629 ET TRN█████████████ SERVICE REF:479195 BNF:SHARON SRIVASTAVA ID:████████ BNF BK:CITIBANK, N.A. ID:0008 PMT DET:████████ | 903709160449717 | -1,000,000.00 |

o.  Another $100,000 to Srivastava's company, Orbimo on September 16.

p.  Another $100,000 to Srivastava's company, Canopus Corporation on September 16.

q.  $142,321.34 to General Wesley Clark's consulting company on September 27.

r.  $87,000 to Law Firm-1 on September 30.

s.  $40,000 to Srivastava's brother Pankaj in India on September 30.

t.  $600,000 to Gaurav Srivastava's Bank of America Account ending in x3528 on October 3.

u.  $29,088.36 to Luxury Travel Services on October 6.

v.  $37,826.88 to Luxury Travel Services on October 17.

w.  $25,000 to Karlin & Peebles, Lascari's law firm on October 18.

86

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

x.  $50,000 to the SAS Commander on October 26.

y.  $39,246.70 on October 31 to the law firm in Country-1 that Srivastava used to arrange for PDMCC to loan $51 million to a company belonging to one of Srivastava's close contacts in Country-1 so that Srivastava could re-direct it to the U.S. to pay for a mansion in California.

z.  $490,000 to a private jet company on November 2.

246.  Later, in the fall of 2022, Srivastava succeeded in convincing Troost to send another $6 million from PDMCC through an intermediary.

247.  Srivastava prepared a sham engagement letter dated October 10, 2022, between Global Energy Law Group (again on fake letterhead that did not match Global Energy Law Group's actual letterhead) for an intermediary entity, "Al Farah Overseas Limited," which, like Bab Global was used for operational security to avoid connecting PDMCC to Global Energy Law Group, as dictated by Srivastava. It requested a $6 million retainer, was signed by "Martin Berg," and the substance of the engagement agreement was a word-for-word copy of Law Firm-1's, at which Jeffrey Berg was a partner who represented Srivastava and his entities at the time:



248.  The "Martin Berg" signature (left) was identical to the "Mark Elders" signature on the fake invoice to PECSA (right) pictured below:




FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

249. On November 24, 2022, "Martin Dukeheimer Berg," supposedly Srivastava's personal secretary, emailed Troost's executive assistant, "I was asked by Mr. G to coordinate delivery of flowers for Niels Birthday. Please find the attached receipt for flowers I ordered for delivery Friday:"

| From: | Martin Berg[martin@unityresourcesgroup.co.uk] |
|---|---|
| Sent: | Thur 11/24/2022 7:02:07 AM (UTC+01:00) |
| To: | Susanne Silver[ssilver@parencom.ch] |
| Subject: | Flower Delivery |

**Martin Dukeheimer Berg**
**Personal Secretary to the Chairman**



| UK | +44 20 3858 0260 |
|---|---|
| USA | +1 424 421 7977 |
| AUS | +61 2 7908 1088 |
| W | www.unityresourcesgroup.com |

250. One of Srivastava's lawyers at Law Firm-1 was named "Michael Durkheimer." On information and belief, "Martin Dukeheimer Berg" did not exist and was a fictionalized amalgam of Jeff Berg and Michael Durkheimer concocted by Srivastava and used by him to appear as though someone were assisting him.

251. Srivastava, himself, emailed Troost, the fictitious "Martin Berg," and Lascari asking for Paramount Inc. to pay him $5.2 million in January 2023; the signature block had the same phone numbers as "Martin Dukeheimer Berg":

| From: | G (Unity)[g@unityresourcesgroup.com] |
|---|---|
| Sent: | Wed 1/4/2023 5:33:38 PM (UTC+01:00) |
| To: | Niels Troost[ntroost@parencom.ch]; Martin Berg[martin@unityresourcesgroup.co.uk]; Thomas Giordano[tgiordano@karlinpeebles.com] |
| Subject: | Release of funds |

Dear Niels
Please authorize release of USD 5.2 m for paramount related expenses.

Thank You

252.    Pursuant to the fake engagement agreement between Global Energy Law Group and Al Farah, Global Energy received a total of $5,999,682.84 in a series of four transactions on November 3 to 4, 2022:



| Date | Transaction description | Customer reference | Bank reference | Amount |
|---|---|---|---|---|
| 11/03/22 | WIRE TYPE:WIRE IN DATE: 221103 TIME:1726 ET TRN:▮▮▮▮ SEQ:▮▮▮▮ ORIG:AL FARAH OVERSEAS LIMITED ID:AE4▮▮▮ SND BK:CITIBANK, N.A. ID:0008 PMT DET:/RFB/AS PER AGREEMENT DATED 01.10.2022 | | 903711030501198 | 1,699,920.71 |
| 11/03/22 | WIRE TYPE:WIRE IN DATE: 221103 TIME:1741 ET TRN:▮▮▮▮ SEQ:▮▮▮▮2 ORIG:AL FARAH OVERSEAS LIMITED ID:AE▮▮▮ SND BK:CITIBANK, N.A. ID:0008 PMT DET:/RFB/AS PER AGREEMENT DATE 01.10.2022 | | 903711030501329 | 1,299,920.71 |
| 11/04/22 | WIRE TYPE:WIRE IN DATE: 221104 TIME:0908 ET TRN:▮▮▮▮ SEQ:▮▮▮▮ ORIG:AL FARAH OVERSEAS LIMITED ID:AE4▮▮▮ SND BK:CITIBANK, N.A. ID:0008 PMT DET:/RFB/AS PER AGREEMENT DATED 01.10.2022 | | 903711040251566 | 1,549,920.71 |
| 11/04/22 | WIRE TYPE:WIRE IN DATE: 221104 TIME:1146 ET TRN:▮▮▮▮ SEQ:▮▮▮▮5 ORIG:AL FARAH OVERSEAS LIMITED ID:AE4▮▮▮ SND BK:CITIBANK, N.A. ID:0008 PMT DET:/RFB/AS PER AGREEMENT DATED 01.10.2022 | | 903711040321597 | 1,449,920.71 |
| Total deposits and other credits | | | | $5,999,682.84 |

253.    Immediately, at Srivastava's direction, Global Energy Law Group started distributing these funds as directed by Srivastava, including but not limited to:

a.  $200,000 to SAS Mont D Arbois Luxury on November 3, which was the Four Seasons in Megève, France.

b.  $100,000 to Srivastava's company, Canopus Corporation on November 17.

c.  $735,000 on November 21 to Granite Escrow Settlement as a downpayment on a $24.5 million mansion in Pacific Palisades:

d.  $100,000 to Srivastava's company, Orbimo on November 21.

e.  $50,000 to Law Firm-1 on November 30, 2022.

f.  $30,000 to Renew America Together, General Wesley Clark's charity on November 30, 2022.

g.  $25,000 to Srivastava's brother Pankaj in India on December 6.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

h. A total of $100,000 to Sharon Srivastava's accounts, $50,000 each on behalf of each of their children on December 6.

i. $25,000 to to SAS Mont D Arbois Luxury, which was the Four Seasons in Megève, France on December 12.

j. $50,000 to the Atlantic Council on December 13.

k. $100,000 to Srivastava's Company, Oribimo on December 19.

l. $100,000 to Srivastava's Company, Canopus Corporation on December 19.

m. $33,193.05 to Lascari's law firm, Karlin & Peebles on December 22.

n. $37,806.84 to Luxury Travel Services on January 4, 2023.

o. $50,000 to Srivastava's Company, Canopus Corporation on January 17.

p. $20,610.59 to Srivastava's Company, Orbimo on January 30.

q. $30,000 to Lascari's law firm, Karlin & Peebles on March 3.

r. $25,000 to Srivastava's brother Pankaj in India on March 6.

254. None of the transfers of the cash Troost sent to Global Energy Law Group went to fund U.S. Government operations as Srivastava falsely claimed to Troost; all of the funds were used to carry out the activities of the Enterprise and to personally enrich the Srivastava family. The conversion of these funds occurred in California: the money arrived in Global Energy Law Group's attorney trust account in California on the condition that it would be used for U.S. Government operations, and the Enterprise converted it to unauthorized purposes entirely within the United States by directing distributions from that California account to Srivastava's personal companies, family members, and other recipients having nothing to do with U.S. Government operations. Plaintiffs' property was located in the United States at the time of its conversion.

FIRST AMENDED COMPLAINT

### ii.    Wire Fraud and Money Laundering Through Defendant Birdsong

255.    Convincing Troost to send him $13 million in cash and to commit 50% of the companies' profits from June 1, 2022 onward was not enough for Srivastava; he wanted a $24.5 million mansion in Pacific Palisades.

256.    Srivastava had no legal right or direct mechanism to draw money from PDMCC, PECSA's UAE-based subsidiary. Nor did Srivastava hold any position of authority at PDMCC. Undeterred, in November and December 2022, Srivastava engineered a fraudulent workaround that would give him immediate access to cash to fund his lavish lifestyle: a $51 million "loan" from PDMCC to a company based in Country-1 (the "**International Company**") operated by a prominent businessman in Country-1 (the "**International Businessman**"). Srivastava had known the International Businessman since around 2020, when Srivastava was conducting fraudulent dealings in Country-1 posing as a U.S. Government operative when engaging with officials of Country-1. The International Businessman was related to a prominent official there. Srivastava had introduced Troost to the International Businessman when he visited Srivastava in Country-1 during the summer of 2022, and the International Businessman attended the Atlantic Council gala in New York City with Troost. The International Businessman was also prominently featured at the Food Security Conference in Country-1 in November 2022.

257.    Srivastava arranged for the International Company to paper over the transaction as a sham loan from PDMCC for "working capital and other business operations," and Srivastava simultaneously arranged to siphon roughly half of those funds to the Enterprise for his personal use. His objective was simple: to finance the purchase of a $24.5 million mansion at 14180 W. Sunset Blvd., Pacific Palisades, California.

258.    Srivastava orchestrated the transaction personally, directing the transaction through a law firm in Country-1 that he hired and paid on October 31,

91

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

2022 via Global Energy Law Group with money fraudulently taken from Troost ("**Law Firm-2**"). Between November 18 and 23, 2022, a lawyer from Law Firm-2 and a representative of the International Company prepared the loan agreement that PDMCC was going to sign. During those text messages, Srivastava's lawyer at Law Firm-2 explained to the International Company's representative that he "confirmed the instruction from G," that "In essence, G is fine with your proposed terms," "just need to get a hold of G to advise the signatory from Paramount," and "I am on standby to release the final execution version to the parties, once instructed by G."

259.   Using funds taken from Troost, Srivastava had Global Energy Law Group pay a $735,000 deposit on the house on November 21, 2022, with Lascari's assistance, on information and belief:



260.   Around the same time, PDMCC's director, in the UAE, received a call from Srivastava during which Srivastava instructed him to lend $51 million to the International Company. When PDMCC's director noted that such a business transaction would ordinarily take the form of a joint venture, Srivastava insisted that the structure had already been "decided" at the highest levels of Country-1. To Troost, Srivastava claimed that the funds were necessary to support the secret "Program." PDMCC's and Paramount's counsel were intentionally excluded; PDMCC's director was put in direct contact with the International Company's counsel to finalize the deal.

261.   On November 26, 2022, PDMCC's director signed a 15-year loan agreement on PDMCC's behalf. On or about December 2, 2022, Srivastava and others willfully and knowingly conspired to cause PDMCC to wire the equivalent of Country-1's currency to $51 million to the International Company in two tranches to two separate banks in Country-1.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

262. Unbeknownst to Plaintiffs, immediately after the International Company received the $51 million in loan proceeds from PDMCC, Srivastava convinced the International Businessman to give him immediate access to roughly half of the funds for his personal use. Srivastava had enlisted Lascari—then at Karlin & Peebles and trustee of the Aurora Point Trust (beneficial owners: Gaurav and Sharon Srivastava)—to build the legal architecture needed to launder the funds into the United States by concealing the U.S. side of the transaction by using his firm's attorney trust account—the Enterprise's preferred method of laundering fraud proceeds. The trust included two Delaware entities controlled by Lascari for the Enterprise: Aurora Point and Birdsong. Srivastava then funneled $25 million of the PDMCC loan to Defendant Birdsong.

263. On December 6, 2022, days after PDMCC sent the $51 million to the International Company, Lascari (from California) and the International Company's representative (in Country-1), exchanged international WhatsApp messages to coordinate the Enterprise's receipt of $25 million as quickly as possible. Lascari said, "We will definitely need the funds transferred in full by Friday, G asked that [the International Businessman] do what needs to be done to ensure no issues with the banking."

264. On or about December 7, 2022, Lascari executed three promissory notes (two for $10 million and one for $5 million) between Birdsong and the International Businessman. The notes memorialized a $25 million loan from the International Company to Birdsong that was secured by the luxury mansion Srivastava intended to buy at 14180 West Sunset Boulevard, Pacific Palisades, California 90272. The promissory notes were a paper pretext under which International Company could wire Srivastava that much cash. Srivastava did not regard this as a true loan; he was never going to pay it back. And Lascari never intended to transfer the "deed of trust" to the International Company that would allow it to foreclose on the mansion if Birdsong did not repay the International Company.

265. The scheme soon encountered an obstacle: the International Company's bank in Country-1 refused to process the outgoing transfer, flagging the nature of the transaction as suspicious, the fact of which the International Company's representative emailed to Lascari in California on December 16, 2022.

266. Srivastava ramped up pressure to get the money, notwithstanding that the bank's compliance department refused, telling the International Company's representative (in Country-1) over international WhatsApp message (sent from California) on December 16, 2022, "[Representative], this is Gaurav. Please call me," and shortly thereafter, "[Representative], please get it done." The International Company's representative responded that they would work with Lascari to "sort out the underlying transaction."

267. Under pressure to move funds quickly so Srivastava could close on the mansion, Lascari created a false paper trail designed to deceive financial institutions and obscure that the money originated from PDMCC. He backdated an engagement letter between his law firm and an offshore entity associated with International Company making it appear the transfer was merely repayment of an inter-company loan between two affiliated entities, unrelated to Birdsong or Srivastava. This was all a fiction that would allow $25 million to make its way from Country-1 to Lascari's attorney trust account in California where it could be misappropriated, and commingled with other clients' funds, and appear on the other side as Birdsong funds paying the seller for the mansion. There was not even any agreement between International Company's offshore company and Birdsong justifying how Birdsong would be entitled to $25 million from that company.

268. Lascari arranged the whole charade via international WhatsApp texts and emails from California to the International Company's representative in Country-1 between December 20 and 28, 2022. Even this revised fabricated structure (International Company to offshore company to Birdsong) drew bank scrutiny. On December 22, 2022, Lascari received notice that "bank compliance [is] being

94

difficult." and that he should prepare another letter from his law firm to a corporate officer of the International Company stating that the International Company's offshore affiliate company had retained him, and instructing that corporate officer to wire the money to his firm's trust account in California—specifically directing him "not [to] mention Birdsong" to the corporate officer. This was essential to conceal the connection between Birdsong and the International Company. Lascari did just that, providing wiring instructions for his firm's attorney trust account in California and not mentioning Birdsong.

269.    On December 28, 2022, the International Company wired $25 million into the bank account of Lascari's law firm, Karlin & Peebles in the United States at First Republic Bank ending in x1869. At the moment those funds arrived in Lascari's California IOLTA account, they became property located in the United States, and the Enterprise's subsequent acts of misappropriation, laundering, commingling, and converting those funds within the United States each constituted an independent act of racketeering causing independent injury to Plaintiffs. By routing the funds through his firm's IOLTA account where they were commingled with other clients' funds, Lascari was able to obscure the connection between the International Company and Birdsong. The obfuscation worked. The International Company successfully moved $25 million from its bank account in Country-1 into Lascari's attorney trust account in California undetected, which Birdsong used to close on the mansion shortly thereafter.

270.    The deed to the Pacific Palisades property was recorded in California on January 5, 2023. With Lascari's assistance, Srivastava not only funneled funds fraudulently obtained from PDMCC into the United States but also concealed his receipt of those funds by routing them through offshore companies and using Birdsong as the nominal purchaser. As a result of this scheme, $24.5 million of Plaintiffs' property was converted into U.S. real property located in this District, where it remains to this day, representing a continuing injury to Plaintiffs' property

95

interests.

271.   From there, Lascari attempted to extinguish the security interest in the Pacific Palisades property and extract additional value from the stolen assets. First, on November 16, 2023, Lascari transferred the mansion from Birdsong to Aurora Point for no value. Then, on December 16, 2023, Lascari caused Aurora Point to extract $4,995,000 in cash from the equity of the criminally funded mansion in the form of a private mortgage loan from a hard money lender in Los Angeles, Jeffry Scapa. This extraction of nearly $5 million from U.S. real property purchased with Plaintiffs' stolen funds constituted a further injury to Plaintiffs' property.

272.   Initially, while extracting the initial $25 million in December 2022, Srivastava, through Lascari, also sought an additional $2 million of PDMCC's loan funds from the International Company. Lascari emailed this request from California on December 8, 2022 to the International Company's representative in Country-1. The International Businessman refused. On information and belief, Srivastava was attempting to secure $2 million more in cash at this time for the Foundation to meet a pledge to the Atlantic Council to promote the Srivastava Enterprise's reputation and standing, collect new contacts with intelligence and government officials, and make him look like a non-official cover operative by setting up a foreign policy institute in his name, like the Scowcroft Center for Strategy and Security, part of the Atlantic Council, as outlined in a memo he sent to his chief of staff, Jim Reese:

New Srivastava Initiative partnership with DOJ, congress, senate & CIA

December 1, 2022
Possible Names
• Srivastava Strategy Initiative
• Srivastava Strategic Competition Initiative
• Srivastava Soft Power Initiative
• Srivastava Future Security Initiative
• Srivastava Future American Security Initiative
• Srivastava Non-Kinetic Security Initiative
• Srivastava Competitive Edge Lab

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

96

FIRST AMENDED COMPLAINT

> Because the United States has been slow to recognize the contours of an emerging global geopolitical dynamic, the NEW INITIATIVE will bring the Scowcroft Center's existing strengths in foresight and strategy development to assist US government officials and other stakeholders in recasting the geostrategic landscape. This task will include utilizing the best available intelligence

> to assess how China, Russia, and other bad-faith actors are gaming the global system to their advantage. The NEW INITIATIVE will incorporate this intelligence to improve officials', executives', and other stakeholders' understanding of what is occurring where, what might occur in the future should these stakeholders act (or fail to act) appropriately to counter adversaries, and what strategies ought to be devised to ensure that democratic norms and values prosper around the world in the coming decades.

> Simultaneously, a key initial priority of the NEW INITIATIVE will be to establish a task force to guide, advise, and inform its work. This task force will include former leaders in the intelligence community, including the FBI and CIA, as well as officials from across the public and private sectors, both in the United States and abroad, from civil society, and from Hollywood.

273. The Foundation entered into a Gift Agreement pledging $2 million to the Atlantic Council for the fiscal year 2023, with the intention to renew annually for four additional years beginning April 1, 2024, for a total of $10 million.

> **Gift Agreement Amendment**
>
> This Amendment to the Atlantic Council Gift Agreement dated May 1, 2023 (hereinafter referred to as "Amendment") is entered into on the date of execution set forth below between;
>
> 1. Atlantic Council of the United States, Inc., having its registered offices at 1030 15th Street, NW, 12th Floor, Washington, DC 20005, USA (hereinafter referred to as the "Council")
>
> 2. Gaurav & Sharon Srivastava Family Foundation, (hereinafter referred to as the "Partner"),

> B. **AMOUNT AND PAYMENT SCHEDULE:** Upon termination of the Agreement per the execution of this Amendment, the Partner's pledge of $2,000,000 to the Council for fiscal year 2023 with an effective date of April 1, 2023, with the intention to renew annually for four additional years beginning April 1, 2024, with the intention of giving an additional $8,000,000, will be written off.
>
> The first installment of **$500,000** paid by the **Partner** via wire from Karlin & Peebles, LLP Attorney CLI on February 9, 2023 will be refunded via wire from the Council to the Partner within 30 days of executing this Amendment.

274. On February 9, 2023, Defendants Srivastava, Lascari, and the Foundation also knowingly conspired to transfer and did transfer the remaining $500,000 from the $25 million in criminal proceeds stolen from PDMCC, which Lascari's law firm, Karlin & Peebles, had received in its First Republic Bank account

97

ending in x1869 from International Company's bank accounts in Country-1, from Karlin & Peebles bank account to the Atlantic Council.

275.   In mid-March 2023, Gaurav and Sharon were focused on setting up their new intelligence initiative at the Atlantic Council. Had they successfully done so, no one would ever doubt his false CIA-affiliation claims again. Srivastava, aided by his public relations representative, Ken Frydman, sat down for an interview with an Atlantic Council staffer about the "Gaurav and Sharon Srivastava Institute for National Security and Intelligence," who summarized Srivastava's narrative as follows:

**About Gaurav Srivastava**

Gaurav Srivastava is an American businessman and philanthropist. He and his wife, Sharon, are the benefactors of the Atlantic Council's new Gaurav and Sharon Srivastava Institute for National Security and Intelligence.

