Paul B. Salvaty (Bar No. 171507)
Email: psalvaty@cohen-williams.com
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5160
Facsimile: (213) 232-5167

Attorney for Defendants Gaurav Srivastava,
Cedar West Ventures, LLC, Unity Resources
Group, Inc., Orbimo Corporation, Unicom
Worldwide, Inc., Birdsong Central LLC,
Aurora Point LLC, and The Gaurav Srivastava
Foundation f/k/a The Gaurav and Sharon
Srivastava Family Foundation

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| NIELS TROOST, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAURAV SRIVASTAVA, et al., <br><br> Defendants. | Case No. 2:26-cv-00631-AH-MAR <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE SRIVASTAVA DEFENDANTS' MOTION TO DISMISS AND ANTI-SLAPP MOTION TO STRIKE THE FIRST AMENDED COMPLAINT** <br><br> *Filed concurrently with Notice of Motion and Motion to Dismiss and Anti-SLAPP Motion to Strike the First Amended Complaint, Declaration of Paul B. Salvaty, [Proposed] Order, Request for Judicial Notice, and [Proposed] Order* <br><br> Judge: Honorable Anne Hwang <br> Date: September 23, 2026 <br> Time: 1:30 p.m. <br> Crtrm.: 9C <br><br> Trial Date:　　　Not set |

COHEN WILLIAMS LLP

# **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................1

II.     BACKGROUND .................................................................................................4

    A.      After Entering the SPA, Troost Torpedoed the Deal to Avoid Giving Up Profits Generated by His Illicit Trade in Russian Oil. ...................................4

    B.      Facing Severe Sanctions, Troost Launches the "Fake-Spy" Disinformation Campaign........................................................................................................9

    C.      Troost's "Fake Spy" Allegations Have Been Shown to Be False. ...............12

    D.      This FAC Repackages Troost's Fake-Spy Story as a RICO and Fraud Case Against a Made-Up "Srivastava Enterprise."................................................14

III.    LEGAL STANDARD .......................................................................................17

    A.      Legal Standard on Rule 12(b)(6) Motion to Dismiss...................................17

    B.      Ninth Circuit Law Governing Anti-SLAPP Motions ..................................17

IV.     ARGUMENT.....................................................................................................18

    A.      The FAC is Barred by the SPA's Mandatory Forum Selection Clause, Which Provides for Exclusive Jurisdiction in Switzerland. .....................................18

    B.      The FAC Is Barred by the Noerr-Pennington Doctrine Because It Is Predicated on First Amendment Protected Petitioning Activity...................21

    C.      Plaintiffs' RICO Claims are Deficiently Pled and Implausible. ..................23

        1.      Plaintiffs Fail to Plead RICO Standing..............................................23

        2.      Plaintiffs Fail to Plead the Elements of RICO....................................24

        3.      No RICO Conspiracy Because No Substantive RICO Claim. ...........29

    D.      The State Claims Also Fail and Must Be Dismissed and Stricken...............29

V.      CONCLUSION.................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                                                        **Page(s)**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................................17, 18

*Atl. Marine, Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
571 U.S. 49 (2013)................................................................................................................19, 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................................17

*Berg v. First State Ins. Co.*,
915 F.2d 460 (9th Cir. 1990) ...................................................................................................3, 24

*Boyle v. United States*,
556 U.S. 938 (2009)....................................................................................................................25

*Conservation Force v. Salazar*,
646 F.3d 1240 (9th Cir. 2011) ...................................................................................................17

*CoreCivic, Inc. v. Candide Grp., LLC*,
46 F.4th 1136 (9th Cir. 2022) ...................................................................................................18

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)....................................................................................................................21

*Eclectic Props. E. v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .....................................................................................................25

*Edwards v. Martin Park, Inc.*,
356 F.3d 1058 (9th Cir. 2004) ...................................................................................................27

*Ford Motor Co. v. Mikhov*,
No. 2:25-CV-04550-MWC-PVC (C.D. Cal. Mar. 10, 2026).....................................................25

*Freeman v. Lasky, Haas & Cohler*,
410 F.3d 1180 (9th Cir. 2005) ...................................................................................................21

*Gray v. Dignity Health*,
70 Cal.App.5th 225 (2021) ........................................................................................................30

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)................................................................................................................26, 27

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Hemi Grp., LLC v. City of New York, N.Y.*,
    559 U.S. 1 (2010)........................................................................................23

*Hoffman v. 162 N. Wolfe LLC*,
    228 Cal.App.4th 1178 (2014) (Aug. 13, 2014) ............................................28

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)......................................................................................23

*Howard v. Am. Online Inc.*,
    208 F.3d 741 (9th Cir. 2000) ...................................................................26, 29

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .....................................................................27

*Kottle v. Nw. Kidney Centers*,
    146 F.3d 1056 (9th Cir. 1998) .....................................................................23

*Lazar v. Superior Ct.*,
    12 Cal.4th 631 (1996) ..................................................................................30

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) .......................................................................17

*Lee v. Hanley*,
    61 Cal.4th 1225 (2015) ................................................................................30

*Makaeff v. Trump Univ. LLC*,
    715 F.3d 254 (9th Cir. 2013) ...................................................................18, 30

*Med. Marijuana, Inc. v. Horn*,
    604 U.S. 593 (2025)......................................................................................24

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002) .....................................................................24

*Metabolife Int'l, Inc. v. Wornick*,
    264 F.3d 832 (9th Cir. 2001) .......................................................................18

*Mindys Cosms., Inc. v. Dakar*,
    611 F.3d 590 (9th Cir. 2010) .......................................................................18

*Minghong Inv., Inc. v. Felix Chac Chuo*,
    No. 2:21-cv-05979-SB-PD (C.D. Cal. Mar. 9, 2022)............................19, 21

iii

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001) ..................................................................................... 17

*Pirozzi v. Fiserv Corp.*,
   668 F.Supp.3d 968 (C.D. Cal. 2022) .......................................................................... 19

*Planned Parenthood Fed'n of Am., Inc. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018) ..................................................................................... 18

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ..................................................................................... 17

*Relevant Grp., LLC v. Nourmand*,
   116 F.4th 917 (9th Cir. 2024) .............................................................................*passim*

*Religious Tech. Ctr. v. Wollersheim*,
   971 F.2d 364 (9th Cir. 1992) ..................................................................................... 27

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)................................................................................................... 25

*Rindal v. Seckler Co. Inc.*,
   786 F.Supp. 890 (D. Mont. 1992)............................................................................... 26

*RJR Nabisco, Inc. v. Eur. Cmty.*,
   579 U.S. 325 (2016)............................................................................................. 23, 24

*Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*,
   806 F.2d 1393 (9th Cir. 1986) ................................................................................... 26

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)................................................................................................... 25

*Seeger v. Odell*,
   18 Cal.2d 409 (1941) ................................................................................................. 28

*Sever v. Alaska Pulp Corp.*,
   978 F.2d 1529 (9th Cir. 1992) ................................................................................... 26

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ..................................................................................... 21

*Stewart Org., Inc. v. Ricah Corp.*,
   487 U.S. 22 (1988)..................................................................................................... 19

iv

COHEN WILLIAMS LLP

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) ...........................................................................29

*Turner v. Cook*,
362 F.3d 1219 (9th Cir. 2004) .........................................................................26

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965)..........................................................................................21

*United States v. Koziol*,
993 F.3d 1160 (9th Cir. 2021) .........................................................................21

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) .........................................................................27

*In re Wellpoint, Inc. Out-of-Network UCR Rates Litig.*,
865 F.Supp.2d 1002 (C.D. Cal. 2011) .............................................................28

*Wesenbeeck v. Netflix CPX, LLC*,
No. 2:25-CV-06800-AH-EX (C.D. Cal. Jan. 15, 2026) ...................................21

*Yan Guo v. Kyani, Inc.*,
311 F.Supp.3d 1130 (C.D. Cal. 2018) .............................................................20

**Statutes**

18 U.S.C. § 1962 ....................................................................................................17

18 U.S.C. § 1964 ..............................................................................................23, 24

Cal. Bus. & Prof. Code § 17200 .....................................................................17, 30

Fed. R. Civ. P. 8 ....................................................................................................29

Fed. R. Civ. P. 9 ........................................................................................27, 28, 29

Fed. R. Civ. P. 12 .............................................................................................*passim*

**Other Authorities**

U.S. Const. amend. I ..............................................................................................21

COHEN WILLIAMS LLP

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## I.    INTRODUCTION

This action is merely the latest—and, by far, most brazen—in a line of baseless lawsuits that Plaintiff Niels Troost ("Troost") and his agents have filed against Defendant Gaurav Srivastava ("Srivastava") and others associated with him around the world.  The litigation arises from a business deal between Troost and Srivastava which Troost himself torpedoed.  It is now clear that, when Troost entered the deal, he had no intention of performing his obligations as doing so would have meant giving up enormous profits generated from illegally trading Russian oil.  After Troost's conduct came to light, numerous authorities brought the hammer down—imposing severe sanctions on Troost and his companies that, for a time at least, paralyzed his ability to operate and left him a pariah in the international community as an undisputed enabler of Russia.  In response, Troost has spent millions of dollars on what has become a relentless, years-long media and lawfare campaign against Srivastava, designed to shift blame away from himself, rehabilitate his tattered reputation, and obtain sanctions relief so he can resume his illicit activities.

