# EXHIBIT B

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 2 of 78   Page ID
#:1217

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

NIELS TROOST,

                      Plaintiff/Counterclaim-Defendant

      -against-

THE ARKIN GROUP DE LLC D/B/A THE ARKIN
GROUP, AND VICTORIA KATAOKA

              Defendants/Counterclaim-Plaintiffs.

-------------------------------------------------------------------x

Index No. 150236/2026

**ANSWER, AFFIRMATIVE
DEFENSES AND
COUNTERCLAIM**

## ANSWER

### PRELIMINARY STATEMENT

Defendants below answer with respect to many of the allegations in the Complaint that they lack knowledge or information sufficient to form a belief as to the truth of facts alleged. To be clear, such answers are not an admission by Defendants that they lack *any* knowledge or information upon which they could form a belief as to the truth of those allegations. As Defendants articulate in their Counterclaim, and Defendants conducted exhaustive research into many of the facts alleged in the Complaint and, based on that research, believe that many such allegations are false. Instead, such answers reflect Defendants' lack of personal knowledge as to these allegations—for example, the authenticity of alleged audio recordings whose original copies have never been provided to Defendants, or the content of communications to which Defendants were not party—and therefore Defendants cannot, in accordance with CPLR 3018(a), admit or deny the truth of these allegations.

Defendants respond to the Complaint as follows:

1.     Deny.

1

Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 3 of 78 Page ID #:1218

2. Deny.

3. Admit the allegations in the first sentence of this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

4. Deny.

5. Admit that "Troost entered into a business relationship with Srivastava . . . and transferred 50% ownership of Paramount to Srivastava" and otherwise deny.

6. Admit that "Srivastava never worked for the CIA," lack knowledge or information sufficient to form a belief as to the truth of the allegation concerning the existence of a "secret U.S. government program" and otherwise deny.

7. Deny.

8. Admit that Srivastava "hired Arkin, a [] 'boutique strategic intelligence firm' led by former chief of worldwide operations at the CIA [Acting Deputy Director of Operations], Jack Devine, and former Director of the CIA's Office of Foreign Intelligence Relationships and current member of the Advisory Board of the International Spy Museum, Carol Rollie Flynn"; lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the unnamed "professional government affairs firm"; and otherwise deny.

9. The allegation that Kataoka acted in "her capacity as an agent and employee of Arkin" is a legal conclusion to which no response is required, and to the extent a response is required, Defendants deny that sentence and the remaining allegations in this paragraph.

10. Admit.

11. Lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning "Srivastava and Srivastava's other agents" and otherwise deny.

Case 2:26-cv-00631-AH-MAR   Document 94-4   Filed 07/13/26   Page 4 of 78   Page ID #:1219

12. Deny that Kataoka's statements on the *Targeted* podcast were false or defamatory and that she said "Troost's disinformation campaign" was "racist" and otherwise admit.

13. Deny.

14. Deny the first sentence of this paragraph, admit that Defendants were aware that Troost had alleged the existence of certain recordings prior to Kataoka's statements during the OffshoreAlert conference and on the *Targeted* podcast, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

15. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

16. Deny that Kataoka made "false statements"; admit that Defendants were aware of the existence and content of the referenced *Wall Street Journal* article prior to the OffshoreAlert conference and that "Kataoka cited and included a screenshot of this *Journal* article in the slideshow accompanying her presentation"; and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

17. Admit that this paragraph accurately characterizes what the referenced article said.

18. Admit that Kataoka "stat[ed] during the London conference that the *Journal* 'was itself targeted as part of the disinformation campaign'" and otherwise deny.

19. Admit that "Kataoka referenced a malpractice lawsuit Paramount filed against the law firm Baker Hostetler" and otherwise deny.

20. Admit Kataoka said that "that legal filings are often 'one of the more legitimate sources of information'" and that "Paramount's complaint [] 'wasn't filed by a major law firm. It was filed by a very small esoteric law firm'" and otherwise deny.

3

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 5 of 78   Page ID
#:1220

21.    Admit that Kataoka said "that she conducted robust due diligence before taking on Srivastava as a client" and that Kataoka's due diligence uncovered "a $51 million loan from Paramount's wholly owned subsidiary, PDMCC, to an Indonesian company" and otherwise deny.

22.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

23.    Deny.

24.    Admit.

25.    Lack knowledge or information sufficient to form a belief as to the truth of the allegation that "Troost . . . is the sole owner of Paramount Energy & Commodities SA" and otherwise admit.

26.    Admit.

27.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

28.    Lack knowledge or information sufficient to form a belief as to the truth of the third and last sentences in this paragraph and otherwise admit.

29.    Admit.

30.    Deny that The Arkin Group only "purports" to "be a boutique strategic intelligence firm that helps global clients mitigate risk and maximize opportunities" and otherwise admit.

31.    Admit.

32.    The allegation that Kataoka "is, and at all relevant times was, an agent and employee of Arkin" is a legal conclusion to which no response is required, and to the extent a response is required, Defendants deny that sentence and otherwise admit the allegations in this paragraph.

4

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 6 of 78   Page ID
#:1221

33.    Admit.

34.    Admit.

35.    Admit that nonparty Gaurav Srivastava is Defendants' client, and otherwise deny.

36.    Lack knowledge or information sufficient to form a belief as to the truth of allegations in this paragraph.

37.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

38.    Deny that it is a "false narrative" to assert that "Troost is waging a vicious disinformation campaign against" Srivastava and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

39.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

40.    Deny that "Kataoka made [] false and defamatory statements" and otherwise admit.

41.    Admit.

42.    Deny that Kataoka made "defamatory statements" and otherwise admit.

43.    Admit.

44.    Admit.

45.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

46.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

47.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

5

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 7 of 78   Page ID
#:1222

48.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

49.     Lack knowledge or information sufficient to form a belief as to the truth of the allegation that "Troost and his business partner eventually parted ways" and otherwise admit.

50.     Admit.

51.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

52.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

53.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

54.     Admit the first sentence in this paragraph, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

55.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

56.     Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

57.     Admit that "[i]n February 2022 . . . , Paramount purchased PDMCC," and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

58.     Lack knowledge or information sufficient to form a belief as to the allegation that Paramount "marketed Russian-origin oil purchased indirectly from small, independent producers" and whether "such activities were, at the time, permitted," and otherwise admit.

6

59.    Admit.

60.    Deny that the "allegations that Troost was connected with and working on behalf of the Russian government" were false, and otherwise admit.

61.    Deny that the "claims that Troost had ties to Russian intelligence" were "untrue," admit the first sentence of footnote 23, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

62.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

63.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

64.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

65.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

66.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

67.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

68.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

69.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 9 of 78 Page ID #:1224

70. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

71. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

72. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

73. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

74. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

75. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

76. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

77. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

78. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

79. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

80. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

8

81. Deny the last sentence of this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

82. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

83. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

84. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

85. Admit the first sentence of this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

86. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

87. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

88. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

89. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

90. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

91. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

9

92.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

93.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

94.    Admit that "Srivastava met with Troost in Bali, Indonesia" and that "Troost made three trips to Indonesia in summer 2022" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

95.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

96.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

97.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

98.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

99.    Admit that "Srivastava introduced Troost to high-ranking foreign government officials" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

100.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

101.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

10

102. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

103. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

104. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

105. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

106. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

107. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

108. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

109. Lack knowledge or information sufficient to form a belief as to the truth of the allegation that Troost "omit[ed] any mention of Srivastava, per Srivastava's instructions" and otherwise admit.

110. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

111. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

112. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

11

Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 13 of 78 Page ID #:1228

113. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

114. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

115. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

116. Admit that "Onouye also represented Srivastava and his company, Unity Resources Group" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

117. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

118. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

119. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

120. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

121. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

122. Admit the first sentence of this paragraph except the characterization of CHF 50,000 as a "token" payment and otherwise deny.

12

123.    Lack knowledge or information sufficient to form a belief as to the truth of whether any of the allegations in this paragraph were "[c]ontrary to Srivastava's representations" and otherwise admit.

124.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

125.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

126.    Admit.

127.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

128.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

129.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

130.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

131.    Admit that "in September 2022, Troost executed the final shareholders' agreement" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

132.    Deny that Srivastava "arranged" for Berg to serve as counsel to Paramount, lack knowledge or information sufficient to form a belief as to the truth of the allegation that "Srivastava said that Baker Hostetler had hundreds of lawyers secretly working for the U.S. government as part of a 'special relationship'" and otherwise admit.

13

Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 15 of 78 Page ID #:1230

133. Admit.

134. Deny that "Srivastava touted [Pat Ryan's name] to bolster his fake credentials," lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning Orbimo Corporation, and otherwise admit.

135. Admit.

136. Admit.

137. Admit.

138. Deny.

139. Deny.

140. Admit that the "Arsari Group [] was owned by Hashim Djojohadikusumo, then-Defense Minister Subianto's brother" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

141. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

142. Admit the first sentence of this paragraph, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

143. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

144. Admit that "Giordano-Lascari and Arsari's principal (the Indonesian president's brother) fully executed a set of three promissory notes totalling $25 million" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

14

145. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

146. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

147. Lack knowledge or information sufficient to form a belief as to the truth of the allegation that "Giordano-Lascari complied" and otherwise admit.

148. Admit the first sentence of this paragraph and otherwise deny.

149. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

150. Admit that Srivastava "den[ied] that he stole any of the $51 million" and otherwise deny.

151. Deny that the only reason "Paramount formed a U.S.-based subsidiary" was "[t]o acquire and hold the shares in this company" and otherwise admit.

152. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

153. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

154. Admit that Srivastava "established [an] office in rented space in Los Angeles" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

155. Deny the first sentence of this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

15

156. Admit that Troost had known Reese prior to 2022, otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

157. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

158. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

159. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

160. Admit the first two sentences of this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

161. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

162. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

163. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

164. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

165. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

166. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

FILED: NEW YORK COUNTY CLERK 02/20/2026 10:22 PM
INDEX NO. 150236/2026
NYSCEF DOC. NO. 49
RECEIVED NYSCEF: 02/20/2026

Case 2:26-cv-00631-AH-MAR   Document 94-4   Filed 07/13/26   Page 18 of 78   Page
ID #:1233

167. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

168. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

169. Admit that "Srivastava and Berg traveled to Dubai and met with Mauron and other PDMCC personnel" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

170. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

171. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

172. Deny the first sentence of this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

173. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

174. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

175. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

176. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

177. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

178.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

179.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

180.    Admit that "Troost's companies had [] decided to continue marketing Russian oil over the price cap" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

181.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

182.    Admit the first sentence in this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

183.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

184.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

185.    Admit that "[o]n May 1, 2023, Paramount received an information request from the Swiss regulator, SECO" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

186.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

187.    Deny that "Srivastava had a documented history of fraud" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

18

188.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

189.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

190.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

191.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

192.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

193.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

194.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

195.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

196.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

197.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

198.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

199.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

200.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

201.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

202.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

203.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

204.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

205.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

206.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

207.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

208.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

209.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

20

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 22 of 78    Page
ID #:1237

210.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

211.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

212.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

213.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

214.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in footnote 99 and otherwise deny.

215.    Lack knowledge or information sufficient to form a belief as to the truth of whether "[a]t that point, Troost had enough" and whether Paramount had grounds to "terminate[] Baker Hostetler for cause" and otherwise admit.

216.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

217.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

218.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

219.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

220.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

Case 2:26-cv-00631-AH-MAR  Document 94-4  Filed 07/13/26  Page 23 of 78  Page ID #:1238

221. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

222. Deny that it is "false[]" to "accus[e] Troost of ties to Russia" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

223. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

224. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

225. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

226. Admit the second sentence of this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

227. Admit the second sentence of this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

228. Deny.

229. Admit that "[t]he Wall Street Journal published a [] feature-length article titled 'A Fake Spy, Russian Oil and $1 Million Funneled to Democrats'" and that this paragraph accurately characterizes what the referenced article said, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

230. Admit that this paragraph accurately characterizes what the referenced article said, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

22

FILED: NEW YORK COUNTY CLERK 02/20/2026 10:22 PM
INDEX NO. 150236/2026
NYSCEF DOC. NO. 49
RECEIVED NYSCEF: 02/20/2026

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 24 of 78    Page
ID #:1239

231. Admit that this paragraph accurately characterizes what the referenced article said, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

232. Admit that Srivastava "hired Arkin and Victoria Kataoka" and otherwise deny.

233. Admit.

234. Admit that Srivastava "hired Arkin and Kataoka" and otherwise deny.

235. Admit that "Arkin and Kataoka knew Srivastava posed a significant risk when they accepted him as a client" and that the referenced articles were published, and otherwise deny.

