# Exhibit 2

## DECLARATION OF TIMOTHY RYAN

I, **TIMOTHY JOHN RYAN**, declare the following under penalty of perjury under the laws of the United States of America:

1. I am of sound mind, over the age of 18, and otherwise competent to make this statement. This statement is a first-hand account based on my own observations, except where indicated. It is a summary of some of the relevant events, but does not include each and every fact that I observed or learned during the events described in my statement. To the extent this statement includes my recollection of statements made by others or me, I am reporting those in sum and substance and in part, unless I specifically say otherwise.

2. I am an Australian national born in 1964 currently residing in Australia and the United Kingdom.

3. In the early 1980's, I joined the Australian Army. In around 1989 and 1990, I worked for the United Nations and then moved to the United Kingdom. From 2002 to 2012, I was the chairman of Bell Pottinger International, part of a multinational public relations, reputation management, and marketing company.

4. In 2012, I founded my own firm, Consulum, which focused on strategic advice for governments and high-level officials in the Middle East. In November 2024, Consulum was acquired by Stagwell, a publicly traded company, for which Consulum provides expertise in strategic communications, public policy, leadership support, and diplomatic outcomes. At the time of the sale, Consulum had grown to a team of approximately 160 professionals with offices in Riyadh, Manama, Dubai, London, Cape Town, and Kuala Lumpur. Consulum is a trusted partner to a range of high-profile government clients.

5. During my time in the Australian Army, I met Gordon Conroy. When I left the army to work for the U.N., Conroy remained and joined the Special Air Service Regiment, commonly known as the Australian SAS, an elite special forces unit of the Australian army. Conroy later left the army and started a company called Unity Resources Group.

6. Around 2012 or 2013, I reconnected with Conroy in Dubai before I returned to the UK. Conroy returned to the UK just before the COVID-19 pandemic. Conroy resided for a time in our guest house in Gloucestershire in southwest England.

7. When Conroy was living in my guest house, he told me that he had become involved in some business dealings with Gaurav Srivastava, known as "G." At one point around the time of the pandemic, Conroy told me that G wanted to move out of London. My wife and I helped G find a residence in Gloucestershire; it was a home belonging to people in one of our neighbouring villages. We vouched for G based on Conroy's relationship with him. G and his wife ended up agreeing to rent the property, and they moved in.

Initials:

8.  While Conroy and G were living in Gloucestershire, Conroy invited G to my house. While G was there, we took a walk. During our walk, G described himself as working for the U.S. government in a clandestine role. G claimed to have worked with a lot of U.S. government agencies, that he was involved in Washington, that he was politically connected, and that he was connected to the security services such as the Central Intelligence Agency ("CIA"). He made it sound mysterious by cryptically saying that he could not tell me more about what he did.

9.  I separately spoke with Conroy about G around the same time. Conroy repeated what G had told me. Conroy said that G had a clandestine role with U.S. national security and/or the intelligence services. Conroy also said that G was connected politically in the United States.

10. After G left, my wife said that she did not get a good feeling from G and did not want him to come by our place again. My first impression was that G was a smooth talker, but I initially did not feel any reason not to believe him. And, I assumed that Conroy had done due diligence on him before introducing him to me.

11. As soon as pandemic flight restrictions were lifted, Conroy and G and G's family suddenly left Gloucestershire and flew somewhere on a private jet. When they were leaving, Conroy texted me a photo of the private jet on June 25, 2020. I still have the photo. I recall Conroy speaking about going to Indonesia to meet with the then defense minister there and/or to Libya, but I do not recall precisely which location they were headed to on this flight.

12. After G and his wife moved out of our friends' residence they had agreed to rent in Gloucestershire, I learned that they had attempted to leave without paying their rent. G eventually paid the rent I believe. I later learned that G also failed to pay the rent he owed on the place where he and his wife had been staying in London. I learnt this because bailiffs had arrived in the village where G and his family had been staying in Gloucestershire looking for G regarding unpaid rent for accommodation in London. I also saw information that he had been implicated in alleged frauds.

13. In September 2022 I attended an Atlantic Council awards gala in New York City, to which I had been invited by the Atlantic Council. G came up to me and acted amicably. He slapped me on the back and acted as if he were in his element. G was sitting at a head table. This was the first time I had seen him since he had been in the United Kingdom. I was surprised to see someone like G, who I had concluded from my due diligence was a scam artist, at the event. His attendance sullied the reputation of the event for me.

14. To my knowledge I have never met nor been in contact with Niels Troost, or anyone at Paramount Energy & Commodities SA or Paramount Energy and Commodities DMCC.

Initials: _____

15. No one at The Arkin Group, to my knowledge, has ever contacted me or anyone I know to conduct due diligence on Gaurav Srivastava.

16. I have fully read, understood, and considered every statement in this declaration, all of which are true to the best of my recollection. I have had an opportunity to and did consult an attorney about the contents of this statement. I understand that this declaration may be used in connection with civil and criminal matters in multiple jurisdictions, and that false statements in this document might subject me to prosecution for perjury or other similar crimes. I have not been offered any benefits, not received any benefits, not been made any promises of future benefits, and I have no expectation of receiving any benefits from any third parties in exchange for signing this statement. I am doing so of my own free will and because I believe the facts to which I am attesting are true.

I, **TIMOTHY JOHN RYAN**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 2 March, 2026

Initials: