ROSEN ✧ SABA, LLP
RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
ALLISON OWENS, ESQ. (State Bar No. 347908)
aowens@rosensaba.com
2310 Rosecrans Ave, Suite 3180
El Segundo, CA 90245
Telephone: (310) 285-1727
Facsimile: (310) 285-1728

JASON A. MASIMORE, ESQ.
jason.masimore@brodbeckslaw.com
BRODBECKS LAW, PLLC
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (347) 804-1093
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

NIELS TROOST; PARAMOUNT ENERGY & COMMODITIES SA, in liquidation; PARAMOUNT ENERGY AND COMMODITIES DMCC; PARAMOUNT ENERGY & COMMODITIES, INC.; and EZI-DIAROC HOLDING SA,

Plaintiffs,

vs.

GAURAV SRIVASTAVA a/k/a "G" a/k/a "Martin Dukeheimer Berg" a/k/a "Philip Johnson"; SHARON SRIVASTAVA; NICOLAS BRAVARD; CEDAR WEST VENTURES, LLC; UNITY RESOURCES GROUP, INC.; ORBIMO CORPORATION; UNICOM WORLDWIDE, INC.; 1234 HOLDING SA; BIRDSONG CENTRAL LLC; AURORA POINT LLC; THE GAURAV SRIVASTAVA FOUNDATION, f/k/a The Gaurav and Sharon Srivastava Family Foundation; GLOBAL ENERGY LAW GROUP PC; OWEN ONOUYE; THOMAS GIORDANO-LASCARI; and JOHN MAGUIRE,

Defendants.

Case No.: 2:26-cv-00631-AH-MAR

**PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND SPECIAL MOTIONS TO STRIKE THE FIRST AMENDED COMPLAINT**

Judge: Hon. Anne Hwang
Date: October 7, 2026
Time: 1:30 p.m.
Courtroom: 9C

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. FACTUAL SUMMARY .......... 8

A. The Enterprise's Pattern of Fraudulent Conduct and Racketeering Activity Laid the Foundation for Victimizing Plaintiffs .......... 8

B. The Enterprise's Fraudulent Scheme Against Plaintiffs .......... 12

C. The Enterprise Fraudulently Obtains Ownership Interests, Temporarily .......... 16

D. The Enterprise Misappropriates $25 Million for the Srivastavas' to Buy a $24.5 Million Pacific Palisades Mansion .......... 18

E. The Enterprise's Theft from Paramount Inc. .......... 19

F. Plaintiffs' Discovery of the Fraud .......... 20

G. The Enterprise's Post-Expulsion Conduct .......... 21

H. The Enterprise's Other Victims and Continuing Conduct .......... 22

III. LEGAL STANDARD .......... 23

IV. ARGUMENT .......... 24

A. *Forum Non Conveniens* Does Not Bar This Action .......... 24

1. Plaintiffs' Tort Claims Do Not Arise Out of the SPA .......... 24

2. Only 1234 Holding and EZI Signed the SPA—The Clause Cannot Bind the Other Eighteen Parties .......... 25

3. In the Alternative, Public Interest Factors Favor This Forum .......... 26

B. Plaintiffs Have Adequately Alleged Domestic Injury Under RICO .......... 27

1. The Defendants' Fraud Scheme Targeted the United States .......... 28

2. The Enterprise Was Conceived of, Headquartered in, and Largely Executed from the United States by U.S. Persons .......... 30

3. Plaintiffs' Property Was in the U.S. When It Was Misappropriated .......... 31

4. The Defendants' Arguments Ignore Binding Precedent and Mischaracterize the Allegations in the FAC .......... 37

C. Plaintiffs Adequately Plead the RICO Elements ..... 39
1. The FAC Adequately Alleges an Enterprise ..... 40
2. Each Defendant Conducted or Participated in the Conduct of the Enterprise ..... 43
3. The FAC Adequately Alleges a Pattern of Racketeering Activity ..... 47
i. Related Racketeering Activity ..... 47
ii. Continuity ..... 56
4. The FAC Satisfies FRCP 8(a)(2) ..... 56
5. The RICO Conspiracy Claim Is Adequately Pled ..... 59
6. Plaintiffs Adequately Plead Proximate Causation ..... 61
D. The Fraud Claims Are Pled with Particularity ..... 64
E. The *Noerr-Pennington* Doctrine Does Not Immunize Defendants' Conduct ..... 67
1. The Predicate Acts Are Not Petitioning Activity ..... 67
2. The Sham Exception Applies ..... 70
3. *Noerr-Pennington* May Not Apply to Foreign Government Petitioning ..... 72
4. Maguire's *Noerr-Pennington* Defense Independently Fails ..... 72
F. The Anti-SLAPP Motion Should Be Denied ..... 74
1. Prong One: The Claims Do Not Arise from Protected Activity ..... 75
2. Multiple Exceptions Apply ..... 76
3. Prong Two: Plaintiffs Demonstrate a Probability of Prevailing ..... 77
G. The State Law Claims Are Adequately Pled ..... 77
1. Fraudulent Misrepresentation ..... 77
2. Conversion ..... 81
3. The UCL Claim Is Independently Grounded ..... 84
H. Defendant Lascari's Attorney-Privilege Arguments Fail; *McDermott* Does Not Immunize RICO Fraud ..... 84
I. The Personal Jurisdiction Arguments of Maguire, Bravard, and

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

1234 Holding Fail .......... 87

J. Alternatively, Leave To Amend Should Be Granted .......... 94

V. CONCLUSION .......... 94

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alberton v. State Bar*,
37 Cal. 3d 1 (1984) .......... 35

*Alliance Mortgage Co. v. Rothwell*,
10 Cal. 4th 1226 (1995) .......... 7, 78

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) .......... 63

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) .......... 79, 81, 82

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 23, 67, 72

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for the West. Dist. of Tex.*,
571 U.S. 49 (2013) .......... 26, 27

*Avila v. Wells Fargo Bank*,
2012 U.S. Dist. LEXIS 132499 (N.D. Cal. Sept. 17, 2012) .......... 84

*Baral v. Schnitt*,
1 Cal. 5th 376 (2016) .......... 5, 75, 76

*Barantsevich v. VTB Bank*,
954 F. Supp. 2d 972 (C.D. Cal. 2013) .......... 88

*Barry v. State Bar of Cal.*,
2 Cal. 5th 318 (2017) .......... 77

*Bascuñán v. Elsaca*,
874 F.3d 806 (2d Cir. 2017) .......... 38, 39

*Baumer v. Pachl*,
8 F.3d 1341 (9th Cir. 1993) .......... 60

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 23, 65

*Bonni v. St. Joseph Health System*,
11 Cal. 5th 995 (2021) .......... 75, 77

*Boyle v. United States*,
556 U.S. 938 (2009) .......... 6, 40, 42

*Brouwer v. Raffensperger, Hughes & Co.*,
199 F.3d 961 (7th Cir. 2000) .......... 60

*Busch v. Buchman, Buchman & O'Brien, Law Firm*,
11 F.3d 1255 (5th Cir. 1994) .......... 89

*Butcher's Union Local No. 498 v. SDC Inv., Inc.*,
788 F.2d 535 (9th Cir. 1986) .......... 7, 88, 90

*Cain v. Superior Ct.*,
110 Cal. App. 5th 639 .......... 86, 87

*Calder v. Jones*,
465 U.S. 783 (1984) .......... 90, 93

*Castillo v. Pacheco*,
150 Cal. App. 4th 242 (2007) .......... 74

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) .......... 84

*City of Alhambra v. D'Ausilio*,
193 Cal. App. 4th 1301 (2011) .......... 77

*Clarke v. American Commerce National Bank*,
974 F.2d 127 (9th Cir. 1992) .......... 85

*CollegeSource, Inc. v. AcademyOne, Inc.*,
653 F.3d 1066 (9th Cir. 2011) .......... 92

*Communist Party v. 522 Valencia, Inc.*,
35 Cal. App. 4th 980 (1995) .......... 37

*Cotati v. Cashman*,
29 Cal. 4th 69 (2002) .......... 75

ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

*DeFrees v. Kirkland*,
No. CV 11-4272 GAF SPX, 2012 WL 1356495 (C.D. Cal. Apr. 11, 2012) ........ 86

*Destfino v. Reiswig*,
630 F.3d 952 (9th Cir. 2011) ........ 57

*Dole v. Milonas*,
889 F.2d 885 (9th Cir. 1989) ........ 86

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ........ 50, 59

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ........ 82

*In re Fischel*,
557 F.2d 209 (9th Cir. 1977) ........ 85

*Fisher v. Machado*,
50 Cal. App. 4th 1069 (1996) ........ 82, 83

*Flatley v. Mauro*,
39 Cal. 4th 299 (2006) ........ 5, 76

*Ford Motor Co. v. Mikhov*,
Case No. 2:25-cv-04550-MWC-PVC, 2026 WL 691879 (C.D. Cal. Mar. 10, 2026) ........ 41, 42

*General Dynamics Corp. v. Superior Court*,
7 Cal. 4th 1164 (1994) ........ 87

*Global Master Int'l Group, Inc. v. Esmond Natural, Inc.*,
76 F.4th 1266 (9th Cir. 2023) ........ *passim*

*Goren v. New Vision Int'l, Inc.*,
156 F.3d 721 (7th Cir. 1998) ........ 60

*Gunner Concrete, Inc. v. ProAll Int'l Mfr., Inc.*,
No. 8:23-cv-02212-JVS-JDE, 2024 U.S. Dist. LEXIS 72051 (C.D. Cal. Apr. 18, 2024) ........ 79

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) ........ 61

*Henley Fin., Ltd v. Goyette & Assocs., Inc.*,
No. 2:20-cv-01834, 2022 U.S. Dist. LEXIS 35208 (E.D. Cal. Feb. 24, 2022) .......... 81

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992) .......... 62, 63

*Jack Richter v. KRG Trading, Inc.*,
No. 24-cv-03622-MWF (SKX), 2026 WL 413399 (C.D. Cal. Jan. 7, 2026) .......... 58, 60

*Jackson v. State Bar*,
25 Cal.3d 398 (1979) .......... 35

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) .......... 63

*Kearney v. Foley & Lardner, LLP*,
590 F.3d 638 (9th Cir. 2009) .......... 68, 72

*Kearney v. Foley & Lardner, LLP*,
607 F. App'x 757 (9th Cir. 2015) .......... 56, 72

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
940 F.2d 397 (9th Cir. 1991) .......... 66

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005) .......... 43, 86

*Manetti-Farrow, Inc. v. Gucci America, Inc.*,
858 F.2d 509 (9th Cir. 1988) .......... 24

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) .......... 23, 28, 66

*McDermott, Will & Emery v. Superior Court*,
83 Cal. App. 4th 378 (2000) .......... 84, 85, 86, 87

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
62 F.3d 967 (7th Cir. 1995) .......... 46

*Mindys Cosmetics, Inc. v. Dakar*,
611 F.3d 590 (9th Cir. 2010) .......... 81

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

*Moore v. Kayport Package Express, Inc.*,
885 F.2d 531 (9th Cir. 1989) .......... 57

*Moran v. Bromma*,
675 F. App'x 641 (9th Cir. 2017) .......... 43

*MSP Recovery Claims, Series LLC v. Amgen Inc.*,
No. 2:23-CV-03130-MEMF-PD, 2024 WL 3464410 (C.D. Cal. July 15, 2024) .......... 23, 64

*Musk v. OpenAI, Inc.*,
795 F. Supp. 3d 1179 (N.D. Cal. 2025) .......... 69

*Nat'l Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) .......... 94

*In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Secs. Litig.*,
120 F.R.D. 687 (9th Cir. 1988) .......... 86

*In re Nolan*,
618 B.R. 860 (Bankr. C.D. Cal. 2020) .......... 37

*Odom v. Microsoft Corp.*,
486 F.3d 541 (9th Cir. 2007) (*en banc*) .......... 40, 42, 57

*Oki Semiconductor Co. v. Wells Fargo Bank*,
298 F.3d 768 (9th Cir. 2002) .......... 60, 63

*In re Orange, S.A.*,
818 F.3d 956 (9th Cir. 2016) .......... 24, 25

*In re Outlaw Lab., LP Litig.*,
2020 WL 1953584 (S.D. Cal. Apr. 23, 2020) .......... 46, 67

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*,
943 F.3d 1243 (9th Cir. 2019) .......... 61

*Park v. Board of Trustees of California State University*,
2 Cal. 5th 1057 (2017) .......... 75

*Pinker v. Roche Holdings, Ltd.*,
292 F.3d 361 (3d Cir. 2002) .......... 89

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

*Pirozzi v. Fiserv Corp.*,
668 F. Supp. 3d 968 (C.D. Cal. 2022) ........ 26

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
480 F. Supp. 3d 1000 (N.D. Cal. 2020) ........ 79

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
890 F.3d 828 (9th Cir. 2018) ........ 77

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*,
508 U.S. 49 (1993) ........ 70

*Qualcomm Inc. v. Broadcom Corp.*,
No. 05-cv-1958-B (BLM), 2007 WL 2900537 (S.D. Cal., Sept. 28, 2007) ........ 86

*Ray v. Spirit Airlines, Inc.*,
126 F. Supp. 3d 1332 (S.D. Fla. 2015) ........ 58, 59

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
732 F. Supp. 3d 1101 (N.D. Cal. 2024) ........ 76

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ........ 61

*Relevant Group, LLC v. Nourmand*,
116 F.4th 917 (9th Cir. 2024) ........ 69, 70, 72

*Reves v. Ernst & Young*,
507 U.S. 170 (1993) ........ 43

*RJ v. Cigna Health & Life Ins. Co.*,
625 F. Supp. 3d 951 (N.D. Cal. 2022) ........ 47

*RJR Nabisco, Inc. v. European Community*,
579 U.S. 325 (2016) ........ 27, 39

*Sabadash v. Brevent*,
2026 WL 719164 (C.D. Cal. Jan. 5, 2026) ........ 77

*Salinas v. United States*,
522 U.S. 52 (1997) ........ 59, 60



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

*San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*,
125 F.3d 1230 (9th Cir. 1997) .......... 68

*Schreiber Distributing Co. v. Serv-Well Furniture Co.*,
806 F.2d 1393 (9th Cir. 1986) .......... 56, 66

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) .......... 89, 90, 91, 92

*In re Schwarzkopf*,
626 F.3d 1032 (9th Cir. 2010) .......... 37

*Sebastian Int'l, Inc. v. Russolillo*,
128 F. Supp. 2d 630 (C.D. Cal. 2000) .......... 47

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) .......... 40

*Smagin v. Yegiazaryan*,
37 F.4th 562 (9th Cir. 2022), *aff'd by Yegiazaryan*, 599 U.S. 533 .......... 36

*Small v. Fritz Cos., Inc.*,
30 Cal. 4th 167 (2003) .......... 77

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) .......... 70, 71, 74

*Steinhart v. County of Los Angeles*,
223 P.3d 57 (Cal. 2010) .......... 37

*Sun Sav. & Loan Ass'n v. Dierdorff*,
825 F.2d 187 (9th Cir. 1987) .......... 49

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) . Here, the FAC's First Cause of Action .......... 57

*T-Mobile US, Inc. v. WCO Spectrum LLC*,
2024 U.S. Dist. LEXIS 250275 (C.D. Cal. 2024) .......... 56

*T-Mobile US, Inc. v. WCO Spectrum LLC*,
No. CV 23-4347-DMG (EX), 2024 WL 6888623 (C.D. Cal. Oct. 22, 2024) .......... 65


ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

*Tatung Co., Ltd. v. Hsu*,
No. SA-CV-13-1743-DOC, 2015 WL 11072178 (C.D. Cal. Apr. 23, 2015) .......... 46, 58, 64

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
835 F.3d 1155 (9th Cir. 2016) .......... 86

*Troost v. The Arkin Group, et al.*,
Index No. 150236/2026 .......... 1

*Twin City Fire Ins. Co. v. Mitsubishi Motors Credit of Am.*,
2004 U.S. Dist. LEXIS 30716 (C.D. Cal. June 14, 2004) .......... 84

*U.S. Bank N.A. v. Ocean Towers Hous. Corp.*,
2017 WL 7240726 (C.D. Cal. Dec. 7, 2017) .......... 85

*United States v. Camick*,
796 F.3d 1206 (10th Cir. 2015) .......... 54

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) .......... 6, 59

*United States v. Jones*,
425 F.2d 1048 (9th Cir. 1970) .......... 49

*United States v. Koziol*,
993 F.3d 1160 (9th Cir. 2021) .......... 55, 68, 71, 74

*United States v. Rogers*,
321 F.3d 1226 (9th Cir. 2003) .......... 51

*United States v. Walter-Eze*,
869 F.3d 891 (9th Cir. 2017) .......... 53

*United States v. Ward*,
914 F.2d 1340 (9th Cir. 1990) .......... 55

*United States v. Yi*,
704 F.3d 800 (9th Cir. 2013) .......... 51

*United States v. Zolin*,
491 U.S. 554 (1989) .......... 86, 87

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*,
143 F. Supp. 3d 982 (N.D. Cal. 2015) .......... 74

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*,
31 F.3d 800 (9th Cir. 1994) .......... 74

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) .......... 23, 64

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) .......... 57, 58

*Wadler v. Bio-Rad Laboratories, Inc.*,
212 F. Supp. 3d 829 (N.D. Cal. 2016) .......... 86

*Walden v. Fiore*,
571 U.S. 277 (2014) .......... 89, 90

*Walter v. Drayson*,
538 F.3d 1244 (9th Cir. 2008) .......... 44, 45

*In re Wellpoint, Inc. Out-of-Network UCR Rates Litig.*,
865 F. Supp. 2d 1002 (C.D. Cal. 2011) .......... 57

*Xu v. Huang*,
73 Cal. App. 5th 802, 288 Cal. Rptr. 3d 558 (2021) .......... 76

*Yan Guo v. Kyani, Inc.*,
311 F. Supp. 3d 1130 (C.D. Cal. 2018) .......... 24

*Yegiazaryan v. Smagin*,
599 U.S. 533 (2023) .......... *passim*

*Yerkyn v. Yakovlevich*,
164 F.4th 224 (2d Cir. 2025) .......... 38, 39

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
No. LA ML19-02905 .......... 93

*Zinus, Inc. v. Foshan Aiyi Fam. Article Co.*,
No. 8:24-CV-00247-JVS-PVC, 2026 WL 252355 (C.D. Cal. Jan. 30, 2026) .......... 84



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**Statutes**

18 U.S.C. § 1343 .......... 25, 47, 84

18 U.S.C. § 1513 .......... 47

18 U.S.C. § 1513(e) .......... 54, 55

18 U.S.C. § 1513(e) and (f) .......... 73

18 U.S.C. § 1951 .......... 47, 84

18 U.S.C. § 1951(a) .......... 55

18 U.S.C. § 1951(b)(2) .......... 55

18 U.S.C. §§ 1956, 1957 .......... 47, 50

18 U.S.C. §§ 1956(a)(2)(A) & (h) .......... 25

18 U.S.C. §§ 1957 and 1956(h) .......... 52

18 U.S.C. § 1961(1)(B) .......... 47

18 U.S.C. § 1961(5) .......... 47

18 U.S.C. § 1965(b) .......... *passim*

Cal. Civ. Code § 2223 .......... 36

Cal. Evid. Code § 956 .......... 86

Fed. R. Civ. P. 15(a)(2) .......... 94

**Other Authorities**

*OFAC Guidance on Implementation of the Price Cap Policy for Crude Oil ... of Russian Federation Origin* (Feb. 3, 2023, rev'd Dec. 20, 2023), available at https://ofac.treasury.gov/media/931036/download?inline .......... 12

*Determination on Certain Services as They Relate to the Maritime Transport of Crude Oil of Russian Federation Origin*, U.S. Treas. Sec. Janet Yellen (Nov. 21, 2022), *available at* https://ofac.treasury.gov/system/files/126/determination_11222022_eo14071.pdf .......... 12

Plaintiffs Niels Troost ("Troost"), Paramount Energy & Commodities SA, in liquidation ("PECSA"), Paramount Energy and Commodities DMCC ("PDMCC"), Paramount Energy & Commodities, Inc. ("Paramount Inc." and together with PECSA and PDMCC, "Paramount"), and EZI-Diaroc Holding SA ("EZI"), by undersigned counsel, respectfully submit this Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss and Special Motions to Strike the First Amended Complaint ("FAC")[1] (ECF Nos. 94 (Srivastava Defendants), 93 (Lascari), 97 (Sharon Srivastava), 92 (Maguire), 96 (Bravard and 1234 Holding).)[2]

## I. INTRODUCTION

Gaurav Srivastava is a professional fraudster who for years has posed as a CIA operative supposedly running elaborate U.S. Government operations under commercial cover to steal money from victims, including over $43 million in cash from Plaintiffs. He could not have succeeded in such an audacious scheme without the other defendants and a structure around him. Through this Enterprise, Srivastava has fooled many important people with this scam, and he continues to do so today. Though he denies these allegations as "facially preposterous" and "thoroughly debunked," (GS at 12) there is no serious dispute as to their merit. More than a dozen first-hand witnesses came forward and confirmed under oath that Srivastava claimed to be a CIA operative.[3] And anyone can listen to Srivastava doing it during his recorded conversations with Troost.[4] Yet, Srivastava shamelessly spends the bulk of his brief denying the facts and claiming that he was never a CIA operative and that he never told anyone that he was. (GS at 4-14.)

---

[1] Unless stated otherwise, all paragraph citations referenced herein are to the FAC.

[2] We refer to the Srivastava Defendants' opposition briefs as "GS"; Lascari's as "TGL"; Sharon Srivastava's as "SS"; Maguire's as "JM"; and Bravard's and 1234 Holding's as "NB." Attached as **Exhibit A** for the Court's convenience is a chart setting out which Defendants made which arguments in their motions.

[3] *See* ¶ 33 n.3; ECF Nos. 88-3, 104-1 to -3.

[4] *See* ¶ 31 n.1 (recordings available at www.troostvarkincomplaint.com; transcripts at *Troost v. The Arkin Group, et al.*, Index No. 150236/2026, NYCEF Nos. 2-22).



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

His vain factual denials are legally pointless because the Court accepts as true all well-pleaded allegations in the FAC and construes them in the light most favorable to Plaintiffs. They are also factually pointless because many first-hand witnesses to his false claims of CIA affiliation have confirmed this under oath, and because his primary factual defense—that The Arkin Group, "a highly respected strategic intelligence firm," "debunked" Plaintiffs' allegations after carrying out a careful investigation on Srivastava's behalf—just blew up in his face.[5] Yesterday, after further investigation, The Arkin Group **publicly disavowed their conclusions and retracted their statements against Troost**:[6]

> The Arkin Group and [their investigator] have determined that the consistent content of the recordings [of Srivastava], the mannerisms of speech, and the presentation of certain facts throughout the recordings substantiated that the recordings are authentic. This determination was reinforced by the technical analysis by a qualified forensic audio expert and supporting documentation provided by Mr. Troost. **These recordings and documentation reflect that Mr. Srivastava claimed to Mr. Troost and others that he was a U.S. intelligence operative. Based on this new information, The Arkin Group and [their investigator] believe their statements that Mr. Troost falsely claimed that Mr. Srivastava posed as a U.S. intelligence operative during their dealings were inaccurate and they withdraw all such statements about Mr. Troost.**

Srivastava's core factual defense has been hoisted by its own petard. Similarly, his co-defendant, Owen Onouye, a central figure in the criminal Enterprise, has admitted under oath that Srivastava posed as a CIA operative and that the Enterprise misappropriated and laundered nearly $13 million of Plaintiffs' money through his

---

[5] GS at 4, 12.

[6] *See* **Exhibit B** (emphasis added).

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

IOLTA account, while Onouye purposefully turned a blind eye to its source.[7]

In any event, Defendants' legal arguments are as infirm as their factual denials.

***The SPA is a red herring.*** The Srivastava Defendants' lead argument is that a Swiss forum selection clause in the SPA mandates dismissal of *all* claims against *all* Defendants for *forum non conveniens*. This is misdirection. Defendants ignore binding Ninth Circuit precedent that applies forum selection clauses to tort claims if, and only if, resolution of the tort claims requires interpretation of provisions in the contract. Plaintiffs' claims do not require interpretation of the SPA. Plaintiffs recovered the shares transferred by the SPA three years ago via rescission, and they do not seek to enforce or interpret the SPA. Plaintiffs' claims are factually independent of any contractual right or duty as to PECSA's shares—the Enterprise misappropriated over $43 million in *cash* (not shares) from California IOLTA accounts starting even *before* the SPA was signed; this was wholly unrelated to the SPA which, in any event, was only entered into by EZI and 1234 Holding and could therefore only be binding on them.