Mr. Srivastava is the founder and chairman of three firms. Unity Resources is a consulting firm that provides on-the-ground insights to help clients navigate challenging environments. Harvest Commodities is a food commodities company, which received widespread attention for shipping wheat and corn through the "grain corridor" in 2022 to ameliorate the food crisis caused by Russia's invasion of Ukraine. Paramount is an energy company engaged in mining, transshipment, and infrastructure, including oil terminals and pipelines. Mr. Srivastava's businesses operate in challenging environments worldwide and coordinate with policymakers, including embassies, the Commerce Department, the State Department, and regulatory agencies.

Mr. and Mrs. Srivastava began philanthropic giving with the stated goal of leaving a better world for their children. According to Mr. Srivastava, "Sharon and her support are critical to what we do as a family, what we do as a company, and what we do in our philanthropy."

The new Srivastava Institute for National Security and Intelligence will focus on strategic competition with an emphasis on non-military instruments of national power, including intelligence, economics, and soft power. Mr. Srivastava selected the Atlantic Council to house the new institute because of its bipartisan orientation and results-oriented ethos that has resulted in sustained impact on US and global policy across multiple presidential administrations.



### iii.    Wire Fraud and Money Laundering Through Paramount Inc.

276.    While Srivastava and the Enterprise were siphoning tens of millions from PDMCC and using it for Srivastava's own personal benefit and to fund the Enterprise's efforts to maintain and improve its reputation to enable their frauds, they simultaneously schemed to extract funds from Paramount Inc. in the United States.

277.    On November 9, 2022, Lascari incorporated Paramount Inc. in Wyoming, listing the address of his then-law firm, Karlin & Peebles, LLP, in California as its principal office. PECSA wholly owned Paramount Inc. Lascari was installed as director of Paramount Inc. and became the sole signatory on its U.S. bank account at Bank of America. In that capacity, Lascari owed fiduciary duties to Paramount Inc. Thereafter, he operated Paramount Inc. and its Bank of America account in the United States to the benefit of the Enterprise rather than Paramount Inc.

278.    On December 29, 2022, PECSA lawfully funded its U.S. subsidiary, Paramount Inc., by wiring $6 million from Switzerland (via its correspondent account at Bank of New York Mellon) into Paramount Inc.'s newly opened Bank of America account in the United States. Upon receipt, these funds became the property of Paramount Inc., a U.S. corporation, held in a U.S. bank. That same day, Lascari confirmed receipt of $5,999,962 after bank fees. Troost sent the wire confirmation to Srivastava at his Gmail address.

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT

279.   Then, Srivastava and the Enterprise moved to divert the funds. On January 2, 2023, the fictitious "Martin Berg" emailed Troost and Lascari requesting authorization to "release USD 5.2m from Paramount Inc. Account," signing as "Personal Secretary to the Chairman," referring to Srivastava:

| From: | Martin Berg[martin@unityresourcesgroup.co.uk] |
|---|---|
| Sent: | Tue 1/3/2023 5:41:47 PM (UTC+01:00) |
| To: | Niels Troost[ntroost@parencom.ch]; Thomas Giordano[tgiordano@karlinpeebles.com] |
| Subject: | Funds Release |

Dear Niels
Please authorize the releases of USD 5.2 m from Paramount Inc. Account . Please confirm via written confirmation in reply to this email so funds can be withdrawn.

Thank You


**Martin Berg**
**Personal Secretary to the Chairman**

280.   On January 4, 2023, Srivastava—using his email address g@unityresourcesgroup.com, signing as "Chairman," and copying the fictitious "Martin Berg"— again demanded release of $5.2 million for unspecified "Paramount related expenses." Troost never would have consented if he had known that Srivastava and the others were defrauding him and Paramount, and he consented only on the condition that an invoice be presented documenting legitimate Paramount-related expenses. No invoices supporting these supposed "expenses" were ever provided.

281.   Despite Troost's explicit condition, Lascari—acting as Paramount Inc.'s sole director and sole signatory on the account, and in breach of his fiduciary duty to Paramount Inc.—transferred $5,250,000 from Paramount Inc.'s Bank of America account in the United States to his law firm's IOLTA account at First Republic Bank in California on January 17, 2023, and then transmitted the funds to Srivastava personally. This transfer constituted a theft of U.S.-located property belonging to a U.S. corporation, executed entirely within the United States by a California-based

100

attorney acting in his capacity as a corporate fiduciary.

282.   A Paramount Inc. bank-reconciliation statement prepared by Lascari on May 2, 2023 falsely listed the $5.2 million transfer as "REIMBURSEMENT TO GS (APPROVD BY NT) [sic]." Troost never approved any personal payment to Srivastava, and the prerequisite invoice explaining the nature of the alleged Paramount-related expenses was never provided.

283.   The reconciliation report reflected a second unauthorized transfer: a $50,000 payment on March 6, 2023, also falsely labeled "REIMBURSEMENT TO GS (APPROVD BY NT)":

284.   Paramount Inc.'s bank records reflect that Lascari wired that $50,000 to Orbimo, Srivastava's company on March 6:

101

285.   On or around April 19, 2023, Bravard requested that Plaintiffs send another $2,000,000.00 to Paramount, Inc. The request fit the pattern: by this point, the Srivastava Enterprise viewed Paramount Inc. as its own personal piggybank, a U.S.-based account from which it could extract cash at will under the guise of "corporate operations."

286.   Throughout early 2023, Paramount Inc.'s assets were diverted to individuals and expenses related to the Srivastava Enterprise.

287.   By May 2023, the theft could no longer be concealed. On May 3, 2023, Troost spoke by phone with Bravard after receiving Lascari's reconciliation report, which purported to explain Paramount Inc.'s outgoing transfers. During that call, as the discrepancies became undeniable, Bravard admitted the truth—that Srivastava had stolen the funds:

| **Troost**: | That is fraud. |
| --- | --- |
| **Bravard**: | I know it's fraud. … A shareholder cannot take money. |
| **Troost**: | Absolutely. And 5.2 million and 50,000 G paid to himself. But you understand that this is not correct, right? |
| **Bravard**: | Yes. I agree with you. |

### iv.   Wire Fraud and Money Laundering through Cedar West

288.   In or around February 2023, Srivastava, Bravard, Lascari, Cedar West Ventures, and 1234 Holding SA willfully and knowingly conspired and attempted to transfer $3,000,000 and, on information and belief, transferred $500,000 from a bank account in the United States to an account ending in x45-92 at UBS (then Credit Suisse) in Switzerland belonging to Dorsay Services Sàrl, Bravard's Swiss company:

FIRST AMENDED COMPLAINT

ROSEN ✦ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245




### 2. Srivastava Uses Paramount Inc. Funds to Hire a Personal Chief of Staff

289.   After forming the Paramount Inc. U.S. subsidiary, Srivastava built out a Los Angeles office designed to impersonate an official U.S. government workspace to carry out the Enterprise's schemes. The office displayed the Great Seal of the United States and custom-engraved ceremonial swords bearing Srivastava's name—objects he falsely claimed were gifts from senior government officials, but that he, himself, had ordered and had engraved. Though Paramount Inc. paid the rent and other expenses, when Troost traveled to Los Angeles in 2023, Srivastava instructed others in the Enterprise to keep Troost away from the Paramount Inc. office, further underscoring that its appearance was part of the fraud.

103



290.   Around January 6, 2023, Srivastava recruited Jim Reese as his "Chief of Staff." Reese is a retired U.S. Army Lieutenant Colonel and former Delta Force operator who left the military in 2007 and who had previously done business with Troost. Troost introduced the two in late 2022. Reese understood he was being retained solely by Paramount Inc. as an independent consultant.

291.   In reality, Srivastava used Paramount Inc.—and Paramount Inc.'s funds—to deploy Reese as a key operative for the Enterprise. Although Reese believed he worked for Paramount Inc., Srivastava had him performing work for entities Srivastava owned or controlled, including Defendants Unity Resources Group and Unicom Worldwide. Reese was even assigned email addresses for Unity and Unicom, which were housed on Paramount Inc.'s servers.

292.   As "Chief of Staff," Reese became deeply involved for a time during January to May 2023[14] in advancing the Enterprise's objectives, using Paramount resources to do so. His responsibilities included:

- Coordinating with Lascari to handle personal arrangements for Srivastava and his family;

- Setting up and furnishing the Enterprise's Los Angeles office using

[14] In around late May and early June 2023, Reese concluded Srivastava was a fraud and withdrew from his association with him.

104

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Paramount Inc. funds, which Lascari leased in his capacity as Paramount Inc.'s sole director;

- Helping Srivastava leverage the Atlantic Council relationship, financed with Troost's and Paramount's money, to enhance the Enterprise's credibility;

- Assisting Srivastava in attempting to build philanthropic and public-relations visibility for the Enterprise;

- Arranging and attending meetings with public officials that Srivastava used to inflate his perceived stature and to lull Troost into remaining in the "Program"; and

- As discussed in further detail below, participating in the Enterprise's early efforts to attack Troost in mid-May 2023 after Troost discovered the fraud and rescinded Srivastava's ownership of PECSA.

293. Srivastava further attempted to bolster his fabricated intelligence persona by feeding Reese false information. Srivastava falsely claimed that XP Services, a helicopter refitting company in Nashville he claimed to own (he did not), had contracts to refit C-130 aircraft for Country-1, even though the company's CEO had expertise only in helicopters. Srivastava also misrepresented that he was born in Ohio (which would have made him a U.S. citizen), and that he graduated from USC—claims contradicted by USC's records. He asked Reese whether he knew General Clark, implying closeness with U.S. military leadership; Reese did know General Clark from his service in the Balkans.

294. In February 2023, Srivastava invited Reese to his California mansion, where Reese observed first-hand the Enterprise's efforts to manipulate its online reputation. Sharon Srivastava introduced Reese to a team of search-engine-optimization ("SEO") contractors as "our family office chief of staff," a title he had never agreed to and did not hold. Reese saw Sharon attempting to have online reports about their civil frauds and unpaid bills removed while boosting favorable stories

FIRST AMENDED COMPLAINT



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

about the Foundation. When Sharon asked if the negative stories could be deleted, the SEO consultants said they could not, though they might be buried with effort. Soon after, the SEO firm contacted Reese for overdue payments of $60,000-$80,000. Builders who had renovated the mansion also later contacted Reese seeking payment, explaining that the Srivastavas had never paid them.

295. Srivastava also directed Reese to conduct a "threat assessment" on the family. When Reese—based on his extensive counterterrorism experience—concluded the threat level was low, Sharon became angry and insisted it must be higher because Srivastava had allegedly been "held hostage by ISIS in the Democratic Republic of the Congo in 2008." This was impossible: ISIS did not operate in the DRC in 2008 (when Srivastava was 18 years old), nor did any ISIS-affiliated group exist in that region at that time.

### 3. The Srivastava Enterprise Continues to Gather Political Clout

296. Meanwhile, Srivastava continued to work to bolster his image as someone deeply connected to U.S. intelligence agencies. Srivastava hired real ex-CIA operatives, including former Station Chief Defendant John Maguire, to lend credibility to his claims of being a CIA operative.

297. In around February 2023, Maguire travelled with Srivastava and Troost to a meeting with the National Security Advisor of Iraq in the private wine cellar of the dining room at the Armani Hotel inside the Burj Khalifa in Dubai.



FIRST AMENDED COMPLAINT

Srivastava and Maguire told the National Security Advisor that they were there on behalf of the FBI and CIA as part of a program offering U.S. Government assistance to locate and capture terrorists for the U.S. Government. At one point, Srivastava claimed that Maguire would replace Secretary of State Anthony Blinken when he resigned. Maguire passed a handwritten note to the National Security Advisor containing names of supposedly wanted terrorists. For this and other meetings in the UAE, Srivastava had arranged for Paramount Inc. to pay over $15,000 for private security officers and multiple large SUVs with drivers, which Srivastava used to create the façade that he and Maguire were on official U.S. business.

298. Following the meeting, the National Security Advisor privately warned one of the attendees to stay away from Srivastava and Maguire, describing them as "dangerous" and not to be trusted. Maguire later (while still participating in the Enterprise) admitted to a former Department of Homeland Security official, Chris Hinn—who had previously worked for Srivastava—that he had been falsely posing as an active-duty CIA officer during meetings with officials in Dubai.

299. During early 2023, Srivastava told Hinn he had worked with the FBI. Srivastava claimed he handled a lot of cases, and that he was very close to leadership at FBI headquarters, stating "I go right to the top." Srivastava also claimed to have recruited for the CIA. Hinn asked Srivastava whom he supposedly worked for within the U.S. government, but Srivastava said it was "Top Secret." Hinn responded that he had security clearance and therefore could hear the answer, but Srivastava claimed it was "extremely" secret and still would not tell him. In Hinn's presence Srivastava at various points referred to his status as a CIA operative.

300. In mid-November 2023, Srivastava called one of the attendees of the meeting with the National Security Advisor of Iraq via international wire communication about trying to conduct Iraqi business under fraudulent pretenses. Srivastava said that he had warned Troost that there was a saying in the U.S., "if you draw the sword against the king, you must kill the king." Srivastava took credit for

107

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

getting Paramount sanctioned and said that the UK, the EU, and the U.S. were also going to sanction Troost. Srivastava said that if a person is his friend, he will do anything for them, but if you go against him, it is not good for that person.

301.   After this call with Srivastava, Maguire also called that meeting attendee via international wire communication to ask to be re-connected to the Iraqi National Security Advisor. Maguire said he wanted to discuss expanding oil operations with a new company in Iraq. Maguire claimed they had a company registered in California, as well as Switzerland, apparently referring to the Paramount companies in which the Enterprise no longer had any ownership interest. Maguire falsely claimed they were working on the project with the "Deputy Director" of the CIA. Maguire claimed to have financial records supporting four years of the company's operations and that they were a $16.5 billion company, which was also false—PECSA had ceased any Russian-related activity and reduced its other activities since the fall of 2022 and PDMCC had ceased all activities as of August 2023. Maguire also told the person that Troost was a fugitive (false), that he was being targeted by the U.S. (false), and that multiple countries were looking for him (false). He warned the person not to speak to Troost.

302.   Maguire and former CIA officer Mary Beth Long (who questioned Mr. Troost at the New York gala after Srivastava told him she still worked for the CIA) also had been previously involved in working together to vouch for another fake CIA officer, Matthew Marshall, who defrauded a Montana billionaire. Their scam was covered by the press and the subject of a multi-episode podcast.[15] During early episodes of the podcast, Long and Maguire vouched for the fake agent's bona fides.[16]

---

[15] Ken Silverstein, *Seed Money*, New York Magazine (Nov. 22, 2022); Rosin, H, Nov. 29, 2022, Episode 6 *All the Voids*, Cover Story, Season 2. Mary Beth Long met with Srivastava and Maguire in mid-April 2023, and was paid through her company, Askari Defense & Intelligence, LLC.

[16] According to Mark Seyler, the FBI Special Agent in charge of the Marshall criminal investigation, when the victim reported Marshall's fraud to the FBI in November 2018, Mary Beth Long contacted the victim's team and told them "he might want to stop digging around and questioning Marshall's CIA background," she was "sure Marshall had been in the CIA, and to suggest someone like John Maguire would be mistaken about something like that was ridiculous." Seyler, *Go Big or Go*

108

Between episodes, however, Marshall pleaded guilty in a U.S. federal court to fraud. Nonetheless, Maguire and Long then wrote letters to the judge supporting Marshall at sentencing. On February 27, 2022, Maguire, signing as a retired CIA officer, wrote that Marshall was his "trusted warrior-brother" and "If I had to define him with one word it would be honorable." *U.S. v. Marshall*, Dkt. No. 191-2. Long, describing herself as "The Honorable Mary Beth Long," wrote that Marshall was "a dedicated patriot" "with a deep sense of right and wrong" who was vouched for by "a former senior-most member of the Department of Defense's Intelligence organization." *Id.* She wrote that Marshall "is a wonderful friend," and "I wish to assure the Marshall family and this Court that I intend to remain a supporter of the family and of [Marshall] when he returns to society." *Id.* Their letters to the judge were apparently unpersuasive; Marshall was sentenced to six years in federal prison. Maguire and Long appeared on a later episode of the podcast singing a different tune from their supportive sentencing letters; Long called Marshall a "con man," saying "John [Maguire] and I laughed, we laughed about it the other day, finally after drinking, 'Well, it happens once in everybody's life,' and 'this guy is a master liar, master liar.'" Maguire, for his part, claimed that he got "played by a grifter" and that he wanted "to go back to headquarters and talk to personnel. I want to know what the fuck the truth is." As to Srivastava, however, Maguire did not get played—Maguire knew full well that Srivastava was not a CIA operative and knew that Srivastava would pay him handsomely for helping him appear to be one and, later, to wage a

---

*Home: Spies, Cops, and Oath Keepers Under the Big Sky* 57, 167 (2024). Maguire and Long then participated in what they called "Operation Lima" to defend Marshall by destroying the victim's reputation; Marshall emailed Long to say they needed to "start taking a body count" and "destroy" the victim, lamenting that his lawyer was too ethical and that he needed Maguire and Long to "blur those lines a bit to get some shit done quickly and effectively." *Id.* 167-68. Long emailed someone who was blackmailing the victim to suggest they "meet to discuss a 'common interest' in 'bringing to heal [*sic*]'" the victim, whom she described as "'a piece of shit.'" *Id.* at 184-85. In June 2021, however, the judge (who had taken testimony from Long and Maguire—the latter of whom the judge described as "combative"—during a classified hearing) found that neither Maguire nor Long had any personal knowledge that Marshall worked for the CIA. *U.S. v. Marshall*, Dkt. No. 121. On information and belief, Maguire and Long ran the same play book against Troost for the Enterprise, with Srivastava taking the place of Marshall as the fake CIA officer.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

vicious disinformation campaign against the Troost family.

303.   On May 20, 2023, after Srivastava had been expelled from Troost's companies, Maguire (texting in gray) texted Srivastava's chief of staff (Jim Reese-in blue) by Signal and claimed that Srivastava used Amos Hochstein, special advisor to President Biden, to get the Biden White House to remove Murtaza Lakhani, a Pakistani-Canadian oil trader from the U.S. sanctions list and that the White House would keep Lakhani off the sanctions list if Lakhani continued to do business with Srivastava and Maguire ("he was on ofac list but he's been pulled off the list for this meeting." "The WH adjusted the list." "If he helps us he can stay off the list"):

 

304.   On information and belief, this was another wire fraud being committed by the Srivastava Enterprise, this time targeting Lakhani and his companies with false assurances that Srivastava and Maguire could use their CIA affiliation to keep Lakhani off the U.S. sanctions list.[17] Indeed, in May 2023, Srivastava mentioned his

---

[17] The UK and the EU sanctioned Murtaza Lakhani in December 2025. Srivastava's post-Paramount fraudulent dealings with Lakhani again shows Srivastava is lying when he now claims he did not want to be associated with the Russian oil business (*see, e.g.*, Logan Podcast, 41:03 to 41:51). Indeed, Lakhani's association with Russian oil has been widely reported. *See, e.g.*, *The Largest Oil Trader: What Is Known About Murtaza Lakhani*, Business Matters (Jul. 8, 2025) ("According to a Bloomberg investigation published in 2023, Rosneft's president, Mercantile & Maritime, and one of Putin's closest allies — Igor Sechin — celebrated New Year in Dubai on a luxury yacht docked near the Palm Jumeirah islands. One of the most important guests on board was Lakhani. The Bloomberg report stated that in 2022,

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

dealings with Lakhani to Troost, falsely associating them with the Program. During an international call on May 8, 2023, Srivastava claimed that Paramount was still in its "extended favor time" with the U.S. government, that he was going to meet Lakhani ("Murtaza") in Dubai, that he was considering whether to fly to Dubai with UAE Ambassador Yusef Otaiba ("Yusef") to meet Lakhani, and that the Program for marketing Russian-origin oil would involve starting to work with the UAE.

### 4. The Srivastava Enterprise Attempts to Gain 100% Control of Paramount Through the "Inversion"

305.  In late 2022, the G7 countries imposed a price cap. While it did not affect the legality of PDMCC's oil marketing operations (provided it did not use G7 services – which it did not), the cap did make it appear that the U.S. government did not approve of such business. Srivastava then fraudulently induced Plaintiffs not to wind up PDMCC's Russian-origin oil operations by falsely representing that the U.S. government actually wanted PDMCC to keep trading as part of the supposed CIA program Troost had joined, that OFAC would be issuing a special license formalizing on paper this arrangement, and that Srivastava and his team (including members of the U.S. government) had even cleared this with Swiss regulators. Srivastava did this so the Enterprise could take benefit from 50% of PDMCC's profits from continuing Russian-origin oil marketing that otherwise would have stopped in December 2022.[18]

306.   Troost was inclined to wind up Paramount's operations (which, again, remained lawful but publicly politically disfavored). At the time, he told Maurice Taylor, PECSA director, that he was increasingly uncomfortable with the Russian oil sector and was under family pressure to exit the industry altogether. He had similar

Sechin devoted much time to developing schemes to circumvent oil sanctions, and Lakhani was one of those actively helping him. Lakhani created an entire network of oil trading and shipping companies in Dubai to distribute Russian oil worldwide."), available at https://bmmagazine.co.uk/business/the-largest-russian-oil-trader-what-is-known-about-murtaza-lakhani/.