Troost is a Dutch citizen living in Switzerland who has been subjected to international sanctions from authorities in the UK, the EU, and Switzerland for supporting Russia's war efforts against Ukraine.  The gravamen of this case and all the others Troost has initiated against Srivastava in U.S. courts and overseas is that Srivastava defrauded Troost out of half his Russian oil business by pretending to be a "CIA operative."  According to Troost, Srivastava said "he ran a clandestine CIA operation (which he referred to as the '**Program**') monitoring Russian oil flows for U.S. national security" and promised Troost that, in exchange for restructuring his international businesses, "Troost and his companies could join the Program through Srivastava and continue marketing Russian-origin crude oil in support of U.S. national interests under a confidential U.S. Government license," without having to worry about sanctions.  (FAC ¶ 12.)  Troost says he should have known better, but Srivastava "exud[es] main character energy" and is "a brazen con man of remarkable skill—a gifted mimic and charlatan" who "has fooled sophisticated world leaders, think tanks, ex-military and intelligence officials, politicians,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

COHEN WILLIAMS LLP

and the Plaintiffs alike." (*See* FAC ¶¶ 2, 41.)  Trusting that Srivastava would use his "CIA connections" to help him obtain this secret "special license" from OFAC,[1] Troost entered into a Share Purchase Agreement ("SPA") dated July 30, 2022, whereby he transferred a 50% interest in his company, Plaintiff Paramount Energy & Commodities SA ("PECSA"), to Srivastava for a "token payment of 50,000 Swiss Francs (just over $50,000)." (*Id.* ¶ 22; *see also* ¶¶ 19-20, 22, 227-228.)  Before completing the transaction, however, Troost reneged on the deal.  He purported to "rescind" the SPA and to "expel" Srivastava from PECSA, claiming he had been "misled" into entering the SPA due to Srivastava's deceit and based on "tangible evidence" of fraud.  (*Id.* ¶ 340; *see also* ¶ 292 and pp. 131-133 ("After uncovering Srivastava's deceptions, Troost rescinds the agreements and expels him from the Company."))

In the aftermath of this purported "rescission," Troost's illegal activities came to light—in large part, because Srivastava reported Troost to the appropriate authorities and sued him in Swiss court.  By late 2024, Troost and his companies had been hit with severe sanctions by the UK, the EU, and Switzerland for having "facilitate[d] the unfettered trade in Russian oil" and for having "provided succor to Putin" and support for "the Russian war machine." (*See* FAC ¶¶ 171, 341; Salvaty Decl., Exs. A, Q.)[2]  In response, Troost launched a barrage of media and litigation attacks on Srivastava.  At the moment, Troost and his agents are pursuing three lawsuits in California alone (two federal, one state) and one lawsuit in New York (originally in the SDNY but now in state court), all arising from the same nucleus of mostly fake facts and all designed to weaponize the U.S. court system against Srivastava for blowing the whistle on Troost's criminal acts.[3]

[1] OFAC is the Office of Foreign Assets Control, a U.S. Department of the Treasury agency that administers and enforces economic and trade sanctions.

[2] Exhibits are attached to the Declaration of Paul B. Salvaty, filed herewith.

[3] By Order dated July 9, 2026, the Honorable Percy Anderson recently determined that one of these lawsuits brought by Plaintiff Troost's attorney is subject to Californias' anti-

2

This case is a quintessential Strategic Lawsuit Against Public Participation ("SLAPP") because its purpose is to harass, intimidate and punish Srivastava, not to vindicate any valid legal rights. Many of the FAC's allegations arise directly from core First Amendment-protected conduct including the reporting of Troost's crimes to the appropriate authorities and efforts by Srivastava to defend against Troost's misinformation campaign. Moreover, most of the wrongdoing alleged in the FAC—particularly Plaintiffs' contention that Srivastava somehow "defrauded" Troost into violating the law—is not actionable under any theory of liability. As for Plaintiffs' five causes of action, the FAC does not plausibly allege the elements of any valid claim:

- ***First***, Plaintiffs' claims are subject to dismissal under the doctrine of *forum non-conveniens*. The SPA—which sits at the center of this dispute—contains a mandatory "Jurisdiction" clause requiring that disputes relating to the contract "shall be exclusively submitted" to the Swiss courts. That provision is presumptively enforceable, and it applies to the entire FAC because all of Plaintiffs' allegations against all Defendants arise from and are inextricably intertwined with the SPA. Moreover, there is extensive litigation happening right now *against* Troost and his companies in Switzerland, and it involves the same issues Troost seeks to re-litigate here as a plaintiff.

- ***Second,*** the RICO claims are barred by the First Amendment and the *Noerr-Pennington* doctrine because they are predicated on protected petitioning activity. *See, e.g.*, *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 927 (9th Cir. 2024) (under *Noerr-Pennington*, persons who petition the government for redress are "generally immune from statutory liability for their petitioning conduct").

- ***Third,*** Plaintiffs have failed to allege facts sufficient to establish RICO standing or to plead the essential RICO elements. Moreover, Plaintiffs' allegations rely

---

SLAPP statute and awarded Srivastava more than $165,000 in attorneys' fees for having to defend and defeat the case. *See infra* at 11; Ex. O.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

on impermissible group pleading, attributing conduct to "Defendants" or "the Srivastava Enterprise" without differentiating among the alleged actors or specifying each Defendants' role in the enterprise or predicate acts.

- *Fourth,* Plaintiffs' state law claims fail under Rule 12(b)(6) and should be stricken on anti-SLAPP grounds because the claims arise from First Amendment activity, and Plaintiffs cannot establish a probability of success on the merits.

Thus, the FAC should be dismissed in its entirety under the doctrine of *forum non conveniens* and Fed. R. Civ. P. 12, and the state law claims should be stricken under California's anti-SLAPP statute.

## II.   BACKGROUND

Many of Plaintiffs' allegations in this case are lifted from a related lawsuit that Troost filed against The Arkin Group, a highly respected strategic intelligence firm that documented Troost's disinformation campaign against Srivastava.  *See* FAC ¶¶ 31, 33, 91, 195; *see also* Dkt. No. 1 (Orig. Compl. ¶ 3 n.1); *Troost v. The Arkin Group DE LLC, et al.*, No. 25-CV-06487 (S.D.N.Y. Aug. 6, 2025) ("the New York litigation").  After Troost initiated the New York litigation, The Arkin Group moved to dismiss and comprehensively dismantled Troost's false "fake spy" narrative.  After the motion to dismiss was filed, Troost quickly dropped the federal case.  Hoping to save face, Troost refiled the same claims against The Arkin Group in New York state court.  *See Troost v. The Arkin Group DE LLC, et al.*, Index No. 150236/2026 (Sup. Ct. of New York Jan. 6, 2026).  The Arkin Group's counterclaim contains a point-by-point rebuttal of Troost's fantastical fake-spy allegations.  (*See* Ex. B.)

### A.   After Entering the SPA, Troost Torpedoed the Deal to Avoid Giving Up Profits Generated by His Illicit Trade in Russian Oil.