236. Deny.

237. Deny.

238. Admit that Defendants have stated in substance that "Srivastava was a wealthy American businessman who was the victim of a bad business deal with a vindictive former business partner" and that "Troost spent [significant funds] on a disinformation campaign falsely accusing Srivastava lying about being a spy" and otherwise deny.

239. The allegation that Kataoka acted "in her capacity as an agent and employee of Arkin" is a legal conclusion. To the extent a response is required, Defendants deny that sentence and otherwise admit the allegations in this paragraph.

240. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in footnote 122 and otherwise admit.

241. Deny that Kataoka's statements were "defamatory" and otherwise admit.

242. Deny that Kataoka's statements were "false and defamatory" and otherwise admit.

243. Admit.

244. Admit.

23

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 25 of 78    Page
ID #:1240

245.    Admit.

246.    Admit.

247.    Admit.

248.    Admit.

249.    Deny that Kataoka's allegations were "false[]" and otherwise admit.

250.    Admit.

251.    Admit.

252.    Admit.

253.    Admit the last sentence of this paragraph and otherwise deny.

254.    Deny that Kataoka "disregarded Paramount's lawsuit" and otherwise admit.

255.    Deny that Kataoka's "advis[ing] Srivastava to 'play clean,' mean[t] he could not be seen publicly accusing Troost of waging a disinformation campaign against him while he was doing the same against Troost's family," lack knowledge or information sufficient to form a belief as to the truth of the allegations in footnote 141, and otherwise admit.

256.    Admit the first sentence of this paragraph and otherwise deny.

257.    Deny that the "narrative portrayed by Srivastava, Arkin, and Kataoka" was "false," and admit that this paragraph otherwise accurately characterizes what the referenced article said.

258.    Deny that Srivastava's "counter-narrative" was "fabricated" and otherwise admit that this paragraph accurately characterizes what the referenced article said.

259.    Deny that the "narrative" "put forward by Kataoka" and "repeated" by Srivastava was "false" and otherwise admit that this paragraph accurately characterizes what the referenced article said.

260.    Admit that this paragraph accurately characterizes what the referenced article said.

24

261.    Admit the first sentence of this paragraph and otherwise deny.

262.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

263.    Deny.

264.    Admit.

265.    Admit that "Troost sold [Livna Shipping] in 2018" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

266.    Deny the first sentence of this paragraph and that Defendants "had articles published by pay-to-play media outlets quoting from Kataoka's presentation at the OffshoreAlert conference" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

267.    Admit.

268.    Admit that this paragraph accurately characterizes what the referenced article said.

269.    Deny that Defendants "paid for TechBullion's content writing and promotion services to amplify the digital reach of Kataoka's comments during the conference" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

270.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

271.    Lack knowledge or information sufficient to form a belief as to the truth of the allegation that "[t]he lack of attribution to a real author is a hallmark that the article is pay-to-play content" and otherwise admit that this paragraph accurately characterizes what the referenced article said.

25

Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 27 of 78 Page ID #:1242

272. Deny that Defendants "paid FingerLakes1.com to" "publish[] the story" or that Defendants "commissioned a story on FingerLakes1.com" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

273. Admit that this paragraph accurately characterizes what the referenced article said and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

274. Deny that Defendants engaged in any of the conduct alleged in this paragraph and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

275. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

276. This allegation is a legal conclusion to which no response is required. To the extent a response is required, Defendants deny.

277. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

278. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

279. Admit that "*Targeted* released a two-part episode about Srivastava and Troost," and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

280. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

26

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 28 of 78    Page ID #:1243

281. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

282. Deny that Kataoka's statements during the OffshoreAlert conference and on the *Targeted* podcast were false and otherwise admit.

283. Admit.

284. Admit.

285. Admit.

286. Deny that Kataoka "dismissed those well-sourced, credible articles because they contradicted her preconceived narrative" and the characterization "[w]orse" and otherwise admit.

287. Admit.

288. Deny that Kataoka's accusations were "incredible" and otherwise admit.

289. Deny the characterization that "Kataoka doubled down" and that Kataoka said "racist tricks" and otherwise admit.

290. Admit that Srivastava "had lunch with Hunter Biden in Los Angeles as recently as January 2025" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

291. Deny.

292. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

293. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

294. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

27

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 29 of 78    Page ID #:1244

295.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

296.    Admit that Defendants investigated and were aware of the lawsuits listed in this paragraph but deny the characterizations of those lawsuits and that they constitute a "long, publicly documented history of fraud."

297.    Admit that Defendants "reviewed Srivastava's civil litigation history" and were aware of the lawsuits identified in paragraph 296, and otherwise deny.

298.    Deny that "the lawsuits in which Srivastava personally was a named defendant or a critical third party go directly to Srivastava's reputation for honesty and fair dealing" and otherwise admit.

299.    Admit that "Defendants also knew about . . . Paramount's malpractice lawsuit against Berg and Baker Hostetler" and that the final sentence of this paragraph accurately characterizes the allegations made in that lawsuit, and otherwise deny.

300.    Admit that Kataoka said that "the lawsuit" was "brought by a 'small' and 'esoteric' law firm," that "Berg no longer works at Baker Hostetler," and that "there was widespread reporting on the lawsuit" and otherwise deny.

301.    Deny.

302.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

303.    Deny.

304.    Admit that Defendants "knew of, and thoroughly reviewed" the *Wall Street Journal*, *Financial Times*, and Project Brazen reporting and otherwise deny.

28

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 30 of 78   Page
ID #:1245

305.    Admit that Kataoka "discredit[ed]" the referenced articles, deny that the referenced articles cited "reliable sources" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

306.    Deny.

307.    Admit that "Troost authorized his representatives to share precisely this information with a prominent D.C.- based international law firm that [] represented Srivastava on the condition that the information would not be shared with Srivastava personally" and that "a prominent law firm in the United Kingdom that represented Srivastava also requested this information from Troost [but] Troost did not provide it" and otherwise deny the allegations in this paragraph and footnote 184.

308.    Admit that *Politico* published the referenced article and otherwise deny.

309.    Admit that this paragraph accurately characterizes what the referenced article said and that "Defendants were aware of this *Politico* reporting."

310.    Deny that Defendants "recognized that Srivastava's credibility was dubious at best" and that they "publicly touted the in-depth nature of their due diligence [] specifically to throw Arkin's institutional credibility behind Srivastava's fabricated claims" and otherwise admit.

311.    Admit the second and third sentences of this paragraph except the characterization of these sentences as "example[s]" and otherwise deny.

312.    Admit that this paragraph accurately characterizes what the referenced article said and otherwise admit.

313.    Deny.

314.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

29

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 31 of 78    Page ID #:1246

315.    Admit that Kataoka saw certain of "these communications" and that she "requested that Srivastava provide her with background on the funds he used to pay for his mansion" and otherwise deny.

316.    Admit that "Kataoka and Arkin were also aware of the [] financial payment that Srivastava made to become a 50% owner of Paramount," lack knowledge or information sufficient to form a belief as to the truth of the last sentence of this paragraph, and otherwise deny.

317.    Deny.

318.    Admit the last three sentences of this paragraph and otherwise deny.

319.    Deny.

320.    Admit that "Troost and his companies [have been] sanctioned by the EU, UK, and Switzerland" and otherwise deny.

321.    Deny.

322.    Deny.

323.    Deny that Defendants' claims were "false" and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

30

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to allege facts sufficient to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the substantial truth doctrine.

### THIRD AFFIRMATIVE DEFENSE

The Complaint challenges statements allegedly made by Defendants about Plaintiff that contain no provably false assertions of fact and are therefore not actionable.

### FOURTH AFFIRMATIVE DEFENSE

Defendants' statements complained of are protected by and privileged under the First and Fourteenth Amendments to the Constitution of the United States, and by the free speech and press provisions of the Constitution and statutory and common law of the state law jurisprudence applicable to the state law substantive issues of this case.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff is limited-purpose public figures for purposes of this action. As a result, Plaintiff may not recover any damages in this action unless he proves, in addition to the other elements of his case, by clear and convincing evidence, that Defendants published the alleged statements with actual malice.

### SIXTH AFFIRMATIVE DEFENSE

Any damages or injuries sustained by Plaintiffs were caused, in whole or in part, by the acts and omissions of Plaintiff himself, or any of his agents, employees, or other representatives and any recovery is therefore barred or reduced in accordance with Plaintiff's own conduct.

31

FILED: NEW YORK COUNTY CLERK 02/20/2026 10:22 PM
INDEX NO. 150236/2026
NYSCEF DOC. NO. 49
RECEIVED NYSCEF: 02/20/2026

Case 2:26-cv-00631-AH-MAR   Document 94-4   Filed 07/13/26   Page 33 of 78   Page
ID #:1248

## SEVENTH AFFIRMATIVE DEFENSE

The sole and proximate cause of the incidents complained of in the Complaint were the acts and/or omissions of parties and/or entities other than Defendants.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff was bound to exercise reasonable care and diligence to avoid loss and to minimize his damages, if any existed, and Plaintiff may not recover for losses which could have been prevented by reasonable efforts on his part or by expenditures that he might reasonably have made.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of waiver.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of estoppel.

## THIRTEENTH AFFIRMATIVE DEFENSE

At all times referenced in the Complaint, Defendants acted in good faith and did not directly or indirectly act or induce any act or acts contributing to the alleged damage suffered by Plaintiff.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the protections of New York's "Anti-SLAPP" statute, Civil Rights Law §§ 70-a, 76-a.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because he will be unable to establish that the challenged statements were published with the requisite degree of constitutional fault.

32

## SIXTEENTH AFFIRMATIVE DEFENSE

Defendants reserve the right to assert all defenses which may be pertinent to or arise from said Complaint once the precise nature of such claims and causes of action are ascertained through discovery. Defendants hereby reserve the right to amend this Answer and/or assert additional affirmative defenses, if applicable.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray for judgment as follows:

a)      That Plaintiff take nothing by his Complaint;

b)      That the Complaint be dismissed in its entirety with prejudice;

c)      That Judgment be entered in favor of Defendants;

d)      For reasonable attorneys' fees and costs of suit incurred herein; and

e)      For such other and further relief as the Court deems just and proper.

## COUNTERCLAIM

### SUMMARY OF THE ACTION

1. The Arkin Group ("TAG") and Victoria Kataoka ("Kataoka," and together with TAG, "Defendants") bring this counterclaim against Plaintiff/Counterclaim-Defendant Niels Troost ("Troost") to seek costs, attorney's fees, compensatory damages, punitive damages, and other relief under New York's "Anti-SLAPP" statute, Civil Rights Law §§ 70-a, 76-a.

2. This lawsuit strikes at the heart of the First Amendment.[1] Troost, a 25-year veteran of the oil trade and long-time enabler of the Russian Federation, seeks to use his private fortune to silence Defendants for publicly reporting the conclusions of their two-month investigation into Troost's business dealings with nonparty Gaurav Srivastava ("Srivastava")—conclusions Troost evidently finds unflattering.

3. By mid-2022, Troost's business of selling Russian oil through his company Paramount Energy & Commodities SA ("Paramount SA") faced an existential threat, with impending sanctions set to eliminate its main source of revenue. Troost sought out Srivastava, a businessman with access to non-Russian commodities markets, to help rescue Paramount SA. After months of discussion, Srivastava agreed and acquired 50% of the company.

4. When an audit urged by Srivastava later revealed Troost had likely been offloading company assets without Srivastava's knowledge, the partnership collapsed. At the same time, Troost faced increasing scrutiny from regulators and the press for conduct that appeared to violate Western sanctions. To deflect attention away from his bad behavior and forestall further inquiry,

---

[1] Troost previously filed a substantively identical lawsuit against Defendants in August 2025 in the United States District Court for the Southern District of New York. *See Troost v. The Arkin Group et al.*, No. 25-cv-6487 (S.D.N.Y.) ("Federal Action"). Troost voluntarily dismissed that complaint on November 26, 2025.