***The domestic injury is overwhelming.*** Defendants' contention that Plaintiffs suffered no "domestic injury" cognizable under RICO applies a standard rejected by the Supreme Court and contrary to binding Ninth Circuit authority that they ignore. The Enterprise's *raison d'être* was to lure Plaintiffs (and other victims) into a joint venture with U.S. persons and U.S. entities inside the U.S. under fraudulent pretenses. They did this to convince Troost they were indirectly partnering in a joint venture helping the U.S. Government, so he would deposit cash inside the U.S. where the Enterprise could then steal it. Harm does not get more "domestic" than this. This Enterprise was *conceived of and led* by a California resident. It *operated* through California-licensed attorneys and California professional corporations. Srivastava tricked Plaintiffs into depositing $13 million in Onouye's California IOLTA account

---

[7] ECF No. 88-3. Defendants Onouye and Global Energy Law Group have admitted RICO liability and agreed to disgorge profits fraudulently received from Plaintiffs.

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

from which the Defendants then misappropriated it. Defendants caused PECSA to create Paramount Inc. as a U.S.-based company. When Paramount Inc. owned $6 million in cash in a California bank account, Defendants misappropriated $5.25 million of it from that account. And Srivastava had PDMCC make $51 million available to the U.S. through an intermediary purportedly to fund the joint venture supporting U.S. operations under Srivastava's commercial cover. Instead, the Enterprise routed $25 million through Lascari's California IOLTA account from which it misappropriated $24.5 million to buy the Srivastava family a Pacific Palisades mansion in cash. All told, Defendants misappropriated, converted, and laundered over $43 million of Plaintiffs' cash after Plaintiffs deposited it and otherwise made it available in the United States for the joint venture.

Defendants' suggestion that Plaintiffs' injury is disqualified from being considered "domestic" simply because some of the Plaintiffs are located outside the U.S. ignores the Supreme Court's express instruction in *Yegiazaryan v. Smagin*, 599 U.S. 533, 543 (2023), that courts examine "the circumstances surrounding the injury," not merely where the first funds originated. The circumstances here make clear that this Enterprise caused Plaintiffs $43 million in harm here in California.

***Noerr-Pennington does not apply.*** The predicate acts alleged are wire fraud and money laundering, not petitioning any branch of government. Defendants cite no authority for their argument's implied premise that fraud schemes and money laundering are protected by the First Amendment. Indeed, even the Ninth Circuit's pattern jury instructions recognize that overt acts of a criminal conspiracy need not be unlawful: "A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy." S3 Modern Federal Jury Instructions-Criminal 11.1 (2026). And what little "petitioning" Defendants invoke was, itself, fraudulent: the Dubai criminal complaint was based on fabricated evidence, and the Chief Prosecutor dismissed it, finding "no grounds for filing a criminal case." (¶ 417(e)(xi).) A losing petition built on doctored evidence is the *opposite* of

protected activity. Moreover, any petitioning activity alleged in the FAC is not the basis of Plaintiffs' damages claim; it is relevant evidence of the Enterprise's pattern, continuity, and ongoing attempts to take much more from Plaintiffs.

***The Anti-SLAPP motion fails at both prongs.*** The gravamen of Plaintiffs' state-law claims is fraud, conversion, and unfair business practices arising from the theft of tens of millions of dollars, not petitioning or speech activity. Defendants failed to carry their threshold burden under *Baral v. Schnitt*, 1 Cal. 5th 376, 395-96 (2016), of identifying specific allegations of protected activity tied to specific elements of specific claims. Even if the Court reaches the second prong, Plaintiffs demonstrate a probability of prevailing on the same analysis that sustains the claims against a Rule 12(b)(6) challenge. Indeed, two defendants have already admitted RICO liability here. Multiple statutory exceptions, including the commercial speech exemption (§ 425.17(c)), the illegality exception (*Flatley v. Mauro*), and the foreign-petitioning exclusion, independently bar the motion.

***The "implausibility" argument is foreclosed by the record.*** Defendants ask this Court to find it "facially absurd" that anyone would believe Srivastava's CIA claims. But witnesses from four continents—including retired generals, former intelligence officers, a former Acting Secretary of Defense, and Srivastava's own co-defendant—independently confirm the identical story. World leaders from Country-1 granted Srivastava lucrative billion-dollar military aircraft deals on the premise that he was legitimate. Authenticated recordings, verified by a former FBI forensic expert (and, now, Srivastava's own investigators), capture Srivastava claiming CIA affiliation in his own words. Even the Kennedy Center recently accepted millions in donations (comprising money stolen from Plaintiffs, on information and belief) and prominently installed a plaque with Srivastava's name "dedicated to the U.S. intelligence community." There is only one reason why witnesses from different parts of the world who do not know each other, many of whom are not connected to



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Troost, would say that Srivastava believably passed himself off as a U.S. intelligence operative: because he did. Again and again.

***The RICO elements are adequately pled and fraud is stated with particularity.*** The FAC provides transaction-level detail—wire transfers with dollar amounts, bank account numbers, routing details, specific dates, WhatsApp messages, and recorded admissions—some of which were organized under individualized lettered subsections identifying at least two independent predicate acts committed by each Enterprise participant. (¶¶ 417(a)-(h).) This satisfies Rule 9(b)'s requirement of "who, what, when, where, and how." Defendant Sharon Srivastava separately argues she did not "operate or manage" the Enterprise, but *Boyle v. United States*, 556 U.S. 938 (2009), expressly rejected any requirement of hierarchical organization, and the FAC details her active participation and status as one of the biggest profiteers from the scheme. Maguire's argument that he was a mere "legitimizer" who did not "direct" enterprise affairs ignores that RICO's net is "woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Christensen*, 828 F.3d 763, 783 (9th Cir. 2015). And Lascari did not simply provide services to the Enterprise. He had a role in its operation or management by occupying a position in the chain of command (director of Enterprise companies (¶¶ 277, 417(d)), exercising authority in structuring cash transactions (¶¶ 266-67), knowingly implementing Srivastava's decisions (¶¶ 263, 353-61), being indispensable to the achievement of the Enterprise's goals (¶ 269), and demonstrating independent action inconsistent with those goals (¶ 362 (falsely denying knowledge of a transaction)).

***The state law claims are independently viable.*** Plaintiffs' claims for fraudulent misrepresentation, conversion, and violation of Business & Professions Code § 17200 each satisfy their respective pleading standards. The fraud claim identifies specific false statements (Srivastava's CIA claims), knowledge of falsity (confirmed by Onouye and recordings), intent to induce reliance, justifiable reliance (corroborated by over a dozen independent victims), and over $43 million in



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

damages. The conversion claim identifies specific, traceable property—$38 million from two California IOLTA accounts and $5.25 million taken from one Plaintiff's U.S. bank account—over which Defendants exercised unauthorized dominion. The § 17200 claim independently incorporates these predicate violations under all three prongs: unlawful, unfair, and fraudulent. Whether reliance was "reasonable" is a question of fact that cannot be resolved at the pleading stage. *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995).

***Lascari's privilege arguments fail.*** Lascari invokes state law, arguing that attorney-client privilege bars all claims against him. But his alleged conduct—serving as director of Enterprise companies, directing wire transfers, executing sham promissory notes, and serving as the Enterprise's escrow conduit—was not legal advice; it was business-agent conduct to which no privilege attaches. Lascari's state law arguments are irrelevant anyway, because federal law applies to these issues, and he has a right to defend himself under federal common law (as applied by the Ninth Circuit). The crime-fraud exception also applies, defeating his arguments.

***Personal jurisdiction exists over Maguire, Bravard, and 1234 Holding.*** Maguire, a genuine former CIA officer who personally vouched for Srivastava's bona fides to victims, argues he lacks minimum contacts with California. But the FAC alleges he knowingly participated in a RICO conspiracy directed from and causing injury in California, traveled to California multiple times to meet with Srivastava in furtherance of the Enterprise, and participated in the attempted extortion of $26 million through international wire communications directed at California-based Enterprise operations. (¶¶ 78, 98-100, 353, 363-366.) Section 1965(b) allows nationwide service where the ends of justice require it, and all three *Butcher's Union* conditions are met: the Court has personal jurisdiction over multiple California-based co-defendants; no single district has jurisdiction over all alleged co-conspirators; and a single nationwide RICO conspiracy exists.

As to Bravard and 1234 Holding, Swiss defendants who deny any California

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

contacts, Section 1965(b) does not depend on individual minimum contacts; it is an independent statutory basis for jurisdiction once its conditions are satisfied. And even under traditional analysis, co-conspirator jurisdiction applies: 1234 Holding used Plaintiffs' money the Enterprise misappropriated from a California IOLTA account to "pay for" 50% of PECSA's shares, which money was first sent to Bravard. Bravard, as the incorporator and controller of 1234 Holding and proxy shareholder for Srivastava, is subject to jurisdiction on the same basis. The FAC also alleges that Bravard emailed Srivastava and Onouye *in California* in furtherance of the scheme to defraud. (¶ 417(c)(iii).) He submitted an invoice for $3 million to Defendant Cedar West, located on Wilshire Boulevard in Los Angeles. (¶ 288.) In any event, this Court has jurisdiction over Bravard and 1234 Holding under Rule 4(k)(2) of the Federal Rules of Civil Procedure.

## II. FACTUAL SUMMARY

The FAC lays out the facts in well-organized detail, with citations to and embedded excerpts of evidence, including first-hand witness statements and recordings of Srivastava and others. It alleges a massive criminal enterprise involving each of the defendants that defrauded Plaintiffs out of $43 million and tried to take more during a long and continuous pattern of racketeering activity that also targeted other victims. Below is a general summary of key allegations, but it is no substitute for the full well-pleaded FAC.

### A. The Enterprise's Pattern of Fraudulent Conduct and Racketeering Activity Laid the Foundation for Victimizing Plaintiffs

Plaintiffs were not the Srivastava Enterprise's first victims. Since at least 2019, Srivastava has posed as a non-official cover operative of the CIA, tricking various otherwise sophisticated victims—including world leaders—into believing that he and his Enterprise were running operations authorized by the U.S. Government under commercial cover. (¶¶ 1, 104.) This fake CIA story formed the backbone of the

numerous interconnected fraud schemes the Enterprise has perpetrated since then.[8] It has fooled and continues to fool sophisticated people to this day. (¶¶ 398-410.) In fact, the successful operation and growth of the Enterprise in the years leading up to meeting Troost in mid-2022 is what allowed Srivastava to find Troost and established the apparent plausibility necessary to firmly establish the false pretenses of the fraud.

In late 2019 and early 2020, Srivastava met a former commander with the Australian Special Air Service (SAS), who operated the original and legitimate Unity Resources Group for years, conducting private military contracting work in Iraq. (¶ 50.) Srivastava claimed to be a "NOC" and that he wanted to set up a massive security company to replace Blackwater, the notorious private military contractor run by Erik Prince. (¶¶ 50, 118.) Srivastava co-opted the Unity Resources Group name for his own company (a defendant here), trading on the SAS Commander's legitimate military-contracting reputation. (*Id.*) Srivastava also recruited a politically well-connected young man from Washington, D.C., to work alongside them. (¶¶ 124-28.) Srivastava told the young man that he was working for the CIA, while Srivastava told others that he had served together in the CIA with the young man's parents, and Srivastava had taken him under his wing to train him for the CIA.[9] (*Id.*)

---

[8] In the Enterprise's early days, Srivastava posed as chairman of a medical device company to defraud others out of $500,000 in a scheme with the same structure—Srivastava as main man, a company he supposedly controlled, fake people, and a law firm IOLTA account to mask his misappropriation of funds. (¶¶ 133-36, 417.)

[9] Srivastava complains about the FAC's extraordinary level of detail into his time in the UK and other damaging, corroborating facts. (GS at 15-16.) But he has always claimed Plaintiffs' account should be disregarded as "facially preposterous." Therefore, and also because RICO requires demonstrating a pattern of racketeering activity, relationships among the Enterprise's participants, and its means and methods, robust allegations over a long period is necessary. Sharon Srivastava also claimed the original complaint lacked facts about her. (ECF No. 64-1 at 3.) Thus, the FAC includes allegations from UK- and LA-based witnesses corroborating not only that Gaurav claimed to be a U.S. intelligence operative, but also that Sharon knowingly actively worked by his side to perpetuate and ratify those false pretenses and actively used that false story, their supposed connections, and the stolen money



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Srivastava identified an opportunity to run his scam in Country-1, and they jetted off to it in mid-2020. (¶ 139.) There, Srivastava, with help from legitimizers around him, established deep and lasting contacts with high-level officials of Country-1 under false pretenses. (¶¶ 142-49.) He claimed he could use his CIA affiliation to remove Country-1's official from a U.S. travel ban. (*Id.*) After the official had been removed, Srivastava falsely took credit for it. Country-1's officials believed he was a CIA operative. Country-1's military, thinking they were dealing with the U.S. under Srivastava's commercial cover, granted Srivastava letter agreements with his companies to supply military aircraft, including 30 American Black Hawk helicopters and 36 American F-15EX fighter jets—deals procured by wire fraud potentially worth billions of dollars. Several agreements were awarded to Enterprise companies that did not yet legally exist at the time. (*Id.*)

At various times in late 2020, Srivastava met with Country-1's officials alongside prominent U.S. Government officials, including the then-Acting U.S. Secretary of Defense. (*Id.*) Srivastava even inserted himself into a private meeting between the Acting Secretary and Country-1 officials to discuss the prospect of the U.S. Government authorizing the sale of American fighter jets; Srivastava's infiltration set off alarm bells within the Department of Defense. (*Id.*) Srivastava harvested photos of himself with those officials, and even with a fighter jet, to use as props to deceive victims. (*Id.* & ¶ 194.) Having secured top-level political support and opportunities to profit via the fraud scheme targeting Country-1's leadership, Srivastava pivoted the Enterprise's focus to find more victims in Africa, which eventually led to encountering Plaintiffs.

To execute that pivot, Srivastava directed his con toward Alhaj Habib Kagimu, a highly respected and successful Ugandan businessman and Honorary Consul for Malaysia who was introduced to Srivastava in late 2020. (¶¶ 105-16.) In 2022,

---

to promote their family socially and economically, a key Enterprise objective. (¶¶ 43-46, 123-24, 150-63.) All this evidence is also relevant to pattern and continuity.



ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Kagimu would go on to introduce Srivastava to Troost as a legitimate CIA operative.

Srivastava told Kagimu that he had been recruited by the CIA at age 16, received military and special operations training to conduct missions in Afghanistan. (*Id.*) To reinforce these claims, Srivastava arranged a phone call with someone claiming to be an Afghani governor saved by Srivastava during a daring CIA extraction. (*Id.*) Srivastava asked Kagimu to help him on behalf of the CIA to secure the release of a political prisoner in Rwanda. Srivastava claimed the matter fell under his authority within the CIA's "special operations division," not ordinary diplomatic channels. (*Id.*) Kagimu also connected Srivastava to Sudanese officials, whom, as Kagimu later learned, Srivastava also tried to scam for money.

In August 2021, Srivastava told those Sudanese officials he was a CIA operative with experience carrying out special operations. (¶¶ 109-10.) He falsely claimed that he could prevent OFAC from sanctioning General Dagalo of the Rapid Support Forces (RSF)—a group that the U.S. government has publicly alleged committed war crimes. (*Id.*) Srivastava also told them he had a personal relationship with then-Vice President Harris, claiming Sharon Srivastava was the financial controller of her campaign. (*Id.*) He further claimed to be in frequent official contact with then-President Biden and to be able to make demands of the President on behalf of U.S. security because of his CIA affiliation. (*Id.*) Through this intricate web of lies, Srivastava's Enterprise successfully defrauded the RSF out of at least $1.2 million dollars through Unity Resources Group, which he received by international wire transfer. (*Id.*) The U.S. sanctioned General Dagalo. (¶ 5.)

In May 2022, Srivastava told Kagimu that he had previously worked in Libya selling weapons with the U.S. Government's permission as part of a CIA effort targeting a Russian terrorist organization. (¶¶ 112-13.) He showed Kagimu photographs of himself with Libyan officials. (*Id.*) Srivastava then told Kagimu that someone owed money to Unity Resources Group and that he wanted to receive a gold-mining concession as payment. He claimed Unity Resources Group had the



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

resources and an affiliated mining company capable of extracting large quantities of gold, which he would sell to "Fort Knox"—again invoking purported U.S. government ties. Srivastava arranged for Kagimu to meet retired General Wesley Clark, the former Supreme Allied Commander Europe of NATO, and used this collaboration to reinforce the impression that Srivastava and his Enterprise was operating as a legitimate U.S. intelligence contractor. (*Id.*)

Having successfully convinced Kagimu that he was a CIA operative and that Unity Resources Group was a CIA front, Srivastava leveraged this relationship—and Kagimu's belief that Srivastava was with the CIA—to target Plaintiffs. Srivastava used his prior "operations" with Kagimu in Africa and Libya, and Unity Resources Group's supposed government work, including with Country-1 officials and General Clark to bolster his claims to Troost that he was a CIA "NOC" and to make his fabricated intelligence persona appear credible. It worked.

**B. The Enterprise's Fraudulent Scheme Against Plaintiffs**

In early 2022, Russia's invasion of Ukraine disrupted global commodity markets and complicated financing for any firm touching Russian-origin crude. (¶ 164.) Troost's company, PECSA, had historically lawfully marketed Russian-origin ESPO crude oil in Asia, and its UAE subsidiary, PDMCC, lawfully operated under applicable UAE law later, and even after the G7 price cap of $60 per barrel took shape in other jurisdictions in early December 2022.[10] (*Id.*) Nonetheless,

[10] Defendants repeatedly characterize Plaintiffs' conduct as "illegal" or "illicit," asserting, among other things, that Plaintiffs profited "from illegally trading Russian oil," sought to "resume [their] illicit activities," and claim Plaintiffs do not dispute violating applicable sanctions regimes. (GS at 1-5, 9 n.7.) Not so. Those characterizations are both disputed and contrary to the allegations of the FAC. Among other things, the FAC alleges that the relevant price cap did not apply in the UAE, where PDMCC's crude-marketing business was located and operated at all relevant times. (¶¶ 5, 164, 306, 337, 341.) The price cap policy was "intended to maintain a reliable supply of crude oil ... to the global market while reducing revenues the Russian Federation earns from oil." *OFAC Guidance on Implementation of the Price Cap Policy for Crude Oil ... of Russian Federation Origin* (Feb. 3, 2023, rev'd



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

financing pressure and a smear campaign by a debtor falsely tying Troost to the Kremlin through public articles created, in Troost's mind, potential political and economic vulnerability. (*Id.*)

In the context of Troost's apprehension about Plaintiffs' businesses being politically targeted (despite having always operated strictly within the boundaries of the law, sanctions included), Kagimu—the Enterprise's Ugandan victim who still believed Srivastava was a CIA operative—introduced Troost by phone to "Mr. G," i.e., Srivastava, then in California, on May 9, 2022. (¶¶ 10-11, 166.) In that call, and over a series of international calls and text messages during the next weeks (¶¶ 10-15, 166-83), Srivastava, from California, established the false pretenses necessary to convince Troost to start sending cash to the U.S. so the Enterprise could then misappropriate it.[11] He told Troost that he worked for the U.S. Intelligence

---

Dec. 20, 2023), available at https://ofac.treasury.gov/media/931036/download?inline. The price cap allowed persons in those jurisdictions to provide various services for Russian-origin crude oil, including trading, in amounts not exceeding $60 per barrel. But this cap on prices did *not* apply outside the jurisdictions that adopted it, including the UAE, where PDMCC's crude marketing business had been located and operated at all relevant times. *Determination on Certain Services as They Relate to the Maritime Transport of Crude Oil of Russian Federation Origin*, U.S. Treas. Sec. Janet Yellen (Nov. 21, 2022), *available at* https://ofac.treasury.gov/system/files/126/determination_11222022_eo14071.pdf. (¶¶ 5, 164, 306, 337, 341.) The regulations *did not prohibit PDMCC's conduct.* Indeed, U.S. Treasury officials publicly stated on March 14, 2023, "about 75 percent of the trade of Russian seaborne oil occurs outside of the price cap. That means no Western services are involved in the transaction and, therefore, *these trades do not violate or evade sanctions* ... we are still denting Russian revenues even though these trades occur outside the price cap" (emphasis added). (¶¶ 27, 325 n.20.) Srivastava's hand-picked lawyers concluded the same as to PDMCC. (¶ 337.) More fundamentally, however, Defendants cannot recast the FAC's allegations in their favor to obtain dismissal. The Court must accept the FAC's well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiffs' favor.

[11] There is no doubt the scheme against Plaintiffs was conceived of and executed largely from California. For example, On May 16, 2022, Srivastava, from California, texted Troost, continuing to develop the relationship and furthering Srivastava's

Community, that the FBI had assembled a file on Troost based on reports by the problematic debtor, and that he could convince "the Agency" to clear Troost of any issues arising from false allegations he was a Russian agent. (¶¶ 169-170.) Srivastava further told Troost that he ran a CIA "Program" that, among others, monitored Russian oil flows globally. (¶¶ 10-12.)

As part of this effort to "clear" Troost, Srivastava told him Plaintiffs needed to use proceeds PDMCC previously (and lawfully) derived from marketing Russian-origin crude oil to fund commercial activity in the U.S. that Srivastava was supposedly undertaking clandestinely on behalf of the U.S. Government to support the Department of Homeland Security and the Executive Branch. (¶¶ 13, 225.) As Srivastava had done in prior schemes, he represented that Unity Resources Group used the law firm the Global Energy Law Group ("GELG") in California to distribute clandestine funding, as officially approved by then-Speaker of the House Nancy Pelosi. (¶¶ 13, 181.) These representations were designed to make Troost believe that Srivastava would deploy the funds he deposited in GELG's California IOLTA account to support legitimate intelligence activities. Srivastava repeatedly asked for $12 million per month. (¶¶ 13, 181, 225.) Believing he was partnering with Srivastava in a joint venture to assist U.S. Government operations through Srivastava's private military contractor, Unity Resources Group, by sending money to a U.S.-based law firm for distribution in furtherance of legitimate operations, Troost deposited over $12 million in GELG's IOLTA account in California. From

---

deception by asking Troost for a written history of his interactions with the debtor and the debtor's own claims of CIA affiliation. After Troost did so, Srivastava called him from California to report that his U.S. Government colleagues supposedly told him the debtor had given the FBI a long report accusing Troost of being a Russian agent (false) and that the FBI was investigating him (also false). Srivastava claimed to have convinced the CIA that the FBI report was false. Having earned Troost's trust, Srivastava claimed that he wanted to work with Troost on behalf of the U.S. Government. (¶ 168.) On June 1, 2022, Srivastava directed Onouye to send a letter on GELG's letterhead from California inviting Troost to meet them there. (¶ 172.)



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

there, the Enterprise then misappropriated it.

Troost's first transfer was on June 21, 2022, wiring $785,000 from Singapore into GELG's IOLTA account in California. (¶¶ 13, 181-84.) Although Srivastava claimed the firm would disburse Troost's U.S. deposits to support legitimate operations, he did not. Srivastava systematically misappropriated the funds once they arrived in California in a series of transfers and used them for the Enterprise. Over a period of weeks and months, some of the funds went to pay off a lien on Sharon Srivastava's Los Angeles house, some funds went to the Enterprise's companies, some funds went to Srivastava's brother, and Srivastava invested a significant amount of the funds back into the Enterprise's criminal operations by paying for Gaurav and Sharon Srivastava's travel to a luxury resort in Country-1. (*Id.*) There, they knew they could convince Troost to give them more funds because the Enterprise's prior victims, Country-1's officials, still believed him and would vouch for Srivastava's U.S. intelligence bona fides. This would further cement the fraudulent pretenses they were using to take Troost's property. (¶ 15.)