[18] Indeed, on April 17, 2023, Bravard wrote to Troost (copying Srivastava and others), "We must dividend up the profit from DMCC into [PEC]SA … This is a very urgent matter, we need to move forward on this, so that we can … declare the dividend, agree on asymmetric split, and execute the inversion … As shareholder, we will need to receive a cash dividend for 2022."

FIRST AMENDED COMPLAINT

discussions at the end of 2022 with Francois Mauron, then the director of PDMCC. The situation caused Troost significant emotional distress. Despite Troost's growing unease, Srivastava pushed him not to wind up the business. Troost even told Taylor that he felt Srivastava was coercing him, to the point that he feared for his and his family's safety.

307.   In late 2022, Srivastava met with Mauron, Bravard, and Troost at the Four Seasons in Megève, France, where he falsely assured them that he "controlled" U.S. law enforcement and OFAC. Srivastava claimed that "everything was fine" with respect to U.S. regulators, boasted of having "a lot of friends" in U.S. law enforcement, and said he had personally donated "a lot of money" to politicians. To bolster the deception, displayed a photograph on his phone showing him and Sharon Srivastava posing with President Biden:



He insisted he was operating under a special license in his name and everything was approved because, he said, "I control this." He also claimed he was speaking "with the lady at SECO"—referring to Helene Budliger Artieda, the Director of Switzerland's sanctions regulator—who allegedly supported the alleged Program as well as his restructuring plan.

308.   While in Megève in or around December 2022, Troost and members of his family took Gaurav and Sharon Srivastava to a Japanese restaurant for dinner. During the dinner and in front of Sharon, Gaurav Srivastava spoke about his supposed secret missions for the U.S. Government in the Middle East, particularly in Afghanistan, and how he had become involved in dangerous situations there. For her

part, Sharon claimed to be from royal Japanese descent; Gaurav added that they often visited the Emperor at the Tokyo Imperial Palace and would stay there.

309.   On or about March 23, 2023, the Srivastavas and Troosts dined at another Japanese restaurant in Los Angeles. While the Troosts were in Los Angeles, Gaurav and Sharon Srivastava had promised to take them to Nobu in Malibu, a famously exclusive and fancy restaurant where it was notoriously difficult to get a last-minute reservation. Srivastava explained that he could book a table through "the Agency," referring to the CIA. When it was time to meet, Srivastava changed plans and told the Troosts to take a taxi to a nondescript sushi place on Wilshire Boulevard in West Los Angeles. Gaurav explained in front of Sharon that other guys from "the Agency" were eating in Nobu that evening and that they could not be seen with the Troosts there. A Troost family member asked Sharon why they had picked this place as an alternative to Nobu. Sharon responded that they often went to this sushi restaurant because the "boys from the Agency" liked it because it is low key and therefore was a good place for "the Agency guys" to get together. Sharon also said that it was Gaurav's favorite spot to meet with the "boys from the Agency" and discuss whatever they needed to discuss. Gaurav then promised to get the Troost family a Nobu reservation in Los Angeles the next day, but Troost later asked him to cancel it and they went to another restaurant recommended by Srivastava closer to their hotel. After their family dinner, Srivastava picked up Troost and they went to a cigar bar together.



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

113

310.   That same month, Troost had an exchange with Ken Frydman, a public relations professional retained by Srivastava. In discussing a forthcoming article being written by *Financial Times* journalist Tom Wilson, Frydman was adamant that Paramount tell Wilson that "Niels and Paramount are operating with the knowledge and consent of the U.S. government" because "[i]f he insists on pursuing this story, Wilson needs to know and publish that. He 'doesn't want to get it wrong.'" Troost agreed, as this is precisely what Srivastava had been telling him all along. Srivastava, however, vetoed the suggestion because he knew that his purported connections with the U.S. government were fake and unsupported and that divulging his supposed dealings with the U.S. government to a reputable journalist would invite further scrutiny and expose his fraud.



311.   On or about January 31, 2023, Srivastava led a conference call with Mauron and other PECSA and PDMCC personnel announcing that the companies would be restructured under U.S. control (the "inversion"). For the first time, he introduced himself to the staff as PECSA's other shareholder, claiming he was an American investor and asserting that all new policies would flow through a U.S. lawyer, Jeffrey Berg, then a Partner at BakerHostetler. He instructed employees that

FIRST AMENDED COMPLAINT

the restructuring was mandatory and that anyone unwilling to comply "could exit the company."

312.    Mauron questioned the strategy, noting that U.S. sanctions already did not apply to a UAE-based entity owned by a Swiss company and that bringing the structure under U.S. jurisdiction could unnecessarily expose the business to the G7 price cap. To address these concerns, Srivastava and Berg traveled to Dubai to meet with Mauron and PDMCC staff on or about February 17, 2023. They reviewed PDMCC's contracts related to Russian ESPO oil trading and claimed their goal was to ensure compliance with U.S. law. Srivastava and Berg reassured Mauron that the inversion was not a problem because an OFAC license was forthcoming and that their U.S. contacts would secure approval. They told Mauron they understood "how this works" better than he did. Berg ultimately assured Mauron and others that PDMCC legally and politically could continue its then-ongoing business marketing Russian ESPO oil and that an OFAC license was "in the works."

313.    By spring 2023, as the inversion remained stalled, Srivastava intensified his pressure campaign on Troost. He told Troost he had a meeting scheduled with President Biden and that foreign governments supported PDMCC's continued Russian oil trading. In a text message, Srivastava claimed he had spoken with the Dutch ambassador, who—despite disagreeing with the United States—would ultimately "comply" with the United States' decision to work with Paramount.

314.    Srivastava further claimed that unless Troost completed the Inversion, he would give Paramount's spot in the purported "Program" to Murtaza Lakhani, leaving Troost and his businesses exposed. He warned that if PDMCC did not maintain U.S. government "cover" through Srivastava, regulators would view Troost as having acted unilaterally, the CIA would view Troost as a Russian agent who had fooled them, and the U.S. Government would impose secondary sanctions for its otherwise lawful marketing post-December 2022.

FIRST AMENDED COMPLAINT

315. In the same time period, to increase pressure and lend credibility to his fabricated authority, Srivastava enlisted senior elected officials to contact OFAC. He persuaded then–Senate Majority Leader Chuck Schumer and Congressman Pat Ryan to ask OFAC to speak with Paramount's legal counsel. As a result, on April 12, 2023, OFAC Assistant Director for Compliance Claire McCleskey emailed Berg, stating that OFAC's Legislative Affairs team had received outreach from Congressman Ryan's office about the Russian oil price cap and inviting discussion.

316. Srivastava also instructed his lawyers to interact directly with OFAC officials to request a special license so that PDMCC could continue its business and Srivastava could continue to take 50% of the profits from PDMCC's Russian-origin oil marketing once the company was under his total control in the United States. On April 28, 2023, Berg and others from BakerHostetler met by video with the Assistant Director at OFAC. At Srivastava's direction, the meeting was intended "to introduce Paramount SA and its wholly owned subsidiary [in Dubai] to OFAC for several reasons, including [Paramount's] impending inversion and to address policy concerns with the price cap sanction on Russian-origin crude oil and petroleum products":

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

> **Outline for April 28 Meeting with OFAC**
> **Mannino, Berg, Sferrazza**
> **Claire McCleskey**
>
> Initial introductory remarks:
> Thanking Claire for meeting us today. Here on behalf of one of Jeff's clients of more than a decade - a U.S.-person with significant multinational interests in energy commodities (the "Client"). Purpose of meeting is to brief on our client's energy businesses, compliance with U.S. sanctions and client's plans to bring a number of his foreign businesses under US ownership and potentially US control, including transactions that could be subject to the price cap on Russian crude oil.
>
> *Facts*
> Our client is currently in the process of bringing those interests into the U.S. by moving multiple companies under a U.S. holding company ("Holdco"). At this, most of his interests in the energy sector are not subject to US jurisdiction; we know that our client is subject to US jurisdiction.

> DMCC's business focuses on oil and gas trading and transportation of oil products between Russian and China, where such trades are conducted at prices exceeding the price caps implemented by G7 member countries (Canada, France, Germany, Italy, Japan, UK, US, and EU). DMCC's operations are conducted and overseen within DMCC. Importantly, DMCC is not engaged with Russian state-owned entities. Our client buys from small upstream operators that are not so uniquely tied to the Russian Government. It is our understanding that our client's competitors are doing the opposite.
>
> DMCC is selling to downstream refineries in China, India, and some other regions that would otherwise be buying from other major traders, directly or indirectly, involved in oil and gas projects in Russia that have ultimate beneficial owners tied to Putin and the Russian Government. Paramount DMCC is currently a small player in the mid-stream sector of the Russian crude oil industry in comparison to its competitors.
>
> [If asked: DMCC's recurring business revolves around selling and transporting oil sourced from the Eastern Siberian Pacific Ocean ("ESPO") Pipeline. Such oil and gas products are compiled and loaded onto ships at the Kozmino port in Russia, typically for delivery to China's Qingdao port. DMCC's customer base includes but is not limited to Ocean Energy, Shandong Port International Trading Group Co. Ltd, and CNOOC Trading (Singapore) PTE. Ltd. Trade frequency amounts to roughly one full vessel per day, sometimes two, leaving the Kozmino port, which yields a growing monthly revenue measured in the billions of U.S. dollars, exceeding $19 billion annually. For context, it is estimated that DMCC is responsible for roughly one-third of the Kozmino exports. ]

317.    Unbeknownst to Plaintiffs, Srivastava's representations that the U.S. government approved of Paramount's business at the highest levels, including OFAC, were false, and Srivastava, who was not a CIA operative as he had claimed, lacked any ability to change that. According to the BakerHostetler attorneys present, the meeting did not go well.[19] In fact, the meeting with OFAC was a colossal disaster;

---

[19] Berg and his team memorialized the meeting in a memorandum that was originally hidden from Troost and Paramount. The memo was only obtained after PECSA initiated a lawsuit against Berg and BakerHostetler that sought client files required to be handed over to PECSA under California law.

FIRST AMENDED COMPLAINT



the OFAC official "almost fell off her chair" when she realized that they were asking for a license for PDMCC, she "was amazed that any company would even have the guts to ask for such a license" and "she did not believe that any such license would be issued." In fact, she stated that PDMCC was exactly the type of company for which OFAC "is getting calls to impose secondary sanctions." The lawyers noted that OFAC "clearly did not support [PDMCC's] activities." OFAC had no intention of changing the Price Cap or authorizing specific companies to trade, "particularly, with respect to the ESPO pipeline" that PDMCC specialized in:

## BakerHostetler

**ATTORNEY-CLIENT PRIVILEGED AND ATTORNEY WORK PRODUCT**

| | |
|---|---|
| **TO:** | **File of Paramount Energy & Commodities SA** |
| **FROM:** | Jeffrey P. Berg<br>Melissa B. Mannino |
| **DATE:** | May 1, 2023 |
| **SUBJECT:** | *April 28, 2023 OFAC Meeting* |

This memo summarizes our April 28, 2023 meeting with Claire O'Neill McCleskey of the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"). Claire is the Assistant Director of Compliance at OFAC. The meeting was requested by our client, who is an indirect 50% owner of Paramount Energy & Commodities SA ("Paramount SA"). The origin of the meeting was laid out in Claire's April 12 email to Jeff; the email stated "I received your name from OFAC's Leg Affairs team, who got some outreach from Congressman Pat Ryan's office on the Russian oil price cap. The Congressman's Chief of Staff said you have some information or views to share on the Russian oil price cap sanctions regime. I'd be happy to discuss this with you if you are interested." Per our client's direction, the meeting was supposed to introduce Paramount SA and its wholly owned subsidiary, Paramount Energy & Commodities DMCC ("Paramount DMCC") to OFAC for several reasons, including the impending inversion and to address policy concerns with the price cap sanction on Russian-origin crude oil and petroleum products. In preparation for the meeting, we meet with our client, drafted questions for the client, drafted talking points, and had internal prep meetings. Jeff shared the talking points with the client and reviewed the questions with the client. The client was clear that we were discuss DMCC's business, which consists almost exclusively, if not exclusively, of trading in Russian-origin ESPO pipeline oil about the price cap.



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

During the meeting, we made clear that Paramount SA focuses on energy trading in Africa and other parts of the world, but not Russia, and that DMCC's business is trading in Russian-origin crude oil above the price cap. We also made clear that we understand Paramount SA's and Paramount DMCC's businesses are in compliance with all applicable sanctions laws and regulations. We stressed that no U.S. person directs or controls the day-to-day operations of the Paramount companies and no U.S. person has any involvement in the trading activities of the Paramount companies. We did not detail that Paramount DMCC's business is trading in ESPO pipeline oil from the Kozmino port. During the factual overview, Claire asked questions regarding why our client, a U.S. person, did not own 50% of Paramount DMCC. Jeff explained why our client did not own 50% of DMCC from a legal perspective. Claire did not appear to be convinced by the explanation and agreed to we move on to the policy discussions. Claire was taking notes during the meeting; she seemed be familiar with the Paramount companies and seemed a surprised when she learned that we were meeting with her to discuss them.

As to the policy issues, Melissa explained that our client does not believe the price cap is serving its intended purpose as Russian-origin oil continues to be traded above the price cap, and the persons and countries that are immensely profiting from trading in Russian-origin crude oil are those that are adverse to U.S. national security and foreign policy interests (Russia, China, Iran, and sanctioned persons). Claire was clear that OFAC and our allied nations believe the price cap is working. Claire explained that the price cap was not intended stop the flow of Russian oil as nations need it; it was to stabilize the energy markets, reduce the monies going to Russia to fund its war on Ukraine, and ensure no Russian crude oil is imported into the United States. Claire mentioned a "Q School" article on the Russian price cap sanction; she said that article discussed the effectiveness of the price cap. Claire also said that she believed the purpose of the meeting was for us to share information about third persons who were violating the price cap. As mentioned above, the content of meeting caught her off guard. Claire stated that she receives calls from Senators and representatives about sanctioning companies, such as Paramount DMCC, it was not clear whether she has received any specific calls about sanctioning Paramount DMCC or other Paramount companies. She was definitely familiar with the Paramount companies. Claire asked if we had ideas on a new policy or how to improve the policy; we said that we had not dug that deep yet.

We proposed several questions to Claire about the likelihood of OFAC issuing a license to Paramount DMCC if its Russian-origin oil activities become subject to U.S. jurisdiction. Initially Claire did not seem to understand the question. She then asked if we were asking if OFAC would issue DMCC a license to engage in trading in Russian-origin crude oil above the price cap; she almost feel off her chair when she realized that was the question. Claire said no one has asked for such a license and she did not believe that any such license would be issued. She seemed amazed that any company would even have the guts to ask for such a license. She reiterated that the U.S. and G7 nations believe the price cap is working.

The meeting lasted about 45 minutes (1:00 pm ET to 1:43 ET). We do not think the meeting went well. OFAC clearly does not support DMCC's activities and DMCC is the type of company that OFAC is getting calls to impose secondary sanctions on. Further, OFAC has no current intent to change the price cap or authorize companies to engage in activities above the price cap, particularly, with respect to ESPO pipeline oil from the Kozmino part. We did not disclose that DMCC's Russian-origin crude oil trading is of the ESPO pipeline oil from the Kozmino port, but Claire already likely knows that fact. To the extent the meeting was helpful, OFAC now knows to reach out to us and understands that the Paramount companies are being proactive and transparent with OFAC.

318.    Instead of disclosing to Troost the discussion that took place during this meeting (which would have stopped the Enterprise's fraud in its tracks), Berg and Srivastava lied about it. On May 1, 2023, Berg emailed Troost and Srivastava



claiming that "the dialog with OFAC" had "momentum." During a call on May 5, 2023, Berg told Troost it was a "good conversation," when Troost asked how the meeting with OFAC went. Berg added that "the meeting itself, I would consider to be good. We certainly didn't hear anything new or alarming or that would cause us to suspect that the company was a target of OFAC" and that "the companies are not doing anything wrong. In our opinion it is not violating U.S. sanctions. That's our position and it hasn't changed. You know, it took a while to get all the facts. . . . We have a view based upon a set of facts which we think is accurate." And Srivastava continued to pressure Troost to complete the inversion, even though Srivastava and his lawyers knew that inverting Paramount was likely to trigger significant issues with OFAC.

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



120

319. During a call on May 6, 2023, Srivastava lied to Troost and told him that OFAC confirmed during their call with the lawyers that he and Paramount were "okay" because it was part of the secret "program":

```
MR. GAURAV SRIVASTAVA:  Well, because -- because
they were -- because there is a list.  I've told this to
you five times, there's a list the Ukrainian government is
circulating that is -- has your name and Paramount name on
it.  It has been sent to SECO, it's been sent to EU, that
they've sent to Dubai, that they have sent to U.S.
Everybody has that list and you are featured on that list
so I needed Jeff to talk to them to make sure that he
explains to everybody and OFAC and OFAC was then going to
relay to other agencies that you're okay.  Otherwise, there
was going to be not -- there was going to be five
investigations happening at the same time and that will for
sure bury the company.
        MR. NIELS TROOST:  But did OFAC then confirm that
we're okay?
        MR. GAURAV SRIVASTAVA:  Yes.  They want to
collaborate on working -- on different state -- on the
state actors.
        MR. NIELS TROOST:  And this is because they
understand that this is part of this program or --
        MR. GAURAV SRIVASTAVA:  They understand that I am
part of this company.
        MR. NIELS TROOST:  And that there is --
        MR. GAURAV SRIVASTAVA:  The program -- the
program did -- they know that this is run out of Los
```

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Angeles by me and that's what they told Jeff and that was that.  You're okay.  And that's what -- and it wasn't only Jeff.  It was Melissa Mannino; it was the full Baker team. It was six people or four people from their side on that -- on that call, you know?  Even O -- Melissa used to work for OFAC.  Melissa said that in her entire time there, OFAC has never made an outreach call to build a relationship with a company.  Ever.  Period.

MR. NIELS TROOST:  So that would -- that's highly unusual then.

MR. GAURAV SRIVASTAVA:  Absolutely.  Forced.  I forced OFAC to do it because I don't want shit to happen. I want to do this business with you and just -- just -- and the company. So it's very unusual. It's very unusual.  It never happens.  That they reach out --

MR. NIELS TROOST:  But then -- but --

MR. GAURAV SRIVASTAVA:  -- (inaudible) Jeff --

MR. NIELS TROOST:  But Jeff and Melissa -- but Jeff and Melissa understand then why -- why it's happening or --

MR. GAURAV SRIVASTAVA:  Of course.  Of course.


MR. GAURAV SRIVASTAVA:  Some day, I will, you know, talk -- we're going to talk and I'll tell you the whole story from top to bottom.  But there is a lot of stories.

MR. NIELS TROOST:  The story -- the -- the story of what?

MR. GAURAV SRIVASTAVA:  The story of why people listen, how they listen, how this whole thing works.  There is a system.  There -- there is a system.  It works.  And we just need to -- we -- if we work with system, we'll grow with the system.  And that's -- you know, and because -- you know, I think you and I care about the same thing, which is to maintain the -- the way of western life.

MR. NIELS TROOST:  I want to do what's best for the western world, yeah.  Absolutely.

MR. GAURAV SRIVASTAVA:  Exactly.

FIRST AMENDED COMPLAINT



```
 1        MR. NIELS TROOST:  Yeah.
 2        MR. GAURAV SRIVASTAVA:  So and that's, you know,
 3   it's not idealism.  We can't —— okay ——
 4        MR. NIELS TROOST:  Okay, Sir.
 5        MR. GAURAV SRIVASTAVA:  But —— but O —— but OFAC
 6   is, you know, that was, you know, that wasn't the call that
 7   Baker Hostetler requested.  OFAC reached out to Jeff to set
 8   up a call with him, to have a chat with him.
 9        MR. NIELS TROOST:  Mmm.
10        MR. GAURAV SRIVASTAVA:  And in the end of the
11   call, they told Jeff we would love to collaborate with you
12   on figuring out who the other bad —— who the bad state
13   actors are.  That's not normal.  OFAC's job is to
14   prosecute; not to be —— not to be ——
15        MR. NIELS TROOST:  No, I don't understand how any
16   of this works but that's ——
17        MR. GAURAV SRIVASTAVA:  But it's working so why
18   don't you just enjoy the fruit rather than trying to
19   understand it.  This is what I don't understand.
```

320. The disastrous OFAC meeting was just the tip of the iceberg. On May 1, 2023, PECSA received an unexpected letter from SECO, the Swiss sanctions regulator, requesting information about Paramount's operations. This surprised and alarmed Troost because Srivastava had repeatedly claimed he had been in direct contact with SECO and that SECO had already approved of Paramount's business. Believing Srivastava's prior representations, Troost forwarded the inquiry to Srivastava, Bravard, and Berg, expressing confusion that SECO was asking for information if the approvals Srivastava had described were real.