Like all of Troost's Srivastava-related lawsuits, the FAC either downplays or completely ignores basic facts about Troost, the SPA, and Troost's unlawful conduct. Troost's illicit oil trading has been widely reported and is largely undisputed.  Troost apparently does not deny that he violated Western sanctions regimes by continuing to direct

4

the trading of Russian oil from Switzerland; his central claim is that his illegal activities were not his fault because Srivastava fraudulently promised to obtain a "confidential U.S. Government license" that would allow him to violate trade sanctions with impunity. (*See, e.g.*, FAC ¶ 12; *see also* ¶ 28 (Srivastava promised Troost that, if he restructured his companies, they would "receive a license" from OFAC "to continue marketing Russian-origin crude"; Srivastava also "claimed to have cleared this with others, including the EU and the Swiss sanctions regulator"); ¶ 217 (Srivastava fraudulently induced Troost to enter SPA by claiming corporate restructuring was needed for Plaintiffs to obtain "OFAC licenses necessary" for them "to be exempted from Western sanctions"); ¶ 305 (Srivastava "fraudulently induced Plaintiffs not to wind up PDMCC's Russian-origin oil operations by falsely representing that the U.S. government actually wanted PDMCC to keep trading," and that "OFAC would be issuing a special license formalizing on paper this arrangement"); ¶ 312 (Troost's people were "assured" that "PDMCC legally and politically could continue its then-ongoing business marketing Russian ESPO oil and that an OFAC license was 'in the works'"); ¶ 440 (Defendants "falsely guarantee[d] that they could prevent Plaintiffs from being sanctioned by the U.S. government").)

Neither Troost nor any Plaintiff has any meaningful connection to the United States. Plaintiff Troost is a Dutch citizen domiciled in Switzerland who apparently has not spent more than a handful of days in the United States. (FAC ¶ 79.) He is the sole shareholder of a Swiss holding company, Plaintiff EZI-Diaroc Holding SA ("EZI"), which is the sole shareholder of a Swiss energy and commodities trading company, Plaintiff PECSA. (FAC ¶¶ 80-81.) Most recently, Troost traded Russian oil through PECSA and its Emirati subsidiary, Plaintiff Paramount Energy & Commodities DMCC ("PDMCC"), and through Transmed Trading SA. (FAC ¶ 82; *see also* Ex. C at 2-3 and Ex. Q.)[4] Troost has alleged

---

[4] The only U.S.-based plaintiff, Paramount Energy & Commodities, Inc., is a non-operative Wyoming subsidiary of PECSA formed shortly before Troost "rescinded" the SPA. (*See* FAC ¶ 83.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

that his main trading partner, Concept Oil Services Limited ("Concept Oil"), "accumulated oil from multiple small, non-state producers."  New York Litigation, Dkt. No. 1 at ¶ 52. Research conducted by Russian watchdog entities indicates that Concept Oil's ultimate beneficial owners likely include Mikhail Arustamov, a Russian oligarch with close ties to Vladimir Putin who previously served as the vice president of the Russian state oil company Transneft.  (Ex. C at 3-4, 10.)

After Russia launched its invasion of Ukraine in February 2022, Western sanctions on Russian energy were rapidly imposed.  Troost hoped to preserve PECSA's Russian oil business rather than exit the market.  In that context, Troost sought an introduction to Srivastava, a United States resident with extensive experience investing in foreign commodities.[5]  Srivastava declined at first but ultimately agreed to partner with Troost and to invest in PECSA, which he understood to be a severely distressed asset, albeit one with potential to diversify away from Russian oil.  (Ex. C at 13-14; *see also, e.g.*, FAC ¶¶ 19-20, 28-29 (outlining corporate restructuring to ensure companies were compliant with U.S. and international law); ¶¶ 174-176, n.7 (Srivastava conducted "assessment" of Troost, urging him to "please be honest" and "[d]on't give stories").)

On July 30, 2022, Troost caused EZI to enter into the SPA with Defendant 1234 Holding SA ("1234 Holding"), which the FAC describes as a "Switzerland-based entity" whose "ultimate beneficial owner" is Srivastava.  (*See* FAC ¶¶ 22, 58, 91.)  Pursuant to the SPA, 50% of PECSA's shares were transferred to Srivastava for 50,000 Swiss francs. (FAC ¶ 22.)  Unlike the original Complaint, the FAC barely mentions the SPA by name,

---

[5] Troost alleges that he also sought an introduction to Srivastava because he was "under pressure" from another "fake spy"—an "extortionate debtor" identified by Troost in his public statements as a mysterious man named "Kane"—who supposedly was threatening to "falsely accuse Troost of being close with Russians connected with the Kremlin."  (*See* FAC ¶¶ 9-10.)  In other words, Troost's story is that he jumped from the arms of one "fake spy" (Kane) to another (Srivastava)—within a few short months—and that his current problems were caused entirely by his trusting nature, not because he operates a multi-billion dollar business marketing Russian oil.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

but its allegations remain largely consistent with the contract terms.  (*See* FAC ¶¶ 19-20, 29, 217, 219, 222, 227, 229; *see also* Ex. D (SPA ¶ 3.11).)  Although Troost claims the Purchase Price was a "token" amount to which he never would have agreed if not for Srivastava's promises to deliver a "special license" from OFAC, his characterization ignores the SPA's other provisions, which were extremely favorable to Troost.  Those provisions make clear that, upon completion of the transaction contemplated by the SPA, Troost would receive an "extraordinary dividend" of $350,000,000 representing Troost's "exclusive right" to retain all of PECSA's earnings as of May 31, 2022.  This core provision appears on the SPA's first page and is repeated throughout the contract:

> D.   The balance sheet of [PECSA] showed voluntary retained earnings as of May 31, 2022, [EZI] is entitled to all these retained earnings and these retained earnings are or will be paid exclusively to [EZI], the 500 Shares sold to [1234 Holding] shall be transferred ex-dividend.  According to [EZI]'s information the value of the company on May 31, 2022 with this voluntary retained earnings is estimated to [be] USD 350,000,000.

(Ex. D (SPA ¶ D); *see also* SPA ¶ 3.1.2 (Purchase Price of 50,000 Swiss francs takes ex-dividend into account); ¶ 4.3.1 (shares sold to 1234 Holding shall be transferred ex-dividend, and ex-dividend shall be paid to EZI); ¶ 5.1.1 (ex-dividend shall be paid to EZI on or before September 30, 2022 or other mutually agreed date).)  While Troost (through EZI) was entitled to retain PECSA's pre-May 31, 2022 earnings, Srivastava (through 1234 Holding) was entitled to share 50% of the profits generated by PECSA after June 1, 2022, which Troost has admitted was worth as much as $150,000,000.  (*See* FAC ¶¶ 22, 227 (alleging PECSA "was valued in the SPA itself at around US $350 million"); *see also* Orig. Compl. (Dkt. No. 1) ¶ 89.)

After Srivastava's initial investment in PECSA but before the ex-dividend was paid, Srivastava sought to exercise his contractual right as a 50% shareholder to audit PECSA's books and records.  In or around early 2023, audits commissioned by Srivastava uncovered proof that Troost was engaged in widespread fraud including, but not limited to, secretly

7

redirecting shared company assets to entities under his exclusive control; servicing purported loan payments to himself; paying fabricated invoices and loans that appeared to be payoffs directed at various Troost associates; and personally directing financial transactions with sanctioned companies from Switzerland.  (Ex. B.)

Srivastava confronted Troost with these audit findings, and it did not go well.  In response, on May 10, 2023, Troost caused his holding company, EZI, to "rescind" the SPA and seized all of PECSA's earnings (both pre- and post-May 31, 2022) for himself.  For his part, Srivastava reported Troost and his companies to the appropriate authorities.  Many of Srivastava's whistle-blowing activities are not only referenced in the FAC—they form the factual predicate for Plaintiffs' RICO and state law claims.  (*See, e.g.*, FAC ¶ 59 (alleging Defendants "used Cedar West to take various actions, including filing a criminal complaint in Dubai attempting to take all of Paramount's assets" and basing claims on "doctored evidence")[6]; ¶ 87 (same); ¶ 343 (alleging that "extortionate scheme" included "email[ing] letters to officials in various countries, including Switzerland, the United States, Turkey and the UAE . . . on the false pretext that Troost had stolen $47 million from Paramount . . . and then shut Srivastava out of the companies so Troost could take all the assets"); ¶ 387 (alleging defendants submitted "false copyright claim"); ¶ 417(e)(xi) (alleging "wire fraud" based on "police report Cedar West filed on or about August 25, 2023, which falsely alleged that Troost and others affiliated with Plaintiffs embezzled over $4 billon of dollars from PDMCC"); *see also* FAC ¶¶ 62-74 (characterizing work with "law firms and lawyers" as part of scheme); ¶¶ 75-78 (characterizing political activities and donations as part of scheme); ¶¶ 367-370 (characterizing First Amendment speech and whistle-blowing activities as "smear campaign" that was part of scheme).)

---

[6] The FAC repeatedly mischaracterizes the proceedings in Dubai, which did not include any findings of "doctored evidence."