Troost advanced what Defendants concluded was a coordinated disinformation campaign against Srivastava—accusing him of telling Troost that he was a "non-official cover" operative (or "NOC") for the Central Intelligence Agency ("CIA") who could procure a secret license from the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") that would allow Troost's companies to continue trading Russian oil above the internationally imposed price cap following Russia's invasion of Ukraine.

5.      Defendants' investigation also uncovered what appears to be a second motivation for this (and other) baseless lawsuits brought by Troost: Evidence that his businesses are tied to the state-backed Russian petroleum trade—including dealings with sanctioned counterparties, Kremlin-linked entities, and individuals believed to have intelligence ties.

6.      The statements Troost challenges in this lawsuit were made in two contexts: First, when Kataoka, a former intelligence analyst for the New York Police Department, summarized Defendants' investigation while speaking at an international symposium in December 2024; and second, when Kataoka discussed the same research during a podcast interview in March 2025.

7.      In both instances, Defendants had full confidence in the accuracy of Kataoka's statements.  That confidence has only grown since.

8.      In TAG's 25 years of existence, it has never once run a disinformation campaign or worked on any project to defame anyone.  Nor has Kataoka.  As is discussed extensively below, this case is not the exception.

9.      Naked attempts at censorship like the one Troost pursues here do not stand under the United States Constitution.  At the core of the First Amendment are protections for speech about political controversies.  Those protections empower individuals and entities like Defendants who research such controversies to speak honestly about their findings.

35

10. Strategic lawsuits against public participation ("SLAPP suits") are lawsuits used to punish speakers for exercising their First Amendment rights by forcing them to spend time and money defending against baseless claims. New York has enacted legislation designed to provide redress to those, like Defendants, who are targeted by SLAPP suits (the "New York anti-SLAPP law"). Under the New York anti-SLAPP law, defendants to an "action involving petition and public participation" may bring a claim for damages where the underlying action "was commenced or continued without a substantial basis in fact and law." Civil Rights Law § 70-a(1)(a).

11. It is among the fundamental principles of American law that truth is an absolute defense to defamation. And, under both the New York anti-SLAPP law and the United States Constitution, Troost is prohibited from recovering in this action unless he can prove, by clear and convincing evidence, that Defendants made the allegedly defamatory statements with actual malice—that is, with knowledge of falsity or with reckless disregard for the truth. Civil Rights Law § 76-a(2).

12. The statements Troost challenges through this lawsuit sprang from an eight-week investigation that relied upon first-hand interviews, email correspondence, text messages, corporate filings, media coverage, social-media posts, litigation filings, bankruptcies, judgments, liens, government licensing and permitting, industry sanctions, criminal records, public databases, and so on. Kataoka's state of mind at the time the contested statements were made was not one of doubt—it was one of reasoned confidence, the antithesis of actual malice.

13. Troost concedes his dispute with Srivastava is a matter of public concern. Troost himself encouraged the *Financial Times* and the *Wall Street Journal* to report on the dissolution of their professional relationship. And Troost worked to ensure his claims were repeated in the press

36

at least 350 times in pay-for-play publications, as well as in other media, including Wikipedia and YouTube.

14.     Troost's lawsuit lacks a substantial basis in law and fact because it challenges speech unequivocally protected by the First Amendment.  Troost will neither be able to prove that Defendants' statements were false, nor that Defendants acted with actual malice.  Troost's apparent theory on actual malice indeed conveys a crude understanding of the investigative process. Defendants did not *ignore* the evidence Troost claims they ignored, but rather reviewed those documents alongside countless other source materials and, drawing on their extensive professional experience, reached conclusions contrary to what Troost would have hoped.

## FACTUAL ALLEGATIONS

**I.      Troost's History of Trading Russian Oil, the Russian Invasion of Ukraine and Troost's Sanctioning**

    A.      <u>Troost founds Paramount as the culmination of his extensive history trading Russian oil.</u>

15.     Troost is a sophisticated businessman with nearly three decades of experience trading Russian oil.

16.     Early in his career, Troost held senior positions at Taurus Petroleum Services Limited ("Taurus") where he managed Taurus' Russian oil business.[2]  Taurus was involved in the United Nations' Oil-for-Food Program, a 1995-2003 initiative through which Iraq was permitted to sell sanctioned oil on the condition that proceeds be used to purchase humanitarian supplies.[3] Upon information and belief, private companies that traded Iraqi oil in connection with the Oil-

---

[2] https://hrvoices.org/document/volcker-report-manipulation-of-the-oil-for-food-programme-by-the-iraqi-regime/

[3] https://hrvoices.org/document/volcker-report-manipulation-of-the-oil-for-food-programme-by-the-iraqi-regime/; https://www.govinfo.gov/content/pkg/CHRG-109shrg24445/html/CHRG-109shrg24445.htm; https://www.theguardian.com/business/2007/feb/14/iraq.oilandpetrol

for-Food Program and transacted business with United States entities would have required a license from OFAC.[4]

17.    The Oil-for-Food Program ended in controversy when subsequent investigations uncovered systematic corruption.[5]  Taurus was among the private companies accused of sanctions evasion in connection with the program in a 2005 United Nations report.[6]  The report identified Troost by name no fewer than nine times.[7]  Upon information and belief, Troost has understood the mechanics and necessity of OFAC licenses for over two decades.

18.    After Taurus, Troost joined Rosneft Trading, a Swiss subsidiary of Russia's largest state-owned oil producer.[8]

19.    In 2009, Troost founded Tenergy Trading SA ("Tenergy"), an energy firm involved in the Russian oil trade.  Following Russia's invasion of Ukraine in 2014, Tenergy's main supplier was sanctioned by OFAC for providing "material support" to individuals connected to the Kremlin.[9]  Tenergy's trading activity dwindled thereafter.[10]

20.    In 2017, Troost founded Paramount SA, an energy trading firm based in Switzerland dealing primarily in Russian crude.

21.    Troost remained Paramount SA's sole shareholder until mid-2022, and appointed Maurice Taylor ("Taylor") as Paramount SA's nominal director.  Pursuant to a fiduciary agreement

---

[4] https://www.govinfo.gov/content/pkg/CDOC-108hdoc117/html/CDOC-108hdoc117.htm
[5] https://www.cfr.org/backgrounders/iraq-oil-food-scandal
[6] https://reliefweb.int/report/iraq/iraq-management-un-oil-food-programme
[7] https://www.files.ethz.ch/isn/13894/ManipulationReport.pdf
[8] https://www.csis.org/analysis/russias-national-oil-champion-goes-global#:~:text=Rosneft's%20transformation%20as%20Russia's%20national,billion%20cubic%20meters%20in%202016; https://www.rosneft.com/about/Rosneft_today/
[9] https://home.treasury.gov/news/press-releases/jl0133
[10] https://www.wsj.com/economy/trade/little-known-commodity-traders-help-russia-sell-oil-11653643583

38

FILED: NEW YORK COUNTY CLERK 02/20/2026 10:22 PM     INDEX NO. 150236/2026

NYSCEF DOC. NO. 49     Case 2:26-cv-00631-AH-MAR     Document 94-4     Filed 07/13/26     Page 40 of 78   Page     RECEIVED NYSCEF: 02/20/2026

ID #:1255

dated January 13, 2017, Taylor agreed to carry out his duties in connection with Paramount SA according to Troost's instructions. He further agreed that Troost could require his resignation at any time, in exchange for indemnity by Troost.

**B.** **Russia's invasion of Ukraine existentially threatened Paramount's oil-trading business.**

22. In early December 2021, reports of Russian troops amassing on the Ukrainian border emerged, with news outlets speculating that an invasion was likely.[11] By late January 2022, experts viewed war between Russia and Ukraine as inevitable.[12]

23. This geopolitical climate would soon threaten Paramount SA's operations. In early February, Troost took action that would later allow him to move Paramount SA's oil business to the United Arab Emirates ("UAE"), a country that has garnered a reputation for its permissive approach towards sanctions enforcement.[13]

24. On February 2, 2022, Paramount SA acquired Paramount Energy & Commodities DMCC ("Paramount DMCC"), a Dubai entity that, upon information and belief, had no prior operations. By means of Paramount SA, Troost became 100% owner of Paramount DMCC.

25. Francois Mauron ("Mauron") was appointed as nominal director of Paramount DMCC. As Taylor had done at Paramount SA, Mauron executed an agreement to carry out his duties as nominal director of Paramount DMCC in accordance with Troost's instructions.

26. On February 24, 2022, Russia launched a full-scale invasion of Ukraine. Sanctions targeting the Russian oil trade followed shortly thereafter. On March 8, 2022, the United States

---

[11] https://www.washingtonpost.com/national-security/russia-ukraine-invasion/2021/12/03/98a3760e-546b-11ec-8769-2f4ecdf7a2ad_story.html; https://www.bloomberg.com/news/articles/2021-11-21/u-s-intel-shows-russian-plans-for-potential-ukraine-invasion

[12] https://www.chathamhouse.org/2022/01/russia-ukraine-war-imminent

[13] *See* https://thesoufancenter.org/intelbrief-2023-january-12/

39

banned the import of Russian crude oil and restricted U.S. investment in nearly all Russian energy companies.[14]

27.    While U.S. sanctions prompted all but a very few European traders to reduce their Russian oil operations (if not abandon their positions altogether),[15] Troost took a different approach.  On March 29, 2022, Swiss watchdog Public Eye reported that, from February 2022 through March 2022, Paramount SA acquired 11.7 million barrels of Russian oil, making Troost the fourth largest purchaser of Russian oil in the world.[16]  Such a boon, however, could not last. On May 27, 2022, the *Wall Street Journal* published an article referencing Paramount SA, among others, titled "Little Known Commodity Traders Help Russia Sell Oil."[17]

28.    On May 4, 2022, the European Commission announced that the European Union would seek to ban all imports of Russian crude oil within the next six months.[18]  On December 3, 2022, the European Union followed through, setting a price cap on trading and brokering Russian crude oil at $60 per barrel.  Switzerland adopted identical sanctions on December 16, 2020.

---

[14] *See* Executive Order 14066, "Prohibiting Certain Imports and New Investments With Respect to Continued Russian Federation Efforts To Undermine the Sovereignty and Territorial Integrity of Ukraine."  87 FR 13625 (March 8, 2022).

[15] www.ft.com/content/eb3b3ea1-5aaa-4136-8f02-01b76fc8f405

[16] www.publiceye.ch/en/topics/ukraine/commodity-trading-with-russia/the-kremlins-crude-friendships; https://www.publiceye.ch/en/media-corner/press-releases/detail/the-astonishing-rise-of-a-small-swiss-trader-in-russian-oil

[17] www.wsj.com/economy/trade/little-known-commodity-traders-help-russia-sell-oil-11653643583?gaa_at=eafs&gaa_n=AWEtsqc16lEhK7Bqj7PWDFJ2CVwlTK0cowK1LVisHiLC1Dx25ZHoKewa48Y084BuUJk%3D&gaa_ts=698299ad&gaa_sig=VcFPAy64n_A5fWMUtPrEQgoPRBcu8egevof85S3whKPqDzeiKrVBPsoZqp3WMxbNRlQ3m3v5rMNHXzJ-snwkgQ%3D%3D

[18] www.reuters.com/business/energy/eu-chief-proposes-russian-oil-ban-over-war-ukraine-2022-05-04/

40

C.    The United Kingdom, European Union and Switzerland impose sanctions against Troost.

29.    Defendants' due diligence, described in greater detail below, included reviewing an audit of both Paramount entities—namely, Paramount SA and Paramount DMCC—that indicated that, from May 2022 through approximately March 2023, Paramount DMCC traded roughly $5 billion worth of Russian oil, yielding a profit of $1.8 billion.