Troost joined Gaurav and Sharon Srivastava in Country-1 on June 30, 2022. (¶ 185.) During that trip and others to meet with the Srivastavas' in Country-1, Srivastava and the Enterprise carried out a sophisticated con on Troost involving world leaders, the appearance of opulent wealth, and a U.S. Government approved Program through which Plaintiffs would partner with Srivastava to continue PDMCC's lawful business operations in alignment with the U.S. Government, as well as Western Governments including Switzerland where Troost was a resident, oil policy objectives. (¶¶ 182-98.)

Believing what he saw and what Srivastava was continuously reinforcing, with vouching by Country-1's officials, Kagimu, and General Wesley Clark, Troost deposited more into GELG's California IOLTA account for operations involving Homeland Security and the Executive Branch (¶ 230-44, 246-54). Troost arranged for PDMCC to deposit nearly $6.2 million into GELG's IOLTA account on July 20,



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

2022, via an engagement letter with GELG forged by Srivastava. (¶¶ 230-44.) But rather than using it for the legitimate purposes Srivastava claimed, the Enterprise immediately began misappropriating Plaintiffs' money from GELG's California IOLTA account, including sending $150,000 to Defendant Bravard, $50,000 to General Clark, $1 million to Sharon Srivastava, $600,000 to Srivastava, hundreds of thousands to Defendant Orbimo and other companies in the Enterprise, $25,000 to Defendant Lascari's law firm, and huge sums of money for luxury travel services. (¶ 245(a)-(z).) Srivastava also, unbeknownst to Plaintiffs, used more than $1 million of their funds misappropriated in California, to make massive donations to politicians; Srivastava then misrepresented his connections with those politicians as being attributable to his status as a U.S. intelligence operative. (¶¶ 7, 210-13.)

Plaintiffs deposited another $6 million into GELG's IOLTA account in November 2022 under an engagement letter forged by Srivastava, deceiving Troost into believing that Srivastava was deploying Plaintiffs' deposit to fund legitimate operations. (¶¶ 246-54.) As before, once Plaintiffs' cash was deposited in the California IOLTA account, Srivastava and the Enterprise then misappropriated it, using $200,000 to rent Gaurav and Sharon's luxury Swiss chalet at Christmas, $735,000 as a downpayment on their $24.5 million California mansion, money to General Clark's charity, over $60,000 to Lascari's law firm, $100,000 for the Srivastavas' children, money to Srivastava's brother, more luxury travel, and hundreds of thousands more to Orbimo and other companies in the Enterprise.[12]

### C. <u>The Enterprise Fraudulently Obtains Ownership Interests, Temporarily</u>

Immediate cash was not enough for Srivastava; he also wanted to take money

[12] Recent third-party discovery from a California bank account has confirmed that Sharon Srivastava used the funds sent to an Enterprise company called Canopus Corporation largely to fund the family's lifestyle, including large payments to luxury jewelers and retailers (*e.g.*, Neiman Marcus, Cartier); luxury resorts; exotic birds; private school tuition; household labor; and Venmo transfers to Sharon Srivastava.



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Plaintiffs' businesses generated in the future. In June through August, 2022, Troost traveled to Country-1, where he met with Srivastava in person multiple times, as well as top officials of Country-1, who vouched for Srivastava. (¶¶ 16-20; 185-98.) Srivastava claimed to be leading special operations and preparing for the G20 summit. (*Id.*) Over the course of multiple days, Srivastava subjected Troost to intensive interrogation sessions, repeatedly invoking "Homeland Security," "the Agency," "the Bureau," and "the Farm"—terms associated with U.S. intelligence and law enforcement agencies. (*Id.*) Srivastava showed Troost scars on his body that he falsely claimed were from injuries sustained during CIA missions (*Id.*) Srivastava also presented a business card belonging to a U.S. Treasury official, documenting his connection to the U.S. Government. (*Id.*)

Srivastava arranged a Zoom videoconference with retired General Wesley Clark, whom he introduced to Troost as a "senior Program participant." (*Id.*) The presence of General Clark, a highly decorated former military leader, on the call served to validate Srivastava's claims of U.S. Government affiliation. (*Id.*) Srivastava then claimed that the CIA Director had personally approved a partnership between the Agency and Troost's companies. (*Id.*) The partnership involved PECSA and its subsidiary PDMCC continuing its business for reasons that achieved Western intelligence and policy objectives against Russia, and therefore, by partnering with Srivastava and the U.S. Government in the Program, with the approval of Western governments, Plaintiffs would not be subjected to secondary sanctions in the U.S. or any sanctions in Europe. (¶¶ 19, 170-79, 305-19.) As part of the Program, Srivastava interrogated Troost for information about other Russian oil traders Srivastava referred to as U.S. Government "targets," shared a chart of that information, and sent Troost a draft political cartoon the U.S. Government was supposedly going to use to attack Russian oil-trading networks. (¶¶ 188-90.) Srivastava falsely explained that Plaintiffs' partnership in the Program would be documented in a covert license from OFAC, further corroborated by the discussions that Srivastava's attorneys reported



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

allegedly having at the time with the OFAC. (¶¶ 188, 305.)

To that end, Srivastava, claiming to be a U.S. person, used the fraudulent pretenses to convince Troost to allow EZI to transfer 50% of PECSA's shares to Defendant 1234 Holding, which was owned indirectly by Bravard and was holding the PECSA (and other) shares for the benefit of Srivastava and his Enterprise through Defendant Cedar West, hoping to take half of all profits.[13] (¶¶ 58-59.) Srivastava said that Plaintiffs could not participate in the Program if the companies remained completely foreign-owned, and that U.S. policy required him to hold meaningful control of the Paramount companies from within the U.S. (¶ 216.)

### D. The Enterprise Misappropriates $25 Million for the Srivastavas' to Buy a $24.5 Million Pacific Palisades Mansion

A total of nearly $13 million in cash and the prospect of half of Plaintiffs' ongoing profits was still not enough for Srivastava. So, at the end of 2022 into early 2023, Srivastava convinced Troost to deposit another $51 million with the Enterprise, purportedly to be used in the U.S. for funding U.S. Government operations. (¶ 24.) To accomplish this Srivastava arranged for PDMCC to deposit $51 million through an intermediary in Country-1 (who believed Srivastava was running CIA operations under commercial cover from the Enterprise's 2020 scheme targeting Country-1's officials), $25 million of which Srivastava and Lascari routed into Lascari's IOLTA account in California under an engagement agreement between Lascari's firm and the intermediary. (*Id.*) From there, the Enterprise misappropriated PDMCC's deposit, giving it to Birdsong Central to purchase a $24.5 million mansion in Pacific Palisades for the Srivastava family. (¶¶ 24, 71-73, 255-72, 358-59.) Defendant Lascari recorded the criminal purpose of the transaction months later in a document he

[13] Plaintiffs reversed this transfer over three years ago by rescission, in May 2023; the Enterprise no longer owns the shares. Thus, Plaintiffs do *not* seek relief in relation to the share transfer. It was, however, wire fraud, and therefore it is evidence of the pattern of racketeering activity directed at the Plaintiffs that ultimately injured them through the misappropriation of their cash in California.



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

drafted confirming that the $51 million Srivastava caused PDMCC to send to the intermediary in Country-1 was for the benefit of Gaurav and Sharon Srivastava, that the intermediary had only held the funds "to be distributed to" the Srivastava family and that the intermediary had sent $25 million of PDMCC's funds to them in January 2023. (¶¶ 358-59 (screenshot of Lascari's document).)

### E. **The Enterprise's Theft from Paramount Inc.**

The Enterprise also directly stole $5,250,000 from Plaintiff Paramount Inc.'s Bank of America account. Plaintiff Paramount Inc. is a Wyoming corporation formed in 2022 as a wholly owned subsidiary of PECSA, which it remains today. (¶ 83.) At its creation, Lascari was its sole director and the sole signatory on its California Bank of America account. (*Id.*). The Defendants rented office space for Paramount Inc., which Paramount Inc. paid for, but made it appear to be a U.S. government workspace; from there they continued to execute their crimes. (¶ 289.) On January 3, 2023, Srivastava used a fictitious person, "Martin Berg" (who also signed an engagement letter for GELG to facilitate the Enterprise's misappropriation of Plaintiffs' money) to request permission by email for Paramount Inc. to release $5.2 million of cash in its California bank account. (¶¶ 279-80.) On January 17, 2023, Lascari, without full authorization, in his role as director of Paramount Inc., exercised his signatory authority over its bank account to send his own law firm's IOLTA account $5,200,000, which he falsely documented in corporate records as a reimbursement to Srivastava that Troost had approved. (¶ 281-83.) Troost had not approved a transfer to Srivastava; he had approved the release of funds to third parties upon receipt of documentary evidence, which never came. (¶ 280.) It never could have come, because the only money Srivastava and his companies were spending during that time was the money they had stolen from Plaintiffs through GELG. Again, on March 6, 2023, Lascari, with no justification, transferred $50,000 from Paramount Inc.'s cash in its California bank account to Defendant Orbimo, falsely labelling that, too, a "reimbursement." (¶ 284.)

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**F. <u>Plaintiffs' Discovery of the Fraud</u>**

At the end of April 2023, Srivastava pressured Troost to complete the "U.S. Inversion," a restructuring that would transfer ownership of all of Troost's companies to a company located in the United States under Srivastava's control. (¶¶ 29, 305-38.) Srivastava told Troost that PECSA needed to be restructured under a new U.S. parent entity (Unicom Worldwide, Inc.), after the U.S. adopted the price cap, and Plaintiffs' continued participation in the Program depended on this total restructuring occurring as soon as possible. (¶ 217.) But had this been accomplished, Srivastava would have gained direct authority over the entirety of Plaintiffs' business operations and all its assets.

However, on May 1, 2023, PECSA received an inquiry from SECO, the Swiss sanctions regulator. (¶¶ 30, 320.) This inquiry prompted Troost to scrutinize Plaintiffs' relationship with Srivastava and the others more closely, since, according to Srivastava's statements, the involvement of Paramount in the Program, as well as the Inversion, was taking place with the consent of Western governments—and in particular, Switzerland. (¶¶ 320-22.) The fact that SECO was interested in Paramount's activities therefore contradicted Srivastava's statements. On May 3, 2023, Troost spoke with Bravard after receiving a reconciliation report that Lascari had prepared. During that conversation, Bravard made a direct admission: "I know it's fraud. A shareholder cannot take money." (¶ 287.) This statement confirmed growing suspicions that Srivastava had been stealing from Paramount rather than directing funds toward any governmental purpose. During the first week of May 2023, Troost confronted Srivastava in a series of recorded calls. Srivastava, who was in California at the time, initially attempted to reassure Troost he was with the CIA and to deflect his concerns. (¶¶ 31, 305-38.) When Troost persisted in demanding answers, Srivastava's tone shifted to extortionate threats of personal and economic harm. He warned of "fucking pandemonium in your life" and declared that he would "fucking destroy everything in three seconds." (¶¶ 32, 327.) When Srivastava was

revealed to be a fraud and that there was no Program, on May 10, 2023, EZI rescinded the SPA, took back the Enterprise's shares from 1234 Holding and expelled Srivastava. (¶ 34.) Plaintiffs, aware now that Srivastava had been lying and they had not been operating with real assurances that Western governments would not target them politically, wound up PDMCC's lawful Russian-origin oil marketing business as quickly as possible.

**G. The Enterprise's Post-Expulsion Conduct**

Much of the remainder of the FAC details the Enterprise's continued efforts to misappropriate more of Plaintiffs' money, including the remaining $26 million of the $51 million PDMCC deposited with the Enterprise through the intermediary in Country-1 (ostensibly for U.S. operations) and half of the businesses' profits. (¶¶ 342-410.) Beginning immediately after his expulsion, Srivastava and other Enterprise members launched a sustained campaign of threats, attempted extortion, intimidation, and disinformation directed at Troost and his family. (*Id.*) They also blanketed public officials worldwide with false accusations about Plaintiffs. These efforts were led by Defendants Srivastava, Maguire, and Lascari.

In mid-May 2023, Maguire sent information about Troost's daughter, including a photograph of her, to the NYPD in an attempt to have her detained. (¶ 424(f)(iv).) This action targeted a family member in the U.S. On May 18, 2023, security camera footage from Paramount Inc.'s LA office captured Maguire and Srivastava meeting at the premises, placing both in LA coordinating their activities after the scheme was uncovered. (¶ 98.)

The Enterprise also mounted a broader smear campaign against Troost, using paid journalists and fabricated stories placed in media outlets. (¶¶ 367-68.) Srivastava created an anonymous website, "sanctionnielstroost.com," specifically to target Troost and his son (then at university in the UK), and other family members. (¶ 424(f)(v).) Srivastava further weaponized legal and regulatory processes across jurisdictions. He filed a criminal complaint, among others, against Troost in Dubai



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

based on doctored evidence, which the Dubai Chief Prosecutor rejected. (¶ 364.)

Between February and September 2023, Srivastava and his associates attempted to misappropriate the remaining $26 million of PDMCC's deposit, which it had made available for use in the U.S. for U.S. operations. Though documented as a loan, it was a sham—Lascari later admitted as much in a document he prepared. (¶¶ 358-59.) On November 16, 2023, Lascari transferred the Pacific Palisades mansion—purchased with Plaintiffs' stolen funds for $24.5 million—from Defendant Birdsong Central to Defendant Aurora Point for no consideration. (¶ 271.) On December 16, 2023, Lascari caused Aurora Point to extract $4,995,000 in cash from the mansion through a private mortgage with a LA-based lender. (*Id.*) These transactions occurred entirely in California and involved California real property and a California lender.

### H. <u>The Enterprise's Other Victims and Continuing Conduct</u>

The Enterprise's pattern of racketeering activity continued. In addition to targeting Plaintiffs, it targeted third parties. In around August 2022, the Enterprise targeted leaders of an African country, claiming Srivastava would personally bring President Biden to meet with its president. (¶ 197-98.) In September 2022, Srivastava used Troost's connections to meet with a friend of the president of Liberia in New York City and offered to have the CIA rig an election in exchange for oil concessions, repeating his lies to Liberia's Deputy National Security Advisor. (¶¶ 199-206.) In May 2023, Srivastava and Maguire targeted Murtaza Lakhani, a notorious Pakistani Canadian oil trader, by falsely claiming they caused President Biden to keep him off the U.S. sanctions list. (¶¶ 303-04.) In November 2023, Srivastava and Bravard attempted to defraud the owner of a Swiss bank, offering to arrange removal of U.S. sanctions in exchange for a 10% ownership stake. (¶ 408.) In June 2025, Srivastava ran a con against the president of the Kennedy Center trying to insert himself into Venezuelan oil deals based on his false persona as a member of the U.S. intelligence community. (¶ 409.) He pledged $10 million to the Kennedy Center, paying $2

million towards the pledge using funds stolen from Plaintiffs pursuant to the scheme. (*Id.*) Brazenly, Srivastava obtained a brass plaque on one of the Center's most prominent reception rooms bearing his name and the inscription, "dedicated to the U.S. intelligence community." Srivastava also cultivated conservative political circles looking for new victims, appearing at a conservative political convention in Las Vegas and posting a photograph with Vice President Vance on social media. (¶¶ 398, 410.) As alleged in the FAC, Srivastava continues to operate the Enterprise, fortifying its reputation and seeking to meet and impress wealthy potential new victims. (¶ 410.)

## III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). To survive, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is "not akin to a probability requirement" and "asks for more than a sheer possibility." *Id.*

For claims sounding in fraud, Rule 9(b) requires that the "circumstances constituting fraud" be stated "with particularity." This means a plaintiff must identify the "who, what, when, where, and how" of the misconduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). RICO claims predicated on mail or wire fraud must meet this standard. *MSP Recovery Claims, Series LLC v. Amgen Inc.*, No. 2:23-CV-03130-MEMF-PD, 2024 WL 3464410, at *12 (C.D. Cal. July 15, 2024).





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

## IV. ARGUMENT

### A. *Forum Non Conveniens* Does Not Bar This Action

The real gravamen of this case—the California-based fraud, misappropriation, conversion, and laundering of more than $43 million—cannot plausibly be characterized as arising out of the SPA. Defendants' *forum non conveniens* arguments fail for three independent reasons: (1) Plaintiffs' tort claims do not require interpretation of any provision in the SPA; (2) only two parties signed the SPA; and (3) public-interest factors favor this forum.

#### 1. Plaintiffs' Tort Claims Do Not Arise Out of the SPA

It is well-settled that a contractual forum-selection clause applies to a tort claim only if "the tort claim require[s the Court] to interpret the underlying contract." *In re Orange, S.A.*, 818 F.3d 956, 963 (9th Cir. 2016) (approving district court's application of this standard to a forum selection clause substantially similar to the SPA); *see also Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir. 1988); *Yan Guo v. Kyani, Inc.*, 311 F. Supp. 3d 1130, 1141 (C.D. Cal. 2018) (denying *forum non conveniens* motion because tort claims "do not require the resolution of disputes regarding the interpretation of specific provisions in the" agreement with the forum clause). Defendants ignore this threshold requirement and the cases establishing it because they cannot meet it.[14]

Plaintiffs do not sue to enforce the SPA, recover for its breach, compel its performance, or obtain a declaration of contractual rights. EZI recovered the shares *more than three years ago* by unilateral rescission and seek no related relief here. The SPA was simply a tool of the Enterprise, i.e., the vehicle through which the Enterprise, for a few months, acquired a 50% interest in PECSA by wire fraud so it could claim a share of future profits. That temporary interest is not the *basis* for

[14] *See* GS at 18 n.15 (conclusory statement without elaboration that the "allegations leave no doubt that all claims 'arise[] out of or in relation to' the SPA.")

Plaintiffs' damages claims; it is *evidence* of the racketeering pattern.[15]

Defendants identify no SPA provision that the Court must interpret for any of Plaintiffs' tort claims, as pled, to succeed. The damages claims rest on the Enterprise's misappropriation and laundering of nearly $13 million from GELG's California IOLTA account; misappropriation and laundering of $25 million through Lascari's California IOLTA account (converted into California real estate); and theft of $5.25 million from Paramount Inc.'s U.S. bank account. (¶¶ 24-25, 65-73, 230-84, 343-417, 428-33.) None of those acts turns on the composition of PECSA's shareholders, the performance or nonperformance of the SPA, or any duty the SPA created.

The Court can fully adjudicate whether the FAC (construed in the light most favorable for Plaintiffs) sufficiently alleges that the Defendants used false pretenses and interstate/international wires to obtain Plaintiffs' money, misappropriated funds held in California trust accounts, laundered those proceeds into California real estate, stole funds from a U.S. corporation, and operated a RICO enterprise—without interpreting a single provision of the SPA or deciding whether the SPA is valid. All of Plaintiffs' damages claims would remain even if the SPA had never existed. Because the claims require no adjudication under the SPA, its forum selection clause is irrelevant. *See In re Orange, S.A.*, 818 F.3d at 962 ("Nothing in the claims required the district court to interpret, let alone reference, the [agreement] to issue a ruling on [plaintiff's] claims.").

### 2. Only 1234 Holding and EZI Signed the SPA—The Clause Cannot Bind the Other Eighteen Parties

The *only* parties to the SPA are EZI (Seller) and 1234 Holding (Buyer). The

---

[15] For example, the Enterprise's use of $150,000 Troost sent to GELG's California IOLTA account to purchase the shares was racketeering activity under 18 U.S.C. §§ 1956(a)(2)(A) & (h). (¶¶ 91, 227, 245(a), 417(c)(i).) Obtaining a temporary property interest in PECSA shares by wire fraud was likewise racketeering activity under 18 U.S.C. § 1343.



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

agreement expressly confers no rights or obligations on anyone else. A bilateral contract between two entities cannot dictate the forum for an eighteen-party RICO action. Defendants assert in a footnote that a clause may bind non-signatories whose conduct is "enmeshed" with the contract. (GS at 19 n.16 (citing *Pirozzi v. Fiserv Corp.*, 668 F. Supp. 3d 968, 974 (C.D. Cal. 2022)). But *Pirozzi* limits that principle to plaintiffs who "seek[] to enforce terms of the contract" or "assert[] claims that must be determined by reference to th[e] contract." *Id.* Neither condition is present. Moreover, even if it were, *Pirozzi* held that each non-signatory defendant attempting to invoke a forum selection clause must establish that his or her alleged personal conduct "is closely related to the contractual relationship." Defendants make no party-by-party or claim-by-claim showing; they simply assert that all of Plaintiffs' claims are "inextricably intertwined" with the SPA. (GS at 3.) That undifferentiated assertion is precisely what the "closely related" test rejects. For these reasons, the Court should deny Defendants' *forum non conveniens* motions.

**3. In the Alternative, Public Interest Factors Favor This Forum**

Because the SPA does not require interpretation, the Court need not decide whether the clause would otherwise be enforceable. But even if the Court were to reach the *Atlantic Marine* public-interest factors, they overwhelmingly favor this forum. *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for the West. Dist. of Tex.*, 571 U.S. 49 (2013). The scheme was "conceived of and largely directed from the United States." (¶ 416.) The Srivastavas' and Lascari reside here. Multiple shell entities were formed and operated from California by California-based attorneys. More than $43 million flowed through California IOLTA accounts. The key cooperating witness (Onouye) and critical documentary evidence (bank records) are in California. California has a strong interest in adjudicating racketeering and Business & Professions Code § 17200 violations committed within its borders. Federal RICO claims are governed by federal law, eliminating the only public-



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

interest factor that could arguably favor Switzerland.[16] *See Atlantic Marine*, 571 U.S. at 64, 62 n.6 (public interest factors include "the local interest in having localized controversies decided at home" and "the interest in having the trial of a diversity case in a forum that is at home with the law"). And two of the Defendants—Lascari and Maguire—do not even join in the *forum non conveniens* dismissal motion.

### B. Plaintiffs Have Adequately Alleged Domestic Injury Under RICO

A civil RICO plaintiff must allege "a domestic injury to business or property." *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 354 (2016). An injury is domestic "when the circumstances surrounding the injury indicate it arose in the United States." *Yegiazaryan v. Smagin*, 599 U.S. 533, 549 (2023). There is no "bright-line rule … that locates a plaintiff's injury at the plaintiff's residence." *Id.* at 543. Courts must examine "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Global Master Int'l Group, Inc. v. Esmond Natural, Inc.*, 76 F.4th 1266, 1271-22 (9th Cir. 2023). The injury is domestic if the racketeering activity "largely occurred in or was directed from and targeted at" the United States. *Id.* at 1276. "[A]bsent some extraordinary circumstance, the injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed." *Id.* at 1272 (quotation omitted).

This is not a case between foreign parties involving foreign crimes committed in foreign countries under foreign laws by foreign citizens, with only incidental and inconsequential contact to the United States through money that briefly touched the U.S. financial system. This is a case about a criminal enterprise that was conceived of, headquartered in, and largely executed from California—by U.S. persons, through U.S. entities, using California IOLTA accounts—to lure Plaintiffs into placing their

---

[16] Even under Swiss law, jurisdiction selection agreements are restrictive, binding only the contracting parties. (**Exhibit C**, Swiss Supreme Court case law 4A_50/2019, dated 28 May 2019, § 3.2.2.)



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

money in the United States so the Enterprise could take it. Indeed, the fraud scheme was uniquely American: it was based on the central lie that Srivastava was an American citizen and a high-powered CIA operative for the U.S. Government. (*See* ¶ 42 (Photo: "Gaurav Srivastava *The American Warrior*").)

Construing the FAC's allegations as true and in the light most favorable to Plaintiffs—as the Court must on a motion to dismiss, *Manzarek*, 519 F.3d at 1031—the FAC more than adequately alleges domestic injury. *First*, the Enterprise's purpose was to lure Plaintiffs into conducting business in the United States and placing money here so it could be misappropriated. *Second*, the Enterprise was conceived of headquartered in, and largely executed from, California by U.S. persons and entities. *Third*, Plaintiffs' property was located in the United States when Defendants took it. *Fourth*, the Defendants' arguments ignore the context-specific inquiry required by *Yegiazaryan* and *Global Master* and mischaracterize the allegations in the FAC. The Ninth Circuit has confirmed that applying a residency- or "injury-felt" test, as urged by the Defendants, is legal error. Applying the correct context-specific standard to the FAC's allegations, read in the light most favorable to Plaintiffs, the domestic injury here is overwhelming. The Court should deny their motion.