321. The next day, May 2, 2023, Troost wrote to Swiss counsel—copying Srivastava and Bravard—and repeated his understanding based on Srivastava's fabricated narrative. Troost told Swiss counsel that BakerHostetler had been engaged in ongoing discussions with OFAC and that a "representative of Paramount" (i.e., Srivastava) had been speaking with senior SECO officials. Troost asked Swiss counsel to incorporate this into PECSA's response to SECO, "especially when SECO

123

asks what steps Paramount has taken to be compliant with the regulations."

| From: | Niels Troost[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C796365B1BC54B45AA3BE868A BB79BEE-NTROOST] |
|---|---|
| Sent: | Mon 5/1/2023 11:16:48 AM (UTC+02:00) |
| To: | Gaurav Sri[ggksrivastava@gmail.com]; N. Bravard[nbravard@parencom.ch]; Jeffrey Berg[jberg@bakerlaw.com] |
| Cc: | Jevgeni Barasev[jbarasev@parencom.ch]; Maurice Taylor[mtaylor@parencom.ch] |
| Subject: | Fwd: letter from SECO |
| Attachment: | 4623_001.pdf |

Dear Jeff and G,
Please see attached! I'm very confused because I was constantly informed that G was speaking directly to the top person at SECO, Helen, and dealing with this and that we got the all clear from SECO.

Please call me urgently and let me know how we proceed.

322. When confronted with SECO's inquiry, Srivastava escalated his fabricated intelligence narrative. He used his Chief of Staff, Jim Reese—whom he had manipulated—to corroborate his lies. That evening, Srivastava and Reese made international phone calls to Troost to reassure him that Paramount was part of a secret CIA program allegedly approved "at the highest levels."

323. On one of those calls, Troost asked, referring to Srivastava, "You don't think he's a charlatan that just wants to take my money and suck me dry[?]" Reese responded, "I don't." Later in the conversation, when Troost asked Reese whether the CIA Director knew Srivastava, Reese answered "yes." When asked whether Paramount was "really building a program here with the Agency," Reese again said "yes," claiming he had attended meetings with Srivastava and senior officials, including Senator Mark Warner, Chairman of the Senate Intelligence Committee.

324. Reese further told Troost that Srivastava was a "NOC" and that the alleged Program had an official codename he could not reveal. Reese claimed he was "breaking his clearance" by discussing it and asserted that there had been no regulatory backlash against PECSA because of Srivastava's "influence" and because Troost's involvement was part of a "covert action." Reese explained to Troost how the NOC program worked in substantial detail.

124

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

325.   Later that evening, Reese again spoke on the phone with Troost, in part about the U.S. government's approval of Paramount trading ESPO, Srivastava's involvement with the CIA, and Srivastava wanting Troost to participate in a program with the U.S. government or else he would use a different company. Reese said, "I just sat with Ben Harris from the U.S. Department of Treasury.[20] The guy who wrote the entire sanctions program. Not a word about it [Paramount]. He even talked about ESPO. He's like "Hey, we got no issues with ESPO," which was the focus of PDMCC's Russian-origin oil marketing business. When Troost asked what the U.S. government's reaction was when they brought up Paramount, Reese said, "He [Harris] says, '[Paramount], we see no issues with." Troost asked specifically about PDMCC. Reese said, "DMCC, in Dubai? Yes, 'We give Dubai a pass.'" In fact, Srivastava, Reese, and others participated in a video call with Ben Harris, earlier that day:

| From: | Jim Reese[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F8D096A3E58042B79680099FA2 175A2A-FABB4692-2C] |
|---|---|
| Sent: | Mon 5/1/2023 5:06:51 PM (UTC-07:00) |
| To: | James Reese[james.p.reese.5@gmail.com] |
| Subject: | zoom call |

JR is inviting you to a scheduled Zoom meeting.

Topic: G, Ankit, Ben, Greg and Jim
Time: May 2, 2023 13:30 Eastern Time (US and Canada)

Join Zoom Meeting
https://us02web.zoom.us/j/81594419409?pwd=UTYzVUx6MXViOTR0YUYzcmZqSXBCZz09

---

[20] Ben Harris is a former Assistant Treasury Secretary for Economic Policy and Chief Economist. In his official capacity he had publicly stated in February 2023, "about 75 percent of the trade of Russian seaborne oil occurs outside of the price cap. That means no Western services are involved in the transaction and, therefore, *these trades do not violate or evade sanctions*" (emphasis added)



FIRST AMENDED COMPLAINT

326.   Despite these claims of U.S. Government approval, Srivastava could produce no proof. Paramount staff—particularly Mauron—remained skeptical. Mauron had seen a March 2023 press report that Srivastava (pictured) purchased an expensive mansion in California and started putting two and two together (that is, started suspecting that the $51 million PDMCC loaned to the International Company actually was a pass-through to Srivastava):



327.   When Troost told Srivastava that Mauron believed Srivastava was scamming Troost, Srivastava became enraged. On May 3, 2023, he threatened Troost that he would "fucking destroy everything in three seconds" and that Troost "ha[d] no fucking idea."

328.   Also that day, on a call with Troost, Srivastava claimed that Democratic Senator Mark Warner, the Chairman of the U.S. Senate Intelligence Committee, supported PDMCC's Russian oil business. Srivastava said he could not give details because he was in a CIA program, which was false. Srivastava instructed Troost to "ask Jim [Reese]," noting "I cannot say things because of the programs I am a part of, but he can. He can talk to you. Under law, he can speak to you because as a friend or whatever, but I can't speak to you, when I'm part of a program that I cannot tell you about all this stuff, but he can." Troost then called Reese and they discussed Srivastava's supposed affiliation with the CIA. During that call, Reese said "G is a

126

NOC . . . a non-official cover operative." Reese explained the background and history of the NOC program and how it works, and confirmed that Troost was a "P3" source for the CIA under Srivastava. After that call, Troost spoke again with Srivastava by phone and said "I had a good chat with Jim, and I understand a lot more now. You probably know what I mean because you told me that I can ask him." Srivastava replied, "Yes, ask him. That's why I told you, because I cannot tell you certain things."

329.    The pressure campaign continued, with Srivastava insisting the Inversion was the only way Troost could speak to U.S. authorities. He told Troost that because the company was not yet under "U.S. control," Srivastava could not issue any documentation. When Troost challenged him—asking, "But even if I'm your asset, you cannot do that?"—Srivastava responded: "I can write so I can make sure there's nothing harmful that happens to you from the U.S., and the U.S. can reach out to its counterparts to make sure that they don't do anything to you that is going to be ultimately affecting you." Srivastava then went further, reconfirming that the Inversion would transform PECSA into a shielded proxy for U.S. operations: "[O]nce you are a U.S. company, you're acting on U.S. behalf. The U.S. ain't going to do shit. I know that. They're fucked. They have given us carte blanche on whatever I want to do. Carte blanche; do whatever you want to do, okay? That's basically it."

330.    On May 4, 2023, Troost again questioned why everything "had to become American." Srivastava responded that the U.S. government cared only about "a pure American enterprise with an American mindset," and that Troost's daughter living in New York was the only reason officials allowed Troost to remain involved.

331.    When Troost requested written proof that Srivastava could protect him from U.S. and Swiss regulators, Srivastava claimed Troost was an "MX-1 asset," but admitted no documentation existed. On information and belief, no such classification exists. Srivastava claimed providing anything in writing would "breach[] the law," but assured Troost that "the U.S. is not going after [him]."

FIRST AMENDED COMPLAINT

332.  On May 5, 2023, Srivastava resumed pressuring Troost, who voiced concerns about violating sanctions if PDMCC operated under a U.S. parent. Srivastava warned Troost that hesitation might make U.S. officials question whether he was deceiving them and threatened that "by tomorrow morning, it will be fucking pandemonium in your life." Srivastava added, "I don't think you understand who you're dealing with ... I can call, it's not a joke man, call eight Senators in a day and the President in the White House and the ambassador of this country. This is not monkey business. This is very serious shit."

333.  Srivastava claimed this reach was possible because he was "part of a program, I've told this to you before, in which there is only 30 people," insisting he could "call anybody" because he operated as a "NOC," and that Troost was "not supposed to even be privy to this information":

> MR. GAURAV SRIVASTAVA:  — you — but you — but — but you have to understand this by now.  The fact that I can reach all these people, I can call — it's not a joke, man, to call eight senators in a day and full thing and the president in the White House and the — you know, the ambassador of this country and — this is not monkey business; this is very serious shit —
>
> MR. NIELS TROOST:  So how is that possible?
>
> MR. GAURAV SRIVASTAVA:  — you know?  Because I am part of a program, I've told this to you before, in which there is only 30 people part of that program that has been open and shut over the years by the American government, okay?  It was shut off for some time, we open it up again, and we open it when we want to open.  I'm — I am part of the program so I can call anybody, can reach out to any state, any agency, anybody, but in non — but it is called Non-Official Cover, NOC, okay?  But you're not supposed to know all this; you're not supposed to even have privy to this information. For your intent and purposes, I am your friend, I'm your partner, I'm a business, whatever.  You're not supposed to know this.  And then you say, "Well, give me a piece of paper."  Well, probably not supposed to know that and how am I supposed to show you a piece of paper?  It's like it's counterintuitive.  Either you —

FIRST AMENDED COMPLAINT



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

334.    To reinforce that Troost had no choice but to proceed with the inversion, Srivastava claimed responsibility for Sam Bankman-Fried's prosecution because Bankman-Fried "fucked with" Srivastava.

335.    On May 6, 2023, Srivastava sent by international wire texts to Mr. Troost accusing him of lying and telling him "most importantly, the inversion has to happen," otherwise, Srivastava threatened, he would tell U.S. authorities that Mr. Troost was a Russian agent ("I do think that there is someone else controlling things. I just a got a call from DC."), he would get Mr. Troost sanctioned ("I am personally going to write to SECO [the Swiss sanctioning authorities] & OFAC about the deception."), and he would block Paramount's assets—a clear extortion attempt by Srivastava[21]:

 

336.    Troost called Srivastava and asked, "What lie are you talking about?" Srivastava replied that he could not talk. Troost then called Reese who said, "G just wanted me to tell you that he's with [then-Speaker of the House] Nancy Pelosi and can't talk right now, so he needs a couple of hours." When Troost spoke with

_____

[21] These texts violated at least Title 18, United States Code, Sections 1343 and 1951.

FIRST AMENDED COMPLAINT

Srivastava by phone later that same day, Srivastava recounted purported conversations he had with members of CIA leadership, including the actual Director of the CIA, Bill Burns, whom he claimed were upset with Troost for delaying the inversion and were therefore considering that Troost might actually be a Russian agent. He also claimed to have gotten one of Country-1's officials off of the U.S. no-fly list and to have kept General Dagalo of the Sudanese Rapid Response Forces off of the sanctions list. He also mentioned Troost's daughter in New York and confirmed that he was one of about thirty NOCs who all know each other. They also discussed the April 28, 2023 call the lawyers had with OFAC, as arranged by Srivastava through members of Congress. Srivastava falsely represented that the meeting went well and that OFAC approved of Paramount's businesses. Troost asked for the memo noting what happened during the call. Srivastava responded, "Yeah, I don't want him [Jeff Berg] to send that memo because it's not necessary. You asked me about it. I don't think it's necessary to send." Srivastava claimed that he had "forced" OFAC to contact the lawyers to set up the call. Troost asked, "But did OFAC then confirm that we're okay?" Srivastava replied, "Yes. They want to collaborate on working on different, on other state actors." Troost asked, "This is because they understand that this is part of this Program?" Srivastava replied, "They understand that I am part of this company. The Program, they know that this is run out of Los Angeles by me. And that's what they told Jeff. And that was that. And you're okay."

337.   In the days that followed, Srivastava continued pressing Troost. He even deployed BakerHostetler to write legal opinions supporting the legality of PDMCC's continued operations and Srivastava's extraction of those profits from the Paramount companies for himself. One such opinion, dated May 8, 2023, stated, "Notwithstanding the origin of the funds for the Dividend (i.e., [PDMCC]'s trading in Russian-origin crude oil above the price cap), we believe that the issuance of the Dividend and receipt of it by the U.S. Shareholder [Srivastava] and the others does

130

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

not fall within any U.S. sanctions prohibitions."[22]

**BakerHostetler**

Baker & Hostetler LLP

Washington Square, Suite 1100

**ATTORNEY-CLIENT PRIVILEG**
**CONFIDENTIAL**

> Notwithstanding the origin of the funds for the Dividend (i.e., DMCC's trading in Russian-origin crude oil above the price cap), we believe that the issuance of the Dividend and receipt of it by the U.S. Shareholder and the others does not fall within any U.S. sanctions prohibitions. As stated above, we understand that DMCC's business is in compliance with all applicable laws. The U.S. Shareholder is not involved in any trading activities of any Paramount entity and is not involved in the day-to-day operations of Paramount SA or DMCC. He would simply be receiving funds from a non-Russian person as a result of being a 50% shareholder of Paramount SA.

| | |
|---|---|
| **TO:** | Paramount Energy & Commodities SA |
| **FROM:** | Baker & Hostetler LLP |
| **DATE:** | May 8, 2023 |
| **SUBJECT:** | U.S. Sanctions Analysis for DMCC's Dividend Distribution |

> The Russian Price Cap sanctions do not permit SA or any other persons from Implementing Countries to be involved in, or otherwise support or assist, DMCC's operations. It is our understanding that DMCC is not subject to the Implementing Countries' Russian Price Cap[2] and may continue to engage in its business operations under the current laws and regulations. SA has compliance policies and procedures in place for its employees and keeps its business operations separate from DMCC to comply with the Russian Price Cap.

338. That same day, Srivastava again assured Troost that SECO's inquiry was merely due to "a government disconnect" and that SECO was receiving press criticism for not acting against PECSA. He claimed SECO had told him that if PECSA wanted to avoid enforcement action, it must complete the Inversion into a U.S. company.

**D.     After Uncovering Srivastava's Deceptions, Troost Rescinds the Agreements and Expels Him from the Company**

339. As doubts about Srivastava mounted among PECSA personnel around this time, Taylor, on behalf of PECSA, commissioned a private investigator to look into Srivastava's past. The investigator's report revealed a documented history of fraudulent behavior. As a result, PECSA began resisting further attempts by Srivastava to exert control, particularly in regard to the inversion. Srivastava's previous fraudulent behavior included:

- In January 2021, a California plaintiff sued Srivastava, alleging that

---

[22] These May 2023 memos justifying Srivastava's receipt of Russian-origin oil marketing profits disprove Srivastava's after-the-fact claims that he was surprised to learn that PDMCC marketed billions' worth of Russian-origin oil, and his discovery of that explains why Troost supposedly fabricated a fake-spy narrative against him.



FIRST AMENDED COMPLAINT

"Gaurav and Sharon Srivastava used a convicted, drug smuggling felon to incorporate a shell corporation (Unity Resources Group, Inc.) which Gaurav and Sharon then used to lease a luxury residence." They allegedly "then stole in excess of $100,000 in wine from a locked wine cellar in the leased home . . . and caused other damages to the home."

- In March 2019, another California plaintiff sued Gaurav and Sharon Srivastava for failing to pay over $100,000 in rent for a private residence, which they allegedly continued to live in. In February 2019, a collection agency sued Gaurav Srivastava after he had agreed to pay hospital expenses for his father and given it checks for $14,850 and $67,238, then allegedly stopped payment on the checks.

- Also in February 2019, Gaurav and Sharon Srivastava signed a settlement agreement in which they admitted that they "knowingly and intentionally made misrepresentations" to a woman to take $100,000 from her when the Srivastavas "knew that their financial condition would not allow them to pay back" the money, they "knew that their representations were false," and they "had no intention to repay [her] any portion of the amount borrowed."

- And, in February 2017, Srivastava was sued for fraud, agreeing to settle the case for $30,000, but he never paid, as is set out by the court in its judgment in *Khoudari v. Davalos*, B298628, 2020 WL 6053398 (Cal. Ct. App., filed Oct. 14, 2020).

340. Initially shocked by these discoveries, Troost finally decided he had enough. On May 10, 2023, his holding company, EZI, rescinded the share transfer to 1234 Holding that had given Srivastava a stake in PECSA. EZI cited "tangible evidence that it was misled."

341. However, the damage the Srivastava Enterprise inflicted was far from over. Eventually, Troost was sanctioned by the UK, the EU, and the Swiss, and

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

PECSA and PDMCC by the UK because of PDMCC's lawful but politically disfavored business. Srivastava has publicly taken credit for causing this. The United States government, however, which learned in detail about Srivastava's fraud, and whose U.S. Treasury sanctioning process is unique in the higher level of evidence required to sanction a person or entity than in the UK, EU, or Switzerland, has rightfully not sanctioned any of them. This, despite Srivastava, Maguire, and others attempting to persuade U.S. officials to sanction them, on information and belief.

**E.      The Srivastava Enterprise Continues Its Racketeering Activities After Troost Cuts Ties**

**1.  Following Srivastava's Removal from PECSA, the Enterprise Launches an Extortionate Scheme Targeting Troost**

342.   Following his expulsion from PECSA on May 10, 2023, Srivastava immediately texted Troost, "Are you kidding me?" What followed was a coordinated effort by Srivastava and his associates to reestablish contact, directly and indirectly, including through Troost's wife and daughter. As Srivastava had repeatedly threatened, his removal triggered a wave of "pandemonium" in Troost's personal and professional life.

343.   Reese was present when Srivastava learned he had been removed from PECSA. Srivastava reacted with anger and immediately arranged a meeting in Washington, D.C. with the Turkish Ambassador to the U.S. for the next day. Srivastava, Bravard, Lascari, Berg, and Cedar West then worked together to email letters to officials in various countries, including Switzerland, the United States, Turkey, and the UAE in an attempt to freeze Paramount's assets on the false pretext that Troost had stolen $47 million from Paramount relating to a Turkish terminal and then shut Srivastava out of the companies so Troost could take all the assets. The truth, as Defendants well knew, was that Plaintiffs removed Srivastava after discovering that he had been defrauding them since he was introduced to Troost in



FIRST AMENDED COMPLAINT

May 2022, a fraud through which Srivastava successfully stole tens of millions of dollars. Defendants omitted these material facts which rendered their correspondence to public officials fundamentally false.

344. On May 11, 2023, Troost received threatening WhatsApp messages from a Colorado number, written in French, warning that the sender would disclose purportedly embarrassing personal information about Troost to Troost's family.

345. That same day, Srivastava and Reese visited the Turkish embassy in Washington, D.C. They later met the Ambassador in a nearby park, where Srivastava falsely accused Troost of working for the Russians and asked for help severing Troost's relationships with Turkish business partners. These accusations directly contradicted Srivastava's comments to the Ambassador just two days earlier, during a May 9 meeting, when he lauded Troost's operations and described himself as an American businessman who owned Paramount.

346. On information and belief, Srivastava or his associates provided Turkish officials—either at this meeting or a subsequent one—with a document containing false and defamatory accusations against Troost and his family, including the fabricated claim that they were funding the Wagner Group.

347. On the evening of May 11, 2023, Srivastava again texted Troost: "We need to talk." The following day, on May 12, an Iranian number, +98 992 084 2035, sent Troost a video via WhatsApp. Troost did not open it for security reasons, and the sender later deleted it. According to *Financial Times* journalist Tom Wilson, "At the same time, the [same Iranian] number started to message me at the FT, offering information about Troost's operations."

348. On May 13, 2023, Srivastava again messaged Troost: "Please call me." Later that day, the Iranian number messaged Troost stating, "48 hours to wire USDT 10 million or your un-blurred confession video will go public." Hours later, Srivastava repeated, "We need to talk. Really."

349. That evening, Troost's daughter received a message from a California

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

134

FIRST AMENDED COMPLAINT

number identifying the sender as a Wall Street Journal reporter requesting a call about "the relationship [a Russian oligarch] has with your father, Niels?" This same number had been shared with Srivastava by Troost on March 20, 2023.

350.   On May 15, 2023, the Iranian number again messaged Troost: "Looks like we're gonna do this the hard way."[23]



351.   Shortly thereafter, Berg—still acting on Srivastava's instructions—emailed letters to the Swiss ambassador to the United States, copying the U.S. Ambassador to Switzerland, repeating the fabricated allegations the Enterprise had brought to the UAE and Turkish ambassadors and informing them that his client, Cedar West, had been expelled from PECSA. Notably, Berg continued to take the (correct) position that PDMCC was ***not*** subject to the G7 sanctions and reinforced that "no persons from Implementing Countries provide services to Paramount DMCC relating to Sanctioned Activity." In other words, they confirmed to authorities that neither Paramount, nor Troost, violated sanctions in any way.

352.   Reese, still serving as Srivastava's de facto Chief of Staff, also wrote to the U.S. Embassy in Bern, Switzerland, seeking a meeting. He subsequently met with

---

[23] Each of these international text messages violates at least Title 18, United States Code, Section 1951.



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Special Agent Glen Moffat of the U.S. State Department Diplomatic Security Service and sent him an article that Maguire and Srivastava had instigated falsely accusing Troost of funding the Wagner Group, a terrorist organization.