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**B.    Facing Severe Sanctions, Troost Launches the "Fake-Spy" Disinformation Campaign.**

Once Troost's Russian oil trading activities came under regulatory scrutiny, in late 2023 and early 2024, the UK and others imposed severe sanctions against him and his companies that crippled his business.  (Ex. A; Ex. C at 5-6; Ex. Q.)  Troost does not seriously dispute that he engaged in the prohibited actions for which he was sanctioned.  Instead, he claims that Srivastava "guaranteed" him that he could do so and that it would all be okay.  (*See, e.g.*, FAC ¶¶ 12, 28, 440, 444, 457, 463.)[7]

On February 22, 2024, the United Kingdom sanctioned Troost and PECSA, finding that "Troost facilitates the unfettered trade of Russian oil outside the reach of UK and G7 sanctions, including through UAE-based PDMCC."  Foreign Secretary James Clever stated at the time that the sanctioned parties "provided succor to Putin by helping him to lessen the impact of our sanctions on Russian gold and oil—two critical sources of revenue for the Russian war machine."  On December 16, 2024, the European Union sanctioned Troost, PECSA, and PDMCC, finding: "In June 2022, [PDMCC] took over and continued without interruption [PECSA]'s oil business vis-à-vis Russia, underlining close and direct operational and strategic control of [PECSA] over its subsidiary, [PDMCC].  [PDMCC] repeatedly traded Russian crude oil above the price cap after its introduction.  Moreover, Niels Troost is affiliated with Livna Shipping Ltd, which has been trading crude oil above the oil price cap after its introduction."  On December 23, 2024, Switzerland adopted the European Union's sanction of Troost.  (*See* Ex. C at 5-6.)

Meanwhile, beginning in 2023, Srivastava challenged Troost's purported rescission of the SPA in a Swiss proceeding.  Troost responded by ratcheting up his efforts to blame his own illegal behavior on Srivastava through a disinformation campaign that has included

---

[7] Troost also claims absurdly that he thought (based on Srivastava's promises) that the *U.S. government "actually wanted" him to violate the law* and to "keep trading as part of the supposed CIA program Troost had joined" and that he was engaging in sanctioned trade activities in "*support of U.S. national interests*."  (*See* FAC ¶¶ 12, 305.)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

litigation, regulatory and criminal complaints, and coordinated public attacks in literally hundreds of publications around the world.  For example:

- In or around December 2023, Troost initiated a criminal proceeding against Srivastava in Switzerland for fraud.  The Swiss court dismissed the case in April 2024, affirmed by a Swiss appellate court in November 2024.  (Ex. C at 17-18.)

- On May 6, 2024, Troost, through PECSA, filed a legal malpractice complaint in Los Angeles Superior Court against Baker Hostetler, the law firm which represented Srivastava and PECSA in connection with the Paramount transaction.  *See Paramount Energy & Commodities SA v. Baker Hostetler*, *et al.*, LA Superior Court Case No. 24STCV11278.  Paramount alleges that Baker Hostetler "conspired" with Srivastava to breach their professional obligations.  In two years of litigation, the only deposition Paramount has taken is that of non-party Srivastava, where PECSA unsuccessfully sought to have Troost's entire legal team attend, raising concerns with the Judge about "use of the [] deposition proceeding for purposes other than the current litigation."  (Ex. E.)

- On August 6, 2025, Troost initiated the New York Litigation with a 108-page complaint against The Arkin Group and one of its managing directors in the Southern District of New York, alleging that statements made during their investigation of Troost on Srivastava's behalf constituted slander and libel per se. *See Troost v. The Arkin Group, et al.*, Case No. 25-CV-6487 (JHR) (S.D.N.Y.), Dkt. No. 1.  The defendants moved to dismiss on November 17, 2025, and Troost filed a Notice of Voluntary Dismissal within 10 days.  (*See* Ex. F; *see also* Compl. ¶ 3, n.1.) The case was refiled and is pending in New York state court.

- On August 12, 2025, Troost's attorney, Jason Masimore (who also serves as trial counsel in this case), filed a defamation lawsuit against Srivastava in this district. *See Masimore v. Srivastava*, C.D. Cal. Case No. 2:25-cv-07505-PA-E ("the Masimore litigation").  The case was dismissed with leave to amend by Order dated March 10, 2026.  Rather than drop the case, Masimore doubled down.  His

10

amended complaint was dismissed with prejudice on May 7, 2026. (Ex. G.) Masimore appealed the very next day. By Order dated July 9, 2026, the Honorable Percy Anderson determined that the Masimore litigation was a SLAPP suit and awarded attorneys' fees against him and in favor of Srivastava in the amount of $165,573.45. (*See* Ex. H.) No doubt, Masimore will continue the appeal of his baseless claims to the Ninth Circuit, regardless.

- Troost (and Masimore) repeatedly have used the litigation process to generate favorable publicity.[8] Troost has orchestrated the publication of literally hundreds of articles (more than 350) that falsely cast Srivastava as a "fake spy" and a fraud. (*See* Ex. C at 9, 11-13.) Troost also has spread his false narrative through interviews with the *Wall Street Journal*, *The Financial Times*, and other publications, portraying himself as the innocent victim of Srivastava's elaborate fake-spy fraud. Most recently, Troost enlisted a journalist to write a book on the topic, and the author has spent months digging into the private affairs of Srivastava and others with whom he has associated. (*See, e.g.*, Exs. I-M.)[9]

In the New York litigation, The Arkin Group documented Troost's disinformation campaign against Srivastava based on its extensive due diligence. They determined that Troost engaged in "aggressive efforts to undermine Srivastava's professional and personal relationships, such as the filing of bar complaints against an attorney who continued to

---

[8] Here, *The Independent* published a pro-Troost article one day after the original Complaint in this case was filed, including extensive quotes from Masimore attacking Srivastava as the "ringleader" of "massive criminal conspiracy" that "compromised US national security and top-level political leadership." (Ex. I.) Similarly-timed articles were published by *Project Brazen* and *The Financial Times*. (*Id.*) In recent weeks, the Srivastava Defendants have identified dozens more pro-Troost articles and posts in pay-for-play outlets such as *The Times of India*, *OCCRP*, *Outlook*, and many others. (Ex. P.)

[9] Troost also has hired a private investigations group W-1 Global who doggedly have sought to interview and harass every possible contact of Srivastava's, including parents at his children's schools.

11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

work on behalf of Srivastava, and evidence that agents of Troost encouraged individuals in Srivastava's orbit to report him to the IRS and the FBI." (*See* Ex. C at 13.)

C.      **Troost's "Fake Spy" Allegations Have Been Shown to Be False.**

Troost's public attacks against Srivastava—including the 192 pages of allegations in this case—always include Troost's core claim that Srivastava defrauded him by pretending to be a "fake spy." The "fake spy" story has been thoroughly debunked and is facially preposterous, but Troost keeps pushing it in the media and in legal filings around the world.

In its motion to dismiss Troost's complaint in the New York litigation, The Arkin Group analyzed Troost's "fake spy" narrative at length. According to The Arkin Group's research, the story appears to have originated in a May 2023 letter that Masimore sent to Baker Hostetler on Troost's behalf, seemingly hoping to convince the firm to drop Srivastava as a client. (Ex. C at 12.) Troost appears to have first brought this fiction to the public as early as October 10, 2023, in a story published by *Project Brazen*, and he has repeated and refined the tale in various publications, Wikipedia articles, and videos around the world—many of which were paid placements. (*Id.*) The story also has been spread by letters of agents of Troost (including Masimore) to Srivastava's personal and professional contacts, his travel agent, his mortgage broker, recipients of his political campaign donations, and even parents at his children's school. (*Id.* at 13; *see also, e.g.*, Ex. N (letter from Masimore to Greenberg Glusker dated January 22, 2024, detailing fake spy allegations and accusing one of firm's transactional partners of "improper conduct" and ethical violations through representation of Srivastava).)

The "fake spy" narrative is inherently absurd. By his own account, Troost has a "graduate degree in international business" and a "degree in Creative International Trading in Crude Oil and Petroleum Productions." He built a commodities trading company "worth hundreds of millions of dollars" "from the ground up." He has a "deep understanding of the nuances and intricacies of the oil industry" and a "deep understanding of the Chinese market." The New York Litigation, Dkt. No. 1 at ¶¶ 26-27, 47, 49. And yet, according to

12

Troost, despite this experience and business acumen, he somehow was tricked into "transfer[ring] half of his business ownership interests to Srivastava," whom he barely knew, based on Srivastava's unverified claims that he was a "CIA operative" who could help Troost obtain a "special" OFAC license to continue selling Russian oil despite Western sanctions.  (*See, e.g.*, Ex. C at 17 (detailing Swiss appellate court rejection of Troost's fraud claim against Srivastava based on, among other things, inherent implausibility of "fake spy" allegations); *see also* Ex. R.)