30.    Paramount DMCC continued to trade Russian oil at prices exceeding the EU and Swiss price cap after December 2023.  Upon information and belief, Troost personally directed Paramount DMCC's trading activity during this period in contravention of Western sanctions.[19]

31.    On February 22, 2024, the United Kingdom sanctioned Troost and Paramount SA, finding that "Troost facilitates the unfettered trade of Russian oil outside the reach of UK and G7 sanctions, including through UAE-based [Paramount DMCC]."[20]

32.    On December 16, 2024, the European Union sanctioned Troost, Paramount SA, and Paramount DMCC, finding that: "In June 2022, [Paramount DMCC] took over and continued without interruption [Paramount SA]'s oil business vis-a-vis Russia, underlining close and direct operational and strategic control of [Paramount SA] over its subsidiary, [Paramount DMCC]. [Paramount DMCC] repeatedly traded Russian crude oil above the price cap after its introduction. Moreover, Niels Troost is affiliated with Livna Shipping Ltd ["Livna"], which has been trading crude oil above the oil price cap after its introduction."[21]

---

[19] In a document dated March 2, 2023, Paramount DMCC represented to its attorneys at BakerHostetler that no transactions related to Russian oil had been effected since the introduction of the price cap in December 2022.

[20] https://www.gov.uk/government/news/new-uk-sanctions-mark-two-years-since-russias-illegal-invasion-of-ukraine

[21] https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=OJ:L_202403183.    Defendants' due diligence indicates that Livna is the booking entity that handled all of Paramount SA's shipments. According to a third-party audit reviewed by Defendants, there are 260 book entries for Paramount entities for close to $100 million in business with Livna during a yearlong period in 2022.  Troost

41

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 43 of 78    Page
ID #:1258

33.     On December 23, 2024, Switzerland adopted the European Union's sanction of Troost.[22]

34.     The United Kingdom's Office of Financial Sanctions Implementation last updated its statement of reasons for sanctioning Troost on April 14, 2025 to say: "TROOST is or has been involved in obtaining a benefit from or supporting the Government of Russia by owning and/or controlling directly or indirectly [Paramount DMCC], which is an involved person in that it is or has been carrying on business in a sector of strategic significance to the Government of Russia, namely the Russian energy sector."[23]

## II.     Troost's Partnership with Srivastava and its Dissolution

### A.     Troost solicits Srivastava's help to save Paramount SA by diversifying its business

35.     By the end of May of 2022, Paramount SA had transferred all of its Russian oil activity (*i.e.,* its primary line of business) to its Emirati subsidiary, Paramount DMCC.  With Paramount SA's profitability gone, Troost needed help to rebuild the company outside the Russian oil trade.

36.     Nonparty Gaurav Srivastava is a businessman with a history of successful ventures that have led to connections in commodities markets across Africa, the Middle East, and Southeast Asia.  Prior to February 2022, Srivastava had never heard of Troost, nor his business Paramount SA.

---

used to own Livna and sold it in 2018 to Michael Wen Paen Chang, Troost's fiduciary at the time and who remains the fiduciary for another Troost entity, Paramount Energy Ltd in Hong Kong. Defendants have been unable to find a shipment in the ledger booked by Livna that was not associated with a Troost entity.  Furthermore, Livna and its identified counterparty Altoprae Marine, which has subsequently been linked to the "dark fleet" and individuals with strong ties to Gennady Timchenko. *See* https://istories.media/en/stories/2025/08/01/shadow-fleet-timchenko/?tztc=1.

[22] https://www.news.admin.ch/en/nsb?id=103694
[23] https://sanctionssearchapp.ofsi.hmtreasury.gov.uk/suspect/16413

42

Case 2:26-cv-00631-AH-MAR   Document 94-4   Filed 07/13/26   Page 44 of 78   Page ID #:1259

37.     In early 2022, Troost requested an introduction to Srivastava through a mutual associate, Habib Kagimu.  Troost's proposal was for Srivastava to leverage his network to help expand Paramount SA's trading activity into new geographic markets and non-oil commodities. In exchange, Troost offered Srivastava 50% equity in the company.  Troost expressed to Srivastava that without such a pivot, Paramount SA's business would collapse.

38.     Troost described the logic of the partnership to Paramount SA employees as follows:

*I've agreed to team up with a new partner who will join as an equal shareholder in Parencom. [...]*

*The principle idea is a 50/50 ownership split and all the money made up until the new shareholding is finalised is not part of the new deal and remains the current shareholder's money. The idea is not to take any money out of the company if it is not necessary and leave the company well capitalised. [...]*

*Eventually, after a number of years, we might sell the entire company or a stake in it to an outside entity, so please also think about long-term planning.*

*We will grow the activity of the company worldwide and the new shareholder's input will consist of making his worldwide network available and my input will be to make our trading and financing expertise available. [...]*

39.     Troost continued to pursue Srivastava to discuss his proposal through the end of May 2022.  Srivastava eventually asked his business representative Nicolas Bravard ("Bravard") to meet with Troost to learn more about the proposal.  The pair arranged an in-person meeting on June 7, 2022; Troost sent his private plane to transport Bravard to Switzerland for the meeting.

40.     Srivastava and Troost began a period of negotiations and, in late July 2022, Troost flew to Bali where Srivastava was vacationing with his family to finalize the terms of the deal.

41.     On July 29, 2022, Troost and Srivastava entered a share purchase agreement (the "SPA") through their respective holding companies, EZI-Diaroc Holding SA and 1234 Holding SA.  Pursuant to the SPA, Srivastava acquired 50% of Paramount SA in exchange for Troost receiving (1) a cash payment equaling approximately $52,400 and (2) entitlement to an ex-

43

Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 45 of 78 Page ID #:1260

dividend distribution based on all of Paramount SA's earnings through May 31, 2022 (the "Ex-Dividend Payment"), with the exact amount to be calculated on a future date by an external audit.

42. The Ex-Dividend Payment was a significant component of the total purchase price. Troost estimated the value of Paramount SA through May 31, 2022 was approximately $350 million. The period thereafter (when Srivastava's economic interests would kick in) did not look promising for the firm. As illustrated *supra*, by May 4, 2022, the European Union was publicly preparing an embargo on Russian oil, *i.e.*, Paramount SA's primary source of revenue.

43. On September 27, 2022, Troost and Srivastava entered into a Shareholders' Agreement consummating the deal (the "SHA").

44. One component of Troost's vision in diversifying Paramount SA was to move the company's legal headquarters from Switzerland to the United States, which would, among other things, enable greater access to U.S. capital markets and financial system. Paramount SA retained the U.S. law firm BakerHostetler to assist in this process.

45. On January 8, 2023, Troost wrote to his Swiss counsel: "Gaurav [Srivastava] and I would like to know if we can put the holding company that owns Paramount in the US, instead of Switzerland, and make S.A. a daughter company of the US holding company. So, instead of Unicom Holding S.A. [a contemplated new entity] owning Paramount (as we were planning), could we have Unicom Holding USA own Paramount S.A.? What would be the tax consequences? For me personally? For the company? Basically all companies would be ultimate daughter companies of a U.S. mother company. Please advise the best way to structure this."

46. In anticipation of Paramount SA redomiciling to the United States, BakerHostetler performed regulatory compliance work, which included the creation and attempted implementation of an employee handbook and, in one instance, meeting with OFAC.

44

B.      Srivastava conducts an audit and discovers Troost's apparent improprieties

47.     Pursuant to the SHA, Troost was to receive the Ex-Dividend Payment no later than April 30, 2023.

48.     To calculate the Ex-Dividend Payment Troost was owed under the SPA, an independent audit of Paramount SA was needed.  Srivastava was also entitled to inspection rights under the SHA—namely, the right to access Paramount SA's books and records on an annual basis or to conduct an annual audit.

49.     In October 2022, shortly after Srivastava and Troost executed the SHA, Srivastava wrote to Troost on the topic of an independent audit.  Troost expressed distaste at the prospect.

50.     Srivastava and his representatives made several attempts to initiate an audit in advance of the April 30, 2023 deadline upon which the Ex-Dividend Payment was due.  These requests were met with resistance from Troost, but in April 2023, Troost finally relented and allowed a limited audit of Paramount SA to proceed.

51.     On April 21, 2023, Bravard received copies of Paramount SA's general ledger in connection with the audit.

52.     His review of the ledger suggested that Troost had been offloading company assets without Srivastava's knowledge.  On April 24, 2023, Bravard wrote to Troost asking for clarification on several points, including:

- TransMed Sale: An entry dated August 10, 2022 (after Srivastava received 50% equity in Paramount SA) recording the sale of a 40% ownership interest that Paramount SA held in a subsidiary named "TransMed Trading SA" to Troost himself.  Srivastava was not aware of this transaction and did not receive any of the proceeds.

45

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 47 of 78    Page
ID #:1262

- GTS Terminal Purchase: Entries dated October 3 and 27, 2022 indicating the transfer of a combined $47 million from Paramount SA to "Solas International Terminals DMCC," an entity owned by Troost and managed by Troost's representative, Mauron. Troost appeared to use these funds to purchase equity in a Turkish oil terminal called the "GTS Terminal."

- Payments to Jim Reese: The commercial relationship between Paramount SA and "MSTNG LLC," an entity owned and operated by Jim Reese, that had received over $1 million in payments from Paramount SA starting in April 2022.

53. Troost responded with lengthy, deflecting explanations, after which communication between Troost and Bravard grew heated. Troost wrote to Srivastava and Bravard: "I have no issue with any of that but I take offence to the way Nicolas [Bravard] is handling things. It's aggressive and accusatory and there is no transparency from his side. From our side everything is fully visible and open. Basic information has to date not been provided by him. The aggressive way he approaches us has to change."

54. The next day, Srivastava weighed in:

"We should have written documentation of every authorization. I am confused on this whole terminal issue as my understanding, from what you explained and Nicolas [Bravard's] understanding based on his understanding of the books is different […] From here on, all decisions should be written and signed off by two people one from each shareholder to keep things clear. It's easier and things are not lost in communication."

55. Bravard responded to Troost:

"Dear Niels, Accusing me of being aggressive and not being transparent is out of order. The reason I am asking you in writing is because I need documents as I will have to write a report to the US on this audit. I am going through all the transactions and I am asking for information as asked by G [Srivastava]. As far as I know, here is what happened: G [Srivastava] didnt know it was not in the group. You moved the shares in Oct 22. You repaid a loan to yourself and took a loan from the company (USD 47MM total), G [Srivastava] didn't know about it. - there are significant flows

46

of money between Paramount and Transmed, what is the benefit for Paramount ? What am I supposed to do ?? Not ask ? I am sure there is clear explanation to all of this. But we have received no information on this."

56. Troost responded with another evasive explanation, after which Srivastava responded at length to the apparent improprieties he and Bravard had found:

"I am upset and sick to my stomach based on what I have learnt from Nicholas [Bravard]. To be clear, this company exists today , because of my personal reputation on the line. I have aligned and believed in the vision that we have seen together & not what has been fed by the press. There is a clear non-compete that we had agreed to & if the facts are true that has been breached. I am furious, if that has happened. Moreover, Maurice [Taylor] , there is fiduciary duty to both shareholders . If that has not been there is an issue. Nicholas [Bravard], is my friend and is someone who is trusted not only by me but circle of close confidants. This is not a joke, if what has happened is actually true. I have now directed resources to start looking through everything. Everyone STOP with that games and manipulation . A 100 % of zero is zero. Either be honest and fix this. OR count me out. Nicholas [Bravard] is the shareholder of the company. And since this happened there are controls that have to be put in place. . . . To be clear, I never agreed to take money from the company, to buy the asset outside the company , maybe my understanding was not correct. If TransMed, trading in the same line of business, then we have a breach of non-compete. This should all be a part of the company. And all funds have to be properly allocated. From here on, we need to be make sure all decisions are on paper and approved in writing. NO VERBAL DISCUSSIONS. Please let's work together or figure out the lock & key. I am very upset & furious."

C.     <u>Troost Terminates the Agreements and Expels Srivastava from the Partnership.</u>

57. On May 1, 2023, Paramount SA received an information request from the Swiss regulator, SECO, about Paramount's trading Russian oil.