**1. The Defendants' Fraud Scheme Targeted the United States**

When Troost first spoke by phone with Gaurav Srivastava, then at his residence in California, in early May 2022, neither Troost nor Paramount had "any meaningful connection to the United States." (GS at 5; *see also* FAC ¶¶ 10-11.)[17] Troost believed he was speaking with a Los Angeles based CIA operative working under commercial cover through his U.S.-registered private military contractor, Unity Resources Group ("URG"), and over the next days and weeks, Srivastava reinforced that deception. (¶¶ 166-84.) From California, Srivastava convinced Troost that they would partner in a U.S. Government program run through URG, that URG

[17] Plaintiff Paramount Inc., PECSA's U.S. subsidiary, did not yet exist. (¶ 277.)



ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

had an OFAC license, and that the U.S. Government wanted URG to partner with a trader. (¶ 170.) Srivastava convinced Troost to contribute business profits into a joint venture in the United States to fund those operations, run by Srivastava out of the United States. (¶ 171.) Srivastava and Onouye invited Troost to the United States "before June 10, 2022, to finalize contract discussions" and "collaboration in connection with Unity's business in the United States." (¶¶ 172-73.)[18]

From California, Srivastava repeatedly told Troost that, to demonstrate he was not a Russian spy and to build a long-term U.S.-based relationship with Srivastava aligned with the U.S. Government, Plaintiffs had to deposit funds into the IOLTA account of GELG, a California law firm that Srivastava claimed was specifically approved by the U.S. Government to clandestinely distribute funding for the operations. (¶¶ 180-81.) Troost understood that the funds would be used to support their joint venture operations helping the Department of Homeland Security and the Executive Branch. (¶ 181.)

None of it was true. The entire suite of misrepresentations was designed to induce Troost's companies to conduct business with the Enterprise in the United States and place Plaintiffs' property here so the Enterprise could take it. It worked. Troost arranged for Plaintiffs' business profits to be deposited into California IOLTA accounts because he had been deceived into believing that the funds would support the "Program." Plaintiffs also created a U.S. subsidiary, Paramount Inc., which rented a Los Angeles office that the Enterprise mocked up to look like a U.S. Government site, which the Enterprise used as its base from January to May 2023. The Defendants stole nearly all of Paramount Inc.'s funds from its California bank account. These circumstances make the injury domestic under *Yegiazaryan*. *See* 599 U.S. at 545 ("This suit illustrates well why the domestic-injury inquiry must account for the facts

[18] That Troost, a commodities marketer with no connection to the military-industrial complex, was partnering with Srivastava through a U.S.-based private military contractor that supposedly held an OFAC license strongly corroborates his belief that he was joining a program supporting U.S. military and political objectives.

of the case, rather than rely on a residency-based rule. While it may be true, in some sense, that [foreign plaintiff] has felt his economic injury in [foreign country], focusing solely on that fact would miss central features of the alleged injury. Zooming out, the circumstances surrounding [foreign plaintiff's] injury make clear it arose in the United States.").

**2. The Enterprise Was Conceived of, Headquartered in, and Largely Executed from, the United States by U.S. Persons**

The Srivastava Enterprise was conceived of in, headquartered in, and largely executed from, California. Many of its principal members were U.S. persons and entities—Gaurav and Sharon Srivastava, Onouye, Lascari, Maguire, GELG, URG, Cedar West, Orbimo, Unicom Worldwide, Birdsong Central, Aurora Point, and the Srivastava Foundation. It operated through California lawyers and California IOLTA accounts, which were essential to the scheme's success, and from which the Enterprise misappropriated Plaintiffs' funds (including converting $24.5 million into California real estate). The Enterprise did all this while being directed by a California resident, often from inside Paramount Inc.'s Los Angeles office from January 2023.

This is not a foreign dispute with incidental wires touching a U.S. account. It is a fraud scheme that selected California as its base in part because the California IOLTA accounts provided concealment, commingling, and credibility and appearance of legitimacy. The fraudulent pretenses would not have worked in extracting cash if the scheme had been run by non-U.S. persons or through non-U.S. entities. It would have aroused suspicion if Srivastava, who claimed to work with the CIA, had directed Troost to send millions to non-U.S. persons or non-U.S. entities.[19] These facts fundamentally distinguish the allegations in the FAC from the Second

[19] Indeed, one of the UK witnesses to Srivastava's CIA claims expressed skepticism in 2020 simply because he was residing outside the U.S. (¶ 123 ("UK Witness-2 asked Srivastava why he was in the UK if he worked for the CIA and for President Trump as he claimed during the conversation. Srivastava said that he liked the English way of life and that he had a lot of business contacts in England.").)



ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Circuit cases Defendants cite, which involved wholly foreign parties and only incidental use of the U.S. financial system. (*See* TGL at 10; *infra*, at 38-39.)

### 3. Plaintiffs' Property Was in the U.S. When It Was Misappropriated

Plaintiffs' property—*more than $43 million*—was inside the United States when the Enterprise took it. That firmly establishes Plaintiffs' injuries as domestic. The money can be divided into two categories:

<u>*$5.25 million from Paramount Inc.*</u>:

Paramount Inc. is a U.S. company then with an L.A. office and a Bank of America account in the U.S. (¶¶ 83, 277.) On December 29, 2022, it owned $5,999,962 in that account. (¶ 278.) Through a series of contrivances facilitated by interstate wire communications, including an emailed request from the fictitious "Martin Berg" (Srivastava's alias), Lascari (Paramount Inc.'s sole director and bank account signatory (¶ 83)), wired $5.2 million from that U.S. account to his attorney trust account on January 17, 2023, and later wired another $50,000 to Orbimo from Paramount's U.S. account, all for the benefit of the Enterprise. (¶ 279-84.) He falsely documented both transfers as reimbursements to Srivastava, approved by Troost. (¶¶ 280-82.)[20] The FAC therefore alleges that Defendants took money in the U.S. from a U.S. company's U.S. bank account. That injury is as domestic as it gets, and

[20] Troost approved the transaction only on the condition that he first receive an invoice documenting legitimate Paramount-related expenses. (¶ 280.) No such invoice existed because there were no legitimate Paramount expenses. Lascari argues that "Plaintiffs do not allege any facts showing that Lascari was aware of Troost's condition to the transfer." (TGL at 13.) That is not the pleading standard, and is wholly inaccurate. On January 4, 2023, Troost emailed Srivastava, copying Lascari, and wrote: "*They* should present an invoice which can then be processed." (emphasis added). The language shows Troost did not understand the funds were going to Srivastava personally. On May 7, 2023, Lascari, himself, forwarded the entire exchange to Bravard with the note "FYI." The FAC implies he was one of the recipients of Troost's response (¶¶ 279-81); if the Court prefers, Plaintiffs can make the point more explicit in an amended pleading.



ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

no amount of "zooming" changes that. *Yegiazaryan*, 599 U.S. at 545.

*Nearly $38 million from California IOLTA accounts*:

Based on Srivastava's false statements, Troost agreed for deposits totaling nearly $38 million to be made into California IOLTA accounts, which the Enterprise then misappropriated. First, Troost arranged three deposits totaling $12,954,922.29 into GELG's California IOLTA account: $785,000 on June 21, 2022 (less transaction fees) (¶ 181); $6,170,250 a month later, on July 20, 2022 (¶¶ 232-44); and $5,999,682.84 from November 3 to 4, 2022 (¶¶ 247-48, 252). Troost arranged to deposit these funds, comprising Plaintiffs' business profits, via intermediaries "to preserve the illusion of governmental compartmentalization" for GELG (¶¶ 231-32), and "for operational security to avoid" connecting Plaintiffs' businesses directly to GELG, "as dictated by Srivastava" (¶ 247). There is no dispute that the FAC alleges the deposits belonged to and were controlled by Troost and the other Plaintiffs when they arrived in the GELG IOLTA account. (*See* TGL at 11 ("it is clear from the context that Troost sent the funds").)

Srivastava arranged for GELG to receive the deposits into its IOLTA as retainers for legal services through engagement letters with the intermediaries, which Srivastava drafted based on the terms of engagement letters he had with other law firms. (¶¶ 234, 247.) After GELG received the deposits in its IOLTA account, the Enterprise misappropriated the funds. Srivastava directed Onouye to distribute the funds to all sorts of recipients to benefit the Enterprise in the weeks and months after the deposits. (*See, e.g.*, ¶¶ 15, 245, 253.) The funds were misappropriated *then*. The IOLTA account was therefore no mere incidental, instant pass-through.

Second, Troost also made $51 million of PDMCC's profits available for deposit in the U.S. "to be used for funding U.S. Government special operations." (¶ 24.) Lascari's IOLTA account received PDMCC's deposit; as before, Srivastava wanted an intermediary between Troost's businesses and his. Accordingly, with Troost's knowledge, Srivastava, who had known the intermediary from Country-1

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

since 2020 (when the Enterprise targeted Country-1's public officials, including the intermediary's family member), arranged for PDMCC to route the money through that intermediary. (Troost had met that intermediary several times over six months.) Although it was documented as a loan from PDMCC to the intermediary, that was a sham. (¶ 257.) Troost's intent for this $51 million was the same as before, to deposit some of Plaintiffs' businesses' profits in the U.S. for Srivastava to deploy in support of their joint venture assisting the U.S. Government with the "Program." On December 28, 2022, the intermediary sent $25 million of PDMCC's money to Lascari's IOLTA account. (¶ 269.) As with Troost's GELG IOLTA deposits, PDMCC's deposit was documented as funds Lascari's IOLTA account received from the intermediary per a legal engagement. (¶ 267.)

After the deposit arrived, the Enterprise misappropriated it, most notably by Lascari taking $24.5 million from the IOLTA account (which was holding it for the intermediary and Plaintiffs) giving it to Birdsong Central to buy a $24.5 million Pacific Palisades mansion for the Srivastava family. On February 9, 2023, he misappropriated $500,000 to the Atlantic Council as a donation to prop up the Enterprise's reputation. (¶¶ 269-70, 272-74.) After these transactions, the Enterprise repeatedly and aggressively tried to obtain the remaining $26 million of PDMCC's money held by the intermediary. (¶¶ 353-66.) But the Defendants were unsuccessful, and therefore Plaintiffs do not claim damages for that $26 million—though Defendants' months-long efforts are further evidence of pattern and continuity.

*The $4,995,000 Mortgage Extraction*:

After using $24.5 million of Plaintiffs' stolen funds to purchase the Pacific Palisades mansion, the Enterprise extracted another $4,995,000 from the property. On November 16, 2023, Lascari transferred the mansion from Birdsong Central to Aurora Point for no consideration. (¶ 271.) One month later, Aurora Point obtained a $4,995,000 private mortgage from Los Angeles lender Jeffry Scapa, secured by the property. (*Id.*) This caused a separate domestic injury. The mansion was purchased

ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

with funds misappropriated from Plaintiffs through Lascari's California IOLTA account, giving Plaintiffs a direct interest in its recovery. By encumbering the property for $4,995,000, the Enterprise reduced the value of that interest by the same amount. The transaction involved California real estate, a California entity, and a California lender. It was not an incidental U.S. contact; it was the extraction of additional value from stolen property located in California.

* * *

The FAC's allegations, construed in the light most favorable to Plaintiffs, support at least three independent damages theories under which the misappropriation constitutes domestic U.S. injury:

*First*, the Ninth Circuit recognizes that "a legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes" is a RICO injury to property. *Global Master*, 76 F.4th at 1274 (quotation and citation omitted). Srivastava induced Troost to arrange the deposits in the U.S. into what Troost believed was a U.S. located joint venture, as part of a secret but allegedly legitimate U.S. government "Program," that would use the deposits to fund U.S. operations. The Enterprise instead misappropriated and laundered the funds in violation of various RICO-predicate criminal statutes, including those prohibiting wire fraud and money laundering. The resulting deprivation of legitimate U.S. business relations inside the United States is a domestic injury—valued at an amount equal to what the Enterprise misappropriated, nearly $43 million.

*Second*, Plaintiffs still legally owned and controlled the funds inside the United States when the Enterprise took them. *See Global Master*, 76 F.4th at 1276. Srivastava deliberately structured the scheme so that Plaintiffs' funds would first be deposited into California IOLTA accounts (via their intermediaries for "operational security") as retainers or inter-company loan repayment proceeds. This structure was essential: it ensured the money *was not legally the Enterprise's* when it arrived in the United States. It was imperative for the Enterprise to use lawyers and IOLTAs as

recipients to establish the basis of apparent legitimacy and security for the arrangement, exploiting the expected legal protection of regulations governing lawyers' conduct and the use of IOLTA accounts.[21] This was critical to the mission's success, as victims would not suspect that lawyers would risk disbarment by using their IOLTA accounts to commit fraud and money laundering.

The Defendants do not (and cannot) contend that the FAC alleges the funds belonged to the Enterprise at the moment of deposit. They cannot because GELG received those funds as legal retainers on behalf of Plaintiff-affiliated intermediaries, and Lascari's firm received those funds on behalf of a Plaintiff-affiliated intermediary client as proceeds of an intercompany loan—in neither case did they legally receive the funds on behalf of the Enterprise. Indeed, if Troost directed his intermediaries to recall those IOLTA deposits today, Onouye and Lascari would have no lawful basis to refuse. But they would be unable to return them or account properly for their use. Indeed, "[t]here was not even any agreement between International Company's offshore company and Birdsong justifying how Birdsong would be entitled to $25 million from that company." (¶ 267.) This subjects Onouye and Lascari to near certain disbarment or discipline for mishandling those clients' funds while those clients' funds were in the U.S. *See Jackson v. State Bar*, 25 Cal.3d 398 (1979).

This feature of the scheme—the Enterprise's enticement of Troost to deposit funds in attorney trust accounts under the appearance of legal retainers—strongly supports a finding of domestic injury. In *Global Master*, the Ninth Circuit endorsed the Second Circuit's observation that a foreign plaintiff's injury is domestic if the

---

[21] *See, e.g.*, *Alberton v. State Bar*, 37 Cal. 3d 1, 13 (1984) (addressing misappropriation of client funds from attorney trust account). *See also supra*, at 30 & n.19 (arousing suspicion). Bank compliance programs would also have posed significant obstacles if the Enterprise attempted to receive the funds directly into its own business accounts; those entities were shells with no substantial commercial activity. Attorney IOLTA accounts more readily accepted large international transfers with fewer questions. (¶¶ 65, 269.)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

plaintiff "would expect that United States law would protect [his] property interests in the event of damage," because "property located in the United States is otherwise subject to all the regulations imposed on private property by state and federal law." 76 F.4th at 1273 (citing *Bascuñán v. Elsaca*, 874 F.3d 806, 821 (2d Cir. 2017)). Construed in the light most favorable to Plaintiffs, the FAC alleges that Plaintiffs deposited, owned, and controlled the funds in the California IOLTA accounts at the moment the Enterprise began misappropriating and laundering them. Focusing on Plaintiffs' injury, "not in isolation, but as the product of racketeering activity," using a "case-specific analysis that looks to the circumstances surrounding the injury," "it is clear the injury arose domestically." 76 F.4th at 1272 (quoting 599 U.S. at 545).

*Third*, the FAC alleges facts sufficient to establish that Plaintiffs held California-based equitable interests in the funds that the Enterprise wrongfully possessed in California, and that the Enterprise damaged those interests by dissipating the funds through money laundering. *See Smagin v. Yegiazaryan*, 37 F.4th 562 (9th Cir. 2022), *aff'd by Yegiazaryan*, 599 U.S. 533. In *Smagin*, the plaintiff obtained a federal judgment in California confirming a foreign arbitration award, giving him the right to execute on California assets. 37 F.4th at 564. The "judgment granted Smagin no rights in Russia" but constituted "property in California because 'that is where Plaintiff desires to exercise the rights conferred by the California Judgment.'" *Global Master*, 76 F.4th at 1272 (quoting *Smagin*, 37 F.4th at 567). The decisive issue was "'where the California Judgment exists as property.'" *Id.* (quoting *Smagin*, 37 F.4th at 567).

Here, just as the California court created the California judgments in *Smagin/Yegiazaryan*, California state law itself created California-based property rights in Plaintiffs' favor the moment the California-based Enterprise wrongfully acquired possession of their funds. "One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Cal. Civ. Code § 2223. "One who gains a thing by fraud ... or other wrongful act, is ... an involuntary trustee

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

of the thing gained, for the benefit of the person who would otherwise have had it." *Id.* § 2224; *see Communist Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980, 990 (1995) (finding such a trust is formed when there is property to which the complaining party is rightfully entitled which was wrongfully detained by another party who is not entitled to it). Under California law, the beneficiary's interest in such a trust is "personal property." *In re Nolan*, 618 B.R. 860, 870 (Bankr. C.D. Cal. 2020); *see also Steinhart v. County of Los Angeles*, 223 P.3d 57, 72 (Cal. 2010); *In re Schwarzkopf*, 626 F.3d 1032, 1039 (9th Cir. 2010) ("[U]nder California law, trust beneficiaries hold an equitable interest in trust property and are 'regarded as the real owner[s] of [that] property.'" (quoting *Steinhart*, 47 Cal. 4th at 1319)).

The FAC alleges that Srivastava fraudulently induced Troost to deposit some of Plaintiffs' business profits into California accounts, which the Enterprise then misappropriated and laundered by transferring them to third parties from whom recovery is impossible. (*See, e.g.*, ¶¶ 15, 183, 245, 253.) By possessing these funds in California, then dissipating them via RICO predicate acts, the Enterprise injured Plaintiffs' California-law equitable interests in those proceeds. Those interests were located in California at the time, just like the judgments at issue in *Smagin*. Plaintiffs have therefore alleged a domestic injury under *Smagin/Yegiazaryan*.

**4. The Defendants' Arguments Ignore Binding Precedent and Mischaracterize the Allegations in the FAC**

Defendants' residency- and origin-of-funds arguments were fully rejected by the *Yegiazaryan* Court. In *Yegiazaryan*, the defendants urged "a bright-line rule that locates a plaintiff's injury at the plaintiff's residence." 599 U.S. at 534. The Supreme Court rejected that approach, holding that domestic injury "is a context-specific inquiry that turns largely on the particular facts alleged in a complaint." *Id.* at 543 (internal quotations omitted). Courts must examine the "circumstances surrounding the alleged injury," including "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Id.*

at 543-44. A plaintiff's residence does not change the result where the racketeering activity was "directed from and targeted at" the United States. *Id.* at 549.

The Ninth Circuit has confirmed that applying a residency- or "injury-felt" test is legal error. *Global Master*, 76 F.4th 1266. In *Global Master* itself, the court found domestic injury even though the plaintiff was Chinese and the goods ended up in China, because the property was located in the United States at the relevant time and the racketeering activity "largely occurred in or was directed from and targeted at" the United States. *Id.* at 1276 (quoting *Yegiazaryan*, 599 U.S. at 549).

Neither Lascari nor the Srivastava Defendants apply the required context-specific test. Lascari nominally quotes *Yegiazaryan* but then reduces the analysis to two questions: where the money originated and where the transferor resides. He argues that any injury necessarily was suffered by Troost in Switzerland or by PDMCC/PECSA in the UAE or Switzerland, respectively, and even characterizes the $5.25 million he took from Paramount Inc.'s own U.S. bank account as an injury to "Troost in Switzerland." (TGL at 11, 13-14.) That is precisely the residency- and origin-based approach *Yegiazaryan* and *Global Master* forbid.

Ignoring disqualifying Ninth Circuit precedent, Lascari goes shopping to the Second Circuit, citing *Yerkyn v. Yakovlevich*, 164 F.4th 224 (2d Cir. 2025) and *Bascuñán v. Elsaca*, 874 F.3d 806 (2d Cir. 2017). Neither helps him. In *Yerkyn*, unlike here, "the vast majority of the allegations point to activity that occurred in Kazakhstan, was perpetrated by Kazakhstani citizens, and took place under the auspices of Kazakhstani law," such that the scheme was neither "conceived" nor "executed" in the U.S., and the defendants' use of U.S. bank accounts was merely incidental. 164 F.4th at 230-31. Similarly, in *Bascuñán*, a dispute between Chilean residents, the "relevant property always remained abroad, and these injuries did not arise from any preexisting connection between Bascuñán and the United States." 874 F.3d at 819. Therefore, the incidental "use of bank accounts located within the United States to facilitate or conceal the theft of property located outside of the United States



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

does not, on its own, establish a domestic injury." *Id*.

This case is different. The FAC alleges that the Enterprise deliberately lured Plaintiffs into placing their property in the United States—both the approximately $13 million deposited into GELG's IOLTA account and the $25 million made available for use in the U.S. "to be used for funding U.S. Government special operations." (¶ 24; *see also* ¶ 260 ("To Troost, Srivastava claimed that the funds were necessary to support the secret 'Program.'").) When Plaintiffs' funds arrived in the California IOLTA accounts in the U.S., they remained Plaintiffs' property. The Enterprise then misappropriated and laundered that U.S.-located property. Unlike the plaintiffs in *Yerkyn* and *Bascuñán*, Plaintiffs were induced to put their property in California before it was harmed. And, under *Bascuñán*'s domestic injury rationale, a foreign plaintiff "would expect that United States law would protect [his] property interests in the event of damage," since the property "is otherwise subject to all the regulations imposed on private property by state and federal law." *Global Master*, 764 F.4th at 1273 (citing *Bascuñán*, 874 F.3d at 821).

The Srivastava Defendants fare no better. They rely solely on the foreign character of the victims and the location of their business operations, concluding that the injuries are "quintessentially foreign" under *RJR Nabisco*. (GS at 24.) But *RJR Nabisco* never adopted a victim-residency test, and *Yegiazaryan* expressly rejected the idea that a plaintiff's foreign residence controls. *See RJR Nabisco*, 579 U.S. 325; *Yegiazaryan*, 599 U.S. at 543-45. They also spend most of their argument tilting at windmills against the share transfer under the SPA, rescinded over three years ago, which Plaintiffs do not contend caused them any injury, must less domestic.

Applying the case-by-case, context-specific analysis required by *Yegiazaryan* and *Global Master* to the allegations of the FAC, construed in the light most favorable to Plaintiffs, Defendants' residency-focused arguments fail. The Court should deny their motion.

**C. <u>Plaintiffs Adequately Plead the RICO Elements</u>**



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

A civil RICO claim requires: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The FAC satisfies each element.

#### 1. The FAC Adequately Alleges an Enterprise

The definition of a RICO enterprise has wide reach and is "liberally construed to effectuate its remedial purposes." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (*en banc*). No particular organizational structure is required to plead an enterprise; an informal association suffices. *Id.* at 551. Such an "association-in-fact" enterprise requires proof of (A) a "common purpose," (B) "relationships among the associates," and (C) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 939, 946 (2009).[22]

**Common Purpose:** The Enterprise's common purpose is to defraud victims by impersonating intelligence operatives and stealing tens of millions of dollars through false pretenses, shell entities, and money laundering. In *Bondit, LLC v. Hallows Movie, Inc.*, plaintiffs adequately pled a common purpose where defendants "used the corporate forms of the entity Defendants as a device to funnel substantial sums of money to themselves" through "false representations ... to induce victims" to make fraudulent investments. Case No. 2:19-cv-09832-SB-RAO, 2020 WL 7777992, at *5 (C.D. Cal. Apr. 1, 2020). There is a direct parallel here: Defendants used shell entities—Cedar West, Birdsong, Aurora Point, Orbimo, Unicom, 1234 Holding, the Foundation, and others—as devices to funnel tens of millions of dollars

[22] Lascari argues that the FAC fails to allege an enterprise as an "entity separate and apart from the pattern of activity in which it engages." (TGL at 14 (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).) Not so; the FAC carefully alleges both the existence of an association-in-fact enterprise *and* its pattern of racketeering activity. Lascari ignores *Boyle*. 556 U.S. at 947 ("the existence of an enterprise" may be "inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity," and "the evidence used to prove the pattern … and the evidence establishing an enterprise 'may in particular cases coalesce.'" (quoting *Turkette*, 452 U.S. at 583)).



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

to Enterprise members after extracting money from Plaintiffs through false representations. (¶¶ 58-59, 96-132, 262-71.)