      **2.**      **The Srivastava Enterprise Attempts to Seize the Remaining $26 Million of PDMCC Funds Held by the International Company**

353. From February through September 2023, Srivastava, Lascari, and Maguire repeatedly attempted to extract the remaining $26 million of PDMCC's loan proceeds held by the International Company. Srivastava and Lascari provided various fictional pretexts to justify on paper to banks why the International Company should send Srivastava more money. On February 20, 2023, Lascari texted the International Company's representative to start generating documents, claiming that "[The IB] paid G for consulting services in 2018. G agreed to lend those funds to [the IB] on demand. G has now called the loan and agreed to the payment schedule":



354. This was false. There was no consulting agreement, and Lascari had never seen any such agreement. And, the International Businessman had not even met Srivastava yet in 2018. A few months later, he offered to draft one up (5 years

FIRST AMENDED COMPLAINT

after-the-fact) to show that the International Businessman owed Srivastava money.

355.    On May 11, 2023, Lascari (from California) messaged the International Company's representative: "We need to start repayment of the remaining funds. How best to proceed?" The next day he pressed again: "Were you able to discuss? We need the first tranche first week of June as I understand was previously agreed."

356.    By that time, the International Company and the International Businessman had become increasingly cautious in dealing with Srivastava and insisted that the $51 million loan from PDMCC be forgiven before any disbursement of funds could take place. In response, Lascari claimed that the $51 million had not originated from PDMCC. Instead, by text message on May 15, 2023, he falsely asserted that Srivastava had "performed consulting services" back in 2018 for that amount, had "agreed to lend those funds back at an interest rate of 5%," and was now in the process of preparing documentation for that supposed 2018 consulting services loan. Essentially, Lascari claimed to understand that those undocumented personal services had been worth $51 million, that Srivastava had loaned (without documentation) 100% of those proceeds back to the International Businessman, and that Srivastava was now collecting them back. Lascari offered to draw up the papers ("this is just a memorialization of that agreement"):

 

FIRST AMENDED COMPLAINT



ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

357. This explanation was implausible. If Srivastava and the International Businessman had truly agreed to such terms in 2018 for Srivastava's "consulting services," for *$51 million*, it made no sense for his lawyer to only now be preparing the documentation—five years later. The International Company's representative responded skeptically on May 15, 2023: "First time I heard about a consulting service performed in 2018. Pls provide evidence. No such transaction booked from our side." Lascari had no evidence to provide because the justification was entirely fabricated. The representative further clarified, "What has been booked is loan between paramount and [the International Company] for 51m dated November 26, 2022. This loan has been legalised and apostilled and reported to [the bank] as per G's request."

358. Per Lascari, the $26 million transfer was to be backed by a supposed personal guarantee Srivastava proposed but had no intention of honoring, which Lascari emailed from California to the International Company's representative in Country-1 on June 29, 2023:





359.   The supposed personal guarantee that Lascari drafted and sent by email is a smoking gun document in which the Srivastava Enterprise admits that the $51 million Srivastava caused PDMCC to lend to the International Company was "for the benefit of" "Gaurav and Sharon Srivastava" and that the International Company had sent "the amount of USD $25 million from" those funds to the Srivastavas in January 2023.

360.   On June 26, 2023, still pressing for funds, Lascari told the International Company's representative: "It is critical we receive at least the $3 MM on July 1. As mentioned, G will provide an indemnity/guarantee while we work out assigning the other loan to a new structure." The representative replied, "It is also critical for us to receive acknowledgment from [PDMCC] as to reduction of loan and subsequent transfer." Lascari responded, "G is happy to acknowledge internally as we discussed." The representative was unsatisfied, responding, "Need to understand how G acknowledgment linked to P [PDMCC] acknowledgment." Lascari replied, "G will personally indemnify [the International Company] for the entire amount." The representative rejected this stating, "G told [the International Businessman] he has no asset in his name..so personal indemnity will not work."



FIRST AMENDED COMPLAINT



361.  On July 2 and July 3, 2023, the pressure campaign intensified. the International Company's representative received escalating demands by text from both Lascari and Srivastava urging immediate transfer of the remaining funds. Lascari insisted: "Any later than the 5th will not work, so this must be resolved by then. G said that is the expectation." The next day, he pressed again: "[The International Businessman] told G we would get 1.5m on the 5th. Please confirm. Do you have our wire instructions?" At the same time, Srivastava sent his own barrage of messages on July 3 and 4, pleading and applying pressure in equal measure: "we cannot wait any longer…I cannot stress enough the importance of keeping the schedule as agreed. It is really important…we really need this resolved…I am at a loss of words here, I really feel that this is not right…" The representative responded, "Gaurav, I am trying to contact [the International Businessman] and get instructions. My hands are tied." Despite her refusal, she continued receiving texts and calls from Srivastava for months afterward.



362.  On July 4, 2023, Lascari followed up yet again, this time directing the International Company's representative to transfer the funds to "Echo Grove LLC," a company Lascari formed for the Enterprise to use to receive and conceal fraudulent

140

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

proceeds. The representative questioned the request, responding: "who is Echo Grove and what connection with original lender, Paramount? We require an acknowledgement from Paramount that the original loan amount to [the International Company] was 50% repaid in Dec 2022 and any subsequent transfers to Echo Grove will also reduce the outstanding amount owed to Paramount." Rather than address the discrepancy, Lascari replied by again falsely asserting that he had no knowledge of any loan between Paramount and the International Company.



363.   When the International Company continued to refuse to send the $26 million, Srivastava and Maguire tried to persuade it to do so by falsely claiming that Troost was under criminal investigation for stealing $1.6 billion dollars and was subject to an impending Interpol Red Notice. But, the International Company's team checked with Country-1's authorities, who confirmed there was no Red Notice on Troost. Srivastava and Maguire also falsely claimed to the International Businessman that PDMCC had been incapacitated. They presented a letter from a UAE law firm to the lawyer who Global Energy Law Group had paid to assist G by facilitating the original $51 million sham loan from PDMCC to the International Company alleging that they had filed a criminal case in Dubai and instructing the International Company that all PDMCC business "should exclusively originate from Giordano-Lascari":



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT



364.    In fact, Lascari never held any position within or authority over PDMCC. He was the director of Cedar West, the entity the Enterprise was using to try to get at PDMCC's assets. And, the letter falsely claimed that Cedar West was the ultimate beneficial owner of 50% of PDMCC to conceal the fact that, in reality, it had been Gaurav Srivastava up until May 2023. Moreover, as the Dubai Chief Prosecutor's investigation later found, their complaint was based on doctored evidence.

365.    Undeterred, Srivastava and Maguire continued pressing for the money. On September 26, 2023, Lascari circulated a draft agreement purporting to transfer the entire $51 million loan from the International Company to Cedar West, which Lascari directed but which was controlled by Srivastava. In parallel, a side letter to the novation agreement sought to secure the immediate transfer of the remaining $26 million to Cedar West, structured as monthly "installments" of $2 million —an attempt to create a fictional repayment structure that would mask the fraudulent diversion of funds. And, it would credit the remaining $25 million of the loan that was sent to the Srivastava Enterprise.

FIRST AMENDED COMPLAINT



366.    On or about September 25, 2023, Srivastava and Maguire personally attempted to blackmail the International Businessman by threatening to falsely accuse him of financing terrorism if he did not transfer the funds. Despite this pressure campaign, International Company refused to transfer Srivastava the remaining $26 million in loan proceeds.

**3.        The Srivastava Enterprise Organizes a Smear Campaign Against Troost in an Attempt to Conceal Its Fraud**

367.    To discredit Mr. Troost so that (1) no one would believe him should he go public to expose the Srivastava Enterprise's crimes; (2) the U.S. and other governments would sanction him, which would effectively freeze the assets they were trying to take and further discredit Troost; and (3) they could convince a government authority or a court to issue an order giving them control over all of

143

ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Paramount's assets, in May 2023, the Srivastava Enterprise—using interstate and international wires—launched an aggressive and malicious smear campaign designed to destroy Troost's personal and professional reputation, which continues to this date.

368. Srivastava orchestrated and financed a deceptive media operation by paying individuals posing as journalists to publish fabricated stories about Troost. He enlisted Maguire to help manage the campaign. Together, they generated and promoted articles alleging that Troost had criminal ties to Russia, including claims that he acted as a front for a sanctioned Russian oligarch. They even fabricated criminal accusations against Troost's wife and children. Maguire told Srivastava he could have the NYPD pick up Mr. Troost's daughter for questioning.

369. One such article, on May 16, 2023, appeared on the blog, "Thyblackman.com," which "address[es] the culture and concerns of the black community." The article, entitled "President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate," contained Srivastava and Maguire's allegations. It accused Troost of being "a front for" a sanctioned Russian oligarch. It said that "you see [the oligarch's] fingerprints all over the oil deals passed through Troost's Switzerland-based" PECSA. It alleged that Troost created PDMCC "to evade these sanctions," even though PDMCC was created years before the Price Cap. The article accused Troost's wife and daughters of committing crimes. It also accused PDMCC's finance director and his executive assistant of being Troost's "mistresses." And it falsely claimed "Troost, at Putin's urging, is one of the largest clandestine funders of the Wagner Group" and that "Troost, simply put, is the ringleader of a global covert criminal enterprise."

370. Srivastava had arranged to pay Armstrong Williams, an American political commentator and talk show host, to place the article on Thyblackman.com, on information and belief. In late April and early May, Srivastava and Mr. Reese had employed Mr. Williams to attempt to persuade New York Times reporter, David Marchese, to interview Srivastava and publish a story about "[t]he failure of the USG



to engage and leverage US companies abroad." On June 3, 2023, Mr. Marchese turned down the interview, saying "I think Gaurav is an interesting guy, with a smart perspective. The hitch on my end is that he A: has no public profile and B: works in a business and on issues that are somewhat opaque to the general reader."

371.    In a spreadsheet of past due expenses Mr. Reese prepared on May 26, 2023, he listed "armstrong $25,000" and "armstrong article $10,000."[24] The website for Thyblackman lists Armstrong Williams as a contributor.

| Invoice date | Vendor | cost |
|---|---|---|
| 5/20/2023 | Office insurance | $1,690 |
| 3/3/2023 | Eco Green Painters | $2,710 |
| 3/9/2023 | Eco Green Painters | $9,980 |
| 3/20/2023 | Westway Electirc Systems | $26,605 |
| 5/1/2023 | Eric Pluies | $15,000 |
| 5/15/2023 | Eric Plues | |
| 5/13/2023 | Arch Angel due diligence | $5,000 |
| 4/15/2023 | John Carafella IT office | $31,000 |
| 5/1 23 | John Carafella IT office | $15,000 |
| 5/1/2023 | JR | $69,071 |
| 5/1/2023 | Hunt | $35,000 |
| 6/1/2023 | office rents | $25,000 |
| | | $236,056 |
| | armstrong article | $10,000 |
| | armstrong | $25,000 |
| | Ankit | $15,000 |
| | Greg | $15,000 |
| | Mcguire | $15,000 |
| | Mary beth | $20,000 |
| | Gen Clark | $136,000 |
| | Gordon Conroy | |

372. Srivastava instructed Reese to email the false article to a U.S. Government official at the State Department:

| From: | Jim Reese[/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f8d096a3e58042b79680099fa2175a2a-fabb4692-2c] |
|---|---|
| Sent: | Wed 5/17/2023 12:33:13 PM (UTC) |
| To: | moffatga@state.gov[moffatga@state.gov] |
| Subject: | Fwd: President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate. |

Glenn
Thanks for coming down and meeting us.  Appreciate you passing this to the Legat.
See article below which just came out on our partner

all the Best
Jim

James Reese
Chief of Staff

Get Outlook for iOS

Subject: President of Russia Vladimir Putin's Hidden War—Niels Troost Crime Syndicate.

https://thyblackman.com/2023/05/16/president-of-russia-vladimir-putins-hidden-war-niels-troost-crime-syndicate/

---

[24] The document also showed amounts due to others such as Srivastava's then-lobbyist Ankit Desai, Maguire, Mary Beth Long, General Wesley Clark, the SAS Commander, and Greg Schultz (Biden's former campaign adviser).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



Rosen ✧ Saba, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

373. Reese, who had direct knowledge of the operation, was present for conversations in which Maguire and Srivastava discussed methods to damage Troost's reputation and drafted articles containing knowingly false allegations about Troost and his company. Reese was alarmed when Srivastava and Maguire began targeting Troost's 24-year-old daughter living in New York.

374. Maguire attempted to weaponize law enforcement by contacting individuals within the New York City Police Department, sending them photographs of Troost's daughter, and falsely claiming she was part of an international criminal network linked to Gennady Timchenko. According to Reese, Maguire told Srivastava that having the NYPD question Troost's daughter about fabricated allegations would pressure Troost into transferring money to Srivastava.

 

375. In December 2023 through at least February 2024, Srivastava, Maguire, and others also targeted Troost's New York-based daughter via interstate emails to her employer falsely claiming she was a Russian spy and urging the employer to report her to the police for the purpose of pressuring Troost and to generate a negative outcome about the Troost family that could then be publicly reported to discredit Troost and to gain litigation advantages against the Plaintiffs so the Enterprise could obtain more money from Plaintiffs.

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

376. For example, on December 17, 2023, ukrainewomen.mother@proton.me sent an email to Mr. Troost's daughter's boss, copying "FCPA.fraud@usdoj.gov," subject, "URGENT: RUSSIAN OLIGARCH IS [employer's] INVESTOR," stating in part: "It is quite disturbing to know that you have been funded by [Ms.] TROOST, the daughter of a wanted fugitive,/criminal . . . . I have reported all of your companies and your network to law enforcement and I would advise you sincerely "selfreport" to appropriate law enforcement agencies on your interactions with [Ms.] TROOST. From our research, she([Ms.] TROOST) is a trained Russian spy who is trying to infiltrate into America on behalf of her father NIELS TROOST & GENADY TIMCHENKO. . . . I hope you see the light and do the right thing and report [Ms.] TROOST to law enforcement. Do the right thing. God Bless." The email also linked to articles about Mr. Troost planted by Srivastava and Maguire.

377. The same day, "ukrainewomen.mother@proton.me" sent another email to Mr. Troost's daughter's employer, copying, among others, reporters Joe Wallace (*The Wall Street Journal*) and Tom Wilson (*The Financial Times*). The subject line was "RUSSIAN CRIMINAL: DAUGHTER NIELS TROOST – [employer]," and it said, "Attached are pictures of RUSSIAN AGENTS/employees of [Ms.] TROOST & RUSSIAN OLIGARCH CRIMINAL DAUGHTER NIELS TROOST, [Ms. NAME] TROOST." The remainder of the email contained photographs of the Troost daughter and others pulled from her and others' public social media accounts.

378. On February 22, 2024, the email address "Ukraine.freedom112233@proton.me" emailed Mr. Troost's daughter's employer in New York, with the subject line, "US/UK SANCTION: [Ms. Troost] NIELS TROOST," stating in part: "How can your company pretend to care about women and children when you supporting Russian criminal financier NIELS OSCAR TROOST and his daughter [Ms.] TROOST."

379. That same day, Srivastava and his team unleashed further attacks on

Troost and his family, on information and belief. Srivastava, from California, sent the following messages to the International Company's representative, in Country-1, cutting and pasting the UK designation announcement, and attaching a particular *Financial Times* article, "UK Sanctions Dutch Oil Trader Over Russia Links":



380.    Also that day, Srivastava's team, on information and belief, using the email address "Ukraine.freedom112233@proton.me" sent another email to Ms. Troost's boss, subject line, "US/UK SANCTION: [Ms.] TROOST":

How can your company pretend to care about women and children when you supporting Russian criminal financier NIELS OSCAR TROOST and his daughter [Ms.] TROOST. See the Below, so you can do the right thing and cut ties to funding going to killing of innocent Ukrainian women and children. Attached is a Financial Times article that was published today about the NIELS OSCAR TROOST. PLEASE NOTE [Ms.] TROOST IS IN POSSESSION OF SANCTIONED MONEY FROM HER FATHER CRIMINAL NIELS OSCAR TROOST.

381.    It attached the same *Financial Times* article and cut and pasted the same portion of the sanction designation announcement that Srivastava simultaneously

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

148



sent to the International Company's representative.

382.   Overall, the anonymous attacks against Ms. Troost, aimed at her employer, bore Srivastava's hallmarks, on information and belief: (1) they directly targeted Ms. Troost, consistent with the tactics Srivastava and Maguire discussed in front of Jim Reese; (2) they included allegations similar to those Srivastava and Mr. Maguire were perpetuating in the media; (3) they, at times, contained extra spaces around punctuation marks like Mr. Reese had observed Srivastava write and are observed in other Srivastava messages; (4) one ended "God Bless," just as Srivastava sometimes ended his communications; (5) one copied "FCPA.fraud@usdoj.gov," the same email address Lascari had contacted on Srivastava's behalf on June 14, 2023[25]; (6) the last one was sent out in tandem with and was identical in all material respects to what Srivastava personally sent to the International Company's representative; and (7) Troost had previously told Srivastava where she worked.

383.   The Srivastava Enterprise orchestrated a similar scheme targeting Troost's son. In September 2024, Srivastava, Maguire, and others caused international email communications to be sent from fake journalists, "emma.kleinish@gmail.com" and "lisa.hagenn@gmail.com" to Troost's son's university in the United Kingdom in an attempt to cause the school to expel his son for the purpose of pressuring Troost and to generate a negative outcome about the Troost family that could then be publicly reported to discredit Troost and to gain litigation advantages against the Plaintiffs so the Enterprise could obtain more money from Plaintiffs.

384.   Srivastava and Maguire also planted fabricated stories in online media Intelligence Online, claiming that Srivastava had uncovered illegal Russian dealings

_____

[25] The DOJ acknowledged receipt on July 10, 2023, and Srivastava sent it to the International Company's representative. This is an unusual use of the DOJ email public tipline for reporting violations of the Foreign Corrupt Practices Act. The FCPA generally does not apply to Troost as a non-U.S. person. Also, reporting to the DOJ tipline is not often effective in starting a criminal investigation. Their tactic appears to have been to generate a return receipt from the DOJ that Srivastava could use to claim that the DOJ was investigating Troost. To date, there is no indication that Troost is the subject of a U.S. investigation.

149

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

by Troost. For example, Srivastava and Maguire planted an article on www.intelligenceonline.com on May 31, 2023,[26] that contained a number of false allegations, including that "Troost has largely gone underground"; Mr. Troost "recently cancelled a trip to New York"; Mr. Troost "secretly co-owned a California-based shell company"; "Troost's former partner provided information to law enforcement in the US and abroad about his alleged sanctions busting"; "Troost cancelled a scheduled visit to New York to attend his daughter's 17 May college graduation"; that Srivastava commissioned an audit "after he became concerned Troost was defrauding the California company"; "Troost falsely established himself as the sole owner of the California company and used its account to conduct international business"; and that an audit showed that Mr. Troost had "extensive, ongoing dealings" with a U.S.-sanctioned oligarch. Maguire, on information and belief, communicated much of the substance of these false allegations to the Intelligence Online "reporter" via international wire communications. The reporter was the same one to whom Maguire had fed negative information about fake CIA officer Matthew Marshall's fraud victim for Marshall.

385. In or about June 5, 2023, Srivastava and others caused Jeff Berg, who had formerly represented PECSA and PDMCC, to draft a letter to be circulated to third parties via email and text that falsely portrayed the events involving the Plaintiffs and Defendants, materially omitted facts about the Srivastava Enterprise's crimes against the Plaintiffs, and attached a resume of Srivastava that claimed he is "an American businessman" (false) who graduated from the University of Southern California at age 18 with a B.S. in Aeronautical Engineering (false) and joined Paramount in 2019 (false).

386. Srivastava escalated the smear campaign by creating anonymous websites, including "sanctionnielstroost.com," which falsely portrayed Troost as a criminal, as well as his family with the intent, among other things, of retaliating

[26] *See FBI alerted of Russian oil trader Niels Troost's secret US business interests*, Intelligence Online (May 31, 2023).

FIRST AMENDED COMPLAINT



against Troost for reporting Srivastava's crimes to U.S. federal law enforcement authorities and discrediting him so the Enterprise could escape with the money. In doing so, on information and belief, Srivastava and others caused interstate and international emails to be exchanged with a website hosting company in Arizona and also coordinated these activities via interstate wire amongst themselves in around September and October 2024.

### 4. The Srivastava Enterprise Launches a Coordinated Effort to Deflect Responsibility and Continue the Enterprise

387. Srivastava's scheme seemingly began to unravel when reputable journalists exposed his own misconduct. On October 10, 2023, Project Brazen published an expose of the Srivastava Enterprise's crimes, titled *The Old 'I'm a Secret Spy, Pay Me' Con*.[27] Defendants Srivastava, Maguire, and others made the damaging (but factually accurate) article disappear from Internet searches by issuing a Digital Millenium Copyright Act notice under the name "Sherrie Hagen." "Hagen" claimed she published the content of the article first on Tumblr and that Project Brazen had violated her copyright by plagiarizing it. But this was false. The post by "Hagen" purporting to be the original article was created in November, *after* the Project Brazen article. On information and belief, these defendants used interstate wire communications to coordinate and to submit the false copyright claim for the purpose of avoiding detection, investigation, and prosecution, and to protect the Enterprise's reputation as they attempted to complete their fraud scheme by obtaining control over all of Paramount's assets.