Remarkably, Troost admits in his own pleading to having a history of trouble with "fake spies."  In the FAC (and in the New York litigation and interviews with the press), Troost claims that one of the reasons he sought out Srivastava as a potential business partner was because he needed help dealing with another "fake spy" who was causing him great distress.  According to Troost, in early 2022, he "came under pressure from a previous business associated who owed Troost money."  (FAC ¶ 9.)  This "debtor" (a man Troost has named publicly as "Kane"), coincidentally, also "had claimed to be affiliated with the U.S. Intelligence Community," and allegedly was threatening to "use his supposed media contacts to launch a public smear campaign against Troost, leveraging the rising public and political sentiment against Russian oil to falsely accuse Troost of being close with Russians connected with the Kremlin."  (*Id.*)  Troost claims Kane's threats were putting him under enormous stress so he turned to Srivastava for help "resolv[ing] the developing threat" that Kane posed to "Troost and his companies."  (*Id.* ¶ 11.)  In other words, Troost claims he is the victim of two completely unrelated "fake spy" schemes perpetrated by two different individuals both of whom claimed to have CIA connections and falsely accused him of close ties to Putin.  After detailing Troost's Kane-related allegations, The Arkin Group notes:

> The most remarkable part of this story is that Troost's putative duping by Kane not only happened immediately before he met Srivastava, but it was also *the reason he alleges he reached out to Srivastava in the first place. . . .* Troost asks us to believe that—having just been purportedly burned by someone

13

claiming to be a CIA operative—he immediately decided to seek the aid of another person with *unverified CIA credentials*.

There are two interpretations of this tale of two spies. One is that Troost is an astonishingly credulous mark who was twice duped by the very same story and in very quick succession. The other is that Troost has a vengeance playbook when it comes to business deals gone wrong. Defendants believed the latter."

(Ex. C at 20-21; *see also* FAC ¶¶ 9-11.)[10] The fact that Troost's entire narrative is built on such a facially ludicrous foundation exposes the implausibility of all of his claims, not only in this litigation but in all the cases he is pursuing against Srivastava in the U.S. and elsewhere around the world.

**D.    This FAC Repackages Troost's Fake-Spy Story as a RICO and Fraud Case Against a Made-Up "Srivastava Enterprise."**

The FAC here includes a lengthy recitation of Troost's fantastical story that he was fraudulently lured into entering the SPA—and giving away half his interest in PECSA—based on an "elaborate" fake-spy scheme whereby Srivastava "promised" that OFAC and SECO "would allow [Troost's] businesses to continue trading Russian-origin oil" regardless of Western sanctions. (*See, e.g.*, FAC ¶ 192; *see also* ¶¶ 440, 444, 457, 463 (alleging Defendants committed fraud by "falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government").)[11]

---

[10] In the original Complaint, Plaintiffs tried to explain away this absurdity by alleging Troost has a "critical weak spot—his lingering tolerance for dubious claims," especially by individuals pretending to be "fake spies". (*See* Orig. Compl. ¶¶ 50-52, n.10.) They apparently decided this ridiculous allegation did more harm than good and dropped it from the FAC.

[11] The Srivastava Defendants allegedly utilized dime-store techniques such as handing Troost the "business card" of someone working at the U.S. Treasury Department (FAC ¶ 188); showing photos of Srivastava with President Biden and Speaker Pelosi (FAC ¶¶

14

For the most part, Plaintiffs' allegations here are the same as those against The Arkin Group in the New York litigation and similar to those in the Baker Hostetler and Masimore litigations. Each case depends upon the alleged "fake spy" fraud and includes extensive allegations about Troost being "pressured" to enter the SPA and subjected to a "smear campaign" after the deal blew up.[12] The primary difference is that, here, Plaintiffs have tried and failed to twist their implausible allegations into a RICO conspiracy and common law fraud. Plaintiffs recast Srivastava, his wife, his former colleagues and attorneys, and his companies as "the Srivastava Enterprise"; they vaguely describe emails and text messages relating to the SPA transaction as "mail fraud" and "wire fraud" that constitute "predicate acts" of "racketeering"; and they refer to a hodgepodge of confusing correspondence and wire transfers concerning lawful financial transactions as "money laundering."

In several respects, the FAC is even more overblown than Plaintiffs' original Complaint. It is now 192 pages in length (72 pages longer than the original Complaint) and buries any semblance of a legal claim beneath a sprawling narrative filled with immaterial allegations concerning private family matters, third party gossip, and events years before the parties ever met each other. For example, the FAC includes allegations about Sharon Srivastava and the Srivastava's children describing Mrs. Srivastava as Mr. Srivastava's "soon-to-be-ex-wife" (FAC ¶ 43); providing information about her upbringing and citizenship status (FAC ¶ 85); and purporting to describe the Srivastavas' unsuccessful efforts to get their young children into a local school. (*See* FAC ¶ 163

---

228, 230); using secret-CIA-spy words like "the Agency" and "the Farm" (FAC ¶ 186); and telling tall tales about Srivastava's involvement with "black ops" (FAC ¶ 68).

[12] That Troost, a Russian oil trader worth hundreds of millions of dollars, felt "financial" and "psychological pressure" to sell an interest in his company to Srivastava is yet another preposterous aspect of Plaintiffs' claims. Plaintiffs' own allegations show it was Troost, not Srivastava, who told people that closing the Paramount transaction was "extremely important and urgent" and that the "survival and future" of his company depended on it. (*See, e.g.*, FAC ¶ 219.)

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

("Ultimately, the Srivastava child was not accepted" into the "private school" to which they had applied because the Srivastavas "failed the vetting process").)  It devotes pages to the Srivastavas' time in the UK in late 2019 and early 2020 (FAC pp. 38-46)—years before Troost had even met them—including unsettling personal details about hotels at which the Srivastava family stayed, photos of their rental property and a plane on which they traveled, and bizarre allegations about private conversations that allegedly occurred between the Srivastavas and their UK house guests.  (*See* FAC ¶ 126 (describing conversation that supposedly happened "[o]ne evening in around April to June 2020" when Srivastava and an unnamed young man "sat and talked by a fire pit at Tickmorend Farm"); ¶ 131 (alleging Srivastava "and his family moved in, along with an *au pair*," and was "often observed" by "UK Witness-3" "walking around the garden speaking on the cell phone and meeting with people" and that the witness "found some documents left in the garden" after the Srivastavas moved out).)  Similarly, there are pages of allegations concerning the Srivastavas' time living in Los Angeles in 2020 (FAC pp. 49-53) including details not only about where they lived but where they traveled "over the Christmas holiday" (including where they switched planes) and what they supposedly discussed with friends or acquaintances in private settings.  These allegations do not plead fraud with particularity, establish a RICO enterprise, or cure Plaintiffs' standing, causation, or venue defects.  The bizarre allegations in the FAC only confirm that Plaintiffs are using this case to publish a sweeping and embarrassing false narrative about the Srivastavas' personal lives and collateral disputes, rather than to plead facts relevant to any legitimate claim.[13]

From this morass, Plaintiffs raise five causes of action: (1) Violation of RICO, 18 U.S.C. § 1962(c); (2) Violation of RICO, 18 U.S.C. §1962(d); (3) Fraudulent

_____

[13] Perhaps most disturbing, the FAC contains dozens of allegations that appear to be based upon potentially privileged communications between Srivastava and his former attorney, Owen Onouye.  The Srivastava Defendants are continuing to investigate Mr. Onouye's apparent collaboration with Plaintiffs and likely will be bringing a motion on this subject, particularly if any part of the case remains in the Central District of California.

Misrepresentation; (4) Conversion; and (5) Violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.* The case should never have been brought in this forum; and the individual claims are defective and subject to dismissal on multiple grounds.

## III. LEGAL STANDARD

### A. Legal Standard on Rule 12(b)(6) Motion to Dismiss

A Rule 12(b)(6) motion to dismiss "tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (*quoting Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining if a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). In *Twombly,* the Supreme Court adopted a "plausibility standard," in which the complaint must "raise a reasonable expectation that discovery will reveal evidence of [the alleged infraction]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A complaint need not contain detailed factual allegations, but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570). Courts "need not accept as true allegations contradicting documents that are referenced in the complaint." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Nor is a court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *Id.* (citation omitted).