58. By May 6, 2023, Srivastava had yet to receive an adequate explanation from Troost over the apparent financial improprieties revealed by the Paramount SA ledger. Srivastava's request that internal controls be implemented at Paramount SA had similarly been ignored. Frustrated, Srivastava texted Troost:

I need actions not words. This is where i am at, if there is no action taken. By next week. This needs to be done. Seems like what you informed me about the Jeff [Berg] conversation was inaccurate! STOP WITH THE GAMES! STOP BULLSHITTING AND LYING! I am personally going to write to SECO and OFAC about the deception and also to [Swiss counsel]/Jeff [Berg] copying the embassy. I am really

47

Case 2:26-cv-00631-AH-MAR     Document 94-4     Filed 07/13/26     Page 49 of 78   Page
ID #:1264

done. Stop with games & tell you staff too or as a shareholder I want to block the funds of the company. I told you not BS me. I am really done Niels.

59.     On May 7, 2023, Bravard wrote to Taylor (then-Director of Paramount SA) stating:

I would like to notify you, that during our audit certain serious concerns have arisen which lead us to believe you have not protected our shareholder's rights.  The glaring transactions of concerns are TransMed share sale where you act as sole director on both sides and the payment of US$ 47MM to one shareholder without our consent in advance, or even our knowledge.  You even authorized a personal loan to one shareholder without the consent of the other shareholder.

Therefore, I instruct you not to disburse any funds, or sign any contract, without our prior written approval, till we have an extraordinary shareholder's meeting. Failure to do so would be seen as breach of fiduciary duty and would be taken very seriously by our US shareholders.

60.     On May 10, 2023, Troost, through his representative, unilaterally rescinded Srivastava's 50% interest in Paramount SA without cause.  In an accompanying letter, Troost, for the first time and with zero elaboration or accompanying facts, accused Srivastava of deception.

## III.     Srivastava's Retention of Defendants

61.     In approximately September 2024, a year and a half after Troost terminated the partnership, Srivastava approached TAG with concerns that his former business partner Niels Troost was waging a "Russian disinformation campaign" against him, possibly with support from Russian intelligence.  According to Srivastava, the campaign was spreading two main falsehoods: (1) that Srivastava posed as a CIA agent in his business dealings with Troost and promised to secure a "secret" license from OFAC exempting Troost from sanctions against the Russian oil trade; and (2) that, operating under this pretext, Srivastava tricked Troost into selling him 50% of Paramount SA.  Following their retention, Defendants conducted an investigation into the nature and scope of the campaign against Srivastava, discerning Troost's agenda behind the campaign, and documenting what Troost's real activities were.

48

62. Such a solicitation was consistent with the type of work TAG regularly handles. TAG is a respected investigative firm that specializes in business intelligence and crisis consulting. TAG was founded by Jack Devine, former Acting Deputy Director of Operations of the CIA (chief of worldwide operations). Kataoka is a managing director of TAG. Prior to assuming this position, Kataoka spent two decades in the intelligence field, most recently serving as an intelligence research specialist for the New York Police Department on a counter-terrorism investigation in collaboration with Federal law enforcement.

63. Given the complexity of the case Srivastava brought to Defendants, they conducted a tremendous amount of due diligence into Srivastava's history, which occupied all of Kataoka's time for eight full weeks in October and November 2024.

64. Kataoka conducted extensive interviews with Srivastava about his relationship with Troost and Troost's purported recordings of their conversations, and also interviewed his representatives, fiduciaries, business partners and friends. She focused her discussion with Srivastava on his relationship with many of the key individuals identified in the Complaint: General Wesley Clark (Compl. ¶¶ 4, 76, 92); Ankit Desai (*id.* ¶ 260); Jim Reese (*id.* ¶¶ 155, 156); Elias Kane (*id.* ¶¶ 61, n.23; *see also infra*, § IV(C)(1)); Habib Kagimu (*id.* ¶ 62); and Ibrahima Camara (*id.* ¶ 61). Their conversations also focused on former Paramount DMCC partner Sultan AbuSultan; Paramount SA employees, Oleg Shchekin and Jevgeni Barasev; as well as key individuals Troost introduced Srivastava to during their partnership, including Russian national Mikhail Svistunov.

65. Defendants also thoroughly reviewed thousands of pages of records and documents, which included:

49

- Documentation related to Srivastava's partnership with Troost, such as contracts, correspondence about the partnership, the potential deals under consideration for Paramount SA, discussions about the creation of a U.S. parent entity and the tax implications for Troost, Srivastava's audit of Paramount SA, and the breakdown in the relationship between Srivastava and Troost;

- Legal correspondence between Troost and Srivastava following the breakdown of their partnership and other correspondence between Troost's representatives and third parties;

- Complaints filed by AbuSultan against Troost in the UAE; complaints filed by Srivastava against Troost in Switzerland and the UAE; a complaint filed by Troost against Srivastava and Paramount SA's attorney at BakerHostetler (*see* Compl. ¶ 133); Srivastava's civil litigation history; and the complaints filed by Srivastava against pay-for-play media in India and the judgments granted in his favor;

- Press coverage (exceeding 350 articles) casting Srivastava as a fake spy; and

- Extensive open-source documentation about Troost's trading activities before and after the Russian invasion of Ukraine, as published in the *Financial Times*,[24] the *Wall Street Journal*,[25] *Reuters*,[26] Swiss watchdog Public Eye,[27] as well as The Dossier Center and iStories (Russian watchdog organizations).[28]

---

[24] https://www.ft.com/content/c99e8c04-ec5a-4e84-bae3-19fda48c661f

[25] https://www.wsj.com/economy/trade/little-known-commodity-traders-help-russia-selloil-11653643583

[26] https://www.reuters.com/business/energy/exclusive-china-quietly-increases-purchaseslow-priced-russian-oil-2022-05-20/

[27] https://www.publiceye.ch/en/topics/commodities/russian-oil-trade-dubai-pulls-out-allthe-stops-to-edge-out-switzerland

[28] https://dossier.center/oil/ and https://istories.media/stories/2025/08/01/tankeri-tenevogoflota-v-rossiiskikh-portakh-obsluzhivayut-lyudi-gennadiya-timchenko/

50

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 52 of 78   Page
ID #:1267

66.    Kataoka did not limit her analysis to materials Srivastava chose to provide.  She also requested significant additional information from him and, to the extent Srivastava or his representatives had it in their possession, it was provided to her.

## IV.    The Well-Founded Basis for Kataoka's Statements During the OffshoreAlert Conference and on the *Targeted* Podcast

67.    As described in detail below, at the close of their investigation, Defendants came to three key conclusions: (i) there was indeed a documented trace of a complex campaign designed to malign and isolate Srivastava; (ii) Srivastava's accounting of his history with Troost was credible; and (iii) Troost's was not.

68.    Kataoka summarized many of the findings from her investigation on December 2, 2024 while serving as a panelist during the OffshoreAlert conference, an international symposium on intelligence, investigations, and recovery for participants in high-value international finance.

69.    Kataoka discussed her research a second time while being interviewed for a podcast in March 2025, called *Targeted*.

70.    Defendants had no control over the other content of the OffshoreAlert conference and the *Targeted* podcast, and were not involved in their creation or production, and took no part in any dissemination of their contents.

71.    At the time of both the OffshoreAlert conference and the *Targeted* podcast, Defendants had full confidence in the accuracy of Kataoka's statements.  That confidence has only grown since.

### A.    The existence of a disinformation campaign against Srivastava was well documented.

72.    Srivastava came to Defendants in response to what he said was a robust campaign to ruin his reputation, and Defendants' investigation into open-source research and documents provided by Srivastava demonstrated that there was indeed a documented trail of such a campaign.

51

Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 53 of 78 Page ID #:1268

*1.     The origin of the "fake spy" story*

73.     The first documented instance known to Defendants of Troost accusing Srivastava of impersonating a CIA agent occurred on May 25, 2023 in a letter sent by Masimore, then a partner at Kobre & Kim, on behalf of Troost to BakerHostetler (the "Kobre & Kim letter"). Masimore continues to serve as Troost's attorney, including in this action.

74.     In the Kobre & Kim Letter, Masimore claims "[f]rom the moment Mr. Srivastava met Mr. Troost, Mr. Srivastava and his associates, through a series of sophisticated manipulations, concocted and caused Mr. Troost to believe a complex narrative about Mr. Srivastava. They convinced Mr. Troost that Mr. Srivastava was a non-official cover ('NOC') operative of the U.S. Central Intelligence Agency ('CIA'). According to Mr. Srivastava and his associates, Mr. Srivastava was conducting a clandestine operation on behalf of the CIA designed to achieve various U.S. Government objectives involving the use, operation, and expansion of [Paramount SA's] business activities, and which required Mr. Troost to (1) give Mr. Srivastava control of 50% of [Paramount SA]; and (2) cause [Paramount SA] to be domiciled into the United States."

75.     The only "evidence" put forward in the Kobre & Kim Letter of this story is transcripts of purported phone calls that Troost secretly recorded between May 3, 2023 and May 8, 2023, immediately after Srivastava had confronted Troost about his apparent wrongdoing revealed by the April 2023 audit of Paramount SA.

76.     The pivotal phone call excerpted in the Kobre & Kim Letter takes place between Jim Reese and Troost. Reese is characterized in the letter (and again in this lawsuit) as "Mr. Srivastava's associate." Reese was in fact introduced to Srivastava by Troost. And the audit conducted in April 2023 showed Reese had received funds in excess of $1 million from Paramount SA, including payments made before Srivastava joined the company.

52

77. In this exchange, Reese walks Troost through the concept of a "NOC" in a way that suggests Troost was unfamiliar with the term, and Reese's explanations appear prepackaged. The call is alleged to have taken place on May 3, 2023, nearly a year into a partnership that Troost claims was based entirely on Srivastava's representation that he could leverage his status as a "NOC" to obtain a secret OFAC license.

78. Masimore, acting on Troost's behalf, proceeded to circulate letters repeating the "fake spy" accusations to other attorneys connected to Srivastava. Defendants concluded that these letters, along with the Kobre & Kim Letter, were attempts to alienate Srivastava from his counsel and other associates.

79. On June 14, 2023, Masimore wrote "as a courtesy" to Swiss attorneys representing Srivastava's business partner informing them of what "our Clients are convinced to be a fraud perpetrated by Mr. Guarav Srivastava" and enclosing the Kobre & Kim Letter as evidence of the purported "fraud."

80. On July 19, 2023, Masimore wrote to Srivastava's family-office attorney Thomas Giordano-Lascari, a partner at the law firm Greenberg Glusker Fields Claman & Machtinger LLP ("Greenberg Glusker"), enclosing the Kobre & Kim Letter and requesting he "confirm by July 25, 2023, whether you continue to represent . . . Mr. Srivastava or any entity affiliated with him."

81. On July 21, 2023, Masimore wrote again to the same Swiss attorneys stating (incorrectly) "Baker & Hostetler LLP, a reputable U.S. law firm, terminated its representation of Mr. Srivastava" and requesting they "confirm by July 26, 2023, whether you continue to represent . . . Mr. Srivastava, or any entity affiliated with him."

82. On July 24, 2023, BakerHostetler wrote to Masimore saying it had come to the firm's attention that Masimore had been representing that BakerHostetler terminated its

53

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 55 of 78    Page
ID #:1270

relationship with Srivastava and his affiliated entities. "That is false," the firm's general counsel stated.

83. On January 22, 2024, Masimore wrote to the general counsel of Greenberg Glusker alleging that certain conduct in connection with Giordano-Lascari's representation of Srivastava "appears, at a minimum, to implicate various California Rules of Professional Conduct." Masimore requested the general counsel "respond within seven days outlining the action that is being taken to rectify the damage Giordano-Lascari has caused."

84. On June 12, 2023, Masimore wrote to Congressman Pat Ryan about Srivastava and his then-wife in order "to bring to your attention [] publicly available facts about their apparent history of fraud."

85. In March 2024, Masimore, acting on behalf of Troost, visited a mortgage lender in Los Angeles with whom Srivastava had previously worked with and encouraged the mortgage lender to report Srivastava to the IRS. Masimore subsequently sent the same lender documents repeating Troost's "fake spy" accusations, including excerpts from the Kobre & Kim Letter.

### 2. The coordinated media campaign

86. Troost's "fake spy" accusations went public on October 10, 2023 through an article published by the website Project Brazen titled, "The Old 'I'm a Secret Spy, Pay Me' Con" (the "Project Brazen article").[29]

87. The Project Brazen article features a blurry screenshot of the Kobre & Kim Letter and echoes the letter's substance, structure, and slant.