Defendants cite to *Ford Motor Co. v. Mikhov*, Case No. 2:25-cv-04550-MWC-PVC, 2026 WL 691879 (C.D. Cal. Mar. 10, 2026), for the non-controversial proposition that allegations that "Defendants had relationships with Srivastava or participated in business, legal, or reputational activity are insufficient" to plead an enterprise. (GS at 25.) But *Mikhov* actually confirms that Plaintiffs' pleading is sufficient. There, the court held that the plaintiffs failed to demonstrate a common purpose because the alleged "enterprise" consisted of Lemon Law attorneys engaged in nothing more than ordinary law-firm billing—"the primary activity at any for-profit law firm hoping to stay in business"—which the court found "incompatible with the types of conduct RICO was enacted to prevent." 2026 WL 691879, at *15 (citation omitted).

Here, the FAC alleges the opposite: a common purpose to defraud victims by impersonating a CIA operative to steal tens of millions of dollars through false pretenses, shell entities, and money laundering. (¶¶ 58-59, 96-132, 262-71.) Each Defendant's participation was not incidental employment or clientage within some independent lawful business, but was itself directed toward that fraudulent objective: Onouye operated the IOLTA conduit that received, misappropriated, and distributed the stolen funds; Lascari, too, allowed for the misuse of his IOLTA account, served as director and signatory of Paramount Inc. (stealing its proceeds) and as director of other Enterprise entities, and structured the sham entities and trust-account transfers that misappropriated and converted proceeds from the fraud scheme and used them to purchase the Pacific Palisades mansion; Bravard conducted a fake U.S. Government interrogation of Troost and served as the strawman shareholder through whom the Enterprise effectuated Srivastava's ownership of 1234 Holding; and Sharon Srivastava personally reinforced the false CIA narrative to victims while directing distribution of proceeds of the fraud. (¶¶ 44, 86, 91, 261-71, 309, 419(b).)



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Because the shared objective here is the fraud itself—not, as in *Mikhov*, a legitimate business that defendants merely happened to operate together—the FAC pleads the common purpose that *Mikhov* found lacking.

**Structure or Organization:** Contractual relationships between defendants and coordinated mechanisms for committing fraud (such as the formation of shell entities) are hallmarks of an association-in-fact enterprise. *See Bondit, LLC*, 2020 WL 7777992, at *5. Gaurav and Sharon Srivastava were husband and wife who jointly participated in and personally benefitted from the scheme; Lascari, an attorney who acted as a business associate of Srivastava's, was installed as sole director and signatory of Paramount Inc. at Srivastava's direction; Bravard served as Srivastava's proxy shareholder and sole director of 1234 Holding, an entity Srivastava beneficially owned and controlled; and Onouye served as Srivastava's business partner and cash mule through GELG, a conduit through which the Enterprise's funds were laundered. (¶¶ 261-70). *See also Boyle*, 556 U.S. at 946.

The Srivastava Defendants invoke *Boyle* for the imposition of a structural requirement but ignore that *Boyle* significantly *lowered* the bar: "[m]embers of the group need not have fixed roles; different members may perform different roles at different times;" and "[t]he group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." 556 U.S. at 948. The Supreme Court expressly rejected any requirement of a "hierarchical structure" or "role differentiation." *Id.* The FAC alleges a far more structured enterprise than *Boyle* requires: specific transactional machinery—the IOLTA accounts, the shell entities, the sham documents, the coordinated WhatsApp communications—demonstrating an apparatus functioning for the commission of racketeering activity over six years.

**Longevity:** The Enterprise operated from at least 2019 through the present—a six-year span that comfortably satisfies the continuing-unit requirement. *See Odom*, 486 F.3d at 552-53.



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**Distinctness.** The FAC also establishes the required "distinctness" between the Enterprise and its individual members. "To establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005). This requirement has a low threshold—even corporate officers are sufficiently distinct from the corporations they control. *Moran v. Bromma*, 675 F. App'x 641, 645 (9th Cir. 2017) ("[A] corporate officer is sufficiently distinct from the corporation for which he works such that a plaintiff can allege the officer as the RICO person and the corporation as the RICO enterprise.") (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)). Here, none of the Defendants even work for the same formal corporation. The FAC pleads each individual defendant as a RICO "person" and the associated-in-fact Enterprise—comprising those individuals and the corporate shell entities they formed and controlled—as a distinct entity.

### 2. Each Defendant Conducted or Participated in the Conduct of the Enterprise

Under *Reves v. Ernst & Young*, 507 U.S. 170 (1993), a defendant must have played "*some* part in directing" the enterprise's affairs. *Id.* at 179 (emphasis in original). Defendants read *Reves* too narrowly. (*See* JM at 16-18.) The Court expressly held that an enterprise may be "'operated' or 'managed' by others 'associated with' the enterprise who exert control over it," and that liability "is not limited to those with a formal position in the enterprise"—"some part in directing the enterprise's affairs is required," but that includes "lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 179, 184. The FAC identifies each Defendant's specific role, satisfying this standard:

**Srivastava:** Led the Enterprise at all times, selected targets, fabricated the CIA narrative, directed wire transfers, and invested proceeds. (¶¶ 261-62.)





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**Bravard:** Acted as proxy shareholder, interrogated Troost under the guise of a government risk assessment, and pressured Troost to transfer shares. (¶¶ 58, 86, 91; 174-78; 221, 224-25.) Srivastava told Troost that Bravard was a "hard-nosed guy." (¶ 176 n.7.) He also received proceeds of the fraud and used some of it to purchase shares from Plaintiffs. He also reassured affiliates of Plaintiffs that "Srivastava was with the CIA," showing a supporting photo (¶ 86), and supported Srivastava's false pretenses that he worked with the U.S. Government. He actively looked for new victims of the Enterprise, identifying an owner of a distressed Swiss bank and attempting to defraud him. (*Id.*) He had the authority to incorporate companies to benefit the Enterprise and carry out its objectives. (¶ 91.)

**Lascari:** Controlled an attorney trust account receiving $25 million which was misappropriated and laundered through the scheme; served as sole director and sole signatory on Paramount Inc.'s bank account; formed Birdsong, Aurora Point, the Foundation, and Unicom; and orchestrated the mansion purchase. (¶¶ 265-69, 272-74.) He personally and improperly transferred $5.25 million from Paramount Inc. to Srivastava and facilitated the $24.5 million mansion purchase, conduct without which the Enterprise's scheme could not have succeeded. This is not "performing services"—it is exerting control. *Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008), is inapposite. (TGL at 16.) There, the attorney was alleged only to have failed to send trust reports and to have written emails and given advice in routine trust administration. The court specifically found she did not "occupy a position in the 'chain of command'" and was not "indispensable to achievement of the enterprise's goal." *Id.* at 1249. *Walter* itself holds that liability attaches where a defendant "knowingly implement[s] decisions of upper management" or where "participation was 'vital' to the mission's success." *Id.* The FAC alleges both: Lascari "took total control over the Srivastava Enterprise's main companies, legally in a superior position to even Gaurav Srivastava" (¶¶ 417(d), 97); he controlled his IOLTA account, which was used to misappropriate and launder more than $25 million; and



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

he was the sole signatory on Paramount Inc.'s bank account—the financial gatekeeper through which enterprise funds flowed, occupying precisely the "chain of command" position *Walter* requires.

**Onouye and GELG:** Operated the IOLTA account through which $13 million was received, misappropriated, distributed and laundered; formed Orbimo at Srivastava's direction; and has admitted to RICO liability. (¶¶ 96-132.)

**Maguire:** Provided false intelligence credentials for Srivastava to enable the wire fraud and money laundering at the core of the Enterprise, participated in extortion attempts, coordinated smear campaigns, and managed disinformation operations designed to assist the Enterprise in collecting more assets from Plaintiffs and to get away with the $43 million they stole. (¶¶ 78, 98-100, 296-304, 365-66, 367–93.) Maguire was an active participant in the Enterprise in early 2023, when it was financially damaging the Plaintiffs, and he helped it attempt to defraud additional victims, such as Murtaza Lakhani and Iraqi leaders. (¶¶ 98-99; 303-04; 402-05.)

**Sharon Srivastava:** Received and directed the misappropriation and laundering of fraud proceeds (including $1M+ received directly), served as President, Secretary, and Treasurer of Enterprise entities, and operated vehicles registered to shell companies. (¶ 44; 52; 89; 417(b).) She also actively assisted in setting up the fraudulent pretenses by being present at meetings in which Srivastava discussed his operations—it made Srivastava's stories more believable with her by his side. She also actively took those stories and added to them for the purposes of enhancing Srivastava's credibility so they could obtain cash. She also actively promoted the Enterprise through the Gaurav and Sharon Srivastava Family Foundation. (¶ 4.) Sharon and Gaurav, "both as officers of our charitable foundation and in private business matters with nation states, meet with dignitaries of many nations, including President Biden and others. ... Sharon and I [Gaurav] met with national leaders including President Biden and U.S. Secretary of State Anthony Blinken," and "in our important endeavors working alongside world leaders" those leaders placed "trust



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

and confidence ... in me and my wife [Gaurav and Sharon].” (¶ 42.)

Even if any individual defendant is not considered part of the “chain of command,” each qualifies at least as a lower-rung participant who was “under the direction of upper management” and whose participation was “vital to the achievement of the enterprise’s primary goal.” *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 977-78 (7th Cir. 1995). Without Lascari, the Enterprise lacked the credibility or know-how to conceal and facilitate wiring more than $25 million in funds into an attorney IOLTA account or to set up the shell entities used to perpetrate the fraud. *See In re Outlaw Lab., LP Litig.*, 2020 WL 1953584 (S.D. Cal. Apr. 23, 2020) (finding attorney-defendant’s conduct satisfied operation or management); *Tatung Co., Ltd. v. Hsu*, No. SA-CV-13-1743-DOC (ANx), 2015 WL 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (finding defendant who gave or took directions in “drafting unreasonable [] agreements” was “indispensable” to the scheme). Without Onouye and GELG, there was no IOLTA conduit for the $13 million. Without Maguire’s genuine former-CIA credentials, the Enterprise could not have sustained the deception that Srivastava was an actual CIA spy and (which induced Troost’s financial transfers), intimidated third parties into compliance, or placed fantastical negative articles with journalists. *See MCM Partners*, 62 F.3d at 978. So too, Sharon Srivastava’s role was vital to the Enterprise’s success. She was not merely present when Gaurav made his false representations; she actively joined him in projecting a sophisticated “Mr. and Mrs. Smith” couple persona that itself was a tool of the Enterprise. Her status as Gaurav’s wife materially enhanced the credibility of those misrepresentations. The apparent ratification by a spouse is qualitatively different from—and more powerful than—the presence of a business associate, because a marital relationship strongly implies trust, shared knowledge, and personal endorsement. Each defendant’s participation was vital—removing anyone would have compromised the Enterprise’s ability to function.



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

### 3. The FAC Adequately Alleges a Pattern of Racketeering Activity

A "pattern of racketeering activity" consists of "at least two acts of racketeering activity, one of which occurred . . . ... within ten years ... . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The acts must moreover be "related" and amount to or threaten "continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989).

The FAC identifies at least four different types of predicate acts of racketeering activity under 18 U.S.C. § 1961(1)(B) committed by the Defendants: (i) wire fraud under 18 U.S.C. § 1343; (ii) money laundering under 18 U.S.C. §§ 1956, 1957; (iii) obstruction of justice under 18 U.S.C. § 1513; (iv) attempted extortion under 18 U.S.C. § 1951. Each Defendant argues, without further analysis, that Plaintiffs recast their otherwise innocuous events as crimes. No Defendant analyze these underlying predicate statutes. This is because the FAC plainly alleges sufficient predicate acts to demonstrate a pattern of racketeering activity.

#### i. Related Racketeering Activity

***Wire Fraud***. The FAC alleges that each of the Defendants committed wire fraud violations. Gaurav Srivastava, Bravard, Lascari, Maguire and Onouye all sent wires in furtherance of the wire fraud violations, while the remaining Defendants actively and intentionally participated in the scheme to defraud. The elements of wire fraud are: "(1) a scheme to defraud, (2) the use of either the mail or wire, radio, or television to further the scheme, and (3) the specific intent to defraud." *RJ v. Cigna Health & Life Ins. Co.*, 625 F. Supp. 3d 951, 961 (N.D. Cal. 2022); *accord Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 634 (C.D. Cal. 2000).

No Defendant seriously disputes the FAC's allegations that there was a scheme to defraud. Nor could they, as the FAC alleges the Enterprise committed numerous acts of wire fraud to defraud Plaintiffs, including the following: (i) the GELG IOLTA misappropriation ($13 million, 2022-2023); (ii) the International Company/Birdsong

misappropriation ($25 million, 2022-2023); (iii) the Paramount Inc. looting ($5.25 million, 2022-2023); (iv) the "Inversion" fraud; (v) the Cedar West Dubai complaint (using doctored evidence attempting to procure Plaintiffs' profits); and (vi) the post-expulsion extortion and smear campaign (2023-present, attempting to take more property from Plaintiffs).

The Defendants used interstate and international wires to further the schemes. Gaurav Srivastava sent WhatsApp messages and text messages from California to Troost to cultivate the false CIA narrative, the basis for all of the stolen and laundered funds, and to pressure International Company into completing the fraudulent $25 million transfer. (¶¶ 180, 265-66.) Bravard emailed Srivastava and Onouye in California on September 5, 2022 to direct the structuring of the "Paramount project" and the creation of a U.S. subsidiary. (¶ 417(c)(iii).) Lascari exchanged WhatsApp messages and emails directing the mechanics of the fund transfers, including instructing International Company's representative on wiring the stolen funds and emailing PECSA's director in Switzerland to conceal Srivastava's involvement. (¶¶ 417(d)-(e).) Onouye and Srivastava exchanged WhatsApp messages as Srivastava directed Onouye to send funds acquired from Plaintiffs from GELG's IOLTA account to Sharon Srivastava, entities controlled by Srivastava and others in furtherance of Enterprise goals and activities, and Maguire sent wire communications misrepresenting Srivastava's power to remove individuals from OFAC lists and used interstate communications to contact the NYPD regarding Troost's daughter. (¶¶ 374, 417(g).) In addition, there was an array of domestic and international wires to and from California transmitting the $43 million in funds that Srivastava and the Enterprise misappropriated from California accounts. Each of these wires was in furtherance of the wire fraud scheme.

As to specific intent to defraud, Plaintiffs do "not need to expressly allege that defendants 'harbored a specific intent to deceive or defraud'" at the motion to dismiss stage. *Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 983 (C.D. Cal. 2025).



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Rather, they may establish the intent element of mail or wire fraud by alleging "the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension' [which] is shown by examining the scheme itself." *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 195-96 (9th Cir. 1987) (citation omitted); *see United States v. Jones*, 425 F.2d 1048, 1058 (9th Cir. 1970). As noted, the scheme to defraud was intentionally calculated to deceive persons of ordinary prudence and comprehension, and the Enterprise continually corroborated Srivastava's false CIA persona with a series of institutional trappings designed to overcome ordinary—even enhanced—skepticism: a genuine former CIA Deputy Station Chief who vouched for him (Maguire), a retired four-star general who unknowingly lent his credibility (Wesley Clark), political leaders of Country-1 (fooled by the Enterprise's earlier schemes) vouching for Srivastava; Sharon's knowing personal ratification of his stories; engagement letters with a law firm and requests to deposit funds in protected IOLTA accounts, a purloined U.S. Treasury official's business card, scars falsely attributed to combat injuries, and a California-licensed attorney (Onouye) who believed the story for years and personally distributed millions of dollars on that basis. (¶¶ 4, 98, 108, 124, 157, 186, 188, 231.) The scheme fooled many of note, including a "highly respected strategic intelligence firm" with real ex-CIA ties that credited Srivastava even *after* credible reporting about him by tier-one news outlets. (¶¶ 59, 390.) A scheme corroborated by this volume and caliber of institutional trappings is calculated to deceive persons of at least ordinary prudence, not merely the credulous.

The FAC goes above and beyond its requirements at this stage, also alleging that each of the Defendants had specific intent to defraud: Srivastava knew he was not a CIA operative yet repeatedly represented otherwise (¶¶ 2-3, 31); Bravard knew that he was not the "inside man" for the FBI in Geneva and that Srivastava was not a CIA operative, and later admitted "I know it's fraud. A shareholder cannot take money" (¶ 287); Lascari knew or was aware of a high probability that the funds he



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

handled were proceeds of crime and deliberately avoided confirming the truth (¶ 417(d)); Onouye knew or was aware of a high probability that the funds in his IOLTA account were not legitimate Government proceeds, but were received pursuant to a fraud scheme, and should not be sent to Sharon Srivastava and others; and Maguire knew Srivastava was not a CIA operative and was paid to lend his authentic intelligence credentials to sustain the false narrative (¶ 78.) Similarly, Sharon Srivastava knew her husband was not a high-level CIA Agent (he is not even a U.S. citizen) and was the direct recipient of $1,000,000 in misappropriated funds from GELG's IOLTA account. The FAC also alleges facts sufficient to hold the Defendants who claim lack of knowledge or mistake liable on a finding of deliberate ignorance. (*Infra*, at 59-61.)

Lascari argues that the Court should infer an "obvious alternative explanation" for Lascari's conduct—that he simply "performed the services he was hired to perform as an attorney"—citing *Ray v. Spirit Airlines, Inc.*, 126 F. Supp. 3d 1332 (S.D. Fla. 2015), and *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014). But that ignores the allegations in the FAC, which make clear that Lascari did not just perform the services of an attorney—he performed the services of a wire fraud participant and money launderer—and ignores the pleading standard. It also completely ignores his role as director of the various corporate entities comprising the Enterprise through which he, as director, took various actions to promote the Enterprises' criminal schemes, including moving money, attempting to take more money, and writing correspondence as those companies' director. In March 2023, Lascari even assumed a legally superior position to Srivastava in the Enterprise's structure, from which he pressed forward with the Enterprise's efforts to get away with Plaintiffs' cash it stole and to take much more. (¶ 417(d).)

***Money Laundering***. The FAC is replete with factual allegations meeting the elements of money laundering under various subsections of 18 U.S.C. §§ 1956 and 1957. The broadest and most straightforward is Section 1957 which simply requires





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

pleading that Defendants (1) knowingly engaged in a monetary transaction; (2) knew the transaction involved criminal property; (3) the value exceeded $10,000; and (4) the property was derived from (in this case) wire fraud. *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003). Generally, other subsections of 1956 add components knowing that the transaction was designed in whole or in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" (§ 1956(a)(1)(B)), or that those transactions were international (§ 1956(a)(2)(B)), or simply that defendants conspired to do any of these things (§ 1956(h)). All of these statutes criminalize attempting such transactions, as well as completing them—and the FAC pleads facts supporting the elements of each.

As to the requirement that a defendant knows that the transactions or attempted transactions involve property derived from some sort of criminal activity, the defendant cannot bury their head in the sand and deliberately avoid learning the source of funds involved in a transaction. *See, e.g.*, *United States v. Yi*, 704 F.3d 800, 804 (9th Cir. 2013) (deliberate ignorance "contains two prongs: (1) a subjective belief that there is a high probability a fact exists; and (2) deliberate actions taken to avoid learning the truth"). The FAC specifically pleads this alternative to actual knowledge. (*See, e.g.*, ¶¶ 417(e) (ii)-(iv).)

*Gaurav Srivastava.* The Srivastava Defendants' 31-page brief uses the word "launder" once—asserting without elaboration that the FAC "refer[s] to a hodgepodge of confusing correspondence and wire transfers concerning lawful financial transactions as 'money laundering.'" (GS at 15.) Nonsense. The FAC describes in meticulous detail several illegal financial transactions and attempted financial transactions and the predicate wire fraud offense underlying them. Maguire, Bravard, and 1234 Holding similarly do not challenge the adequacy of the money laundering allegations. Their failure to engage is a concession that the FAC adequately pleads money laundering.

*Sharon Srivastava and Lascari.* Both Sharon and Lascari challenge the money



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

laundering allegations, claiming they lacked knowledge. (SS at 3-4; TGL at 19-20). Construed in a light most favorable to Plaintiffs, the FAC more than adequately pleads all elements of money laundering—based on actual knowledge and, alternatively deliberate ignorance—against Sharon Srivastava and Lascari.

The FAC alleges that Sharon Srivastava knowingly engaged in transactions involving proceeds of specified unlawful activity, including a $210,393.90 cashier's check used to satisfy a lien on her home and a $1,000,000 deposit into her personal Citibank account from the GELG's IOLTA account, and that she knew Srivastava's claims were false and that the family had no legitimate income aside from the proceeds of fraud. (¶¶ 417(b)(i)-(ii), 419(b).) Sharon argues these allegations are conclusory and that she "played no part" in the transactions, but the FAC alleges the transfers were made "at Gaurav and Sharon Srivastava's instruction," and Rule 9(b) expressly permits knowledge and intent to be alleged generally. (¶ 417(h)(i); Fed. R. Civ. P. 9(b).) Moreover, the FAC alleges that Sharon Srivastava was directly aware of the Enterprise's fraud scheme and actively participated in it. She is no "passive recipient." Not only was the influx of cash substantially too large to receive without questions, third party discovery so far confirms the allegations in the FAC, showing that she went to Morgan Stanley and opened up a brokerage account, signing for it personally on September 8, 2022—right during the heart of the fraud—and then deposited the $1 million into it.

As to Lascari, the FAC alleges that he, as Paramount Inc.'s director, knowingly improperly transferred $5.25 million out of its bank account to his firm and to Orbimo for the Enterprise, in violation of 18 U.S.C. §§ 1957 and 1956(h). (¶¶ 417(e)(ii)-(iii).) Lascari argues his substantive case, claiming there is no evidence he was aware the transactions were not approved, and that the FAC does not allege that he knew. (TGL at 19.) We addressed this above; construed in a light most favorable to Plaintiffs, the FAC does allege that he was aware—and, in fact, there is irrefutable evidence that he knew this. (*See supra*, at 31 & n.20.)



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Lascari also argues that the FAC pleads facts showing that he did not know the source of the $25 million he laundered for the Enterprise (TGL at 19.) To the contrary, the FAC documents in detail Lascari's intentional dissembling about the source of funds: (1) first, in December 2022, it was a set of promissory notes between the International Company and Birdsong Central (¶ 264); (2) then, in January, he turned it into an intracompany loan repayment between the International Company and its offshore affiliate (¶ 268); (3) then, in May 2023, Lascari claimed it was a $51 million consulting contract with Srivastava from 2018, but which Lascari had never seen because it did not exist (he even offered to draft one)—*he also knew it was false* since he personally had already transferred $25 million, documenting it as an intracompany loan repayment from the International Company to its offshore affiliate (¶¶ 353-57); and (4) finally, in an act of desperation to take more money for the Enterprise, Lascari drafted and sent by international wire the smoking gun document (cut and pasted into the FAC) admitting that, all along, the Srivastavas' took the money from PDMCC (¶¶ 358-59. (Lascari pretends this does not exist: "Missing from Plaintiffs' allegations are any facts showing that the funds from []International Company were connected to a loan from PDMCC." (TGL at 19)).) For months after that, Lascari relentlessly kept trying to arrange international transfer of the money, which itself was wire fraud, and attempted money laundering, and money laundering conspiracy. (¶¶ 361-64; 417(e)(ix).)

Lascari does not address these allegations in his opposition. In a light most favorable to the Plaintiffs, the FAC alleges that Lascari knowingly personally committed wire fraud and money laundering predicate offenses, or alternatively, at the very least he deliberately avoided the truth by ignoring the numerous red flags (*e.g.*, shifting source-of-funds stories from Srivastava, and bank compliance rejection) and failing to investigate. ¶ 417(d); *accord United States v. Walter-Eze*, 869 F.3d 891, 909-10 (9th Cir. 2017) (finding a deliberate ignorance jury instruction in a federal financial fraud conviction justified where defendant ignored red flags

about the business and transactions and failed to investigate the truth).

***Obstruction of Justice***. A defendant is guilty of retaliation under 18 U.S.C. § 1513(e) if it (1) knowingly, (2) with the intent to retaliate, (3) takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, (4) for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense. 18 U.S.C. § 1513(e); *see United States v. Camick*, 796 F.3d 1206, 1220 (10th Cir. 2015) (reciting elements).