388. In February 2024, the Atlantic Council severed all ties with Srivastava, despite his donations exceeding $2.5 million, after discovering that he had lied about properly registering his foundation as a 501(c)(3) and could not verify other basic aspects of his background.[28]

---

[27] Soobin Kim and Bradley Hope, *The Old 'I'm a Spy, Pay Me' Con*, Project Brazen (Oct. 10, 2023).

[28] Caitlin Oprysko, *The China lobbying terminations continue*, Politico (Feb. 23, 2024); *see also* David Lippman, X, @dlippman (Feb. 23, 2024).

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

151

FIRST AMENDED COMPLAINT



389. Democratic political figures later froze or returned Srivastava's donations, after learning he was not credible.

390. Additional exposure followed in late 2024, when *The Wall Street Journal* published a detailed investigative article supported by messages, financial records, affidavits, and recorded calls. The article dismantled Srivastava's public persona and confirmed his fraudulent conduct. With further scrutiny pending—particularly from *The Financial Times*—Srivastava attempted to deflect blame.[29]

391. Srivastava and the Enterprise responded by hiring The Arkin Group, an investigative firm with real ex-CIA ties, and Victoria Kataoka, a former NYPD intelligence specialist, to promote and legitimize a false counter-narrative accusing Troost of running a disinformation campaign. This was another deliberate attempt to obscure Srivastava and the Enterprise's misconduct.

392. As *The Financial Times* prepared its exposé, Srivastava, Arkin, and their associates crafted and publicly promoted a story legitimizing Srivastava as a wealthy American businessman betrayed by Troost. *The Financial Times* conducted a substantial investigation. They reviewed sworn affidavits and business records, conducted multiple interviews, and listened to recordings of Srivastava himself falsely claiming CIA ties. *The Financial Times* found that Srivastava did not produce any credible witnesses or evidence to substantiate his narrative.[30]

393. Despite these findings, the enterprise continued to push its disinformation campaign through pay-to-publish outlets such as *TechBullion* and *EU Policies*.[31] These sites, which accept paid submissions, published articles portraying Srivastava as the victim of a global conspiracy led by Troost. These stories mirrored the themes Arkin and Kataoka promoted and served to amplify the false narrative.

[29] Joe Wallace, *A Fake Spy, Russian Oil and $1 Million Funneled to Democrats*, Wall Street Journal (Aug. 27, 2024).
[30] Tom Wilson, *Niels Troost has a staggering story to tell about how he got sanctioned*, Financial Times (Dec. 14, 2024).
[31] Luke Wright, *The Weaponization of Lies: How Gaurav Srivastava's Life Became a Battlefield*, TechBullion (Dec. 23, 2024); Editor Team, *How a Shadowy Disinformation Campaign Targeted Gaurav Srivastava*, EU Policies (Dec. 5, 2024).

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

394. Srivastava's team also created additional websites, including "officialgauravsrivastava.com" and "gauravsrivastavascandal.com," that falsely accused Troost and his advisors of running a disinformation operation. These sites included videos featuring Kataoka and other content intended to discredit Troost.

395. The Enterprise expanded its campaign onto video and audio platforms, launching a YouTube channel and later sponsoring a podcast titled Targeted, produced by Next Chapter Podcasts in California. On information and belief, this podcast was a contrivance by Vantage and Aron Shaviv (a personal friend of the host), working with The Arkin Group. Although marketed as a show about victims of disinformation, the episodes concerning Srivastava—released in March 2025—served primarily as a promotional tool for his false narrative. These episodes incorporated scripted storylines and manufactured "digital artifacts" to lend credibility to the lies.

396. In the podcast, host Zach Abramowitz interviewed Kataoka, who repeated her earlier claims and emphasized her firm's supposed due diligence of Srivastava. She was presented as a credible investigator who had independently validated Srivastava's story. The podcast was distributed widely and accumulated more than 1.2 million views, becoming a central component of Srivastava's strategy to recast himself as a victim.[32]

397. For her part, Sharon Srivastava also spread press articles falsely claiming to be the victim of a disinformation campaign waged by Troost.[33]

398. Parallel to this media offensive, Guarav Srivastava sought to rebuild

---

[32] Podcasting Today, *Targeted Podcast hits 1.2 million listeners in three months*, (July 2, 2025).
[33] *See, e.g.*, *The Woman in the Crossfire: How Sharon Srivastava's Life Was Shattered by a Manufactured Scandal*, Canyon News (May 20, 2025), available at https://www.canyon-news.com/the-woman-in-the-crossfire-how-sharon-srivastavas-life-was-shattered-by-a-manufactured-scandal/; Chris Bates, *Sharon Srivastava and the High Cost of Online Misinformation*, BreakingAC.com (June 6, 2025), available at https://breakingac.com/news/2025/jun/06/sharon-srivastava-and-the-high-cost-of-online-misinformation/; Rana Maqsood, *Sharon Srivastava and the Human Cost of a Digital Disinformation Campaign*, The Financial (June 11, 2025), available at https://finchannel.com/sharon-srivastava-and-the-human-cost-of-a-digital-disinformation-campaign/126392/b-schools-2/2025/06/.

FIRST AMENDED COMPLAINT

political influence. After long aligning with Democratic figures, Srivastava shifted toward Republican circles following his exposure. He appeared on conservative podcasts. He presented a speech to a conservative audience at a political convention in Las Vegas. And, in June 2025, he even posted a photograph with Vice President J.D. Vance, claiming to be working with him. Srivastava did this to regain political clout and potentially use governmental contacts to retaliate further against Troost and perpetuate the scheme. However, Srivastava still maintained his close ties with the Biden family, and even is represented by Hunter Biden's lawyer, Abbe Lowell, a prominent criminal defense lawyer:[34]



Hunter Biden lunched with a Democrat mega-donor accused in lawsuits of pretending to be a CIA agent, defrauding associates and even allegedly stealing his landlord's furniture

399. This effort to restore political capital was only one facet of the Enterprise's attempt to survive exposure. Even after losing access to Troost and PECSA, the Enterprise adapted and continued its racketeering activities through new schemes built on the same false CIA persona.

**5.    After Failing with Troost, Srivastava and the Enterprise Continue Running New Fraud Schemes**

400. After Troost expelled Srivastava from PECSA—cutting off the

---

[34] Josh Boswell, *Desperate, broke and his meal ticket dad powerless, Hunter Biden is caught in a cozy lunch with a controversial guest…*, DailyMail.com (Mar. 30, 2025). In fact, Hunter Biden's daughter, Naomi Biden, lives in a house owned by Sharon Srivastava. *See Vance's Link to the Dems Donor Who Is a Friend of the Bidens*, The Daily Beast (Oct. 17, 2025), *available at* https://www.thedailybeast.com/did-vances-new-friend-tell-vp-hes-a-biden-landlord.

154



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Enterprise's ability to exploit Plaintiffs for financial gain—the Srivastava Enterprise did not disband. Instead, it continued operating and, on information and belief, engaged in at least two additional schemes in which Srivastava once again posed as a well-connected CIA "NOC" to pursue profit and influence.

401.   As alleged above in paragraphs 303 to 304, the Enterprise targeted Murtaza Lakhani, a well-known and prolific Russian oil dealer in late May 2023 with claims they could help him with sanctions issues under the false pretenses that Srivastava worked for the U.S. Government, after Srivastava was expelled from the companies.

402.   And, in or around November 2023, a person who had attended the Dubai meeting with the National Security Advisor for Iraq received a phone call from Srivastava. During the call, Srivastava discussed the falling-out with Plaintiffs and proposed additional business opportunities. Srivastava explained what allegedly happens "when he is crossed." He claimed that Paramount had been sanctioned and effectively shuttered, that Troost's phone was being monitored, and that INTERPOL would soon issue a Red Notice for Troost. Srivastava then underscored the point with a threat he had previously made to Troost: "If you come at the king, you best not miss." Srivastava said he had warned Troost that if Troost "puts a sword" to him, he should make sure Srivastava was dead and not merely hurt.

403.   Srivastava asked whether the National Security Advisor for Iraq they had met in Dubai had followed up with him about the supposed terrorists. When he said no, Srivastava abruptly shifted topics, asking whether he could connect him with a source who would sell high-sulfur diesel for cash out of the Ceyhan port in Turkey.

404.   The next day, Srivastava called again. He said that because Troost had "turned against" him, the U.S. government—specifically the U.S. Treasury Department—was now scrutinizing PECSA and its oil-trading activities. He also claimed he was engaged in various unspecified "government things" in a Middle Eastern country in which the U.S. government purportedly had business interests.



FIRST AMENDED COMPLAINT

405. Shortly after Srivastava's calls, Maguire also contacted the person. Maguire asked him to reconnect Maguire and Srivastava with the Iraqi National Security Advisor, claiming they wished to discuss expanding oil operations in Iraq through a new company allegedly registered in both Geneva and California. Maguire also represented that he was working on this project with the Deputy Director of the CIA.

406. Maguire falsely claimed that Troost had "stolen all of Plaintiffs' money," that the UAE government had frozen Troost's funds and would transfer them to Srivastava to support the new company, and that Troost was a fugitive on sanctions lists and being pursued by multiple countries.

407. On information and belief, Srivastava traveled to Iraq as part of this scheme in November 2023, January 2024, June 2024, and October 2024.

408. Also in or about November 2023, about six months after Srivastava was expelled from Paramount, Srivastava and Bravard attempted to defraud a new victim—the majority owner of Swiss Bank. The intended victim's bank, at that time, had been subject to U.S. sanctions because of its past as the Swiss subsidiary of a Russian Bank, even though the takeover of the Swiss Bank had been approved in advance by Swiss and U.S. authorities. Bravard contacted the banker in Switzerland and falsely represented that he and Srivastava could convince OFAC to remove the Swiss Bank from the U.S. sanctions list in exchange for a 10% ownership stake in the bank. On information and belief, Srivastava and Bravard coordinated this scheme through international wire communications, with Srivastava in the U.S. and Bravard in Switzerland, and elsewhere.

409. In June 2025, Srivastava convinced the John F. Kennedy Center for the Performing Arts to accept a $10 million donation commitment from him ($2 million paid up front from proceeds fraudulently taken from the Plaintiffs, on information and belief). In exchange, a prestigious reception room for dignitaries within the Kennedy Center, formerly called "The Africa Room" now bears a prominent plaque

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



with Srivastava's name on it ironically "dedicated to the U.S. intelligence community." Richard Grenell, former Acting Director of National Intelligence, and the former President and Executive Director of the Kennedy Center, continues to support Srivastava (including contacting the U.S. law enforcement on his behalf), along with Lisa Dale, the former Senior Vice President of Development for the Kennedy Center. On information and belief, they have been working with Srivastava and others on potential projects relating to Venezuelan oil and increasing the Srivastava Enterprise's reputation in politically conservative circles.

410. In August 2025, Srivastava spoke at the America First-Ground Zero conference in Las Vegas, Nevada, introduced by famous conservative podcaster Laura Logan. The speech is available here. He introduced himself as "an energy investor from California"; his official website claims his speech "addressed the urgent need for America to defend its strategic and economic interests both at home and abroad. From the power of oil as an intelligence tool to the corrosive influence of entrenched networks in Washington, he outlined how policy sabotage weakens US security and prosperity, and called for unity in safeguarding America's leadership on the world stage." Through his prominent appearance at the conference, as well as recent efforts to infiltrate those close to the current administration, Srivastava was continuing his Enterprise, attempting to fortify its reputation, and trying to meet and impress wealthy potential new victims.

## FIRST CAUSE OF ACTION

### Violation of RICO, 18 U.S.C. § 1962(c)

### (Against All Defendants)

411. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 410 in this Complaint as if fully set forth at length herein.

412. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

157



of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

413. At all relevant times, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3), being capable of holding "a legal or beneficial interest in property."

414. The Srivastava Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Defendants did not operate as isolated or independent actors; they acted as coordinated and interdependent participants in a single, ongoing criminal organization with a common illicit purpose. That purpose was designed to defraud and extort individuals and legitimate businesses—including and principally Plaintiffs—out of tens of millions of dollars, and to launder the proceeds to conceal their source and to promote the criminal schemes.

415. The Enterprise executed its fraud by misrepresenting the nature of its connections, relationships, and access to U.S. government officials; falsely claiming that certain key members—particularly Srivastava—were deep-cover "non-official cover" CIA operatives or front companies or worked for the FBI or other intelligence agencies; and fabricating a covert "Program" that Srivastava allegedly ran and that Defendants falsely claimed would ensure U.S. government protection, prevent sanctions, and provide privileged access to high-level officials. These misrepresentations were designed to gain the trust of unwary victims, including Plaintiffs, and to coerce them into entrusting Defendants with corporate control and tens of millions of dollars, which Defendants then stole. To cover their tracks and maintain leverage over victims, the Enterprise laundered its ill-gotten gains and engaged in campaigns of intimidation, defamation, and extortion, all to conceal the scheme, silence exposure, and sustain its ongoing criminal operations.

416. At all relevant times, the Srivastava Enterprise engaged in, and its activities affected, interstate and foreign commerce. The Enterprise's activities were conceived of and largely directed from the United States, and specifically from

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

158

California. These activities were carried out through coordinated use of interstate and international electronic communications, U.S. financial institutions (including Bank of America, First Republic Bank, JP Morgan Chase, and U.S. Bank), California-based law firm trust accounts used to receive, commingle, and distribute fraud proceeds, and a network of U.S.-incorporated corporate vehicles—including entities formed in California, Wyoming, and Delaware—designed to obscure beneficial ownership, fabricate legitimacy, and facilitate the movement of illicit proceeds within and through the United States. A key aim of the Enterprise was to entangle its victims in business dealings in the United States, purportedly with the U.S. government, itself.

*The Individual Defendants:*

417. Each of the individual defendants played a part in directing the Enterprise's affairs:

a. At the center of the Enterprise was Defendant Gaurav Srivastava, who posed as a clandestine "non-official cover" CIA operative and repeatedly claimed privileged access to senior U.S. officials, law-enforcement authorities, and regulators. Other Defendants and Enterprise associates knowingly propagated, reinforced, and legitimized this false narrative; executed corporate and financial maneuvers to obtain, divert, or seize Plaintiffs' property; and defended the scheme through intimidation, defamation, misdirection, and obstruction. Srivastava, the "Chairman" led the Enterprise at all times, selected targets, arranged contrivances to fool victims, persuaded others to join or assist, and invested fraudulent proceeds back into the Enterprise. As alleged in this Complaint, Srivastava participated in a pattern of numerous predicate acts of racketeering activity, including but not limited to:

i. Wire Fraud (Numotech): On August 22, 2019, Srivastava sent an interstate wire communication in the form of an email from "chairman.g@numotech.com" to a victim in furtherance of a scheme to defraud the victim into sending him $500,000 purportedly for Numotech, Inc., but instead for

159

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



Srivastava personally; Srivastava never intended to pay it back.

ii.    Wire Fraud (Numotech): On September 9, 2019, Srivastava caused the fraud victim to direct Chase Bank to wire $500,000 to a U.S. Bank, NA account in California of Srivastava's lawyer.

iii.    Wire Fraud (United Kingdom): Having devised a scheme to obtain money from others by false pretenses, specifically, claiming to be a U.S. Government operative working with the CIA, including to UK Witness-1, -2, and -3, in an effort to identify and profit from victims, on March 20, 2020, Srivastava sent a copy of his California driver license to UK Witness-3 from the U.S.-based email address "Chairman.G@numotech.com."

iv.    Wire Fraud (Country-1): In furtherance of a scheme to obtain money and property from Country-1 via false representations that Srivastava was running CIA front companies for the U.S. Government, and had used his affiliation with the CIA to get Country-1's official off of a U.S. travel ban, Srivastava, among other things:

1.    Caused Global Energy Law Group to send an interstate wire from California to Wyoming to incorporate Orbimo on or about December 22, 2020;

2.    Caused Global Energy Law Group to send an interstate wire from California to Wyoming to incorporate Zegasus Corporation on or about December 22, 2020; and

3.    Caused Global Energy Law Group to wire $10,000 from its account in California to the account of the "CIA Trainee" outside of California on June 8, 2020.

v.    Wire Fraud (Sudan): In furtherance of a scheme to obtain money from the Sudanese Rapid Support Forces via false representations that Srivastava was running CIA front companies for the U.S. Government and could use his official position keep General Dagalo off of the U.S. sanctions list, Srivastava,

160

FIRST AMENDED COMPLAINT

among other things:

1.    Engaged in an international phone call with Sudanese officials in or about August 2021;

2.    Transmitted by international wire on June 7, 2022 to Kagimu a letter he had written to Sudanese General Dagalo on Unity Resources Group stationary about a monetary dispute relating to having provided the Rapid Support Forces with training

vi.    Money Laundering (Sudan) (18 U.S.C. § 1957(a)): On or about June 7, 2022, Srivastava knowingly attempted to engage in a monetary transaction in excess of $10,000 comprising proceeds obtained from victims in Sudan via the wire fraud scheme alleged in this Complaint and referred to in the previous sub-paragraph. Srivastava knew that this attempted transaction involved criminally derived property.

vii.    Wire Fraud/Money Laundering (Plaintiffs): From May 2022, through the present, Srivastava carried out the wire fraud scheme alleged in this Complaint targeting Plaintiffs designed to fool them into partnering with him and the U.S. Government and sending the Enterprise cash, and he laundered the proceeds of that scheme. In furtherance of the scheme, Srivastava caused numerous interstate and international wires, including the many identified in this Complaint, and directed various money transactions alleged in this Complaint, in violation of 18 U.S.C. §§ 1343, 1956 and 1957. Through this scheme, Srivastava obtained and laundered over $43 million in cash, injuring Plaintiffs in their business and property in the United States.

viii.    Attempted Extortion (18 U.S.C. § 1951): On May 6, 2023, Srivastava, then in California, sent Troost, then in Switzerland, texts to Mr. Troost attempting to affect the movement of articles and commodities in commerce by attempting to obtain property from Troost with his consent induced by the wrongful use of threatened economic harm, to wit, Srivastava accused him of lying and told

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

161



him "most importantly, the inversion has to happen," otherwise, Srivastava threatened, he would tell U.S. authorities that Mr. Troost was a Russian agent ("I do think that there is someone else controlling things. I just a got a call from DC."), he would get Mr. Troost sanctioned ("I am personally going to write to SECO [the Swiss sanctioning authorities] & OFAC about the deception."), and he would block Paramount's assets.

ix.     Attempted Extortion (18 U.S.C. § 1951): During a series of international calls (facilities in foreign commerce) between Srivastava, then in the U.S., and Troost, then outside the U.S., during the first week of May 2023, Srivastava attempted to affect the movement of articles and commodities in commerce by attempting to obtain property from Troost with his consent induced by the wrongful use of threatened economic harm by threatening that he would convince U.S. intelligence and law enforcement that Troost was a Russian spy (false) and cause him and his companies to be sanctioned if he failed to comply. In fact, Srivastava promised Troost it would be "fucking pandemonium in your life" if Troost did not complete the transfer of his companies giving the Enterprise total control over and access to all of Paramount's assets.

x.     Attempted Extortion (18 U.S.C. § 1951): Through international text messages (facilities in foreign commerce) to Troost on May 13 and 15, 2023, during the first week of May 2023, Srivastava and Maguire attempted to affect the movement of articles and commodities in commerce by attempting to obtain 10 million USDT (a cryptocurrency stablecoin) from Troost with his consent induced by the wrongful use of threatened economic harm by threatening that he would publicly release damaging personal information if he failed to comply.

xi.     Obstruction of Justice (18 U.S.C. § 1513(e) and (f)): In December 2023 through at least February 2024, Srivastava and Maguire knowingly targeted and conspired to target Troost's New York-based daughter by sending disturbing, anonymous emails to her employer falsely claiming she was a Russian

162

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

spy and urging the employer to report her to the police for the purpose of getting her fired from her employment and causing her emotional distress, with the intent, among other things, to retaliate against Troost for reporting the crimes alleged in this Complaint to federal authorities, which Troost did in the fall of 2023.

xii.    Obstruction of Justice (18 U.S.C. §§ 1513(d), (e) and (f)): In September 2024, Srivastava and Maguire, did cause and conspired to cause international email communications to be sent from fake journalists, "emma.kleinish@gmail.com" and "lisa.hagenn@gmail.com" to Troost's son's university in the United Kingdom in an attempt to harm Troost's son by causing the school to expel his son and thereby interfere with his livelihood, with the intent, among other things, to retaliate against Troost for reporting the crimes alleged in this Complaint to federal authorities.

xiii.    Obstruction of Justice (18 U.S.C. §§ 1513(d), (e) and (f)): In around March 2024, Srivastava and Maguire did cause and conspired to cause to be published on the "sanctionnielstroost.com" website a page dedicated to Troost's other daughter based in the UK, which mentioned the name of her employer, alleged that her family was connected to the Wagner Group (a Russian terrorist group), and publicly questioning how her employer could work with her. They did this in an attempt to harm her employment and livelihood and to cause her emotional distress with the intent, in part, to retaliate against Troost for reporting the crimes alleged in this Complaint to federal authorities.