### B. Ninth Circuit Law Governing Anti-SLAPP Motions

"California law provides for the pre-trial dismissal of certain actions, known as Strategic Lawsuits Against Public Participation, or SLAPPs, that masquerade as ordinary lawsuits but are intended to deter ordinary people from exercising their political or legal rights or to punish them for doing so." *Makaeff v. Trump Univ. LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (cleaned up). Aspects of California's anti-SLAPP statute apply in federal actions. *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1143 (9th Cir. 2022); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001).

17

Courts employ a two-step test for anti-SLAPP motions. First, the defendant must make a "prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *Makaeff*, 715 F.3d at 261 (citation omitted). If the court finds the defendant has made a prima facie showing, at the second step, the burden then shifts to the plaintiff "to establish a reasonable probability that it will prevail on its claim." *Id.* In particular, "the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain favorable judgment if the evidence submitted by the plaintiff is credited." *Mindys Cosms., Inc. v. Dakar*, 611 F.3d 590, 599 (9th Cir. 2010) (citation omitted).[14]

## IV. ARGUMENT

### A. The FAC is Barred by the SPA's Mandatory Forum Selection Clause, Which Provides for Exclusive Jurisdiction in Switzerland.

One of the central premises of Plaintiffs' lawsuit is that the "Srivastava Enterprise" defrauded Troost into transferring one-half of PECSA's shares to Srivastava for a "token" amount. (FAC ¶¶ 21-22, 227-229.)[15] This potential business deal between Troost and Srivastava—which sits at the center of all the parties' disputes—is reflected in the SPA, which is a formal contract which Troost and Srivastava caused to be signed on July 30,

---

[14] When an anti-SLAPP motion to strike challenges the legal sufficiency of a claim, courts apply the Rule 12(b)(6) standard to assess whether a claim is properly stated. *Planned Parenthood Fed'n of Am., Inc. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018) *amended*, 897 F.3d 1224 (9th Cir. 2018); *see also CoreCivic*, 46 F.4th at 1143 (*quoting Iqbal*, 556 U.S. at 678 ("Under the familiar plausibility pleading analysis, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face'" to survive an anti-SLAPP motion.).

[15] In response to the Srivastava Defendants' initial Motion, Plaintiffs amended their pleading to include fewer explicit references to the SPA, undoubtedly to try to obscure its significance to the case and to make their RICO claims appear less connected to the parties' contractual dispute. (*See, e.g.*, Orig. Compl. ¶ 88 (detailed allegations concerning Share Purchase Agreement that were deleted from FAC).) Even as amended, however, Plaintiffs' own allegations leave no doubt that all claims "arise[] out of or in relation to" the SPA.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

COHEN WILLIAMS LLP

2022.   The SPA's express terms include a mandatory forum selection clause that requires all SPA-related claims to brought in Switzerland.

A defendant may move to dismiss, even if venue is otherwise proper, if a valid forum-selection clause points to a different forum.  *Atl. Marine, Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013).  A court considering a *forum non conveniens* motion weighs a number of factors related to public and private interests. *Minghong Inv., Inc. v. Felix Chac Chuo*, No. 2:21-cv-05979-SB-PD, 2022 WL 2189365, at *2 (C.D. Cal. Mar. 9, 2022).  "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Atl. Marine*, 571 U.S. at 63 (*quoting Stewart Org., Inc. v. Ricah Corp.*, 487 U.S. 22, 31, (1988)).  If there is a mandatory forum-selection clause, courts adjust their analysis and do not consider private interest arguments. *Id.* at 64.  "The practical effect is that 'a valid forum-selection clause should be given controlling weight in all but the most exceptional cases.'"  *Minghong Inv.*, 2022 WL 2189365, at *2, *quoting Atl. Marine*, 571 U.S. at 63 (cleaned up).[16]

Here, Section 13 of the SPA, entitled "Governing Law and Jurisdiction," provides:

13.1      Governing Law

13.1.1      The Agreement and the transactions contemplated herein shall be subject exclusively to the laws of Switzerland, i.e., shall be governed by and construed in accordance with the laws of Switzerland exclusively, in particular exclusively of the principles of private international law and of the principles regulating the conflicts of law.

13.2.      Jurisdiction

---

[16] Forum selection clauses may be enforced by a non-signatory and against non-signatories, particularly where, as here, the alleged conduct is enmeshed in the contractual relationship. *See, e.g., Pirozzi v. Fiserv Corp.*, 668 F.Supp.3d 968, 974 (C.D. Cal. 2022).

19

13.2.1    Any dispute, controversy or claim arising out of or in relation to this contract, including the execution, non-execution, validity, invalidity, breach or termination thereof shall be exclusively submitted to the state courts of [PECSA]'s domicile at the time of signature of the Agreement.  (Ex. D.)

Plaintiffs offer no reason why this mandatory forum selection clause is invalid or why enforcement would be "unreasonable."  To the contrary, enforcement would give effect to the parties' contract and require that Plaintiffs' baseless claims are addressed in Switzerland, where Troost resides and his holding company EZI is domiciled.  It would also prevent Plaintiffs from engaging in flagrant forum shopping.  There have been numerous criminal and civil Swiss proceedings over these same issues over the past several years, and several are ongoing.  (*E.g.*, Exs. O-P; Decl. ¶ 20.)  In one of the Swiss cases, Defendant 1234 Holding is suing PECSA for breach of the SPA; in another, a Swiss court rejected Troost's fake-spy allegations for their sheer implausibility.  (*See* Ex. C at 18, n.28; *see also* Ex. R.)

Nor are there any "public interest" factors that even arguably could be found to "overwhelmingly disfavor" dismissal, as required to override the parties' contract.  *See Yan Guo v. Kyani, Inc.*, 311 F.Supp.3d 1130, 1139 (C.D. Cal. 2018).  The Central District has little to no interest in this lawsuit; the SPA provides that disputes should be decided under Swiss law; and Troost's litigation onslaught against Srivastava is placing an undue and completely unnecessary burden on California's very busy courts, particularly in this District.  *See Atl. Marine*, 571 U.S. at 63-64; *see also Minghong Inv.*, 2022 WL 2189365, at *5; *Wesenbeeck v. Netflix CPX, LLC*, No. 2:25-CV-06800-AH-EX, 2026 WL 130576, at *6 (C.D. Cal. Jan. 15, 2026).  Accordingly, the Complaint should be dismissed in its entirety based on the SPA's forum-selection clause and the doctrine of *forum non conveniens*.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**B.    The FAC Is Barred by the *Noerr-Pennington* Doctrine Because It Is Predicated on First Amendment Protected Petitioning Activity.**

Even if the SPA's terms could be ignored, the FAC would be barred by the *Noerr-Pennington* doctrine, which "is a rule of statutory construction that requires courts to construe statutes to avoid burdening conduct that implicates the protections of the Petition Clause of the First Amendment." *United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021). That clause protects "the right of the people . . . to petition the government for a redress of grievances." *Id.* (*quoting* U.S. Const. amend. I).[17] The doctrine bars RICO claims, like this one, predicated on petitioning activity. *See Relevant Grp.*, 116 F.4th at 927; *see also Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1186 (9th Cir. 2005).

Under *Noerr-Pennington* persons who petition any branch of government for redress are "generally immune from statutory liability for their petitioning conduct." *Relevant Grp.*, 116 F.4th at 923; *see also E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965). As the Ninth Circuit explains:

> The classic example is *Noerr* itself, where a group of truck operators sued a group of railroad companies . . . after the railroads began a publicity campaign to obtain legislation favoring their industry. The Court held that the publicity campaign was protected petitioning activity, notwithstanding any underlying anticompetitive motive on the railroads' part. We have since extended *Noerr* protection to lawsuits, noting that the doctrine "overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution."

*Relevant Grp.*, 116 F.4th at 927 (citations omitted).

---

[17] The doctrine originally arose in the antitrust context but has since been applied "outside the antitrust field." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 930 (9th Cir. 2006).