88. Following the Project Brazen article, at least 350 articles repeating the same accusations (and using the same verbiage) emerged across the internet in small publications

---

[29] https://whalehunting.projectbrazen.com/the-old-im-a-secret-spy-con/

accepting paid content. Srivastava brought a successful lawsuit in India seeking to remove some of these articles; in the course of the litigation, the *Tribune India* admits an article it published was a "sponsored content programme."

89. On August 10, 2024, a Wikipedia page titled "Guarav Srivastava scandal" was created.

90. Approximately two weeks later, on August 27, 2024, the *Wall Street Journal* article titled "A Fake Spy, Russian Oil and $1 Million Funneled to Democrats" that features prominently in the Complaint was published.

91. The Srivastava-focused Wikipedia site was designated an "attack page" and removed by senior Wikipedia editors. The page's author was subsequently blocked from Wikipedia for violating the site's "undisclosed paid editing" policy requiring authors affirmatively disclose all paid contributions.

92. The volume, timing, and uniformity of these articles led Defendants to believe that they were coordinated, rather than organic, media interest that reflected a curated, self-reinforcing narrative.

B. <u>Srivastava's explanation of his history with Troost was credible.</u>

93. In reviewing thousands of documents created during Troost's partnership with Srivastava, spanning from its inception in May 2022 through Troost's termination of it on May 10, 2023, Defendants did not encounter a single mention of a CIA-sponsored OFAC license.

94. Defendants' due diligence confirmed that the fundamental logic of the partnership was not to secure a secret, CIA-brokered OFAC license, but rather to diversify Paramount SA's business activity away from Russian oil.

95. This logic is documented in Troost's emails to his team at the time. It also tracks with the value that Troost sought to inject into Paramount SA by bringing Srivastava aboard.

55

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 57 of 78    Page
ID #:1272

Srivastava procured non-oil, non-Russian commodity deals for Paramount SA—such as a deal to sell Ukrainian grain to Indonesia and a rare-earths exploration deal in Indonesia—and attempted to bring several more in Congo, Guyana, Indonesia, Libya, Pakistan, South Africa, Turkey, and Vietnam.

96.    Defendants saw no evidence that Srivastava tried to steal from Paramount SA. Pursuant to the SHA, all profits earned by Paramount SA prior to May 31, 2022 belonged to Troost and were to be paid to him through the Ex-Dividend Payment. Contemporaneous correspondence shows that, through his representatives, Srivastava encouraged Troost to take that dividend.

97.    Defendants were aware of, and considered, Srivastava's litigation history that Troost alleges shows "Srivastava's publicly documented history of fraud." (Compl. ¶ 296.) Defendants conducted an extensive review of Srivastava's civil litigation history in conjunction with their investigation, which included analyzing all relevant public court filings and administering first-hand interviews with individuals involved. Defendants did not "downplay the significance of these publicly available (and embarrassing) lawsuits because they knew that Srivastava's litigation history tended to undermine Srivastava's credibility" (*id.* ¶ 297), they instead concluded that Srivastava's civil litigation history had been mischaracterized by Troost to serve a post-hoc narrative.

98.    Defendants were likewise aware of Paramount DMCC's $51 million loan to Indonesian firm PT Arsari Pradana Utama ("Arsari"). (*See, e.g.*, Compl. ¶¶ 140-150.) But here too, Defendants concluded, based on their diligence, that Srivastava did not "steal[] $25 million from PDMCC." (*Id.* ¶ 139.)

56

99. Instead, upon information and belief, this loan was extended in connection with a tin and minerals investment (the "Minerals Deal") pursuant to an agreement executed on behalf of Paramount DMCC by then-Director Francois Mauron on November 26, 2022.

100. Srivastava has a longstanding relationship with Prabowo Subianto, then-Defense Minister and now-President of Indonesia. Arsari is owned and operated by Hashim Djojohadikusumo ("Hashim"), Prabowo Subianto's brother. Srivastava previously acted as an independent consultant for Hashim. In December 2022, Hashim, through his entity, Arsari, transferred $25 million to Srivastava in consideration for consulting services rendered in 2018.

101. In communications contemporaneous with the transfer, attorneys on behalf of Srivastava and Arsari expressly acknowledged that the transaction was unrelated to the recently executed Minerals Deal. Both Paramount DMCC and Arsari were represented by legal counsel. Srivastava never had control over Paramount DMCC and did not serve as Paramount DMCC's agent in connection with the Minerals Deal.[30]

C. <u>Troost's narrative for what happened, on the other hand, beggared belief.</u>

102. Defendants found that Troost's explanation of his history with Srivastava (and the accusations underlying that explanation) was self-serving enough to cast serious doubt on his credibility.

---

[30] Following their initial due diligence, Defendants uncovered evidence that Paramount DMCC had entered into an agreement with Arsari in or around November 2023 whereby Paramount DMCC forgave $25 million of the loan balance outstanding from the Minerals Deal in exchange for copies of Arsari's transactional history with Srivastava. This agreement—that is, one whereby Troost essentially paid $25 million to Arsari to uncover potentially sensitive information about Srivastava—predated Troost's accusation that Srivastava purportedly stole $25 million from Paramount DMCC. This further demonstrated to Defendants the Arsari loan was not evidence of theft.

FILED: NEW YORK COUNTY CLERK 02/20/2026 10:22 PM
NYSCEF DOC. NO. 49

INDEX NO. 150236/2026
RECEIVED NYSCEF: 02/20/2026

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 59 of 78    Page
ID #:1274

*1.     Troost has a history of trouble with fake spies.*

103.    Troost asks the world to believe that he is an unlucky man who was duped by an individual claiming to be a CIA operative, but Troost sells himself short. Troost is actually a *very* unlucky man because, by his own account, this is not the first time this has happened to him.

104.    In May 2022, after he first reached out to Srivastava, Troost sought Srivastava's help with an issue he was having with a trader named Ibrahim Mohamadou Kane ("Kane"), with whom Troost had previously done business.

105.    Troost told Srivastava that Kane was threatening to spread false information about him to journalists, namely, that Troost was connected to, and working on behalf of, the Russian Federation. (*Accord* Compl. ¶ 60.) In communications with Srivastava, Troost characterized Kane's efforts as a "smear campaign."

106.    On May 16, 2020, Troost sent Srivastava a memorandum detailing his purported history with Kane. (*Accord* Compl. ¶ 61, n.23.)

107.    In the memorandum, Troost leveled allegations against Kane familiar to Defendants, as Troost later asserted nearly identical accusations against Srivastava.

108.    According to the memorandum:

- Troost was introduced to Kane through a business associate in late 2019. Kane allegedly told Troost's business associate that Kane was a "special agent working for the CIA" with "very strong connections to 'the Agency.'"

- Kane allegedly attempted to bolster his credentials by "claim[ing] that he was close friends with General Wesley Clark."

- Kane allegedly relied on fear tactics to induce Troost's cooperation—first by sharing that Kane was privy to "information from . . . special people that you guys

58

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 60 of 78    Page
ID #:1275

are being watched and should be very careful," and then by offering to "protect [Troost] fully." Kane then allegedly offered to "use his special CIA status" to connect Troost to "special projects" being carried out "in the interests of the US Government."

- Kane allegedly led Troost to believe that "the CIA would work with [Kane and Troost] and use [their] expertise in commodity trading 'for special [U.S. government] projects around the world, including Sudan and Uganda.'"

- And, Kane allegedly offered to arrange "a special OFAC deal, which [Kane] claimed was given to him by the US Government and his CIA handlers," which would enable Troost to trade sanctioned oil from Venezuela.

109. Defendants reviewed a copy of the memorandum during their investigation. But rather than believing that "[t]his memo became Srivastava's blueprint for defrauding Troost" (Compl. ¶ 61, n.23), Defendants believed the far more likely story—that Troost has a playbook when it comes to business deals gone wrong. The notion that this happened twice to Troost, in Defendants' view, was far less likely than the fact that it did not happen at all.

110. There is also, it appears, another fake spy in Troost's past. In May 2022—the same month Troost mounted fake spy accusations against Kane—Troost entered into an agreement with Emirati businessman Sultan AbuSultan ("AbuSultan"). Under the contract, AbuSultan was to receive a share of Paramount DMCC's revenue in exchange for arranging a new line of credit for the company. The deal subsequently collapsed. AbuSultan sued Troost later that year, seeking damages in excess of $240 million.

111. During the ensuing litigation, Troost accused AbuSultan of fabricating ties to the Emirati intelligence services to attract Troost's business. Among other allegations, Troost claimed

59

AbuSultan had promised to use his government connections to shield Troost from negative press coverage. The case ultimately settled.

### 2. Troost had a clear motivation to impute responsibility onto Srivastava for the conduct that ultimately led to Troost's being sanctioned.

112. Troost's supposed basis for his rescission of the SPA and the SHA was that Srivastava had lied to Troost about being a CIA operative who could obtain a secret OFAC license that would permit Troost to continue trading in Russian oil.

113. But based on evidence uncovered in their investigation, Defendants concluded that Troost's explanation was mere pretext, and that the real reason he rescinded the agreements was twofold: (1) the audit Srivastava conducted in April 2023, which revealed that Troost had likely stolen from Paramount SA; and (2) the pressure Troost faced from mounting scrutiny by the media[31] and SECO (the Swiss sanctions regulator) regarding Paramount SA's relationship to Paramount DMCC's Russian oil portfolio and the extent to which that nexus complied with Western sanctions.

114. Defendants concluded that Troost's use of the "fake spy" narrative as pretext made sense because it offered him at least two strategic advantages.

115. Most immediately, it gave him a basis to get Paramount SA back. As Troost admits, Paramount DMCC (Paramount SA's Emirati subsidiary) continued to trade in Russian oil until at least August 2023. By rescinding the SPA and the SHA, Troost ensured Srivastava would no longer have visibility into that conduct.

---

[31] On March 20, 2023, the *Financial Times* published an article titled, "Two companies, one trade: the switch that keeps Putin's oil flowing," which examined Paramount DMCC's continued trade of Russian oil. At one point, the article states that "Paramount SA and Paramount DMCC say the two entities are operated and managed 'totally independently', and that Troost has no 'direct' holding in the Dubai-based Paramount." https://www.ft.com/content/c99e8c04-ec5a-4e84-bae3-19fda48c661f

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 62 of 78    Page ID #:1277

116. The "fake spy" narrative also gave Troost a way to deflect responsibility for the sanctions imposed on him precisely because of Paramount DMCC's continued trade in Russian oil despite Western sanctions regimes. Troost could see the writing on the wall: Paramount DMCC's expanded Russian oil trade was going to draw regulatory scrutiny. Troost's concerns were well founded, and Troost and his companies were eventually sanctioned by the European Union, United Kingdom, and Switzerland.

117. Troost could not rewrite that historical fact, but what he could do was lay the groundwork for the Hail-Mary argument that he never intended to violate any sanctions because he thought he was going to get an OFAC license.

### 3. The alleged recordings of conversations between Troost and Srivastava do not prove Troost's claims.

118. Troost's story when Defendants initially heard it, and now again his Complaint, centers on purported phone calls that Troost allegedly secretly recorded between May 3, 2023 and May 8, 2023, immediately after Srivastava had confronted Troost about his apparent wrongdoing revealed by the Paramount SA audit.

119. Troost is correct that Defendants were aware of the existence of these alleged recordings before the OffshoreAlert conference and *Targeted* podcast. Troost is not correct, however, that they constitute "irrefutable evidence to show that Srivastava lied about being a CIA operative" (Compl. ¶ 14), much less that Defendants recklessly disregarded them.

120. Srivastava denies the authenticity of these recordings, and Defendants' due diligence identified at least three reasons to credit Srivastava on this matter.

121. *First*, in an era of powerful generative AI and deepfakes, putative audio recordings mean very little. Troost concedes the significance of this concern when he contends that the recordings have been "authenticated by a former FBI electronics engineer who is an audio

61

forensics expert." (Compl. ¶ 305, n.182.) But this sparse allegation provides very little information to back up this purported authentication—especially in the context of a 323-paragraph complaint running to more than 100 pages.