*Gaurav Srivastava.* The FAC alleges that, after his fraud was exposed and he knew that Plaintiffs were likely to tell law enforcement about Srivastava and the co-defendants fraud schemes, Srivastava undertook a campaign of retaliation, including sending threatening WhatsApp messages to Troost the day after his expulsion, making false accusations against Troost to Turkish officials, filing a criminal complaint against Troost in Dubai based on doctored evidence, and orchestrating a multi-jurisdictional smear campaign—actions harmful to Troost and Troost's businesses taken in retaliation for exposing the Enterprise's conduct to regulators and law enforcement. (¶¶ 344-45, 351-52, 364, 383, 417(e)(xi).) The Srivastava Defendants characterize this conduct as protected whistleblowing and petitioning activity, but as explained in Section F, above, a petition built on fabricated evidence and filed in retaliation for a victim's cooperation with authorities is not protected activity, and that factual dispute cannot be resolved at the pleading stage.

*John Maguire.* The FAC alleges that Maguire retaliated against Troost for reporting the Enterprise's conduct to federal authorities by drafting and disseminating disparaging and fake news articles about Troost, his family, and his companies, contacting the NYPD and sending them a photograph of Troost's daughter, falsely claiming she was part of an international criminal network linked to a sanctioned Russian oligarch, and telling Srivastava this would "pressure Troost into transferring money to Srivastava"—a knowing, retaliatory act harmful to

Troost's family. (¶¶ 373-74.) The FAC further alleges Maguire participated in sending anonymous emails falsely accusing Troost's daughter of being a "trained Russian spy" to her employer, in retaliation for Troost's reports to federal authorities. (¶ 375.) Maguire's characterization of this conduct as legitimate reporting to law enforcement, *see* JM at 21, ignores that the FAC alleges his own admission that the accusations were knowingly false and made for the specific retaliatory purpose of pressuring Troost, which independently satisfies each element of Section 1513(e).

***Attempted Extortion***. A defendant is guilty of extortion when it "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion *or attempts* or conspires so to do." 18 U.S.C. § 1951(a). "Extortion," in turn, is defined as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). *See United States v. Ward*, 914 F.2d 1340, 1347 (9th Cir. 1990) (upholding Hobbs Act extortion conviction for "pretending to be an undercover agent … who could cause the victim substantial financial harm if" he did not pay, which "attempted to instill fear in the victim").

Gaurav Srivastava attempted to extort Troost. In May 2023, he wrongfully threatened to report him to law enforcement and have him sanctioned if he did not transfer the Paramount entities to an entity under Srivastava's control in the U.S. (the "Inversion"). (¶ 335.) He threatened Troost again that week with "fucking pandemonium in your life" and that he would "fucking destroy everything in three seconds" if Troost did not execute the inversion. (¶¶ 32, 327.) Srivastava and Maguire together attempted to get Troost to pay $10 million USDT (a commodity under U.S. law) by threatening to release false damaging personal information about Troost. (¶ 348.) *See United States v. Koziol*, 993 F.3d 1160, 1181-82 (9th Cir. 2021). These wrongful threats of personal and economic ruin, and demands for cryptocurrency satisfy each element of attempted extortion under Section 1951(a).

*    *    *

Each of the foregoing predicate acts shares a common purpose (defrauding Plaintiffs), common participants (Srivastava, Lascari, Bravard, and the shell entities), common methods (false representations, sham documentation, and routing stolen funds through IOLTA accounts and shell entities), and a common victim (Plaintiffs)—satisfying the relatedness prong. *H.J. Inc.*, 492 U.S. at 240. Notably, in *Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986)—which Defendants cite—the Ninth Circuit expressly *found relatedness satisfied*; dismissal rested entirely on the continuity prong because the fraud there involved a single shipment diversion in a single year with no threat of repetition. *Id.* at 1399. Here, by contrast, the FAC alleges predicate acts spanning six years across multiple victims and multiple jurisdictions, which continues today unabated.

**ii. Continuity**

The predicate acts occurred over a six-year span, which far exceeds the two years identified as a "substantial period of time" for closed-ended continuity. *See Kearney v. Foley & Lardner, LLP*, 607 F. App'x 757, 759 (9th Cir. 2015). Further, the Enterprise defrauded multiple victims. Because closed-ended continuity is satisfied, open-ended continuity is not required. *Id.* However, the FAC also alleges a continuing threat: targeting Troost's contacts, like the Liberians in New York in September 2022, the Swiss Bank scheme identifying a new victim in 2023, the Iraq oil scheme in 2023-2024, Srivastava's political rebranding to find new victims in 2024-2025, and the Enterprise's continued use of the same fabricated intelligence narrative against new targets. (¶¶ 199-206; 408; 301, 303-04; 398, 410.) *See T-Mobile US, Inc. v. WCO Spectrum LLC*, 2024 U.S. Dist. LEXIS 250275, at *31 (C.D. Cal. 2024) (finding open-ended continuity adequately pled even where "one underlying scheme against one victim" because predicate acts went "beyond mere isolated and sporadic acts").

**4. The FAC Satisfies FRCP 8(a)(2).**

Invoking FRCP 8(a), the Srivastava Defendants and Maguire contend that the

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

FAC's allegations are "impermissibly collective." (GS at 28; JM at 15-16). This argument ignores the meticulous details set out in the FAC. "[I]n the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (quotations omitted). Here, the FAC's First Cause of Action contains individualized allegations for each Defendant organized under lettered subsections (a) through (h), identifying at least two independent predicate acts committed by each Enterprise participant with particularized detail. (¶¶ 417(a)-(h), 418). *See In re Wellpoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1035 (C.D. Cal. 2011) ("a plaintiff must allege at least two predicate acts by each defendant"). Each Defendant's role is described with "the time, place, and manner of each fraud plus the role of each defendant in each scheme." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989); *see also Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) (en banc) ("The only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself."). This is the opposite of "everyone did everything" allegations—it is individuated, transaction-level specificity identifying each Defendant's role at each stage. *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011).

Furthermore, in the Ninth Circuit, a pattern of racketeering activity via wire fraud can be established by a *co-schemer's* fraudulent acts. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 4890594, at *12 (N.D. Cal. Oct. 30, 2017) ("a defendant may be held liable for ... wire fraud if (1) the defendant was a knowing participant in a scheme to defraud; (2) the defendant had the intent to defraud; and (3) a co-schemer committed acts of ... wire fraud during the defendant's participation in the scheme"). Accordingly, each defendant need not have personally committed every predicate act—participation as a knowing member of the scheme subjects each to liability for the co-schemers' wire fraud within its

scope. *See also Jack Richter v. KRG Trading, Inc.*, No. 24-cv-03622-MWF (SKX), 2026 WL 413399, at *5 (C.D. Cal. Jan. 7, 2026) (allowing RICO claims where plaintiffs identified shell entities and sham agreements and defendants "diverted hundreds of thousands of Plaintiffs' funds directly into their own shell entities," holding defendants could be "legally liable for their co-schemers' use of ... wires") (citation omitted).

Maguire's assertion that the FAC "often fails to distinguish" among defendants ignores the specificity of these individualized allegations. Paragraph 417(g) identifies many of Maguire's specific predicate acts, including wire communications misrepresenting Srivastava's power to remove individuals from OFAC lists, participation in the attempted extortion of the International Businessman, and the attempt to extract $26 million under false pretenses. Even where the FAC uses collective allegations for contextual or structural purposes, such allegations are permissible in civil RICO cases so long as the "allegations of fraud" are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged[.]" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *11 (N.D. Cal. Oct. 30, 2017) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (permitting collective allegations against related entity defendants); *Tatung*, 2015 WL 11072178, at *30 (permitting group pleading where summary allegations were "necessary to structure an expansive and complex pleading" and noting that "[g]roup pleading is barred only when the complaint fails to list the specific factual basis for the group allegations"). The FAC puts each Defendant on notice: it identifies each by name, describes the specific predicate acts each committed, and ties each Defendant's conduct to communications, draft agreements, transaction dates, bank records, witness testimony, and documentary evidence.

Likewise, authorities for Lascari's argument that his alleged conduct is explained by an "obvious alternative explanation" are inapposite. *Ray* involved an





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

airline's standard commercial relationships with agents, employees, and consultants performing routine business functions—a paradigm of ordinary outsourcing, not fraud. 126 F. Supp. 3d 1332. *Eclectic Props*. involved a real estate investment where the inference of specific intent to defraud was genuinely speculative on the pleaded facts. 751 F.3d 990. Here, the FAC does not rest on generic "business relationship" allegations. It alleges specific conduct inconsistent with innocent lawyering: Lascari transferred $5.2 million from Paramount Inc. to Srivastava personally without verifying the conditions Troost had imposed; he facilitated routing $25 million through his own trust account into a $24.5 million mansion purchase; and he represented in writing that he was "not aware of a Paramount/[International Company] loan" despite having personally received and distributed the proceeds of that very purported loan through his trust account—a statement the FAC alleges was knowingly false. (¶¶ 362, 417(d)-(e).) These are not ambiguous facts susceptible to an innocent explanation; they are affirmative misrepresentations and undisclosed self-dealing that a reasonable factfinder could not attribute to ordinary legal representation.

**5. The RICO Conspiracy Claim Is Adequately Pled**

Defendants seek dismissal of the § 1962(d) conspiracy claim on the ground that it "fails for the same reasons the substantive RICO claim" does. Because the substantive claim survives for the reasons stated above, this argument is moot. It is also legally unsound.

"[A] RICO conspiracy under § 1962(d) requires only that the defendant was 'aware of the essential nature and scope of the enterprise and intended to participate in it.'" *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004)). A conspirator need not have committed or expressly agreed to commit the two or more predicate acts required for a substantive § 1962(c) violation. *Salinas v. United States*, 522 U.S. 52, 63-64 (1997) ("A conspiracy may exist even if a conspirator does not agree to commit

or facilitate each and every part of the substantive offense.") (citations omitted). Nor must the agreement be express—it may be "inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774-75 (9th Cir. 2002) (citations omitted). The FAC alleges that each Defendant was aware of the Enterprise's nature and scope, demonstrated by their coordinated participation over multiple years, and that each intended to participate in it. Onouye's admissions, incorporated in the FAC, confirm the existence of the conspiracy.

Each individual Defendant's attempt to escape conspiracy liability fails.

**Lascari** contends the FAC shows only that he "provided services for his clients." (TGL at 20-21.) But Lascari cites *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721 (7th Cir. 1998), whose holding on the conspiracy standard was expressly modified by *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000), which held that personal participation in operation or management is *not* required for conspiracy liability. A defendant need only agree that *someone* will conduct the enterprise's affairs through racketeering. *Id.* at 965. The FAC ties Lascari directly to the Enterprise: he formed shell entities on Srivastava's behalf, executed sham and backdated agreements, and transferred funds to and from his IOLTA account in furtherance of the scheme—conduct evidencing awareness and subjecting him to § 1962(d) liability. *See Richter*, 2026 WL 413399, at *6 (defendants subject to § 1962(d) liability where plaintiffs alleged they entered into sham agreements and diverted funds to shell entities).

**Maguire** cites *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) for a more demanding conspiracy standard, but *Baumer* pre-dates *Salinas*, which controls and requires only awareness and intent to participate. In any event, the FAC pleads facts giving rise to Maguire's awareness: he was paid to lend authentic intelligence credentials to sustain the false CIA narrative central to the Enterprise and its criminal violations (¶ 78); he received money from the Enterprise via his company, Xenophon



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Group (¶ 98); he coordinated directly with Srivastava to execute joint fraudulent representations to third parties (¶¶ 417(g)(i)-(ii)); and he and Srivastava jointly attempted to blackmail the International Businessman (¶¶ 365-66).

**Bravard** was recorded admitting "I know it's fraud" and acknowledging that Srivastava had improperly "paid to himself" $5.2 million and $50,000 of Plaintiffs' funds (¶ 287), a direct admission of awareness.

**Sharon Srivastava** was present when Srivastava falsely told UK witnesses he was in the CIA and recruited a man to the agency (¶ 123), and received over $1.3 million in personal deposits of Enterprise proceeds. (¶¶ 44, 417(b).) These allegations far exceed the minimum showing of awareness and intent required under § 1962(d).

### 6. Plaintiffs Adequately Plead Proximate Causation

Statutory RICO standing requires a plaintiff to show "(1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was by reason of the RICO violation, which requires the plaintiff to establish proximate causation." *Global Master*, 76 F.4th at 1271. "Property" for these purposes "comprehends anything of material value owned or possessed," and money is a form of property. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) (citing Webster's Third New International Dictionary 1818 (1961)). Plaintiffs' injuries are proximately caused "by reason of" Defendants' racketeering because the predicate offenses were not merely a "but for" cause but "the proximate cause as well." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). At the pleading stage, Plaintiffs need only allege "that someone in the chain of causation relied on Defendants' alleged misrepresentations and omissions." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1260 (9th Cir. 2019).

The FAC pleads both direct and indirect reliance, well exceeding this minimum standard. Direct reliance includes: wires to GELG's IOLTA account arranged on the basis that Srivastava had legitimate connections to the U.S.

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

government and that the deposited funds were to be distributed for use as part of the Program (¶¶ 13, 181-82, 243-44); and Troost's express conditioning of his consent to the $5.2 million Paramount Inc. transfer on first receiving supporting invoices—consent he never would have given had he known Srivastava and the Enterprise was defrauding him and that no such invoices existed (¶¶ 280-81). The FAC is chock full of allegations explaining why Troost believed and then relied on Srivastava's elaborate deception and misrepresentations which appeared corroborated at every turn. Srivastava fooled many sophisticated people and continues fooling them to this day. Indirect reliance is demonstrated by intermediaries in the chain of causation who executed transfers based on Srivastava's misrepresentations, including Onouye, who, at first, believed Srivastava was running CIA operations when he distributed funds from the GELG IOLTA account. (¶ 231.)

The Srivastava Defendants mischaracterize Plaintiffs' damages claim. They argue that "the alleged injury is inherently speculative and legally untenable" because "Plaintiffs essentially claim they lost the opportunity to engage in and continue to profit from Russian oil trading that resulted in sanctions." (GS at 24.) This is not true—Plaintiffs are seeking to reclaim the $43 million that the Enterprise misappropriated and laundered. Plaintiffs do not seek compensation for lost business opportunities or reputational damage. Three practical considerations from *Holmes* confirm that Plaintiffs' injuries are direct, not derivative. First, Plaintiffs' damages are readily ascertainable: the FAC identifies specific wire transfers, dollar amounts, bank account numbers, and dates, corroborated by Onouye's sworn admissions and contemporaneous bank records. 503 U.S. at 269. Second, there is no risk of duplicative recovery—Plaintiffs are the only parties seeking to recover the $43 million the Enterprise stole. *Id.* at 269-70. Third, Plaintiffs are the directly injured victims best situated to vindicate the law. *Id.* at 270. All three *Holmes* factors favor Plaintiffs.

Maguire's arguments fail as well. His contention that he did not personally

facilitate any predicate acts is contradicted by the FAC, which alleges that Maguire directly assisted the Enterprise's scheme to defraud through 2023—including wire communications misrepresenting that Srivastava had the power to get individuals removed from OFAC lists (¶ 78), and participated in the attempted extortion of the International Businessman (¶¶ 365-66), and the attempt to extract a further $26 million transfer on false pretenses (¶¶ 353, 363). Maguire's additional contention that his alleged participation post-dates the economically damaging predicate acts is also factually incorrect: Maguire attended a meeting in Dubai with Srivastava in February 2023 to attempt to defraud Iraqi officials, *prior to* another misappropriation from Paramount Inc.'s bank account to Orbimo in March 2023, demonstrating that the Enterprise's affairs were continuous. (*See* ¶ 297.) Maguire also ignores that the FAC alleges that his participation has been critical in the Enterprise's efforts to keep the $43 million that it stole, *i.e.*, to get away with their scheme—he knowingly adopted responsibility for the prior takings. RICO conspirators are "jointly and severally liable for the acts of their co-conspirators" because "the damage wrought by the conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002) (quotation omitted); *see also In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 622-23 (N.D. Cal. 2020) (rejecting defendant's argument at motion to dismiss stage that plaintiff failed to adequately allege proximate cause of injuries sustained before the defendant allegedly joined the RICO conspiracy "because liability under RICO is purposefully 'joint' and 'several'…As [defendant] is alleged to have joined the RICO conspiracy…[defendant] may be liable for conduct throughout the whole Enterprise"). Plaintiffs have pled concrete losses directly arising from the predicate acts and direct reliance on Maguire's misrepresentations, distinguishable from "derivative" or "passed-on" injuries at issue in *Holmes* and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). Under these circumstances, *In re JUUL Labs* and *Oki*



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

*Semiconductor* establish that Maguire is jointly liable for Plaintiffs' damages resulting from the predicate acts committed in furtherance of the RICO conspiracy from its inception.

### D. <u>The Fraud Claims Are Pled with Particularity</u>

Defendants argue the FAC fails to identify the "who, what, when, where, and how" of the alleged misconduct and that the RICO claims fail the plausibility standard under *Iqbal*/*Twombly*. The Srivastava Defendants cherry-pick only four paragraphs in a 400+ paragraph FAC to support this assertion (GS at 27-28), while ignoring the individualized allegations against each Defendant in FAC ¶ 417(a)-(h) and the hundreds of paragraphs of factual detail. This argument asks the Court to ignore the four corners of the pleading.

The FAC identifies with granular specificity: (1) **Who**—each individual defendant and their specific role in each transaction; (2) **What**—wire transfers with dollar amounts, bank account numbers, and routing details; (3) **When**—specific dates for each transaction (e.g., December 6, 2022 WhatsApp messages; December 7, 2022 promissory notes; December 20, 2022 backdated engagement letter); (4) **Where**—specific financial institutions (Bank of America, GELG IOLTA, Karlin & Peebles trust account, Granite Escrow); and (5) **How**—the mechanisms of fraud including the fake CIA persona, sham engagement letters, fabricated loan structures, backdated documents, and offshore routing. (*See* ¶¶ 166-288, 417(a)-(h).)

This is the opposite of the conclusory pleading that has been found insufficient in this District. Unlike in cases where complaints allege bare conclusions without factual support, the FAC provides transaction-level detail drawn from bank records, contemporaneous WhatsApp messages, and now-admitted facts from co-defendant Onouye's sworn declaration. Rule 9(b) is satisfied. *See MSP Recovery Claims*, 2024 WL 3464410, at *12; *Tatung Co., Ltd. v. Hsu*, 2015 WL 11072178, at *22.

The FAC also repeatedly sets forth the false representations made by Defendants and *why they were false*. *See Vess*, 317 F.3d at 1106. Srivastava's lies



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

about being a CIA agent and the "Program" were captured in recorded calls (¶ 31); Srivastava concedes that was not, and has never been, affiliated with the CIA (¶¶ 2-3). These fabrications were communicated to and perpetrated by Enterprise participants from August 2019 through at least June 2025. (¶ 424.) The specific false representations are traceable to individual defendants: Srivastava told Onouye he owned URG and worked with the CIA under "commercial cover" (¶¶ 67, 231); Maguire admitted to posing as active CIA and asserting that CIA affiliation could remove individuals from sanctions lists (¶¶ 298, 303); Bravard was introduced as the FBI's "inside man" in Swiss banking and reinforced the deception with a photo of Srivastava and President Biden to further legitimize Srivastava's deception (¶¶ 86, 228); and Sharon Srivastava told witnesses that "the boys from the Agency" frequented particular restaurants with her husband (¶¶ 150-63, 309).

Defendants forward premature defenses in an attempt to defeat plausibility. The Srivastava Defendants argue it would be "entirely unreasonable and implausible" to rely on a "guarantee" to violate the law—a mischaracterization of the FAC and sanctions law (GS at 28; *see supra*, at 12 n.10); Lascari contends he merely "performed services for his clients" (TGL at 18); and Maguire characterizes himself as a mere "consultant" or "advisor" (JM at 18). But "[a] Defendant's potential defenses to the allegations of the complaint are not reasons to dismiss it," and an alternative explanation can "fall short of being 'so convincing that plaintiff's explanation is implausible.'" *T-Mobile US, Inc. v. WCO Spectrum LLC*, No. CV 23-4347-DMG (EX), 2024 WL 6888623, at *5 (C.D. Cal. Oct. 22, 2024). And *Twombly*'s plausibility standard does not require a plaintiff to negate all alternative explanations—it requires only that the complaint "state a claim to relief that is plausible on its face." 550 U.S. at 570. The FAC has done so.

Lascari separately argues there is a "complete absence of any allegations showing that Lascari or his law firm benefitted from the activities of the alleged enterprise." (TGL at 18.) This argument fails because the Ninth Circuit does not





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

require proof of benefit to adequately plead RICO violations. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986) ("In a charge involving mail or wire fraud, it is not necessary to show that . . . the defendants secured a gain."). Sharon Srivastava cites *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991), but that case is inapposite: the mail-fraud predicate there failed because it alleged only a vague, multi-year date range for purported mailings and the alleged underlying conduct (capturing "market share") did not implicate a property interest cognizable under the mail fraud statute. By contrast, the FAC identifies specific dates, dollar amounts, and financial institutions for the transactions implicating Sharon Srivastava—including the June 22, 2022 cashier's check and the September 16, 2022 Citibank deposit—and alleges that Plaintiffs' own money was the target of the scheme. (¶ 417(b)(i)-(ii).) Sharon also challenges the money laundering predicates as "conclusory," but Rule 9(b) expressly provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The FAC goes further: it alleges that Sharon "had authority [over] how to apportion proceeds, including to herself," "knew [Srivastava's] claims were false," and knew "they had no legitimate income aside from the proceeds of fraud." (¶ 417(b).) And contrary to the assertion that she "played no part" in the September 2022 transaction (SS at 4), the FAC alleges the $1 million transfer was made "at Gaurav and Sharon Srivastava's instruction." (¶ 417(h)(i).)

**The "implausibility" argument fails at the 12(b)(6) stage.** Defendants argue the "fake spy" story is facially absurd and no reasonable person would rely on it. But this Court "must accept factual allegations in the complaint as true." *Manzarek*, 519 F.3d at 1031. The FAC does not rest on Troost's word alone. It alleges that witnesses from multiple continents—who do not know each other and have no connection to Troost—independently confirm that Srivastava held himself out as a U.S. intelligence operative and they believed him. These include: retired U.S. generals who participated in meetings arranged by Srivastava (¶¶ 77, 193, 198); former



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

intelligence officers who vouched for his credentials (¶¶ 77-78, 98-100, 127-28); a licensed California attorney who believed the CIA story for years and has now admitted RICO liability (Onouye, FAC ¶¶ 96-102); UK-based witnesses who knew the Srivastava family during 2019-2020 (¶¶ 117-41); Los Angeles-based witnesses formerly close to the Srivastavas' (¶¶ 150-63); and officials and businesspeople from Country-1 who confirm Srivastava posed as a CIA agent in Country-1 (¶¶ 142-49). The FAC also alleges that authenticated audio recordings—verified by a former FBI Electronics Engineer—capture Srivastava directly claiming CIA affiliation to Troost. (¶¶ 31-33.) Even the Kennedy Center recently allowed Srivastava to install a prominently placed plaque with his name, "dedicated to the U.S. intelligence community," again propping up his supposed U.S. intelligence bona fides. (¶ 409.) There is only one reason why witnesses from different parts of the world who do not know each other, none of whom is connected with Troost, would say that Srivastava passed himself off as a U.S. intelligence operative: because he did. That is not implausible. That is corroborated.

A Swiss prosecutor's preliminary assessment declining to investigate Troost's *criminal* complaint is not binding on a U.S. federal court applying *Iqbal*. And Troost's prior duping history, while rhetorically effective, does not render the allegations implausible; if anything, it shows a modus operandi that sophisticated fraudsters exploit. *See In re Outlaw Lab'y, LP Litig.*, 2020 WL 1953584, at *11 (S.D. Cal. 2020) ("On a motion to dismiss, the Court is to presume the truth of the allegations.").

### E. <u>The *Noerr-Pennington* Doctrine Does Not Immunize Defendants' Conduct</u>

#### 1. The Predicate Acts Are Not Petitioning Activity

Defendants argue that Plaintiffs' RICO claims are barred by the *Noerr-Pennington* doctrine because they are "predicated on First Amendment protected petitioning activity," including filing criminal complaints, reporting Troost to



ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

regulatory authorities, and engaging in media activity. (GS at 21-22.) This argument fails at every step of the applicable legal framework.