xiv.    Obstruction of Justice (18 U.S.C. §§ 1513(d), (e) and (f)): In around March 2024, Srivastava and Maguire did cause and conspired to cause to be published on the "sanctionnielstroost.com" website a page dedicated to Troost's son based in the UK, which mentioned the name of his university, and asked whether the university should "educate a student whose family wealth is so deeply entangled with illegal actions." They did this in an attempt to cause the university to expel Troost's son and harm his livelihood with the intent, in part, to retaliate against Troost

ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

163

for reporting the crimes alleged in this Complaint to federal authorities.

xv.      Wire Fraud: In furtherance of a scheme to defraud the Plaintiffs out of money and property based on the false pretenses that Srivastava was a CIA operative and that Troost and the Paramount companies were partnering with the U.S. Government, Srivastava attempted, during a series of international calls (facilities in foreign commerce) between Srivastava, then in the U.S., and Troost, then outside the U.S., during the first week of May 2023, to lull Troost into not pulling out of the Enterprise's plan for Troost to authorize all of his companies to be redomiciled in the U.S. under Srivastava's control by reassuring Troost that his suspicions that Srivastava might be defrauding him were unfounded.

xvi.      Money Laundering (18 U.S.C. § 1957): On information and belief, in or about June 2025, Srivastava caused approximately $2 million in proceeds of the fraud scheme against Plaintiffs alleged in this Complaint to be transferred as a donation to the Kennedy Center and to secure a plaque bearing Srivastava's name on it dedicated "to the U.S. intelligence community."

xvii.      Wire Fraud: In furtherance of a scheme to defraud the Plaintiffs out of money and property based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, on July 20, 2023, Srivastava (then in Country-1) texted Onouye of Global Energy Law Group (then in California), and asked him to "Pls confirm," after which Onouye sent him a screen shot of the IOLTA account balance, reflecting that it risen to over $6.4 million after it had received funds from Plaintiffs transferred through an intermediary that Srivastava had falsely represented to Troost were to be used to fund U.S. Government operations.

b.      Defendant Sharon Srivastava worked side-by-side with Gaurav. She had authority within the Enterprise to take steps to manage its reputation, such as working with search engine optimization personnel. She had authority how to apportion proceeds, including to herself ($1,000,000 to her own bank account), and

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

164

FIRST AMENDED COMPLAINT

to lead their efforts to climb the social ladder, whether it be through prestigious private schools for their children, or the interior and exterior design of their mansion, all paid for the Enterprise's illicit earnings. Her participation was vital to the Enterprise, particularly as she ratified Srivastava's false claims about being a CIA operative by participating in those conversations with others, making it appear more likely that his representations were true because potential victims would think it unlikely that they were encountering a husband-wife fraud duo. She knew his claims were false, and that they had no legitimate income aside from the proceeds of fraud. Sharon occupied a position in the chain of command within the Enterprise, knowingly implemented the Enterprise's decisions for the purposes of profiting from fraud, and was indispensable to the achievement of the Enterprise's goal of profiting through Srivastava's fake CIA operative fraudulent scheme. As alleged in this Complaint, Srivastava participated in a pattern of predicate acts of racketeering activity, including but not limited to:

i.      Money Laundering (18 U.S.C. § 1957(a)): On June 21, 2022, Sharon Srivastava knowingly engaged in a monetary transaction involving a cashier's check for $210,393.90 comprising proceeds obtained from Plaintiffs via the wire fraud scheme alleged in this Complaint to make a payment to the LA County Sheriff related to a real estate property she owned in California. Sharon knew that this transaction involved criminally derived property.

ii.      Money Laundering (18 U.S.C. § 1957(a)): On September 16, 2022, Sharon Srivastava knowingly engaged in a monetary transaction in which she received $1,000,000 into her Citibank account, which were proceeds obtained from Plaintiffs via the wire fraud scheme alleged in this Complaint. Sharon knew that this transaction involved criminally derived property.

c.      Defendant Nicolas Bravard was in the chain of command in the Srivastava Enterprise. He willingly acted as an interrogator of Troost at the beginning intentionally to create the false impression he was being vetted for a U.S.

165



Government program. He created a company and allowed his companies to be used by the Enterprise as a barrier to keep Srivastava off of the paperwork. A former banker, he was in charge of understanding Troost's companies' assets and asset structures so that they could figure out how much to take. He carried out Srivastava's orders to pressure Troost into transferring 50% of the shares in his companies to the Enterprise. And, often present in Switzerland, he worked to keep Troost's Swiss advisors on board as the Enterprise convinced Troost to take actions that made little commercial sense but enriched the Enterprise.  As alleged in this Complaint, Bravard participated in a pattern of predicate acts of racketeering activity, including but not limited to:

i.      Money Laundering (18 U.S.C. § 1956(a)(2)(A) and (B); 1956(h)): On July 21, 2022, Bravard and Srivastava arranged for Global Energy Law Group to transfer by wire $150,000 from Global Energy Law Group's attorney trust account in California, to Bravard's bank in Switzerland in the name of his company, Dorsay Services. At the time, Bravard knew that these were proceeds of a crime and, in fact, they were proceeds fraudulently taken from Plaintiffs as part of the wire fraud scheme alleged in this Complaint. The transaction was structured this way to conceal the source of the proceeds, and the proceeds were sent to Switzerland so that Bravard could arrange to use those proceeds to buy 50% of Troost's ownership of PECSA without Troost realizing the Enterprise had used his own money to do so.

ii.      Wire Fraud: In furtherance of a scheme to defraud the Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, Bravard, in Europe, texted Srivastava, in Country-1 on July 23, 2022 telling Srivastava that he believed the Plaintiffs had made $150 million in the prior two months, giving Srivastava advice on how to convince Troost to give them more money, and accusing Troost of "renegotiating."

iii.      Wire Fraud: In furtherance of a scheme to defraud the

FIRST AMENDED COMPLAINT



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, Bravard, in Europe, emailed Srivastava and Onouye in California on September 5, 2022, to explain the "key points we need to focus on the structuring of the P [Paramount] project," which included advice on how to keep Srivastava off of the paperwork and suggesting that they create a U.S. subsidiary to "take over all compliance, control of the group."

d.    Defendant Thomas Giordano-Lascari was one of the most important and capable members of the Srivastava Enterprise. As a lawyer, Lascari controlled an attorney trust account first at Karlin & Peebles, then at another firm, which the Srivastava Enterprise used to conceal the source and ownership of fraud proceeds. The Enterprise installed Lascari as the sole director of Paramount Inc. and sole signatory on its bank account. Lascari also served as a director of various Srivastava Enterprise entities, including Cedar West. Within the Enterprise, Lascari maintained authority to form companies, such as Echo Grove LLC, to conceal assets and facilitate transactions. As a director of Paramount Inc., he owed a duty to that company. As a lawyer, he owed a duty not to assist his client Srivastava commit

-----Message d'origine-----
De : Thomas Giordano <tgiordano@karlinpeebles.com>
Envoyé : mardi, 9 mai 2023 17:50
À : Maurice TAYLOR <maurice.taylor@mtadmin.ch>
Cc : 'Jeffrey Berg' <jberg@bakerlaw.com>; 'N. Bravard' <nbravard@parencom.ch>
Objet : RE: UBO issue

Dear Maurice,

Please let me clarify.

1. The 50% of the shares of Paramount SA have always legally been owned by 1234, which is a company owned by Nicolas Bravard.

2. However, 1234 holds those shares a fiduciary for the beneficial owner of the shares, which is Cedar West Ventures, LLC, formerly known as Lothian Road Ventures, LLC.

3. The owner of Lothian Road Ventures, LLC is a Delaware limited partnership called Maple Trees LP.

4. The general partner of Maple Trees LP is another LLC called Forest Shore LLC.

5. I own Forest Shore LLC. I am also the manager of all of the US entities above.

6. Under the Maple Trees LP agreement, I control all the decisions of Cedar West Ventures, LLC; the limited partners are purely passive.

7. Accordingly, as I understand the Swiss UBO definition applicable to this structure, I am the physical person to be disclosed for Swiss corporate law purposes.

8. You already have copies of my passport and utility bill that has been provided to Susanne months ago.

I trust the above clarification is satisfactory. Please continue to work with Nicolas, though, who remains our fiduciary.

Kind regards,
Thomas

167



crimes. He also owed a duty to Plaintiffs not to commit fraud. In March 2023, to avoid Srivastava being revealed to Swiss financial institutions as the ultimate beneficial owner of 50% of PECSA's shares, Lascari took total control over the Srivastava Enterprise's main companies, legally in a superior position to even Gaurav Srivastava. He documented this in an email he sent from California in furtherance of the wire fraud scheme targeting Plaintiffs to PECSA's director in Switzerland on March 9, 2023, copying Bravard and others:

e.    As alleged in this Complaint, Lascari participated in a pattern of predicate acts of racketeering activity, including but not limited to:

i.    Wire Fraud: In furtherance of a scheme to defraud the Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, Lascari from California, sent the email referred to in the previous paragraph to recipients in Switzerland for the purpose of keeping Srivastava's involvement concealed from financial institutions on March 9, 2023.

ii.    Money Laundering (18 U.S.C. 1957, 1956(h)): On March 6, 2023, Lascari, in his capacity as director of Paramount Inc. and signatory on its Bank of America account, on Srivastava's instruction, transferred $50,000 to Paramount Inc.'s bank account into the bank account for Orbimo, reference "Reimbursement." Lascari knew these were the proceeds of a crime, or was aware of a high probability that these were the proceeds of a crime and deliberately avoided learning the truth, and, in fact, these were the proceeds of the wire fraud scheme targeting Troost and the Plaintiffs.

iii.    Money Laundering (18 U.S.C. 1957, 1956(h)): On January 17, 2023, Lascari, in his capacity as director of Paramount Inc. and signatory on its Bank of America account, transferred $5.2 million to the attorney trust account at Karlin & Peebles for the benefit of the Srivastava Enterprise. Lascari knew these were the proceeds of a crime, or was aware of a high probability that these were the

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

168



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

proceeds of a crime and deliberately avoided learning the truth, and, in fact, these were the proceeds of the wire fraud scheme targeting Troost and the Plaintiffs. On information and belief, Lascari thereafter transferred funds from these proceeds from his attorney trust account to recipients as directed by Srivastava, in further violation of 18 U.S.C. §§ 1957 and 1956(h).

iv.      Money Laundering (18 U.S.C. § 1957, § 1956(h)): On or about December 19 to 22, 2022, acting in concert with Srivastava, Lascari instructed Onouye by email, copying Gaurav Srivastava, Sharon Srivastava, and others, to execute a document releasing $735,000 from an escrow account to fund the purchase of the Pacific Palisades mansion for $24.5 million. Lascari knew these were the proceeds of a crime, or was aware of a high probability that these were the proceeds of a crime and deliberately avoided learning the truth, and, in fact, these were the proceeds of the wire fraud scheme targeting Troost and the Plaintiffs.

v.       Wire Fraud: In furtherance of a scheme to defraud the Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, Lascari from California, sent multiple text messages and emails to the International Company's representative in Country-1 in December through January 2023, as alleged in this Complaint, in order to facilitate the transfer of $25 million in proceeds fraudulently obtained from PDMCC.

vi.      Money Laundering (18 U.S.C. §§ 1956(a)(2)(B)(i) and 1956(h)): On December 28, 2022, Lascari and Srivastava caused the International Company to wire $25 million from Country-1 to Lascari's attorney trust account at Karlin & Peebles in the U.S. At the time, Lascari knew these were the proceeds of a crime, or was aware of a high probability that these were the proceeds of a crime and deliberately avoided learning the truth, and, in fact, these were the proceeds of the wire fraud scheme targeting Plaintiffs alleged in this Complaint. The transaction was structured this way to conceal the source of the proceeds, and the proceeds were sent

FIRST AMENDED COMPLAINT



to California so that Lascari could commingle them in the attorney trust account with Birdsong assets to then be used to purchase a $24.5 million mansion in Pacific Palisades.

vii.    Money Laundering (18 U.S.C. §§ 1957 and 1956(h)): Between December 28, 2022 and January 5, 2023, Lascari knowingly engaged in a monetary transaction comprising proceeds obtained from Plaintiffs via the wire fraud scheme alleged in this Complaint, in that he caused $24.5 million in his attorney trust account at Karlin & Peebles to be transferred to the seller of a mansion in Pacific Palisades on behalf of Birdsong to effect its purchase. Lascari knew that this transaction involved criminally derived property or was aware of a high probability that these were the proceeds of a crime and deliberately avoided learning the truth.

viii.    Wire Fraud: In furtherance of a scheme to defraud the Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, Lascari from California, sent multiple text messages and emails to the International Company's representative in Country-1 in May through July 2023, as alleged in this Complaint, in order to facilitate the transfer of $26 million in proceeds fraudulently obtained from PDMCC. This included, but was not limited to, a text message on May 15, 2023, falsely asserting that Srivastava had "performed consulting services" back in 2018 for a $51 million fee and then "agreed to lend those funds back at an interest rate of 5%," and a later email on June 29, 2023, attaching an agreement claiming that the International Company had borrowed $51 million (from PDMCC) "for the benefit of" Gaurav and Sharon Srivastava, "which funds have been held by" the International Company "to be distributed to [Srivastava] at [Srivastava's] direction," and that the International Company "sent the amount of $25 million from [PDMCC's loan proceeds] to [Srivastava] on or about January 5, 2023."

ix.    Money Laundering (18 U.S.C. §§ 1957 and 1956(h)): From

ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT

ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

February 2023 through September 2023, Lascari and Srivastava attempted to cause the International Company to send $26 million to Lascari for the Enterprise, which were the remaining funds of the $51 million Srivastava had defrauded PDMCC into sending to International Company. Lascari knew that this transaction involved criminally derived property or was aware of a high probability that these were the proceeds of a crime and deliberately avoided learning the truth.

x.      Money Laundering (18 U.S.C. §§ 1957 and 1956(h)): On or about September 18, 2024 and October 21, 2024, Lascari transferred $20,000 and $100,000, respectively, from his attorney trust account at Greenberg Glusker to The Arkin Group on behalf of the Srivastava Enterprise to pay the Arkin Group to undertake a public campaign to discredit the factual allegations in this Complaint concerning the scheme to defraud the Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government. Lascari knew that these transactions involved criminally derived property or was aware of a high probability that these were the proceeds of a crime and deliberately avoided learning the truth.

xi.      Wire fraud: In furtherance of a scheme to defraud the Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, Lascari from California in his capacity as director of Cedar West, sent international wire communications to lawyers and others in the UAE related to a police report Cedar West filed on or about August 25, 2023, which falsely alleged that Troost and others affiliated with Plaintiffs embezzled over $4 billion of dollars from PDMCC. The Enterprise did this to attempt to steal PDMCC's retained earnings from Plaintiffs. On March 11, 2025, the Chief Prosecutor for Dubai found that there were "no grounds for filing a criminal case." The Chief Prosecutor's investigation found that Srivastava submitted doctored evidence, specifically that "some accounting statements relied upon by [Srivastava] ... had been modified by deleting

FIRST AMENDED COMPLAINT

key credit entries, which led to portraying payments as if they were made without consideration, while the company's original records prove otherwise." The Chief Prosecutor's investigation "verified the accuracy of the accounting entries related to the transactions, transfers, and amounts [claimed stolen], as well as the validity of the approvals and signatures on those entries ... [and] did not find evidence of misappropriation of those funds by any of the accused." In fact, the investigation did not "find any reports issued by the external auditor or any regulatory or banking authorities indicating the existence of suspicious activities related to the company's accounts."

f.      Defendant John Maguire is a well-known former CIA Officer with a reputation within the Intelligence Community, particularly in the U.S. and the Middle East. He joined the Srivastava Enterprise in early 2023 and was indispensable to its operations. His partnership legitimized Srivastava as a U.S. Government operative, in particular in dealings in the Middle East, such as their meeting with the National Security Advisor of Iraq in which they falsely claimed to be hunting terrorists for the U.S. Government. Maguire also was well-experienced in vicious and multifaceted reputation attacks, having deployed one earlier against billionaire Michael Goguen in Montana, working alongside another well-known former CIA Officer Mary Beth Long, in connection with a business dispute. The Enterprise needed Maguire's experience and contacts in the international intelligence community and with law enforcement, including in New York and in the UAE. He provided credibility and operational know-how, both personal know-how, and contacts with former operators skilled at cyber operations. Maguire helped identify potential fraud targets and developed and executed negative reputation strategies against Troost and his family as the fraud against Plaintiffs unraveled. On information and belief, after the Biden administration ended, Maguire used his status and notoriety in an attempt to influence members of the new administration in order to protect Srivastava.

172

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

g.      As alleged in this Complaint, Maguire participated in a pattern of predicate acts of racketeering activity, including but not limited to

i.      Wire Fraud: In furtherance of a scheme to defraud Murtaza Lakhani out of money and property by promising to assist him with sanctions-related issue on the false premise that Srivastava was a CIA operative, on May 20, 2023, Maguire sent an interstate text message to Srivastava's chief of staff by Signal and claimed that Srivastava used Amos Hochstein, special advisor to President Biden, to get the Biden White House to remove Murtaza Lakhani, a Pakistani-Canadian oil trader from the U.S. sanctions list and that the White House would keep Lakhani off the sanctions list if Lakhani continued to do business with Srivastava and Maguire ("he was on ofac list but he's been pulled off the list for this meeting." "The WH adjusted the list." "If he helps us he can stay off the list");

ii.      Wire Fraud: In furtherance of a scheme to defraud Iraqi officials out of money and property, just as Srivastava had defrauded other countries' officials, by falsely claiming that Maguire and Srivastava were working with U.S. intelligence, on or about November 16, 2023, Maguire (then in the U.S.) called an attendee of a prior meeting Maguire and Srivastava attended with the Iraqi National Security Advisor (then outside the U.S.) and asked him to reconnect Maguire to the National Security Advisor to discuss expanding oil operations on a project he was supposedly working on with the Deputy Director of the CIA.

iii.      Wire Fraud: In furtherance of a scheme to defraud the Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, Maguire sent an Intelligence Online reporter by interstate text message false information about Troost, Troost's family, and Troost's associates during the last two weeks of May 2023 to cause Intelligence Online to publish a negative article about Troost on May 31, 2023.

iv.      Wire fraud: In furtherance of a scheme to defraud the

173



Plaintiffs out of money based on the false pretenses that Srivastava was a CIA operative and Troost and the Paramount companies were partnering with the U.S. Government, in mid-May 2023, Maguire sent the New York Police Department by interstate text message, information about Troost, his business, his associates, and his family, including Troost's daughter's photograph, to attempt to cause them to detain her and ask questions about his business activities in an effort to harm her livelihood and cause her emotional distress, with the intent, among other things, to pressure Troost into not attempting to recover the $43 million Srivastava had already obtained from Plaintiffs by fraud.

v.      Obstruction of Justice (18 U.S.C. § 1513(e) and (f)): In December 2023 through at least February 2024, Maguire and Srivastava knowingly targeted and conspired to target Troost's New York-based daughter by sending disturbing, anonymous emails to her employer falsely claiming she was a Russian spy and urging the employer to report her to the police for the purpose of getting her fired and causing her emotional distress, with the intent, among other things, to retaliate against Troost for reporting the crimes alleged in this Complaint to federal authorities, which Troost did in the fall of 2023.

vi.      Obstruction of Justice (18 U.S.C. §§ 1513(d), (e) and (f)): In September 2024, Maguire and Srivastava, did cause and conspired to cause international email communications to be sent from fake journalists, "emma.kleinish@gmail.com" and "lisa.hagenn@gmail.com" to Troost's son's university in the United Kingdom in an attempt to harm Troost's son by causing the school to expel his son and thereby interfere with his livelihood, with the intent, among other things, to retaliate against Troost for reporting the crimes alleged in this Complaint to federal authorities.

vii.      Obstruction of Justice (18 U.S.C. §§ 1513(d), (e) and (f)): In around March 2024, Srivastava and Maguire did cause and conspired to cause to be published on the "sanctionnielstroost.com" website a page dedicated to Troost's

174

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✦ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

other daughter based in the UK, which mentioned the name of her employer, alleged that her family was connected to the Wagner Group (a Russian terrorist group), and questioning how her employer could work with her. They did this in an attempt to harm her employment and livelihood and to cause her emotional distress with the intent, in part, to retaliate against Troost for reporting the crimes alleged in this Complaint to federal authorities.

viii.    Obstruction of Justice (18 U.S.C. §§ 1513(d), (e) and (f)): In around March 2024, Srivastava and Maguire did cause and conspired to cause to be published on the "sanctionnielstroost.com" website a page dedicated to Troost's son based in the UK, which mentioned the name of his university, and asked whether the university should "educate a student whose family wealth is so deeply entangled with illegal actions." They did this in an attempt to cause the university to expel Troost's son and harm his livelihood with the intent, in part, to retaliate against Troost for reporting the crimes alleged in this Complaint to federal authorities.

h.    Defendant Owen Onouye served as counsel to the Srivastava Enterprise and provided assistance to various affiliated corporations, including by forming Orbimo and serving as its Vice President. Onouye operated Global Energy Law Group and allowed Srivastava to use its attorney trust account to receive, hold, misappropriate, and distribute tens of millions of dollars pursuant to the fraud scheme within the United States. Their participation in the Enterprise was vital to its successfully extracting and converting proceeds of fraud for the benefit of the Enterprise. More than $13 million of Plaintiffs' funds were deposited into Global Energy Law Group's attorney trust account in California, where those funds were converted by the Enterprise to unauthorized personal uses. As alleged in this Complaint, Onouye and Global Energy Law Group participated in a pattern of predicate acts of racketeering activity, including but not limited to:

i.    Money Laundering (18 U.S.C. § 1957): On September 16, 2022, Onouye, at Gaurav and Sharon Srivastava's instruction, caused Global Energy

FIRST AMENDED COMPLAINT

Law Group to use its attorney trust account to transfer $1,000,000 to the personal account of Sharon Srivastava at Citibank. Onouye and Global Energy Law Group were aware of a high probability that these were the proceeds of a crime and deliberately avoided learning the truth, and, in fact, these were the proceeds of the wire fraud scheme targeting Troost and the Plaintiffs alleged in this Complaint.

ii.    Money Laundering (18 U.S.C. § 1957): On October 3, 2022, Onouye, at Srivastava's instruction, caused Global Energy Law Group to use its attorney trust account to transfer $600,000 to the personal account of Srivastava ending in x3528. Onouye and Global Energy Law Group were aware of a high probability that these were the proceeds of a crime and deliberately avoided learning the truth, and, in fact, these were the proceeds of the wire fraud scheme targeting Troost and the Plaintiffs alleged in this Complaint.