21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

This case too is a classic example of an attempt to impose liability for protected petitioning activities. One of Plaintiffs' central theories is that Defendants violated RICO and harmed Plaintiffs by reporting and publicizing Troost's illegal activities which led to the sanctions. The petitioning activities about which Plaintiffs complain include, among many others, taking "various actions, including filing a criminal complaint in Dubai attempting to take all of Paramount's assets" and basing claims on "doctored evidence" (FAC ¶¶ 59, 87); reporting Plaintiffs to "officials in various countries, including Switzerland, the United States, Turkey and the UAE . . . on the false pretext that Troost had stolen $47 million from Paramount . . . and then shut Srivastava out of the companies so Troost could take all the assets" (FAC ¶ 343); Srivastava's attorney "still acting on Srivastava's instructions—emailed letters to the Swiss ambassador to the United States, copying the U.S. Ambassador to Switzerland, repeating the fabricated allegations the Enterprise had brought to the UAE and Turkish ambassadors informing them" that Cedar West "had been expelled from PECSA" (FAC ¶ 351); alleging meeting with "Special Agent Glen Moffat of the U.S. State Department Diplomatic Security Service" "falsely accusing Troost of funding the Wagner Group, a terrorist organization" (FAC ¶ 352); alleging "defendants used interstate wire communications to coordinate and to submit" a "false copyright claim" (FAC ¶ 387); alleging "wire fraud" based on "police report Cedar West filed on or about August 25, 2023, which falsely alleged that Troost and others affiliated with Plaintiffs embezzled over $4 billion of dollars from PDMCC" (FAC ¶ 417(e)(xi).) (*See also* FAC ¶¶ 62-74 (characterizing work with "law firms and lawyers" as part of scheme); ¶¶ 75-78 (characterizing political activities and donations as part of scheme); ¶¶ 367-70 (characterizing First Amendment speech and whistle-blowing activities as "smear campaign" that was part of scheme).)[18]

---

[18] The original Complaint included additional allegations that directly targeted protected petitioning activities. Although some of these allegations have been fuzzed-over or dropped in the FAC, there is no reason to believe Plaintiffs have abandoned them or that they won't pursue them aggressively if given the chance to do so.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

COHEN WILLIAMS LLP

The FAC alleges no facts to support the *Noerr Pennington* doctrine's narrow exception for "sham" "litigation." Plaintiffs cannot seriously dispute that they violated international sanctions by selling Russian oil after the embargoes went into effect. (*See, e.g.*, FAC ¶ 341; Ex. Q.) Their main argument is that the criminal conduct should be excused—and responsibility shifted to Defendants—because Srivastava "guaranteed" them that they would not be sanctioned and that he would get them a "special license" as part of a secret CIA program, apparently with retroactive effect. (*See, e.g.*, FAC ¶¶ 12, 28, 440, 444, 457, 463.) And there is no dispute that international regulators determined that the allegations against Troost had merit; this is why the UK, the EU, and Switzerland levied such severe sanctions against him and his companies. *Relevant Grp.*, 116 F.4th at 932 (cleaned up) ("A winning lawsuit is by definition not a sham."); *see also Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1063 (9th Cir. 1998) (cannot allege sham by "recast[ing] disputed issues from the underlying litigation as 'misrepresentations' by the other party.").

## C.    Plaintiffs' RICO Claims are Deficiently Pled and Implausible.

In addition to these fundamental defects in their case, Plaintiffs fail to allege facts sufficient to establish RICO standing or to plead the essential RICO elements.

### 1.    Plaintiffs Fail to Plead RICO Standing.

To establish RICO standing, plaintiffs must plead (1) an injury to business or property; (2) caused by the alleged RICO violation, and (3) a domestic injury. *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 346 (2016); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). RICO requires a direct injury "by reason of" racketeering activity. 18 U.S.C. § 1964(c); *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010).

Here, Plaintiffs' alleged injuries arose from Plaintiffs' own unlawful actions and from the sanctions imposed on them by multiple foreign governments. Plaintiffs' criminal conduct and the decisions by the UK, EU, and Switzerland to punish them are intervening acts that defeat proximate causation. *See Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025) ("Time and again, we have reiterated that §1964(c)'s 'by reason of' language

23

COHEN WILLIAMS LLP

demands 'some direct relation between the injury asserted and the injurious conduct alleged…the key word is 'direct'; foreseeability does not cut it.") (citations omitted).

Nor can Plaintiffs establish the required *domestic* injury.  The alleged victims are foreign persons and entities; the alleged business operations were centered in Switzerland and the UAE; the alleged sanctions were imposed by foreign governments; and the alleged economic injuries concern foreign oil-trading operations and foreign ownership interests. (FAC ¶¶ 26, 79-82 215-220, 341.)  Under *RJR Nabisco*, such injuries are quintessentially foreign and insufficient to support civil RICO standing.  579 U.S. at 346.  Plaintiffs also cannot manufacture a domestic injury by alleging that funds later passed through U.S. bank accounts; those allegations may concern the alleged movement or concealment of proceeds, but they plainly do not concern the location of *Plaintiffs'* supposed injury.  (*See, e.g.*, FAC ¶¶ 430-433.)

Plaintiffs' theory also fails because the alleged injury is inherently speculative and legally untenable.  Plaintiffs essentially claim they lost the opportunity to engage in and continue to profit from Russian oil trading that resulted in sanctions by the UK, EU, and Switzerland.  (*See* FAC ¶¶ 12, 27-30, 305.)  RICO does not protect an expectancy interest in continuing unlawful or sanctionable conduct without governmental interference.  *Cf. Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 n.4 (9th Cir. 2002) (permitting injury of "legal entitlement to business relations"); *see also Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990) (injuries to property are not actionable under RICO absent tangible financial loss).

### 2.    Plaintiffs Fail to Plead the Elements of RICO.

Even if Plaintiffs had RICO standing, they do not plausibly allege the RICO elements: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketing activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

### (a)    Plaintiffs Do Not Plead a RICO Enterprise.

Plaintiffs must plead specific facts showing that an association in fact enterprise has "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to

24

accomplish the purpose." *See Eclectic Props. E. v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (*citing Boyle v. United States*, 556 U.S. 938, 946 (2009)).  Allegations that various Defendants had relationships with Srivastava or participated in business, legal, or reputational activity are insufficient.  *See Ford Motor Co. v. Mikhov*, No. 2:25-CV-04550-MWC-PVC, 2026 WL 691879 (C.D. Cal. Mar. 10, 2026).

Here, Plaintiffs lump together a grab bag of family members, a foundation, business entities, consultants, and lawyers as the "Srivastava Enterprise."  The supporting allegations do not seriously attempt to plead facts to suggest a coherent organization or structure.  The alleged pre-SPA conduct consists almost entirely of Srivastava's supposed "fake CIA" pitch. (*See, e.g.*, FAC ¶¶ 1-4, 11-13, 214-220.)  As for the post-SPA conduct, Plaintiffs point to litigation, whistle-blowing, and media activities after Troost launched his own offensive. (*See, e.g.*, FAC ¶¶ 35-36, 59, 87, 343.)  Plaintiffs cannot manufacture a RICO enterprise by grouping together Srivastava's companies, family, consultants, investigators, lawyers, and public-relations contacts simply because they assisted Srivastava with a business deal or helped respond to Troost's media attacks.  Their allegations describe the fallout from a failed business transaction—not an "enterprise" that is an element of RICO.

### (b)    Plaintiffs Do Not Allege Conduct.

The FAC also fails to plausibly allege that any Defendant conducted or participated in the operation or management of a RICO enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  Instead, the Complaint relies on conclusory allegations that "Defendants" or the "Srivastava Enterprise" engaged in wrongdoing, without plausibly explaining how any one Defendant directed the affairs of the supposed enterprise itself.

Many of the FAC allegations center on Srivastava's alleged promises to deliver a "special" OFAC license and his alleged high-level government connections. (FAC ¶¶ 12-13, 186-192, 216-220.)  The remaining allegations concern business, litigation, investigative, and media activity undertaken after the parties' relationship collapsed. (FAC

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

¶¶ 35-36, 98-99, 343, 367-370.)   There are no plausible factual allegations that any Defendant operated or managed a distinct racketeering enterprise.

### (c)   There is No Pattern of Racketeering Activity.

Plaintiffs' RICO claims also fail because the FAC does not plausibly allege a "pattern of racketeering activity," which requires both: (1) related predicate acts; (2) conduct that amounts to or threatens continued criminal conduct.  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989); *Howard v. Am. Online Inc.*, 208 F.3d 741 (9th Cir. 2000).

As an initial matter, Plaintiffs cannot simply recast events surrounding a failed business deal as predicate acts of mail and wire fraud.  At most, the FAC alleges a commercial dispute, not a pattern of racketeering activity.  *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393 (9th Cir. 1986) (no RICO pattern where alleged predicate acts related to a single transaction with no threat of continuing activity); *Rindal v. Seckler Co. Inc.*, 786 F.Supp. 890, 898-99 (D. Mont. 1992) ("If the pattern requirement has any force whatsoever, it is to prevent this type of commercial fraud/breach of contract claim from being transformed into a federal RICO claim.") (cleaned up).