122. *Second*, Troost takes Defendants to task for failing to "ma[k]e any effort to contact Troost . . . to investigate the recordings" because "Troost would have been happy to have shared that information with them (just as he had with the media)." (*Id*. ¶ 307.) This accusation is misleading.

123. Troost, through Masimore, refused to provide the recordings to two different firms representing Srivastava after the firms learned the recordings' alleged existence. (*Id*. n.184.)

124. Masimore offered to disclose copies of the recordings to one of the law firms except on the express condition that the law firm agree—by means of a non-disclosure agreement—to conceal the information from its own client. The law firm in question refused Masimore's offer.

125. The other law firm requested the recordings multiple times. In the Complaint, Troost justifies this refusal on the basis that Srivastava's counsel "undoubtedly would have continued to promote Srivastava's false narrative even after becoming aware of clear evidence that Srivastava was lying." (*Id*.) This is not an objection someone with genuine recordings who wanted to get the truth out would make.

126. Troost's mystifying behavior surrounding access to the recordings led Defendants to conclude that a request for copies in their name would fare no better given that they too had been retained by Srivastava.

127. In any event, Defendants themselves did attempt to obtain these recordings. Ahead of its December 2024 article about Srivastava and Troost, the *Financial Times* sent written

62

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 64 of 78   Page
ID #:1279

questions to Srivastava.  In response, Srivastava's media representative—at Kataoka's request—asked for copies of the audio recordings.  None were provided.

128.    Instead, the *Financial Times* explained to Srivastava's media representative that it did not have original (or any) copies of the recordings and only listened to them while in the company of Troost's attorneys.

129.    Following *Politico's* March 2024 article concerning Srivastava, *Politico* shared a single excerpt of a recording with Srivastava's media relations representative, again at Kataoka's request, but the metadata revealed that some change had been made to the file in July 2023, more than a month after the recording was allegedly taken.

130.    For reasons described above, anything other than the original file was, in Defendants' view, unreliable.  Troost's refusal to provide copies of the original recordings for review and authentication not only suggests that these recordings are not all they appear to be, it also flatly defeats any argument that Defendants recklessly disregarded the truth Troost says they reflect.

131.    *Finally*, Troost alleges that he made these recordings "once [he] became suspicious that Srivastava may have been lying to him."  (Compl. ¶ 14.)  But, even if the recordings are to be believed, the notion that Troost first decided to surreptitiously record Srivastava in May 2023—*i.e.*, in the immediate aftermath of the audit findings and the SECO letter—because of newfound suspicion of his business partner, rather than because he intended to exploit sound bites he managed to elicit from Srivastava, made no sense to Defendants then, and it makes no sense now.[32]

---

[32] Moreover, Troost lives in Switzerland and Srivastava lives in California, which are both two-party consent states.  The recordings, if genuine, were therefore likely made illegally.

63

132. Moreover, Ibrahima Camara, Habib Kagimu, Jim Reese, Maurice Taylor, Jean Marc Wasem, Ousmane Bamba, Christopher Hinn, Gerald Smith, Francois Mauron, and Robin Luisier—the individuals who have filed affidavits in this lawsuit and related litigation—all have financial connections to Troost, a fact that perpetually caused Defendants to view their testimony with circumspection.

### 4. *Troost's story was, and is, facially nonsense.*

133. Troost claims that he was snookered by a man not only claiming to work for the CIA running a covert program approved by the U.S. government, but also claiming that he would use that program to protect Troost from U.S. and Swiss regulators as PDMCC continued to trade Russian oil above the price cap.

134. Troost claims that he transferred 50% ownership of Paramount SA to Srivastava for a token payment, and ran the risk of Western sanctions, without any written proof of those assertions.

135. And Troost says he only became suspicious that Srivastava may have been lying to him *ten months* after betting his company and livelihood on a man who claimed to be a CIA operative who could procure a secret OFAC license to allow unfettered trade in Russian oil despite global sanctions.

136. Setting these contentions against all of the well supported evidence they had uncovered during their due diligence, Defendants did not find these claims by a sophisticated person to be a genuine admission of profound and ruinous gullibility and, instead, concluded that they were pretext.

64

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 66 of 78    Page
ID #:1281

## V.  The Hallmarks of a SLAPP Lawsuit

137.    Troost has brought this lawsuit, as well as his self-dismissed Federal Action, for the sole purpose of harassing, intimidating, punishing and maliciously inhibiting Defendants' free exercise of speech.

A.    <u>This action and the Federal Action lack a substantial basis in law and fact because he cannot prove actual malice or falsity.</u>

138.    The fundamental contention of Troost's lawsuits is that Defendants are liable for speaking publicly about the conclusions they formed after conducting extensive due diligence into the partnership between Troost and Srivastava—including its dissolution and aftermath—because those conclusions are not what Troost wanted them to be.  Troost's defamation lawsuits inhibit not only Defendants' free speech but pose similar risks for the investigative industry as a whole.

139.    Troost concedes his dispute with Srivastava is a matter of public concern.  Troost himself encouraged the *Financial Times* and the *Wall Street Journal* to publish articles about the dissolution of their professional relationship.  And Troost worked to ensure that his claims were repeated in the press at least 350 times in pay-for-play publications, as well as in other media, including Wikipedia and YouTube.

140.    Media coverage of Troost's trading activity renders him a public figure for the purposes of this dispute.  To date, articles have been published on topics that include, but are not limited to:

- Troost's record of working with entities that were later sanctioned, including IPP (sanctioned in 2014) and Demex Trading Limited DMCC (sanctioned in 2024).[33]

---

[33]https://www.offshore-energy.biz/america-and-uk-put-two-russian-oil-majors-on-blacklist-as-us-sanctions-spree-spreads-to-183-shadow-fleet-vessels/; Demex Trading Limited DMCC predecessor Concept Oil was the successor to IPP after IPP was sanctioned.  Concept Oil is believed to be owned by Latvian national and Monaco Resident Mikhail Zeligman.  Demex DMCC became the successor to Concept Oil after Paramount SA transferred its activities to

65

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 67 of 78    Page
ID #:1282

- Troost's access to the Russian Malychi market, which certain public watch-dog entities have reported may have benefitted politically exposed people in Russia with close ties to President Vladimir Putin, including Gennady Timchenko and Mikhail Arustamov.[34]

- Troost's activation of Paramount DMCC on the eve of Russia's invasion of Ukraine in February 2022.[35]

- Troost's reliance on vessels later associated with the Russian "dark fleet."[36]

- Troost's purchase of a share in an oil terminal identified as a site where Russian oil was mixed with other oil and repackaged for the European market.[37]

141.    Troost also acknowledges that Kataoka made her statements at the OffshoreAlert conference and on the *Targeted* podcast having "done her due diligence" before describing her conclusions.  (Compl. ¶ 253.)  And indeed, as recounted extensively above, Kataoka conducted a tremendous amount of due diligence into the dispute between Srivastava and Troost.  Kataoka did not investigate just the materials that Srivastava provided Kataoka, but he agreed to give her whatever additional materials she asked for that he could provide.  Kataoka also conducted her

---

Paramount DMCC.  Both Concept Oil and Demex DMCC are believed to be managed by Russian national and former Transneft Product executive Mikhail Mezhentsev.

[34] https://www.publiceye.ch/en/topics/commodities/russian-oil-trade-dubai-pulls-out-all-the-stops-to-edge-out-switzerland; https://dossier-center.appspot.com/surgut/; https://istories.media/stories/2023/04/28/kto-zarabativaet-na-torgovle-rossiiskoi-neftyu-v-period-sanktsii/; https://istories.media/stories/2025/08/01/tankeri-tenevogo-flota-v-rossiiskikh-portakh-obsluzhivayut-lyudi-gennadiya-timchenko/

[35] https://www.publiceye.ch/en/media-corner/press-releases/detail/from-russian-oil-to-grain-the-opaque-business-of-a-geneva-based-trader; https://www.wsj.com/economy/trade/little-known-commodity-traders-help-russia-sell-oil-11653643583; https://www.ft.com/content/c99e8c04-ec5a-4e84-bae3-19fda48c661f; https://www.publiceye.ch/en/topics/ukraine/commodity-trading-with-russia/the-excellent-russian-connections-of-a-small-geneva-trader

[36] https://www.reuters.com/business/energy/exclusive-china-quietly-increases-purchases-low-priced-russian-oil-2022-05-20/

[37] https://www.ft.com/content/e5be1cac-3901-4066-a036-f78546b55eaf

66

own due diligence using publicly available information. Far from being recklessly indifferent to the truth of what she found, she was preoccupied with the truth. And her statements at the OffshoreAlert conference and on the *Targeted* podcast reflect her well founded conclusions from that due diligence.

142. Troost's inevitable failure to prove his case will only further demonstrate that he brought this lawsuit and the Federal Action without basis in law or fact, with the sole intent to inhibit Defendants' exercise of their constitutionally guaranteed speech rights.

B. <u>Troost's history of attacking people associated with Srivastava further demonstrates the motivation behind this lawsuit and the Federal Action.</u>

143. Troost has a history of targeting individuals associated with Srivastava in an effort to alienate him from those representing him and others in his network. Troost's method of accomplishing that aim here is to censor Defendants' free speech.

144. As described in more detail above (*see supra*, § IV(A)(1)), Masimore, acting at Troost's direction, wrote letters to or directly contacted law firms representing Srivastava containing Troost's fake-spy narrative in an effort to deprive Srivastava of representation. Masimore similarly wrote a letter to Congressman Pat Ryan, clearly attempting to distance Srivastava from a politician to whom had had donated, and attempted to have a mortgage lender report Srivastava to the IRS.

145. This lawsuit and the Federal Action are but another example of this pattern, as Troost seeks by this lawsuit and the Federal Action to intimidate Defendants into ceasing their representation of Srivastava and speaking out publicly on matters related to Troost.

67

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 69 of 78    Page
ID #:1284

C.     Troost's history of filing baseless lawsuits—along with his efforts to publicize them—further demonstrates his motivation behind this lawsuit and the Federal Action.

146.    Troost also has a history of filing baseless lawsuits related to his dispute with Srivastava.

147.    In November 2024, a Swiss appellate court affirmed the dismissal of a complaint Troost filed against Srivastava for, among other things, fraud.  *See* Tribunal Fédérale [TF] Nov. 20, 2024, 7B_20/2025 (Switz).[38]  The appellate court noted that Srivastava "had merely alleged that he was a CIA agent, able to obtain an OFAC licence for [Paramount SA], without documenting his claims," and that "[Troost] could and should have carried out checks, given both the atypical nature of the said claims and the significance of the acts of disposal undertaken on this basis."  (*Id*. ¶ C.)[39]

148.    The court further observed that, prior to the SPA, Srivastava and Troost "had only known each other for a few weeks; they had never had any prior business dealings" and there "was therefore no particular bond of trust between them." (*Id*. ¶ 5.4.2.)  "In such a context," the court wondered how Troost "could have become, as he claims, 'completely dependent on and under the influence'" of Srivastava.  (*Id*.)

149.    Finally, the court noted that Srivastava's alleged "proposal to help [Paramount SA] to continue its activity in an area which had been subject, since June 29, 2022, to prohibitions and/or restrictions, was unusual and, as such, likely to arouse suspicion" and found unbelievable that Troost, "an experienced businessman" who "could have been expected to exercise particular caution," "did not take the slightest step to verify the allegations made by" Srivastava.  (*Id*.)

---

[38] https://justice.ge.ch/apps/decis/fr/pcpr/show/3371636
[39] This decision was issued in French; the above quotations are translations.

68

Case 2:26-cv-00631-AH-MAR   Document 94-4   Filed 07/13/26   Page 70 of 78   Page ID #:1285

150.    In addition to filing meritless actions, Troost has consistently worked to ensure that his filings receive immediate and widespread media coverage, underscoring the promotional purpose his litigation efforts serve.

151.    The Complaint filed in this action serves as another example: It functions not only as a pleading but also as a vehicle to promote Troost's narrative.  Troost's filing of this lawsuit was covered by *The Independent* and *GIR News*.[40]  Inquiries from *The Independent* were made before the Complaint became publicly available through NYSCEF.

152.    Troost's previous filing against Defendants in SDNY likewise received attention from, *inter alia*, the *Financial Times*, *Politico*, and *OilPrice.com*.[41]  Defendants were first alerted to this wave of publicity when a *Financial Times* reporter contacted them on the day of the August filing of the SDNY lawsuit.

153.    Paramount SA's lawsuit against BakerHostetler in California, which Kataoka discussed during the Offshore Alert conference, was covered by *Reuters*, among others.[42]  On January 21, 2026, Troost filed a complaint against Srivastava in the United States District Court for the Central District of California that mirrors the Complaint in this action.  That lawsuit has likewise drawn coverage from *The Independent* and the *Financial Times*.[43]

---

[40] https://www.independent.co.uk/news/world/americas/niels-troost-fake-spy-lawsuit-russian-oil-b2899880.html; https://globalinvestigationsreview.com/just-sanctions/article/sanctioned-dutch-oil-trader-sues-intelligence-firm-in-new-york-state-court

[41] https://www.politico.com/newsletters/politico-influence/2025/08/07/an-olympics-sized-lobbying-initiative-00499144; https://www.ft.com/content/92cfc4b3-7638-41d5-80c6-c51ff80e9c31; https://oilprice.com/Latest-Energy-News/World-News/Sanctioned-Oil-Trader-Sues-Intelligence-Firm-as-Spy-Saga-Continues.html

[42] https://www.reuters.com/legal/legalindustry/sanctioned-oil-trader-sues-us-law-firm-over-alleged-fake-cia-program-2024-05-08/

[43] https://www.ft.com/content/a471ebb2-5d5c-488a-866a-133265a1bd4a; https://www.independent.co.uk/news/world/americas/niels-troost-fake-spy-lawsuit-russian-oil-b2899880.html

69

D.       Evidence of Troost's ties to Russia further demonstrates the motivation behind this lawsuit and the Federal Action.

154.    Upon information and belief, Troost has filed this lawsuit and the Federal Action to intimidate Defendants from speaking about the evidence they have uncovered about Troost's ties to Russia.

155.    After the OffshoreAlert Conference and the *Targeted* podcast, Defendants continued investigating Troost and determined he had ties to individuals involved in managing foreign intermediaries of the Russian "dark fleet."

156.    Upon information and belief, in early 2023, while in the United Arab Emirates, Troost and his business associate, Ibrahim Camara ("Camara"), arranged a meeting with Srivastava at the Edition Hotel, during which Srivastava was introduced to a Russian individual later identified as Mikhail Svistunov ("Svistunov").

157.    Upon information and belief, Svistunov introduced himself to Srivastava as "Mikael Selentiev."

158.    Upon information and belief, Svistunov works in an advisory position at Rosneft, Russia's largest state-owned oil producer.

159.    Upon information and belief, the position held by Svistunov is typically reserved for intelligence services.

160.    Datasets leaked in Russia (commonly referred to as "reverse contact databases") indicate that Svistunov's phone number has been saved in other people's contact lists under the names "Misha Government" and "Mikhail AP," where, upon information and belief, "AP" refers to "Presidential Administration." In the contact list of Evgeny Martynov—an individual associated with Russia's ruling political party and with suspected ties to Russian intelligence services— Svistunov is listed, simply, as "Mikhail."

70

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 72 of 78    Page
ID #:1287

161.     Upon information and belief, Troost and Camara also attempted to arrange an introduction for Srivastava to Abdoulaye Pona, Director of the Mali Institute of Mining and Minerals, and Aminata Toure, both of whom have documented relationships with the Wagner Group and assisted in organizing a delegation visit to Moscow in November 2021.

162.     Paramount SA employee, Oleg Shchekin is a Russian national who, according to Russian pension databases, has ties to ао росипподромы (Russian Hippodromes), an entity that, upon information and belief, is purportedly linked to a colonel of the Federal Security Service of the Russian Federation.

163.     Kataoka's review of the ledgers for Paramount SA and Paramount DMCC, as well as an associated audit, showed financial transactions with sanctioned Russian companies, including Bank Saint Petersburg, Ingosstrakh Insurance Company, and Surgutneftegaz PJSC.

164.     The ledgers also reflected transactions with other entities whose ultimate beneficial owners are sanctioned, including TAIF-NK JSC, NNK Orenburgneftegaz LLC, NNK Oil LLC, NNK Samaraneftegaz LLC, and NNK Severnaya Neft LLC.

165.     Paramount-related entities rely on individuals—such as Taylor, Mauron and Michael Wen Paen Chang—to reduce Troost's direct corporate visibility while maintaining control through fiduciary networks across multiple jurisdictions including the Netherlands, Singapore, Hong Kong, Switzerland and the United Arab Emirates.

166.     In July 2022, Troost acquired a 40% stake in Global Terminal Services, which controls the Dörtyol terminal in Turkey.  After Russia's invasion of Ukraine in February 2022, that terminal purportedly became a hub for Russian crude and refined products entering Europe.

## VI.     Injuries Sustained by Defendants

167.     Defendants have incurred costs and attorney's fees in responding to this lawsuit and the Federal Action.

71

168. In addition, TAG employees have been forced to spend a significant amount of time to responding to this lawsuit and the Federal Action. Kataoka has been forced to divert time from substantive investigative work, and Devine has spent an inordinate amount of time on this lawsuit and the Federal Action in the past several months which took him away from daily business activity, management, and business development. This loss of time spent on TAG's substantive work has deprived TAG of a material amount of revenue.

169. Defendants have further suffered emotional and reputational harm due to this lawsuit and the Federal Action.

## AS FOR COUNTERCLAIM ONE

170. Defendants repeat and reallege Paragraphs 1-169 as if fully set forth within.

171. New York Anti-SLAPP law empowers defendants to an "action involving petition and public participation" to bring a counterclaim to recover damages upon showing the underlying action "was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law." Civil Rights Law § 70-a(1)(a).

172. An action involves "public petition and participation" where the plaintiff's claim is based upon "(1) any communication in a . . . public forum in connection with an issue of public interest; or (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." Civil Rights Law § 76-a(1)(a).

173. An award of attorney's fees is mandatory upon a showing that the SLAPP action was commenced or continued without a substantial basis in fact and law. Compensatory damages are available under the statute upon a further showing that the underlying SLAPP action was "commenced or continued for the purpose of harassing, intimidating, punishing or otherwise

72

FILED: NEW YORK COUNTY CLERK 02/20/2026 10:22 PM
INDEX NO. 150236/2026
NYSCEF DOC. NO. 49
RECEIVED NYSCEF: 02/20/2026

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 74 of 78    Page
ID #:1289

maliciously inhibiting the free exercise of speech, petition or association rights." Civil Rights Law § 70-a(1)(b). Punitive Damages are available upon an additional showing that the underlying action was "commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights." Civil Rights Law § 70-a(1)(c).

174. Through this lawsuit and the Federal Action, Troost seeks to hold Defendants liable for publicly chronicling the findings of their two-month investigation into Troost's relationship with Srivastava—a topic that has attracted extensive media coverage from outlets like the *Financial Times* and the *Wall Street Journal* due to its proximity to issues of national security, international trade, and foreign affairs.

175. Defendants made a portion of the statements at issue in this litigation and the Federal Action during an international conference attracting "over 250 attendees from nearly two dozen countries," and the remainder during a podcast "readily available online to a global internet audience." (*See* Compl. ¶¶ 277, 278).

176. This lawsuit and the Federal Action therefore qualify as "action[s] involving public petition and participation" as defined by Civil Rights Law § 76-a(1)(a) and, in turn, are covered by the New York anti-SLAPP law.

177. Pursuant to both the New York anti-SLAPP law and the United States Constitution, Troost is prohibited from recovering in this action unless he can prove, by clear and convincing evidence, that Defendants made the allegedly defamatory statements with actual malice, that is, with "knowledge of . . . falsity" or with "reckless disregard" for the truth. Civil Rights Law § 76-a(2). Actual malice is a subjective inquiry focusing on the state of mind of the publisher at the

73

time of publication, requiring a demonstration that the defendants in fact entertained serious doubts as to the truth of their statements.

178. Kataoka's statements at the OffshoreAlert Conference and on the *Targeted* podcast were based on her extensive, rigorous and fair-minded due diligence into Srivastava and Troost's partnership, its dissolution and its aftermath. She believed what she said, and she only discredited contrary evidence that she uncovered if, after fully investigating that evidence and relying on her significant expertise and background in investigations of this type, she concluded that it was not worthy of credit.

179. Truth is an absolute defense to defamation. For a statement to be actionable under the First Amendment, it must be materially false.

180. The detailed allegations set forth herein firmly establish that this lawsuit and the Federal Action lack a substantial basis in law and fact because they challenge speech that is substantially true and consequently protected by the First Amendment and because he cannot prove actual malice. This lawsuit and the Federal Action likewise lack a substantial basis in fact, as their allegations concerning falsity and actual malice are divorced from reality and evidence a bad-faith and malicious distortion of the actual factual record.

181. At bottom, this lawsuit and the Federal Action are nothing more than a naked attempt to punish Defendants for exercising their constitutional rights and to censor Defendants (and others) from publicly discussing the findings of Defendants' inherently newsworthy investigation in the future. Troost was fully aware that his claims against Defendants have no substantial basis in law or fact, yet he commenced this lawsuit and the Federal Action for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting Defendants' speech, petition and association rights.

74

Case 2:26-cv-00631-AH-MAR    Document 94-4    Filed 07/13/26    Page 76 of 78    Page ID #:1291

182.    As a result of this lawsuit and the Federal Action, Defendants have experienced diminution in their reputation.  Defendants have lost wages as a result of time spent responding to this lawsuit and the Federal Action, and have further experienced emotional distress and suffering as a result of these frivolous and harassing lawsuits.

183.    Accordingly, pursuant to New York Civil Rights Law § 70-a, Defendants are entitled to assert a counterclaim and to recover their costs, attorney's fees, compensatory damages, and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray for judgment as follows:

a)    Awarding Defendants all expenses, costs, disbursements, attorney's fees, and interest as authorized by all applicable law and rules;

b)    Awarding Defendants actual and compensatory damages to be specifically determined at trial;

c)    Awarding Defendants punitive damages in an amount to be specifically determined at trial; and

d)    Such other and further relief as the Court may deem just and proper.

Dated:  February 20, 2026                Respectfully submitted,

**PRYOR CASHMAN LLP**

*/s/ Sidhardha Kamaraju*

Sidhardha Kamaraju
Aaron Wiltse
Megan Dougherty

75

FILED: NEW YORK COUNTY CLERK 02/20/2026 10:22 PM INDEX NO. 150236/2026

NYSCEF DOC. NO. 49 Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 77 of 78 Page RECEIVED NYSCEF: 02/20/2026 ID #:1292

7 Times Square, Suite Level 40
New York, NY 10036
Tel: 212-326-0895
Tel: 212-326-0818
Email: skamaraju@pryorcashman.com
Email: awiltse@pryorcashman.com

Michael Niborski (*pro hac vice application
forthcoming*)
1901 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: 310-638-6616
Email: mniborski@pryorcashman.com

*Attorneys for defendants The Arkin Group DE LLC
d/b/a The Arkin Group and Victoria Kataoka*

FILED: NEW YORK COUNTY CLERK 02/20/2026 10:22 PM INDEX NO. 150236/2026

NYSCEF DOC. NO. 49 Case 2:26-cv-00631-AH-MAR Document 94-4 Filed 07/13/26 Page 77 of 78 Page RECEIVED NYSCEF: 02/20/2026 ID #:1292

76

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, a true and correct copy of the above document

was served via New York State Courts Electronic Filing ("NYSCEF") and electronic mail on the

following:

Thomas A. Clare
Nicholas J. Brechbill
James E. O'Toole
Max Diamond
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
tom@clarelocke.com
nick@clarelocke.com
james@clarelocke.com
max@clarelocke.com

Jason A. Masimore
BRODBECKS LAW, PLLC
305 Broadway, 7th Floor
New York, NY 10007
jason.masimore@brodbeckslaw.com

*Attorneys for Plaintiff*

*/s/ Aaron Wiltse*
Aaron Wiltse