The *Noerr-Pennington* doctrine "is a rule of statutory construction that requires courts to construe statutes to avoid burdening conduct that implicates the protections of the Petition Clause of the First Amendment." *United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021). Courts apply a three-part test: they "(1) identify whether the lawsuit imposes a burden on petitioning rights, (2) decide whether the alleged activities constitute protected petitioning activity, and (3) analyze whether the statutes at issue may be construed to preclude that burden on the protected petitioning activity." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009). The doctrine does not apply unless each of those prongs are answered in the affirmative. *See id.* Defendants ignore this framework entirely, which is by itself fatal to their defense.

This case does not arise from government reporting. It arises from a multi-year criminal enterprise predicated on wire fraud, money laundering, extortion, and obstruction of justice. The FAC's RICO predicate acts consist of wire fraud in connection with Srivastava's fake CIA scheme and the misappropriation of $43 million (¶¶ 227, 417); laundering of nearly $38 million through use of attorney IOLTA accounts and California real estate (¶¶ 263-70); theft of $5.25 million from Paramount Inc.'s Bank of America account (¶¶ 281-83); and attempted extortion through improper threats of personal and economic ruin (¶¶ 32, 335, 348). *None* of these predicates involves petitioning any branch of government. Because the FAC's predicate acts are not petitioning activity, Plaintiffs' RICO action imposes no burden on petitioning rights. A judgment against Defendants for stealing $43 million would not deter anyone from filing government petitions. Nor can RICO be construed to immunize fraud. "The First Amendment does not protect fraud." *San Antonio Cmty. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1239 (9th Cir. 1997).

Moreover, the financial damage to Plaintiffs was complete before any

ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

government reporting occurred. The $13 million was misappropriated and laundered through GELG's IOLTA accounts, the $25 million was misappropriated and laundered through Lascari's IOLTA account and then converted into Pacific Palisades real estate, and the $5.25 million was stolen from Paramount Inc.—all before mid-May 2023, when any reporting activity began after the May 10 rescission and expulsion. Much of what Defendants point to as "petitioning" is not petitioning at all. Media campaigns do not implicate the Petition Clause. *See Musk v. OpenAI, Inc.*, 795 F. Supp. 3d 1179, 1186 (N.D. Cal. 2025) (holding that the *Noerr-Pennington* doctrine did not apply to a media campaign that "did not assist [counter-defendant] in petitioning any member of government or the courts"). The supposed petitioning activities, even if that is what they were, are also not the bases for Plaintiffs' damages—they are evidence of continuity and pattern, and evidence of Defendants' methods to attempt to get away with their crimes. It is well-recognized that overt acts of a criminal conspiracy need not be unlawful: "A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy." S3 Modern Federal Jury Instructions-Criminal 11.1 (2026). And, Defendants cite no authority for their argument's implied premise that wire fraud, money laundering, and conspiracy is protected by the First Amendment, nor any authority that petitioning activity is admissible as *evidence of* a pattern of racketeering activity.

Defendants' reliance on *Relevant Group, LLC v. Nourmand*, 116 F.4th 917 (9th Cir. 2024), is misplaced. *Relevant Group* involved rival hotel developers who challenged competing projects through California Environmental Quality Act administrative and judicial proceedings—classic government petitioning about land use. The Ninth Circuit found those CEQA proceedings were not objectively baseless, noting they resulted in settlements containing substantive, non-monetary environmental provisions—evidence the underlying proceedings had genuine merit. Here, by contrast, the core RICO predicate acts are not petitioning activities at all:

they are wire fraud (false representations that Srivastava was a CIA operative, fraudulent inducement of payments, misappropriation from attorney IOLTA accounts) and money laundering (routing stolen funds through IOLTA accounts to conceal the source of the funds and make the funds appear legitimate and to promote the scheme, and the use of shell companies and California real estate to conceal and promote the scheme).

Defendants conflate post-hoc reporting and whistleblowing—which may be protected—with the underlying fraud scheme, which is not. And unlike the CEQA proceedings in *Relevant Group*, the FAC alleges that defendants' own petitioning activity was itself baseless: the Dubai criminal complaint was based on "doctored evidence" and "modified" accounting records, and the Dubai Chief Prosecutor found "no grounds for filing a criminal case." (¶¶ 59, 87, 417(e)(xi).) Where *Relevant Group*'s petitioning had objective merit, Defendants did not.

**2. The Sham Exception Applies**

Even accepting Defendants' characterization of certain activity as petitioning, the sham exception bars *Noerr-Pennington* protection. The Ninth Circuit identifies three circumstances triggering this exception: (1) "where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful"; (2) "where the conduct involves a series of lawsuits brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose"; and (3) "if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006) (internal quotation marks omitted). All three circumstances are present here.

**Objectively baseless petitions with unlawful motive.** A petition is objectively baseless if "no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49,

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

60 (1993). Here, the FAC alleges—and the Dubai Chief Prosecutor expressly found—that Defendants' criminal complaint was based on doctored evidence: "some accounting statements relied upon by [Srivastava] ... had been modified by deleting key credit entries." (¶ 417(e)(xi).) A petition supported by fabricated evidence is, by definition, objectively baseless. *See United States v. Koziol*, 993 F.3d 1160, 1172 (9th Cir. 2021) (*Noerr-Pennington* did not protect defendant who "fabricated evidence, lied about the existence of evidence, and knew that his claims were baseless"). The unlawful motive is equally clear: the Dubai complaint was filed *after* Troost expelled Srivastava from PECSA and *after* Enterprise members threatened Troost with "fucking pandemonium" and demanded 10 million USDT in cryptocurrency. (¶¶ 32, 348.)

**Pattern of baseless filings without regard to merits.** The second sham exception applies "where the defendant is accused of bringing a whole series of legal proceedings without regard to the merits." *B&G Foods*, 29 F.4th at 539. Defendants filed the Dubai criminal complaint in August 2023, "email[ed] letters to officials in various countries, including Switzerland, the United States, Turkey and the UAE" on the "false pretext that Troost had stolen $47 million from Paramount" (¶ 343), and submitted a false copyright claim (¶ 387). This coordinated, multi-jurisdictional campaign was not genuine petitioning—it was a systematic effort to maintain leverage after the fraud unraveled.

**Intentional misrepresentations depriving proceedings of legitimacy.** The third exception applies where "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Sosa*, 437 F.3d at 938. The intentional submission of doctored accounting records to the Dubai prosecutor falls squarely within this exception. *See Koziol*, 993 F.3d at 1172 n.12 ("[F]alsified evidence, if included in a filed complaint or otherwise submitted to the court, would certainly qualify as intentional misrepresentations[.]"). Defendants' only response is a footnote asserting, without support, that the FAC

"mischaracterizes" the Dubai proceedings. But at the motion to dismiss stage, the Court must accept the FAC's well-pleaded allegations as true. *Iqbal*, 556 U.S. at 678.

**3. *Noerr-Pennington* May Not Apply to Foreign Government Petitioning**

Finally, Defendants argue that because "international regulators determined that the allegations against Troost had merit," their petitioning cannot be a sham, citing *Relevant Grp.*, 116 F.4th at 932 ("A winning lawsuit is by definition not a sham."). But Defendants *lost* their petitions. The Dubai Chief Prosecutor found "no grounds for filing a criminal case" after discovering fabricated evidence. (¶ 417.) A losing petition based on fabricated evidence is the *opposite* of a "winning lawsuit." Moreover, the *Noerr-Pennington* doctrine is grounded in the U.S. First Amendment's Petition Clause. Whether it extends to petitioning of foreign governments is at best uncertain—and the Dubai criminal complaint, filed with a foreign government using doctored evidence, is not the type of domestic democratic participation that *Noerr-Pennington* was designed to protect. Defendants do not provide authority for applying the *Noerr-Pennington* doctrine to their alleged foreign-facing activity.

**4. Maguire's *Noerr-Pennington* Defense Independently Fails**

Maguire separately argues that *Noerr-Pennington* bars the claims against him because the FAC alleges he "communicated with journalists, contacted law enforcement personnel, participated in efforts to provide information to government," and that "many of the FAC's allegations concern publications, websites, press activity, communications with reporters, and public commentary relating to matters of public concern." (JM at 21.) Like the Srivastava Defendants, Maguire ignores the *Kearney* three-part framework entirely and offers only conclusory characterizations of categories of conduct, without identifying how any specific allegation against him "imposes a burden on petitioning rights" or constitutes "protected petitioning activity." *Kearney*, 590 F.3d at 644. That failure is independently fatal to his defense for the same reasons stated above.



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

In any event, none of the conduct the FAC attributes to Maguire involves petitioning any branch of government for redress. The FAC alleges that Maguire: served as the Enterprise's "most notable legitimizer" by using his status as a genuine former CIA Deputy Station Chief to lend authentic intelligence credentials to sustain Srivastava's false CIA narrative, knowing Srivastava was not a CIA operative (¶¶ 78, 98); attended a February 2023 meeting with Srivastava, Troost, and Iraq's National Security Advisor at the Armani Hotel in Dubai, where he and Srivastava falsely claimed to represent the FBI and CIA and Maguire personally passed a handwritten note containing names of purported "wanted terrorists" (¶¶ 297-98); later admitted to a former Department of Homeland Security official that he had been "falsely posing as an active-duty CIA officer during meetings with officials in Dubai" (¶ 298); contacted the NYPD, sent them photographs of Troost's daughter, and falsely claimed she was part of an international criminal network linked to a sanctioned Russian oligarch—telling Srivastava this would "pressure Troost into transferring money to Srivastava" (¶ 374); planted a false article on Intelligence Online (¶ 384); sent false interstate text messages regarding sanctions relief (¶ 303); falsely claimed to an Iraq-meeting attendee that he was working with the "Deputy Director" of the CIA and that Troost was "a fugitive" being pursued by multiple countries (¶¶ 301, 405-06); participated in sending anonymous emails falsely accusing Troost's daughter of being a "trained Russian spy" to her employer in retaliation for Troost's reports to federal authorities, in violation of 18 U.S.C. § 1513(e) and (f) (¶ 375); and helped create a website targeting Troost's children in the UK and caused fake-journalist emails to be sent to his son's university in an attempt to have him expelled (¶¶ 417(f)(vii)-(viii)). None of this is petitioning. Maguire does not, and cannot, argue otherwise.

Even accepting Maguire's characterization of his NYPD contact and Iraq meeting as "petitioning," the sham exception independently defeats immunity. Maguire's NYPD report was objectively baseless—the accusation that Troost's

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

daughter belonged to an international criminal network was, on the FAC's allegations, a knowing fabrication, and the unlawful motive is explicit: Maguire told Srivastava the report would "pressure Troost into transferring money to Srivastava." (¶ 374.) Extortionists "are not free simply to file a complaint and thus don the protective mantle of *Noerr-Pennington* immunity." *Koziol*, 993 F.3d at 1172 n.12. Maguire's conduct also reflects a pattern of baseless filings without regard to the merits—the fabricated NYPD report, the Dubai complaint based on doctored evidence, and the repeated false statements to Iraqi officials together constitute "a pattern or practice of successive filings undertaken essentially for purposes of harassment." *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994); *B&G Foods*, 29 F.4th at 539. And Maguire's own admission that he was "falsely posing as an active-duty CIA officer during meetings with officials in Dubai" establishes that his representations to government officials were knowingly false—intentional misrepresentations that independently deprive any claimed petitioning of legitimacy. (¶ 298). *See Sosa*, 437 F.3d at 938.

### F. <u>The Anti-SLAPP Motion Should Be Denied</u>

California's anti-SLAPP statute exists to dispose of "nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue." *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 997 (N.D. Cal. 2015). The "archetypal" SLAPP suit is "generally meritless" litigation "brought by large private interests to deter common citizens from exercising their political or legal rights." *Id.*; *Castillo v. Pacheco*, 150 Cal. App. 4th 242, 249-50 (2007). This is the opposite of that case: Plaintiffs bring a well-documented $43 million fraud and racketeering action against the parties who stole their money. Defendants move to strike the state-law claims under Code of Civil Procedure § 425.16. The motion should be denied at the first prong—and even if the Court reaches the second prong, Plaintiffs demonstrate a

probability of prevailing.

**1. Prong One: The Claims Do Not Arise from Protected Activity**

At the first step, the moving party "bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." *Baral v. Schnitt*, 1 Cal. 5th 376, 395-96 (2016). Under *Park v. Board of Trustees of California State University*, 2 Cal. 5th 1057 (2017), and *Bonni v. St. Joseph Health System*, 11 Cal. 5th 995, 1067-68 (2021), courts must "determine whether particular acts alleged within the cause of action supply the elements of a claim or instead are incidental background." The "critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech." *City* of *Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002) (emphasis in original). A claim "may be struck only if the speech or petitioning activity itself is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." *Park*, 2 Cal. 5th at 1060.

Defendants fail to carry this burden. Rather than identifying specific allegations of protected activity tied to specific elements of specific claims, Defendants offer only a conclusory list: "filing criminal complaints 'around the world,'" "reporting Plaintiffs to authorities," and "engaging in other activities intended to call regulatory, prosecutorial, and public attention to Plaintiffs' illegal activities." This is precisely the kind of generalized assertion *Baral* forecloses. "Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." *Baral*, 1 Cal. 5th at 394-96. The motion should be denied on this basis alone.

Nor, in any event, do Plaintiffs' claims rely on any protected activity. The gravamen of Plaintiffs' state-law claims is fraud, conversion, and unfair business practices arising from the theft of tens of millions of dollars—not the petitioning or speech activity Defendants identify. The conversion claim is grounded in Defendants' misappropriation of specific, identifiable funds: $5,250,000 and $50,000



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

from Paramount Inc.'s Bank of America account (¶¶ 278-84); approximately $13 million diverted to GELG's California trust account (¶ 430); and $25 million laundered through Lascari's trust account and converted into the $24.5 million Pacific Palisades mansion (¶¶ 428, 431). The fraudulent misrepresentation claim rests on Srivastava's false statements that he was a CIA operative running a covert "Program," that he had control over OFAC and other U.S. agencies, and that Plaintiffs' transferred funds would support U.S. Government operations (¶¶ 1-3, 12-13, 19, 31, 170-71, 187-88, 254, 335). The § 17200 claim is grounded in these same unlawful predicate acts. None of these claims depend on political contributions, the Dubai criminal complaint, or any "misinformation campaign" as *elements*—those activities are, at most, evidence of the Enterprise's operations, which is insufficient to support a motion to strike. *Baral*, 1 Cal. 5th at 394-96.

For the same reasons that *Noerr-Pennington* does not immunize defendants' conduct, the anti-SLAPP motion fails at step one. *See Realtek Semiconductor Corp. v. MediaTek, Inc.*, 732 F. Supp. 3d 1101, 1117 (N.D. Cal. 2024).

### 2. Multiple Exceptions Apply

**Commercial Speech Exemption.** The exemption under § 425.17(c) applies where statements are made by a person "primarily engaged in the business" in connection with "commercial transactions." *Xu v. Huang*, 73 Cal. App. 5th 802, 812, 288 Cal. Rptr. 3d 558, 566 (2021). Srivastava's misrepresentations were made while soliciting Plaintiffs' investment of corporate assets and operational control in connection with Paramount's oil-trading business—quintessentially commercial activity. *See id.* at 817.

**Illegality Exception.** Under *Flatley v. Mauro*, 39 Cal. 4th 299, 320 (2006), anti-SLAPP protection does not apply where the defendant's activity is "illegal as a matter of law." The Dubai complaint—submitted with "doctored evidence" per the Dubai Chief Prosecutor—constitutes illegal conduct.

**Foreign Petitioning Is Not Protected.** "In California, 'petitioning activity

undertaken in a foreign country is not protected by the anti-SLAPP statute.'" *Sabadash v. Brevent*, 2026 WL 719164, at *5 (C.D. Cal. Jan. 5, 2026) (citing *Guessous v. Chrome Hearts, LLC*, 179 Cal. App. 4th 1177, 1186 (2009)).

**3. Prong Two: Plaintiffs Demonstrate a Probability of Prevailing**

Even if Defendants carried their burden at step one, Plaintiffs need only demonstrate "minimal merit." *Bonni*, 11 Cal. 5th at 1009; *Barry v. State Bar of Cal.*, 2 Cal. 5th 318, 321 (2017). At this stage, the Court must "accept as true all evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated the evidence submitted by the plaintiff as a matter of law." *City of Alhambra v. D'Ausilio*, 193 Cal. App. 4th 1301, 1306-07 (2011). Critically, where defendants challenge only legal sufficiency (as they do here), Plaintiffs "can properly respond merely by showing sufficiency of pleadings, and there's no requirement for a plaintiff to submit evidence." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). The same analysis that sustains the claims against a Rule 12(b)(6) challenge demonstrates the probability of prevailing for anti-SLAPP purposes. As set forth in Section G below and throughout this opposition, the pleadings are more than sufficient to show that each state-law claim has, at minimum, "minimal merit."

**G. <u>The State Law Claims Are Adequately Pled</u>**

**1. Fraudulent Misrepresentation**

Under California law, a fraudulent misrepresentation claim requires: (1) misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) justifiable reliance, and (5) damages. *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173-74 (2003). Each element is satisfied:

**False Representations:** The FAC alleges with particularity that Defendants made false statements of material fact: Srivastava falsely claimed to be a "non-official cover" (NOC) CIA operative running a clandestine "Program" monitoring



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Russian oil flows for U.S. national security (¶¶ 1-3, 12, 19); that he had direct contact with the CIA Director, the ability to "control" OFAC and other U.S. agencies, and influence over top U.S. politicians (¶¶ 31, 187-88, 335); that the U.S. Government had approved a special license allowing Plaintiffs to continue marketing Russian-origin crude oil under the Program and avoid sanctions (¶¶ 12-13, 170-71, 188); and that funds transferred by Plaintiffs would be used to support U.S. Government operations (¶¶ 20, 254). None of these representations were true. (¶¶ 2-3, 12, 444-45.)

**Knowledge:** The FAC adequately pleads scienter through both direct and circumstantial evidence. Srivastava knew he was not a CIA operative, yet repeatedly represented otherwise. (¶¶ 2-3, 31, 77-78.) The FAC alleges that Srivastava fabricated elaborate stories he knew to be false, including claims that he had been recruited by the CIA at age 16, received military training in Afghanistan, and obtained scars from CIA combat missions—when in fact those scars were from a childhood kidney operation. (¶¶ 108, 124.) The other defendants' knowledge is established through their active participation in the scheme, including creating sham documents, executing false promissory notes, and coordinating cover stories.

**Intent to Induce Reliance:** The FAC alleges the scheme was specifically designed to gain Plaintiffs' trust and extract their assets. (¶¶ 1, 40-42, 75-78, 131, 214-29.) Circumstantial evidence further establishes Defendants' fraudulent intent, including recorded admissions (¶¶ 31-33, 319, 328-37), prior identical schemes against other victims (¶¶ 105-16, 117-28, 150-62), and the use of known legitimizers with a documented history of vouching for fraudulent CIA personas. (¶¶ 75-78, 98-100, 299-302.)

**Justifiable Reliance:** Whether reliance was reasonable is a question of fact inappropriate for resolution at the pleading stage. *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995). Courts apply a "high bar" to find lack of reasonable reliance as a matter of law, requiring "undisputed facts" that "leave no room for a



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

reasonable difference of opinion." *Gunner Concrete, Inc. v. ProAll Int'l Mfr., Inc.*, No. 8:23-cv-02212-JVS-JDE, 2024 U.S. Dist. LEXIS 72051, at *11-12 (C.D. Cal. Apr. 18, 2024). Here, Plaintiffs' reliance is corroborated by sworn declarations from over a dozen victims and witnesses (¶ 33), including retired generals (¶¶ 77, 193, 198) and former intelligence officers (¶¶ 77-78, 98-100, 127-28)—all deceived by the sophistication of the Enterprise's scheme. And a California-licensed attorney (Onouye) believed the CIA story for years.

**Damages:** Over $43 million stolen. (¶ 26.)

Defendants' individual attempts to escape the fraud claim on the theory that each did not personally utter the core CIA misrepresentation fail for two independent reasons. First, each defendant is liable as a co-conspirator regardless of whether he or she personally made the CIA-related misrepresentations. "By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994); *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 480 F. Supp. 3d 1000, 1027 (N.D. Cal. 2020) (sustaining fraud claim against conspiracy member where the evidence supported a finding that the defendant "knew the target [of the misrepresentation] generally, the goal, and that the misrepresentations would be made"). Second, and independently, each individual defendant made his or her own affirmative misrepresentations, as detailed below.

**Maguire.** Maguire argues the FAC alleges only his "mere presence" at meetings, which cannot satisfy Rule 9(b). Not so. The FAC alleges that Maguire, "a genuine former CIA Deputy Station Chief, functioned as the Enterprise's most notable legitimizer," and that his presence and active participation in meetings alongside Srivastava—including with foreign officials and Troost himself—"communicated to those he encountered that Srivastava's claims of intelligence affiliation were authentic." (¶ 78.) But the FAC alleges far more than mere presence:





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Maguire personally "falsely claimed that Troost had 'stolen all of Plaintiffs' money,' that the UAE government had frozen Troost's funds and would transfer them to Srivastava to support the new company, and that Troost was a fugitive on sanctions lists and being pursued by multiple countries." (¶ 406.) These are specific, affirmative misrepresentations satisfying Rule 9(b). Maguire's knowledge of falsity is established both directly—the FAC alleges he "knew that Srivastava was not a CIA operative and was paid to lend his authentic intelligence credentials to sustain the false CIA narrative," ¶ 78—and circumstantially, through his documented history of vouching for a different fake CIA officer, Matthew Marshall, who defrauded a Montana billionaire in a nearly identical scheme. (¶ 302.)

**Sharon Srivastava.** Sharon argues there are "no plausible, actionable allegations" that she made a specific misrepresentation and that mere presence during others' misrepresentations does not satisfy Rule 9(b). The FAC alleges more than presence. Sharon "helped reinforce [Srivastava's] secret agent persona by affirming his secret mission stories in front of others," including "claiming ISIS took Srivastava hostage while on a mission." (¶ 43.) In the lobby of the Raffles Hotel, "Srivastava, in front of Sharon, explained to Troost, his wife, and owners of the hotel that he owned two companies with over two thousand employees (false) that took government helicopters and refitted them for special missions (also false)." (¶ 191.) And at a Los Angeles sushi restaurant, Sharon herself told Troost that "the 'boys from the Agency' liked" the restaurant and that it was "Gaurav's favorite spot to meet with the 'boys from the Agency' and discuss whatever they needed to discuss." (¶ 309.) The FAC alleges that Sharon's "participation was vital to the Enterprise, particularly as she ratified Srivastava's false claims about being a CIA operative by participating in those conversations with others, making it appear more likely that his representations were true because potential victims would think it unlikely that they were encountering a husband-wife fraud duo. She knew his claims were false, and that they had no legitimate income aside from the proceeds of fraud." (¶ 419(b).) These



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

are specific, affirmative misrepresentations, not mere social allegations.

**Lascari.** Lascari argues the fraud claim fails because the FAC "allege[s] no facts showing that Lascari made any" misrepresentations about Srivastava being a CIA operative. But Lascari is liable as a co-conspirator regardless of whether he personally made the CIA misrepresentation, *see Applied Equip. Corp.*, 7 Cal. 4th at 511, and the FAC independently alleges his own affirmative misrepresentations. Lascari sent an email from California to PECSA's director in Switzerland on March 9, 2023 "for the purpose of keeping Srivastava's involvement concealed from financial institutions." (¶¶ 417(d)-(e).) When Troost expressly conditioned release of $5.2 million from Paramount Inc. on presentation of "an invoice ... documenting legitimate Paramount-related expenses," Lascari—a party to that very communication—disregarded the condition and transferred the funds to his firm's IOLTA account and then to Srivastava personally. (¶¶ 280-81.) And Lascari falsely asserted that he had no knowledge of any loan between Paramount and the International Company, when he had in fact personally orchestrated the entire structure of the $25 million transfer. (¶ 362.) Lascari's backdated engagement letters are further direct evidence of his knowledge of the scheme's fraudulent nature. (¶¶ 267-68.)

### 2. Conversion

Conversion requires: (1) plaintiff's ownership or right to possession, (2) defendant's wrongful act or disposition of the property, and (3) damages. *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010). The FAC identifies specific, identifiable property:

(a) $5,250,000 in Paramount Inc.'s Bank of America account;

(b) $13 million deposited in Global Energy's IOLTA account;

(c) $25 million deposited in and routed through Lascari's trust account.

"California courts generally permit actions for conversion where a readily ascertainable sum has been misappropriated, commingled, or misdirected." *Henley*



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

*Fin., Ltd v. Goyette & Assocs., Inc.*, No. 2:20-cv-01834, 2022 U.S. Dist. LEXIS 35208, at *17 (E.D. Cal. Feb. 24, 2022). An "unauthorized transfer of funds is sufficient to constitute disposal of a plaintiff's funds in a manner inconsistent with the plaintiff's rights." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016). That is precisely what Onouye and Lascari did—receiving Plaintiffs' identifiable funds into trust accounts and distributing them for Srivastava's personal benefit. Moreover, "an agent, with knowledge of another's right to receive a specific amount of money, can be liable for conversion when he applies it for his own use." *Fisher v. Machado*, 50 Cal. App. 4th 1069, 1073 (1996).

Each individual defendant's argument that the conversion claim fails as to them is unavailing.

**Maguire** argues that the FAC does not allege he "received Plaintiffs' funds, exercised control over Plaintiffs' assets, possessed Plaintiffs' property, participated in the alleged transfers, or exercised authority over assets allegedly belonging to Plaintiffs." (JM at 24-25.) As a threshold matter, Maguire is liable for conversion as a co-conspirator. *See Applied Equip. Corp.*, 7 Cal. 4th at 511 ("a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy"). Beyond that, the FAC specifically alleges Maguire's direct participation in efforts to obtain Plaintiffs' funds: "Srivastava, Lascari, and Maguire repeatedly attempted to extract the remaining $26 million of PDMCC's loan proceeds held by the International Company" from February through September 2023. (¶ 353.) The FAC also alleges that Maguire "received money from the Enterprise via his Williamsburg, Virginia-based company, Xenophon Group." (¶ 98.) And Maguire met with the Iraqi National Security Advisor and represented that he and Srivastava were working with U.S. intelligence to expand oil operations, falsely claiming "that Troost had 'stolen all of Plaintiffs' money'" and that the UAE government had frozen Troost's funds. (¶¶ 405-06.) These allegations establish active participation in the Enterprise's coordinated efforts to obtain and convert Plaintiffs' assets, not mere



(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

bystander conduct.

**Sharon Srivastava** argues that "Plaintiffs do not plead facts showing that Mrs. Srivastava wrongfully exercised dominion over identifiable property belonging to Plaintiffs" and that "[g]eneralized allegations of receipt of funds or benefits are insufficient." (SS at 5.) But the FAC alleges *specific, identifiable* funds that Sharon received: "more than $210,000 on June 22, 2022 to pay off a lien on her house, and receiving $1,000,000 on September 12, 2022, and $100,000 on December 6, 2022, in her personal Citibank account." (¶ 44.) The FAC further alleges that Sharon "had authority [over] how to apportion proceeds, including to herself ($1,000,000 to her own bank account)." (¶ 419(b).) These are not "generalized allegations of receipt"—they are specific amounts, specific dates, and specific accounts documenting Sharon's personal receipt and exercise of dominion over identifiable stolen funds.

**Lascari** argues conversion fails because the FAC does not allege he took "any specifically identifiable property independent of the parties' contractual and ownership disputes arising from the SPA." But Lascari's conversion liability does not depend on the SPA. The FAC alleges Lascari personally converted: (1) $25 million that he caused the International Company to wire to his attorney trust account, which he then used to purchase the Pacific Palisades mansion (¶¶ 263-70); (2) $5.2 million that he, as Paramount Inc.'s sole director and signatory, transferred from Paramount Inc.'s Bank of America account to his own trust account and thence to Srivastava personally (¶¶ 278-81, 417(e)(iii)); and (3) $50,000 transferred from Paramount Inc. to Orbimo (¶¶ 284, 417(e)(ii)). In each instance, Lascari was an agent over the funds supposed to remit payment for certain stated purposes but instead paid those funds for the personal benefit of the Enterprise. *Fisher v. Machado*, 50 Cal. App. 4th 1069, 1073 (1996). None of these transactions requires interpretation of the SPA; each involves misappropriation of identifiable, U.S.-located funds by a domestic fiduciary.





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

### 3. The UCL Claim Is Independently Grounded

To state a claim under Section 17200, a plaintiff must assert "any unlawful, unfair or fraudulent business act or practice." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Section 17200 claims predicated on RICO violations satisfy Plaintiffs' burden at the pleading stage. *Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 991 (C.D. Cal. 2025) (plaintiffs stated a UCL claim based on unlawful practices where plaintiffs' adequately pled RICO claims were predicated on the same activity). Plaintiffs far exceed this burden because all three prongs are independently satisfied. **Unlawful prong:** Violations of 18 U.S.C. § 1962 (RICO), § 1343 (wire fraud), §§ 1956-57 (money laundering), and § 1951 (extortion) constitute predicate "unlawful" acts. *See e.g.*, *Zinus, Inc. v. Foshan Aiyi Fam. Article Co.*, No. 8:24-CV-00247-JVS-PVC, 2026 WL 252355, at *6 (C.D. Cal. Jan. 30, 2026) (granting declaratory and injunctive relief and damages where plaintiffs' UCL claims predicated on RICO violations under 1964(c) were adequately pled). **Fraudulent prong:** The underlying fraud is well pled for the reasons stated above. **Unfair prong:** "An unfair trade practice under Section 17200 exists 'when a business practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Twin City Fire Ins. Co. v. Mitsubishi Motors Credit of Am.*, 2004 U.S. Dist. LEXIS 30716, at *6 (C.D. Cal. June 14, 2004). Defendants' deception to induce Plaintiffs' cooperation and subsequent laundering of over $43 million through attorney trust accounts satisfies this standard. Because Section 17200 "'borrows' violations from other laws," Plaintiffs' fraud and conversion claims are "independently actionable as unfair competitive practices." *Avila v. Wells Fargo Bank*, 2012 U.S. Dist. LEXIS 132499, at *5-6 (N.D. Cal. Sept. 17, 2012).

## H. Defendant Lascari's Attorney-Privilege Arguments Fail; *McDermott* Does Not Immunize RICO Fraud

Lascari argues that "every meaningful aspect of Plaintiffs' case" against him





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

"involves discussions with his clients, communications of his clients' objectives to him, the advice he gave, and his recommended strategies" and that an "effective defense by Lascari would require him to depend on the same privileged information." (TGL at 7.) He contends that *McDermott, Will & Emery v. Superior Court*, 83 Cal. App. 4th 378 (2000), requires dismissal on public policy grounds. This argument fails for several independent reasons.

**First, the privilege does not apply to business-agent functions**. The attorney-client privilege "is inapplicable where the attorney merely acts as a negotiator for the client, gives business advice or otherwise acts as a business agent." *U.S. Bank N.A. v. Ocean Towers Hous. Corp.*, 2017 WL 7240726, *12 (C.D. Cal. Dec. 7, 2017). Records reflecting ordinary business or financial activity are not privileged. *See In re Fischel*, 557 F.2d 209, 212 (9th Cir. 1977); *Clarke v. American Commerce National Bank*, 974 F.2d 127, 130 (9th Cir. 1992) (billing and accounting records not privileged).

Lascari's role as pled in the FAC consisted overwhelmingly of business and escrow-agent functions: as sole director and signatory on Paramount Inc.'s bank account, he transferred $5,250,000 to his firm's IOLTA account; he caused a $25 million wire from the International Company to be routed into that same IOLTA account, where it was commingled before being used to purchase the Pacific Palisades mansion, as director of Birdsong Central; he personally executed three sham promissory notes as director of Birdsong Central; and he exchanged WhatsApp messages and emails directing the mechanics of fund transfers—instructing the International Company's representative that "[w]e will definitely need the funds transferred in full by Friday." (¶¶ 262-71, 359, 361-62.) None of this reflects legal advice given in confidence; it reflects Lascari's function as a business agent, escrow conduit, and signatory on financial transactions. No privileged communication need be disclosed for Plaintiffs to prove—or for Lascari to defend against—these allegations.



ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**Second, the crime-fraud exception applies.** "There is no privilege under this article if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud." Cal. Evid. Code § 956. The Ninth Circuit has expressly recognized that outside counsel and their client can together form a RICO enterprise. *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 362 (9th Cir. 2005). Where a complaint pleads a prima facie claim for fraud and a relationship between the fraud and the communications at issue, the crime-fraud exception applies. *DeFrees v. Kirkland*, No. CV 11-4272 GAF SPX, 2012 WL 1356495, at *16 (C.D. Cal. Apr. 11, 2012). *McDermott* and its progeny cannot shield an attorney alleged to have conspired to commit fraud or violate RICO.

**Third, Lascari has the right to defend himself.** Lascari's theory reads California's confidentiality rules to forbid him from saying what he needs to say to defend himself, citing Cal. Bus. & Prof. Code § 6068(e)(1) and the concurring opinion in *Cain v. Superior Ct.*, 110 Cal. App. 5th 639, 669-70 (2025. (TGL at 7-8.) Federal, not state, law governs privilege in this federal question litigation. *Dole v. Milonas*, 889 F.2d 885, 889 n.6 (9th Cir. 1989); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 835 F.3d 1155, 1158 (9th Cir. 2016); *see also United States v. Zolin*, 491 U.S. 554, 562 (1989). And Federal law *permits* an attorney to disclose what is reasonably necessary to defend against a client-related claim. *See In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Secs. Litig.*, 120 F.R.D. 687, 691 (9th Cir. 1988) (applying then-Model Rule 1.6(b)(2):"A lawyer may reveal such information [relating to representation of a client] to the extent the lawyer reasonably believes necessary: (2) ... to establish a defense to a ... civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client"); *Qualcomm Inc. v. Broadcom Corp.*, No. 05-cv-1958-B (BLM), 2007 WL 2900537 at *1 (S.D. Cal., Sept. 28, 2007); *accord Wadler v. Bio-Rad Laboratories, Inc.*, 212 F. Supp. 3d 829, 845-47 (N.D. Cal. 2016) (use of information in context of Sarbanes-Oxley/Dodd-Frank

whistleblower retaliation case).

Even if federal law did not apply to these questions—and it does—Lascari's state authority does not support his motion. *Cain* addressed the confidentiality interest of a former client weighed against a criminal defendant's right to counsel and did not address the crime-fraud exception. *McDermott* is also inapposite in a more fundamental respect: the attorney's own client held the privilege, and the plaintiffs suing on the client's behalf could not release it. 83 Cal. App. 4th at 383-84. Here, Plaintiffs are not Lascari's clients, they are third-party victims of a fraud scheme in which Lascari is alleged to have personally participated. Even if applicable, *McDermott* does not create blanket immunity for attorneys who join a criminal enterprise, and it says nothing about the rights of strangers to the attorney-client relationship who were injured by that enterprise's conduct. Beyond this structural distinction, Plaintiffs are not suing Lascari for malpractice or for how he advised his client. They are suing him for personally directing financial transactions, executing fraudulent documents, and laundering money through his trust accounts. The distinction is between a lawyer being sued for what he *said* (*McDermott*) and a lawyer being sued for what he *did* (this case). The crime-fraud exception independently pierces the privilege where legal services were used to further a crime or fraud, and courts routinely allow civil claims by third parties against attorneys alleged to have joined their clients' frauds.

**Fourth, dismissal is premature.** Public policy dismissals of claims against an attorney "will seldom if ever be appropriate at the demurrer stage of litigation" and instead "will be litigated and determined in the context of motions for protective orders[.]" *General Dynamics Corp. v. Superior Court*, 7 Cal. 4th 1164, 1190 (1994). If and when privilege issues arise during discovery, this Court can conduct *in camera* review. *See Zolin*, 491 U.S. at 568-72.

**I. <u>The Personal Jurisdiction Arguments of Maguire, Bravard, and 1234 Holding Fail</u>**



ROSEN ✧ SABA, LLP (Mod)
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Maguire (domiciled in Montana), Bravard (a Swiss/French citizen residing in Switzerland), and 1234 Holding SA (a Swiss entity) each argue that this Court lacks personal jurisdiction over them. Their arguments fail under 18 U.S.C. § 1965(b), which provides for nationwide service of process in RICO actions.

Under *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 538-39 (9th Cir. 1986), § 1965(b) permits jurisdiction over all alleged co-conspirators when: (1) the court has personal jurisdiction over at least one participant; (2) no single district has jurisdiction over all alleged co-conspirators; and (3) a single nationwide RICO conspiracy exists. All three conditions are met.

**First**, the Court has personal jurisdiction over multiple defendants: Srivastava resides in California; Onouye and Lascari are California-licensed attorneys; GELG is a California professional corporation; Unity Resources Group and Orbimo list California addresses.

**Second**, no single district has jurisdiction over all defendants—because there is none. The defendants reside in or are citizens of California, Montana, Delaware, Wyoming, Switzerland, France, and India. Neither Maguire nor Bravard nor 1234 Holding identifies an alternative forum in which all defendants could be joined. That failure is itself dispositive. *See Barantsevich v. VTB Bank*, 954 F. Supp. 2d 972, 989 (C.D. Cal. 2013) (failure to identify an alternative district warrants dismissal of the § 1965(b) challenge).

**Third**, the FAC pleads a single, nationwide RICO enterprise. The "ends of justice" thus require joinder of all co-conspirators here. *Butcher's Union*, 788 F.2d at 539.

Maguire argues that Plaintiffs failed to identify the specific subsection of § 1965 authorizing nationwide jurisdiction, calling this "one of the principal jurisdictional defects" uncured by the FAC. (JM at 9.) This argument elevates form over substance. Section 1965(b) is the only provision of § 1965 that authorizes nationwide service, and Plaintiffs have pled all three elements the Ninth Circuit

requires for its application. The only constitutional limitation on nationwide service under § 1965(b) is whether the defendant has sufficient minimum contacts with the *United States*—the "national contacts" analysis. *See Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 369 (3d Cir. 2002); *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994). Maguire is a U.S. resident domiciled in Montana who operates Xenophon Group, a Virginia-based consulting company through which he received Enterprise funds. (FAC ¶ 98; Maguire Decl. ¶¶ 3, 19.) He traveled to California approximately six times between 2022 and 2024, and his own declaration concedes that "some of these trips" were to meet with Srivastava. (Maguire Decl. ¶ 18.) He contacted the NYPD in New York via interstate communications. (FAC ¶ 417(g)(iv).) He communicated with journalists and intelligence contacts via interstate wires to coordinate activities against Troost. (¶¶ 367-68, 417(g)(iii).) And he claimed to third parties that he and Srivastava had "a new company registered in California." (¶¶ 100, 301.) Maguire's contacts with the United States are pervasive; the national-contacts test is satisfied many times over. Bravard's U.S. contacts—receiving $150,000 from a California trust account, emailing California-based co-conspirators about structuring the "Paramount project," soliciting $2 million for a U.S. entity, and conspiring to transfer $500,000 from a U.S. bank account—similarly satisfy this test.

Bravard and 1234 Holding separately argue that they lack traditional minimum contacts with California under *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004) and *Walden v. Fiore*, 571 U.S. 277 (2014), and submit a declaration asserting that Bravard has not travelled to the United States since 2019, is not the ultimate beneficial owner of 1234 Holding, did not direct funds from California, holds no position with any U.S. company, and has not purposefully directed conduct at California. (NB at 5–6; Bravard Decl. ¶¶ 2-16.) These arguments fail for two independent reasons.

**First, § 1965(b) provides an independent statutory basis that does not**

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**depend on individual contacts.** Once § 1965(b) applies, as it does here, traditional minimum-contacts analysis under *Walden* and *Schwarzenegger* is beside the point. Section 1965(b) provides nationwide service of process where the three *Butcher's Union* elements are met, regardless of whether any individual defendant has independent contacts with the forum. *See Butcher's Union*, 788 F.2d at 538-39. Bravard argues Plaintiffs "do not plead RICO jurisdiction" because they did not invoke § 1965(b) in the FAC. (NB at 7.) But § 1965(b) is a jurisdictional statute, not a pleading requirement—Plaintiffs need not incant magic words in the complaint to invoke a statutory basis for service of process. The FAC pleads a single nationwide RICO conspiracy, and that is sufficient.

**Second, even absent § 1965(b), the FAC alleges conduct by Bravard purposefully directed at California.** Bravard's declaration states he has not traveled to the United States since 2019 and did not "direct that any funds be sent from California." But physical presence is not required for specific jurisdiction. Under the *Calder* effects test, jurisdiction exists where a defendant commits an intentional act expressly aimed at the forum, causing harm the defendant knows is likely to be suffered there. *Calder v. Jones*, 465 U.S. 783, 789-90 (1984). The FAC alleges that Bravard:

- Was introduced to Troost as "the FBI's 'inside man in Swiss banking'" (¶ 86)—a representation that expressly invoked a *U.S. federal agency* as the basis of Bravard's authority and credibility. Bravard's entire role in the scheme was premised on a purported connection to the U.S. government, and his conduct—pressuring Troost to transfer assets that would flow into U.S. accounts and be controlled by California-based Enterprise members—was designed to exploit that claimed U.S. nexus.
- Emailed Srivastava and Onouye *in California* on September 5, 2022, to explain the "key points we need to focus on the structuring of the P [Paramount] project," including advising them to "create a US subsidiary"





(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

to "take over all compliance, control of the group." (¶ 417(c)(iii).)

- Received $150,000 wired *from* GELG's California IOLTA account to his Dorsay Services account in Switzerland on July 21, 2022, which the FAC alleges were proceeds of crime that Bravard knew to be criminally derived. (¶ 417(c)(i).) Bravard then used those California-sourced funds to pay the nominal CHF 50,000 for the 50% PECSA shares nine days later.
- Conspired with Srivastava, Lascari, Cedar West, and 1234 Holding to transfer $3,000,000 (and, on information and belief, actually transferred $500,000) from a U.S. bank account to Bravard's Dorsay Services account at UBS in Switzerland in approximately February 2023. (¶ 288.)
- On April 19, 2023, requested that Plaintiffs send $2,000,000 to Paramount Inc.—the U.S. subsidiary whose Bank of America account was the Enterprise's vehicle for extracting and laundering stolen funds within the United States. (¶ 285.)
- Coordinated with Srivastava—who was based in California—throughout 2022-2023 through international wire communications to carry out the scheme, including pressuring Troost into transferring shares and attempting to execute the "inversion" plan to redomicile the entire Paramount business under U.S./Enterprise control. (¶¶ 214-29, 343.)

Even absent § 1965(b), the Court has specific jurisdiction over Maguire under the *Schwarzenegger* test. Maguire argues his California trips were "occasional" and unrelated to the core fraud. (JM at 4-5.) The FAC tells a different story. Surveillance footage from Paramount Inc.'s Los Angeles office shows Maguire physically present at the Enterprise's California headquarters on May 18, 2023, meeting with Srivastava while they were "on the offensive against Plaintiffs, attempting to assure that the Enterprise successfully got away with the proceeds of fraud." (¶ 98.) Maguire also met with Srivastava and former CIA officer Mary Beth Long in California on or about April 13, 2023. (*Id.*) On December 5, 2023, while in California, Maguire falsely told

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Srivastava's former Chief of Staff Jim Reese that Troost was sanctioned in the United States and that UK authorities were pursuing Troost. (¶ 100.) And Maguire claimed to third parties that he and Srivastava had "a new company registered in California" for Iraqi oil operations. (¶¶ 100, 301.) Maguire contends these contacts post-date the SPA and initial wire transfers and therefore the claims do not "arise out of" them. (JM at 5-6.) This mischaracterizes the RICO claims, which are premised on a *continuing pattern* of racketeering activity conducted through a California-based enterprise—not merely the SPA transaction. Maguire's own predicate acts of wire fraud, extortion, and obstruction occurred during the very period of his documented California presence in April and May 2023.

Because the first two prongs of the *Schwarzenegger* test are satisfied for both Maguire and Bravard, the burden shifts to them to make a "compelling case" that jurisdiction would be unreasonable. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1079 (9th Cir. 2011). Neither can carry that burden. Maguire contends he is a retired pensioner for whom California litigation would impose a "substantial burden." (Maguire Decl. ¶¶ 31-32.) But a defendant who voluntarily traveled to California six times in two years to advance a racketeering enterprise cannot credibly claim that litigating there would be fundamentally unfair. Bravard argues that as a Swiss citizen he has "no contacts of any kind" in California. (NB at 4.) But he voluntarily injected himself into a California-centered scheme by communicating with California-based Enterprise members, arranging to receive fraud proceeds from California trust accounts, and helping structure the Enterprise's plan to create a U.S. subsidiary. California has a compelling interest in adjudicating claims arising from the misappropriation of tens of millions of dollars through California attorney trust accounts, and there is no alternative forum capable of resolving all claims against all defendants. Neither Maguire nor Bravard has made the "compelling case" that jurisdiction would be unreasonable. *See Schwarzenegger*, 374 F.3d at 802.

Taken together, the FAC alleges that Bravard—even if he never set foot in

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

California after 2019—systematically and knowingly directed conduct at California by communicating with California-based co-conspirators, receiving fraud proceeds from California bank accounts, requesting that additional funds be sent to California-based accounts, and actively participating in a scheme whose financial infrastructure was anchored in California attorney trust accounts and U.S. corporate entities. That is sufficient to satisfy the *Calder* effects test for specific jurisdiction, independently of § 1965(b).

As for Bravard's declaration that he is not the ultimate beneficial owner of 1234 Holding, this is consistent with, not contrary to, the FAC's theory. (Bravard Decl. ¶ 11.) The FAC alleges that *Srivastava* was the ultimate beneficial owner and that Bravard served as a *strawman*. (¶¶ 58, 86, 91.) Bravard's denial of UBO status confirms rather than undermines the allegation that 1234 Holding was a vehicle controlled by Bravard on Srivastava's behalf. Either way, Bravard's role as the formal owner, sole director, and signatory who carried out the Enterprise's instructions makes him a knowing participant whose conduct was directed at California through the Enterprise he served.

Finally, even if § 1965(b) does not apply (it does), Bravard's and 1234 Holding's personal jurisdiction arguments fail because this Court may exercise jurisdiction under Federal Rule of Civil Procedure 4(k)(2). This rule applies when "(1) the claim against the defendant arises under federal law; (2) the defendant is not subject to the personal jurisdiction of any state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction comports with due process." *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, No. LA ML19-02905 JAK (MRWx), 2025 WL 2684021, at *8-9 (C.D. Cal. Aug. 15, 2025) ("Rule 4(k)(2) has been deemed sufficient to provide personal jurisdiction over foreign defendants in RICO cases, even where the nationwide service provision of 18 U.S.C. § 1965(b) did not apply to them.") (citation omitted). These factors are satisfied here. First, Plaintiffs' claims arise under the federal RICO statute; second, if the court were to

find that § 1965(b) does not apply, then no other court would have jurisdiction over Bravard or 1234 Holding; and, third, as discussed above, the FAC pleads sufficient minimum contacts in the United States such that the exercise of jurisdiction over Bravard and 1234 Holding in this case comport with due process. *See id.*

### J. Alternatively, Leave To Amend Should Be Granted

While Plaintiffs maintain that the Motions to Dismiss should be denied in their entirety, should the Court nevertheless find any deficiency in FAC, Plaintiffs respectfully request leave to amend. "It is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *see also* Fed. R. Civ. P. 15(a)(2) (leave to amend "shall be freely given when justice so requires."). Since this is the first pleading challenge that the Court will rule on, Plaintiffs should be given leave to amend should the Court find that the FAC contains any deficiency, allowing them the benefit of the Court's guidance in this complex case. Furthermore, to the extent any claim requires additional detail, Plaintiffs can readily supplement their allegations with additional facts, including additional facts learned since the filing of the FAC.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss the First Amended Complaint in their entirety and deny the Anti-SLAPP Motion to Strike. In the alternative, should the Court find any defect in the pleading, Plaintiffs respectfully request that the Court grant Plaintiffs an opportunity to amend.

DATED: August 26, 2026

ROSEN ✧ SABA, LLP

By: Ryan Saba

RYAN D. SABA, ESQ.
ALLISON OWENS, ESQ.
Attorneys for Plaintiffs

(Mod) ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

BRODBECKS LAW PLLC

By: /s/ Jason A. Masimore
JASON A. MASIMORE, ESQ.
(*pro hac vice*)

*Attorney for Plaintiffs*

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245