418.    Defendants Cedar West, Unity Resources Group, Orbimo, Unicom Worldwide, 1234 Holding, Birdsong, Aurora Point, and the Foundation were incorporated, controlled, used, or manipulated by members of the Enterprise to hold, move, and launder illicit proceeds; to mask ownership and the flow of funds; and to create the false appearance of legitimate business activity.

419.    The Enterprise possessed an ascertainable structure and functioned continuously over a multi-year period. Srivastava devised strategy, directed operations, and served as the public face of the fraudulent intelligence narrative. Defendant Bravard acted as a proxy and shareholding front in Switzerland, helping to secure and disguise control of companies targeted by the Enterprise.

420.    Other members of the Enterprise performed operational tasks such as managing internal communications, sending documents, coordinating with foreign intermediaries, "vetting" potential victims; initiating wire transfers; and maintaining ongoing interstate and international communications via email, secure messaging platforms, and phone or video calls.

421.    At all relevant times, the Srivastava Enterprise: (a) functioned as a

FIRST AMENDED COMPLAINT

continuing unit with an ascertainable structure separate and distinct from the individual predicate acts; (b) shared a common purpose of executing and expanding the fraudulent and extortionate scheme to obtain millions of dollars from victims; (c) maintained systematic linkages among members through interpersonal and contractual relationships, financial ties, shared communications, and ongoing coordination; and (d) possessed sufficient longevity to permit the Enterprise to pursue, adapt, and continue its unlawful objectives.

422.   The Enterprise existed and operated with longevity independent of any single transaction. Its formation predated its approach to Plaintiffs, and its activities continued long after Plaintiffs terminated their business relationship with the Enterprise. Even after the fraud was exposed, Enterprise members shifted to new victims, continued efforts to extract funds from individuals and entities associated with the original schemes, and persisted in using the same fabricated intelligence narrative, the same methods of moving and hiding funds, and the same tactics for spreading false and misleading information.

423.   The Srivastava Enterprise is distinct from the pattern of racketeering activity described herein. Its existence is demonstrated by its recruitment, coordination, oversight, and deployment of numerous individuals who performed ongoing administrative, financial, and professional tasks beyond the individual predicate acts of wire fraud, extortion, and money laundering—including creating and maintaining business records, negotiating and executing agreements, managing corporate structures, and handling the bookkeeping and accounting necessary to receive, distribute, and disguise the proceeds of the fraudulent scheme.

424.   The Enterprise engaged in a pattern of racketeering activity comprised of repeated violations of federal wire fraud, extortion, obstruction of justice and money laundering statutes, including 18 U.S.C. §§ 1343, 1513, 1951, 1956, and 1957. These predicate acts—which began no later than 2019 and have occurred continuously and systematically to the present day—included, but were not limited

FIRST AMENDED COMPLAINT



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

to:

- manufacturing and disseminating false claims of CIA affiliation, OFAC authorization, and U.S. government backing to induce victims to enter into relationships with Srivastava for monetary gain and to induce Plaintiffs to restructure their companies and cede control of corporate assets;

- fraudulently obtaining a 50% stake in PECSA and positioning Srivastava-controlled entities to seize the remainder of Plaintiffs' business operations;

- directing multi-million-dollar transfers under sham "legal services," fabricating "Program operations," and falsifying consulting arrangements;

- diverting and laundering proceeds through law-firm trust accounts, U.S. and foreign shell entities, and real-estate acquisitions—including the purchase of a $25 million Los Angeles mansion using proceeds of the scheme;

- engineering cross-border loan and note structures to access Plaintiffs' liquid funds;

- deploying political donations, staged public-relations events, and promotional appearances to lend credibility to the fabricated intelligence persona; and

- conducting disinformation, smear campaigns, intimidation, and threats—including threats directed at Plaintiffs' children—to preserve leverage, suppress exposure, obstruct investigations, retaliate against Plaintiffs for reporting the crimes alleged in this Complaint to U.S. federal law enforcement authorities, and coerce continued payments.

These acts were related in purpose, participants, method, victims, and results, and they pose a continuing threat of ongoing criminal activity.



425. Defendants aided and abetted others in the violations of the above federal laws, rendering them indictable as principals in the 18 U.S.C. §§ 1343, 1513. 1951, 1956 and 1957 offenses.

426. Each Defendant participated, directly or indirectly, in the conduct of the Enterprise's affairs, shared in its illicit proceeds, and knowingly furthered the scheme by incorporating and managing shell entities; drafting, circulating, and executing sham instruments; opening and controlling bank and trust accounts; initiating, approving, or processing wire transfers; misrepresenting government positions and intelligence "Programs"; organizing political and public-relations fronts; and disseminating false narratives, threats, and defamatory materials.

427. Defendants knew their actions would cause harm to Plaintiffs. Nevertheless, they knowingly participated in the Enterprise and engaged in schemes of deception that utilized the internet and wire transfers as part of their fraud, extortion, and money laundering activities in order to steal funds from Plaintiffs by means of false pretenses, misrepresentations and omissions, and extortion.

428. As a direct and proximate result of the Enterprise's conduct, Plaintiffs suffered substantial damages to their business and property, including but not limited to: the theft of $5,250,000 and $50,000 from Paramount Inc.'s Bank of America account in the United States; the diversion of approximately $13 million in Plaintiffs' funds to Global Energy Law Group's attorney trust account in California under false pretenses, where those funds were converted by the Enterprise to personal use; the laundering of $25 million of Plaintiffs' funds through Lascari's attorney trust account at Karlin & Peebles in California and the conversion of those funds into U.S. real property at 14180 W. Sunset Blvd., Pacific Palisades, California; the subsequent extraction of $4,995,000 in equity from that California property through a private mortgage; the diversion of Paramount Inc.'s corporate resources to fund Enterprise operations in the United States, including office rent, staffing, and equipment for a fraudulent office in Los Angeles; the loss of corporate control over Paramount Inc.,

179

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

a U.S. corporation; and additional coerced transfers, regulatory exposure, reputational harm, impairment of business operations, and significant investigation and remediation costs.

429.   Plaintiffs' injuries arose in the United States. Considering the nature of the injuries, the racketeering activity that directly caused them, and the injurious aims and effects of that activity, the circumstances surrounding Plaintiffs' injuries demonstrate that those injuries are domestic. First, Plaintiff Paramount Inc. is a U.S. corporation whose tangible property—funds on deposit in its Bank of America account—was located in the United States at the time it was stolen by the Enterprise through Lascari's unauthorized transfers. Lascari was Paramount Inc.'s sole director and sole signatory on its U.S. bank account, and in that capacity owed fiduciary duties to Paramount Inc. under applicable law. His misappropriation of Paramount Inc.'s assets constitutes a breach of a domestic fiduciary relationship governing domestic corporate property—an inherently domestic injury arising from the violation of duties owed to a U.S. corporation with respect to U.S.-located assets. Moreover, Paramount Inc. had an independent going-concern value in the United States: it maintained offices, staff, and operational infrastructure in Los Angeles, and the Enterprise's theft destroyed Paramount Inc. as a functioning U.S. business entity. The theft of those funds was completed when Lascari, acting in breach of those fiduciary duties, transferred $5,250,000 from that U.S. account to his law firm's IOLTA account in California on January 17, 2023, and separately transferred $50,000 to Orbimo on March 6, 2023, without authorization or legitimate business purpose. Once Plaintiffs' funds were deposited into U.S. bank accounts, they constituted U.S.-located property belonging to a U.S. corporation, and their subsequent misappropriation by a domestic fiduciary constitutes a domestic injury regardless of where the funds originated.

430.   Second, the approximately $13 million that Plaintiffs caused to be sent to Global Energy Law Group's attorney trust account in California was converted by

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

the Enterprise upon its arrival in the United States. Plaintiffs authorized those transfers on the condition that the funds would be used for U.S. Government operations as Srivastava had falsely represented. The conversion occurred in California when Global Energy Law Group, at Srivastava's direction, distributed the funds to Srivastava's personal companies, family members, luxury resorts, and political contributions—none of which constituted the authorized purpose. The property was located in the United States at the time of its conversion, and the conversion was carried out entirely within the United States.

431. Third, the Enterprise's money laundering predicates under 18 U.S.C. §§ 1956 and 1957 constitute independent acts of racketeering that caused independent domestic injuries to Plaintiffs' property, separate and apart from the underlying wire fraud. Even if the initial fraudulent inducement of PDMCC's $51 million transfer to the International Company occurred abroad, the laundering of those proceeds occurred entirely within the United States: $25 million was routed into Lascari's attorney trust account at Karlin & Peebles in California, commingled with other funds to obscure its origin, and used to purchase a $24.5 million mansion in Pacific Palisades, California, with the deed recorded on January 5, 2023. Plaintiffs' property was located in the United States—in California bank accounts and California real property—at the time each money laundering predicate was committed. Each such act caused independent domestic injury to Plaintiffs by concealing the fraud and impeding Plaintiffs' ability to discover, trace, and recover their stolen property; by converting liquid assets into illiquid U.S. real property controlled by the Enterprise; and by further dissipating Plaintiffs' recoverable property through subsequent transactions in the United States, including the transfer of the mansion from Birdsong to Aurora Point and the extraction of $4,995,000 in equity through a private mortgage from a Los Angeles lender. Plaintiffs' stolen property remains located in the United States to this day in the form of California real estate.

432. Fourth, the pattern of racketeering activity that directly caused



FIRST AMENDED COMPLAINT

Plaintiffs' injuries largely occurred in or was directed from and targeted at the United States. Srivastava resided in and directed the Enterprise from California; the Enterprise's U.S.-based attorneys formed and controlled corporate shells used to receive, misappropriate, move, and conceal fraud proceeds within the United States; the Enterprise used U.S. financial institutions—including Bank of America, First Republic Bank, JP Morgan Chase, and U.S. Bank—to facilitate its predicate acts; and stolen funds were deployed within the United States to purchase real property, make political contributions to U.S. officials, and sustain the Enterprise's operations. These domestic activities were not merely tangential links to the United States; they were the core mechanism through which the Enterprise executed its scheme and the means by which Plaintiffs' property was stolen, converted, and concealed. The Enterprise did not use U.S. financial institutions and California attorney trust accounts merely as a conduit; it selected them as the destination for Plaintiffs' stolen property precisely because they provided the concealment, commingling, and conversion capabilities that enabled the Enterprise to permanently deprive Plaintiffs of their assets. The principal aim of the scheme was to entangle Plaintiffs into doing business in the United States with U.S. persons and, as Plaintiffs believed, the U.S. Government itself.

433. Fifth, each act of laundering, concealment, conversion, and dissipation of Plaintiffs' stolen property within the United States constituted a new and independent domestic injury—not merely the downstream effect of a foreign one. The Enterprise's use of U.S. financial infrastructure was not incidental to the scheme; it was the chosen mechanism through which the Enterprise converted fraud proceeds into assets it could use and enjoy within the United States. Each distribution from a California IOLTA account, each unauthorized transfer from Paramount Inc.'s U.S. bank account, each use of stolen funds to purchase U.S. real property, make U.S. political contributions, fund U.S. office space, or pay U.S. professionals inflicted a fresh domestic injury on Plaintiffs by further diminishing and concealing the property

FIRST AMENDED COMPLAINT

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



Plaintiffs seek to recover. Specifically, after converting $24.5 million of stolen funds into California real estate, the Enterprise then extracted an additional $4,995,000 in value from that domestic asset through a private mortgage from a Los Angeles lender—a further domestic injury distinct from the initial purchase, compounding the harm to Plaintiffs' recoverable property within the United States. These continuing injuries arose in the United States regardless of where the underlying funds originated or where the initial fraud was conceived.

434. By reason of their injury, Plaintiffs are entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION

### Violation of RICO, 18 U.S.C. § 1962(d)

### (Against All Defendants)

435. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 434 contained in this Complaint as if fully set forth at length herein.

436. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. 18 U.S.C. § 1962(d).

437. The Srivastava Enterprise is an enterprise engaged in and whose activities affect interstate commerce for the purpose of stealing and defrauding funds from Plaintiffs.

438. Defendants are employed by and/or associated with the Srivastava Enterprise, as applicable.

439. The Defendants and the Srivastava Enterprise have knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Srivastava Enterprise's affairs, as applicable, through a pattern of racketeering activity consisting of repeated violations of the federal wire fraud, extortion, obstruction of justice, and money laundering statutes in violation of 18 U.S.C. §§ 1343, 1513, 1951, 1956, and 1957, including but not limited to the activity

183

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

specifically enumerated in the First Cause of Action.

440.    Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to steal funds from Plaintiffs) by: (1) misrepresenting the nature of their connections, relationships, and access to U.S. government officials and national security leaders; (2) falsely representing that Srivastava was a deep-cover "non-official cover" operative for the CIA; (3) fabricating a covert "Program" purportedly run by Srivastava that would supposedly ensure that Defendants would be protected by the U.S. government; (4) falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government, all for the purpose of gaining the trust of their victims and coercing them to entrust Defendants with their assets, which Defendants ultimately stole; and (5) concealing the source and destination of the funds and laundering them through various accounts and companies.

441.    The Srivastava Enterprise's fraudulent conduct and participation in the racketeering activity described herein has directly and proximately caused Plaintiffs domestic injuries to their business and property in the United States, as more fully described in the First Cause of Action. These injuries include, but are not limited to, the theft of funds from Paramount Inc.'s U.S. bank accounts, the conversion of Plaintiffs' funds within California attorney trust accounts, the laundering and conversion of Plaintiffs' funds into U.S. real property, and harm to Paramount Inc. as a going concern, all of which arose in the United States.

442.    By reason of their injury, Plaintiffs are entitled to compensatory, punitive, and treble damages, pre- and post-judgment interest, attorney's fees, costs incurred in bringing this action, and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION

### Fraudulent Misrepresentation

### (Against All Defendants)

443.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 442

FIRST AMENDED COMPLAINT

contained in this Complaint as if fully set forth at length herein.

444. Defendants knowingly and willfully executed the schemes described herein with the intent to defraud Plaintiffs by, among other things: (1) misrepresenting their connections, relationships, and access to U.S. government officials and national security leaders; (2) falsely representing that Srivastava was a deep-cover "non-official cover" operative for the CIA; (3) fabricating a covert "Program" purportedly run by Srivastava that would supposedly ensure that Defendants would be protected by the U.S. government; and (4) falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government.

445. Defendants' representations were false.

446. Defendants made and conspired to make these false representations with full knowledge of their falsity.

447. Defendants made and conspired to make these false representations with the intent that Plaintiffs rely on them. More specifically, Defendants made these false representations for the purpose of gaining Plaintiffs' trust and coercing them to entrust Defendants with their assets, which Defendants ultimately stole.

448. Plaintiffs reasonably, foreseeably, and justifiably relied on Defendants' misrepresentations. Plaintiffs' reliance was rendered reasonable, and indeed virtually impossible to avoid, by the Enterprise's deliberate deployment of Defendant Maguire—a genuine former CIA Deputy Station Chief—who, by his mere presence and active participation in meetings alongside Srivastava, communicated to Plaintiffs that Srivastava's claims of intelligence affiliation were authentic. No reasonable person confronted with a genuine former senior CIA official acting in concert with Srivastava and failing to contradict his claims would have had cause to doubt Srivastava's representations. The quality of the deception apparatus Defendants constructed—which deceived not only Plaintiffs but also retired generals, former intelligence officers, foreign diplomats, and national security professionals— demonstrates that Plaintiffs' reliance was objectively reasonable under the

185

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

circumstances.

449. As a direct and proximate result of these misrepresentations by the Defendants, Plaintiffs have suffered substantial damages.

450. Defendants, and each of them, knowingly and willfully conspired and entered into an agreement among themselves to engage in this fraud, and in furtherance of that agreement, engaged in each of the acts alleged herein.

451. Furthermore, on information and belief, this conspiracy remains ongoing as Defendants continue to attempt to conceal their fraud through defamatory and extortionate acts.

452. Defendant Thomas Giordano-Lascari carried out these acts in his capacity as director of Paramount Inc., and as director of various of the Enterprise entities. Lascari also had an independent legal duty not to defraud individuals engaged in transactions with his clients.

453. As set forth in detail above, Defendants acted maliciously, fraudulently, and oppressively within the meaning of those terms as set forth in California Civil Code Section 3294, and as such, Plaintiffs are entitled to recover punitive damages from Defendants.

## FOURTH CAUSE OF ACTION

### Conversion

### (Against All Defendants)

454. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 453 contained in this Complaint as if fully set forth at length herein.

455. Plaintiffs owned and had the right to possess its assets, including the funds they obtained through their legitimate business activities.

456. Defendants substantially interfered with Plaintiffs' property by knowingly or intentionally taking possession of Plaintiffs' funds.

457. Defendants took possession of Plaintiffs' funds by (1) misrepresenting their connections, relationships, and access to U.S. government officials and national

ROSEN ✦ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FIRST AMENDED COMPLAINT



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

security leaders; (2) falsely representing that Srivastava was a deep-cover "non-official cover" operative for the CIA; (3) fabricating a covert "Program" purportedly run by Srivastava that would supposedly ensure that Defendants would be protected by the U.S. government; and (4) falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government, all for the purpose of gaining Plaintiffs' trust and coercing them to entrust Defendants with their assets, which Defendants ultimately stole. Although Plaintiffs voluntarily transferred funds to Defendants, Plaintiffs were defrauded and coerced into doing so, and thus Defendants did not obtain consent.

458.   As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered substantial damages.

459.   Defendants, and each of them, knowingly and willfully conspired and entered into an agreement among themselves to engage in this conversion, and in furtherance of that agreement, engaged in each of the acts alleged herein.

460.   Furthermore, on information and belief, this conspiracy remains ongoing as Defendants continue to attempt to conceal their conversion and publicly promote the image of Srivastava through defamatory and extortionate acts, and fraudulent conveyances.

461.   As set forth in detail above, Defendants acted maliciously, fraudulently, and oppressively within the meaning of those terms as set forth in California Civil Code Section 3294, and as such, Plaintiffs are entitled to recover punitive damages from Defendants.

## FIFTH CAUSE OF ACTION

### Violation of Cal. Bus. & Prof. Code § 17200 et seq.

### (Against All Defendants)

462.   Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 461 contained in this Complaint as if fully set forth at length herein.

463.   Defendants engaged in unlawful, unfair, and fraudulent business acts or

FIRST AMENDED COMPLAINT



practices by misrepresenting information to Plaintiffs, including by (1) misrepresenting their connections, relationships, and access to U.S. government officials and national security leaders; (2) falsely representing that Srivastava was a deep-cover "non-official cover" operative for the CIA; (3) fabricating a covert "Program" purportedly run by Srivastava that would supposedly ensure that Defendants would be protected by the U.S. government; and (4) falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government, all for the purpose of gaining Plaintiffs' trust and coercing them to entrust Defendants with their assets, which Defendants ultimately stole.

464.   The actions of Defendants violated 18 U.S.C. § 1962 et seq. and 18 U.S.C. § 1343 et seq.

465.   As a result of these unlawful, unfair, and fraudulent practices, Plaintiffs have suffered substantial harm.



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

188

FIRST AMENDED COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

    a.  Award compensatory, punitive, and treble damages;

    b.  Order the return of funds wrongfully obtained by Defendants;

    c.  Award costs, attorney's fees, and interest;

    d.  Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  June 1, 2026

ROSEN ✧ SABA, LLP

By:   /s/ Ryan D. Saba
      RYAN D. SABA, ESQ.
      Attorneys for Plaintiffs

BRODBECKS LAW PLLC

By:   /s/ Jason A. Masimore
      JASON A. MASIMORE, ESQ.
      (*pro hac vice*)
      *Attorney for Plaintiffs*

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

189

FIRST AMENDED COMPLAINT