The FAC likewise fails the relatedness requirement.  Plaintiffs improperly lump together transaction-related communications, litigation, and public statements without showing that these acts constituted predicate crimes sharing common purposes, results, participants, or methods.  *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004).  Where, as here, the alleged acts are functionally part of "a single episode having the singular purpose" of achieving one discrete objective, courts have found no actionable RICO pattern.  *See, e.g., Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992).

Nor does the FAC plausibly allege continuity.  Closed-ended continuity requires "a series of related predicates extending over a substantial period of time," while open-ended continuity requires a threat of ongoing criminal conduct.  *H.J. Inc.*, 492 U.S. at 242.  From the face of the FAC, Plaintiffs appear to contend that the purported scheme ended when Troost "rescinded" the SPA and seized all of PECSA's revenues for himself, including the 50% share of post-June 1, 2022, revenues that, by his own admission, rightfully belonged

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

to 1234 Holding under the SPA.  (FAC ¶¶ 227-229, 339-340.)  These allegations foreclose any plausible inference of continuing racketeering activity.  *See Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992).  Ultimately, the FAC alleges a single failed business deal, subsequent sanctions-related fallout, and years of acrimonious litigation and public sparring.  Those allegations do not constitute a "pattern of racketeering activity" under RICO.

### (d)    The FAC Does Not Satisfy Rule 9(b).

Plaintiffs also fail to satisfy Rule 9(b), which requires plaintiffs to plead the circumstances constituting fraud with particularity by identifying the "who, what, when, where, and how" of the alleged misconduct.  This heightened standard exists to provide defendants fair notice of the claims against them and to protect against conclusory, speculative, or reputationally damaging accusations.  *See* Fed. R. Civ. P. 9(b); *Edwards v. Martin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) ("Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged.") (cleaned up); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (complaint "must set forth what is false or misleading about a statement, and why it is false") (citation omitted).  Rule 9(b) applies to fraud-based RICO predicates and state-law fraud alike and exists to prevent precisely this type of amorphous, reputation-harming pleading.  *See Kearns*, 567 F.3d at 1125.

Here, Plaintiffs' fraud theory is premised on outlandish assertions of false representations about Srivastava's CIA connections and his ability to deliver a secret OFAC license that would protect Plaintiffs from being subjected to sanctions without identifying the requisite details including dates, times, words or context.  (*See* FAC ¶¶ 12, 13, 23, 28.)  Plaintiffs also reference supposed predicate acts of "mail" and "wire" fraud in sweeping, categorical terms, but fail to identify the specific communications supporting each predicate act—including the date, sender, recipient, and substance of the communication, and the role of each Defendant—or explain why any statement was false

27

when made, or how the communication furthered any cognizable scheme. (FAC ¶¶ 424, 426-427, 439.) In many instances, their scattershot allegations are self-contradictory, indecipherable and appear to merely be a catalog of communications that Plaintiffs dislike.

Plaintiffs' own theory also precludes them from pleading reasonable or justifiable reliance. Even assuming the allegedly false promises were made, it would be entirely unreasonable and implausible for Plaintiffs to rely upon a "guarantee" that they could violate the law and somehow be "protected by the U.S. government." (*See* FAC ¶¶ 440, 444, 457, 463.) Similarly, it would be completely unjustified and implausible for Plaintiffs to rely upon a promise "guaranteeing that [Defendants] could prevent Plaintiffs from being sanctioned by the U.S. government." (*Id.*) *See, e.g.*, *Hoffman v. 162 N. Wolfe LLC*, 228 Cal.App.4th 1178 (2014), *as modified on denial of reh'g* (Aug. 13, 2014) (whether reliance is justifiable may be decided as a matter of law if reasonable minds can come to only one conclusion); *see also Seeger v. Odell*, 18 Cal.2d 409, 415 (1941) (if conduct of plaintiff was "manifestly unreasonable ... he will be denied a recovery"). Yet this is the central theory of Plaintiffs' case. And their own allegations also show that "damages" in the form of severe international sanctions flowed from their own misconduct, not from any alleged fraud by Defendants. Plaintiffs' failure to plead fraud with particularity, and their inability to allege reasonable reliance or damages, precludes them from satisfying Rule 9(b).

### (e) The FAC Engages in Group Pleading.

Plaintiffs' allegations are also impermissibly collective. Plaintiffs must allege facts showing that *each* defendant participated in the conduct of the purported enterprise through a pattern of racketeering activity. *See, e.g.*, *In re Wellpoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F.Supp.2d 1002, 1035 (C.D. Cal. 2011) (In RICO action, "… a plaintiff must allege at least two predicate acts by *each* defendant."). The FAC repeatedly attributes conduct to "Defendants" or the "Srivastava Enterprise", without identifying which Defendant committed which predicate act, directed which activity, or managed the alleged enterprise. Such group pleading is insufficient under Rules 8 and 9(b), particularly in the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

RICO context.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (Rule 9(b) does not permit plaintiffs to "lump multiple defendants together").

### 3.    No RICO Conspiracy Because No Substantive RICO Claim.

Plaintiffs' RICO conspiracy claim brought under 1962(d) fails for the same reasons as the substantive RICO claim.  A RICO conspiracy claim requires a plausible allegation that each defendant agreed to participate in the conduct of an enterprise through a pattern of racketeering activity.  *Howard*, 208 F.3d at 751.

### D.    The State Claims Also Fail and Must Be Dismissed and Stricken.

Plaintiffs' state law claims for fraudulent misrepresentation, conversion and unfair business practices are based on the same deficient and self-defeating allegations as the RICO claims.  (*See, e.g.*, FAC ¶¶ 440, 444, 457, 463 (asserting liability for "falsely guaranteeing that they could prevent Plaintiffs from being sanctioned by the U.S. government").)  They too are legally deficient and should be dismissed under Rule 12(b)(6) and stricken on anti-SLAPP grounds.

Plaintiffs' state law claims—like the RICO claims—are premised in large part on First Amendment protected activities including, for example, filing criminal complaints "around the world," including a "criminal complaint in Dubai" (FAC ¶ 59, 87); reporting Plaintiffs to authorities and causing Plaintiffs to become "targets" of sanctions imposed first by the United Kingdom, and later by the European Union and Switzerland.  (*See* FAC ¶ 343, Orig. Complaint ¶ 13, Decl. Ex. Q); and engaging in other activities intended to call regulatory, prosecutorial, and public attention to Plaintiffs' illegal activities.  *See supra* at Section IV.B, pp. 22-23.

Because the Srivastava Defendants have made a *prima facie* showing that the state law claims arise from constitutionally protected speech, the burden shifts to Plaintiffs to establish a probability of success on the merits.  *Makaeff*, 715 F.3d at 261.  Here, Plaintiffs cannot satisfy their burden because they cannot allege the essential elements of any of their state law claims.  The FAC fails to allege facts to support a claim for fraudulent misrepresentation, either with the requisite particularity or at all.  *See, e.g.*, *Lazar v.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

*Superior Ct.*, 12 Cal.4th 631, 638 (1996).  The FAC fails to plead a claim for conversion because Plaintiffs do not plausibly allege wrongful dominion over any specifically identifiable property independent of the parties' contractual and ownership disputes arising from the SPA.  *Lee v. Hanley*, 61 Cal.4th 1225, 1240 (2015).  And the Section 17200 claim is entirely derivative and duplicative of Plaintiffs' deficient fraud and conversion theories.  *Gray v. Dignity Health*, 70 Cal.App.5th 225 (2021).

**V.   CONCLUSION**

For the foregoing reasons, the Court should grant the Srivastava Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint and also grant the Srivastava Defendants' Anti-SLAPP Motion to Strike.

Dated:  July 13, 2026                    **COHEN WILLIAMS LLP**

By:    _____*/s/ Paul B. Salvaty*_____
Paul B. Salvaty
Attorney for Defendants Gaurav Srivastava, Cedar West Ventures, LLC, Unity Resources Group, Inc., Orbimo Corporation, Unicom Worldwide, Inc. Birdsong Central LLC, Aurora Point LLC, and The Gaurav Srivastava Foundation f/k/a The Gaurav and Sharon Srivastava Family Foundation

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

## FILER'S CERTIFICATION

I certify that the parties met in person or by videoconference, thoroughly discussed each and every issue raised in the motion, and attempted in good faith to resolve the motion in whole or in part.  Additional details of the parties' meet and confer efforts are detailed in my Declaration filed concurrently herewith.

*/s/ Paul B. Salvaty*
Paul B. Salvaty

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT